IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LANDRIA BRITT, as Administratrix )
of the Estate of JOHN W. BRITT, )
Deceased, )
          )
         *Plaintiff,* )
          )
vs. )      CIVIL ACTION NO. 2:06cv868-ID-CSC
          )
U S A TRUCK, INC.; THEODORE )
LEVERNE JOHNSON, *et al.*, )
          )
         *Defendants.* )

## PLAINTIFF'S SUBMISSIONS AND RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

NOW COMES Landria Britt, Administratrix of the Estate of John W. Britt, and

submits the following evidence and argument in response to the defendants' motion for

partial summary judgment.  Plaintiff submits the depositions of Defendant Theodore

Laverne Johnson, Michael Weindell, Casey Hansen, Eric McConnell, and all documents

referenced herein, *Exhibit A*: a composite exhibit containing documents "USA Truck: 00191,

00198-99, 00214, 00229-232, 00295, 00370, 00681, 00706, 00964-65"[1]; *Exhibit B*; the statement

of T. Johnson given to the Montgomery Police Department; and *Exhibit C*: the diagram of

the scene drawn by the Montgomery Police Department, *Exhibit D, E*: photos of the scene

of the collision, *Exhibit F*: Johnson's "Driver's Daily Logs" numbered "USA Truck: 0003-

0169."

---

[1] Reference to "USA Truck" document numbers are to documents produced by
Defendant USA in response to plaintiff's discovery requests and Bates stamped "USA, etc.".

PERTINENT FACTS

John W. Britt was killed on February 20, 2006, when Defendant Theodore Leverne Johnson was operating an 18-wheeler within the line and scope of his employment with Defendant USA Truck, Inc., and turned the USA rig into the path of John Britt's vehicle. The collision occurred on the West South Blvd. in Montgomery, Alabama near the intersections of the boulevard and the east entrance to the T. A. Truck Stop. (See Exhibit D). Defendant Johnson admitted to the Montgomery Police Department that he had smoked marijuana prior to the collision. (T. Johnson depo., p. 75). Defendant USA Truck, Inc. was notified within a few hours of the fatal accident that Johnson tested positive for marijuana and Johnson was fired. (See USA 706). Additionally, when questioned by the Montgomery Police Department after the accident, Defendant Johnson admitted that before he turned in front of John Britt's vehicle, he actually saw Britt approaching and even saw two additional vehicles, for a total of three vehicles, all approaching as oncoming traffic and all of the vehicles had their lights on. (T. Johnson depo., p. 81-85). (See Exhibit E). Johnson had been driving the USA truck for close to the maximum allowable time for driving on February 20, 2006 and freely admitted that he never stopped in the median lane before turning in front of John Britt (T. Johnson depo., p. 83-84), Johnson further stated, that in fact Johnson actually expected the vehicles that he observed approaching, to slow down or stop to allow him to make his turn into the truck stop. (T. Johnson depo, p. 85). Johnson also concedes that he could not have completed the turn into the truck stop without Britt and the other oncoming traffic having to slow down or stop. (T. Johnson depo., p. 86). In

addition, Johnson concedes that the oncoming traffic had the right of way.  (T. Johnson depo., p. 81).

## I.  ARGUMENT[2]

### I.  Negligent Entrustment

'[T]he essential ingredients of a cause of action for negligent entrustment are:  (1) an entrustment;  (2) to an incompetent;  (3) with knowledge that he is incompetent;  (4) proximate cause;  and (5) damages.' " *Halford v. Alamo Rent-A-Car, LLC,* 921 So.2d 409, 412 (Ala.2005) (quoting *Mason v. New,* 475 So.2d 854, 856 (Ala.1985).

The element of entrustment is undisputed in this case, as both Johnson and U.S.A. Trucks concede that Johnson was acting in the line and scope of his employment with U.S.A. and that he was driving the truck with U.S.A.'s permission.

Regarding the element of incompetence, Alabama law provides that:

" 'Incompetence' comprehends various kinds of unfitness...." " '[I]ncompetence is not confined to *downright inability to perform* the allotted service.  *It goes to reliability in all that is essential to make up a reasonably safe person,* considering the nature of the work, and the general safety of those ... [... who will be in the line of danger from the operations with which the person is intrusted].' "

*Edwards v. Valentine*, 926 So.2d 315 at 321 (Ala.2005), citing *Rush v. McDonnell,* 214 Ala. 47, 51, 106 So. 175, 178 (1925). (*Internal Citations Omitted*).

---

[2] Defendants' motion for partial summary judgment addresses the issues of negligent entrustment, negligent hiring and supervision, negligent retention and wantonness.  For consistency, the plaintiff will address each of these issues in the same order as addressed by the by defendants.

....

"Thus, the plaintiff alleging negligent entrustment may show that the driver to whom the defendant entrusted the vehicle was "unable or unlikely to have operated the motor vehicle with reasonable safety due to one of several characteristics or conditions," including "general incompetence" or "habitual negligence." More specifically, proof may "be established by evidence of *previous acts of negligent or reckless driving,...previous accidents,* or *previous acts of driving while intoxicated.*"

*Edwards v. Valentine*, 926 So.2d 315 at 321-22 (Ala.2005) (*Internal Citations Omitted*).

## NEGLIGENT HIRING AND SUPERVISION/NEGLIGENT RETENTION

In *Poplin v. Bestway Express,* 286 F. Supp. 2d1316 (M.D. Ala.2003this Court noted:

"Alabama recognizes the rots of negligent entrustment, negligent hiring, negligent supervision, negligent training, and negligent retention. *Bruck v. Jim Walter Corp., 470 So.2d 1141, 1143* (Ala. 1985). (Outlining elements of negligent entrustment, *CB&P Enterprises, Inc. v. Mellert,* 762 So.2d 356, 362 (Ala. 2000) (recognizing torts of negligent hiring, supervision and retention); *Big B, Inc. v. Cottingham,* 634 So.2d 999, 102-3 (Ala. 1993) (affirming denial of directed verdict for defendant on claims of negligent supervision and training). Alabama also recognizes that a corporation or employer may be liable for the torts of its employees under the doctrine of respondeat superior. *Pryor v. Brown & Roof U.S.A., Inc.,* 674 So.2d 45, 47-48 (Ala. 1995)."

*Poplin v. Bestway Express,* 286 F.Supp. 2nd 1316 (M.D. Ala 2003) at p.

## FACTS SUPPORTING PLAINTIFF'S CLAIMS OF NEGLIGENT ENTRUSTMENT; NEGLIGENT HIRING AND SUPERVISION AND NEGLIGENT RETENTION

Defendants filed their motion for summary judgment on September 3, 2007 before any depositions were taken in the case. Plaintiff Landria Britt deposed the defendants on November 2 and 3, 2007. The defendants' deposition as well as documents produced by the defendants are more than well supported by substantial evidence sufficient to defeat

defendants' motion for summary judgment. Plaintiff cites the following substantial evidence in support of her claim. The following facts demonstrate the plaintiff's negligent entrustment claims, negligent hiring and supervision and negligent retention are well supported by substantial evidence:

A.   Defendant USA was aware that Defendant Johnson had been convicted of four moving violations while an operator of a motor vehicle and had his license suspended on three occasions, prior to the time that USA hired Johnson on August 1, 2005. (USA 295). Casey Hansen, the safety supervisor at USA Truck, could not think of a worse driving record than Johnson's (USA 295) for any USA truck driver. (See C. Hansen depo., p. 19). The court's attention is also drawn to the fact when Johnson filled out and signed the application (USA 295), he actually had more driving events (moving violations and suspensions) than there were spaces on USA Truck's form. Nonetheless, USA Truck put Johnson on the road driving an 18-wheeler.

B.   During the month of September, 2005, which was one month after Johnson was hired, Defendant USA Truck, Inc. audited Johnson's logs for the first and only time and found that because of log falsifications or errors Johnson was to be moved to phase 1 as a driver. USA Truck acknowledged on its log error form (USA 370) that in fact the error rate for the month of September on the logs was 26.67 %. (USA 370).

C.   USA Truck was aware that on November 7, 2005 Johnson failed to deliver a shipment (USA 214). Defendant USA's vice president of Human Resources  Michael Weindel admitted that Johnson did not meet the requirements of USA Truck on November

7, 2005.  (M. Weindel depo., p. 46).

D..  Although Defendant USA Truck's has approximately 2,800 drivers on the road today and the same in February, 2006, USA and those drivers run in all 48 states, USA Truck does not have an ongoing system for monitoring to see if its drivers actually have a valid CDL once they are hired.  That is, there is no ongoing monitoring to discover suspensions such as Johnson's suspension 18 days before John Britt was killed.  (M. Weindel depo., p. 7-9; p. 230-231).

E.  Michael Weindel, the vice president of Human Resources, admitted that USA Truck, Inc. was aware of Johnson's bad driving record when he was hired (Weindel depo., p. 66) and that, although USA Truck has a limit of three moving violations, USA Truck was aware that Johnson had four violations at the time he was hired (M. Weindel depo., p. 76).

F.  Defendant USA Truck did not audit Johnson's driver log books on a 100% basis prior to the February 20, 2006 fatality wreck which killed John Britt and in fact Johnson's log books were only audited one time, in September, 2005 when they were found to be falsified.  (See Hansen depo., p. 23-26).

G.  Casey Hansen, the safety supervisor, agrees that on review of USA Truck documents 5 through 169, if, out of 127 days in those documents, 78 of those days on the log books showed exactly 60 mph or 61.4% of the time, that information should have raised suspicion with USA Truck that the logs had been falsified.  (See Hansen depo., p. 26-29).  However, no one at USA Truck was reviewing the logs at the time; rather, at most USA Truck only reviewed about 10% of the logs and none of Johnson's logs were reviewed after

September, 2005 until the fatality wreck. USA ignored this insufficiency and allowed Johnson to continue driving an 18-wheeler.

H.    On October 10, 2005, the Department of Transportation caught USA's truck driver Johnson in Tennessee and cited him for failure to stop for an inspection (bypassing) while driving for USA Truck. In addition, the registration plate on USA Truck's trailer was expired. (USA 232). Defendant USA was aware of this DOT violation.

I.    On February 2, 2006, (18 days before Johnson turned in front of John Britt and killed him in Montgomery), the Department of Transportation caught Johnson in Missouri at 11:36 a.m. driving a USA Truck with a suspended CDL license. That is, USA Truck permitted Johnson to drive its truck while his license was actually suspended. (USA 231). USA Truck expected to return Johnson to work as a truck driver on February 10, 2006 (10 days before John Britt was killed) and in fact filled out a personnel form indicating and confirming USA's knowledge of the CDL suspension. (USA 191). Even with actual knowledge of the suspension and Johnson's awful driving record (the worse seen by the safety supervisor). USA Truck put. T. Johnson back on the road. USA was aware of this DOT violation because the DOT required T. Johnson to park the truck and USA had to send a driver to retrieve it.

J.    Defendant USA Truck had actual knowledge that the windshield on the USA tractor being operated by Johnson at the time of the fatal collision, was cracked which was a violation of DOT regulations. (See Hansen depo., p. 51). Johnson testified that the windshield had been cracked for quite awhile and that he had tried to get USA Truck to

repair the windshield by sending USA Truck 12 or more emails on a system called Qualcomm. According to Johnson "They [USA Truck] were really just more persistent on me just taking the load and just keep going like it wasn't really major, a major problem. But I knew it was a problem." (Emphasis supplied). (T. Johnson depo., p. 57-58). Johnson said that USA "just blew it off". Johnson stated that USA Truck wanted him to keep pulling loads even though he had asked them to fix the windshield and that he had sent a dozen or so messages trying to get the windshield fixed. (T. Johnson depo., p. 54 - 59).

The foregoing facts demonstrates that defendants' motion for summary judgment is due to be denied as plaintiff has presented substantial evidence of negligent entrustment; negligent hiring and supervision, and negligent retention.

II. <u>WANTONNESS OF THEODORE LEVERNE JOHNSON</u>

Under Alabama law, wantonness is statutorily defined as "conduct which is carried on with a reckless or conscious disregard for the rights or safety of others," 1975 Ala.Code § 6-11-20(b)(3).

In *Monroe v. Brown*, 307 F.Supp.2d 1268, 1271 (M.D.Ala.2004), this Court provided a thorough examination of Alabama case law regarding wantonness:

> "[Wantonness] has been defined by the Supreme Court of Alabama as "the conscious doing of some act or the omission of some duty, while knowing of the existing conditions and being conscious that, from doing or omitting to do an act, injury will likely or probably result." *Alfa Mut. Ins. Co.,* 723 So.2d at 1256. The distinction between negligence and wantonness thus lies in the state of mind of the defendant. *Lynn Strickland,* 510 So.2d at 145. However, "[t]o prove wantonness, it is not essential to prove that the defendant entertained a specific design or intent to injure the plaintiff." *Alfa Mut. Ins. Co.,* 723 So.2d at 1256.

The *Monroe* court also noted "the Supreme Court of Alabama's admonition that '[w]antonness should be submitted to the jury unless there is a total lack of evidence from which **\*1272** the jury could reasonably infer wantonness.' " *Monroe*, citing *McDougle v. Shaddrix*, 534 So.2d 228, 231 (Ala.1988).

Regarding the tortfeasor's state of mind, "[T']he actor's knowledge may be proved by showing circumstances from which the fact of knowledge is a reasonable inference; it need not be proved by direct evidence." *Hamme v. CSX Transportation, Inc.*, 621 s.2d 281, 283 (Ala.1993). "To be wanton, it is not required that the actor know that a person is within the zone made dangerous by the actor's conduct; rather, it is sufficient that the actor knows that there is a strong possibility that another might rightfully come within the zone." *Hamme,* citing, *Restatement (Second) of Torts,* § 500, comment d (1965). Wantonness does not require an intent to injure another, but may consist of an inadvertent act or failure to act, when the one acting or failing to act has knowledge that another is probably imperiled by the act or the failure to act and the act or failure to act is in reckless disregard of the consequences. *Hamme,* citing *Roe v. Lewis*, 416 So.2d 750 (Ala.1982); *Atlantic Coastline R.R. v. Brackin,* 248 Ala. 459, 28 So.2d 193 (1946).

In *Hamme*, the facts regarding the tortfeasor's state of mind in the moments just before a collision between the plaintiff's vehicle and a locomotive are substantially similar to the case at bar. *Hamme* at 283. In that case, plaintiff Hamme was struck by a CSX locomotive at a railroad crossing early on a rainy morning. *Id*. Hamme testified that, prior to the collision, he heard no whistle sound as required at all railroad crossings and saw no

lights. *Id*. However, Wood, who was the conductor of the train and an employee of CSX, admitted that he saw Hamme's truck 900 feet from the crossing. *Id*. Wood further testified that, although he did not think that Hamme was going to stop for the train to pass, he did not apply the emergency brakes until after the train had hit the truck. *Id*.

<u>FACTS SUPPORTING PLAINTIFF'S WANTONNESS CLAIM</u>

**A.** Marijuana had been smoked by Defendant Johnson prior to this fatal collision, which fact Defendant Johnson readily admitted to Office Gann at the Montgomery Police Department after John Britt was killed. (T. Johnson depo., p. 75).

**B.** Defendant Johnson actually saw John Britt and two other vehicles approaching before he started his turn across the three oncoming lanes, to enter into the truck stop.

Q.    First couple pages?

A.    No, not really.  I just pretty much skimmed through it.

Q.    Tell me why you didn't read past page 2?

A.    I got tired.

Q.    All right.  Was it spinning from the marijuana?

A.    Oh, no.

Q.    I didn't ask you when we started the deposition, but you told the police that night John Britt was killed that you smoked marijuana.

A.    Right.

Q.    Have you smoked some since John Britt was killed?

A.    No, not to my knowledge.  I pretty much made a vow to leave that alone, if

you really want to get technical.

Q.    All right.  Now, when you had this wreck, you were turning left into the

truck stop; is that correct?

A.    Right.

Q.    And if you had it to do over again, even knowing what you know now,

would you do anything any different?

A.    I know I wouldn't have gotten high that Saturday.

Q.    You wouldn't have gotten high that Saturday?

A.    Right.

Q.    You think we're sitting here now because you got high Saturday?

A.    Exactly, right.

Q.    Okay.  You said you saw a bunch of traffic.  Now there was a traffic in all

three of these lanes before you started making your turn, is that right?

A.    Right.

(T. Johnson depo., p. 95).

"... This oncoming traffic, there is no question you saw that?

A.    Yeah, yeah, I seen it, right, right, yeah."

(T. Johnson depo., p. 88).

Q.    ... Alright so when you got up here in this median lane isn't it true you saw

some traffic meeting you, some oncoming traffic, meeting you and that traffic

would have been going west back toward I-65?

-11-

A.    Right, I seen a bunch of traffic.

Q.    And you saw at least three vehicles didn't you?

A.    I seem more than three.

Q.    More than three?

A.    Yeah before I turned.

(T. Johnson depo., p. 80).

**C.**    Johnson was well-aware that he was pulling his rig into the path of oncoming traffic. In fact, he admits that vehicles occupied each of the three oncoming lanes that he had to cross in order to complete his left turn. Much like the conductor, Wood, in the *Hamme* case, it is more than reasonable to infer that Johnson's act of knowingly obstructing all lanes of the highway, assuming that all oncoming traffic would, first, notice his rig and, secondly, notice it in time to avoid a collision, constitutes clear and convincing evidence of wantonness.

**D.**    Johnson admits and concedes that with regard to his maneuver of turning left across three oncoming lanes to go into the driveway of the T. A. Truck Stop, the oncoming traffic which included John Britt and at least two other vehicles, had the right of way.

Q.    Now if you are going to turn across into the truck stop and this oncoming traffic meeting you who has the right of way there, do you have the right of way?  Can you turn in front of them or did they have the right of way you are suppose to stop and let them clear?

A.    Stop and let them clear.  They got the right of way.

-12-

**E.** Johnson did not come to a stop in the median lane before cutting across in front of John Britt and the other two oncoming vehicles.

> Q. Alright. You were in third gear when you went across this median line to go intruding into those lanes is that right? You are in third gear —
>
> A. Right.
>
> Q. — When you get started in there, is that right?
>
> A. Right, right, right, I am rolling, yeah.
>
> Q. Alright. Did you ever come to a stop in that median lane?
>
> A. No.

(T. Johnson depo., p. 83-84).

**F.** Johnson was aware that he had the maximum allowable amount of freight on his truck, 40,000 pounds, but the gross weight of his rig was 72,280 pounds (T. Johnson depo., p. 79-80) and that the load would make it harder to accelerate the rig. (T. Johnson depo., p. 80). Nonetheless, Johnson attempted to shift the tractor from third gear into fourth gear without utilizing the clutch and in doing so, "Missed fourth gear" because of his reckless maneuver. Johnson was aware that if he did not use the clutch, he could miss putting the tractor into another gear which would delay his travel across the intersection (T. Johnson depo., p. 80) because he had had problems shifting into fourth gear without the clutch "plenty of times." (T. Johnson depo., p. 84). Nonetheless, Johnson attempted to shift without using the clutch even though he was turning in front of John Britt and the other oncoming traffic.

**G.**    Although Johnson observed John Britt and two other vehicles approaching, Johnson was aware that he could not have made the turn without John Britt and the other vehicles either slowing down or stopping and he expected them to do so in order to allow him (Johnson/USA) to get out of their way.

Q.    Alright so what you expected them to do was to slow down and let you get out of the way, is that right?

A.    Right, well which I almost was.

Q.    And you would agree with me wouldn't you that from the time you started that turn where that traffic was you could not have gotten out of the way unless that oncoming traffic either slowed down or stopped, isn't that right?

A.    Repeat that question.

Q.    From the time you got out into this lane here this first lane until you would have gotten out of the way up there you could not have made that turn without this oncoming traffic either slowing down or stopping, isn't that correct?

A.    Right.

(T. Johnson depo., p. 85-86).

**H.**    Johnson admits that at the time of the collision it was raining, the road was wet, and he had his windshield wipers on (T. Johnson depo., p. 90).  Although Johnson saw traffic coming in all three lanes facing him prior to making the left turn in front of them, he did not get in a hurry trying to get across the lane; rather just make a normal turn.

-14-

Q.      From when you left the median lane to when John Britt ran under your truck and was killed, did you ever get in a hurry trying to get across that lane?

A.      No, not really.

Q.      Okay, you are just making a normal turn?

A.      Right.

(T. Johnson, depo., p. 92).

**I.**   Defendant Johnson told Officer Gann of the Montgomery Police Department that he was aware that the oncoming traffic was only 250 feet away from him at the time that he turned in front of that oncoming traffic.

Q.      Alright now when you talked to the policeman that night you told him that that traffic was about 250 feet away, didn't you?

A.      Right.

Q.      Before you started into your turn?

A.      Right.

(T. Johnson depo., p. 96).

**J.**   Eric McConnell, the risk manager at USA Truck, admits and concedes that 250 feet was too close for Johnson to turn in front of the oncoming traffic and that in fact at 250 feet the calculations do not work out for Johnson to complete his turn without the oncoming traffic having to stop.

Q.      The calculations don't work out where your truck could have completed that turn without the oncoming traffic having to stop, do they?

-15-

A.    No.

(Eric McConnell depo., p. 15).

### III.   NEGLIGENCE OF USA TRUCK FOR FAILING TO ENFORCE DOT REGULATIONS

USA Truck, Inc. is directly liable to the plaintiff on the failure to enforce regulation claim in at least two separate and in dependant ways.

First, an interstate motor carrier like USA Truck, Inc. has a statutory duty under federal law to take steps to prevent any injury to the driving public, such as John Britt, by determining the competency of its drivers.  (See 49 C.F.R. Section 383.1 (a), 391.21, 391.23. Secondly, under Alabama law, USA Truck had a duty to train and determine the competency of its drivers as well.  (See generally *Thompson v. Havard,* 285 Ala. 718, 723, 235 So.2d 853, 858 1970.

Defendant USA wantonly failed to discharge its duties under federal and state law regarding the hiring, training, supervision and retention of its employee and driver Theodore Johnson by, among other things, putting Johnson back on the road driving an 18-wheeler.  Plaintiff incorporates her argument and refer to the evidence cited herein in support of her negligent enforcement claim.

Respectfully submitted,

 /s/ *David E. Allred*

DAVID E. ALLRED
D. CRAIG ALLRED
Attorneys for Plaintiff

OF COUNSEL:

DAVID E. ALLRED, P.C.
Post Office Box 241594
Montgomery, Alabama 36124-1594
Telephone:     (334) 396-9200
Facsimile:     (334) 396-9977

JEMISON & MENDELSOHN, P.C.
Post Office Box 241566
Montgomery, Alabama 36124-1566
Telephone:     (334) 213-2323
Facsimile:     (334) 213-5663


## CERTIFICATE OF SERVICE

I hereby certify that I have this 13th day of November, 2007 electronically filed the foregoing *Plaintiff's Submissions and Response in Opposition to Defendants' Motion for Partial Summary Judgment* with the Clerk of the Court for the United States District Court, for the Middle District of Alabama, Northern Division, using the CM/ECF system, which will send notification of such filing to:

> Thomas L. Oliver, II, Esq.
> Lea Richmond, IV, Esq.
> CARR ALLISON
> 100 Vestavia Parkway
> Birmingham, Alabama 35216


    /s/ David E. Allred
OF COUNSEL

*Unit 7875 seems to*
*w ll be getting into the*

*NS*
*2-8-06*

# USA TRUCK
## ABSENCE/STATUS CHANGE

*(Employees out of service for more than 24 hours for reasons other than normal days off, holidays and vacations)*

# TO: PERSONNEL DEPT. (BOX 134 - CORP. OFFICE)

**Employee Name:** *Theodore Johnson*     **First Date Absent:** *2-2-06*

**SSN:** *221 / 64 / 9506*     **Expected Return Date:** *2-10-06*

## REASON FOR ABSENCE:

_____ Personal Sick Leave (explain)     _____ Suspension (explain)
_____ Family Death     _____ Jury Duty
_____ On-the-Job Injury     _____ Family/Medical Leave Act
_____ Personal Leave of Absence (explain)     _____ Military Leave
     __X__ Other (explain)

**COMMENTS:**
*CDL Sustinded*
_____

__X__ **Return to Work**

     **Date:** *2-9-06*

**Supervisor/Fleet Manager** *[signature]*     **Date:** *2-2-06*

**Fleet Number:** *6*

**********************************************************

*For Personnel Use Only:*

**Vac./Anniv. Date:** _____     **Eligible For:**
**125 Plan:** _____     **FMLA:** _____ yes _____ no
**Emp. Address:** _____ yes _____ no     **Sick Days Avail:** _____
_____     **Vac. Days Avail:** _____
**(City)         (St)     (Zip)**     **Sal. Cont. Effect:** _____

*Payroll Advise Required* __✓__ yes _____ no

     *R20 2/10/06*

Britt/USA Truck00191

PLAINTIFF'S
EXHIBIT
A

Revised 10-99

No.0326  P. 2

# PAC Services
A LDM Company

# US MVR Express

Customer Name:
Actor Name:               U S A Truck - Personnel (44028)
Customer Reference:       Brenda Brantley ()
Customer Sub:                                                              45189197
SSN:                      221549506

...... M V R  R E P O R T ......

STATE: DELAWARE
                              D R I V E R   I N F O R M A T I O N

JOHNSON, THEODORE LEVERNE
18 STEPHANIE DR                                    REF:
CHRISTIANA LANDING
BEAR (NEW CASTLE), DE 197010000
LICENSE: 1300631

DOB:01/25/82 SOC/SEC:                    SEX:M HGT:6'03" WT:270 EYES:BRO HAIR:
REQUESTED AS/ALSO KNOWN AS: JOHNSON 1300631 012582

               D R I V E R   L I C E N S E   I N F O R M A T I O N

CLASS                 ISSUED    EXPIRES  STATUS
                                                                      RESTRICTIONS
CDL CLASS A           01/28/04 01/25/08 PVT: SUS UM
                                         CDL: SUS UM

       M I S C E L L A N E O U S / S T A T E   S P E C I F I C   I N F O R M A T I O N

  CLASS: CDL-A=COMB VEH>26,000 GVWR, TOWED UNIT>10,001 GVWR
         ENDOR : N, T
  ENDOR: N=TANK, T=DOUBLES/TRIPLES
ORGISS: 06/17/1999
  MISC: IMAGE ON FILE Y IMAGE DATE 01/28/2004  ID CARD# 0000000  DUP 02
  MISC: ORGAN DONOR N
  MISC: DRIVER ED CODE CS
  MISC: DRIVER ED CODE CS  FUTURE ACTION R  COMMERCIAL TRANSFER 10/28/2002
  MISC: TOT VIOLS 4  TOT POINTS 4

               D R I V I N G   R E C O R D   I N F O R M A T I O N

TYPE V/S-DATE C/R-DATE DESCRIPTION
                                                                   V/C-CODE   PTS
CONV 04/22/05 05/25/05 DR PROPER LANE/DIRECTION
                       REFNUM:DRA33892  COMML VEH:0  HAZ MATL:0      4126 A3
                       CT:N7  FINE:02
CONV 02/20/05 03/29/05 SPEEDING 74 68
                       REFNUM:SPU37644  COMML VEH:0  HAZ MATL:0      4169

Britt/USA Truck00198

No. 0326   P. 3

```
                              CT:E7   FINE:00
ACCI 05/26/04 12/21/04  FED MOTOR CARRIER VIOLATION
                         REFNUM:SPT65906  COMML VEH:0   HAZ MATL:0       4702
ACCI 05/26/04 12/21/04  CT:U4.  FINE:00  ACCIDENT:Y
                         INATTENTIVE DRIVING
                         REFNUM:SPT65905  COMML VEH:0   HAZ MATL:0      4176 B
REIN                     CT:U4   FINE:02  ACCIDENT:Y
SUSP 12/20/04  01/12/05  SUSPENSION LIFTED
                         SUSP FAIL ANS SUM/DFLT FINE:CLEARED
SUSP 01/24/06            REFNUM:SPT65905  CT:U4
                         SUSP UNINS MV 2005334A13451
SUSP 11/10/04            REFNUM:200533
                         SUSP FAIL ANS SUM/DFLT FINE:CLEARED
REIN                     REFNUM:SPT68304  CT:E7
   01/28/04    02/03/05  SUSPENSION LIFTED
SUSP 01/12/05            CDL ENDORSEMENT CHG: XT--- TO NT---
                         SUSP FAIL ANS SUM/DFLT FINE:CLEARED
                         REFNUM:C045840  CT:MO
-----------------------------------------------------------------------------
DAC RPT#:033-      DAC ACCT#:10322-       DAC REF#:103220602021229
DMV DATE:02/02/06 DMV ACCT#:
=============================================================================
V/S-DATE=Violation/Suspension Date    C/R-DATE=Conviction/Reinstatement Date
```

Britt/USA Truck00199

November 29, 2005

Theodore Johnson
2 Canoe Ct
Newark, DE  19702

From:  Brannon Thompson

Dear Theodore,

From day one when you came to work at USA Truck, you heard the words Pride, Commitment, Communication and most of all Customer Service.

USA Truck has one way to get miles for you and that is by selling our service.  When a customer calls and asks us to do a job, by our word, we have committed to give them premium service.  When we provide premium service, our Sales department is able to maintain and attract customers.  Customers in today's fast-paced and competitive environment expect premium service from USA Truck.

On 11/7/2005 you failed to deliver a shipment on PRO  as scheduled.  Further service failures of this nature will not be tolerated and will result in further action being taken.

Through teamwork, communication and commitment, we will give our customers the service they deserve. We can ask for more loads when we pick-up and deliver on time. This in return will provide you and your family quality paychecks.

If you have any questions, please call me.

Sincerely,

Brannon Thompson

/vjp

Britt/USA Truck00214

```
S263                    PERSONNEL MASTER - EMPLOYEE INFO                    --
COMMAND ===>                              MSGS:10          L3 23:02 GWEDDLE USAT
SSN 221649506 NM(LFM) JOHNSON         THEODORE       LEVERNE              > F
JOB CATEGORY J7   OPERATIVES(SEMISKILLED)       RECRUITER 001  COMPANY 004 >
TITLE      E33  ROAD DRIVER - SINGLE                       SUBSIST Y
DIVISION/PAY       >                          PAY ACTION REQ
ADDRESS 2 CANOE CT                    ALT ADDR 705 THORNHILL DR

        NEWARK          DE 19702         NEWARK         DE 19702
COUNTY  NEWCASTLE            PH 302 738 0652  PH 302 250 8202   PED-C 07 30 2005
EMPLOYEE TYPE E8 ROAD DRIVER                    EMERG
BIRTH DATE  01 25 1982  STATION  050    CHECK TO
HIRE DATE   08 01 2005  EMPL. REHIRED
VAC/ANNIV   09 02 2005  RACE C VETERAN N
HEIGHT 6 03 WEIGHT 275  MARITAL STATUS S
INITS       PRT BADGE   ANNUAL REVIEW 08 01 2006 ACCT                  MAIL N
AVIR CERT               BRAKE CERT         EXPRESS CASH   DIRECT DEPOSIT
ABSENCE A6 SUSPENSION                LST DAY 02 02 2006 RETURN 02 09 2006
TERMINATION      >                            PREV TERM DATE
CHG   DATE          LAST DAY WORKED       REHIRE   REINSTATED
INQUIRY ONLY, NO UPDATING
```

Britt/USA Truck00229

```
S264                    Personnel Master - Driver Info              DRV
COMMAND ===>                          MSGS:10        L3 23:02 GWEDDLE USAT
SSN 221649506 Name JOHNSON, THEODORE LEVERNE     >
Unit 7695   Fleet 06   Domicile D              Agent/Brkr N Load Locks
Student N   Team Pay N   COM Fuel Card 1569630314  ASSIGNED    1200 08 01 2005
Needs Miles M Drv CAN Y TCH Fuel Card 511681006643 ASSIGNED    1200 08 01 2005
Training Group RED   >       School ATT212 AMERICAN TRUCK TRAINING  >
Student Date      08 01 2005 CO Drv Date  09 02 2005 Curr Assignment 09 02 2005
Phys Exp Date     07 29 2007 60 Day Review ..        11 Mo Review
Probation N Ends             Recertified             Instr
Med Card Date     07 29 2007 DOT Inspect  02 02 2006 > Driver Phase 0 >
Haz Exp Date   07 29 2008    Cert Trainer            Smoking Pref Y
CDL Haz Exp                  CDL Haz Applied                  CDL Haz Decl
Drivers License - Nbr 1300631           State DE  Expire 01 25 2009
Trainers (1) Assigned 08 03 2005 SSN 234210924 NWANZEMBONWE, CLETUS    >
         (2) Assigned 08 04 2005 SSN 526110520 HURON, GREG             >
         (3) Assigned 08 25 2005 SSN 213926322 LEVY, GLENN             >
Return to Work     02 10 2006 Days Owed   1 MTD Days Home   8  MTD Times Home  1
Next Home Date     03 03 2006                        Auto Safety Msg   N
Owed Trigger Date  02 21 2006 TUESDAY       Reason
```

Britt/USA Truck00230

S291                              PERSONNEL INFORMATION                              PINF
COMMAND ===>                                MSGS:10        L3 23:02 GWEDDLE USAT
SSN 221649506 JOHNSON, THEODORE LEVERNE  >

02 14 2006   FAXED VER AND D/A TO KNIGHT...CS


02 02 2006   DOT-MO-1136AM-DRIVING A CMV (CDL) WHILE DISQUALIFIED- SUSPENDE
             D CDL FROM DELAWARE
             NO MACRO

01 02 2006   DOT-NY-1030AM-BRK TUBING AND HOSE ADEQUACY- TRUCK TO TRAILER R
             ED LINE AIR LEAK UPON BRK APPLICATION; BRKS-AIR LOSS RATE- FAI
             LED TO MAINTAIN AIR UPON BRK APPLICATION

Britt/USA Truck00231

11 10 2005   DOT-TX-706AM-DEFECTIVE MUD FLAP- R/S TORN


10 10 2005   DOT-TN-1400-FAILURE TO STOP FOR INSPECTION (BY-PASSING); EXPIR
             ED SINGLE STATE REGISTRATION
             CITED
             NO MACRO- NO FAX
10 05 2005   FXD D/A TO AMERICAN DRIVER TRAINING...MRO

Britt/USA Truck00232

## DRIVING RECORD

### (To be completed by driver, maintenance, sales, or management applicants)

Has your license ever been suspended or revoked? ( ) YES (X) NO   If yes, explain:*_____

Have you ever been convicted of driving under the influence of alcohol or drugs? ( ) YES (X) NO   When?_____

Do you posses a commercial driver's license? _Yes_ What endorsements? _All but Passeng_ ✗   Restrictions? _NONE_
_TANKER & DOUBLES TRIPLES_

Driver's License Number:* _1300631_    State:* _DE_    Expiration Date:* _1·25·09_

### LIST ALL DRIVER'S LICENSES HELD IN THE PAST THREE (3) YEARS

| State* | License Number* | Type | Expiration Date* |
|--------|-----------------|------|------------------|
| DE | 1300631 | CLASS A | 1/25/09 |
| DE | 1300631 | OP | GAVE UP |
| | | | |
| | | | |

### TRAFFIC VIOLATIONS
### LIST ALL TRAFFIC CONVICTIONS, FORFEITURES, OR SUSPENSION OF LICENSE IN A MOTOR VEHICLE (other than parking violations) FOR THE PAST TEN (10) YEARS.  (If none, write NONE)*

| Date | Location (State) | Charge | For Speeding - List M.P.H. Over Limit | Penalty |
|------|------------------|--------|----------------------------------------|---------|
| 10/02 | DE | Improper Passing | | Fine |
| 3/04 | DE | Inattentive Driving | | Fine |
| 3/05 | DE | Speeding | 74 in a 65 | Fine |
| 5/05 | DE | Improper lane Direction | | Fine |
| 11/04 | DE | Failed to appear in Court | | suspension |
| 12/04 | DE | Failed to appear in Court | | Suspension |
| 1/05 | DE | Failed to appear in Court | | Suspension |

### ACCIDENT RECORD
### LIST ALL ACCIDENTS YOU HAVE BEEN INVOLVED IN WHILE OPERATING A TRUCK, CAR, OR MOTORCYCLE, OR OTHER MOTORIZED VEHICLE, INCLUDING PROPERTY DAMAGE. INCLUDE ALL ACCIDENTS WHETHER AT FAULT OR NOT AT FAULT FOR THE PAST 10 YEARS. (If none, write NONE)

| Date* | Type | Nature of Accident* (Head-on, etc.) | Were You At Fault? | Were You Ticketed? | Fatalities* | Injuries* | Amount of Property Damage |
|-------|------|-------------------------------------|--------------------|--------------------|-------------|-----------|---------------------------|
| | | NONE | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |
| | | | | | | | $ |

Britt/USA Truck00295

**RELEASE:** I hereby authorize release on my driving record to USA Truck, Inc. which will include but is not limited to the record of all accidents in which I have been involved and of all arrests and warning tickets which have been issued to me.

x _[signature]_

### (Applicant Signature)

* D.O.T. Required                                                 (4)

SCSFB_3_A        USA                    )                              )

USA TRUCK, INC
LOG ERRORS
FOR PERIOD: 09-01-2005 THRU 10-01-2005

JOHNSON, THEODORE LEVERNE 2216495 6                    6519   6      8
----------------------------    --------------------   ---- ----- -----
DRIVER NAME                     EMPLOYEE ID NUMBER      UNIT FLEET GROUP


DUE TO LOG FALSIFICATIONS OR ERRORS YOU HAVE BEEN MOVED TO PHASE 1



ERRORS SECTION: ACCUMULATED SERVICE ERRORS FOR 30 DAY PERIOD
          BEGINNING 09-01-2005: ERROR RATE =  26.67%

LOG DATE      TYPE         SERVICE ERROR DESCRIPTION
==========    ==========   ==========================================
09-20-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 10:30
09-21-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 10:45
09-22-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 10:45
09-23-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 10:45
09-24-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 05:30
09-25-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 11:00
09-26-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 09:30
09-27-2005    70_HR_RULE   EXCEEDING 70 HOUR RULE AT 06:15

Britt/USA Truck00370

```
               ACCIDENTS 1                           PGA        AC
COMMAND ===                                      LI 14:11 GABULAR USAT
SSN 215649506 JOHNSON, THEODORE LEVERNE          ACCIDENT NBR 0000054792
ADDR 2 CANOE CT           BIRTH DATE 01-25-1982  ANNIV DATE 09-02-2005
                          STUDENT N               TRAINER
       NEWARK         DE   FLEET 06  TRACTOR 007875 TRAILER 054484
                                                 REPORT PRINTED N PT 00
DESCRIPTION USA PARKED AND ADV HIT USA ON THE RT SD HEADLIGHT AND BUMPER
AREA. NO INJ, NO TOW, NO POLICE.


CARGO     DESC CHEMICALS
DOT       REPORTABLE N    REASON                 INCIDENT Y
COSTS     USA     0.00    ADVERSE      0.00      EXPENSES        0.00
HAZMAT    HAZ N UN     SPILL    CLEANUP COMPANY
ACCIDENT LOCATION CINCINNATI     OH DATE 01 20 2006 FRIDAY    TIME 00 00
         WEATHER  CLEAR  CAUSE AV > ADVERSE VEHICLE  PREVENTABLE/NONPREV N
         OBJECT INVOLVED ADVERSE              ADVERSE INVOLVED Y
         EMPLOYEE CALLED FROM CINCINNATI       OH  PH
         TYPE HP > HIT WHILE PARKE  GENERAL LOCATION TP > TRUCKSTOP/PILOT
RECEIVED BY AMY DULANEY             DATE 01 20 2006 TIME 09 07


PF 1-HELP      3-EXIT     5-        7-        9-        11-ACI3    PA1-PREV
PF 2-NAME      4-ACCIDAT  6-EXPAND  8-      10-ACI2     12-        PA2-NEXT
```

Britt v. USA00681

MAS
2-22-06

*Did not Receive Frd Unix*

*b of Addison*
*Montromey AL*

# USA TRUCK
## ABSENCE/STATUS CHANGE

(Employees out of service for more than 24 hours for reasons other than normal days off,
holidays and vacations)

## TO: PERSONNEL DEPT. (BOX 134 - CORP. OFFICE)

Employee Name: _Theodore Johnson_    First Date Absent: _2-21-06_

SSN: _221_ / _64_ / _9506_    Expected Return Date: ~~2-24-06~~

_Return time unknown
do to circumstances
of accident_

## REASON FOR ABSENCE:

_____ Personal Sick Leave (explain)
_____ Family Death
_____ On-the-Job Injury
_____ Personal Leave of Absence (explain)

_X_ Suspension (explain)
_____ Jury Duty
_____ Family/Medical Leave Act
_____ Military Leave
_____ Other (explain)

COMMENTS: _Suspension for Accident  Equipment has not been released yet_

_____ Return to Work _ented pos. Marijuana_    _____

Supervisor/Fleet Manager: _Sharon King_    _22-06_

Fleet Number: _0_    _302 368 6600_
_X 208_

****************    *******

## For Personnel Use Only:

Vac./Anniv. Date: _8-1-05_
125 Plan: _✓_ yes
Emp. Address: _____    _____ yes _X_ no

_____    _____
(City)    (St)    (Zip)

_Payroll Advise Required_ _✓_ yes _____ no
_R2D  2/23/06_

Revised 10-99

Britt v. USA00706

Employee Screening                                                    Page 1 of 1

# Result Report

### *Confidential*

05/31/2006

USA Truck, Inc.
3200 Industrial Park Rd.
VAN BUREN, AR  72956

Attn:    DER

Re:      SSN:221649506/Name:THEODORE JOHNSON
         Specimen ID #:6508085

The above referenced employee submitted a Drug Screen specimen for DOT, Post Accident
substance abuse testing in accordance with applicable federal regulations, including 49 CFR part
40 and 382, on 02/21/2006.

The specimen was submitted to:        American Family Care
                                      2936 Marti Lane
                                      MONTGOMERY, AL  36116

Testing of the specimen was performed:
in compliance with SAMHSA guidelines        Quest Diagnostics - Irving
at.
                                      4770 Regent Blvd
                                      IRVING, TX  75063

The specimen was POSITIVE-DILUTE for MARIJUANA METABOLITE,SPECIFIC GRAVITY (50 ng/mL SCREEN), .
Test verification was completed on 02/24/2006 09:50:39.

The specimen was tested for:          1) AMPHETAMINE 1000
                                      2) COCAINE 50
                                      3) MARIJUANA 50
                                      4) OPIATE 2000
                                      5) PHENCYCLIDINE 25

This information should be included in your confidential substance abuse testing records.

Sincerely,

Robert Pflug, M.D.
Medical Review Officer

POSITIVE

[ Close ]   [ Print ]

Britt v. USA00964

05/15/2006 MON 14:32 FAX   --- IMAGE VERIFIER                          ☒004/014
ImageViewer2000                                                       Page 1 of 1

FEB-23-2006 THU 07:23 AM TRANSPLACE          FAX NO. 479 770 7830    P. 02
                                              cop42          Page 1 of 1

POSITIVE

Britt v. USA00965

VOLUNTARY  STATEMENT  FORM
MONTGOMERY  POLICE  DEPARTMENT

DIV:  Traffic          BUREAU:  AI              DATE: 2/21/06

NAME:  Theodore Johnson                        AGE:   SEX/RACE:
ADDRESS: 2 Canoe Court, Newark, Delaware        PHONE:

CONCERNING:  Fatality Collision at 980 West South Boulevard at approximately
             2050 Hours

LOCATION OF INTERVIEW PAB: **YES** NO (SPECIFY):

STATEMENT TAKEN BY:  Corporal T. A. Bradley, #138
And also present Corporal S. R. Gann, #158

Beginning time 23:50 Hours.

Q:  Mr. Johnson, will you please read the first paragraph for me?
A:  Before asking you any questions, I must explain to you that you can
    remain silent, that anything you say can be used against you in court,
    that you can talk to a lawyer first and that you have the right to the
    advice and presence of a lawyer even though you cannot afford to hire
    one.  If you cannot afford to hire a lawyer and want to have one present
    during interrogation, the court will appoint one before we question you.
    If you want to answer questions now you can do so, but you can stop at
    any time.

Q:  Do you understand those rights, Mr. Johnson?
A:  Yes.

Q:  Do you understand that you just read your rights and that you could stop
    at anytime?
A:  Yes.

Q:  Is that what you read?
A:  Yes.

AC/C1350

_____            _____
Detective Signature                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                        Page 1 of 63

Q:  Alright.  Will you read the second paragraph for me?
A:  I fully understand the foregoing statement and do so willingly agree to answer questions.  I understand and know what I am doing.  No promise or threats have been made by anyone and no pressure of any kind has been made against me by anyone.

Q:  Do you understand that statement?
A:  Yes.

Q:  Is that your signature right below it?
A:  Yes.

Q:  Is that my signature above that paragraph?
A:  Yes.

Q:  Is that Corporal Gann's signature as a witness?
A:  Yes.

Q:  Okay.  Mr. Johnson, tonight on the West South Boulevard, in your own words, tell me what happened.
A:  I was pulling over at the truck stop to fuel up for tomorrow because I was about to settle down tonight.  I was only going to drive about another 30, 40 miles to the rest area, and I was, I pulled in to, to fuel up and I seen that the traffic was, it was a little bit of traffic out, but I had an opening and I, I, I had opening and I seen that it was clear.  So therefore, I took it and I turned in, and that's when I noticed, once I turned in, I noticed that there was a truck, there was car coming on the side of me that wasn't like slowing down, and that's when I, I was pulling in.  I was trying to hurry up to pull, pull it in further, I mean pull it in more, but I guess, I, I don't know.  I didn't make it in time or what, I don't, I'm not for sure, but that's when I noticed, I noticed that, I looked at the, at the, at my driver's side mirror and I seen that the truck had went through underneath of the trailer and that's when I got out the truck and people came and gathered around and, and someone called the authorities.  I ran to the truck to go, I first went to the, to the car to see if the guy was okay, and some other guy was there was talking to him.  I, I don't know to see if he was replying or anything, but he was replying.  Therefore, I ran, I went to the truck to get my cell phone to try to call the police or something or somebody or something and that's when somebody had already, somebody had already beat me to the punch.  They had, ya'll had already came out

AC/C1350

_____          _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

after I got to the truck, and that's pretty much it.

Q:    Okay.  Let's break this down a little bit.  Number one you were heading to the truck stop, correct?
A:    Correct.

Q:    Where were you coming from?
A:    I was coming from Atlanta.  Well, I was coming from Haw River, North Caroline this morning.  That's where I started off at.

Q:    So you started Harvard, North Carolina?
A:    Haw, Haw River.

Q:    Haw River, North Carolina.
A:    Yes.

Q:    I'm sorry, Haw River, North Caroline this morning.  Okay.  And what roadway were you traveling prior to the collision?
A:    I-85 South.

Q:    85 South?
A:    Yes.

Q:    To what?
A:    To I-65 South.

Q:    Okay.  Once you got on I-65, then where did you go?
A:    I got off at the exit that TA was at, the truck stop.

Q:    Okay.  Do you know what exit that is?
A:    I believe it's 162 or 168.  I'm not quite sure.

Q:    Okay.  Do you know the name of that exit?
A:    No, I do not.

Q:    Okay.  That would be at the bottom of the ramp 65 southbound is Exit 168.  It's Western Boulevard, okay.  When you came down the bottom of the exit ramp from I-65 South and you came to the red light...
A:    Uh-huh.


AC/C1350

_____


_____                    _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:  just which way did you turn?
A:  I turned left.

Q:  Okay.  Tell me about this roadway that you turned left on.  What kind of
    roadway was it?
A:  It was like a, I believe it was a four, four lane highway.  It was like
    a four lane highway.

Q:  Okay.  It's a four lane flattop, correct?
A:  Yes.

Q:  Okay.  When you turned left onto the boulevard, which direction were you
    heading?
A:  I was heading, I'm not quite sure.  I don't know.

Q:  Okay.  If you're heading towards the truck stop, you would be heading
    east.  If you're heading towards 65, you would be heading west.  Newark
    is back towards 85.  South is if you were going towards Florida.  Okay.
    So you're down on the bottom of the ramp, you're fixing to make a right
    hand turn onto the boulevard, which direction are you traveling?
A:  East, I believe it would be east.

Q:  When you made that left turn, what lane did you get into?
A:  I got into the far right first and I signaled over to the left to get
    into the turning lane for the truck stop.

Q:  So when you made your left turn, you, you went to the outside lane,
    outside right lane?
A:  Correct.

Q:  Were you in the right lane, once you passed underneath the bridge,
    underneath 65?
A:  No, I wasn't.  I had made it over to the left lane.

Q:  Okay.  You made your turn and you immediately got into the left lane,
    the inside lane?
A:  Yeah.

Q:  Inside straight lane, correct?
A:  Correct.

AC/C1350

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    Okay.  Now you were east in the inside straight lane.  You just went
      under 65,  You are coming up on the red light.  Then what did you do?
A:    Coming up on the red light?

Q:    You're coming up on the red light.  You just went underneath 65, the
      entrance ramp from 65 North is on your right.  The entrance ramp, or the
      exit, I'm sorry, the exit ramp for 65 North is on your right.  The
      entrance ramp for 65 north is on your left.  You were heading east on
      the boulevard.  You're in the left straight lane.
A:    Uh-huh.

Q:    If you were coming, you either had a red light or you had a green light
      when you're going underneath there, underneath that light.
A:    Uh-huh.

Q:    Then what did you do?
A:    I signaled over to get in the left hand lane and got into the turning
      lane, where the truck stop was at, the truck entrance.

Q:    How far back did you get in that turn lane?
A:    I'd say I was in that turn lane about like a little bit after I went
      under the under bridge, a little bit like approximately like, as soon as
      I hit the underpass, I signaled over because I seen it was clear.

Q:    Okay.  So once you passed that red light underneath the under pass that
      red light, you were underneath 65 and through that green light, that's
      when you got in the turn lane?
A:    Yes.

Q:    Okay.  Now seeing that you're not from here, I'm going to describe the
      truck stop for you, okay.  There are two entrances into the truck stop.
      There is what I like to call the west side entrance and the east side
      entrance.  The first entrance you will come to is the west entrance.
      It's closet to the interstate.  The second entrance is east entrance.
      It's further away from the interstate.  What entrance did you go to?
A:    The east.

Q:    Okay.  Were you in the turn lane prior to the west entrance?
A:    Yes.


AC/C1350

_____

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    You traveled from 65 in the turn lane pass the west entrance all the way
      up to the east entrance?
A:    Yes.


Q:    Okay.  Was there any traffic headed in that turn lane?
A:    No.


Q:    When you came up on the west entrance, did you come to a stop?
A:    I couldn't, I didn't hear the question.


Q:    Okay.  When you came up on the east entrance, did you come to a stop?
A:    Yes.


Q:    Okay.  You did a complete stop?
A:    Yes.


Q:    Okay.  Now you're sitting here facing east, you're in that turn lane.
      You haven't made your turn yet.  Have you activated your turn signal?
A:    Yes.


Q:    Describe to me what you saw straight ahead of you.
A:    I saw oncoming traffic, but I had enough time to, to turn in.


Q:    Okay.  You said you seen oncoming traffic?
A:    Correct.


Q:    What kind, could you describe the traffic?  Tell me what kind of vehicle
      or how far back they were or how many there were.
A:    No, not off the top of my head I can't.


Q:    Okay.  Do you remember, did you see the mazda truck?
A:    No, I did not.


Q:    How far back at distance wise, a rough estimate, tell me how far back
      was the truck?  You said you had plenty room to make the turn.
A:    I was probably about 250 feet.


Q:    Is that the distance you need to make your turn safely.
A:    I'll say I had about a good 200, 200 to 250 feet.


AC/C1350

_____

_____                    _____
Detective Signature                            Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 6 of 63

Q:  250 feet?
A:  Uh-huh.

Q:  For you to make your turn before the traffic came on, right up on you, correct?
A:  Uh-huh.

Q:  Is that a safe distance for a big rig to make a turn?
A:  Yeah, I would say so.

Q:  Okay.  Was there a lot of traffic?
A:  No.

Q:  Was there a lot of traffic coming at you?
A:  No.

Q:  Okay.  Did you know what the speed limit is through there?
A:  No, I do not.

Q:  Did you see a speed limit sign at, at anytime while you're on the boulevard?
A:  No, I did not.

Q:  Okay.  How fast were you going when you made your turn?
A:  When I turned or when I made the turn?

Q:  Well, when you, you got, you're sitting there in the turn lane.  You're at a stop...
A:  Right.

Q:  You are sitting at the east entrance.  You've got your turn signal on.
A:  Right.

Q:  Let me back that up a second.  You're sitting there stopped at the east entrance.  You've got your turn signal on.  What gear did you go into?
A:  The third gear.

Q:  You went into the third?
A:  Yes.


AC/C1350

_____                    _____
Detective Signature                                Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:   Okay.  You went to make your turn...
A:   Yes.

Q:   About how fast approximately were you going when you were making your turn, just a rough estimate?
A:   I'll say about, when I first started to turn about, about 5 miles an hour.

Q:   Okay.  Now what year is your vehicle?
A:   05.

Q:   2005.  What type of vehicle is it?
A:   An International.

Q:   International.
A:   I'm not sure what the rest of it.

Q:   Okay. It is an International tractor-trailer, right?
A:   Uh-huh.

Q:   Tractor, right?
A:   Yes.

Q:   You know what size the tractor is?
A:   Not off the top of my head, no, I do not.

Q:   Okay.  What kind of load were you carrying?
A:   Fiber glass load.

Q:   How much weight was on there?
A:   40, about 4,000.

Q:   With the tractor, the trailer, and the, the material in the trailer, you weighed out at roughly about 74,000 pounds, right?
A:   Yeah, I would say so, yeah.

Q:   Okay.  Now you're fixing to make a left turn. You've got distance of 250 feet from the first traffic, and you say you're doing approximately 5 to 10 mile an hour.
A:   Correct.

AC/C1350

_____                    _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:  With that much weight on the trailer with a 2005 International, do you
    feel that you have enough room and enough time and enough power pulling
    that truck to make your turn safely into the truck stop?
A:  Yes.

Q:  Okay.  Were you the only occupant in this vehicle?
A:  Yes.

Q:  Okay.  How long have you been driving?
A:  About, I'll say March 10th will be my sixth month.

Q:  You've been driving for six months?
A:  Yes.

Q:  Okay.  What kind of CDL do you have?
A:  Class A.

Q:  Class A.  How long have you had a Class A license?
A:  For about since I was, I believe I was 19, 20.

Q:  How old are you now?
A:  24, about 4, you can say about 4 years.

Q:  You've had a Class A license CDL for 4 years?
A:  Yes.

Q:  Okay.  What other trucks have you driven?
A:  Milk truck and a small little water truck used to clean sewers.

Q:  Okay.  This milk truck how many axles did it have?
A:  Two.

Q:  And this water truck?
A:  Two.

Q:  Have you ever driven a vehicle more than two axles besides the rig you
    were driving tonight?
A:  No.

Q:  And you've been driving that vehicle for six months?
A:  Correct.

AC/C1350

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:  Have you been working for the same company for six months?
A:  Correct.

Q:  And you figure 250 feet with traffic coming towards you , while making a left hand turn.  You had enough time to make a turn?
A:  Correct.

Q:  Okay.  Now you started to make your turn.
A:  Uh-huh.

Q:  Okay.  Now I have never driven a tractor-trailer.  I have driven big rigs for the military, but I have not done that in some years.  The radius of a turn, on a tractor-trailer, what is the radius of a turn on a tractor-trailer on a truck that size?
A:  The radius...

Q:  You would have to make a left hand turn.  Okay.  Now obvious, all truck drivers know that you had to go some distance, turn your wheel, and come back because the front of the trailer rotates with the truck, but the back of the trailer does not.
A:  Right, right.

Q:  Okay.  So how far pass the east exit did you have to go prior to making your turn?
A:  I didn't have to go because I was already like, I was, I was already like angled over like you know what I mean.

Q:  Angled over such as?
A:  Such as I was halfway in the turning lane and the little, like the back of the trailer was more or less in the, in the, not the turning lane but the, the, the travel lane.

Q:  The straight lane?
A:  Yeah.

Q:  Going eastbound?
A:  Yes.

Q:  So you weren't all the way into the turn lane were you?
A:  No.

AC/C1350

_____                    _____
Detective Signature                                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:    What about the front of the truck were you pass the turn lane into the
      westbound straight lane, inside lane?
A:    I don't think so.

Q:    If you're in the turn lane, you're telling me that the trailer is
      partially in eastbound straight lane...
A:    Right.

Q:    We're going to call that the inside lane.
A:    Right.

Q:    Okay.  Now the rear of the trailer is in eastbound inside straight lane.
      The front of the trailer is in the turn lane.
A:    Right.

Q:    The rear of the tractor is obviously in the turn lane.  Where is the
      front of your truck?  Is it in the turn lane also or is it in the
      westbound inside lane, straight lane?
A:    No, it's in the, it's, I'm in the turn lane. I'm in the turn lane, but I
      was like, like, I'll say about, about two to maybe, I don't know, about
      two feet pass like the, the entrance.

Q:    Okay.  Now you're sitting there in you truck.  You're behind the wheel.
      You're facing east.  You're in the turn lane.  You're canned.  You're
      not fully straight into the turn lane, but you're canned.
A:    Right, right.

Q:    Okay.  You're looking at the traffic coming at you.  How many sets of
      headlights did you see?
A:    I saw four.

Q:    You saw four sets of headlights?
A:    Uh-huh.

Q:    Four sets of two or two sets of two?
A:    Two sets of two.

Q:    Two sets of two.  Okay.  Do you remember what lane those two sets of two
      were in?
A:    The far, the far right like coming, the far right coming this away.

AC/C1350

_____               _____
Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
Q:   They're coming at you.
A:   yes

Q:   Are the, they're coming at you westbound.
A:   Right.

Q:   Are they in the far right or they're in the far left?
A:   In the far right.

Q:   Far right.  Okay.  So they're in the inside lane coming at you.  What
     about the other ones?
A:   They was like right next to that one like but a little bit further back.

Q:   Okay.  Now the lanes traveling east and the lane traveling west, the
     straight lanes, there are a three a piece.  Okay.  You have the inside.
     You have the center and you have the outside.  Okay.  Now according to
     you, the way you've explained to me, the first set of headlights was in
     the outside straight lane heading west.
A:   Uh-huh.

Q:   The second set of headlights was in the center lane heading west.  Did
     you see any headlights in the outside straight lane.
A:   Yes.

Q:   You did?
A:   Yes.

Q:   So were there three sets of two or two sets of two?
A:   I mean you can count, I mean I could count all of the headlights that
     was on the road, but it was like that's, I mean...

Q:   Okay.  According to your statement, you told me...
A:   Right.

Q:   Were there were two sets of two.
A:   Right.

Q:   That tells me there were two vehicles coming at you.
A:   No, it was...
```

AC/C1350

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:   It was one in the center, in the inside, but there are three lanes.
A:   Right.

Q:   There's the inside, center, and outside.
A:   Right.

Q:   So is there, what, I need to know is, where these vehicles are at, what lane these vehicle are in.
A:   There was vehicle in the outside lane, a vehicle in the center lane. There was a vehicle in the, in, in, in the...

Q:   Inside lane.
A:   Yeah, the inside lane.

Q:   Were they all...
A:   There were vehicles behind them as well too.

Q:   Okay.  Now were they all together or were they scattered in different measurements, in different, the one in the middle was further back, the one in the middle was further back.
A:   Okay.

Q:   What about the outside lane?
A:   It was about the same as the other, the...

Q:   Inside lane.
A:   Yeah, about the same.

Q:   Okay.  Now how far back were the two in the inside and outside lane? Were they 250 feet or were they further back?
A:   The two, the two in the out, yeah, about 250 feet, yeah.  The one in the third lane I would say about cause that one would have been about, about 300 feet, another 50 feet, maybe 25 feet.

Q:   Okay.  But all, you could see all the headlights, right?
A:   Yeah.

Q:   Was there any vehicle coming at you westbound that you felt did not have headlights on or was missing a headlight?
A:   Unh-unh, no.

AC/C1350

_____

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:  Could you see the tra, understandable you're sitting there stopped,
    they're coming at you.  Do they look like any of them were doing excess
    speed?
A:  Unh-unh.

Q:  Okay.  Now you're fixing to make your left turn in private property.
    What is the name of this private property?
A:  TA Truck Stop.

Q:  And why were you stopping there?
A:  For fuel.

Q:  How much fuel did you have in your truck at that point and time?
A:  I'll say about a quarter tank.

Q:  A quarter tank.  Okay.  When you were making your left turn, did you
    have a turn signal on?
A:  Yes.

Q:  Did you have your headlights on?
A:  Yes.

Q:  Okay.  Did you, before you started out this morning, did you make a full
    point inspection of the vehicle?
A:  Yes.

Q:  Okay.  With a full point inspection, what does that consist of?
A:  Consist of your brakes, your tires, your headlights, your, check your
    oils, all of that, your trailer doors, your air line, all of that.

Q:  Okay.  Did you check your headlights this morning when you left?
A:  Yes.

Q:  Were they working?
A:  Yes.

Q:  Properly?
A:  Yes.

Q:  Both high and low?
A:  Yes.

AC/C1350

---

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:  Okay.  Were all of your trailer lights working?
A:  Yes.

Q:  Okay.  What kind of trailer lights do you have on the side of that truck?  Are they orange?  Are they red, are they white or...
A:  They're yellow.

Q:  They're yellow?
A:  Yes.

Q:  Okay.  Yellow neon lights?
A:  Yes.

Q:  Where on the trailer are they located?
A:  It's on like in, like the middle of the trailer and it's one in the back that's a red one in the back.

Q:  Okay.  Is there just a single light on certain area of the truck on that trailer?  Are there multiple lights in certain areas on that truck?  You understand what I'm asking?
A:  Unh-unh.

Q:  Okay.  The center of the truck, if you're standing looking at the side of the truck, you're looking at the trailer, up top, are there three yellow lights together on that trailer or three yellow lights in the middle of that trailer on the bottom?
A:  On the tractor or the trailer?

Q:  On the trailer?
A:  Oh, no, there's not.

Q:  They're just single lights?
A:  Yeah.

Q:  Okay.
A:  One in the front, one in the middle and one right there.

Q:  Okay.  Are there any on top?
A:  No.  There, no, no, ain't none on top, no, it ain't.


AC/C1350

_____

_____        _____
Detective Signature            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:  With the lights that you have on the vehicle, you said they're working, correct?
A:  Correct.

Q:  And the lights on the trailer were working, correct?
A:  Correct.

Q:  If I, if you were to turn in front of me at night, would I be able to visibly be able to see those lights?
A:  Yes.

Q:  Okay.  Are they bright enough to where I would see them 250 feet?
A:  Yes.

Q:  Okay.  Alright.  You're sitting there and you're fixing to make your left turn.  You're in the driver seat.  You're looking out your windshield.  What's the first thing you see out your windshield?
A:  But before I make the turn?

Q:  Before you make your turn.
A:  Before I make the turn, I seen oncoming traffic.

Q:  Okay.  When I got out to inspect your vehicle sitting inside your truck just put myself where you were sitting...
A:  Uh-huh.

Q:  I noticed your windshield had been damaged.
A:  Correct.

Q:  Was that damage done prior to the collision?
A:  Correct.

Q:  When did that damage happen?
A:  Saturday, the 20th, Saturday the 18th.

Q:  How did that happen?
A:  I was in New York snow.  I had ice on my windshield and I think I tried to, cause my windshield wasn't, windshield wipers wasn't getting the snow off.  The ice was building up on them and I, I banged on the, the windshield and it cracked on me.

AC/C1350

_____          _____
Detective Signature                                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:   Okay.
A:   I tried to knock some of the ice off.

Q:   I understand.  So that is old damage to the vehicle?
A:   Correct.
Q:   You at no time hit any part of your head and your body on that windshield during the collision tonight?
A:   No.

Q:   Okay.  Do you think that cracked windshield could have hindered you from seeing any traffic coming at you?
A:   No.

Q:   Okay.  There was not, so that windshield wouldn't have hindered from seeing the traffic coming at you?
A:   Unh-unh.

Q:   Okay.  You're sitting in the truck.  You're in the driver's seat.  You're facing east.  You're in the turn lane.  You're fixing to make a left turn and you told me you had your blinker on.  Was it raining at the time?
A:   Unh-unh, just, just dry, just dried up.  It'd just stopped.  It was raining when I was on I-85 South when I was coming south. Before I got off 65, it was a little drizzle.

Q:   Okay.  Were your windshield wipers operating at the time of the collision?
A:   Yes.

Q:   Were your windshield wipers operating at the time you were sitting in the turn lane prior to making the turn?
A:   I don't remember.  I had them on delay so I mean I don't remember if they were.

Q:   Okay.  You've got your windshield wipers on delay...
A:   Uh-huh.

Q:   Two, three, four minute delay?
A:   Yeah, I say about, about a three, four minutes.


AC/C1350

_____                    _____
Detective Signature                                 Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

```
Q:   Okay.  What time of day was this collision?
A:   I don't even know to be honest with you.

Q:   Was it, let me rephrase that.  Was it morning, daylight, dust, evening?
A:   Evening.

Q:   Evening?
A:   Yeah.

Q:   Okay.  So nighttime, right?
A:   Yes.

Q:   So it was at night.  When you're looking down the boulevard, you say
     it's not raining, but you've got your windshield wipers on delay.
     You've got that cracked windshield.  You've got your turn signal on.
     You see three vehicles coming at you.  One in the outside, one in the
     inside lane, about 250 feet.  The third one in the center lane was
     probably about 300 feet back?
A:   Uh-huh.

Q:   Okay.  They're heading westbound at you.  It's nighttime.  It just
     stopped raining.  It just stopped drizzling.  You've got your windshield
     wipers on delay.  Was the roadway lit enough for you to see these
     vehicles?
A:   Yes.

Q:   Okay.  Was it lit enough for you to tell the color of the vehicles?
A:   No.

Q:   Was it lit enough for you to tell the type of vehicles?
A:   No.

Q:   Okay.  Was it lit enough for you to see a distance seeing the vehicles
     coming at you?
A:   Yes.

Q:   Okay.  So the, the boulevard properly lit for you to see the traffic
     oncoming and passing, okay.
A:   Yes.
```

AC/C1350

_____

_____          _____
Detective Signature             Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    Okay.  Let's get into this turn.  Alright, you're fixing to make this
      turn.  You've got your turn signal on.  You've got three cars coming at
      you at least, one on the outside, one on the inside, and one further
      back in the center.  You can't tell what type of vehicles or what color
      they are.  You can't tell me how fast they were moving whether one is
      moving faster than other or one doing excess speed.  You're going to
      make this turn.  What told you that you, that you enough, what in your
      mind told you that you had enough room to make a 250 foot turn with a
      74,000 pound truck and 250 feet?
A:    I seen that it was clear enough to make the turn.

Q:    So with your experience driving...
A:    Uh-huh.

Q:    ...and the time that you have behind the wheel of a big rig like that,
      250 feet is enough distance to take a tractor-trailer and make a left
      hand turn over three lanes into private property from a turn lane in the
      center of the roadway and the emergency lane, which is, basically,
      that's a five lane turn.  Okay.  You're got three straight lanes.
      You've got an emergency lane and you're turning from the center turn
      lane.  So you, you're roughly going over lanes 14 feet, okay.  So that's
      5 times 14.  Let's go 4 times 14, okay, which is 70, roughly about 72
      feet.  So you were going to make a 72 foot turn with a 74,000 pound
      truck in 250 foot time.  Is that safe enough distance?
A:    I would say so, yes, because I've done it before.

Q:    Okay.  At anytime did you feel that you needed to wait, something
      telling you, you need to wait?
A:    Unh-unh.

Q:    Okay.  You're making your left turn, and you're in the process of
      turning.  You told me your truck is canted.  You told me you're
      partially in the eastbound straight lane, the turn lane, and the trac,
      the tractor itself is in the turn lane.  You're making your turn.  When
      you make your turn, do you look to your left in the way you were heading
      or do you look to your right out pass your window at the traffic coming?
A:    Both.

Q:    Both.  Okay.  When you were sitting there making that turn, which way
      did you look?
A:    I looked left first and right.

AC/C1350

---

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:   Okay.  You're in the process of turning.  You're turning left.  Granted, I've, I've never driven a tractor before so I'm assuming you're grabbing the wheel...

A:   Uh-huh.

Q:   The tractor-trailer steering column I'm assuming is bigger than a regular car steering wheel, right?

A:   It somewhat bigger.

Q:   Okay.  You're turning this wheel.

A:   Uh-huh.

Q:   Okay.  And you're noticing the truck is going in towards the private property.  Did you look back out towards the roadway while you're making your turn?

A:   Yes, I, I kept eye on it.

Q:   You always keep an eye out your passenger side?

A:   Yeah.

Q:   Do you have side mirrors on this truck?

A:   On the rear.

Q:   On, on the side, you know what I'm talking about?

A:   On the doors?

Q:   Yeah.

A:   Yeah.

Q:   Rearview mirrors?

A:   Yeah.

Q:   Okay.  How many mirrors do you have there?

A:   I got four total.

Q:   Four total on each side or two...

A:   Two on each side.

Q:   Two on each side.  Okay.  Now when you're using them, on a regular daylight no problems, traveling down the roadway.

A:   Uh-huh.

AC/C1350

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:   Okay.  You're trucking down the interstate.  These mirrors are specially made for these trucks.  Am I correct?
A:   Right.

Q:   It's to help you see the distance all the way back towards the truck, correct?
A:   Yes.

Q:   There are blind spots in this truck.
A:   Correct.

Q:   Am I correct?
A:   Correct.

Q:   Okay.  You're making this turn.  You're making a left turn.  It's night.  The roadway is wet.  You notice that the truck is turning into private property.  You're crossing over, you're starting to cross over the lanes.
A:   Yes.

Q:   Okay.  At what point and time, did you look to your right?  What lane were you in?
A:   I was in the, the tractor, the front of the tractor was in the third lane.  It was in the, was in the, the, like almost, the nose of it was almost into the entrance.

Q:   Okay.  So you're in the westbound outside lane, well, the tractor was?
A:   Yes.

Q:   And you looked back to your right?
A:   Yes.

Q:   What did you see?
A:   I seen the car that was in the middle lane speed started to pick up.

Q:   You saw the speed pick up?
A:   Yes.

Q:   On this vehicle in the center lane?
A:   No, no, not the one in the center lane, in the, in the, in the, the far, the far, the lane that I was in, the lane that the front of the trailer

AC/C1350

_____                    _____
Detective Signature                                     Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

was in, the lane...

Q:  The outside lane?
A:  Yes.

Q:  The outside westbound lane?
A:  Yes.

Q:  Okay.  You saw it pick up speed?
A:  Yes, I seen the vehicle pick up speed.

Q:  Can you tell me what kind of vehicle it was at that point and time?
A:  Unh-unh.

Q:  Can you tell me what color the vehicle was at that point and time?
A:  Unh-unh.

Q:  Can you give me an approximate, just a rough estimate how fast, fast you
    think it was going?
A:  I'd say about at least, had to be at least a good 40, maybe 45.

Q:  Okay.  Did you see how many occupants were in that vehicle?
A:  No, I didn't.

Q:  Okay.  Could you see into the vehicle?
A:  Unh-unh.

Q:  How far away was that vehicle in the outside lane from your vehicle when
    you saw it?
A:  When I saw it?

Q:  When you saw it and you're sitting there and the out, your truck is
    facing into the truck stop.
A:  Uh-huh.

Q:  So you're in the outside straight westbound lane.
A:  Uh-huh.

Q:  You look to your right and you see this vehicle in the outside westbound
    lane.  It's coming at you.  How many headlights did you see?
A:  I seen two.

AC/C1350

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
Q:   You saw two headlights?
A:   Yes.

Q:   It's coming at me.  How far was it?
A:   I'll say about, I'll say about, it got down to about 200, 250 feet.

Q:   Now you told me you were sitting in the turn...
A:   Right.

Q:   The vehicle was already at 250 feet.
A:   Yes.

Q:   And you're making your, your turn.  You've already crossed over one,
     two, you're in the third lane going in the truck stop and it's still 250
     feet?
A:   No.

Q:   It's got to be closer.  How far was it?
A:   I just said 100, about 150 feet.

Q:   Okay.  150 feet, that's, that's way better, okay, 150 feet.
A:   Uh-huh.

Q:   Okay.  You said 150 feet and you saw two head, headlights.
A:   Uh-huh.

Q:   Two, are you sure he's in the outside lane?
A:   Not for sure, but he was the, he was closet to that lane.

Q:   Okay.  Okay.  So we're, we've already made the process of turn.  We've
     got a turn signal on.  We're turning into the truck stop.  The tractor
     is in the third outside lane going into private property.  The pick-up
     is 100 to 150 feet from your truck heading straight at you.
A:   Uh-huh.

Q:   What do you do?
A:   I speeded up to try to hurry up to pull into the parking lot.

Q:   Did you step on the gas or did you change gears?
A:   I stepped on the gas.
Q:   Did you push it to the floor?
```

AC/C1350

---

_____          _____
Detective Signature                    Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
A:    Yes.

Q:    All the way to the floor?
A:    Yes.

Q:    Did you push the clutch in?
A:    Unh-unh, by that time, I was already in fifth gear so...

Q:    You were in fifth gear?
A:    Yes.

Q:    Okay.  We went from third, we were in third gear starting out in the
      turn lane.
A:    Uh-huh.

Q:    Did you automatically go from third to fifth...
A:    Uh-huh.

Q:    Did you start out in third in this turn or did you go three, four, five?
A:    I went third to fifth.

Q:    Okay.  So you went to three low to five low?
A:    Yes, four, four got stuck on me.

Q:    But you tried going to fourth?
A:    Yes.

Q:    When did you try to go into fourth?
A:    As I was in the, I would say like when I first started to make my turn
      because third is so easy to pull from.

Q:    Uh-huh.
A:    So I, so third didn't take that long for it to revel up so I went
      straight, tried to go straight to fourth.  By the time then I was
      already, I would say already in the, in the, the far lane going into the
      truck stop.

Q:    Okay.  So you started out in third.  You're making your turn.  You try
      to catch fourth.
A:    Uh-huh.
Q:    Okay.  And you couldn't catch fourth.  Have you had a problem with
```

AC/C1350

_____          _____
Detective Signature                  Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

fourth, catching fourth before?
A:  Unh-unh.

Q:  Have you had any malfunction with fourth gear on the roadway?
A:  Unh-unh, it hadn't been no malfunction.

Q:  Have you reported any type of service malfunction to your service when you turn the truck in at the end of work?
A:  Unh-unh.

Q:  Has, had, had any type of maintenance on the transmission or engine before the fourth gear?
A:  I just got this truck.

Q:  Okay.  So you have no idea whether...
A:  No.

Q:  Do you know if the transmission had been rebuilt or...
A:  Unh-unh.

Q:  So the fourth gear is a problem?
A:  Unh-unh.

Q:  Okay.  So you're, you went from three tried to take four, couldn't catch four.  When you tried to catch four, did the truck bog down?
A:  Yes.

Q:  Okay.  Did it slow down?
A:  Yes.

Q:  Okay.  So you're making a turn 5 to 10 miles an hour.  You're going from three low, try to catch four low, you couldn't catch it.  The truck bogged down, the truck slows down.  What did you do when you tried to catch, obviously, a truck like this when you go from three low to four low, do you have to use the clutch?
A:  Unh-unh.

Q:  This is an automatic?
A:  No, it is a manual way.

Q:  Uh-huh.

AC/C1350

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

A:   I don't, I don't usually normally use the clutch if I was...

Q:   You don't use the clutch when changing gears?
A:   Unh-unh.

Q:   Okay.  Okay.  So here we are.  We're making our turn.  We're in third gear and you're not using the clutch.  You try to catch fourth gear without using the clutch and it doesn't catch.  So then you try to go to five low, right?
A:   Uh-huh.

Q:   Or is it five high?
A:   Five low.

Q:   Five low, okay.  You hit five low.  Did you use the clutch when you hit five low?
A:   Yeah, I had to use the clutch because fourth, it wouldn't go in fourth smooth so therefore, I used to clutch to basically just put it in fifth to hurry up and get to the turn.

Q:   Okay.  When you pushed the clutch in to hit five, are you sure you pushed the clutch in and not the brakes?
A:   Correct.

Q:   Okay.  Did you have your foot on the gas at the same time you hit that clutch?
A:   No.

Q:   So you're saying I'm sitting there behind the wheel.  I'm driving, got my hand on the gear shift.  The gear shift sits to your right, correct?
A:   Uh-huh.

Q:   Got my hand on the steering wheel, I'm hitting the clutch.  You had a clutch on the left, a brake, and then the gas pedal, correct?
A:   Yes.

Q:   Okay.  You're hitting the clutch.  You foot is off the gas.  You're catching fifth and you're looking to your right.  Am I correct?
A:   Correct.

Q:   Okay.  Then you, and you do that simultaneously, all in one fully

AC/C1350

_____          _____
Detective Signature                  Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

motion, grabbed the gear, the clutch, the steering column and look to your right all at the same time, right?

A:   I wouldn't say it was at the same time, but...

Q:   Well, it, but the process is like that, right?
A:   Correct.

Q:   You've got to have, to catch your gear you got to have the clutch in?
A:   Right.

Q:   Okay.  And to make your turn, you've got to have your hand on the steering wheel?
A:   Right.

Q:   To catch the gear, you've got to have your hand on the steering column or on the gear shift, right?
A:   Correct.

Q:   And you're looking to your right?
A:   Right.

Q:   Is there anything coming out of that exit as you were going in?
A:   Coming out of the exit?

Q:   Coming out of the east exit as you were going in?
A:   Not that I can recall, no.

Q:   Okay.  So it was a clear...
A:   Yeah.

Q:   It is a clear turn?
A:   Uh-huh.

Q:   Okay.  And you've got distance now of a 100 feet?
A:   150.

Q:   100, 150 feet to the closet vehicle in the outside lane?
A:   Uh-huh.


Q:   And you say tractor was sitting there in the third outside westbound

AC/C1350

---

_____                    _____
Detective Signature                           Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

lane fixing to go on the private property?
A:    Correct.

Q:    And that tells me your whole trailer was still stretched across that boulevard.
A:    Right.

Q:    Blocking all three lanes and by that time, are you straightened up and going in or is your truck still coming around making the turn?
A:    It's, it's pretty much straight.  I was pretty, I was pretty much straight after I got in.  As, as the guy, as the collision occurred, I was straight so it's, it's, that's all I can really say on that.

Q:    Okay.  So you're, you're pulling in to private property now, okay.
A:    Uh-huh.

Q:    You're coming off the roadway.  Your trailer is starting to ease into private property.  With the debris and where the impact was on your trailer, that tells me your trailer was still partially on the roadway, okay.  Now did you feel the impact?
A:    Yes.

Q:    You did?
A:    Yes.

Q:    What did it feel like?
A:    It just felt like something was bumbling like it was shaking the, the trailer.

Q:    Did the truck shake?
A:    A little bit, a little bit, but not to where I could feel it, enough to where I could feel it, but it wasn't...

Q:    How did you feel?  Did you feel behind you, did you feel your hands on the steering wheel, did you feel it where you were sitting?
A:    Yeah, where I was sitting and, and, and the steering wheel.

Q:    Okay.  So you feel this impact.  Did you hear the impact?
A:    I didn't hear it.

Q:    Okay.  Did you see the impact in your mirror?

AC/C1350

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

A:    I, no, I seen, I seen it come, but I'm thinking maybe he might have
      went, tried to go behind the trailer or something and that's when he
      looked on my driver's side mirror and I seen that he had went under it
      with the roof come up, came off.

Q:    Okay.  So were you looking straight ahead, when you felt this rumbling,
      why way were you looking?  Were you looking straight out the windshield
      or were you looking to your left or right?
A:    I was looking in my mirrors.

Q:    Which one, which one, your left or your right?
A:    I was looking in my left mainly, I was in the left.

Q:    Your driver's side?
A:    Yes.

Q:    You felt the impact. You looked to your left, okay.  What did you see
      when you looked in that mirror?
A:    I didn't see nothing at first. That's when I looked to the right and I
      didn't see nothing over there.  I looked back to the left and then I
      seen he come under.  I seen, I seen a car that came under and spent
      around.

Q:    Okay.  So you looked to your left to right back to your left.  Were you
      still moving when you were doing this?
A:    Uh-huh.

Q:    So you're still pulling forward.  Okay.  You heard a rumble.  You look
      left, right, left.  You're still moving forward.  You see this vehicle
      come out from your trailer.  What did you do then?
A:    I immediately stopped the truck and got out the truck.

Q:    Okay.  I'm sitting there or actually, you're sitting there, okay.
      Stopping the truck, how would you stop a big rig?
A:    I put my foot on the clutch, put my foot on the brake, and took it the
      gear and pulled the, the air hose that air brakes.

Q:    Okay.  What gear were you in?
A:    I was in fifth.

Q:    So you take it out of five low and you put it where?

AC/C1350

---

_____                    _____
Detective Signature                        Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 29 of 63

A:    Put it in neutral.

Q:    So it's in neutral?
A:    Right.

Q:    You've got your foot on the clutch and a foot on the brake?
A:    Right.

Q:    Did you slam on the clutch and brake or did you ease on them?
A:    Soon as I felt the impact, I, I eased them on like I eased them on.

Q:    Now once you put it neutral, you got the clutch and you got the brake and you said you did what after that?
A:    I pulled the air lines out to, to lock the brakes and then got out the truck.

Q:    The air, air brakes?
A:    Yeah.

Q:    Air brakes work?
A:    Yes.

Q:    Okay.  Did you use your jake brake at all?
A:    Unh-unh.

Q:    Just, you just put the air valves on?
A:    Yeah.

Q:    Okay.  Where were the air valves?  If I'm sitting there in front of your steering wheel, where are the air valves at?
A:    They're right on the right hand side right, right in front of the, the stick.

Q:    Right in front of the stick?
A:    Yeah.

Q:    Right so it's up there by your right knee area by the dashboard?
A:    Yeah.


Q:    Okay.  So you looked to your right.  You see this vehicle come out from

AC/C1350

_____                    _____
Detective Signature                                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

underneath your trailer spinning. You immediately ease on your brake, your clutch, drop it neutral, pop your air brake. Okay. Now when you saw this vehicle spinning out from your trailer, which way did it spin? Did it spin towards the cab of your truck? Did it spin away from the back of the trailer? Did it spin towards back out towards the boulevard? Did it spin towards TA Truck Stop? I'm trying to get a lo, if you're, you're going into the truck stop and you, the trailer is occupying at least two lanes of the westbound traffic and he goes underneath that trailer, which was is he going when he comes out? Is he going out towards the center of the boulevard, toward that turn lane? Is he going toward the ditch, towards TA or is he going straight down towards 65? Which way did he go?

A:   He spun out towards the center of the intersection like in the center of the...

Q:   Towards the turn lane?
A:   Yeah, correct.

Q:   Okay. Did he come out nose first or back first?
A:   I don't remember. I really don't remember.

Q:   Okay.
A:   He came out, yeah, he came out nose first, nose first, yeah.

Q:   He came out nose first?
A:   He had to come out nose first.

Q:   Okay. If he came out nose first, alright, a clock, turns counter clockwise and clock wise. Which way did he spin.
A:   Uh-huh.

Q:   Kind of clockwise runs like this, okay. When he came out, did he spin right to left or left to right, clockwise or turn clockwise? Did the back of, when he came underneath the trailer, did the butt of the vehicle go towards TA or the butt of the vehicle go towards the turn lane?
A:   To the turn lane.

Q:   The butt of this vehicle went towards the turn lane?
A:   Yeah.
Q:   And the front end came towards the truck stop?

AC/C1350

---

_____                    _____
Detective Signature                           Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

A:    Yeah.

Q:    How many times did he spin that you saw?
A:    I seen, it wasn't a, I don't think it was a complete spin.  It was like
      he, it was like a semi spin like you know what I'm mean if you do like
      180 like.

Q:    Okay, it did a 180?
A:    Yeah.

Q:    And did, did he skid the rest of the way when he came to a stop or did
      he just do a 180 and come to a stop or did he slide further down and
      come to a stop?
A:    I don't, I don't remember.  He, naw, he slid.  He did, he slid a little
      further.  He slid a little further.  He did, he didn't, he spun out, he
      spun out and slid like, like that almost like, like this like.

Q:    So he's going clockwise.  He's coming out.  He came out nose first from
      under the trailer, bam.  He comes underneath the trailer, his butt end
      of the truck goes towards the turn lane and the nose of his truck goes
      towards the truck stop?
A:    Uh-huh.

Q:    He's spinning clockwise, okay, and he's heading out towards the turn
      lane and you said he does a 180.  Okay.  Is that all he did was a 180 or
      did he do a 360?
A:    I, I don't quite know for sure.

Q:    Okay.  That's fine.  Okay.  Now you placed the brake on, you place the
      clutch on, you take it and you put it in neutral and you apply the air
      brakes.  What did you do then?
A:    I, I immediately got out of the truck and went to go check to see if he
      was okay.

Q:    Okay.  So you went from your, you got out of the truck.  Where was your
      truck when you got out?
A:    It was in, in the parking lot, in the, on the property.

Q:    How far onto the property were you?
A:    I say about, about, I don't know.  I just, I barely cleared it.  Like, I
      was like the, the trailer was like probably about 10, 15 feet from the

AC/C1350

_____          _____
Detective Signature                       Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

entrance.

Q:    So you were 10 to 15 feet onto private property?
A:    Yeah.

Q:    From the back of the truck?
A:    Yeah, I would say.

Q:    Okay.   Alright.   So the truck was fully on private property at that
      time?
A:    Yes.

Q:    Okay.  Now when you got out of you truck, did you run immediately to his
      vehicle or did you stop and look at the damage on your vehicle?
A:    I went to his vehicle.

Q:    You went to his vehicle?
A:    Yes.

Q:    Okay.  When you ran up to his vehicle, what did you do?
A:    I, I just, I, I was in shock.   I didn't do anything.   That's when
      everybody else came over.

Q:    Okay.  I'm running up to the truck.  This side of it's facing way.  I
      run to the truck.  I see his body sitting there, okay.  Did he say
      anything?
A:    Unh-unh.

Q:    He did not say anything?
A:    No.

Q:    Did he, did he, he didn't say anything to anybody?
A:    He said something, another guy, another guy had got up and had met me
      like at the truck and another guy asked him was he alright and it was
      another guy, it was about four other people on the other side of the
      truck.   Me and the one guy was on the one side, on the drive, standing
      on the driver's side and there was about four other people that was on
      the passenger side.

Q:    Okay.  So you ran out to the driver's side with another man?

AC/C1350

_____

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

A:    Yes.

Q:    And four other people ran up to the passenger side?
A:    Correct.

Q:    Did any of the five people besides you see this accident or make a statement that they saw this accident?
A:    I'm not even, I'm not sure.

Q:    Did you get any names, phone numbers of any of those five people that were standing there with you?
A:    I did not.

Q:    Okay.  You run up to the driver's side.  You were standing there with this guy and the guy standing next to you what does he do?
A:    He, he asked, he asks, he's talking to guy like asking is he, is he okay and what...

Q:    What kind of questions is he asking?
A:    He said, he said, he was like hey, hey, hey, my, my man are you okay, are you okay, like that.

Q:    Okay.  Do you know where this guy came from that ran up next to you?
A:    No, I do not.

Q:    Did he come from the truck stop or across the other side of the boulevard or did he stop...
A:    Yeah, yeah, he came from the truck stop.

Q:    Are you sure he came from the truck?
A:    Yes, because he was coming, yeah, cause soon as I came out the truck, he was coming like this a way.  So he might have been coming from further up the boulevard or at the truck stop, one of the two.

Q:    Was he in a vehicle or did he come running up on foot?
A:    He was on foot.

Q:    Okay.  So this guy runs up to the driver's side of the truck with you?
A:    Uh-huh.

Q:    You're sitting there looking at the other driver.  Was he moving?

AC/C1350

_____

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

A:    No, a little bit, not really, but a little bit.

Q:    What was moving?
A:    His, his side, the side of him, the side of him, he was like...

Q:    His side, okay.  When you ran up, where was he laying?
A:    He was laying, his legs were in the driver's seat and his, his upper
      torso was in the like the back of the, behind the passenger seat.

Q:    Okay.  So he's laying, he's laying on his side.  We're going to say he's
      laying on his right side, okay.  He's laying, his legs are still in the
      driver's seat and you're saying his tor, upper torso or upper part of
      body is laying behind the driver's seat and you said his side was
      moving.  Was it his right side or his left side?
A:    It was his left side.

Q:    Okay.  So his left side moving?
A:    Yeah.

Q:    What kind of movement?
A:    Like little movement like, like almost like he was like breathing like
      or tried to move...

Q:    So you could see his, were you watching his ribs move, his chest move up
      and down?
A:    Yes.

Q:    Okay.
A:    I was watching more like his, his stomach like his rib area.

Q:    Okay.  So you're standing with this guy and you, you're looking at the
      other driver.  You're standing on the other, the driver's side of the
      vehicle.  You see his, his breathing or his body moving a little bit.
A:    Uh-huh.

Q:    Did he make any statements?  Did the driver, other driver make any
      statements or say anything or attempt to say anything?
A:    Unh-unh.  Soon as I seen that he was starting to like he was breathing
      like, I went back to the truck to get my cell phone so I could try to
      call...
Q:    Now are you sure you saw him breathing?

AC/C1350

_____          _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

A:     Yeah.

Q:     Okay.
A:     I seen, I, I wouldn't say breathing, but I seen him moving.  I seen him move.

Q:     You seen him move?
A:     Yes.

Q:     Okay.  What was the questions that the other man standing next to you on the driver's side saying?
A:     He was just, the only two questions I heard him say was yo, my man are you alright, that's the only question I really heard him say and then after that, after that, the other guy, the other guy on the other side he was like he, he, he was like the driver on, the guy who walks to the truck with me ask is he saying anything, speaking to the other guy, people on the other side of the truck and he was like, he was like yeah, he's replying, he's replying to.

Q:     So you got the guy standing next to you make some type of question.  You find out the guy's alright to the driver in the truck?
A:     Yes.

Q:     The other people on the other side are responding saying he's responding to so it's communication across the vehicle, correct?
A:     Correct.

Q:     Okay.  The guy standing next to you did he have a uniform on?
A:     No, I don't remember, I don't...

Q:     Do you remember what he was wearing?
A:     No, not at the time, he, he was...

Q:     Do you remember any of the people on the other side having a uniform on or what they were wearing?
A:     Nobody didn't have no uniforms or anything.

Q:     That's fine.  Did you hear any type of response from that driver?
A:     I didn't hear, I didn't hear anything.

Q:     Okay.  We're standing there.  Everybody cross, is talking across trying

AC/C1350

_____            _____
Detective Signature                 Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____                    Page 36 of 63

```
              to communicate with this driver.  What did you do then?
A:    Soon as I seen that he was moving, I started to walk to the truck to go
      get my cell phone so I could call somebody.


Q:    Who were you going to call?
A:    I was going to call the ambulance, the, whoever, 911.


Q:    Okay.  How far from his truck to your truck was the distance was?
A:    From his truck to my truck?


Q:    Uh-huh.
A:    I'd say about, about 50, 50, 50, 60 feet.


Q:    50, 60 feet.
A:    Yeah.


Q:    Okay.  Now when you got out of your truck eventually and went to this
      vehicle, did you run over there or did you walk over?
A:    I walked.


Q:    Did you run from his vehicle back to your truck or did you walk?
A:    I walked.


Q:    Okay.  You get back up into your truck or you go to you truck and you're
      fixing to climb up in your truck what did you grab when you got up in
      your truck?
A:    My cell phone.


Q:    Is that the only thing you grabbed?
A:    Yes.


Q:    And you come back out of the truck?
A:    Yes.


Q:    Okay.  You come back down out of your truck.  Then what do you do?
A:    I went to the, at the back of the trailer to see if it was okay.


Q:    Okay.  You grabbed the cell phone, and you got the cell phone in what
      hand?
A:    Uh-huh.
Q:    Left or right?
```

AC/C1350

_____          _____
Detective Signature                  Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

A:    I don't, I don't remember that.

Q:    Okay.  You got the cell phone.  Do you immediately dial 911?
A:    Unh-unh.

Q:    What do you do?
A:    I, I just got the cell phone and I'm sitting there, I'm in shock like I
      don't know what to do so therefore, I just, I, I'm sitting at the back
      of the truck, and that's when I started to hear sirens and lights and
      all that stuff come on.

Q:    So you heard emergency crews coming?
A:    Yes.

Q:    So you did not dial anything in your phone, but you heard the emergency
      crews coming?
A:    Uh-huh, then it's another driver, another driver from the truck stop
      walked by and he was like you might want to call your company to, to let
      them know what's going on like you know he gave me a heads up like.

Q:    Okay.  Did you know who this guy was?
A:    Unh-unh.

Q:    Have you ever seen him before?
A:    Unh-unh.

Q:    Do you know his name?
A:    No, I do not.

Q:    Did he leave a phone number?
A:    No, he didn't.

Q:    Okay.  So this guy walks up to you.  You're standing outside your truck.
      You got your cell phone.  You don't dial 911 or any emergency, but you
      could hear emergency vehicles coming, you could hear the sirens?
A:    Uh-huh.

Q:    Did you see any emergency vehicles at that time?
A:    I seen lights further down westbound, further down, westbound.

Q:    I-65?

AC/C1350

_____        _____
Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 38 of 63

A:   Yeah.

Q:   But on the boulevard?
A:   Yes.

Q:   You saw them.  Where did you see them at?  Coming towards or going away from you?
A:   Coming towards.

Q:   Okay.  But you saw the emergency equipment?
A:   Yes.

Q:   You would hear the emergency equipment coming?
A:   Correct.

Q:   Okay.  So you're standing with your cell phone and this guy walks up to you and tells you hey, dude, you might want to call your company and let them know what's going on.  What do you do then?
A:   I called the company.

Q:   Okay.  Who did you call?
A:   I called the accident for USA Truck.

Q:   Okay.  And who was that gentleman or lady that you spoke with?
A:   I don't know.  I, she was just some, I just dialed the number that said accident and it was a number 1-800 number.

Q:   Okay.  So you dialed this number?
A:   Uh-huh.

Q:   Did someone pick up?
A:   Yes.

Q:   Was it a male or a female?
A:   Female.

Q:   Did she give you her name?
A:   No, she didn't.


Q:   What did you tell her?

AC/C1350

_____          _____
Detective Signature                Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

A:    I told her this is the driver for truck 7695, I was just in an accident, a fatal accident.

Q:    You told her you were involved in a fatal accident?
A:    Yes.

Q:    How did you know it was a fatal accident?
A:    Because the, I assumed because the roof of the car had came off and the guy came from underneath of the car so.

Q:    But you told me you saw him breathing and you walked, instead of run back from his truck to your truck so that tells me that I'm calm enough and cool enough to know the guy is breathing so it can't be a fatal, right?
A:    Right.

Q:    But you tell this lady on the phone that you've been involved in a fatal accident.
A:    Right.

Q:    Why?
A:    Because I want her to expect the worst instead of, instead of...

Q:    Did you want her to expect the worst or were you expecting the worst?
A:    Or I was expecting the worst.

Q:    Okay.  So you're looking at this vehicle.  You look at the damage and you're looking at your trailer.  You're talking to this lady on the phone and you said, hey, this is the driver of such and such number truck.
A:    Uh-huh.

Q:    I've just been involved in a fatal accident.  Where?
A:    In Montgomery, Alabama.

Q:    Then what did you say to her?
A:    I said I was in an accident.  She was like hold on and she, she went to go do something, transferred me to different number to some other guy and then I was talking to him telling him...

Q:    Did you make, did she make any statements to you?  What did she say to

AC/C1350

_____

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

you when you told you were involved in a fatal accident?

A:  She didn't, she was like, she didn't, I don't remember her saying too much.  She was just like just like hold on, I'm a transfer you to, to, I don't know, somebody, I don't remember what she said.

Q:  So she transferred you and who picked up the line then, male or female?
A:  Male.

Q:  A male, did he give you a name?
A:  He probably did, but I don't remember.

Q:  Okay.  What did he, what kind of question did he ask you?
A:  He asked me was there any damage done to the, to the trailer.

Q:  Okay.  Is that the first question he asked you?
A:  I don't remember really, but I remember that was one of the questions that he did ask me.

Q:  But you don't remember whether that was the first question he asked you?
A:  Unh-unh.

Q:  Okay.  What other questions did he ask you?
A:  He asked me, he asked me about the, was the trailer, like was the, was it movable or is the authorities coming out and, and what else did he say, he was like is the other guy okay.  He asked me was the other guy okay and I was like I'm not sure, I'm not sure.

Q:  Is that what you said?
A:  Yes.

Q:  Is that exactly what you said?
A:  Correct.

Q:  I am not sure?
A:  Yes.

Q:  Then what did he ask you?
A:  He asked, he was like, he was like he took some information or something.

Q:  What kind of information?

AC/C1350

_____          _____
Detective Signature               Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

A:  My name, my social security number and all that stuff and he said he was going to call me right back.  He said keep your cell phone on I'm going to call you right back.

Q:  Okay.  Did you give him your cell number?
A:  Yes.

Q:  Okay.  He asked about the medical status of the other driver?
A:  Correct.

Q:  He asked about the status of the load and of your vehicle?
A:  Correct.

Q:  Did he ask at anytime about you, whether you were alright?
A:  Not off the top of my head, I can't, I don't believe he did.

Q:  Okay.  And you have no idea who this gentleman was that you talked to?
A:  Unh-unh.

Q:  It was just somebody that the company that...
A:  Yes.

Q:  Someone involve in accident investigations and that stuff?
A:  Correct.

Q:  Okay.  Do you know where these people are located?
A:  Which people are you talking about?

Q:  The person you talked to on the phone?
A:  No, I don't know where he's located, but I know where the company is.

Q:  Where is the company located?
A:  Van Buren, Arkansas.

Q:  In Arkansas, Van Buren, Arkansas, okay.  So you called them.  Have you hung up the phone with him yet?
A:  Yeah, I been off the phone with him.

Q:  Okay.
A:  After I gave him my cell phone number, we got off the phone.

Q:  Okay.  Then what happens?

AC/C1350

_____          _____
Detective Signature                        Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

A:    I'm walking around the truck looking in, in shock of what just happened
      and I...

Q:    Okay.  You get out of the truck.  You're standing next to the truck.
      You got the cell phone.  This guy runs up and says hey, look, you might
      want to call your company.  You start dialing numbers, okay.  Where are
      you standing when you make this phone call?
A:    At the back of the trailer.

Q:    Back of the trailer?
A:    Yeah.

Q:    The back driver's side or the back passenger side?
A:    The back passenger side.

Q:    The back passenger side.  Okay.  You're talking on the phone and you're
      talking to this company.  You get off the phone and then where do you
      go, what do you do?
A:    I'm just standing there.

Q:    Behind the truck, back of your truck, passenger side?
A:    No, I'm, I'm, I'm standing, walking around the back of the, walking
      around the back of the trailer basically.  I'm not just sitting there
      standing there.

Q:    Do you walk up and look at the damage to your trailer?
A:    Yes.

Q:    Where was the damage to your trailer?
A:    The right, the front of the front axle where the service line is at.

Q:    Okay.  That would be the rear two tandems on the trailer, am I correct?
A:    Yes.

Q:    Okay.  Just in front of the first rear panel let's the inside rear panel
      on the passenger side there's a set of brake lines, air lines that run
      underneath the trailer, correct?
A:    Yes.


Q:    Now when you start off this morning, were those brake lines secured and

AC/C1350

_____

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 43 of 63

operating functionally?
A:    Yes.

Q:    Were the brake drums on the trailer working functionally?
A:    Yes.

Q:    Were the tires, everything on that trailer working functionally?
A:    Yes.

Q:    Okay.  Now when you walk inside that trailer _____, what did you see?
A:    When I walked on side of the trailer?

Q:    You walked, as you saw the trailer...
A:    Yeah.

Q:    ...you walked up to the passenger side of the trailer just in front of the rear panel and you looked at the damage.  What kind of damage did you see?
A:    I seen that the air lines was busted and it had...

Q:    Where were they located at?
A:    They were, they were in front of the, the rear axle, the trailer axle.

Q:    Were they on the ground, were they hanging there, were they...
A:    They were hanging like.  I mean they didn't look like they were all there either.

Q:    Were they disconnected?
A:    Yes.

Q:    Were they ripped out?
A:    Yes.

Q:    Okay.  Were they ripped out from the front of the trailer?  Were they ripped out from the panels?
A:    I don't remember.

Q:    Okay.  Do you remember whether they were laying on the ground?
A:    Yeah, they were just laying, I mean they were laying there like.
Q:    Okay.  Did you see them busted and...

AC/C1350

_____        _____
Detective Signature                     Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____                    Page 44 of 63

A:   Yeah.

Q:   Just lying on the ground, but you don't know whether they were ripped
     out from the front of the tandems or they were ripped out from the rear
     tandems?
A:   Unh-unh.

Q:   Okay.  What else, what other kind of damage did you see?
A:   That's pretty much the main thing I really, I, I seen like paint like
     from the car and stuff on the trailer like...

Q:   Where on the trailer?
A:   On the, on the passenger side in the, in the rear.

Q:   Okay.
A:   Like right there, right there where the, the lines are at.

Q:   Okay.
A:   The lines.

Q:   Was it in front of the rear tandems or connection to the rear tandems or
     the front of the trailer?  Where on the trailer, was the paint scrubs
     and the paint transfer, where the impact of the truck was?
A:   Right there like right there where the service line, the air lines is
     at.

Q:   Okay. Was it Right in front of the rear tandems?
A:   Yeah.

Q:   Okay.  Now, okay, now you're standing there.  You're looking at this
     damage.  You're surveying this damage.  You realize your brake lines are
     cut.  Do you go back into your truck?
A:   No.

Q:   Did you go back into your truck at any point and time after you grabbed
     your cell phone?
A:   Yes.

Q:   Okay.  When did you go back into your truck?
A:   After, after I seen that ya'll were coming, I, I went back to the truck.
Q:   Okay.

AC/C1350

_____                    _____
Detective Signature                          Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

A:    And I tried to, I tried to move the truck.  I tried to move it.  I...

Q:    You tried to move the truck?
A:    Yeah, I tried to move it.

Q:    Why did you try to move the truck?
A:    Because I felt that I was holding up traffic like I was blocking traffic.

Q:    But you told me you were 10 feet, 10 to 12 feet into private property so how could you be holding up traffic?
A:    Because it was cars coming, trucks coming this away like you said it's two exits and entrances.

Q:    Okay, right.  So there was traffic coming and going, but you see the emergency crews starting to come too, right?
A:    Yes.

Q:    You get back up in your truck.  You tried to move the truck.  Did you move that truck?
A:    No, it didn't move.

Q:    You did not move that truck whatsoever?
A:    No.

Q:    Not even an inch?
A:    Unh-unh.

Q:    Did you try to put it in gear?
A:    Yes.

Q:    What happened?
A:    It didn't move.  It wasn't getting no air.

Q:    No air?
A:    Yes, so...

Q:    Were the brakes still locked?
A:    Yes, the valves kept popping out on me.  My valves wouldn't work.
Q:    Okay.  So actually the brakes, the brake valves were locked and they would not release?

AC/C1350

_____                    _____
Detective Signature                           Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

```
A:    Right.

Q:    Is that what you're telling me?
A:    Right.

Q:    Okay.  So your brake valves are locked.  You're trying to move the
      truck, but the truck doesn't move?
A:    Right.

Q:    Did you try to put the truck in gear?
A:    Yes.

Q:    What gear did you try to go into?
A:    Third.

Q:    You tried to go back into three low?
A:    Yes.

Q:    Okay.  Did it go into three low?
A:    Yes.

Q:    Did the clutch work?
A:    Unh-unh.

Q:    The clutch did not work.
A:    The valves popped out on me and then I was just like forget it.

Q:    So did it actually go into three low?
A:    What do you mean did it actually go into three low?

Q:    Okay.  Did, you got your foot on, in the, you had your foot clutch.
A:    Uh-huh.

Q:    You're trying to move the truck.  You're trying to go into three low.
      Did you catch three low?  Did it actually go into gear?
A:    Oh, yeah, it went in gear.

Q:    For that part?
A:    Yeah, it was in gear.
Q:    It went into gear?
A:    Right.
```

AC/C1350

---

_____                    _____
Detective Signature                            Witness Signature


Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    But with the air locks being on, it would not move?
A:    Unh-unh.

Q:    Okay.  So you got the clutch in.  You try to go into three low.  You try
      to move the vehicle and the vehicle won't move.  Okay.  I've got to ask
      you this.  Were you trying to leave the scene?
A:    Unh-unh.

Q:    Okay.  Where were you trying to move that truck to?
A:    To the side of the, right there in the entrance like right on the side.

Q:    So you were trying your best for to move out of the way?
A:    Yeah.

Q:    Okay.  Not a problem.  You try to catch a gear, try to catch three low,
      got your foot in on the clutch.  The clutch goes in, but the air locks
      will not come undone?
A:    Unh-unh.

Q:    Now where were you when the authorities came and got you?  Were you
      sitting in the truck or were you standing outside the truck?
A:    I believe when the first officer approached me, I was outside the truck.

Q:    Did you take anything out of that truck anything other than the cell
      phone?
A:    Unh-unh.

Q:    Did you try to remove anything from the truck or around the truck or on
      the truck?
A:    Unh-unh.

Q:    Prior to speaking with law enforcement?
A:    Other than my paperwork and cell phone.

Q:    Did you re, did you retrieve or take out any medication out of that
      truck?
A:    Unh-unh.

Q:    Okay.  Now authorities are there and Corporal Gann has now approached
      you and I'm assuming you go with Corporal Gann, Gann walks you over to

AC/C1350

_____        _____
Detective Signature                     Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                  Page 48 of 63

his car and starts to ask you questions and getting your information and everybody is there doing their job. The paramedics are there. The fire department is there. The ambulance is there. Everybody is there doing their job.

A: Uh-huh.

Q: Okay. Now we're done with the basic principal actions of this accident. Okay. We are to the point now in our investigation where we need to know about some of your past. We need to know about some of your physical effects, okay. Now you were telling me that you've been driving a big rig like this for six months, correct?

A: Uh-huh.

Q: But you've had a CDL for four years, correct?
A: Correct.

Q: Okay. Now you said that you needed to stop and get some gas and that's why you came to TA Truck Stop, correct?
A: Correct.

Q: Were you planning on once you got the gas, were you planning on staying at the truck stop or were you planning on going down the road to the rest area?
A: Going down the rest area.

Q: How far down is the rest area?
A: It's two of them. I got, I had enough miles to where I could make it to either one of them, but there, I mean whatever one I would, I probably spotted, I was gone park there.

Q: Okay. Now here comes the tricky part. I'm not very educated when it comes to commercial vehicle rules and regulations...
A: Uh-huh.

Q: Now when it comes to driving, okay. So you're going to have to help me through this, alright. Now are there a certain number of hours you're allowed to drive that truck?
A: Correct.

Q: How many?
A: 11.

AC/C1350

_____          _____
Detective Signature                Witness Signature

Signature of Person Giving Statement: I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:    How many hours have you been driving when you had this accident?
A:    I'd say about 8 or 9.

Q:    8 or 9?
A:    Uh-huh.

Q:    What time did you start off from your last, when you came to a stop and
      rested yesterday.
A:    Uh-huh.

Q:    Up until the time of the accident?
A:    This morning...

Q:    What time did you leave?
A:    This morning I left about 12:30, 1:00.

Q:    In the morning or...
A:    That afternoon.

Q:    So around lunch, 12:30, 1:00?
A:    Uh-huh.

Q:    This collision occurred at 8:50.  If you left at 12, it gives you 9
      hours.
A:    Uh-huh.

Q:    If you left at 12:30, 8 and a half.  You're still within your limits 11
      hours, which at this point I, that is probably true.  I don't know,
      okay. I'm not a tractor-trailer expert.  I, I, I'm not a commercial
      vehicle, I'm not, I work Traffic Homicide.  I'm, I'm used to cars.
A:    Right.

Q:    I'm not use to big rigs.  I don't, I, okay.  Okay.  Now this logbook of
      yours...
A:    Uh-huh.

Q:    Is it computer or is it hand written.
A:    Paper.
Q:    Paper.
A:    Uh-huh.

AC/C1350

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____                    Page 50 of 63

Q:   Okay.  Did you log as you rode this morning?
A:   No.

Q:   Why not?
A:   Because I didn't, I, I was stuck at this, the pilot truck stop waiting
     for like 5 hours to get fuel like my, my gas card was messed up so I was
     just sitting, I was, I was at that truck stop for like three hours.  As
     soon as they let me go, soon as everything was good to go, I, I just
     hurried up and left.  I just...

Q:   Okay.  Were you three hours or five hours?
A:   Three.

Q:   Three hours?
A:   Yeah.

Q:   Okay.  What time was that?
A:   I got up this morning around, I got up this morning about 9.  I went to
     go fuel, but they, my card wasn't working right so I was sitting around
     there for about three hours then.

Q:   Okay.  What did you do for that three hours?
A:   Nothing, stayed in the room doing nothing, eating, I went to go eat and
     that's about it.

Q:   Okay.  You went to eat.  Okay.  You say you got up around 9 this
     morning?
A:   Uh-huh.

Q:   What time did you go to sleep last night?
A:   Like 11:30, I went to bed about 11:30.

Q:   Where were you at when you went to sleep?
A:   Haw River, North Carolina.

Q:   Okay.  And you were in your truck?
A:   Uh-huh.

Q:   Okay.  You slept in the truck last night?
A:   Uh-huh.

AC/C1350

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
Q:    By yourself?
A:    Yes.

Q:    Did you take any medications last night?
A:    No.

Q:    Did you drink any alcohol last night?
A:    No.

Q:    Did you do any hard drugs last night, I mean cocaine, hash, marijuana?
A:    Unh-unh.

Q:    Anything illegal?
A:    Unh-unh.

Q:    Did you take any over the counter drugs last night?
A:    Unh-unh.

Q:    Okay.  Did you take any over the counter drugs this morning when you got
      up?
A:    No, I didn't.

Q:    Did you take any hard illegal drugs when you got up this morning?
A:    Unh-unh.

Q:    Did you drink any type of alcohol...
A:    Unh-unh.

Q:    ...when you got up this morning?  Did you drink any alcohol the three
      hours you were at the gas station?
A:    Unh-unh.

Q:    Okay.  Does your company do random piss test?
A:    Yes.

Q:    When is the last piss test you had?
A:    I never had one.

Q:    You never had one.
A:    Since I started, since, since...
```

AC/C1350

---

_____          _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

```
Q:    And you've been with the company six months?
A:    Since, yes, since I first started.

Q:    Okay.  Did you have to take one to get the job?
A:    Yes.

Q:    What was that result?
A:    Negative.

Q:    Negative.  Okay.  Have you ever had a hot piss test while driving your
      vehicle, commercial vehicle?
A:    Yeah, in the past year.

Q:    You have?
A:    Uh-huh.

Q:    When?
A:    I'll say about, about three years ago.

Q:    Three years ago.  Who were you working for?
A:    A company called Cargill.

Q:    Cargill?
A:    Uh-huh.

Q:    Cargill moving or Cargill Constructions?
A:    Cargill, I don't know, Cargill, they deliver to 7-Eleven's.

Q:    Okay.  What kind of vehicles were you driving when you did that?
A:    A small box truck.

Q:    A small box truck?
A:    Uh-huh.

Q:    Okay.  But you did piss hot?
A:    Yeah.


Q:    On the test?
A:    Yes.
```

AC/C1350

_____

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:    Okay.  And that was three years ago?
A:    Uh-huh.

Q:    So that was 2003?
A:    Unh-unh, end, end of, year, the beginning of 2003, end of 2002 around
      December or January.

Q:    Okay.  So you've had one hot test since then?
A:    Uh-huh.

Q:    Have you ever been in trouble with the law with anything to do with
      drugs?
A:    Unh-unh.

Q:    Have you had any arrests when it comes to drugs?
A:    Unh-unh.

Q:    Have you ever had any DUI's?
A:    Unh-unh.

Q:    Have you ever had any DUI's with a Commercial license?
A:    Unh-unh.

Q:    But you did test positive one time back in 2002, 2003?
A:    Yes.

Q:    Okay.  And now your driving a commercial vehicle.  Okay.  Okay. So we've
      got you left at 12:30.  The accident happens roughly about 9:00, 10
      minutes till 9.  So we got 8 to 9 hours.  How often do you document your
      logbook?
A:    Like at the end of the day.

Q:    The rest of the day?
A:    Yeah.

Q:    Okay.  Have you ever been popped for, by law enforcement or by any
      company for falsifying documentation on your logbooks?
A:    Unh-unh.

Q:    Have you ever falsified documentation on your logbooks?

AC/C1350

_____

_____              _____
Detective Signature                         Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

A:    Uh-huh.

Q:    Do you keep more than one logbook in the truck?
A:    Unh-unh.

Q:    Okay.
A:    I mean we, I, I keep logbooks in the truck, but not on, I don't run two
      at a time like that.

Q:    I'm talking about having one document book.
A:    Yeah.

Q:    One logbook...
A:    Yeah.

Q:    You don't have a separate one, with what's really going on versus...
A:    No.

Q:    Your not doing one up to pull something over on the company?
A:    No, I don't do that.

Q:    Okay.  Have you ever been caught doing that?
A:    Unh-unh.

Q:    Okay.
A:    I don't know how.

Q:    Okay.  So you did your vehicle inspection this morning and you set
      around for three hours.  You got something to eat.  What did you eat?
A:    Wendy's.

Q:    Wendy's, okay.  What did you have?
A:    Two five piece nuggets and French fries.

Q:    Okay.  Have you bee suffering from any type of illness like a cold or
      flu, anything that would wear you out or make you fatigue within the
      last two or three days?
A:    Unh-unh.

Q:    Okay.  Do you have any type of medical history in your family or with
      you that'll cause you or give you a hinder in driving a vehicle such as

AC/C1350

_____          _____
Detective Signature               Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

low blood sugar, diabetes?
A:   Unh-unh.

Q:   Any type of physical ailment that would keep you from driving a
     commercial vehicle due to some type of medical?
A:   No.

Q:   Okay.  And you said you weren't drinking any alcohol today?
A:   Unh-unh.

Q:   When is the last time you drank any alcohol?
A:   Saturday.

Q:   Okay.  Saturday...
A:   Uh-huh.

Q:   When did you do it Saturday morning, Saturday afternoon, Saturday night?
A:   Saturday evening.

Q:   Saturday evening.  I mean what, what we were drinking?
A:   I had one Budweiser and a shot of a mixed drink, some, I don't know,
     some, it was a house party.

Q:   Okay.  So you had a mixed drink one
A:   Yeah.

Q:   You had a Budweiser.  Is that all you had?
A:   Uh-huh.

Q:   One and one?
A:   Uh-huh.

Q:   Okay.  Did you drive at all Sunday?
A:   Sunday, no.

Q:   Did you drive at all Monday, today?
A:   Yes.


Q:   Okay.
A:   Oh, yeah, I mean, yeah, I did drove, I drove Sunday, yeah, my fault.

AC/C1350

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

I'm tripping.

Q:  Okay.
A:  I did drive Sunday.

Q:  Okay.  We had this one and one, one beer, one mixed drink Saturday
    afternoon, Saturday evening.
A:  Uh-huh.

Q:  And did you drive the tractor-trailer Sunday?
A:  Sunday night.

Q:  What time?
A:  I left out about, it was about, I want to say...

Q:  Sunday evening, Sunday afternoon?
A:  I want, it was the evening time.

Q:  Later in the evening or early evening?
A:  Yeah, later in the evening, like almost 7.

Q:  Okay.
A:  7, 7, 8:00.

Q:  So you left out from where?
A:  From Newark, Delaware.

Q:  Newark, Delaware.  And you were heading to, you were headed, you drove
    to where?
A:  Haw River, North Carolina.

Q:  Okay.  Did you get any sleep from the time you were drinking till the
    time you drove?
A:  Yes.

Q:  How many hours of sleep did you get?
A:  About 11, 12.


Q:  Okay.  Now you had two drinks.  You had a mixed drink and you had a
    beer.

AC/C1350

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

A:    Uh-huh.

Q:    You had 12 hours of sleep prior to driving.  Did you have alcohol prior
      to that?
A:    No.

Q:    Did you do any drugs between now and then that Sunday or Saturday?
A:    Saturday, yeah.

Q:    Okay.  Saturday what did we do?
A:    I smoke marijuana .

Q:    How many joints?
A:    I had a half of joint.

Q:    You smoke half a joint?
A:    Yes.

Q:    What time?
A:    It was evening time the same time we was drinking.

Q:    Okay.  So we had half a joint...
A:    Uh-huh.

Q:    You had one mixed drink and one beer?
A:    Uh-huh.

Q:    Okay.  Mr. Johnson...
A:    Uh-huh.

Q:    Now I know, I'm 34 years old, and I consider myself a very professional
      type of guy.
A:    Uh-huh.

Q:    I do not drink and drive.
A:    Uh-huh.


Q:    Okay.  I do not do drugs, but I do know this.  I do drink on my off
      time.  I would not just have one beer and one mixed drink, okay.  So you

AC/C1350

_____                    _____
Detective Signature                          Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

are going to sit here and tell me you had one beer, one mixed drink, and a half of joint?

A:    I'm not a drinker.

Q:    Okay.  Fair enough, and I respect that, okay, but as you stated, you had one beer, one mixed drink and half a joint?

A:    Correct.

Q:    Is that all the drinks you did?

A:    Correct.

Q:    Is that the only drink you did?

A:    Correct.

Q:    Okay.   This  is  roughly  early  Saturday  evening  and  you  slept approximately 12 hours before driving the tractor-trailer?

A:    Correct.

Q:    Okay.  Now you're not a drinker.  How often do you do pot?  You might as well be honest with me because if this gets back to your company, they're going to be popping you with a piss test every other day, okay. Alright.  Now you need to tell me, when is the last time you did pot.

A:    Saturday.

Q:    How much did you do?

A:    A half of joint.

Q:    Do you do half of joint regularly?

A:    Unh-unh.

Q:    How often do you smoke pot?

A:    When I'm home on, in my hometown.

Q:    How often are you home?

A:    Every two weeks.

Q:    Every two weeks.  How long are you normally home?

A:    Two days.

Q:    Two days.  How much pot do you smoke in the two days?

A:    Like a, a, a joint, I don't buy, I don't buy...

AC/C1350

_____                    _____
Detective Signature                            Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:  I'm not saying you buy it.  I, we're talking about you driving.
A:  Right.

Q:  Okay.  We're talking about driving a commercial vehicle while under the
    influence.  I'm not, I'm not here to bust you on drugs.  I'm not here to
    bust you on buying or selling.
A:  Right.

Q:  That's not my job.
A:  Right.

Q:  If that was my job, I'll be over in the Narcotics Bureau right now.
A:  Okay.

Q:  Okay.  My job is Traffic Homicide.
A:  Right.

Q:  My job is to find out why people get behind wheels doing drugs and think
    they could drive.  I got to make sure that you were not under the
    influence when driving that tractor-trailer.
A:  Uh-huh.

Q:  Okay.  I want to know how often do you do drugs.
A:  Like when I'm home like if somebody has something, I mean like I don't
    go out and look for it, like you know what I mean, like, it's not a,
    it's not something that I plan on doing like, you know what I mean.

Q:  Okay.  So it's...
A:  It's sporadically.

Q:  It's just sporadic?
A:  Yeah, like that.

Q:  And it's a controlled thing?
A:  Yeah.

Q:  Okay.  Now did you have any marijuana Saturday?
A:  Yes.
Q:  Did you have any marijuana Sunday?
A:  No.

AC/C1350

_____              _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

Q:  Did you have any marijuana today?
A:  No.

Q:  Is there any in the truck?
A:  No.

Q:  Is there any in the trailer?
A:  No.

Q:  Okay, good.  And you had at least 12 hours of sleep after that half of
    joint and one beer and the one mixed drink?
A:  Correct.

Q:  Okay.  Have you ever been involved in an accident when you were stoned
    or on drugs?
A:  No.

Q:  Is marijuana the only drug that you do?
A:  Yes.  I wouldn't say, I wouldn't say I do it like...

Q:  Well, it's used as a recreation type...
A:  Yeah.

Q:  Okay.  Which is your personal business, as long as you're not out
    hurting anybody and as long as, you know, I don't care how you get it.
    You're in another state out of my jurisdiction.  You're not behind the
    wheel.  There's nothing I can do about it.
A:  Alright.

Q:  Okay.  I'm not here to bust you.  I'm not here to arrest you.  It's not
    my job.
A:  Okay.

Q:  Okay.  I'm not worried about that.  Okay.  I just want to make sure that
    you're not under the influence when, when driving this vehicle.  Now
    have you ever received any traffic citations in any type of vehicle?
A:  Yes.

Q:  What have they been?
A:  I just found out recently that I had a speeding, speeding and, and a

AC/C1350

_____          _____
Detective Signature                      Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts,
values and/or descriptions given by me in this statement are the whole
truth to the best of my knowledge and belief.

_____

driver on the, on the shoulder, Improper Passing on the Right, that's what they called it, but I was...

Q:  Okay.
A:  Passing driving on the shoulder.

Q:  Improper Passing.
A:  Yeah.

Q:  And a speeding ticket.  How, how long ago did you get those tickets?
A:  I, honestly, I honestly don't remember the speeding ticket.

Q:  Okay. That's fine.
A:  But the passing on the shoulder that was about, about, that should be almost getting ready to come off my driving so it should be about what, three, almost about three years.

Q:  What state were you in when you got that ticket?
A:  Delaware.

Q:  Delaware?
A:  Yeah.

Q:  Were you in your personal vehicle?  Were you in a commercial vehicle?
A:  Personal.

Q:  Personal vehicle?
A:  Uh-huh.

Q:  What kind of vehicle do you drive?
A:  A Chrysler Concorde.

Q:  A Chrysler Concorde.  What year is it?
A:  93.

Q:  93, okay.  Alright.  And you've told me you've never been arrested for DUI before?
A:  Unh-unh.

Q:  You never been stopped for DUI?
A:  Unh-unh.

AC/C1350

_____        _____
Detective Signature                    Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____

Q:  Okay.  And you have popped hot on one piss test back in 2002, 2003?
A:  Yeah, the job, my job found out about it and I had to...

Q:  Right.  Have you been doing besides Saturday have you been doing marijuana in the last six months with this job?
A:  Unh-unh, this, this Saturday...

Q:  This past saturday?
A:  No.

Q:  Okay.
A:  Saturday was the first time.

Q:  Okay.  Do you have any drugs on you?
A:  Unh-unh.

Q:  Okay.  You have anything else you wish to add to this statement?
A:  No, not off the top of my head I, I don't.

Q:  Okay.  I appreciate your time, Mr. Johnson.  You did a good job.

Ending time _____ Hours.

AC/C1350

_____

_____          _____
Detective Signature                  Witness Signature

Signature of Person Giving Statement:  I hereby affirm that the facts, values and/or descriptions given by me in this statement are the whole truth to the best of my knowledge and belief.

_____
                                              Page 63 of 63

WEST SOUTH BOULEVARD
BETWEEN
I-065 AND SASSAFRAS CIRCLE

TO I-065

UNIT #1

TIRE SCUFF MARKS

UNIT #2

EAST
PRIVATE ENTRANCE
& EXIT OF TA TRUCK STOP
LOCATED AT 980 WEST SOUT BOULEVARD

DEBRIS FIELD

SASSAFRAS CIRCLE

GRAPHIC SCALE

0    60    90    120    180

DRAWN BY : STEPHEN JONES
PLS# 24026/ CITY OF MONTGOMERY ENG DEPT
ASSISTED BY :CPL. S.R. GANN /#158 &
CPL T.A. BRADLEY / #138
EVENT # 2682/ 20 FEBRUARY 2006/ 2050 HOURS
CASE # 06-01730
SHEET 2 OF 3 SHEETS

NOTE:
This drawing for the sole use of the City of Montgomery Engineering Dept and /or
Montgomery Police Dept. Any other use or reproduction renders this document
null and void. Document must have either a red or raised seal to be valid.





**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)     WHITE - Safety     PINK - Driver

| 09 | 02 | 05 | 0 | 105.19 |
|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # |

DRIVER ID  221649506

(DRIVER'S SIGNATURE IN FULL)  _Theodore Johnson_

(PRINT DRIVER'S NAME)  Theodore Johnson

(NAME OF CO-DRIVER)  N/A

(TRAILER #1 - SHOW ALL UNITS)     (TRAILER #2)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

**Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days**

| | Total Hours |
|---|---|
| 1: OFF DUTY | 24 00 |
| 2: SLEEPER | 0 |
| 3: DRIVING | 0 |
| 4: ON DUTY (NOT DRIVING) | 0 |
| Total Hours | 24 00 |

1. 0
2. 0
3. 0
4. 0
5. 0
6. 0
7. 0

Today  0

Total Hours Last 7 Days  70

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

OFF DUTY

9/2/05 ———— 9/12/05

Newark, Delaware

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____  TIME: _____  TRACTOR/TRUCK NO.: _____  TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER. DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____     DRIVER'S SIGNATURE: _____     DATE: _____

© Copyright 2003 & Published by J. J. Keller & Associates, Inc., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0003

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)     WHITE - Safety     PINK - Driver

09 12 05 | 0 | 6519 | 22164950.6
MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID

*Theodore John*
(DRIVER'S SIGNATURE IN FULL)

*Theodore Johnson*
(PRINT DRIVER'S NAME)

(TRAILER #1 - SHOW ALL UNITS)     (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

*N/A*
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 24:00 |
| 2: SLEEPER | :00 |
| 3: DRIVING | :00 |
| 4: ON DUTY (NOT DRIVING) | :00 |
| | 24:00 Total Hours |

Use Local Time Standard at Home Terminal

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1. 0
2. 0
3. 0
4. 0
5. 0
6. 0
7. 0 Today

Total Hours Last 7 Days
(1) 70

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

*OFF - DUTY*
*Bethel, PA*

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER _____ ☐ LOADING ☐ CURRENT ☐ UNLOADED
PRO NUMBER _____ ☐ LOADING ☐ CURRENT ☐ UNLOADED
PRO NUMBER _____ ☐ LOADING ☐ CURRENT ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

*NO INSPECTION*

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

Britt/USA Truck
0004

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____     DRIVER'S SIGNATURE: _____     DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    ☐ Original ☐ Driver

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | 13 | 05 | 549 | 6519 | 221049506 | |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID | |

54485    52107    _Theodore Johnson_
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)    (DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**    _Theodore V Johnson_
3200 Industrial Park Rd. - Van Buren, AR 72956    (PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00:00 |
| 2: SLEEPER | 12:25 |
| 3: DRIVING | 11:00 |
| 4: ON DUTY (not driving) | 00:75 |
| Total Hours | 24:00 |

Today: 11.75

Total Hours Last 7 Days: 58.25

REMARKS

Total Hours Available Tomorrow (70 Hours Less) Total

Bethel, PA    Rt., Bethlehem    Rt, 78 the 22    Dr, H
Mantua, OH    Fuel, P.i,    Wenzon, OH    Rt.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 9005107.06    ☒ LOADING ☐ CURRENT ☐ UNLOADED

PRO NUMBER _____    ☐ LOADING ☐ CURRENT ☐ UNLOADED

PRO NUMBER _____    ☐ LOADING ☐ CURRENT ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE: 9/13/05    TIME: 1745    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 52107

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore J_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

© Copyright 2003 & Published by J. J. Keller & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0005

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

9 | 14 | 05    4.09    6.5.19    22.6.4.9.5.0.9
MONTH | DAY | YEAR    MILES TODAY    UNIT #    DRIVER ID

521.07
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

*Theodore Johnson*
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days |
|---|---|
| 1 | 0 |
| 2 | 0 |
| 3 | 0 |
| 4 | 0 |
| 5 | 0 |
| 6 | 11.75 |
| 7 | 9.25 |
| Today | 0 |
| Total Hours Last 7 Days | 21 |

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00.00 |
| 2: SLEEPER | 14.75 |
| 3: DRIVING | 08.75 |
| 4: ON DUTY (NOT DRIVING) | 00.50 |
| | 24.00 |
| | Total Hours |

Total Hours Available Tomorrow (70 Hours Minus Total)
49

**REMARKS**

Warren, OH PU

Oak Creek, WI Fuel PU

Rothschild WI

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

PRO NUMBER 9.0.05.1.0.7.96
☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER _____
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER _____
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

### DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/14/05    TIME: 1545    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 52107

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0007

**DRIVER'S DAILY LOG**   (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 09 | 15 | 05 | 437 | 6519 | 2211649506 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

52107
(TRAILER #1 - SHOW ALL UNITS)       (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: *Theodore Johnson*

PRINT DRIVER'S NAME: Theodore Johnson

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

NAME OF CO-DRIVER: N/A

**Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days**

| | Total Hours |
|---|---|
| 1 | 0 |
| 2 | 0 |
| 3 | 0 |
| 4 | 0 |

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00.75 |
| 2: SLEEPER | 09.75 |
| 3: DRIVING | 08.75 |  11.75 |
| 4: ON DUTY (NOT DRIVING) | 02.75 |  9.25 |
| | 24.00 |  11.50 |

Total Hours Today: 32.50

Total Hours Last 7 Days: 37.50

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Bellevue WI P.t.: Green B.+ WI UNLOAD
Kimberly WI LOADING
Kimberly WI P.t.:
Hebron IN Lunch Hebron IN Fuel P.t.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 9005107060 | PRO NUMBER | 905280686 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☒ UNLOADED | | ☒ LOADING  ☒ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/15/05   TIME: 2100   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52107

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0009

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 0 9 | 1 4 | 0 5 | 4 0 5 | 6 5 1 9 | 2 2 1 6 4 9 5 0 6 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

5 2 1 0 7

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

|  | Total Hours |
|---|---|
| 1: OFF DUTY | 0.00 |
| 2: SLEEPER | 11.75 |
| 3: DRIVING | 9.25 |
| 4: ON DUTY (NOT DRIVING) | 11.50 |
| | 7.25 |
| Total Hours | 24.00 |

REMARKS

Hebron IN

Britt/USA Truck
0010

Golden King

| Total Hours On Duty | |
|---|---|
| Total Lines 3 + 4 On Daily Log Last 7 Days | |
| 1 | 0 |
| 2 | 0 |
| 3 | 0 |
| Today | 39.75 |
| Total Hours Last 7 Days | 30.25 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | |

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9 0 5 2 8 0 6 8 6 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/16/05    TIME: 1430    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 52107

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 09 | 17 | 05 | 549 | 6519 | 221649506 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

52875    528.75
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

*Theodore Johnson*
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 11.75 |
| 2: SLEEPER | 9.25 |
| 3: DRIVING | 11.50 |
| 4: ON DUTY (NOT DRIVING) | 7.25 |
| | 12.25 |

24.00
Total Hours

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1. 0
2. 0

52
Today
Total Hours Last 7 Days

18
Total Hours Available Tomorrow (70 Hrs Minus Total)

REMARKS

Corbin KY Pt.
Kingsport TN Unload
Greenville TN Pt.: Fuel BFAF. Pt.
BFH. Pt.
Sutton, WV Pt.

Britt/USA Truck
0011

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 905280606 | PRO NUMBER | 903348544 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☒ UNLOADED | | ☒ LOADING  ☑ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE: 9/17/05    TIME: 1730    AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 52875

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

# DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS) White - Safety  PINK - Driver

| | | | | | Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days |
|---|---|---|---|---|---|

**09** **17** **05** **549** **6519** **221.64950**
MONTH   DAY   YEAR   MILES TODAY   UNIT #   DRIVER ID

**52107** **52875**
(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: _Theodore Johnson_

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

PRINT DRIVER'S NAME: _Theodore Johnson_

NAME OF CO-DRIVER: N/A

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 1.00 |
| 2: SLEEPER | 11.75 |
| 3: DRIVING | 1.025 |
| 4: ON DUTY (NOT DRIVING) | 0.150 |
| Total Hours | 24.00 |

Total Hours Last 7 Days: **52**

Total Hours Available Tomorrow (70 Hours Minus Total): **18**

## REMARKS

Corbin KY

Kingsport TN Unload

Crossville TN

Pt. Fuel Athen TN 10H P.I.

Sutton WV

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER **905290606** | PRO NUMBER **903348544** | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☒ UNLOADED | ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE: **9/17/05**   TIME: **1730**   TRACTOR/TRUCK NO.: **6517**   TRAILER(S) NO.(S): **52875**

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Johnson_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0012

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 09 | 18 | 05 | 420 | 6519 | 22169506 |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

52825
(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: *Theodore Joh*

PRINT DRIVER'S NAME: Theodore Johnson

NAME OF CO-DRIVER: N/A

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00:00 |
| 2: SLEEPER | 16:50 |
| 3: DRIVING | 07:00 |
| 4: ON DUTY (NOT DRIVING) | 00:50 |
| | 24:00 Total Hours |

Today 7.50
Total Hours Last 7 Days 59.5

**REMARKS**

903348544

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE: 91805    TIME: 1430    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 52875

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Joh*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                 DRIVER'S SIGNATURE:                 DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0014

# DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

09 | 19 | 05      302      6519      22164950

MONTH | DAY | YEAR      MILES TODAY      UNIT #      DRIVER ID

DRIVER'S SIGNATURE IN FULL: *Theodore Johnson*

52875

(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

(PRINT DRIVER'S NAME) Theodore Johnson

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

(NAME OF CO-DRIVER) N/A

| | Total Hours |
|---|---|
| Total Hours On Duty (Total lines 3 + 4) On Daily Log Last 7 Days | |
| | 11.75 |
| | 9.25 |
| | 11.50 |
| 1: OFF DUTY | 7.25 |
| 2: SLEEPER | 17.75 |
| 3: DRIVING | 05.50 — 13.25 |
| 4: ON DUTY (NOT DRIVING) | 00.75 — 7.50 |
| Total Hours | 24.00 — 6.25 |
| Today | 65.75 |

Total Hours Last 7 Days

Total Hours Available Tomorrow (70 Hours Minus Total)

4.25

REMARKS

Pendleton NY
St. Collinsville
Unload

Rochester NY
LOAD

Erie PA
pt.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 90508068.0   ☐ LOADING  ☒ CURRENT  ☒ UNLOADED

PRO NUMBER 90131.0242   ☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER   ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

# DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING: 52875

DATE: 9/19/05   TIME: 845   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52875

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:      DRIVER'S SIGNATURE:      DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0016

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | | DRIVER ID |
|-------|-----|------|-------------|--------|--|-----------|
| 09 | 20 | 05 | 460 | 6519 | 22.61.9506 | |

52875
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL) _Theodore John_

(PRINT DRIVER'S NAME) Theodore Johnson

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days



| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|--|-----------|------------------------------------------|------|--|-----------|-------------|
| 1: OFF DUTY | | | | | | 10.30 |
| 2: SLEEPER | | | | | | 8.50 |
| 3: DRIVING | | | | | | 11.00 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 00.50 |
| | | | | | Total Hours | 24.00 |

REMARKS

Erie PA
Fl & Fuel

E. Saint Louis IL

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 901 31 2042 | PRO NUMBER | | PRO NUMBER | |
|------------|-------------|------------|--|------------|--|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

9.75
1.50
7.75
2.75
7.50
8.25
11.50

Today 65.50

Total Hours Last 7 Days

Total Hours Available Tomorrow (70 Hours Minus Total)

74.50

### DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9.20.05   TIME: 1300   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52875

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _Theodore John_

COMPLETE-THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0017

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 09 | 21 | 05 | 39.7 | 65.19 | 22164950 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | | DRIVER ID |

| 52875 | 53457 |
|---|---|
| (TRAILER #1 - SHOW ALL UNITS) | (TRAILER #2) |

**(DRIVER'S SIGNATURE IN FULL)**

Theodore Johnson
**(PRINT DRIVER'S NAME)**

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
**(NAME OF CO-DRIVER)**

| | Total Hours |
|---|---|
| 1: OFF DUTY | 01:00 |
| 2: SLEEPER | 14:00 |
| 3: DRIVING | 08:25 |
| 4: ON DUTY (NOT DRIVING) | 05:75 |
| | 24:00 Total Hours |

**REMARKS**

E. Saint Louis, IL
Pre inspection MD
Fuel

FS
Cargo 000050207
5.000 OF 11
Lunch
Kansas City MO
I.F.

**Total Hours On Duty**
(Total Lines 3 + 4)
On Daily Log
Last 7 Days

| 1 | 16.50 |
| 2 | 7.25 |
| 3 | 12.25 |
| 4 | 7.50 |
| 5 | 6.25 |
| 6 | 11.50 |
| 7 | 9 |

Today
65.25
Total Hours
Last 7 Days

4.75
Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 90131224 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING | ☑ CURRENT ☐ UNLOADED | ☐ LOADING | ☐ CURRENT ☐ UNLOADED | ☐ LOADING | ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/21/05   TIME: 1630   TRACTOR/TRUCK NO.: 4519   TRAILER(S) NO.(S): 53457

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE:**

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0019

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety   PINK - Driver

09 | 22 | 05
MONTH | DAY | YEAR

55.0
MILES TODAY

65.19
UNIT #

221 1049.5.06
DRIVER ID

53457
(TRAILER #1 - SHOW ALL UNITS)

533.18
(TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 10.11.00 |
| 2: SLEEPER | | | | | | 1.0.25 |
| 3: DRIVING | | | | | | 11.0.00 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 10.0.75 |
| | | | | | | 24.00 Total Hours |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days
1. 7.25
2. 12.25
3. 7.50
4. 6.25
5. 11.30
6. 9
7. 10.75

Today 9.50

Total Hours Last 7 Days 64.50

Total Hours Available Tomorrow (70 Hours Minus Total) 5.50

REMARKS

Kansas City, MO
P.t.;

Jefferson City, MO
Drop tr. #53457
#53318
Fuel, P.t.;

Fayetville, TN
P.t.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER  9.95.28.1.69.H
☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/22/05   TIME: 1645   TRACTOR/TRUCK NO.: 0519   TRAILER(S) NO.(S): 53318

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore Johnson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0021

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 09 | 23 | 05 | 577 | 0519 | 221049506 |
|----|----|----|-----|------|-----------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

53318 (TRAILER #1 - SHOW ALL UNITS)    53081 (TRAILER #2)

_Theodore Johnson_ (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A (NAME OF CO-DRIVER)

| | Total Hours | |
|---|---|---|
| On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | | |
| 1 | 12.25 |
| 2 | 7.50 |
| 3 | 6.25 |
| 4 | 11.50 |
| 5 | 9 |
| 6 | 10.75 |
| 7 | 11.50 |

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0.10.00 |
| 2: SLEEPER | 11.15.00 |
| 3: DRIVING | 10.15.00 |
| 4: ON DUTY (NOT DRIVING) | 0.10.00 |
| Total Hours | 24.00 |

Today **68.75**
Total Hours Last 7 Days

**7.25** Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Fayetteville, TN PU, Ossian, IN Drop 53318 Unit, Hook 53081, Milton, IN, Loring, IN, Fuel I & U, Davenport, IA PU

Britt/USA Truck
0022

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 905281691 | PRO NUMBER | 903349342 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/23/05   TIME: 1045   TRACTOR/TRUCK NO.: 0519   TRAILER(S) NO.(S): 53081

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Johnson_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 09 | 24 | 05 | 453 | 6519 | 0216495006 |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

53081 (TRAILER #1 - SHOW ALL UNITS)     53376 (TRAILER #2)

*Theodore Johnson* (DRIVER'S SIGNATURE IN FULL)

**Theodore Johnson** (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

1: OFF DUTY
2: SLEEPER
3: DRIVING
4: ON DUTY (NOT DRIVING)

**Total Hours**
01.00
13.50
08.25
01.25
24.00

**REMARKS**

Davenport IA P.T.

Webster City IA DOT Webster City Lunch

Davenport IA Fuel / P.T.

Britt/USA Truck
0023

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |
| --- | --- |
| 1. | 7.50 |
| 2. | 6.25 |
| 3. | 11.50 |
| 4. | 9 |
| 5. | 10.75 |
| 6. | 11.50 |
| 7. | 9.50 |

Today 66

Total Hours Last 7 Days (1) 4

Total Hours Available Tomorrow (70 Hours Minus Total)

*CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER*

PRO NUMBER 903349342    □ LOADING  ☒ CURRENT  ☒ UNLOADED

PRO NUMBER 905281366    ☒ LOADING  ☒ CURRENT  □ UNLOADED

PRO NUMBER ___    □ LOADING  □ CURRENT  □ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/21/05   TIME: 1615   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 53876

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN. INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE *Theodore Jph*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. Keller & Associates, Inc., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**   (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 09 | 25 05 | 429 | 6519 | 021649520 |
|MONTH|DAY YEAR|MILES TODAY|UNIT #|DRIVER ID|

53876
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

**Total Hours**
On Duty
(Total Lines
3 + 4
On
Daily Log)
Last 7 Days

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
|1: OFF DUTY| 09.00 |
|2: SLEEPER| 15.00 |
|3: DRIVING| 08.50 |
|4: ON DUTY (NOT DRIVING)| 06.50 |
| | 24.0 |

Total Hours

6.25
11.50
9
10.75
11.50
9.50
9.

Today
67.50
Total Hours
Last 7 Days

9.5
Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

REMARKS

Davenport IA
Rt.

Dexter MI
Fuel, Rt.

Britt/USA Truck
0024

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9052818 | | PRO NUMBER | | | PRO NUMBER | | |
|---|---|---|---|---|---|---|---|---|
| ☐ LOADING | ☒ CURRENT | ☐ UNLOADED | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9 25 05   TIME: 1600   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 53876

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
      INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore Johnson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**   (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 09 | 26 | 05 | 450 | 6519 | 221,649,506 |
|----|----|----|-----|------|-------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

538716
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

_Theodore Johnson_ (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

|  | Total Hours |
|--|-------------|
| 1: OFF DUTY | 10 / 10.0 |
| 2: SLEEPER | 14 / 7.5 |
| 3: DRIVING | 07 / 5.0 |
| 4: ON DUTY (NOT DRIVING) | 00 / 7.5 |
|  | 24 / 00 |
|  | Total Hours |

REMARKS

Dexter MI
21, Parkway MI UNION
Bmflm(?) MI
Allegheny PA Pt.

Britt/USA Truck
0025

| Total Hours On Duty 3+4 On Daily Log Last 7 Days |
|---|
| 11.50 |
| 9 |
| 75 |
| 11.50 |
| 9.50 |
| 9 |
| 8.25 |
| Today 69.5 |
| Total Hours Last 7 Days (1) .50 |
| Total Hours Available Tomorrow (70 Hours Minus Total) |

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 905031,606 | PRO NUMBER 9,033,498,99 | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 9/26/05   TIME: 1630   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 53876

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _Theodore Jo_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**    (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

09 27 05
MONTH  DAY  YEAR

49.1
MILES TODAY

6519
UNIT #

2210 49506
DRIVER ID

53876
(TRAILER #1 - SHOW ALL UNITS)

(TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
|---|
| 1. 9 |
| 2. 10.75 |
| 3. 11.50 |
| 4. 9.50 |
| 5. 9 |
| 6. 9.25 |
| 7. 12 |

Today **10**

Total Hours Last 7 Days **70**

(1) **0**

Total Hours Available Tomorrow (70 Hours Minus Total)

| | Use Local Time Standard at Home Terminal | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 04.00 |
| 2: SLEEPER | | 09.00 |
| 3: DRIVING | | 08.75 |
| 4: ON DUTY (NOT DRIVING) | | 03.25 |
| | | 24.00 Total Hours |

REMARKS:
Allegheny, PA
P.U. Bizzurell Ford PA
Moorestown NJ unload
Mt. Laurel NJ @ load
Bethel PA unload PA
Home time Newark NJ

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 903349899
☐ LOADING  ☑ CURRENT  ☑ UNLOADED

PRO NUMBER 901313199
☐ LOADING  ☑ CURRENT  ☑ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:    53876

DATE: 9/27/05    TIME: 1945    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 53876

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

Britt/USA Truck
0026

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

MONTH 09  DAY 28  YEAR 05   MILES TODAY 0   UNIT # 65,19   DRIVER ID 221.64.9596

(DRIVER'S SIGNATURE IN FULL) Theodore Johnson

(PRINT DRIVER'S NAME) Theodore Johnson

N/A (NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1: OFF DUTY — 24:00
2: SLEEPER
3: DRIVING
4: ON DUTY (NOT DRIVING)

Total Hours 24:00

Today

Total Hours Last 7 Days

**REMARKS**  Hometime Off - Duty Newark, DE   9/27 — 9/30

Total Hours Available Tomorrow (70 Hours Minus Total) 70

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER □ LOADING □ CURRENT □ UNLOADED
PRO NUMBER □ LOADING □ CURRENT □ UNLOADED
PRO NUMBER □ LOADING □ CURRENT □ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

□ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
  INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE: _____   Britt/USA Truck 0027

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

# DRIVER'S DAILY LOG BOOK

### FORM PRESCRIBED BY THE
### DEPARTMENT OF TRANSPORTATION

FOR MONTH OF _October_                    YEAR _2005_

**CARRIER**  **USA TRUCK, INC.**          **DRIVER** _Theodore Johnson_

**ADDRESS**  **P.O. BOX 449**             **ADDRESS** _2 Canoe Court_

**CITY**  **VAN BUREN**  **STATE** **AR 72956**   **CITY** _Newark_  **STATE** _DE_

## FINDER – RETURN THIS BOOK TO DRIVER OR CARRIER
### DRIVER'S DAILY LOG
PRESCRIBED BY DEPT. OF TRANSPORTATION
INSTRUCTIONS FOR THE USE OF DRIVER'S DAILY LOG

1. Drivers and motor carriers will be held responsible for the proper maintenance of the daily logs. Drivers shall keep the log current to the time of the last change of duty status. Failure to make logs, failure to make required entries therein, falsification of entries, or failures to file logs with the motor carrier will make both the driver and the carrier liable to prosecution.
2. The driver shall forward the original log to his home terminal. If the services of a driver are used by more than one carrier during a calendar day, the driver shall furnish each motor carrier a copy of his log for the entire day. In such case the log shall indicate the name of each carrier served by the driver during that day.
3. The original logs shall be retained by the motor carrier for a period of six months. Duplicate copies of the logs are the driver's personal records and are to be kept for a period of one month in the possession of the driver while he is on duty.
4. The time standard in effect at the driver's home terminal shall be used. The log shall be prepared, maintained, and submitted, for a 24-hour calendar day beginning at midnight.
5. All entries shall be made by the driver except that the name and main office address of the motor carrier may be printed or otherwise entered by an authorized representative of the carrier. The name of the motor carrier shall be that for which the driving is performed. In case of the driver of a leased vehicle, the name shown shall be that of the motor carrier performing the transportation.
6. (a) The driver shall certify to the correctness of log by signing his name in full.
   (b) Below driver's signature he shall list initials and last name of each co-driver.
7. In addition to the identification of the carrier and the driver's signature, the entries shall indicate:
   (a) The month, day, and year for which the log is prepared.
   (b) The total mileage while driving.
   (c) (1) The carrier's vehicle number or, if no such number is provided the state license number of each power unit.
       (2) The carrier's trailer or trailers' number or numbers or if no such numbers are provided, the state license number of each trailer unit.
   (d) Driver's home terminal address.
   (e) The actual period or periods during the calendar day spent in the activities specified on Lines 1, 2, 3, and 4 by drawing a continuous line between the appropriate time markers. The following directions are illustrative only and are not to be construed as modifying the definitions or regulations in Sections 395.1 to 395.12, inclusive:

LINE 1, OFF DUTY – All time, except that spent in a sleeper berth, when the driver is not working, is not required to be in readiness to work, or is not under any responsibility for performing work.
LINE 2, SLEEPER BERTH – All time resting in a sleeper berth.
LINE 3, DRIVING – All time spent at the controls of a motor vehicle in operation.
LINE 4, ON DUTY (Not Driving) – All time spent by a driver in performing work other than driving. This includes loading or unloading, preparing reports, remaining in readiness to perform work, remaining in charge of disabled vehicles, stops for meals, etc.
   (f) Under "Remarks" the time and the name of the place where each change of duty occurred, such as the place of reporting for work, starting to drive and where released from work. Explain reason for emergency resulting in hours exceeding those permitted by the regulations.
   (g) Under "Remarks" show the transportation performed each day by entering a shipping document number or numbers, or name of a shipper and commodity.
   (h) In the column "Total Hours," the hours and fractions thereof shown in each of Lines 1, 2, 3, and 4. The sum of the entries in this column must total 24 hours.
   (i) DAILY RECAP: Column "A" Total Hours On-Duty (total Lines 3 & 4 on Daily Log) for Last 7 Days, including today. Total Hours Available Tomorrow; take 70 hours minus total in Column "A".

USA-064



Britt/USA Truck
0028

# DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

| 4 | 4 | 03 | 5 8 6 | 2 8 0 2 3 | 5 5 5 9 9 7 7 7 7 |
|---|---|----|-------|-----------|-------------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

| 2 2 4 8 5 | 2 2 4 8 6 | *John Doe* |
|-----------|-----------|-----------|
| (TRAILER #1 - SHOW ALL UNITS) | (TRAILER #2) | (DRIVER'S SIGNATURE IN FULL) |

| (TRAILER #3) | (TRAILER #4) | John Doe |
|--------------|--------------|----------|
| | | (PRINT DRIVER'S NAME) |

Jane Doe
(NAME OF CO-DRIVER)

**Total Hours On Duty** (Total Lines 3 + 4) On Daily Log) Last 7 Days

1. 10.00
2. 6.25
3. 13.75
4. 7.25
5. 2.0
6. 8.5
7. 12.75 Today

60.50
Total Hours Last 7 Days

(1) 9.50
Total Hours Available Tomorrow (70 Hours Minus Col. A)

|  | Total Hours |
|--|-------------|
| 1: OFF DUTY | 2,0,0 |
| 2: SLEEPER | 9,2,5 |
| 3: DRIVING | 1,1,0,0 |
| 4: ON DUTY (NOT DRIVING) | 1,7,5 |
| | 2,4,0,0 Total Hours |

REMARKS

SAN JON, NM P.T.I.

ALBUQUERQUE, NM D & H P.T.I.

LUPTON, AZ DOT INSPECTION

WILLIAMS, AZ

Britt/USA Truck
0029

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 7 8 6 1 3 0 9 4 2 | PRO NUMBER | 7 2 7 1 4 1 8 3 4 | PRO NUMBER | | | | | |
|------------|-------------------|------------|-------------------|------------|--|--|--|--|--|
| ☐ LOADING ☐ CURRENT ☒ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | | | | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: **4/4/03**    TIME: **15:45**    TRACTOR/TRUCK NO.: **28023**    TRAILER(S) NO.(S): **22486**

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *John Doe*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 1 0 | 0 1 | 0 5 | | 1 0 | | 0 5 1 9 | | 2 2 1 6 9 5 0 6 |
|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | | MILES TODAY | | UNIT # | | DRIVER ID |

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Jol
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | |
| 2: SLEEPER | |
| 3: DRIVING | |
| 4: ON DUTY (NOT DRIVING) | |

Total Hours

**REMARKS**

Humphries
Newark, DE
10/1/05 - 10/2/05

Total Hours
On Duty
(Total Lines
3 + 4)
On
Daily Log)
Last 7 Days

Total Hours
Last 7 Days
(1)

Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____   TIME: _____   TRACTOR/TRUCK NO.: _____   TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0030

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| | | | | | Total Hours On Duty |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY 475 | UNIT # | DRIVER ID |

6 33 08    55502
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

_Theodore Johnson_ (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A (NAME OF CO-DRIVER)

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

| | Total Hours |
|---|---|
| 1: OFF DUTY | 11.00 |
| 2: SLEEPER | 10.25 |
| 3: DRIVING | 11.05 |
| 4: ON DUTY (NOT DRIVING) | 10.10 |
| | 12.40 Total Hours |

Today 11.50
Total Hours Last 7 Days 11.50

REMARKS

Newark DE    Bethel PA    Hazlet Hauler 53308    Lancaster PA 53308    Bensalie VA P.t.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 90131807 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☑ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____    TIME: 0150    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 55502

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

Britt/USA Truck
0031

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE    DRIVER'S SIGNATURE:    DATE

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 10 | 04 | 05 | 525 | 6519 | 021 64 9506 |

55502 (TRAILER #1 - SHOW ALL UNITS)    54787 (TRAILER #2)

_Theodore Jh_ (DRIVER'S SIGNATURE IN FULL)

_Theodore Johnson_ (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.0 | 0.0 |
| 2: SLEEPER | 1.4 | 8.25 |
| 3: DRIVING | 10.8 | 7.5 |
| 4: ON DUTY (NOT DRIVING) | 10.1 | 0.0 |
| | 24.1 | 0.0 |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1. 0
2. 0
3. 0
4. 0
5. 0
6. 11.50
7. 9.75 Today

21.25 Total Hours Last 7 Days

48.75 Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Anderson SC
Fuel / SC
Greenville SC unloaded
Anderson SC Drop & Hook 54787
Charlotte NC PU

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 40131396 7 | PRO NUMBER | 40240435 2 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☑ CURRENT ☑ UNLOADED | | ☑ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/4/05    TIME: 1115    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 54787

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Johnson_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0033



**DRIVER'S DAILY LOG** (ONE CALENDAR DAY · 24 HOURS)   WHITE · Safety   PINK · Driver

| 12 | 05 | 05 | 476 | 0519 | 02164950.06 |
|----|----|----|-----|------|-------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

54737
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)          Shadow Johnson (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

|  | MID-NIGHT | | | | | | | NOON | | | | | | | MID-NIGHT | Total Hours |
|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|--|
| 1: OFF DUTY | | | | | | | | | | | | | | | 0.00 |
| 2: SLEEPER | | | | | | | | | | | | | | | 15.25 |
| 3: DRIVING | | | | | | | | | | | | | | | 0.90 |
| 4: ON DUTY (NOT DRIVING) | | | | | | | | | | | | | | | 3.35 |
|  | | | | | | | | | | | | | | Total Hours | 0.00 |

**REMARKS**

Britt/USA Truck
0034

Total Hours On Duty
(Total Lines 3 + 4
On Daily Log)
Last 7 Days

1. 0
2. 0
3. 0
4. 0
5. 11.50
6. 9.75
7. 8.25

Today
29.50
Total Hours Last 7 Days

40.50
Total Hours Available Tomorrow
(70 Hours Minus Total)

*CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER*

| PRO NUMBER | 10-34-34-350 | PRO NUMBER | | PRO NUMBER | |
|--|--|--|--|--|--|
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1-5-05   TIME: 1530   TRACTOR/TRUCK NO.: 0519   TRAILER(S) NO.(S): 54747

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | |
|---|---|
| 10 DAY 05 | 550 | 65/9 | Ban UHG 910 |
| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID |

54787
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

_Theodore Jot_
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**

3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Total Hours
On Duty
(Total Lines)
3 + 4
On
Daily Log)
Last 7 Days

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00.00 |
| 2: SLEEPER | 03.25 | 11.5 |
| 3: DRIVING | 04.00 | 9.75 |
| 4: ON DUTY (NOT DRIVING) | 00.75 | 8.25 |
| | 24.00 | 10.75 |

Total Hours
Today

**REMARKS**

Britt/USA Truck
0035

40.25
Total Hours
Last 7 Days

67.75
Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☐ CURRENT ☒ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/6/05    TIME: 1800    TRACTOR/TRUCK NO.: 65/9    TRAILER(S) NO.(S) 54787

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Jt_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE · Safety   PINK · Driver

| 1|0| |0|7| |0|5| | |4|1|2| | |6|5|9| |2|2|1|6|4|9|5|0|6| |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

|5|4|7|8|7|
(TRAILER #1 - SHOW ALL UNITS)                    (TRAILER #2)

*Theodore Johnson*
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 10:00 / 11.50 |
| 2: SLEEPER | | | | | | 14.50 / 9.75 |
| 3: DRIVING | | | | | | 10:15:0 / 8.25 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 10:00 / 10.75 |
| | | | | | | 24:00 / 8.50 |

Total Hours

**REMARKS**

Old (crierim)
Albany NY
fuel ng

Britt/USA Truck
0036

Elkton MD
P.t.

Today **48.75**
Total Hours
Last 7 Days

**21.29**
Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

Total Hours
On Duty
(Total Lines
3 + 4)
On
Daily Log)
Last 7 Days

1. **0**
2. **0**

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER |9|0|1|3|1|4|3|6|7| | PRO NUMBER | | PRO NUMBER |
|☒ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/07/05   TIME: 1475   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 54787

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 10 | 08 | 05 | 330 | 6519 | 221649506 |

54787
(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

| | Total Hours |
|---|---|
| 1. | 0 |
| 2. | 11.50 |
| 3. | 9.75 |
| | 12.00 |
| 3. | 8.25 |
| | 18.05 |
| 4. | 10.75 |
| | 05.00 |
| 6. | 8.50 |
| | 10.00 |
| 7. | 5.75 |
| | 04.00 |

Total Hours
Today
54.50

Total Hours Last 7 Days
75.50

Total Hours Available Tomorrow (70 Hours Minus Total)

Use Local Time Standard at Home Terminal

| | MID-NIGHT | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | NOON | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 2: SLEEPER | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 3: DRIVING | | | | | | | | | | | | | | | | | | | | | | | | | | |
| 4: ON DUTY (NOT DRIVING) | | | | | | | | | | | | | | | | | | | | | | | | | | |

Total Hours

**REMARKS**

Elkton, MD
Ft.

Blanche, VA
Ft.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 901314367 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| □ LOADING ☑ CURRENT □ UNLOADED | | □ LOADING □ CURRENT □ UNLOADED | | □ LOADING □ CURRENT □ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/8/05    TIME: 2230    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 54787

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore Johnson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

Britt/USA Truck
0037

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:        DRIVER'S SIGNATURE:        DATE:

© Copyright 2003 • Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 10 | 09 | 05 | 322 | 6519 | 021 L4950 |

54737
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

NA
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0.10 |
| 2: SLEEPER | 13.25 |
| 3: DRIVING | 05.50 |
| 4: ON DUTY (NOT DRIVING) | 10.25 |
| | 24.00 Total Hours |

**REMARKS**

Birmingham, AL
E.T.

Crossville, TN
P.T.

Britt/USA Truck
0038

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days

11.50
9.75
9.25
10.75
8.50
5.75
5.75

Today
60.35

Total Hours Last 7 Days

9.75

Total Hours Available Tomorrow (70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 40151436 7 | PRO NUMBER | PRO NUMBER |
|---|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/05   TIME: 1445   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 54737

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore J.

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

| | | |
|---|---|---|
| 1 2 1 0 05 | 525 | 6519 |
| MONTH DAY YEAR | MILES TODAY | UNIT # |

DRIVER ID   23104PSON

54787   52386
(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

DRIVER'S SIGNATURE IN FULL   Theodore Jonson

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

PRINT DRIVER'S NAME   Theodore Jonson

NAME OF CO-DRIVER   N/A

| Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days | |
|---|---|
| | 9.75 |
| | 8.25 |

Use Local Time Standard at Home Terminal

| | Total Hours | |
|---|---|---|
| 1: OFF DUTY | 01:00 | 10.75 |
| 2: SLEEPER | 13.25 | 8.50 |
| 3: DRIVING | 09.75 | 5.75 |
| 4: ON DUTY (NOT DRIVING) | 01:00 | 5.75 |
| | 24:00 | 9.75 |
| | Total Hours | Today 58.50 |

**REMARKS**   Crossville, TN   Nashville, TN   Dandridge, TN
PL Sauther   Fuel PU Petton   Drop Hook   PL

Britt/USA Truck
0039

Total Hours Last 7 Days   97.50

Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 101314367 | PRO NUMBER 403352171 | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | ☑ LOADING  ☐ CURRENT  ☑ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12 10 05   TIME: 1850   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52386

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE   Theodore Jonson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:   DRIVER'S SIGNATURE:   DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

10 | 11 | 05      551      6519      021649506

MONTH | DAY | YEAR      MILES TODAY      UNIT #      DRIVER ID

52386

(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

*Theodore Johnson*
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days |
|---|---|
| | 8.25 |
| | 10.75 |

Use Local Time Standard at Home Terminal

| | MID-NIGHT | NOON | MID-NIGHT | Total Hours |
|---|---|---|---|---|
| 1: OFF DUTY | | | | 0.00 |
| 2: SLEEPER | | | | 14.00 |
| 3: DRIVING | | | | 0.9.50 |
| 4: ON DUTY (NOT DRIVING) | | | | 0.0.5.0 |
| | | | | 24.00 Total Hours |

| | |
|---|---|
| | 8.50 |
| | 5.75 |
| | 5.75 |
| | 9.75 |
| | 10 Today |
| | 58.75 Total Hours Last 7 Days |
| | 11.25 Total Hours Available Tomorrow (70 Hours Minus Total) |

**REMARKS**

*Dandridge TN P.T.*   *Tons Brooke, VA Fuel P.T.*   *Elkton MD P.T.*

Britt/USA Truck
0040

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 903352171      PRO NUMBER ____      PRO NUMBER ____
☐ LOADING ☑ CURRENT ☐ UNLOADED    ☐ LOADING ☐ CURRENT ☐ UNLOADED    ☐ LOADING ☐ CURRENT ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE 10/11/05    TIME 1800    TRACTOR/TRUCK NO. 6519    TRAILER(S) NO.(S): 52386

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore J.*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:      DRIVER'S SIGNATURE:      DATE:

© Copyright 2003 & Published by J.J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**   (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 1 | 0 | 1 | 2 | 0 5 | | 4 4 0 | | 6 5 1 9 1 | | | D 2 1 6 4 9 5 6 6 |
| MONTH | | DAY | | YEAR | | MILES TODAY | | UNIT # | | | DRIVER ID |

52386   51571
(TRAILER #1 - SHOW ALL UNITS)   54785   (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore John
(DRIVER'S SIGNATURE IN FULL)
Theodore Johnson
(PRINT DRIVER'S NAME)
N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 09.0 |
| 2: SLEEPER | 15.0 |
| 3: DRIVING | 09.0 |
| 4: ON DUTY (NOT DRIVING) | 01.0 |
| | 24.0 Total Hours |

**Total Hours**
On Duty
(Total Lines
3 + 4
On
Daily Log)
Last 7 Days

10.75
8.50
5.75
5.75
9.75
10
9

Today
59.50
Total Hours
Last 7 Days
70.50

Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

**REMARKS**

Eufaula MO
Al Reagan NI 52386
Drop trailer 51571
Hook trailer 54785
Hook
DP 51071 54785
Breezewood PA
Fuel Pt.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 1033527171   ☐ LOADING   ☑ CURRENT   ☑ UNLOADED
PRO NUMBER 9013144435   ☐ LOADING   ☐ CURRENT   ☐ UNLOADED
PRO NUMBER _____   ☐ LOADING   ☐ CURRENT   ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/12/05   TIME: 2215   TRACTOR/TRUCK NO.: 0519   TRAILER(S) NO.(S): 54785

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

Britt/USA Truck
0041

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

© Copyright 2003 & Published by J.J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 10 | 13 | 25 | 5.25 | 65.19 | 021649506 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

54785
(TRAILER #1 - SHOW ALL UNITS)         (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: *Theodore Johnson*

PRINT DRIVER'S NAME: Theodore Johnson

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

|  | Total Hours |
|---|---|
| 1: OFF DUTY | 10.00 |
| 2: SLEEPER | 14.00 |
| 3: DRIVING | 08.25 |
| 4: ON DUTY (NOT DRIVING) | 00.25 |
| | 24.00 |

8.50
5.75
5.75
.75
.10
9
9

Total Hours

**REMARKS**

Brownsville PA
17, Sidney PA
Lunch

Pt. NJ
11/2013

Today: 57.75
Total Hours Last 7 Days

12.25
Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 901314435 |
| □ LOADING  ☑ CURRENT  □ UNLOADED |

| PRO NUMBER | |
| □ LOADING  □ CURRENT  □ UNLOADED |

| PRO NUMBER | |
| □ LOADING  □ CURRENT  □ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/13/5   TIME: 1315   TRACTOR/TRUCK NO.: 1519   TRAILER(S) NO.(S): 54735

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

Britt/USA Truck
0042

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

Copyright 1992 • Published by J.J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 1 0 | 1 4 | 0 5 | | 6 0 0 | | 6 5 1 9 | | 2 2 1 6 4 9 5 0 6 |
|---|---|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | | MILES TODAY | | UNIT # | | |

5 4 7 8 5
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

DRIVER

_Theodore Johnson_ (DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| Total Hours On Duty Total Lines 3 + 4 On Daily Log Last 7 Days | |
|---|---|
| 5.75 | |
| 5.75 | |
| 9.75 | |

Use Local Time Standard at Home Terminal

| | Total Hours | |
|---|---|---|
| 1: OFF DUTY | 03 00 | 03.00 |
| 2: SLEEPER | 10 00 | 10 |
| 3: DRIVING | 10 00 | 9 |
| 4: ON DUTY (NOT DRIVING) | 01 00 | 9 |
| | 24 00 | 11 |
| | Total Hours | Today |

**REMARKS**

Brazil, IN
Indiana City Shed Loading
Whiteland, IN Fuel Pit
Wheeling Park

| 60.25 |
|---|
| Total Hours Last 7 Days |
| 9.75 |
| Total Hours Available Tomorrow (70 Hours Minus Total) |

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 1 0 1 3 1 1 4 5 5 | PRO NUMBER | 9 0 3 3 5 2 6 6 6 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/14/05    TIME: 2030    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 54785

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _Theodore Johnson_

Britt/USA Truck
0043

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 1 D | 15 | 05 | 435 | 05.19 | D2 16 49 506 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

5H785
(TRAILER #1 - SHOW ALL UNITS)            (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Total Hours On Duty
(Total Lines 3 + 4)
On Daily Log
Last 7 Days
5.75
9.75

| | Total Hours | |
|---|---|---|
| 1: OFF DUTY | 9.75 | 0 |
| 2: SLEEPER | 6.25 | 9 |
| 3: DRIVING | 7.25 | 9 |
| 4: ON DUTY (NOT DRIVING) | 0.75 | 11 |
| | 24.00 | 8 |
| | Total Hours | Today |

REMARKS

Wheeling WV Dr.

Hagerstown MD Fuel t/t

@ Burlington NJ Dropped trailer

Newark DE HOME TIME

62.50
Total Hours Last 7 Days

47.50
Total Hours Available Tomorrow
(70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 903.352666 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☒ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____  TIME: _____  TRACTOR/TRUCK NO.: _____  TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE: _____    Britt/USA Truck 0044

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC. Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 1 0 | 1 6 | 0 5 | 0 | 6 5 1 9 | 2 2 1 6 4 9 5 0 6 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

N/A
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**

Theodore Johnson
(PRINT DRIVER'S NAME)

3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

| | | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 24 0 0 |
| 2: SLEEPER | | 0 0 0 0 |
| 3: DRIVING | | 0 0 0 0 |
| 4: ON DUTY (NOT DRIVING) | | 0 0 0 0 |
| | | 24 00 Total Hours |

Use Local Time Standard at Home Terminal

**Total Hours On Duty** (Total Lines 3 + 4 On Daily Log)
Last 7 Days

1. 9.75
2. 10
3. 9
4. 9
5. 11
6. 8
7. 0

Today

56.75
Total Hours Last 7 Days

13.25
Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS     Hometime
OFF DUTY     10/15 — 10/17
Newark, DE

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED | PRO NUMBER | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED | PRO NUMBER | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED |
|---|---|---|---|---|---|---|---|---|---|---|---|

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____   TIME: _____   TRACTOR/TRUCK NO.: _____   TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

No INSPECTION

DRIVER'S SIGNATURE: ___   Britt/USA Truck
0045

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                          DRIVER'S SIGNATURE:                          DATE

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

# DRIVER'S DAILY LOG

(ONE CALENDAR DAY - 24 HOURS)      WHITE - Safety      PINK - Driver

**10** **18** **05**      **4,05**      **6519**      **221,649,50.6**
MONTH    DAY    YEAR      MILES TODAY      UNIT #      DRIVER ID

**521,84**
(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

_Theodore Johnson_
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
## 3200 Industrial Park Rd. - Van Buren, AR 72956

_Theodore Johnson_
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 11,650 |
| 2: SLEEPER | 10,210.0 |
| 3: DRIVING | 106,75.0 |
| 4: ON DUTY (NOT DRIVING) | 100,17.5 |
| | **24,00** Total Hours |

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days

1. 0
2. 0
3. 0
4. 0
5. 0
6. 0
7. 7.50

Today 7.50

Total Hours Last 7 Days 62.50

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Newark, DE P.t.i
Bethel, PA Picev up 52184
Breezewood PA Fuel Pt.i
Wheeling WV P.t.i

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER **9005201.18**   ☐ LOADING  ☑ CURRENT  ☐ UNLOADED

PRO NUMBER   ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER   ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: **10/19/05**   TIME: **0001**   TRACTOR/TRUCK NO.: **6519**   TRAILER(S) NO.(S): **52184**

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

Britt/USA Truck 0046

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:      DRIVER'S SIGNATURE:      DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | |
|---|---|---|
| MONTH | DAY | YEAR |

MILES TODAY    UNIT #    DRIVER ID

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson

(PRINT DRIVER'S NAME)

N/A

(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | |
| 2: SLEEPER | |
| 3: DRIVING | |
| 4: ON DUTY (NOT DRIVING) | |

**Total Hours**

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |
|---|---|
| 1. | |
| 2. | |
| 3. | |
| 4. | |
| 5. | |
| 6. | 7.50 |
| | 9.50 |

Today

17

Total Hours Last 7 Days

53

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 900520118 | PRO NUMBER | 903353752 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING | ☒ CURRENT | ☒ UNLOADED | ☐ LOADING | ☒ CURRENT | ☒ UNLOADED |
| | | | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE:                TIME:                TRACTOR/TRUCK NO.:                TRAILER(S) NO.(S):

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE:**

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                DRIVER'S SIGNATURE:                DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0047

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 10 | 20 | 05 | 660 | 6519 | 9521649506 |

52184
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 2.00 |
| 2: SLEEPER | 2.25 |
| 3: DRIVING | 9.00 |
| 4: ON DUTY (NOT DRIVING) | 0.75 |
| | 24.00 Total Hours |

REMARKS

Brooklyn Crown
St Franklophy
Fuel

Texarkana Ar
Fuel Pl.
Sulpher Springs TX
Ro

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1. 0
2. 0
3. 0
4. 7.5
5. 9.5
6. 
7. 11.75
Today 9.75

Total Hours Last 7 Days 41.25

Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 403353750 | ☐ LOADING ☑ CURRENT ☐ UNLOADED |
| PRO NUMBER | | ☐ LOADING ☐ CURRENT ☐ UNLOADED |
| PRO NUMBER | | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/30/15   TIME: 1945   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52188

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Jr_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:        DRIVER'S SIGNATURE:        DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0049

# DRIVER'S DAILY LOG

(ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

MONTH 10 DAY 21 YEAR 05

MILES TODAY 416

UNIT # 6519

221649506

DRIVER ID

(DRIVER'S SIGNATURE IN FULL) Theodore Johnson

(PRINT DRIVER'S NAME) Theodore Johnson

(TRAILER #1 - SHOW ALL UNITS) 52184

(TRAILER #2)

N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 12:00 |
| 2: SLEEPER | 3:75 |
| 3: DRIVING | 9:25 → 9.5 |
| 4: ON DUTY (NOT DRIVING) | 12:00 → 11.75 |
| | 24:00 → 10.25 |

Total Hours

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days: 0, 0, 0, 1.5, 9.5, 11.75, 10.25

Total Hours Today: 39

Total Hours Last 7 Days: 31

Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS: Sulfer Springs TX, Pt in, Garland TX unloading, Garland TX unloading, Joplin MO Fuel

## CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 903353750  ☐ LOADING  ☑ CURRENT  ☐ UNLOADED

PRO NUMBER 904325128  ☑ LOADING  ☑ CURRENT  ☐ UNLOADED

PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/21/05   TIME: 1545   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52184

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. Keller & Associates, Inc., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck 0051

**DRIVER'S DAILY LOG**   (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | | | | | |
|---|---|---|---|---|---|---|
| MONTH 10 | DAY 22 | YEAR 05 | MILES TODAY 285 | UNIT # L519 | DRIVER ID 0321N49506 | Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days |

(TRAILER #1 - SHOW ALL UNITS)                (TRAILER #2)

Theodore Gibson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 00:00 |
| 2: SLEEPER | | | | | | 9:00 |
| 3: DRIVING | | | | | | 4:75 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 0:25 |
| | | | | | Total Hours | 24:00 |

Total Hours: 1. 0  2. 0  3. 7.5  4. 4.5  5. 1.75  6. 0.25  7. 5  Today 44

REMARKS

Joplin MO

E Saint Louis PA

Britt/USA Truck
0052

Total Hours Last 7 Days 26

Total Hours Available Tomorrow (70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 40132512 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/22/05   TIME: 1330   TRACTOR/TRUCK NO.: L519   TRAILER(S) NO.(S): 52184

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE  Theodore Gibson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                DRIVER'S SIGNATURE:                DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 10 | 23 | 05 | 157 | 65.19 | 22106 49506 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

5218H
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Total Hours
On Duty
(Total Lines
3 + 4
On
Daily Log)
Last 7 Days

1. 0
2. 7.5
3. 9.5
4. 11.75
5. 10.25
6. 5
7. Today

| | Total Hours |
|---|---|
| 1: OFF DUTY | |
| 2: SLEEPER | |
| 3: DRIVING | |
| 4: ON DUTY (NOT DRIVING) | |

Use Local Time Standard at Home Terminal

**REMARKS**

St. Louis MO
Pt. 1
Bloomington IL
Fuel Pt. 2

Britt/USA Truck
0053

Total Hours
Last 7 Days
(1)

Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

*CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER*

| PRO NUMBER | 904305108 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING | ☒ CURRENT ☐ UNLOADED | ☐ LOADING | ☐ CURRENT ☐ UNLOADED | ☐ LOADING | ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

_____

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

| 10 | 24 | 05 | 500 | 6519 | 221.6995.06 |
|----|----|----|-----|------|-------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

52184
(TRAILER #1 - SHOW ALL UNITS)

52130
(TRAILER #2)

(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0.10.0 |
| 2: SLEEPER | 1.1.75 |
| 3: DRIVING | 1.0.10.0 |
| 4: ON DUTY (NOT DRIVING) | 0.1.25 |
| | Total Hours |
| | 2.4.0.0 |

Total Hours On Duty
(Total Lines 3 + 4)
On Daily Log)
Last 7 Days

7.5
9.5
11.75
10.25
5
3.25
11.25

Today
57.50
Total Hours Last 7 Days

71.50
Total Hours Available Tomorrow
(70 Hours Minus Total)

**REMARKS**

Birmingham TL Pt.
Wheeling TL unloading
Chicago IL 38th St.
Hebron IN Fuel
Indianapolis IN Pt.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 904 325,128 | PRO NUMBER | 905285277 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING | ☒ CURRENT  ☐ UNLOADED | ☐ LOADING | ☒ CURRENT  ☐ UNLOADED | ☐ LOADING | ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/24/05  TIME: 2115  TRACTOR/TRUCK NO.: 6519  TRAILER(S) NO.(S): 52130

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

Britt/USA Truck
0054

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:  DRIVER'S SIGNATURE:  DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 D 05 05 | 585 | 65.19 | 2210195 06 | | | Total Miles On Duty | |
| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID | | | | |

52130
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

_Theodore Johnson_
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Total Lines 3 + 4 On Daily Log Last 7 Days

Use Local Time Standard at Home Terminal

| | MID-NIGHT | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 10.0.0 |
| 2: SLEEPER | | 1.3.5.0 |
| 3: DRIVING | | 09.75 |
| 4: ON DUTY (NOT DRIVING) | | 00.75 |
| | Total Hours | 24.0.0 |

9.5
11.75
10.25
5
3.25
11.25
10.5

Today
61.5

**REMARKS**

Texarkana/s. TX
Pt. 1

Piedmont SC
Santa fuel SCS
Fuel Pt. 1 unloading
Pt. 1

Britt/USA Truck
0055

Total Hours Last 7 Days
8.50

Total Hours Available Tomorrow
(70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 1052 35277 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☒ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 0 05 05   TIME: 1830   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52130

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE-Safety   PINK-Driver

| 10 | 26 | 05 | 4 35 | 65 19 | 0216495 00 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

52130     54471
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

_Theodore Johnson_
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

_Theodore Johnson_
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 09 00 |
| 2: SLEEPER | 16 25 |
| 3: DRIVING | 10 7 25 |
| 4: ON DUTY (NOT DRIVING) | 00 50 |
| | 24 00 |
| | Total Hours |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days
1. 11.75
2. 10.25
3. 5
4. 3.25
5. 11.25
6. 10.5
7. 7.75
Today
59.75
Total Hours Last 7 Days
10.25
Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS

Sandy Sp 07.25
Lavonia, LA
Pt. Drop 52130
Pick 54471
Batesville TN
Pt.

Britt/USA Truck
0056

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 9024.08559 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☑ LOADING  ☑ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10 26 05   TIME: 1745   TRACTOR/TRUCK NO.: 0519   TRAILER(S) NO.(S): 54471

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _Theodore J._

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC. Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS) WHITE = Safety PINK = Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER |
|---|---|---|---|---|---|
| 10 | 27 | 05 | 4.8.0 | 6519 | 821649506 |

54471 (TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

_Theodore Johnson_ (DRIVER'S SIGNATURE IN FULL)

_Theodore Johnson_ (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| Total Lines On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |
| 1: OFF DUTY | 10.00 |
| 2: SLEEPER | 15.25 |
| 3: DRIVING | 10.00 |
| 4: ON DUTY (NOT DRIVING) | 0.75 |
| | 24.00 Total Hours |

Use Local Time Standard at Home Terminal

Total Lines On Duty Last 7 Days:
10.25
5
3.25
11.25
10.50
7.75
7.75
Today
55.75
Total Hours Last 7 Days
14.25
Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Bakerville, TN
P.T. Langton, TN loading
W. Memphis, AR Fuel Pt.
Brett, AR

Britt/USA Truck
0057

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 902408559 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/27/05    TIME: 1530    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 54471

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Jo_

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

# DRIVER'S DAILY LOG (ONE CALENDAR DAY · 24 HOURS) WHITE · Safety PINK · Driver

| MONTH 10 | DAY 28 | YEAR 05 | MILES TODAY 275 | UNIT # 6519 | DRIVER ID 221 04 9500 |

54471 (TRAILER #1 - SHOW ALL UNITS)     (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: Theodore Johnson
PRINT DRIVER'S NAME: Theodore Johnson
NAME OF CO-DRIVER: N/A

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0700 |
| 2: SLEEPER | 1700 |
| 3: DRIVING | 0500 |
| 4: ON DUTY (NOT DRIVING) | 0100 |
| | 2400 Total Hours |

REMARKS: Prescott AR   Hope AR unloading   Ashdown AR loading   Britt/USA Truck 0058   Van Buren AR dropping trailer Rt.

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
|---|---|
| 1. | 5 |
| 2. | 3.25 |
| 3. | 11.25 |
| 4. | 10.50 |
| 5. | 7.75 |
| 6. | 7.75 |
| 7. Today | 6 |
| Total Hours Last 7 Days | 51.5 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | 18.50 |

## CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 9 04 08 559 | PRO NUMBER 9 04 326 14 9 | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/28/05     TIME: 2245     TRACTOR/TRUCK NO.: 6519     TRAILER(S) NO.(S): 54471

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:     DRIVER'S SIGNATURE:     DATE:

© Copyright 2003 & Published by J.J. KELLER & ASSOCIATES, INC. Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

10 29 05

MONTH   DAY   YEAR   MILES TODAY 290   UNIT # 6519   DRIVER ID DOT 6495066

51632

(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

Theodore Johnson

(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson

(PRINT DRIVER'S NAME)

N/A

(NAME OF CO-DRIVER)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00.00 |
| 2: SLEEPER | 13.75 |
| 3: DRIVING | 05.00 |
| 4: ON DUTY (NOT DRIVING) | 00.25 |
| | 24.00 Total Hours |

| | Total Hours On Duty (Total Lines 3 + 4) |
|---|---|
| On Daily Log) Last 7 Days | |
| 1 | 3.25 |
| 2 | 11.25 |
| 3 | 10.50 |
| 4 | 7.75 |
| 5 | 7.75 |
| 6 | 6 |
| 7 | 5.25 |
| Today | 51.75 |
| Total Hours Last 7 Days | 78.25 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | |

**REMARKS**

Van Buren AR P.t.    W. Memphis Ar P.t.    Britt/USA Truck 0059

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 900529767 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☒ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/29/05   TIME: 1900   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 51632

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:   DRIVER'S SIGNATURE:   DATE:

© Copyright 2003 & Published by J J KELLER & ASSOCIATES, INC. - Neenah, WI • (800) 327-6868 • Printed in USA

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS) WHITE - Safety PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 10 | 30 | 05 | 570 | 6519 | 221649506 |

51632

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

DRIVER'S SIGNATURE IN FULL
Theodore Johnson

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

(PRINT DRIVER'S NAME)

N/A

(NAME OF CO-DRIVER)

| Total Hours On Duty |
|---|
| (Total Lines 3 + 4 On Daily Log) Last 7 Days |
| 11.25 |
| 10.5 |
| 7.75 |
| 7.75 |
| 6 |
| 5.25 |
| 10 |
| Today 58.50 |
| Total Hours Last 7 Days |
| 11.50 |
| Total Hours Available Tomorrow (70 Hours Minus Total) |

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00:00 |
| 2: SLEEPER | 14:00 |
| 3: DRIVING | 09:50 |
| 4: ON DUTY (NOT DRIVING) | 00:50 |
| | 24:00 Total Hours |

REMARKS

W. Memphis AR P.t.

Franklin KY fuel

Gaston IN P.t.

Britt/USA Truck 0060

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9005224161 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10 30 05   TIME: 1900   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 51632

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE Theodore Jo

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS) WHITE—ORIG · PINK—DRIVER

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 10 | 31 | 05 | 522 | V519 | 221049500 |

(TRAILER #1 - SHOW ALL UNITS) 51632     51650 (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

T. Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | MID-NIGHT ... NOON ... MID-NIGHT | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 01:00 |
| 2: SLEEPER | | 11:75 |
| 3: DRIVING | | 09:50 |
| 4: ON DUTY (NOT DRIVING) | | 01:75 |
| | | 24:00 Total Hours |

**REMARKS**

Gaston, IN P.t.
Ann Arbor, MI unloading Ann Arbor MI Lunch
Dearborn MI Drop 51632 Hook 54650
Dexter, MI
Fowlerville, MI
Monroe MI P.t.

Britt/USA Truck
0061

Total Lines On Duty (Total Lines) 3 + 4 On Daily Log Last 7 Days
10.5
7.75
7.75
6
5.25
10
11.25

Today 58.50
Total Hours Last 7 Days

11.50
Total Hours Available Tomorrow (70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 90500147 | PRO NUMBER | 90335804 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/5     TIME: 1715     TRACTOR/TRUCK NO.: V519     TRAILER(S) NO.(S): 54650

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:     DRIVER'S SIGNATURE:     DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA




# DRIVER'S DAILY LOG BOOK

### FORM PRESCRIBED BY THE
### DEPARTMENT OF TRANSPORTATION

FOR MONTH OF _November_          YEAR _05_

**CARRIER** _USA TRUCK, INC._          **DRIVER** _Theodore Johnson_

**ADDRESS** _P.O. BOX 449_          **ADDRESS** _13 Stephanie Dr_

**CITY** _VAN BUREN_   **STATE** _AR 72956_   **CITY** _Bear_   **STATE** _DE_

## FINDER – RETURN THIS BOOK TO DRIVER OR CARRIER
### DRIVER'S DAILY LOG
PRESCRIBED BY DEPT. OF TRANSPORTATION
INSTRUCTIONS FOR THE USE OF DRIVER'S DAILY LOG

1. Drivers and motor carriers will be held responsible for the proper maintenance of the daily logs. Drivers shall keep the log current to the time of the last change of duty status. Failure to make logs, failure to make required entries therein, falsification of entries, or failures to file logs with the motor carrier will make both the driver and the carrier liable to prosecution.
2. The driver shall forward the original log to his home terminal. If the services of a driver are used by more than one carrier during a calendar day, the driver shall furnish each motor carrier a copy of his log for the entire day. In such case the log shall indicate the name of each carrier served by the driver during that day.
3. The original logs shall be retained by the motor carrier for a period of six months. Duplicate copies of the logs are the driver's personal records and are to be kept for a period of one month in the possession of the driver while he is on duty.
4. The time standard in effect at the driver's home terminal shall be used. The log shall be prepared, maintained, and submitted, for a 24-hour calendar day beginning at midnight.
5. All entries shall be made by the driver except that the name and main office address of the motor carrier may be printed or otherwise entered by an authorized representative of the carrier. The name of the motor carrier shall be that for which the driving is performed. In case of the driver of a leased vehicle, the name shown shall be that of the motor carrier performing the transportation.
6. (a) The driver shall certify to the correctness of log by signing his name in full.
   (b) Below driver's signature he shall list initials and last name of each co-driver.
7. In addition to the identification of the carrier and the driver's signature, the entries shall indicate:
   (a) The month, day, and year for which the log is prepared.
   (b) The total mileage while driving.
   (c) (1) The carrier's vehicle number or, if no such number is provided the state license number of each power unit.
       (2) The carrier's trailer or trailers' number or numbers or if no such numbers are provided, the state license number of each trailer unit.
   (d) Driver's home terminal address.
   (e) The actual period or periods during the calendar day spent in the activities specified on Lines 1, 2, 3, and 4 by drawing a continuous line between the appropriate time markers. The following directions are illustrative only and are not to be construed as modifying the definitions or regulations in Sections 395.1 to 395.12, inclusive:

LINE 1, OFF DUTY – All time, except that spent in a sleeper berth, when the driver is not working, is not required to be in readiness to work, or is not under any responsibility for performing work.
LINE 2, SLEEPER BERTH – All time resting in a sleeper berth.
LINE 3, DRIVING – All time spent at the controls of a motor vehicle in operation.
LINE 4, ON DUTY (Not Driving) – All time spent by a driver in performing work other than driving. This includes loading or unloading, preparing reports, remaining in readiness to perform work, remaining in charge of disabled vehicles, stops for meals, etc.
   (f) Under "Remarks" the time and the name of the place where each change of duty occurred, such as the place of reporting for work, starting to drive and where released from work. Explain reason for emergency resulting in hours exceeding those permitted by the regulations.
   (g) Under "Remarks" show the transportation performed each day by entering a shipping document number or numbers, or name of a shipper and commodity.
   (h) In the column "Total Hours," the hours and fractions thereof shown in each of Lines 1, 2, 3, and 4. The sum of the entries in this column must total 24 hours.
   (i) DAILY RECAP: Column "A" Total Hours On-Duty (total Lines 3 & 4 on Daily Log) for Last 7 Days, including today. Total Hours Available Tomorrow; take 70 hours minus total in Column "A".

USA-064

Britt/USA Truck
0062



**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

MONTH | 4 4  DAY | 0 3  YEAR
MILES TODAY | 5 8 6
UNIT # | 2 8 0 2 3
DRIVER ID | 5 5 5 9 9 7 7 7

(TRAILER #1 - SHOW ALL UNITS) | 2 2 4 8 5
(TRAILER #2) | 2 2 4 8 6
(TRAILER #3)
(TRAILER #4)

(DRIVER'S SIGNATURE IN FULL) *John Doe*
(PRINT DRIVER'S NAME) John Doe
(NAME OF CO-DRIVER) Jane Doe

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days
1. 10.00
2. 6.25
3. 13.75
4. 7.25
5. 2.0
6. 8.5
7. 12.75  Today
60.50  Total Hours Last 7 Days
(1) 9.50  Total Hours Available Tomorrow (70 Hours Minus Col. A)

1: OFF DUTY — 2 0 0
2: SLEEPER — 9 2 5
3: DRIVING — 1 1 0 0
4: ON DUTY (NOT DRIVING) — 1 7 5
Total Hours — 2 4 0 0

**REMARKS**
SAN JON, NM P.T.I.
ALBUQUERQUE, NM D & H P.T.I.
LUPTON, AZ DOT INSPECTION
WILLIAMS, AZ

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER | 7 8 6 1 3 0 9 4 2
☐ LOADING  ☐ CURRENT  ☒ UNLOADED

PRO NUMBER | 7 2 7 1 4 1 8 3 4
☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 4/4/03      TIME: 15:45      TRACTOR/TRUCK NO.: 28023      TRAILER(S) NO.(S): 22486

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *John Doe*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:
☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:      DRIVER'S SIGNATURE:      DATE:

© Copyright 2003 and Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0063

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | | | | |
|---|---|---|---|---|---|
| 1 1 0 1 0 5 | 6 1 5 | 6 5 1 9 | 22 1 64 95 44 | | |
| MONTH  DAY  YEAR | MILES TODAY | UNIT # | DRIVER-ID | | |

5 4 6 5 0
(TRAILER #1 - SHOW ALL UNITS)

_____ (TRAILER #2)

*Theodore Johnson* (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| On Duty (Total Lines 3 + 4) On Daily Log | |
| Last 7 Days | 7.75 |
| 1. | 7.75 |
| 2. | |
| 3. | 6 |
| 4. | 5.25 |
| 5. | 5.10 |
| 6. | 1.25 |
| | 10.75 |
| Total Hours | |
| Today | 58.75 |
| Total Hours Last 7 Days | |
| Total Hours Available Tomorrow (70 Hours Minus Total) | 11.25 |

|  | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 00100 |
| 2: SLEEPER | | | | | | 13:25 |
| 3: DRIVING | | | | | | 10:25 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 00:50 |
| | | | | | | 24:00 |

**REMARKS**

*Monroe IN P.T.*

*Newark NJ Dropped Trailer 54650 P.T.*

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 9 0 3 3 5 3 8 0 4 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING | ☒ CURRENT  ☒ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/1/05   TIME: 1615   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 54650

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

© Copyright 2003 & Published by J. J. Keller & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0064

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 11 | 02 | 05 | 123 | 0519 | 22,164,9506 |

N/A
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

_Theodore Johnson_
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 7.25 |
| 2: SLEEPER | 4.50 |
| 3: DRIVING | 2.00 |
| 4: ON DUTY (NOT DRIVING) | 0.25 |
| | 24.00 Total Hours |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days **2.75**

**80.56**

5.25
10
11.25
10.75
2.25

Today **53.25**
Total Hours Last 7 Days **76.75**
Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Newark NJ PT-1
Newark DE Pt Hometime   11/02/05   11/5/05

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/2/05     TIME: 0645     TRACTOR/TRUCK NO.: 0519     TRAILER(S) NO.(S): N/A

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. Keller & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0065

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 11 | 03 | 05 | 6519 | 221649506 |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # |

N/A

(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

DRIVER ID

_Theodore J_ (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Total Hours On Duty
(Total Lines 3 + 4)
On Daily Log
Last 7 Days

MID-NIGHT   Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 24 00 |
| 2: SLEEPER | 00 00 |
| 3: DRIVING | 00 00 |
| 4: ON DUTY (NOT DRIVING) | 00 00 |
| | 24 00 Total Hours |

1. 6
2. 5.25
3. .10
4. 11.25
5. 10.75
6. 2.25
7. 0
Today 53.25

Total Hours Last 7 Days

16.75

Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS

Hometime
Newark, DE
11/2/05 — 11/5/05

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____    TIME: _____    TRACTOR/TRUCK NO.: _____    TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
  INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

_NO INSPECTION_

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0066

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

11 06 05   12H   651.9   92104950.06
MONTH DAY YEAR   MILES TODAY   UNIT #   DRIVER ID

54805
(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

Theodore Johnson
DRIVER'S SIGNATURE IN FULL

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | MID-NIGHT | 1 2 3 4 5 6 7 8 9 10 11 NOON 1 2 3 4 5 6 7 8 9 10 11 | MID-NIGHT | Total Hours | |
|---|---|---|---|---|---|
| 1: OFF DUTY | | | | 17.50 | 0 |
| 2: SLEEPER | | | | 10.3.50 | 0 |
| 3: DRIVING | | | | 10.21.25 | 0 |
| 4: ON DUTY (NOT DRIVING) | | | | 00.4.75 | 0 |
| | 1 2 3 4 5 6 7 8 9 10 11 NOON 1 2 3 4 5 6 7 8 9 10 11 | | | 24.00 | 3 |
| | | | | Total Hours | Today |

**REMARKS**

Newark, DE
Pt. Elkton, MD
Fuel Smyrna DE
Pickup Stuff
New Castle, DE Pt.

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

Total Hours Last 7 Days
07

Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 100524935 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☑ LOADING | ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/6/05   TIME: 2030   TRACTOR/TRUCK NO.: 651.9   TRAILER(S) NO.(S): 54805

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore Johnson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0067

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 11 | 07 | 05 | 440 | 0519 | 20111950 |

54805
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Colvon
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theorae Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Total Hours On Duty
(Total Lines 3 + 4)
On Daily Log
Last 7 Days

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 00:00 |
| 2: SLEEPER | | | | | | 15:30 |
| 3: DRIVING | | | | | | 08:00 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 00:50 |
| | | | | | | 24:00 |

Total Hours

1. 0
2. 0
3. 0
8.5

Today 11.5
Total Hours Last 7 Days
58.5
Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

New Castle DE
Wilmington
P.T. loading

Wythville VA
P.T.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | MO13175401 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☑ LOADING ☑ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/7/05    TIME: 1500    TRACTOR/TRUCK NO.: 0519    TRAILER(S) NO.(S): 54805

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Kendal Johnson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0068

# DRIVER'S DAILY LOG

(ONE CALENDAR DAY - 24 HOURS)     WHITE - Safety     PINK - Driver

MONTH 11  DAY 09  YEAR 05     MILES TODAY 615     UNIT # 6519     DRIVER ID 0216495061

(TRAILER #1 - SHOW ALL UNITS) 54805     (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL) _Theodore Johnson_

**U S A Truck, Inc.**

(PRINT DRIVER'S NAME) Theodore Johnson

3200 Industrial Park Rd. - Van Buren, AR 72956

(NAME OF CO-DRIVER) N/A

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.01.00 |
| 2: SLEEPER | 12.1.75 |
| 3: DRIVING | 1.0.25 |
| 4: ON DUTY (NOT DRIVING) | 0.1.00 |
| | 24.00 Total Hours |

**Total Hours On Duty** (Total Lines 3 + 4 On Daily Log) Last 7 Days

1. 0
2. 0
3. 0
4. 0
5. 3
6. 8.5
7. 11.25 Today

**REMARKS**

Nashville, VA
Pt.
Kingsport, TN Unloading facility
Greeneville, TN Fuel Pt.
Jackson, TN Pt.

22.75 Total Hours Last 7 Days

47.25 Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 901317542 | PRO NUMBER 903354917 | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☐ CURRENT  ☒ UNLOADED | ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT

AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/8/05     TIME: 1845     TRACTOR/TRUCK NO.: 6519     TRAILER(S) NO.(S): 54805

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Johnson_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: ___     DRIVER'S SIGNATURE: ___     DATE: ___

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0069

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 11 | 99 | 05 | 377 | 4519 | 021649500 |
|----|----|----|-----|------|-----------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

54805
(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

Theastie Johnson
(DRIVER'S SIGNATURE IN FULL)

Theastie Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

|  | Total Hours |
|--|-------------|
| 1: OFF DUTY | 0000 |
| 2: SLEEPER | 11675 |
| 3: DRIVING | 10675 |
| 4: ON DUTY (NOT DRIVING) | 10050 |
|  | 2400 Total Hours |

**REMARKS**

Jackson, TN P.T.
Benton, AR P.T.
Fuel P.T.
Texarkana AR P.T.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | M033549.17 | PRO NUMBER | | PRO NUMBER | |
|------------|-----------|------------|--|------------|--|
| ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |
|---|---|
| 1. | 0 |
| 2. | 0 |
| 3. | 0 |
| 4. | 3 |
| 5. | 8.5 |
| 6. | 11.25 |
| 7. | 7.25 |
| Today | 30 |
| Total Hours Last 7 Days | 40 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | |

---

### DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/9/05   TIME: 1345   TRACTOR/TRUCK NO.: 0514   TRAILER(S) NO.(S) 54805

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE:**

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

© Copyright 2003 & Published by J. J. Keller & Associates, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0070

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 11 | 10 | 05 | 467 | 6519 | 021 0119 500 |
|----|----|----|-----|------|--------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

54,805
(TRAILER #1 - SHOW ALL UNITS)   535,52   (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days

Use Local Time Standard at Home Terminal

|  | Total Hours |
|--|-------------|
| 1: OFF DUTY | 3 |
| 2: SLEEPER | 8.5 |
| 3: DRIVING | 11.25 |
| 4: ON DUTY (NOT DRIVING) | 7.25 |
|  | 9.75 |

**Total Hours**

Today 37.75

Total Hours Last 7 Days 90.25

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Texarkana AR
PL.t Mt. Vernon TX
Drop 54805
Hook 53552
Long weekly 725
Loading
Mt. Pleasant TX
DOT INSPECTION
Jackson MS

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 40 33 54 9 1 7 | PRO NUMBER 90 43 27 9 06 | PRO NUMBER |
|---------------------------|--------------------------|------------|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | ☒ LOADING ☒ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/10/05   TIME: 1445   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 53552

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:     DRIVER'S SIGNATURE:     DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0071

# DRIVER'S DAILY LOG

(ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 11 | 11 | 05 | 399 | 659 | 221049506 | Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID | |

53552

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

1: 0
3: 3

Use Local Time Standard at Home Terminal

| | Total Hours |
| 1: OFF DUTY | 8.5 |
| 2: SLEEPER | 11.25 |
| 3: DRIVING | 7.25 |
| 4: ON DUTY (NOT DRIVING) | 9.75 |

Total Hours 24.00

REMARKS

Jackson MS Fuel Pt.
Tuscaloosa, AL
Tuscaloosa AL Fuel Pt.
Atlanta, GA Pt.

Today 7.75

Total Hours Today 47.50

Total Hours Last 7 Days 22.5

Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 404327906 | PRO NUMBER | | PRO NUMBER | |
| ☐ LOADING | ☑ CURRENT | ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/11/05   TIME: 1530   TRACTOR/TRUCK NO.: 659   TRAILER(S) NO.(S): 53552

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore JX

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                DRIVER'S SIGNATURE:                DATE:

© Copyright 2003 & Published by J. J. Keller & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0072

# DRIVER'S DAILY LOG
(ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 11 | 02 | 05 | 648 | 6519 | 221649506 |
|----|----|----|-----|------|-----------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

53552
(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: *Theodore Johnson*

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

PRINT DRIVER'S NAME: Theodore Johnson

NAME OF CO-DRIVER: N/A

| | Total Hours |
|---|---|
| **Total Hours On Duty** (Total Lines 3 + 4) On Daily Log) Last 7 Days | 3 |
| 1. | 8.5 |
| 2. | 11.25 |
| 3. | 7.25 |
| 4. | 9.75 |
| 5. | 7.75 |
| 6. | 5.25 |
| Today | 52.75 |
| **Total Hours Last 7 Days** | 97.25 |

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 0.00 |
| 2: SLEEPER | | | | | | 8.75 |
| 3: DRIVING | | | | | | 14.50 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 0.75 |
| | | | | | | 24.00 |

**REMARKS**

Atlanta, GA
Greensboro, GA unloading
Augusta, GA loading
Columbia, SC #

**Total Hours Available Tomorrow** (70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 904327906 | PRO NUMBER | 90240896 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11.02.05    TIME: 1000    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 53552

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:        DRIVER'S SIGNATURE:        DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0073

**IVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

MONTH **11** DAY **13** YEAR **05**    MILES TODAY **600**    UNIT # **6519**    DRIVER ID **P3164950**

(TRAILER #1 - SHOW ALL UNITS) **3352**    (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: *Theodore Johnson*

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

(PRINT DRIVER'S NAME) *Theodore Johnson*

(NAME OF CO-DRIVER) N/A

| | Total Hours |
|---|---|
| | On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
| 1. | 8.5 |
| 2. | 11.75 |
| 3. | 7.75 |
| 4. | 9.75 |
| 5. | 7.75 |
| 6. | 5.35 |
| 7. | |

Use Local Time Standard at Home Terminal

1: OFF DUTY
2: SLEEPER
3: DRIVING
4: ON DUTY (NOT DRIVING)

Total Hours

**REMARKS**

Columbia SC PT Fuel

Dunn NC Fuel

Elkton MD

Total Hours **60.85**
Total Hours Last 7 Days **9.75**
Total Hours Available Tomorrow (70 Hours Minus Total)

**ECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

O MBER **902410890**    ☒ CURRENT   ☐ UNLOADED    PRO NUMBER ☐ LOADING ☐ CURRENT ☐ UNLOADED    PRO NUMBER ☐ LOADING ☐ CURRENT ☐ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

TE: **11/13/05**    TIME: **1615**    TRACTOR/TRUCK NO.: **6519**    TRAILER(S) NO.(S): **3352**

I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

ABOVE DEFECTS CORRECTED
ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

ECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0074

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|

DRIVER'S SIGNATURE IN FULL

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

PRINT DRIVER'S NAME    N/A

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |

1: OFF DUTY
2: SLEEPER
3: DRIVING
4: ON DUTY (NOT DRIVING)

Total Hours: 11.25 / 7.25 / 7.75 / 7.75 / 5.25 / 10.50 / 5.5

**Total Hours**

**REMARKS**

Elkton, MD
Baltimore, MD
Carlisle, PA
Hagerstown, MD

Total Hours Today: 57.5

Total Hours Last 7 Days: 72.75

Total Hours Available Tomorrow (70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| 4004 0899 | 90 13 8 431 | |
| ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | ☑ LOADING  ☑ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/14/05    TIME: 1915    TRACTOR/TRUCK NO.: 0519    TRAILER(S) NO.(S): 53552

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE:**

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. Keller & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0075

# DRIVER'S DAILY LOG

(ONE CALENDAR DAY - 24 HOURS)     WHITE - Safety     PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # |
| 11 | 5 | 05 | 475 | 0519 |

(TRAILER #1 - SHOW ALL UNITS)     (TRAILER #2)

51355

DRIVER ID  0221049506

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
| 1: OFF DUTY | 00:00 |
| 2: SLEEPER | 15:75 |
| 3: DRIVING | 08:00 |
| 4: ON DUTY (NOT DRIVING) | 00:25 |
| | 24:00 |
| REMARKS | Total Hours |

Total Hours
On Duty
(Total Lines
3 + 4
On
Daily Log)
Last 7 Days

1.25
9.75
7.75
5.25
10.50
5.50
8.25

Today
57.25

Total Hours
Last 7 Days

19.75

Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

REMARKS: Hagerstown, MD — Pt.1, Fuel     Richmond, RD — PL

## CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 901318431 | ☐ LOADING | ☑ CURRENT | ☐ UNLOADED |
| PRO NUMBER | | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED |
| PRO NUMBER | | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE: 11/5/05     TIME: 11:30     TRACTOR/TRUCK NO.: 0519     TRAILER(S) NO.(S): 53552

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:     DRIVER'S SIGNATURE:     DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0076

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 11 | 16 | 05 |
|----|----|----|
| MONTH | DAY | YEAR |

645 MILES TODAY    65.19 UNIT #    22,164,950.6 DRIVER ID

535552 (TRAILER #1 - SHOW ALL UNITS)    52367 (TRAILER #2)

Theodore Johnson (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | MID-NIGHT | 1 2 3 4 5 6 7 8 9 10 11 | NOON | 1 2 3 4 5 6 7 8 9 10 11 | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 00.00 |
| 2: SLEEPER | | | | | | 12.25 |
| 3: DRIVING | | | | | | 10.75 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 01.00 |
| | | | | | | 24.00 |

**Total Hours On Duty** (Total Lines 3 + 4) On Daily Log) Last 7 Days

| 1. | 9.75 |
| 2. | 7.75 |
| 3. | 5.25 |
| 4. | 10.5 |
| 5. | 5.5 |
| 6. | 8.25 |
| 7. Today | 11.75 |
| Total Hours Last 7 Days | 58.75 |

Total Hours Available Tomorrow (70 Hours Minus Total)    11.25

**REMARKS**

Richmond KY    Berea KY Unload    Lexington from Gallatin TN    Franklin KY Fuel P.T.    W. Memphis, AR P.T.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 90131843.1 | ☐ LOADING ☒ CURRENT ☐ UNLOADED |
| PRO NUMBER 903357.74.6 | ☐ LOADING ☒ CURRENT ☐ UNLOADED |
| PRO NUMBER | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/16/05    TIME: 1975    TRACTOR/TRUCK NO.: 0519    TRAILER(S) NO.(S): 52367

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE:**

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0077

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| | | |
|---|---|---|
| 11 17 05 | 287 | 0519 | 021649506 |
| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID |

52367
(TRAILER #1 - SHOW ALL UNITS) (TRAILER #2)

_Theodore Johnson_
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10:00 |
| 2: SLEEPER | 8:75 |
| 3: DRIVING | 5:00 |
| 4: ON DUTY (NOT DRIVING) | 0:25 |
| | Total Hours 24:00 |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days

2.75
5.25
10.5
5.5
8.75
11.75
5.25
Today

**REMARKS**

W. Memphis AR

Texarkana AR

59.95
Total Hours Last 7 Days

15.75
Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 903357746 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/17/05    TIME: 1400    TRACTOR/TRUCK NO.: 0519    TRAILER(S) NO.(S): 52367

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Johnson_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0078

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

11 | 18 | 05    300    65 19    221 649 50 6

MONTH | DAY | YEAR    MILES TODAY    UNIT #    DRIVER ID

52367    *Theodore Johnson* (DRIVER'S SIGNATURE IN FULL)

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.00 |
| 2: SLEEPER | 9.25 |
| 3: DRIVING | 05.00 |
| 4: ON DUTY (NOT DRIVING) | 09.75 |
| | 24.00 |

**Total Hours**

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |
|---|---|
| 1. | 5.25 |
| 2. | 10.50 |
| 3. | 5.50 |
| 4. | 8.25 |
| 5. | 11.75 |
| 6. | 5.25 |
| 7. Today | 5.75 |

Total Hours Last 7 Days
52.25

Total Hours Available Tomorrow (70 Hours Minus Total)
17.75

**REMARKS**

Texarkana, AR P.t.
Rockwall TX
Fuel Phillips TX
Unloading Dallas TX P.t.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 90335 7746 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☒ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/18/05    TIME: 1345    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 52367

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0079

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | | |
|---|---|---|---|
| 11 | 19 | 05 | 5.25 | 6519 | 221649506 |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

523.67      (TRAILER #1 - SHOW ALL UNITS)      52052      (TRAILER #2)      Theotora Qt.  (DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theotra Johnson  (PRINT DRIVER'S NAME)

N/A  (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | |
| 2: SLEEPER | |
| 3: DRIVING | |
| 4: ON DUTY (NOT DRIVING) | |

Total Hours

**REMARKS**

Dallas TX
P.U.
Ashdown AR
Drop 52367
Hook 52052
Benton AR
fuel I.H.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER  1043294 08
☐ LOADING   ☑ CURRENT   ☐ UNLOADED

PRO NUMBER
☐ LOADING   ☐ CURRENT   ☐ UNLOADED

PRO NUMBER
☐ LOADING   ☐ CURRENT   ☐ UNLOADED

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | 10.5 |
|---|---|
| | 5.5 |
| | 8.25 |
| | 11.75 |
| | 5.25 |
| | 5.75 |
| | 9.50 |
| Today | 56.50 |
| Total Hours Last 7 Days | 13.50 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/19/05   TIME: 1530   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52052

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:      DRIVER'S SIGNATURE:      DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0080

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

MONTH 11   DAY 20   YEAR 05   MILES TODAY 390   UNIT # 6519   DRIVER ID 021649506

(TRAILER #1 - SHOW ALL UNITS) 52052   (TRAILER #2)

Theodore JJ (DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.00 |
| 2: SLEEPER | 1.7.0.5 |
| 3: DRIVING | 0.6.5.0 |
| 4: ON DUTY (NOT DRIVING) | 0.0.0.5 |
| | Total Hours 24.00 |

**REMARKS**

W. Memphis, AR   P.U.

Knoxville, TN   P.U.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 904329408   ☑ CURRENT   ☐ LOADING   ☐ UNLOADED

PRO NUMBER ____   ☐ LOADING   ☐ CURRENT   ☐ UNLOADED

PRO NUMBER ____   ☐ LOADING   ☐ CURRENT   ☐ UNLOADED

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days

5.5
8.25
11.75
5.25
5.75
9.50
6.75

Today 5.75

Total Hours Last 7 Days 47.75

Total Hours Available Tomorrow (70 Hours Minus Total)

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/20/05   TIME: 1545   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52052

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:   DRIVER'S SIGNATURE:   DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0081

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 11 | 21 | 05 | 660 | 0517 | 021049504 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

50022
(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Total Hours On Duty (Total Lines 3 + 4) On Daily Log

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 09.00 |
| 2: SLEEPER | | | | | | 02.00 |
| 3: DRIVING | | | | | | 11.00 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 02.00 |
| | | | | | | 24.00 |

Total Hours Last 7 Days
8.05
11.75
5.25
5.75
9.50
6.75
12
Today
57.25

Total Hours Last 7 Days
40.75

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**   Knoxville, TN   P.T. loading   Dandridge TN   Morristown TN   loading   empty   Bethel PA P.T.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 904329408 | PRO NUMBER | 903358092 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☒ UNLOADED | | ☒ LOADING ☒ CURRENT ☒ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/21/05   TIME: 1930   TRACTOR/TRUCK NO.: 0517   TRAILER(S) NO.(S): 50052

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

© Copyright 2003 & Published by J. J. Keller & Associates, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0082

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety   PINK - Driver

| | | | | | | |
|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID | |
| (TRAILER #1 - SHOW ALL UNITS) | | | (TRAILER #2) | | (DRIVER'S SIGNATURE IN FULL) | |

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days |
|---|---|
| 3 + 4 | 11.75 |
| | 5.75 |

MID-NIGHT  Use Local Time Standard at Home Terminal  MID-NIGHT  **Total Hours**

| | | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 5.75 |
| 2: SLEEPER | | 9.50 |
| 3: DRIVING | | 6.75 |
| 4: ON DUTY (NOT DRIVING) | | 1.0 |
| | Total Hours | 1.75 |
| | Today | .75 |

**REMARKS**

Hometime
11/22/65 - 11/26/65

Total Hours Last 7 Days: 77.2

Total Hours Available Tomorrow (70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____      DRIVER'S SIGNATURE: _____      DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Brit/USA Truck
0083

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

MONTH   DAY   YEAR    MILES TODAY    UNIT #

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

DRIVER ID

(DRIVER'S SIGNATURE IN FULL)

*Theodore Johnson*

(PRINT DRIVER'S NAME)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

(NAME OF CO-DRIVER)

| | | Total Hours |
|---|---|---|
| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | | |

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | |
| 2: SLEEPER | |
| 3: DRIVING | |
| 4: ON DUTY (NOT DRIVING) | |

**Total Hours**

| | |
|---|---|
| Today | 51 |
| Total Hours Last 7 Days | |
| Total Hours Available Tomorrow (70 Hours Minus Total) | |

**REMARKS**

Newark, DE

Home town

11/20/05 — 11/20/05

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

No INSPECTION

DRIVER'S SIGNATURE: _____

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed In USA

Britt/USA Truck
0084

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

MONTH  DAY  YEAR          MILES TODAY    UNIT #                    DRIVER ID

(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)       _Herbert Johnson_
                                                        (DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**                                   _Theodore Johnson_
3200 Industrial Park Rd. - Van Buren, AR 72956          (PRINT DRIVER'S NAME)

                                                        N/A
                                                        (NAME OF CO-DRIVER)

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 1 0 .5 |
| 2: SLEEPER | | | | | | 0 4 10.9 |
| 3: DRIVING | | | | | | 0 8 7.5 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 1 0 .0 |
| | | | | | Total Hours | 2 4 .0 |

REMARKS

Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days

Today  9.75
Total Hours Last 7 Days  63.75

Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER  9 0 0 5 2 8 7 0 5
☑ LOADING  ☑ CURRENT  ☑ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE 1/27/05  TIME 2000  TRACTOR/TRUCK NO.: 6517  TRAILER(S) NO.(S) 55491

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                     DRIVER'S SIGNATURE:              DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0085

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 11 | 28 | 05 | 4.50 | 6519 | 201 649 5060 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

5599.1
(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

*Theodore Johnson* (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00.00 |
| 2: SLEEPER | 15.75 |
| 3: DRIVING | 07.50 |
| 4: ON DUTY (NOT DRIVING) | 00.75 |
| **Total Hours** | **24.00** |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1. 0
2. 0
3. 0
4. 0
5. 0
6. 9.75
7. 8.25
Today 18
Total Hours Last 7 Days 52
Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Little Falls NY
Saratoga Spgs NY fuel
Binghamton NY fuel PT.
Harrisburg PA PT.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 90131972 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☑ LOADING  ☑ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE: 11/28/05    TIME: 2045    AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:    TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 5599

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. KELLER & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0086

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 11 | 29 | 05 | 660 | 6519 | 00164950 6 |

(TRAILER #1 - SHOW ALL UNITS)    53911

DRIVER'S SIGNATURE IN FULL: Theodore Johnson

(TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

PRINT DRIVER'S NAME: Theodore Johnson

NAME OF CO-DRIVER: N/A

| | Total Hours On Duty (Total Lines 3 + 4 on Daily Log) Last 7 Days |
|---|---|
| 1. | 0 |
| 2. | 0 |
| 3. | 0 |
| 4. | 0 |
| 5. | 9.75 |
| 6. | 8.75 |
| 7. | 11.5 |

Today 7.50
Total Hours Last 7 Days 70.50
Total Hours Available Tomorrow (70 Hours Minus Total)

MID-NIGHT — Use Local Time Standard at Home Terminal — Total Hours

1: OFF DUTY
2: SLEEPER
3: DRIVING
4: ON DUTY (NOT DRIVING)

**REMARKS**

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9913972 | □ LOADING | ☒ CURRENT | □ UNLOADED |
| PRO NUMBER | | □ LOADING | □ CURRENT | □ UNLOADED |
| PRO NUMBER | | □ LOADING | □ CURRENT | □ UNLOADED |

---

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/29/05     TIME: 0100     TRACTOR/TRUCK NO.: 6519     TRAILER(S) NO.(S): 53991

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. Keller & Associates, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0087

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|

TRAILER #1 - SHOW ALL UNITS          TRAILER #2

DRIVER'S SIGNATURE IN FULL

PRINT DRIVER'S NAME

N/A

NAME OF CO-DRIVER

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.00 |
| 2: SLEEPER | 11.31.25 |
| 3: DRIVING | 155150 |
| 4: ON DUTY (NOT DRIVING) | 10.01.25 |

| | 9.75 |
| | 8.25 |
| | 11.50 |
| | 5.75 |

**REMARKS**

24.00   Total Hours

Today 35.25

Total Hours Last 7 Days 34.75

Total Hours Available Tomorrow (70 Hours Minus Total)

Cookeville, TN

Memphis, AR

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT

AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 11/3/05   TIME: 1245   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S):

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
  INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

© Copyright 2003 & Published by J. J. Keller & ASSOCIATES, INC., Neenah, WI • (800) 327-6868 • Printed in USA

Britt/USA Truck
0088



# DRIVER'S DAILY LOG BOOK

### FORM PRESCRIBED BY THE
### DEPARTMENT OF TRANSPORTATION

FOR MONTH OF *December*                                          YEAR *05*

**CARRIER** USA TRUCK, INC.                    **DRIVER** *Theodore Johnson*

**ADDRESS** P.O. BOX 449                       **ADDRESS** *18 Stephanie Dr.*

**CITY** VAN BUREN    **STATE** AR 72956    **CITY** *Bear*    **STATE** *DE*

## FINDER – RETURN THIS BOOK TO DRIVER OR CARRIER
### DRIVER'S DAILY LOG
PRESCRIBED BY DEPT. OF TRANSPORTATION
INSTRUCTIONS FOR THE USE OF DRIVER'S DAILY LOG

1. Drivers and motor carriers will be held responsible for the proper maintenance of the daily logs. Drivers shall keep the log current to the time of the last change of duty status. Failure to make logs, failure to make required entries therein, falsification of entries, or failures to file logs with the motor carrier will make both the driver and the carrier liable to prosecution.
2. The driver shall forward the original log to his home terminal. If the services of a driver are used by more than one carrier during a calendar day, the driver shall furnish each motor carrier a copy of his log for the entire day. In such case the log shall indicate the name of each carrier served by the driver during that day.
3. The original logs shall be retained by the motor carrier for a period of six months. Duplicate copies of the logs are the driver's personal records and are to be kept for a period of one month in the possession of the driver while he is on duty.
4. The time standard in effect at the driver's home terminal shall be used. The log shall be prepared, maintained, and submitted, for a 24-hour calendar day beginning at midnight.
5. All entries shall be made by the driver except that the name and main office address of the motor carrier may be printed or otherwise entered by an authorized representative of the carrier. The name of the motor carrier shall be that for which the driving is performed. In case of the driver of a leased vehicle, the name shown shall be that of the motor carrier performing the transportation.
6. (a) The driver shall certify to the correctness of log by signing his name in full.
   (b) Below driver's signature he shall list initials and last name of each co-driver.
7. In addition to the identification of the carrier and the driver's signature, the entries shall indicate:
   (a) The month, day, and year for which the log is prepared.
   (b) The total mileage while driving.
   (c) (1) The carrier's vehicle number or, if no such number is provided the state license number of each power unit.
       (2) The carrier's trailer or trailers' number or numbers or if no such numbers are provided, the state license number of each trailer unit.
   (d) Driver's home terminal address.
   (e) The actual period or periods during the calendar day spent in the activities specified on Lines 1, 2, 3, and 4 by drawing a continuous line between the appropriate time markers. The following directions are illustrative only and are not to be construed as modifying the definitions or regulations in Parts 395, inclusive:

LINE 1, OFF DUTY – All time, except that spent in a sleeper berth, when the driver is not working, is not required to be in readiness to work, or is not under any responsibility for performing work.
LINE 2, SLEEPER BERTH – All time resting in a sleeper berth.
LINE 3, DRIVING – All time spent at the controls of a motor vehicle in operation.
LINE 4, ON DUTY (Not Driving) – All time spent by a driver in performing work other than driving. This includes loading or unloading, preparing reports, remaining in readiness to perform work, remaining in charge of disabled vehicles, stops for meals, etc.
   (f) Under "Remarks" the time and the name of the place where each change of duty occurred, such as the place of reporting for work, starting to drive and where released from work. Explain reason for emergency resulting in hours exceeding those permitted by the regulations.
   (g) Under "Remarks" show the transportation performed each day by entering a shipping document number or numbers, or name of a shipper and commodity.
   (h) In the column "Total Hours," the hours and fractions thereof shown in each of Lines 1, 2, 3, and 4. The sum of the entries in this column must total 24 hours.
   (i) DAILY RECAP: Column "A" Total Hours On-Duty (total Lines 3 & 4 on Daily Log) for Last 7 Days, including today. Total Hours Available Tomorrow; take 70 hours minus total in Column "A".

USA-064

Britt/USA Truck
0089

# DRIVER'S DAILY LOG

(ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 4 | 4 | 0 3 | 5 8 6 | 2 8 0 2 3 | 5 5 5 9 9 7 7 7 7 |
|---|---|------|--------|-----------|-------------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

| 2 2 4 8 5 | 2 2 4 8 6 |
|------------|------------|
| (TRAILER #1 - SHOW ALL UNITS) | (TRAILER #2) |

| (TRAILER #3) | (TRAILER #4) |

*John Doe*
(DRIVER'S SIGNATURE IN FULL)

John Doe
(PRINT DRIVER'S NAME)

Jane Doe
(NAME OF CO-DRIVER)

**Use Local Time Standard at Home Terminal**

| | Total Hours |
|---|---|
| 1: OFF DUTY | 2 0 0 |
| 2: SLEEPER | 9 2 5 |
| 3: DRIVING | 1 1 0 0 |
| 4: ON DUTY (NOT DRIVING) | 1 7 5 |
| | 2 4 0 0 Total Hours |

**REMARKS**

SAN JON, NM P.T.I.

ALBUQUERQUE, NM D & H P.T.I.

LUPTON, AZ DOT INSPECTION

WILLIAMS, AZ

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 7 8 6 1 3 0 9 4 2 | PRO NUMBER | 7 2 7 1 4 1 8 3 4 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☐ CURRENT ☒ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |
|---|---|
| 1. | 10.00 |
| 2. | 6.25 |
| 3. | 13.75 |
| 4. | 7.25 |
| 5. | 2.0 |
| 6. | 8.5 |
| 7. | 12.75 Today |
| | 60.50 Total Hours Last 7 Days |
| (1) | 9.50 Total Hours Available Tomorrow (70 Hours Minus Col. A) |

# DRIVER'S VEHICLE INSPECTION REPORT

AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 4/4/03    TIME: 15:45    TRACTOR/TRUCK NO.: 28023    TRAILER(S) NO.(S): 22486

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE *John Doe*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:        DRIVER'S SIGNATURE:        DATE:

Britt/USA Truck
0090

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 12 | 01 | 05 | 540 | 519 | 291649506 |

(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

DRIVER'S SIGNATURE IN FULL

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1. OFF DUTY | 0.75 |
| 2. SLEEPER | 13:00  8.25 |
| 3. DRIVING | 09:00  11.5 |
| 4. ON DUTY (not driving) | 01:00  3.75 |
| | 24:00  10 |

Total Hours

**REMARKS**

Memphis AR
Benton AR
Benton AR
Dallas TX

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 901319721 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☒ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE: 12/1/05   TIME: 3130   TRACTOR/TRUCK NO.: 519   TRAILER(S) NO.(S): 53919

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE          DRIVER'S SIGNATURE          DATE

Britt/USA Truck
0091

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | | | | |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
| (TRAILER #1 / SHOW ALL UNITS) | | | 5563 | (TRAILER #2) | (DRIVER'S SIGNATURE IN FULL) |

Theodore Johnson
(PRINT DRIVER'S NAME)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1. OFF DUTY | 0000 |
| 2. SLEEPER | 1453 |
| 3. DRIVING | 0700 |
| 4. ON DUTY | 0055 |
| | 2400 |

Total Hours

**REMARKS**

Jackson MS

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE _____ TIME _____ TRACTOR/TRUCK NO. 6519   TRAILER(S) NO.(S) 55531

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER. DESCRIBE DEFECT IN DETAIL. USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED.

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____ DRIVER'S SIGNATURE _____ DATE _____

Britt/USA Truck
0092

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 12 03 05 | 781 | 6519 | 221 | 04 9 50.6 |
|---|---|---|---|---|
| MONTH DAY YEAR | MILES TODAY | UNIT # | | |

5553 — (TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

DRIVER ID    Theodore Johnson

(DRIVER'S SIGNATURE IN FULL)    Theodore Johnson

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

(PRINT DRIVERS NAME)

N/A    (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 9.75 |
| 2: SLEEPER | 8.85 |
| 3: DRIVING | 11.50 |
| 4: ON DUTY | Dance 5.75 |
| | 15150 10 |
| | 08155 9.5 |
| | 0125 8.5 |
| | 89 00 Total Hours Today |
| | 67.75 Total Hours Last 7 Days |

**REMARKS**

Jacksonville FL

Madisonville

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 904 3703916 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE 12 3 05   TIME 1580   TRACTOR/TRUCK NO. 6519   TRAILER(S) NO (S): 55531

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE   Theodore J

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE    DRIVER'S SIGNATURE    DATE

Britt/USA Truck
0093

262(9)

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 11 | 04 | 05 | 435 | 6519 | 021649506 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

| 55551 | 54951 |
|---|---|
| (TRAILER #1 - SHOW ALL UNITS) | (TRAILER #2) |

DRIVER'S SIGNATURE IN FULL: _Theodore Johnson_

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

PRINT DRIVER'S NAME: Theodore Johnson

N/A
(NAME OF CO-DRIVER)

| Total Hours |
|---|
| 8.25 |
| 1.50 |
| 5.75 |

| | MIDNIGHT | NOON | MIDNIGHT | Total Hours |
|---|---|---|---|---|
| 1. OFF DUTY | | | | 01:00 |
| 2. SLEEPER | | | | 14:75 |
| 3. DRIVING | | | | 07:85 |
| 4. ON DUTY | | | | 01:00 |
| | | | | 24:00 |

Total Hours

| 10 | 7.5 | 8.5 | 8.25 |
|---|---|---|---|

Today: 54.75

Total Hours Last 7 Days: 78.25

Total Hours Available Tomorrow (70 Hours Max/Total)

**REMARKS**

Madison GA
Pit. 1 unloading
Rabun? GA
lunch
Black GA
Taylors GA Dug 5555?
Buck 54951
Elvena SC Pt.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 51055585610 | PRO NUMBER | 902415075 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | | ☐ LOADING ☑ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
(REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:)

| DATE | 11/4/05 | TIME | 1845 | TRACTOR/TRUCK NO. | 6519 | TRAILER(S) NO.(S) | 55551 |
|---|---|---|---|---|---|---|---|

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL. USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _Theodore Johnson_

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

| MECHANIC'S SIGNATURE | DRIVER'S SIGNATURE | DATE |
|---|---|---|

Britt/USA Truck
0094

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| | | |
|---|---|---|
| MONTH / DAY / YEAR | MILES DRIVEN TODAY | UNIT # |
| (TRAILER(S)) SHOW ALL UNITS | (TRAILER #2) | |

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

DRIVER No.  221649506

DRIVER'S SIGNATURE IN FULL

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1. OFF DUTY | 10 |
| 2. SLEEPER | 25 |
| 3. DRIVING | 8.5 |
| 4. ON DUTY | 8.25 |
| | **Total Hours** |

**REMARKS**
Florence SC
Dir.

Perryville MD
Hwy 222 Pit

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE _____  TIME _____  TRACTOR/TRUCK NO.: 6519    TRAILER(S) NO.(S): 54951

☐ DEFECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR AS RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DEFECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE          DRIVER'S SIGNATURE          DATE

Britt/USA Truck
0095

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE-Safety   PINK-Driver

| 12 06 05 | 335 | 6519 | 221649506 |
| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER |

54951
(TRAILER #) - SHOW ALL UNITS          (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (DRIVER'S SIGNATURE IN FULL)
Theodore Johnson (PRINT DRIVER'S NAME)
N/A (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| | 5.95 |
| 1. OFF DUTY | 10 |
| 2. SLEEPER | 2.5 |
| 3. DRIVING | 8.5 |
| 4. ON DUTY | 8.25 |
| | 9.25 |
| | 24.00 |

Total Hours

REMARKS

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 708V15075
☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS SUBMIT THE FOLLOWING

DATE 12 06 05   TIME 1300   TRACTOR/TRUCK NO. 6519   TRAILER(S) NO.(S) 54951

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANICS SIGNATURE                DRIVER'S SIGNATURE                DATE

Britt/USA Truck
0096

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER # |
|---|---|---|---|---|---|

MILES TODAY

(TRAILER #1 SHOW ALL UNITS)     (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL)
Theodore Johnson (PRINT DRIVER'S NAME)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

N/A (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1. OFF DUTY | 00.00 |
| 2. SLEEPER | 14.00 |
| 3. DRIVING | 08.75 |
| 4. ON DUTY | 01.25 |
| | 24.00 Total Hours |

**REMARKS**

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | 901320927 | PRO NUMBER |
|---|---|---|---|
| □ LOADING  □ CURRENT  □ UNLOADED | □ LOADING  □ CURRENT  □ UNLOADED | | □ LOADING  □ CURRENT  □ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE _____ TIME _____  TRACTOR/TRUCK NO. 6519   TRAILER(S) NO.(S): 55367

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK/SIDE IF NECESSARY

DRIVER'S SIGNATURE _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____     DRIVER'S SIGNATURE _____     DATE _____

Britt/USA Truck
0097

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

**U S A Truck, Inc.**
3200 Industrial Park Rd., Van Buren, AR 72956

PRINT DRIVER'S NAME: Theodore Johnson

NAME OF CO-DRIVER: N/A

| | Total Hours |
|---|---|
| 1. OFF DUTY | 00 00 |
| 2. SLEEPER | 18 00 |
| 3. DRIVING | 05 25 |
| 4. ON DUTY | 00 25 |
| | 24 00 Total Hours |

REMARKS

El Kton, MO

CHECK BOX SHOWING CURRENT STATUS OR PRO NUMBER

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE _____ TIME 30:15 TRACTOR/TRUCK NO. 159 TRAILER(S) NO.(S) 550267

☐ DEFECT, NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED.

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:

DRIVER'S SIGNATURE:

DATE:

Britt/USA Truck
0098

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS) WHITE - Safety PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|

(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. • Van Buren, AR 72956

DRIVER'S SIGNATURE IN FULL
*Theodore Johnson*
(PRINT DRIVER'S NAME)
*Theodore Johnson*
N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

|  | | Total Hours |
|---|---|---|
| 1. OFF DUTY | | 8.5 |
| 2. SLEEPER | | 8.25 |
| 3. DRIVING | | 6 |
| 4. ON DUTY (NOT DRIVING) | | 10 |
| | | 6 |
| | | 24:00 Total Hours |

**REMARKS**

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 903360750 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☒ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10/09/15   TIME: 1205   TRACTOR/TRUCK NO: 1639   TRAILER(S) NO.(S): 51910

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED**

☐ ABOVE DEFECTS CORRECTED.

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0099

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS) ☐ WHITE - Safety   ☐ PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 12 | 09 | 05 | 2 | 0519 | 021 679506 |

(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

Kendall Johnson (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

| | MID-NIGHT | | | | | | | | | | NOON | | | | | | | | | | | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. OFF-DUTY | | | | | | | | | | | | | | | | | | | | | | | | 29.00 |
| 2. SLEEPER | | | | | | | | | | | | | | | | | | | | | | | | 00.00 |
| 3. DRIVING | | | | | | | | | | | | | | | | | | | | | | | | 12.00 |
| 4. ON DUTY (not driving) | | | | | | | | | | | | | | | | | | | | | | | | 02.00 |
| | | | | | | | | | | | | | | | | | | | | | | | | 24.00 Total Hours |

**REMARKS**

Newark, DE
Hometime
12/9/05 ---- 12/11/05

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 0 5 3 2 6 7 8 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING.

DATE:_____  TIME:_____  TRACTOR/TRUCK NO.:_____  TRAILER(S) NO (S):_____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE:_____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:_____   DRIVER'S SIGNATURE:_____   DATE:_____

Britt/USA Truck
0100

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY 24 HOURS) — WHITE: Salary  PINK: Driver

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

(DRIVER'S SIGNATURE IN FULL)
Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1 OFF DUTY | 14.00 |
| 2 SLEEPER | 1.00 |
| 3 DRIVING | 9.00 |
| 4 ON DUTY | 10.00 |
| | 24.00 Total Hours |

REMARKS

Newark, DE
PA

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER  90053861?    ☐ LOADING  ☒ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/11/06  TIME: 1400  TRACTOR/TRUCK NO.: 6317  TRAILER(S) NO.(S): 51910

☒ DEFECT: NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DEFECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE      DRIVERS SIGNATURE      DATE

Britt/USA Truck
0101

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 12 | 12 | 05 | 6120 | 6519 | 2216495060 |
|----|----|----|------|------|------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

01.9.0    54261
(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL)
*Theodore Johnson*

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

*Theodore Johnson*
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | MID-NIGHT | Use Local Time Standard at Home Terminal | | | | | | | | | | | NOON | | | | | | | | | | | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | | | | | | | | | | | | | | | | | | | | | 0.00 |
| 2: SLEEPER | | | | | | | | | | | | | | | | | | | | | | | | | | 12.00 |
| 3: DRIVING | | | | | | | | | | | | | | | | | | | | | | | | | | 11.00 |
| 4: ON DUTY (NOT DRIVING) | | | | | | | | | | | | | | | | | | | | | | | | | | 01.00 |

Total Hours: 24.00

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

Total Hours Today 12
Total Hours Last 7 Days 12
Total Hours Available Tomorrow (70 Hours Minus Total) 58

**REMARKS**

*New York, NY   Backyard NY unload reiner   Ted Johnson   New York, NY*

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 900532078 | PRO NUMBER 901321226 | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING: 54261

DATE: 12/12/05   TIME: 2000   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 54261

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACKSIDE IF NECESSARY

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

Britt/USA Truck
0102

F
262:9

# DRIVER'S DAILY LOG

(ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 12 | 13 | 05 | 405 | LAM DRIVER |
|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # |

Total Hours On Duty
Total Lines 13 + 4
On Daily Log
Last 7 Days

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)    (DRIVER ID)

_Theodore Hanson_ (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

_Theodore Hanson_ (PRINT DRIVER'S NAME)

_N/A_ (NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

|  | MID-NIGHT | ... | NOON | ... | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 09:00 |
| 2: SLEEPER | | | | | | 11:00 / 25 |
| 3: DRIVING | | | | | | 10:00 / 75 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 09:00 / 50 |
| | | | | | Total Hours | 04:00 / 00 |

2:25
Today
19:25
Total Hours Last 7 Days
38.75
Total Hours Available Tomorrow
70 Hours Minus Total

**REMARKS**

_Dublin VA_    _Ashland VA fuel P.t.,_    _Mebane NC P.t._

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 901 321 220 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/13/05    TIME: 1730    TRACTOR/TRUCK NO.: 0519    TRAILER(S) NO.(S): 54261

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0103

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 12 | 14 | 05 | 526 | 05.19 | 03 04 05 04 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

54261
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVERS NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0 |
| 2: SLEEPER | 0 |
| 3: DRIVING | 0 |
| 4: ON DUTY (NOT DRIVING) | 12 |

Total Hours On Duty (Total Lines 3+4 On Daily Log) Last 7 Days

| 1. | 0 |
| 2. | 0 |
| 3. | 0 |
| 4. | 0 |
| 5. | 12 |
| 6. | 7.25 |
| 7. | 9.25 |

Total Hours Today: 28.5

Total Hours Last 7 Days: 41.5

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Mobile AL

Montgomery AL
Pt.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

PRO NUMBER 901321220
☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/14/05    TIME: 1745    TRACTOR/TRUCK NO.: 0519    TRAILER(S) NO.(S): 54261

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   - INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

Britt/USA Truck
0104

F
2620

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)     WHITE - Safety     PINK - Driver

| | | | | | | Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days |
|---|---|---|---|---|---|---|
| 12 15 05 | 435 | 6519 | 22 164 950 6 | | |
| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID | | |
| 5426 | (TRAILER #2) | | Theodore Johnson | | |
| (TRAILER #1 - SHOW ALL UNITS) | | | (DRIVER'S SIGNATURE IN FULL) | | |

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 10 01 00 |
| 2: SLEEPER | | | | | | 1 5 1 75 |
| 3: DRIVING | | | | | | 07 25 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 01 11 00 |
| | | | | | Total Hours | 24 0 0 |

| Last 7 Days | |
|---|---|
| 1. | 0 |
| 2. | 0 |
| 3. | 0 |
| 4. | 12 |
| 5. | 7.25 |
| 6. | 9.25 |
| 7. Today | 8.25 |
| | 36.75 |
| Total Hours Last 7 Days | 33.25 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | |

**REMARKS**

Montgomery AL
fuel Pt.
Decatur AL
loading AL

Knoxville TN
unloading Pt.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 4013 21 220 | PRO NUMBER | 4024 75 166 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☐ CURRENT ☑ UNLOADED | | ☑ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12 15 05     TIME: 1530     TRACTOR/TRUCK NO.: 6519     TRAILER(S) NO.(S): 5426

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE** Theodore Johnson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED.
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

Britt/USA Truck
0105

# DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

**MONTH** **DAY** **YEAR**  **MILES TODAY**  **UNIT #**  **DRIVER ID**

(TRAILER #1 - SHOW ALL UNITS)  (TRAILER #2)  (DRIVER'S SIGNATURE IN FULL)

(PRINT DRIVER'S NAME)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | | Total Hours |
|---|---|---|
| 1: OFF DUTY | | |
| 2: SLEEPER | | |
| 3: DRIVING | | |
| 4: ON DUTY (NOT DRIVING) | | |

**Total Hours**

**REMARKS**

| Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days | |
|---|---|
| Today | |
| Total Hours Last 7 Days | |
| Total Hours Available Tomorrow (70 Hours Minus Total) | 73.5 |

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

**DATE:** 12/18/05  **TIME:** 1815  **TRACTOR/TRUCK NO.:** 6519  **TRAILER(S) NO.(S):** 54011

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
  INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE:**

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

**MECHANIC'S SIGNATURE:**  **DRIVER'S SIGNATURE:**  **DATE:**

Britt/USA Truck
0106

F
26208

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 1 2 | 1 9 | 0 5 | | 5 2 5 | | 0 5 9 | | 2 2 1 6 4 9 5 0 6 1 | |
| MONTH | DAY | YEAR | | MILES TODAY | | UNIT # | | DRIVER ID | |

5 4 2 6 1
(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

DRIVER ID: _Theodore Calison_ (DRIVER'S SIGNATURE IN FULL)

_Theodore  Johnson_ (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days |
| --- | --- |
| | 7.25 |
| | 9.25 |
| | 8.25 |
| | 9.25 |

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
| --- | --- | --- | --- | --- | --- | --- |
| 1: OFF DUTY | | | | | | 0.00 |
| 2: SLEEPER | | | | | | 11.25 |
| 3: DRIVING | | | | | | 5.75 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 0.100 |
| | | | | | | 24.00 |

Total Hours Today 9.75

**REMARKS**

Malden NY
Pt.
Arlington VT
unloading
Barriton N/NE
loading
Newburgh NY
Pt. Pt.
Newark, DE
Pt.

Total Hours Last 7 Days 51.25

Total Hours Available Tomorrow (70 Hours Minus Total) 15.75

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 9 0 0 5 3 4 5 2 6 | PRO NUMBER | 9 0 1 3 2 2 0 9 9 | PRO NUMBER | |
| --- | --- | --- | --- | --- | --- |
| ☐ LOADING | ☑ CURRENT ☑ UNLOADED | ☑ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/19/05   TIME: 1930   TRACTOR/TRUCK NO.: 10519   TRAILER(S) NO.(S): 51261

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

Britt/USA Truck
0107

F
2629

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | | DRIVER ID |
|---|---|---|---|---|---|---|

585    0519    22    049526

(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: Theodore

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

PRINT DRIVER'S NAME: Theodore Johnson

NAME OF CO-DRIVER: N/A

| | | Total Hours |
|---|---|---|
| | On Duty | |
| | Total Lines | |
| | 3 + 4 | |
| | On | |
| | Daily Log) | |
| | Last 7 Days | 9.25 |

| Status | Total Hours | |
|---|---|---|
| 1: OFF DUTY | 00 10.0 | 8.25 |
| 2: SLEEPER | 13.75 | 9.25 |
| 3: DRIVING | 09 1.75 | 6 |
| 4: ON DUTY (NOT DRIVING) | 0750 | 4.5 |
| | 04 00 | 9.75 |
| | | 10.25 |

Total Hours: 04 00

Today: 57.25

Total Hours Last 7 Days: 62.75

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Newark, DE
PTF

Hous River, NC
Plt Fuel

Gaffney, SC
PT.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 901 33 2049 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| LOADING | CURRENT | UNLOADED | LOADING | CURRENT | UNLOADED | LOADING | CURRENT | UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 10 26 05    TIME: 1945    TRACTOR/TRUCK NO.: 10519    TRAILER(S) NO.(S): 54201

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore Johnson

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

Britt/USA Truck
0108

F
2624

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 12 | 21 | 05 | 75 | 4518 | 022,11049 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

54261
(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

DRIVER'S SIGNATURE IN FULL

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | |
| 2: SLEEPER | |
| 3: DRIVING | |
| 4: ON DUTY (NOT DRIVING) | |

Total Hours

Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days  8.25

9.25

6

4.5

9.75

10.25

1.75

Today 49.75

Total Hours Last 7 Days 20.25

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Heflin, SC
Sand Springs, SC
Unload 0900 PM

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 901322099 | ☐ LOADING ☑ CURRENT ☑ UNLOADED | PRO NUMBER | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | PRO NUMBER | | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/21/05   TIME: 0745   TRACTOR/TRUCK NO.: 4518   TRAILER(S) NO.(S): 54261

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

Britt/USA Truck
0109

F
262#9

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 12 | 22 | 05 | 630 | 6519 | 22.64.9500 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

5 42 61    52676
(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days | 9.25 |
|---|---|

MID-NIGHT   Use Local Time Standard at Home Terminal   MID-NIGHT   Total Hours

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | NOON | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | | | | | | | | | | | | | | | | | | | 0900 |
| 2: SLEEPER | | | | | | | | | | | | | | | | | | | | | | | | 275 |
| 3: DRIVING | | | | | | | | | | | | | | | | | | | | | | | | 0150 |
| 4: ON DUTY (NOT DRIVING) | | | | | | | | | | | | | | | | | | | | | | | | 0075 |
| | | | | | | | | | | | | | | | | | | | | | | | | 2400 |

| | |
|---|---|
| | 6 |
| | 4.5 |
| | 9.75 |
| | 10.25 |
| | 1.75 |
| | 11.25 |

Total 52.75
Total Hours Last 7 Days 17.25
Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Sandy Springs
Sumter SC Drop 5/3/67 Hook 52676
Dunn NC Fuel pt. H1
Washington PA

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 1009 1 9929 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☑LOADING ☒CURRENT ☐UNLOADED | ☐LOADING ☐CURRENT ☐UNLOADED | ☐LOADING ☐CURRENT ☐UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/22/05   TIME: 2145   TRACTOR/TRUCK NO.: 6519   TRAILER(S) NO.(S): 52676

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

Britt/USA Truck
0110

F
26249

## DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

| MONTH 12 | DAY 23 | YEAR 05 | MILES TODAY 99 | UNIT # 05/1 | DRIVER ID 221114950 |

52676
(TRAILER #1 - SHOW ALL UNITS)        (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: Theodore Johnson
PRINT DRIVER'S NAME: Theodore Johnson

### U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

NAME OF CO-DRIVER: N/A

| | Total Hours |
|---|---|
| 1: OFF DUTY | 3.00 |
| 2: SLEEPER | 0.900 |
| 3: DRIVING | 10.11.25 |
| 4: ON DUTY (NOT DRIVING) | 10.04.25 |
| Total Hours | 24.00 |

Total Hours On Duty (Total Lines 3+4) On Daily Log Last 7 Days: 006
4.5
9.75
10.25
1.75
11.75
2
Today 4.5
Total Last 7 Days
94.5
Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS: Washington DC / Newark, DE / Ft. Howard, MD 12/23 — 12/23

### CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 9034 17922  ☐ LOADING  ☒ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

### DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/23/05   TIME: 1100   TRACTOR/TRUCK NO.: 659   TRAILER(S) NO.(S): 52676

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: 

### COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

Britt/USA Truck
0111

F
2624

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 12 | 24 | 05 | | 0 | | 9519 | 82104195 |
|----|----|----|-|----|-|------|----------|
| MONTH | DAY | YEAR | | MILES TODAY | | UNIT # | DRIVER ID |

52676
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Sheldon Cat
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days |
|-|-|
| | 4.5 |
| | 9.75 |
| | 10.25 |
| | 1.75 |
| | 11.25 |
| | 2 |
| | 0 |

Use Local Time Standard at Home Terminal

MID-NIGHT  1 2 3 4 5 6 7 8 9 10 11 NOON 1 2 3 4 5 6 7 8 9 10 11 MID-NIGHT    **Total Hours**

| 1: OFF DUTY | 24:00 |
| 2: SLEEPER | 0:00 |
| 3: DRIVING | 0:00 |
| 4: ON DUTY (NOT DRIVING) | 0:00 |
| | **24:00** Total Hours |

Today 7.75

Total Hours Last 7 Days 31.5

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Newark, DE
Hometime
12/23/05 — 12/27/05

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER  90241 7922    ☐ LOADING  ☒ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTON

**DRIVER'S SIGNATURE:** _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0112

F
26249

**RIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 12 | 27 | 05 | 95 | 0519 | 0216495000 |
|----|----|----|----|------|------------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

(TRAILER #1 - SHOW ALL UNITS)         (TRAILER #2)

*Theodore Johnson* (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days |
|---|---|
| 1 | 0 |
| 2 | 0 |
| 3 | 0 |
| 4 | 0 |
| 5 | 0 |
| 6 | 0 |
| 7 Today | 2 |

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 1:00 |
| 2: SLEEPER | 11:00 |
| 3: DRIVING | 10:14:75 |
| 4: ON DUTY (NOT DRIVING) | 10:0:25 |
| | Total Hours 24:00 |

Total Hours Last 7 Days
2

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

*Memphis, TN*
*Bordentown, NJ*

**HECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| RO UMBER | | PRO NUMBER | | PRO NUMBER | |
|----------|---|-----------|---|-----------|---|
| 002417922 | | | | | |
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

ATE: 12/27/05   TIME: 1400   TRACTOR/TRUCK NO.: 0319   TRAILER(S) NO.(S): 52676

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE.

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

Britt/USA Truck
0113

**DRIVER'S DAILY LOG** ONE CALENDAR DAY – 24 HOURS

**U S A Truck, Inc.**
3200 Industrial Park Rd - Van Buren, AR 72956

NAME OF CO-DRIVER

Theodore Johnson

N/A

| | Total Hours |
|---|---|
| 1: | 18 00 |
| 2: | 01 00 |
| 3: Driving | 01 75 |
| 4: | 00 25 |
| | 24 00 |
| | Total Hours |

**REMARKS**

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE                TIME              TRACTOR/TRUCK NO.  6319      TRAILER(S) NO.(S): 52676

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE                                    DRIVER'S SIGNATURE                          DATE

Britt/USA Truck
0114

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY, 24 HOURS)

**U S A Truck, Inc.**
3200 Industrial Park Rd., Van Buren, AR 72956

DRIVER'S SIGNATURE IN FULL

PRINT DRIVER'S NAME

NAME OF CO-DRIVER

1. OFF DUTY
2. SLEEPER
3. DRIVING
4. ON DUTY

Total Hours

**REMARKS**

CHECK BOX SHOWING CURRENT STATUS OF BREAK/DRIVERS

PRO NUMBERING: □ LOADING  □ CURRENT  □ UNLOADED    □ LOADING  □ CURRENT  □ UNLOADED    BOX NUMBER: □ LOADING  □ CURRENT  □ UNLOADER

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____  TIME: _____  TRACTOR/TRUCK NO: W519  TRAILER(S) NO(S): 53696

□ DEFECT  NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0115



Britt/USA Truck
0116

**DRIVER'S DAILY LOG**

**U S A Truck, Inc.**

DRIVER'S SIGNATURE IN FULL

PRINT DRIVER'S NAME

NAME OF CO-DRIVER

REMARKS

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE _____ TIME _____ TRACTOR/TRUCK NO. _____    TRAILER(S) NO.(S) _____

☐ NO DEFECT, NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

☐ I DEFECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER. DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _____

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____    DRIVER'S SIGNATURE _____    DATE _____

Britt/USA Truck
0117



Britt/USA Truck
0118

F
2624

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | | DRIVER ID | |
|---|---|---|---|---|---|---|
| 12 | 30 | 05 | 325 | 0519 | 0827 0419506 | |

5261076
(TRAILER #1 - SHOW ALL UNITS)     7875 (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1. | 0 |
| 2. | 0 |
| 3. | 0 |
| 4. | 2 |
| 5. | 10.25 |
| 6. | 11.5 |
| 7. | 7 |

**REMARKS**

| Total Hours Today | 30.75 |
| Total Hours Last 7 Days | 31.0 |

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9013202735 | PRO NUMBER | 970538258 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☑ CURRENT ☒ UNLOADED | | ☐ LOADING ☑ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/30/05   TIME: 1445   TRACTOR/TRUCK NO.: 0519 7875   TRAILER(S) NO.(S): 526076

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:     DRIVER'S SIGNATURE:     DATE:

Britt/USA Truck
0119

F
262

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 12 | 31 | 05 | 645 | 77.75 | 9216949500 |
|----|-----|------|-----------|-----------|-----------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

*Theodore Johnson* (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

*Theodore Johnson* (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.000 |
| 2: SLEEPER | 11.2175 |
| 3: DRIVING | 11.0175 |
| 4: ON DUTY (NOT DRIVING) | 0.050 |
| | 24.00 |
| | Total Hours |

**REMARKS**

Lebanon TN
Pt. 1

Bloomington IL

Washington PA
Pt.

Right side:
Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1. 0
2. 0
3. 2
4. 10.25
5. 11.5
6. 7
7. 11.25

Today 4.7

Total Hours Last 7 Days (1) XX

Total Hours Available Tomorrow (70 Hours Minus Total)

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 4005389850 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/31/05   TIME: 2030   TRACTOR/TRUCK NO.: 65M   TRAILER(S) NO.(S): 50070

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:      DRIVER'S SIGNATURE:      DATE:

Britt/USA Truck
0120



# DRIVER'S DAILY LOG BOOK

### FORM PRESCRIBED BY THE
### DEPARTMENT OF TRANSPORTATION

FOR MONTH OF _January_                                        YEAR _06_

CARRIER _USA TRUCK, INC._                    DRIVER _Theodore Johnson_

ADDRESS _P.O. BOX 449_                        ADDRESS _18 Stephanie Drive_

CITY _VAN BUREN_    STATE _AR 72956_    CITY _Bear_    STATE _DE_

## FINDER – RETURN THIS BOOK TO DRIVER OR CARRIER
### DRIVER'S DAILY LOG
#### PRESCRIBED BY DEPT. OF TRANSPORTATION
#### INSTRUCTIONS FOR THE USE OF DRIVER'S DAILY LOG

1. Drivers and motor carriers will be held responsible for the proper maintenance of the daily logs. Drivers shall keep the log current to the time of the last change of duty status. Failure to make logs, failure to make required entries therein, falsification of entries, or failures to file logs with the motor carrier will make both the driver and the carrier liable to prosecution.
2. The driver shall forward the original log to his home terminal. If the services of a driver are used by more than one carrier during a calendar day, the driver shall furnish each motor carrier a copy of his log for the entire day. In such case the log shall indicate the name of each carrier served by the driver during that day.
3. The original logs shall be retained by the motor carrier for a period of six months. Duplicate copies of the logs are the driver's personal records and are to be kept for a period of one month in the possession of the driver while he is on duty.
4. The time standard in effect at the driver's home terminal shall be used. The log shall be prepared, maintained, and submitted, for a 24-hour calendar day beginning at midnight.
5. All entries shall be made by the driver except that the name and main office address of the carrier may be printed or otherwise entered by an authorized representative of the carrier. The name of the motor carrier shall be that for which the driving is performed. In case of the driver of a leased vehicle, the name shown shall be that of the motor carrier performing the transportation.
6. (a) The driver shall certify to the correctness of log by signing his name in full.
   (b) Below driver's signature he shall list initials and last name of each co-driver.
7. In addition to the identification of the carrier and the driver's signature, the entries shall indicate:
   (a) The month, day, and year for which the log is prepared.
   (b) The total mileage while driving.
   (c) (1) The carrier's vehicle number or, if no such number is provided the state license number of each power unit.
       (2) The carrier's trailer number or numbers or if no such numbers are provided, the state license number of each trailer unit.
   (d) Driver's home terminal address.
   (e) The actual period or periods during the calendar day spent in the activities specified on Lines 1, 2, 3, and 4 by drawing a continuous line between the appropriate time markers. The following directions are illustrative only and are not to be construed as modifying the definitions or regulations in Parts 395, inclusive:

LINE 1, OFF DUTY – All time, except that spent in a sleeper berth, when the driver is not working, is not required to be in readiness to work, or is not under any responsibility for performing work.
LINE 2, SLEEPER BERTH – All time resting in a sleeper berth.
LINE 3, DRIVING – All time spent at the controls of a motor vehicle in operation.
LINE 4, ON DUTY (Not Driving) – All time spent by a driver in performing work other than driving. This includes loading or unloading, preparing reports, remaining in readiness to perform work, remaining in charge of disabled vehicles, stops for meals, etc.
   (f) Under "Remarks" the time and the name of the place where each change of duty status occurred, such as the place of reporting for work, starting to drive and where released from work. Explain reason for emergency resulting in hours exceeding those permitted by the regulations.
   (g) Under "Remarks" show the transportation performed each day by entering a shipping document number or numbers, or name of a shipper and commodity.
   (h) In the column "Total Hours," the hours and fractions thereof shown in each of Lines 1, 2, 3, and 4. The sum of the entries in this column must total 24 hours.
   (i) DAILY RECAP: Column "A" Total Hours On-Duty (total Lines 3 & 4 on Daily Log) for Last 7 Days, including today. Total Hours Available Tomorrow; take 70 hours minus total in Column "A".

USA-064

Britt/USA Truck
0121



**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 4 | 4 | 03 | 586 | 28023 | 5559977777 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

TRAILER #1 - SHOW ALL UNITS)  12485    (TRAILER #2)  12486

(TRAILER #3)    (TRAILER #4)

*John Doe*
(DRIVER'S SIGNATURE IN FULL)

*John Doe*
(PRINT DRIVER'S NAME)

Jane Doe
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | , 2 0.0 |
| 2: SLEEPER | , 9 2.5 |
| 3: DRIVING | 1, 1 0.0 |
| 4: ON DUTY (NOT DRIVING) | , 1 7.5 |
| REMARKS | 2, 4 0.0 Total Hours |

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days

**10.00**
**6.25**
**13.75**
**7.25**
**2.0**
**8.5**
**12.75** Today

**60.50** Total Hours Last 7 Days

(1) **9.50** Total Hours Available Tomorrow (70 Hours Minus Col. A)

SAN JON, NM P.T.I.

ALBUQUERQUE, NM D & H P.T.I.

LUPTON, AZ DOT INSPECTION

WILLIAMS, AZ

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 786130942 | PRO NUMBER | 727114834 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☐ CURRENT ☒ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 4/4/03    TIME: 15:45    TRACTOR/TRUCK NO.: 28023    TRAILER(S) NO.(S): 22486

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *John Doe*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:

DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0122

28249

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|-------|-----|------|-------------|--------|-----------|
| 01 | 30 | 00 | 7875 | | 221,649,506 |

(TRAILER #1 - SHOW ALL UNITS)    51923    (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: _Theodore Johnson_

PRINT DRIVER'S NAME: Theodore J. Johnson

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

(NAME OF CO-DRIVER): N/A

| | | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 10.00 |
| 2: SLEEPER | | 1.65.0 |
| 3: DRIVING | | 10.50.50 |
| 4: ON DUTY (NOT DRIVING) | | 10.100 |
| | Total Hours | 24.00 |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

1. 2
2. 10.75
3. 11.5
4. 7.5
5. 11.75
6. 10.5
7. 6.5

Today 60.5

Total Hours Last 7 Days 9.5

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Newburgh NY
Williamsburg PA
Newburgh NY
fuel
Mayan PA 50359
hauled 51923
Dublin PA

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 902423424 | PRO NUMBER 901325460 | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☐ CURRENT ☑ UNLOADED | ☐ LOADING ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/30/00    TIME: 1630    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 51923

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0123

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)  WHITE - Safety  PINK - Driver

26249

01 31 06      435      78.75      02164950□
MONTH  DAY  YEAR      MILES TODAY      UNIT #

5 7 3      DRIVER ID  Theodore Johnson
(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)      (DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**      Theodore Johnson
3200 Industrial Park Rd. - Van Buren, AR 72956      (PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | 10.75 |
| | 11.5 |
| | 7.5 |
| | 11.75 |
| | 10.5 |
| | 6.5 |
| | 7.5 |
| Total Hours Today | 66 |
| Total Hours Last 7 Days | |
| Total Hours Available Tomorrow (70 Hours Minus Total) | 4 |

|  | MID-NIGHT | 1 2 3 4 5 6 7 | NOON | 1 2 3 4 5 6 7 8 9 10 11 | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 0900 |
| 2: SLEEPER | | | | | | 1400 |
| 3: DRIVING | | | | | | 0285 |
| 4: ON DUTY (NOT DRIVING) | | | | | | |

Use Local Time Standard at Home Terminal

Total Hours  2400

REMARKS      Dubois, PA      Greenfield, IN

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER  9013258160
☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/31/06  TIME: 1500  TRACTOR/TRUCK NO.: 7875  TRAILER(S) NO.(S): 51403

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:      DRIVER'S SIGNATURE:      DATE:

Britt/USA Truck
0124

26249

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | |
|---|---|---|
| MONTH  DAY  YEAR | MILES TODAY | UNIT # |
| (TRAILER #1 - SHOW ALL UNITS) | (TRAILER #2) | |

DRIVER ID
*Theodore Johnson* (DRIVER'S SIGNATURE IN FULL)
*Theodore Johnson* (PRINT DRIVER'S NAME)
N/A (NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. · Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.25 |
| 2: SLEEPER | 11.5 |
| 3: DRIVING | 7 |
| 4: ON DUTY (NOT DRIVING) | 11.25 |
| | Total Hours  24.00  4.25 |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

0
2
10.25
11.5
7
11.25

Today
46.25

Total Hours Last 7 Days
283.75

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**  Washington PA  Scranton PA

*CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER*

| PRO NUMBER 900538359 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/11/06    TIME: 1415    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 52676

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *Theodore Johnson*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:            DRIVER'S SIGNATURE:            DATE:

Britt/USA Truck
0125

20249

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 01 | 02 | 06 | 327 | 7,875 | 22164950 |
|----|----|----|-----|-------|----------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

53676
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

DRIVER'S SIGNATURE IN FULL

## U.S.A. Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

|  | MID-NIGHT | | | | | | | | | | | NOON | | | | | | | | | | | | MID-NIGHT | Total Hours |
|--|-----------|--|--|--|--|--|--|--|--|--|--|------|--|--|--|--|--|--|--|--|--|--|--|----------|-------------|
| 1: OFF DUTY | | | | | | | | | | | | | | | | | | | | | | | | | 00:00 |
| 2: SLEEPER | | | | | | | | | | | | | | | | | | | | | | | | | 18:50 |
| 3: DRIVING | | | | | | | | | | | | | | | | | | | | | | | | | 05:25 |
| 4: ON DUTY (NOT DRIVING) | | | | | | | | | | | | | | | | | | | | | | | | | 00:25 |
|  | | | | | | | | | | | | | | | | | | | | | | | | | 24:00 Total Hours |

REMARKS

Scranton PA

Pennacke NY

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 900538258 | PRO NUMBER | PRO NUMBER |
|----------------------|------------|------------|
| ☐ LOADING ☑ CURRENT ☑ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

Total Hours On Duty
(Total Lines 3 + 4)
On Daily Log
Last 7 Days
2

10.25
11.5
7
11.25
4.25
5.5
Today

51.75
Total Hours
Last 7 Days

18.25
Total Hours Available Tomorrow
(70 Hours Minus Total)

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/2/06    TIME: 1415    TRACTOR/TRUCK NO.: 10519    TRAILER(S) NO.(S): 53676

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0126

F
28249

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 01 | 03 | 05 | 5-15 | 16509 | 0221649506 |
|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT NO. 7875 | DRIVER ID |

5221026 _____ _____    Theodore Johnson

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)    (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days |
|---|
| 10.25 |
| 11.5 |
| 7 |
| 11.25 |
| 4.25 |
| 5.5 |
| 9.5 |

Use Local Time Standard at Home Terminal — MID-NIGHT ... NOON ... MID-NIGHT    **Total Hours**

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.0 / 11.0 / 1.0 |
| 2: SLEEPER | 11.0 / 4.5 / 0 |
| 3: DRIVING | 10.8 / 1.75 / 4.25 |
| 4: ON DUTY (NOT DRIVING) | 7.0 / 1.75 / 5.5 |
| | 9.0 / 4.0 / 0 / 9.5 |
| | **Total Hours** |

Today: 9.5

Total Hours Last 7 Days: 59.25

Total Hours Available Tomorrow (70 Hours Minus Total): 70.75

REMARKS:
Panama NY P.T. fuel/roadside unloading
Panama NY loading

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | P100539558 | PRO NUMBER | 401323393 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/3/05    TIME: 1715    TRACTOR/TRUCK NO.: 037875    TRAILER(S) NO.(S): 50678

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0127

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

01 04 06    1040    7825    021499509

MONTH  DAY  YEAR    MILES TODAY    UNIT #    DRIVER ID

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore Johnson (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
|---|---|
| 1: OFF DUTY | 10.00.0 |
| 2: SLEEPER | 1.2.45.0 |
| 3: DRIVING | 11.1.0.0 |
| 4: ON DUTY (NOT DRIVING) | 10.0.45.0 |
| | 24.00 Total Hours |

1. 11.5
2. 7
3. 11.25
4. 4.25
5. 5.5
6. 9.5
7. 11.5
Today 60.5
Total Hours Last 7 Days
9.5 Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS

Newark, NJ P.U.

Ashland, VA Fuel P.U.

Anderson, SC P.U.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 901303393  ☐ LOADING  ☑ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED
PRO NUMBER  ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/4/06    TIME: 0030    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 52676

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0128

**DRIVER'S DAILY LOG**   (ONE CALENDAR DAY - 24 HOURS)     WHITE - Safety     PINK - Driver

01 05 00     5.10     .7875     22164950

| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID |
| --- | --- | --- | --- |

52676     55572

(TRAILER #1 - SHOW ALL UNITS)     (TRAILER #2)     (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.

3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
| --- | --- |
| 1: OFF DUTY | 01100 |
| 2: SLEEPER | 31.50 |
| 3: DRIVING | 08.50 |
| 4: ON DUTY (NOT DRIVING) | 01100 |
| | 2400 Total Hours |

**REMARKS**

Anderson SC
Hutchins SC (unloading)
Louden TN
Oak Ridge TN
Lux Oak Ridge TN (Fuel)
Fr. Smith IA

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 910132339.3     ☐ LOADING  ☒ CURRENT  ☒ UNLOADED

PRO NUMBER 903364.5164     ☐ LOADING  ☒ CURRENT  ☒ UNLOADED

PRO NUMBER ____     ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days | |
| --- | --- |
| | 7 |
| | 11.25 |
| | 4.25 |
| | 5.5 |
| | 9.5 |
| | 11.5 |
| | 9.50 |
| Today | 58.5 |
| Total Hours Last 7 Days | 19.5 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | |

## DRIVER'S VEHICLE INSPECTION REPORT

AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1500     TIME: 900     TRACTOR/TRUCK NO.: 7875     TRAILER(S) NO.(S): 55572

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:     DRIVER'S SIGNATURE:     DATE:

Britt/USA Truck
0129

F
2C249

## DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 0 1 | 0 6 | 0 6 | 4 5 | 7875 | 501 64 9506 | |
|---|---|---|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID | |

05572            55752
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL)

### U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodora Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
|---|---|
| | 11.25 |
| | 4.25 |

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | 5.5 |
| 2: SLEEPER | | | | | 9.5 |
| 3: DRIVING | | | | | 11.5 |
| 4: ON DUTY (NOT DRIVING) | | | | | 9.5 |
| | | | | | 8.25 |

Total Hours
54.75

Total Hours Last 7 Days
18.25

Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS

Roanoke VA

Bethel PA
Dropped 55572
Hooked 55572

Newark DE
PL.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9 0 3 3 6 4 5 6 4 | PRO NUMBER | 9 0 0 5 3 9 0 0 0 1 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☒ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 6/05    TIME: 1600    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 55572

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DATE:

Britt/USA Truck
0130

F
26248

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|-------|-----|------|-------------|--------|-----------|

7875   D21419SON

Theodore On   (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson   (PRINT DRIVER'S NAME)

N/A   (NAME OF CO-DRIVER)

(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0.0 |
| 2: SLEEPER | 24.0 |
| 3: DRIVING | 0.0 |
| 4: ON DUTY (NOT DRIVING) | 0.0 |
| | 24.0 Total Hours |

**REMARKS**

Newark, DE
34 hr Reset   1/6/06 - 1/9/06

-6/06
-1/9/06

21.5

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9005390070 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING | ☑ CURRENT   ☐ UNLOADED | ☐ LOADING | ☐ CURRENT   ☐ UNLOADED | ☐ LOADING | ☐ CURRENT   ☐ UNLOADED |

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days

4.25
5.5
9.5
11.5
9.5
8.25
0
Today 48.5
Total Hours Last 7 Days
Total Hours Available Tomorrow (70 Hours Minus Total)

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____   TIME: _____   TRACTOR/TRUCK NO.: _____   TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

Britt/USA Truck
0131

F
26249

**DRIVER'S DAILY LOG**   (ONE CALENDAR DAY - 24 HOURS)     WHITE - Safety     PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

(DRIVER'S SIGNATURE IN FULL)
Theodore Johnson
(PRINT DRIVER'S NAME)
N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

Total Hours

| | | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 00:00 |
| 2: SLEEPER | | 14:25 |
| 3: DRIVING | | 07:00 |
| 4: ON DUTY (NOT DRIVING) | | 01:75 |
| | Total Hours | 24:00 |

Total Hours
Today
7.75

Total Hours
Last 7 Days

Total Hours
Available
Tomorrow
(70 Hours
Minus
Total)

Total Hours
On Duty
(Total Lines
3 + 4
On
Daily Log)
Last 7 Days
1. 0
2. 0
3. 0
4. 0
5. 0
6. 0
7. 7.75

**REMARKS**

Newark DE
Johnkin NY unloading
Bordentown NJ

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | PRO NUMBER | PRO NUMBER |
|---|---|---|
| □ LOADING ☑ CURRENT ☑ UNLOADED | □ LOADING □ CURRENT □ UNLOADED | □ LOADING □ CURRENT □ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____   TIME: 10:15   TRACTOR/TRUCK NO.: 18:15   TRAILER(S) NO.(S): 55752

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR
RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS
OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF
VEHICLE

MECHANIC'S SIGNATURE: _____     DRIVER'S SIGNATURE: _____     DATE: _____

Britt/USA Truck
0132

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS) WHITE - Safety PINK - Driver

| | | | |
|---|---|---|---|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # |

(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

DRIVER ID

Theodore Johnson (DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | MID-NIGHT | | | | NOON | | | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | | | | | |
| 2: SLEEPER | | | | | | | | | | |
| 3: DRIVING | | | | | | | | | | |
| 4: ON DUTY (NOT DRIVING) | | | | | | | | | | |

REMARKS

Total Hours
Today 9.75

Total Hours Last 7 Days

Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | | | | PRO NUMBER | | | | PRO NUMBER | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ LOADING | ☑ CURRENT | ☐ UNLOADED | | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED | | ☐ LOADING | ☐ CURRENT | ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/10/06    TIME: 0700    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 53032

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:          DRIVER'S SIGNATURE:          DATE:

Britt/USA Truck
0133

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | Total Hours On Duty |
|---|---|

MONTH   DAY   YEAR   MILES TODAY   UNIT #   DRIVER ID
5.30.3    4.35    7875    02110495001
(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)   (DRIVERS SIGNATURE IN FULL)

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| | | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 0.0 |
| 2: SLEEPER | | 7.00 |
| 3: DRIVING | | 7.75 |
| 4: ON DUTY (NOT DRIVING) | | 2 |
| | **Total Hours** | 7 |

Total Hours Today 16.75

Total Hours Last 7 Days 33.2

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Newport DE
P.T.i.

Haw River NC
PL.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 9013239.13   □ LOADING   ☒ CURRENT   □ UNLOADED
PRO NUMBER [ ]   □ LOADING   □ CURRENT   □ UNLOADED
PRO NUMBER [ ]   □ LOADING   □ CURRENT   □ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE:              TIME:              TRACTOR/TRUCK NO.:   7875    TRAILER(S) NO.(S):   53030

□ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☑ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                DRIVER'S SIGNATURE:                DATE:

Britt/USA Truck
0134

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| | | | | | | F |
| --- | --- | --- | --- | --- | --- | --- |
| 26249 | | | | | | |

MONTH `04` DAY `21` YEAR `2002` — MILES TODAY `644` — UNIT # `7875` — DRIVER ID `2214 9500`

TRAILER #1 - SHOW ALL UNITS `53032`    (TRAILER #2)    DRIVER'S SIGNATURE IN FULL _Theodore Johnson_

## U S A Truck, Inc.
### 3200 Industrial Park Rd - Van Buren, AR 72956

PRINT DRIVER'S NAME _Theodore Johnson_

NAME OF CO-DRIVER _N/A_

| | MID-NIGHT | | NOON | | MID-NIGHT | Total Hours |
| --- | --- | --- | --- | --- | --- | --- |
| 1: OFF DUTY | | | | | | `00:00` |
| 2: SLEEPER | | | | | | `13:00` |
| 3: DRIVING | | | | | | `10:25` |
| 4: ON DUTY (NOT DRIVING) | | | | | | `00:35` |
| | | | | | Total Hours | `24:00` |

Use Local Time Standard at Home Terminal

Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days

1. `0`
2. `0`
3. `7.75`
4. `2`
5. `7`
6. `11`

Today `07.75`

Total Hours Last 7 Days `22.75`

Total Hours Available Tomorrow (70 Hours Minus Total) `47.25`

**REMARKS**

_Haw River NC — RS Fuel_    _Meridian MS — Pt._

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER `9 0 1 3 2 3 7 1 3` | PRO NUMBER | PRO NUMBER |
| --- | --- | --- |
| ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: `4/21/02`    TIME: `1835`    TRACTOR/TRUCK NO.: `7875`    TRAILER(S) NO.(S): `53032`

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _Theodore Johnson_

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0135

F
26249

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| 0 | 13 | 06 | 360 | 7875 | 2216495001 |
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

53030
(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)

Theodore J
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
| 1. | 0 |
| 2. | 2.75 |
| 3. | 2 |
| 4. | 7 |
| 5. | 11 |
| 6. | 6.5 |
| 7. | Today 39.25 |

Use Local Time Standard at Home Terminal

| | MID-NIGHT | | | NOON | | | MID-NIGHT | Total Hours |
| 1: OFF DUTY | | | | | | | | 09:00 |
| 2: SLEEPER | | | | | | | | 17:15:00 |
| 3: DRIVING | | | | | | | | 06:00 |
| 4: ON DUTY (NOT DRIVING) | | | | | | | | 025.0 |
| | | | | | | | | 24:00 Total Hours |

Total Hours Last 7 Days
35.75

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Meridian MS
Pt. i. fuel

Rd. Alloo LA
Baton Rouge
Atchafalaya Bridge HH
Pt.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 9013259/3 | PRO NUMBER | | PRO NUMBER | |
| ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/3/06    TIME: 1815    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 53032

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: Theodore J

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE.

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0136

# DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS) WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 01 | 14 | 00 | 450 | 7875 | 22164495 |

(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: Theodore Johnson

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

PRINT DRIVER'S NAME: Theodore Johnson

NAME OF CO-DRIVER: N/A

|  | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | 09:00 |
| 2: SLEEPER | | | | | 16:00 |
| 3: DRIVING | | | | | 07:50 |
| 4: ON DUTY (NOT DRIVING) | | | | | 00:50 |
| | | | | Total Hours | 24:00 |

REMARKS

Beaver Bridge Ltd
Ptt. Fuel Pit Atlanta
loading

Montgomery AL.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 90242150 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING | ☐ CURRENT | ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days

| 1. | 0 |
| 2. | 7.75 |
| 3. | 2 |
| 4. | 7 |
| 5. | 11 |
| 6. | 6.5 |
| 7. | 8 |
| Total | 40.25 |

Total Hours Last 7 Days

Total Hours Available Tomorrow (70 Hours Minus Total) 27.75

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/14/00   TIME: 1530   TRACTOR/TRUCK NO.: 7875   TRAILER(S) NO.(S): 53032

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:   DRIVER'S SIGNATURE:   DATE:

Britt/USA Truck
0137

F
26049

# DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

01 15 04 | 3601 | 7875 | 221649506
MONTH   DAY   YEAR | MILES TODAY | UNIT # | DRIVER ID

53032
(TRAILER #1 - SHOW ALL UNITS) | (TRAILER #2)

DRIVER ID: *Theodore Johnson*
DRIVER'S SIGNATURE IN FULL

Theodore Johnson
PRINT DRIVER'S NAME

N/A
NAME OF CO-DRIVER

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| | 2.75 |
| | 2 |
| | 7 |
| 1: OFF DUTY | 0.00 |
| 2: SLEEPER | 11 |
| 3: DRIVING | 7.45 |
| 4: ON DUTY (NOT DRIVING) | 6.5 |
| | 10.00 |
| | 8 |
| | 00.15 |
| | 6.5 |
| Total Hours | 24.00 |

Use Local Time Standard at Home Terminal
MID-NIGHT ... NOON ... MID-NIGHT    Total Hours

On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days

Total Hours Last 7 Days
48.75

Total Hours Available Tomorrow (70 Hours Minus Total)
21.25

### REMARKS

Montgomery AL
P.U.

Newman LA
Fuel P.T.

Gaffney SC
P.T.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER: 902421506    ☑ CURRENT
☐ LOADING  ☑ CURRENT  ☐ UNLOADED

PRO NUMBER: _____
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

PRO NUMBER: _____
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/15/06    TIME: 1415    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 53032

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0138

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| | | | | | |
|---|---|---|---|---|---|
| 01 14 04 | 1400 | 7875 | 0211049504 | | |
| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID | | |

53032   51923
(TRAILER #1 - SHOW ALL UNITS)   (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10:00 |
| 2: SLEEPER | 13:50 |
| 3: DRIVING | 10:00 |
| 4: ON DUTY (NOT DRIVING) | 00:50 |
| | 24:00 Total Hours |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days

1. 2
2. 7
3. 11
4. 6.5
5. 8
6. 6.5
7. 10.5

Today 5.5

Total Hours Last 7 Days 18.5

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Gaffney SC
Pt 1

Roanoke VA
Dropped 53032 Fuel
Hooked 57823

Ft Pickett DE
Hometime 1/16 ~ 1/18

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

PRO NUMBER 9034015 06
☐ LOADING  ☒ CURRENT  ☒ UNLOADED

PRO NUMBER 400540 052
☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER
☐ LOADING  ☐ CURRENT  ☐ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/16/06   TIME: 1945   TRACTOR/TRUCK NO.: 7875   TRAILER(S) NO.(S): 51823

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:   DRIVER'S SIGNATURE:   DATE:

Britt/USA Truck
0139

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY · 24 HOURS)    WHITE · Safety    PINK · Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
| 01 | 17 | 06 | | 787 | Bonhomme |

01603

(TRAILER #1 · SHOW ALL UNITS)    (TRAILER #2)    (DRIVER'S SIGNATURE IN FULL)

Theodore Johnson
(PRINT DRIVER'S NAME)

**U S A Truck, Inc.**
3200 Industrial Park Rd. · Van Buren, AR 72956

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | | Total Hours |
|---|---|---|
| 1: OFF DUTY | | 10.0 |
| 2: SLEEPER | | 8 |
| 3: DRIVING | | 6.5 |
| 4: ON DUTY (NOT DRIVING) | | 10.5 |
| | Total Hours | 0 |

**REMARKS**

Newark DE
1/16/06 — 1/18/06

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 10047215.04 | PRO NUMBER | | PRO NUMBER | |
| □ LOADING | ☑ CURRENT □ UNLOADED | □ LOADING □ CURRENT □ UNLOADED | | □ LOADING □ CURRENT □ UNLOADED | |

| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | |
|---|---|
| 1 | 7 |
| 2 | 11 |
| 3 | 6.5 |
| 4 | 8 |
| 5 | 6.5 |
| 6 | 10.5 |
| 7 | 0 |
| Today | 49.5 |
| Total Hours Last 7 Days | |
| Total Hours Available Tomorrow (70 Hours Minus Total) | 20.5 |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

□ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
    INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER · DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

NO INSPECTION

_____ DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED
□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0140

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 01 | 309 | 405 | 7375 | 0214945 | |
| 51833 | | | 54484 | | |
| (TRAILER #1 - SHOW ALL UNITS) | | | (TRAILER #2) | | |

DRIVER'S SIGNATURE IN FULL: _Theodie_

PRINT DRIVER'S NAME: Theodie Johnson

NAME OF CO-DRIVER: N/A

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0.00 |
| 2: SLEEPER | 14.50 |
| 3: DRIVING | 0.75 |
| 4: ON DUTY (NOT DRIVING) | 0.75 |
| **Total Hours** | 24.00 |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

**REMARKS**

Newark DE
Lakewood NJ
unload.19
Phillipsburg NJ
Drop 4404 pick...
Dickinson PA
pt.

7.5 Today
7.5 Total Hours Last 7 Days
2.5 Total Hours Available Tomorrow (70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER 900542242 | PRO NUMBER 900543047 | PRO NUMBER |
|---|---|---|
| ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | ☐ LOADING  ☒ CURRENT  ☐ UNLOADED | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/18/00    TIME: 1845    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 54484

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0141

F
28249

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

MONTH 01 | DAY 18 | YEAR 05 | MILES TODAY 492 | UNIT # 7875 | 221 64 9506

(TRAILER #1 - SHOW ALL UNITS) 54484 | (TRAILER #2)

DRIVER ID
Theodore Joh (DRIVER'S SIGNATURE IN FULL)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR · 72956

Theodore Johnson (PRINT DRIVER'S NAME)

N/A (NAME OF CO-DRIVER)

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
|---|---|
| 1. | 0 |
| 2. | 0 |
| 3. | 0 |
| 4. | 0 |
| 5. | 0 |
| 6. | 7.5 |
| 7. | 8.5 |

| | MID-NIGHT | Use Local Time Standard at Home Terminal | NOON | | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 00:00 |
| 2: SLEEPER | | | | | | 15:50 |
| 3: DRIVING | | | | | | 08:10 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 00:50 |
| | | | | | Total Hours | 24:00 |

Total Hours Today 16

Total Hours Last 7 Days 34

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Dickson PA
Carlisle PA
Franklin OH
PA

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER 1005422943 | PRO NUMBER | PRO NUMBER |
|---|---|---|
| ☐ LOADING ☑ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED | ☐ LOADING ☐ CURRENT ☐ UNLOADED |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1-19-05   TIME: 1500   TRACTOR/TRUCK NO.: 7875   TRAILER(S) NO.(S): 54484

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:   DRIVER'S SIGNATURE:   DATE:

Britt/USA Truck
0142

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 01 | 20 | 06 | 555 | 7875 | 221649500 |

(TRAILER #1 - SHOW ALL UNITS)  53989  (TRAILER #2)

DRIVER'S SIGNATURE IN FULL: Theodore

PRINT DRIVER'S NAME: Theodore Johnson

NAME OF CO-DRIVER: N/A

## U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0.00 |
| 2: SLEEPER | 11.3125 |
| 3: DRIVING | 9.025 |
| 4: ON DUTY NOT DRIVING | 0.1125 |
| Total Hours | 24.400 |

**REMARKS**

Franklin OH
Cananati OH  unloading / reloading
Dandridge, TN  fuel pt.
Gaffney SC  pt.

| Total Hours |
|---|
| **On Duty** (Total Lines 3 + 4) On Daily Log Last 7 Days |
| 1. 0 |
| 2. 0 |
| 3. 0 |
| 4. 0 |
| 5. .75 |
| 6. 8.5 |
| 7. 10.25 |
| Today |
| 26.25 Total Hours Last 7 Days |
| 43.75 Total Hours Available Tomorrow (70 Hours Minus Total) |

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 9.0054.2042 | PRO NUMBER | 9.03367.103 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/20/06    TIME: 2100    TRACTOR/TRUCK NO.: 7875    TRAILER(S) NO.(S): 53989

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0143

F
26249

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 01 | 21 | 06 | 1600 | 7375 | 221649530 |
|----|----|----|------|------|-----------|
| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |

| 3389 | 150917 | Theodore Jenson |
|------|--------|-----------------|
| (TRAILER #1 - SHOW ALL UNITS) | (TRAILER #2) | (DRIVER'S SIGNATURE IN FULL) |

53416   **U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Jenson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 9.00 |
| 2: SLEEPER | 3.25 |
| 3: DRIVING | 11.00 |
| 4: ON DUTY (NOT DRIVING) | 0.75 |
| | **Total Hours** 24.00 |

**REMARKS**

Gaffney SC
P.T. Equity In 36
deadhead 20 DFH

Roanoke VA
DFH PU

_____ MO

| | |
|---|---|
| Total Hours On Duty (Total Lines 3 + 4) On Daily Log) Last 7 Days | 0 |
| | 0 |
| | 0 |
| | 0 |
| | 7.5 |
| | 8.5 |
| | 0.25 |
| | 11.75 |
| Today | 39 |
| Total Hours Last 7 Days | 39 |
| Total Hours Available Tomorrow (70 Hours Minus Total) | 31 |

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 903367103 | PRO NUMBER | 900543814 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☑ UNLOADED | | ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/21/06   TIME: 1430   TRACTOR/TRUCK NO.: 7375   TRAILER(S) NO.(S): 53416

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

Britt/USA Truck
0144

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY — 24 HOURS) — WHITE — Safety — PINK — Driver

MONTH   DAY   YEAR        MILES TODAY        UNIT #

(TRAILER #1 — SHOW ALL UNITS)        (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. — Van Buren, AR 72956

DRIVER'S SIGNATURE

NAME OF CO-DRIVER

**REMARKS**

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER   □ LOADING   □ CURRENT   □ UNLOADED   □ LOADING   □ CURRENT   □ UNLOADED   □ LOADING   □ CURRENT   □ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, CHECK THE FOLLOWING

DATE:        TIME:        TRACTOR/TRUCK NO.:        TRAILER(S) NO(S).:

□ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER. DESCRIBE DEFECT IN DETAIL. USE BACK SIDE IF NECESSARY.

NO INSPECTION

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED

□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE        DRIVER'S SIGNATURE        DATE

Britt/USA Truck
0145

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY 24 HOURS)

**U.S A Truck, Inc.**
3200 Industrial Park Rd., Van Buren, AR 72956

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | LOADING | CURRENT | UNLOADED | PRO NUMBER | LOADING | CURRENT | UNLOADED | PRO NUMBER | LOADING | CURRENT | UNLOADED |
|---|---|---|---|---|---|---|---|---|---|---|---|

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, SUBMIT THE FOLLOWING

DATE _____ TIME _____ TRACTOR/TRUCK NO. _____ TRAILER(S) NO.(S): _____

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN. INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER. DESCRIBE DEFECT IN DETAIL. USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____    DRIVER'S SIGNATURE _____    DATE: _____

Britt/USA Truck
0146

F
26049

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

MONTH    DAY    YEAR    MILES TODAY    UNIT #    DRIVER ID

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)    (DRIVER'S SIGNATURE IN FULL)

MILES TODAY: 52377    UNIT #: 1875

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 10.0100 |
| 2: SLEEPER | 0.2400 |
| 3: DRIVING | 0.1450 |
| 4: ON DUTY (NOT DRIVING) | 0.0050 |
| | 24.00 Total Hours |

REMARKS

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER: 100544779
☐ LOADING   ☐ CURRENT   ☐ UNLOADED

PRO NUMBER:
☐ LOADING   ☐ CURRENT   ☐ UNLOADED

PRO NUMBER:
☐ LOADING   ☐ CURRENT   ☐ UNLOADED

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

Total Hours Today

Total Hours Last 7 Days

Total Hours Available Tomorrow (70 Hours Minus Total)

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 12/6    TIME: 2530    TRACTOR/TRUCK NO.: 1875    TRAILER(S) NO.(S): 52377

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:    DRIVER'S SIGNATURE:    DATE:

Britt/USA Truck
0147

F
28249

## DRIVER'S DAILY LOG  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| MONTH | DAY | YEAR | MILES TODAY | UNIT # | DRIVER ID |
|---|---|---|---|---|---|
| 01 | 25 | 06 | 1615 | | |

(TRAILER #1 - SHOW ALL UNITS)          (TRAILER #2)

DRIVER'S SIGNATURE IN FULL

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

Merlove Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1: OFF DUTY | 00:00 |
| 2: SLEEPER | 13:25 |
| 3: DRIVING | 01:25 |
| 4: ON DUTY (NOT DRIVING) | 00:50 |
| Total Hours | 24:00 |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

Today 15.75

Total Hours Last 7 Days 54.25

Total Hours Available Tomorrow (70 Hours Minus Total)

REMARKS

Britt USA Pt.

Lebanon IN Trif Pt.

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

| PRO NUMBER | 900544779 | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING  ☑ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/25/06   TIME: 2015   TRACTOR/TRUCK NO.: 7875   TRAILER(S) NO.(S): 52377

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED.

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:                    DRIVER'S SIGNATURE:                    DATE:

Britt/USA Truck
0148

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

MONTH 01  DAY 26  YEAR 06   MILES TODAY 1045   UNIT # 7875   DRIVER ID 221649506

(TRAILER #1 - SHOW ALL UNITS) 52377   (TRAILER #2)

(DRIVER'S SIGNATURE IN FULL) Theodore Johnson

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

(PRINT DRIVER'S NAME) Theodore Johnson

(NAME OF CO-DRIVER) N/A

Use Local Time Standard at Home Terminal

| | Total Hours |
|---|---|
| 1: OFF DUTY | 0 |
| 2: SLEEPER | 12.50 |
| 3: DRIVING | 10.75 |
| 4: ON DUTY (NOT DRIVING) | 0.75 |
| **Total Hours** | 24.00 |

Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days

| | |
|---|---|
| 1 | 0 |
| 2 | 0 |
| 3 | 3 |
| 4 | 0 |
| 5 | 2 |
| 6 | 10.75 |
| 7 | 11.5 |

Today 11.5
Total Hours Last 7 Days 27.25
Total Hours Available Tomorrow (70 Hours Minus Total) 48.75

**REMARKS**

Lebanon, IN  P.U.

Villetock, IN  unload May 11 6:11  loading

Marston, MO  P.U.

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

PRO NUMBER 900544779   ☐ LOADING  ☒ CURRENT  ☒ UNLOADED

PRO NUMBER 905294917   ☐ LOADING  ☒ CURRENT  ☐ UNLOADED

PRO NUMBER   ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1-26-06   TIME: 1745   TRACTOR/TRUCK NO.: 7875   TRAILER(S) NO.(S): 52377

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

**COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:**

☐ ABOVE DEFECTS CORRECTED

☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:   DRIVER'S SIGNATURE:   DATE:

Britt/USA Truck
0149

F
26249

**DRIVER'S DAILY LOG**  (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

| 01 27 06 | 39.0 | 7875 | 021 64 95 40 |
|----------|------|------|----------------|
| MONTH DAY YEAR | MILES TODAY | UNIT # | DRIVER ID |

52377
(TRAILER #1 - SHOW ALL UNITS)      (TRAILER #2)

**U S A Truck, Inc.**
3200 Industrial Park Rd. - Van Buren, AR 72956

DRIVER'S SIGNATURE IN FULL

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

Total Hours On Duty (Total Lines 3 + 4 On Daily Log) Last 7 Days

Use Local Time Standard at Home Terminal

| | MID-NIGHT | 1 2 3 4 5 6 7 8 9 10 11 | NOON | 1 2 3 4 5 6 7 8 9 10 11 | MID-NIGHT | Total Hours |
|---|---|---|---|---|---|---|
| 1: OFF DUTY | | | | | | 10.00 |
| 2: SLEEPER | | | | | | 11.50 |
| 3: DRIVING | | | | | | 10.75 |
| 4: ON DUTY (NOT DRIVING) | | | | | | 11.50 |
| | | | | | | 24.00 |

1. 0
2. 0
3. 3
4. 2
3+4 10.75
4 1.5
Total Hours 7.5

Today 37.75

Total Hours Last 7 Days 35.25

Total Hours Available Tomorrow (70 Hours Minus Total)

**REMARKS**

Marston MO
Brownsville TN
United Nashville TN loading
Hurricane Mills TN Trailers
Lebanon TN Pt

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | 0529H817A | PRO NUMBER | 9033167858 | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☒ CURRENT ☐ UNLOADED | | ☐ LOADING ☐ CURRENT ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 1/27/06   TIME: 2200   TRACTOR/TRUCK NO.: 7875   TRAILER(S) NO.(S): 52377

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE:

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE:        DRIVER'S SIGNATURE:        DATE:

Britt/USA Truck
0150

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

MONTH DAY YEAR    MILES DRIVEN    UNIT #    DRIVER ID

TRAILER #1 SHOWABLE UNITS    TRAILER #2    Theodore Collins

**U S A Truck, Inc.**    Theodore J. Johnson
3200 Industrial Park Rd.   Van Buren, AR 72956    (PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

1. OFF DUTY
2. SLEEPER
3. DRIVING
4. ON DUTY

REMARKS    Total Hours

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER    □ LOADING  ☒ CURRENT  ☒ UNLOADED        PRO NUMBER    □ LOADING  □ CURRENT  □ UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I REPORT THE FOLLOWING:

DATE:    TIME:    TRACTOR/TRUCK NO.    TRAILER(S) NO.(S):

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN. INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER. DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED.

□ ABOVE DEFECTS CORRECTED

□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE    DRIVER'S SIGNATURE    DATE

Britt/USA Truck
0151

**DRIVER'S DAILY LOG**

U S A Truck, Inc.
3200 Industrial Park Rd. Van Buren, AR 72956

**REMARKS**

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE: TIME: TRACTOR/TRUCK NO. TRAILER(S) NO.(S)

I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THE MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

ABOVE DEFECTS CORRECTED.
ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE                    DRIVER'S SIGNATURE                    DATE:

Britt/USA Truck
0152



# DRIVER'S DAILY LOG BOOK

### FORM PRESCRIBED BY THE
### DEPARTMENT OF TRANSPORTATION

**FOR MONTH OF** February    **YEAR** 06

**CARRIER** USA TRUCK, INC.    **DRIVER** Theodore Johnson

**ADDRESS** P.O. BOX 449    **ADDRESS** 18 Stephanie Dr.

**CITY** VAN BUREN    **STATE** AR 72956    **CITY** BEAR    **STATE** DE

## FINDER – RETURN THIS BOOK TO DRIVER OR CARRIER
### DRIVER'S DAILY LOG
PRESCRIBED BY DEPT. OF TRANSPORTATION
INSTRUCTIONS FOR THE USE OF DRIVER'S DAILY LOG

1. Drivers and motor carriers will be held responsible for the proper maintenance of the daily logs. Drivers shall keep the log current to the time of the last change of duty status. Failure to make logs, failure to make required entries therein, falsification of entries, or failures to file logs with the motor carrier will make both the driver and the carrier liable to prosecution.
2. The driver shall forward the original log to his home terminal. If the services of a driver are used by more than one carrier during a calendar day, the driver shall furnish each motor carrier a copy of his log for the entire day. In such case the log shall indicate the name of each carrier served by the driver during that day.
3. The original logs shall be retained by the motor carrier for a period of six months. Duplicate copies of the logs are the driver's personal records and are to be kept for a period of one month in the possession of the driver while he is on duty.
4. The time standard in effect at the driver's home terminal shall be used. The log shall be prepared, maintained, and submitted, for a 24-hour calendar day beginning at midnight.
5. All entries shall be made by the driver except that the name and main office address of the motor carrier may be printed or otherwise entered by an authorized representative of the carrier. The name of the motor carrier shall be that for which the driving is performed. In case of the driver of a leased vehicle, the name shown shall be that of the motor carrier performing the transportation.
6. (a) The driver shall certify to the correctness of log by signing his name in full.
   (b) Below driver's signature he shall list initials and last name of each co-driver.
7. In addition to the identification of the carrier and the driver's signature, the entries shall indicate:
   (a) The month, day, and year for which the log is prepared.
   (b) The total mileage while driving.
   (c) (1) The carrier's vehicle number or, if no such number is provided the state license number of each power unit.
       (2) The carrier's trailer or trailers' number or numbers or if no such numbers are provided, the state license number of each trailer unit.
   (d) Driver's home terminal address.
   (e) The actual period or periods during the calendar day spent in the activities specified on Lines 1, 2, 3, and 4 by drawing a continuous line between the appropriate time markers. The following directions are illustrative only and are not to be construed as modifying the definitions or regulations in Parts 395, inclusive:
   LINE 1, OFF-DUTY – All time, except that spent in a sleeper berth, when the driver is not working, is not required to be in readiness to work, or is not under any responsibility for performing work.
   LINE 2, SLEEPER BERTH – All time resting in a sleeper berth.
   LINE 3, DRIVING – All time spent at the controls of a motor vehicle in operation.
   LINE 4, ON DUTY (Not Driving) – All time spent by a driver in performing work other than driving. This includes loading or unloading, preparing reports, remaining in readiness to perform work, remaining in charge of disabled vehicles, stops for meals, etc.
   (f) Under "Remarks" the time and the name of the place where each change of duty occurred, such as the place of reporting for work, starting to drive and where released from work. Explain reason for emergency resulting in hours exceeding those permitted by the regulations.
   (g) Under "Remarks" show the transportation performed each day by entering a shipping document number or numbers, or name of a shipper and commodity.
   (h) In the column "Total Hours," the hours and fractions thereof shown in each of Lines 1, 2, 3, and 4. The sum of the entries in this column must total 24 hours.
   (i) DAILY RECAP: Column "A" Total Hours On-Duty (total Lines 3 & 4 on Daily Log) for Last 7 Days, including today. Total Hours Available Tomorrow; take 70 hours minus total in Column "A".

USA-064

Britt/USA Truck
0153



**DRIVER'S DAILY LOG** (ONE CALENDAR DAY · 24 HOURS)   WHITE · Safety   PINK · Driver

MONTH 4  DAY 4  YEAR 03   MILES TODAY 586   UNIT # 28023   DRIVER ID 555997777

(TRAILER #1 · SHOW ALL UNITS) 124185   (TRAILER #2) 12486

DRIVER'S SIGNATURE IN FULL: *John Doe*

(TRAILER #3)   (TRAILER #4)   PRINT DRIVER'S NAME: *John Doe*

NAME OF CO-DRIVER: *Jane Doe*

| | Total Hours |
|---|---|
| Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days | 10.00 |
| 1 | 6.25 |
| 2 | 13.75 |
| 3 | 7.25 |
| 4 | 2.0 |
| 5 | 8.5 |
| 6 Today | 12.75 |
| Total Hours Last 7 Days | 60.50 |

**Status lines:**
1: OFF DUTY — 2,0,0,0
2: SLEEPER — 9,2,5,0
3: DRIVING — 1,1,0,0
4: ON DUTY (NOT DRIVING) — 1,1,7,5

Total Hours: 2,4,0,0

(1) 9.50 Total Hours Available Tomorrow (70 Hours Minus Col. A)

REMARKS:
SAN JON, NM P.T.I.
ALBUQUERQUE, NM D & H P.T.I.
LUPTON, AZ DOT INSPECTION
WILLIAMS, AZ

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER 786130942   ☐ LOADING  ☐ CURRENT  ☒ UNLOADED
PRO NUMBER 727141834   ☐ LOADING  ☒ CURRENT  ☐ UNLOADED
PRO NUMBER _____   ☐ LOADING  ☐ CURRENT  ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: 4/4/03   TIME: 15:45   TRACTOR/TRUCK NO.: 28023   TRAILER(S) NO.(S): 22486

☒ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
   INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: *John Doe*

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____   DRIVER'S SIGNATURE: _____   DATE: _____

Britt/USA Truck
0154

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)   WHITE - Safety   PINK - Driver

U S A Truck, Inc.
3200 Industrial Park Rd. - Van Buren, AR 72956

DRIVER ID

(DRIVER'S SIGNATURE IN FULL)
Theodore Johnson

(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours |
|---|---|
| 1. OFF DUTY | |
| 2. SLEEPER | 8.000 |
| 3. DRIVING | 8.000 |
| 4. ON DUTY | 3.375 |

Total Hours 24.00

REMARKS

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER D1325800   ☑ CURRENT   ☐ LOADING   ☐ UNLOADED

PRO NUMBER   ☐ LOADING   ☐ CURRENT   ☐ UNLOADED

PRO NUMBER   ☐ LOADING   ☐ CURRENT   ☐ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE 01/11/20   TIME 1115   TRACTOR/TRUCK NO.: 7875   TRAILER(S) NO(S): 51933

☑ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL. USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED.

☐ ABOVE DEFECTS CORRECTED.
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE.

MECHANIC'S SIGNATURE                DRIVER'S SIGNATURE                DATE

Britt/USA Truck
0155



Britt/USA Truck
0156

DRIVER'S DAILY LOG (ONE CALENDAR DAY - 24 HOURS) WHITE - Safety    PINK - Driver

**U S A Truck, Inc.**
3200 Industrial Park Rd - Van Buren, AR 72956

Theodore Johnson
N/A

**REMARKS**

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

| PRO NUMBER | | PRO NUMBER | | PRO NUMBER | |
|---|---|---|---|---|---|
| ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | | ☐ LOADING  ☐ CURRENT  ☐ UNLOADED | |

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE _____ TIME _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

☐ I DETECTED NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECTED THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL. USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____    DRIVER'S SIGNATURE _____    DATE _____

Britt/USA Truck
0157

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY-24 HOURS)

**U S A Truck, Inc.**
3200 Industrial Park Rd · Van Buren, AR 72956

| | Total Hours |
|---|---|
| 1 OFF DUTY | 10.00 |
| 2 SLEEPER | 05.50 |
| 3 DRIVING | 07.50 |
| 4 ON DUTY | 00.75 |
| | 24.00 |

REMARKS

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE _____ TIME 1830    TRACTOR/TRUCK NO. 7695    TRAILER(S) NO (S) 56130

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER. DESCRIBE DEFECT IN DETAIL. USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____    DRIVER'S SIGNATURE _____    DATE _____

Britt/USA Truck
0158



Britt/USA Truck
0159

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY -24 HOURS)  WHITE - Safety  PINK - Driver

08 13 08  |  840  |  7695  |  0816649506

(MONTH - DAY - YEAR)  |  MILES TODAY  |  UNIT #

5b130

(TRACTOR #)  (ORIGINATING)  (TRAILER #2)

U S A Truck, Inc.
3200 Industrial Park Rd - Van Buren, AR 72956

Theodore Johnson

DRIVER ID

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

DRIVER'S SIGNATURE IN FULL

**REMARKS**

Milford AT

**CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER**

PRO NUMBER  | LOADING  | CURRENT  | UNLOADED

PRO NUMBER  | LOADING  | CURRENT  | UNLOADED

PRO NUMBER  | LOADING  | CURRENT  | UNLOADED

**DRIVER'S VEHICLE INSPECTION REPORT**
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE 8/13/08  TIME 2315  TRACTOR/TRUCK NO. 7695   TRAILER(S) NO (S): 5b130

A. DEFECT NOT DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR
RESULT IN ITS MECHANICAL BREAKDOWN

B. DEFECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS
OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

**DRIVER'S SIGNATURE**

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

ABOVE DEFECTS CORRECTED.

ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF
VEHICLE

MECHANIC'S SIGNATURE

DRIVER'S SIGNATURE

DATE

Britt/USA Truck
0160

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

MONTH / DAY / YEAR    MILES TODAY    UNIT #

6 / 30    36151    7695    0210495000

FROM (TOTAL UNITS)    (TRAILER #2)    DRIVER ID.    Ylindon Johnson

61013    U S A Truck, Inc.    Theodore Johnson
3000 Industrial Park Rd - Van Buren, AR 72956    (PRINT DRIVER'S NAME)

N/A

NAME OF CO-DRIVER

| | Total Hours |
|---|---|
| 1 OFF DUTY | 0 |
| 2 SLEEPER | 0 |
| 3 DRIVING | 7.25 |
| 4 ON DUTY | 0400 |
| | 00.75  4.5 |
| | 24.00  6.75 |

**Total Hours**    1125

**REMARKS**

**DRIVER'S VEHICLE INSPECTION REPORT**
REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING

DATE 6/30    TIME 1330    TRACTOR/TRUCK NO. 7695    TRAILER(S) NO (S): 5193

NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR MECHANICAL BREAKDOWN

THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

IF DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER, DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

DRIVER SIGNATURE    DATE

Britt/USA Truck
0161



Britt/USA Truck
0162

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY — 24 HOURS)

U.S.A. Truck, Inc.
3200 Industrial Park Rd.  Van Buren, AR 72956

Theodore Johnson

REMARKS

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE ____ TIME ____ TRACTOR/TRUCK NO. ____ TRAILER(S) NO(S) ____

☑ DEFECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ DEFECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER – DESCRIBE DEFECT IN DETAIL – USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE ____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE ____     DRIVER'S SIGNATURE ____     DATE ____

Britt/USA Truck
0163

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY) 24 HOURS   WHITE - Safety   PINK - Drive

**U S A Truck, Inc.**
3200 Industrial Park Rd., Van Buren, AR 72956

REMARKS

DRIVER'S VEHICLE INSPECTION REPORT

DATE _____ TIME _____ TRACTOR/TRUCK NO. _____ TRAILER(S) NO.(S) 5173

☑ I DEFECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

☐ I DEFECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY

DRIVER'S SIGNATURE _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____          DRIVER'S SIGNATURE _____          DATE _____

Britt/USA Truck
0164

DRIVER'S DAILY LOG

U S A Truck, Inc.

REMARKS

DRIVER'S VEHICLE INSPECTION REPORT

TRAILER(S) NO.(S) 5376S

DRIVER'S SIGNATURE

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE                    DRIVER'S SIGNATURE                    DATE

Britt/USA Truck
0165



Britt/USA Truck
0166

**DRIVER'S DAILY LOG**

U S A Truck, Inc.
3200 Industrial Park Rd - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE _____ TIME 1830   TRACTOR/TRUCK NO. _____   TRAILER(S) NO.(S): 53105

☒ I FIND NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION, OR RESULT IN ITS MECHANICAL BREAKDOWN.

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN. INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED.

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE _____       DRIVER'S SIGNATURE _____       DATE _____

Britt/USA Truck
0167

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)

U.S. A Truck, Inc.
3200 Industrial Road, Van Buren, AR 72956

**DRIVER'S VEHICLE INSPECTION REPORT**

DATE _____ TIME _____ TRACTOR/TRUCK NO. _____ TRAILER(S) NO.(S) 53165

☐ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.

☐ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN.
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER ( DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY )

DRIVER'S SIGNATURE _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED

☐ ABOVE DEFECTS CORRECTED
☐ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE
MECHANIC'S SIGNATURE _____    DRIVER'S SIGNATURE _____    DATE _____

Britt/USA Truck
0168

**DRIVER'S DAILY LOG** (ONE CALENDAR DAY - 24 HOURS)    WHITE - Safety    PINK - Driver

02 20 06    7695    02164950

MONTH DAY YEAR    MILES TODAY    UNIT #    DRIVER ID

03 1165

(TRAILER #1 - SHOW ALL UNITS)    (TRAILER #2)    Theodore Johnson
(DRIVER'S SIGNATURE IN FULL)

## U S A Truck, Inc.
### 3200 Industrial Park Rd. - Van Buren, AR 72956

Theodore Johnson
(PRINT DRIVER'S NAME)

N/A
(NAME OF CO-DRIVER)

| | Total Hours On Duty (Total Lines 3 + 4) On Daily Log Last 7 Days |
|---|---|
| 1. | 11.5 |
| 2. | 11.75 |
| 3. | 8.5 |
| 4. | 7 |
| 5. | 6.25 |
| 6. | 7 |
| 7. | Today |

Use Local Time Standard at Home Terminal

MID-NIGHT 1 2 3 4 5 6 7 8 9 10 11 NOON 1 2 3 4 5 6 7 8 9 10 11 MID-NIGHT    **Total Hours**

1: OFF DUTY

2: SLEEPER

3: DRIVING

4: ON DUTY (NOT DRIVING)

**REMARKS**    Haw River NC
fuel

Total Hours
Last 7 Days
(1)

Total Hours
Available
Tomorrow
(70 Hours Minus Total)

CHECK BOX SHOWING CURRENT STATUS OF PRO NUMBER

PRO NUMBER  801327840    □ LOADING  ☒ CURRENT  □ UNLOADED

PRO NUMBER  □ LOADING  □ CURRENT  □ UNLOADED

PRO NUMBER  □ LOADING  □ CURRENT  □ UNLOADED

## DRIVER'S VEHICLE INSPECTION REPORT
AS REQUIRED BY THE D.O.T. FEDERAL MOTOR CARRIER SAFETY REGULATIONS, I SUBMIT THE FOLLOWING:

DATE: _____ TIME: _____ TRACTOR/TRUCK NO.: _____ TRAILER(S) NO.(S): _____

□ I DETECT NO DEFECT OR DEFICIENCY IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN

□ I DETECT THE FOLLOWING DEFECTS OR DEFICIENCIES IN THIS MOTOR VEHICLE AS WOULD BE LIKELY TO AFFECT THE SAFETY OF ITS OPERATION OR RESULT IN ITS MECHANICAL BREAKDOWN
INDICATE WHETHER DEFECTS ARE ON TRACTOR/TRUCK OR TRAILER - DESCRIBE DEFECT IN DETAIL, USE BACK SIDE IF NECESSARY.

DRIVER'S SIGNATURE: _____

COMPLETE THIS SECTION ONLY IF DEFECTS WERE NOTED:

□ ABOVE DEFECTS CORRECTED

□ ABOVE DEFECTS NEED NOT BE CORRECTED FOR SAFE OPERATION OF VEHICLE

MECHANIC'S SIGNATURE: _____    DRIVER'S SIGNATURE: _____    DATE: _____

Britt/USA Truck
0169

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LANDRIA BRITT, as          )
Administratrix of the      )
Estate of JOHN W. BRITT,   )
Deceased,                  )
                           )
          Plaintiff,       )
                           ) Civil Action
v.                         ) No. 06-cv-868-ID-CSC
                           )
USA TRUCK, INC.; THEODORE  )
LEVERNE JOHNSON, et al.,   )
                           )
          Defendants.      )


          Deposition of THEODORE LEVERNE JOHNSON,
taken pursuant to notice at Courtyard by Marriott,
1102 West Street, Wilmington, Delaware, beginning at
9:29 a.m., on Saturday, November 3, 2007, before Julie
H. Parrack, Registered Merit Reporter, Certified
Realtime Reporter and Notary Public.
APPEARANCES:
        DAVID E. ALLRED, ESQUIRE
        DAVID E. ALLRED, P.C.
          7030 Fain Park Drive - Suite 9
          Montgomery, Alabama  36117
          On behalf of Plaintiff
        THOMAS L. OLIVER, II, ESQUIRE
        LEA RICHMOND, IV, ESQUIRE
        CARR ALLISON
          100 Vestavia Parkway
          Birmingham, Alabama  35216
          On behalf of Defendants

WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
(302) 655-0477
www.wilfet.com

Wilcox and Fetzer, Ltd.   Registered Professional Reporters        302-655-0477

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 2 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson
2

1                    THEODORE LEVERNE JOHNSON,

2               the deponent herein, having first been duly

3               sworn on oath, was examined and testified as

4               follows:

5    BY MR. ALLRED:

6      Q.   Tell us your full name, please, sir.

7      A.   Theodore Leverne Johnson.

8      Q.   Okay.  And where do you live, Mr. Johnson?

9      A.   2 Canoe Court.

10              THE REPORTER:  I'm sorry, could you spell

11   it, please?

12              THE WITNESS:  2 Canoe Court.

13     Q.   I'm going to have to ask you to speak up now,

14   because I have trouble understanding you.  Do you have

15   something in your mouth?

16     A.   Candy.

17     Q.   Can you take that out so we can hear you a

18   little better?

19     A.   I guess.

20     Q.   All right.  How long have you lived at the

21   number 2 Canoe Court address?

22     A.   About four years.

23     Q.   All right.  And that's in Wilmington, Delaware?

24     A.   No, Newark.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

3

1    Q.    I'm sorry?

2    A.    Newark.

3    Q.    Newark, all right.  Okay, we're taking your

4    deposition at the Courtyard Hotel, Marriott Hotel in

5    Wilmington, Delaware, and this case is pending in the

6    U.S. District Court for the Middle District of Alabama

7    in Montgomery.  And the judges want us to ask the

8    witnesses if they want to read and sign the deposition

9    transcript or if you waive signature.  What do you

10   want to do?

11   A.    Run that by me again, resign --

12   Q.    I'm sorry, I can't hear you now.

13           MR. OLIVER:  I can explain it to you.  We

14   didn't cover this.  When she types up this -- she's

15   going to type it up into a transcript.

16           THE WITNESS:  Okay, a transcript, okay,

17   all right.

18           MR. OLIVER:  And so you have two choices:

19   we can ship it to you and you can read through it and

20   sign off to make sure she typed it correctly, or you

21   can just assume she typed it correctly and waive it

22   and then you don't have to read through it.  It's

23   whatever your decision is.

24           THE WITNESS:  Send it to me.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

4

1    Q.    Send it to you?

2    A.    Yeah, send it to me.

3    Q.    All right.  Give the court reporter an address

4    where it can be sent to you.

5    A.    2 Canoe Court, Newark, Delaware, 19702.

6    Q.    Okay.

7              MR. ALLRED:  And I would like to ask the

8    court reporter, please, ma'am, if you would expedite

9    my copy unsigned and send it to me just as soon as you

10   can, because we have some deadlines coming up in the

11   case, please, ma'am.

12   Q.    All right.  Who else lives at the address at

13   number 2 Canoe Court?

14   A.    My mother, stepfather, grandmother and two

15   brothers, smaller brothers.

16   Q.    What about your sister, where does she live?

17   A.    She is in Philadelphia.

18   Q.    Okay.  Where do you work, Mr. Johnson?

19   A.    Tri-State Grouting.

20   Q.    And what do you do for them?

21   A.    Cleaning sewers.

22   Q.    Tri-State Grout?

23   A.    Grouting, Grouting, G-R-O-U-T-I-N-G.

24   Q.    Okay.  And cleaning sewers?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

5

1    A.    Correct.

2    Q.    Tell me what a typical day -- what kind of

3    sewers do you clean, residential or municipal sewers

4    or what?

5    A.    Residential and some municipal, some, majority

6    residential.

7    Q.    All right.  I'm familiar with a company down in

8    the part of the country where I come from called

9    Roto-Rooter.

10    A.    Um-hum, yeah.

11    Q.    It's similar to that?

12    A.    Yeah.

13    Q.    You all have one up here?

14    A.    Yeah, we got one of them.

15    Q.    All right.  And that's similar to what you do?

16    A.    Yeah, something similar, yeah, pretty much.

17    Q.    How long have you been with Tri-State Grouting?

18    A.    Just started pretty much, really.  About, I'd

19    say about three, four months back again.

20    Q.    All right.  Do you have a driver's license

21    today?

22    A.    Yeah.

23    Q.    Do you have a CDL anymore?

24    A.    Yeah.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

6

1    Q.    Do you do any driving with your work at

2    Tri-State Grouting?

3    A.    Uh-uh.

4    Q.    "Uh-uh," meaning no?

5    A.    No.

6    Q.    Okay.

7              MR. OLIVER:  It would be better to answer

8    yes or no, because it's harder for her to take it

9    down.

10             THE WITNESS:  Oh, okay.

11             MR. OLIVER:  When you say "uh-uh" or

12   "um-hum."

13             THE WITNESS:  I got you, my fault.

14   Q.    What is your job title with Tri-State Grouting?

15   A.    Laborer.

16   Q.    So your job doesn't involve any driving at all?

17   A.    No, not right now.

18   Q.    And when you go to a job site, is somebody else

19   driving the Tri-State Grouting vehicle?

20   A.    Yes.

21   Q.    What is Tri-State's address?

22   A.    467 Walther Road.

23   Q.    And the name of the road?

24   A.    Walther, W-A-L-T-H-E-R.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

7

1    Q.   In what city?

2    A.   Bear, Delaware.

3    Q.   Spell it for me.

4    A.   B-E-A-R "apostrophe" D-E.

5    Q.   Bear, Delaware?

6    A.   Right.

7    Q.   All right.  Who is the person at Tri-State

8    Grouting that hired you and knows about your employ?

9    A.   Oh, Mark Schneider.

10   Q.   What's his position?

11   A.   Owner, own the company.

12   Q.   All right.  Prior to working for Tri-State

13   Grouting, what kind of work did you do?

14   A.   Driving.

15   Q.   What kind of driving did you do?

16   A.   What I did, I did some regional driving and,

17   what else?  Regional driving, some warehouse jobs,

18   work, pretty much.

19   Q.   Okay.  When you did regional driving, explain

20   to me what regional driving is.

21   A.   Driving in the region, like a regional area,

22   not going -- I mean staying up like in the Northeast

23   area pretty much.

24   Q.   In the Northeast part of the country?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

8

1    A.    Yeah.

2    Q.    What states did you drive in?

3    A.    New Jersey and Delaware and Maryland.

4    Q.    All right.  Who did you work for?

5    A.    Davis Companies.

6    Q.    Davis?

7    A.    Yeah, Davis Companies.

8    Q.    And what kind of company is that?

9    A.    Temp service, temporary employment.

10   Q.    A temp service?

11   A.    Yeah.

12   Q.    So Davis Companies is a temp service.  Did you

13   sign up with them to see if they could find you some

14   work somewhere?

15   A.    Right.

16   Q.    And then they found you work doing regional

17   driving, but you would be driving for somebody else;

18   is that correct?

19   A.    Right.

20   Q.    All right.

21   A.    Like a middleman.

22   Q.    Who were the companies that you drove for when

23   you were going through the Davis Companies?

24   A.    Was it -- what was it?  One company was --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

9

1    damn, what was it called again?  Burris, Burris

2    Logistics, Burris Logistics, yeah.

3       Q.    Bird?

4       A.    Burris, B-U-R-R-I-S.

5       Q.    Burris company?

6       A.    Yeah.

7       Q.    What kind of company is that?

8       A.    It is a refrigerator unit regional driver

9    company.

10      Q.    What's the address of the Davis Companies --

11      A.    I don't remember.

12      Q.    -- that temp service?

13      A.    I don't remember.

14      Q.    What town is it in?

15      A.    It's in Cherry Hill, New Jersey.

16      Q.    What kind of vehicles did you drive when you

17   worked for, or worked through the Davis Company?

18      A.    Tractor-trailer.

19      Q.    All right.  Did you have a CDL when you were

20   doing this work?

21      A.    Yeah, correct.

22      Q.    What other companies besides Burris did you

23   drive for while you were working through the Davis

24   Companies?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 10 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

10

1    A.   I don't remember.  I know -- I forget the name

2    of it.

3    Q.   All right, how many other companies did you

4    work for through the Davis Companies?

5    A.   It was one more company, one more, it was one

6    more, I just don't remember.  I forget the name of it.

7    It was a while ago.  I forget the name of it.

8    Q.   All right.  How long did you do this temp work

9    through the Davis Companies?  What month and year

10   through what month and year?

11   A.   Damn, it was through the third -- I mean it was

12   like soon, soon as I --

13   Q.   I'm sorry?

14   A.   -- soon, soon as I stopped driving for USA

15   Truck.

16   Q.   All right.  That would be in February of '06?

17   A.   Yeah, beginning March of '06, I would say.

18   Q.   About March of '06?

19   A.   Correct.

20   Q.   Through about three or four months ago; is that

21   right?

22   A.   No.  No, not about three or four months.

23   About, I'd say about, it was a month and a period of

24   time I was unemployed.  But yeah, that's pretty much

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

11

1   right, though.

2      Q.   All right.  So you started working through the

3   Davis Companies about March of '06?

4      A.   Right.

5      Q.   And one of the companies you worked for was

6   Burris companies?

7      A.   Right.

8      Q.   And you drove a refrigerated unit?

9      A.   Yeah.

10     Q.   Around in New Jersey, Delaware and Maryland?

11     A.   Yeah, right.

12     Q.   Is that right?

13     A.   Right, right, right.

14     Q.   And then there was another company you did work

15  for but you can't remember the name of it through the

16  Davis Companies; is that right?

17     A.   McLane, McLane, McLane.

18     Q.   McLane?

19     A.   Yeah, McLane.

20     Q.   All right.  Any other companies you can

21  remember that you worked for through the Davis

22  Companies?

23     A.   No.

24     Q.   All right.  And then did you have some time

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 12 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

12

1    between -- if you started in March of '06 and then

2    working through the Davis Companies and then you

3    started cleaning out sewers three or four months ago,

4    but you say you didn't work through the Davis

5    Companies up through that period of time three or four

6    months ago?

7       A.   No.

8       Q.   Did you get fired or you didn't have a job or

9    what?

10      A.   It was periods of time I was unemployed, and

11   just sometimes I would like do temp service jobs from

12   here and them.

13      Q.   Did any --

14      A.   Like a bunch of them.

15      Q.   Go ahead, okay.  Did any of these people

16   terminate you or fire you?

17      A.   No, uh-uh.

18      Q.   When you say you were unemployed, what periods

19   of time?  Take me from March '06 and tell me when you

20   were next unemployed or when you became unemployed

21   after that date, March of '06 when you started with

22   Davis.

23      A.   I became unemployed in -- what was that?  I

24   want to say about -- what was that?  Damn.  What was

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

13

1    that, 12 of '0 -- about 12 of '06, yeah.  About 12 of

2    '06.

3      Q.   All right.  And how long did you stay

4    unemployed?

5      A.   Not long.

6      Q.   How long is not long?

7      A.   About two, three months.

8      Q.   All right.  So until about February of '07,

9    maybe March of '07 you were unemployed?

10     A.   Yeah, right.

11     Q.   All right.  And then in March of '07 where did

12   you start working, if you did?

13     A.   In March of '07 I was at -- what was that

14   company again?  I did work for my uncle like, like it

15   was a little small little construction company,

16   renovating houses or whatever you want to call it.

17     Q.   How long did you do that?

18     A.   For about three, four months.

19     Q.   Did you have any other jobs before you started

20   cleaning out sewers?

21     A.   That.  I do that from time to time, work with

22   him.

23     Q.   All right.  Did you have any other jobs from

24   the time you started with your uncle until you took

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

14

1   the sewer cleaning job?

2       A.   Warehouse position.

3       Q.   All right, what kind of warehouse position did

4   you have?

5       A.   Warehouse.  It's just cleaning up the

6   warehouse.

7       Q.   Just cleaning up?

8       A.   Yeah, cleaning up and doing --

9       Q.   Which warehouse did you clean up?

10      A.   What was it?  ADVO.

11      Q.   Say it again?

12      A.   ADVO, A-D-V-O.

13      Q.   ADVO?

14      A.   Yeah.

15      Q.   All right.  And where is that?

16      A.   It's in Newark, Delaware.

17      Q.   Were you actually employed by the ADVO

18   warehouse -- who were you employed by?

19      A.   No, temp service.

20      Q.   Temp service?

21      A.   Yeah, temp service.

22      Q.   All right, which temp service were you employed

23   by?

24      A.   Adecco.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

15

1    Q.    Decker?

2    A.    Adecco, "A-D-D-E-C-C-O."

3    Q.    And what city are they in?

4    A.    New Castle.  New Castle, Delaware.

5    Q.    Any other jobs after the warehouse position and

6    before the sewer cleaning position?

7    A.    After the warehouse position and before the

8    sewer cleaning position?

9    Q.    Right.

10   A.    To my knowledge, no.

11   Q.    Okay.  When is the last time you worked as a

12   truck driver?

13   A.    The Davis Companies.

14   Q.    All right.  And would that be for when you

15   drove for Burris and McLane maybe?

16   A.    Right.

17   Q.    Okay.

18   A.    Oh, yeah, I drove for Walley's Trucking, too,

19   that was another one.

20   Q.    Walley's Trucking?

21   A.    Yeah, I drove there in -- what was that?

22   Q.    Did you do that through the temp service?

23   A.    Uh-uh, no.

24   Q.    Did you apply directly with Walley's Trucking?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

16

1    A.    Correct.

2    Q.    What town are they in?

3    A.    In Wilmington, Delaware.

4    Q.    Wilmington.  Walley's Trucking?

5    A.    Right.

6    Q.    What month and year through what month and year

7    did you work for Walley's Trucking?

8    A.    From about February '07 to about, I'd say

9    about, to about the time of Adecco, I was working at

10   Adecco.

11   Q.    Which would get you up to what?  When did you

12   start through Adecco?

13   A.    I'd say about, damn, what was that, October --

14   what was that, August, October; August or October of

15   2007.

16   Q.    You started with Adecco in August of 2007?

17   A.    Right.

18   Q.    How long did you work at the position through

19   Adecco with ADVO warehouse?  That had nothing to do

20   with driving, did it?

21   A.    Nope.

22   Q.    Okay.  And before August of 2007, when was the

23   last time you had worked as a truck driver?

24   A.    Before August 2007?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

17

1     Q.    Right, August of this year.

2     A.    About February 2006.

3     Q.    Okay.  With USA Truck?

4     A.    No, no, no -- yeah, I mean no, not February

5     2006.  February 2007.  And then the following time

6     before then was 2006.

7     Q.    All right.  Did any of these trucking companies

8     or employers or any of the companies, temporary

9     services, any of them ever fire you, terminate you?

10    A.    Temp services?  No.

11    Q.    Any of the people you've worked for since you

12    were fired by USA Truck, have you been fired by

13    anybody else that you worked for?

14              MR. RICHMOND:  Object to form.

15    A.    No, not to my knowledge, no.

16    Q.    Do you have any arrests or convictions since

17    February of 2006?

18    A.    Arrests?

19    Q.    Do you have any arrests since February of '06?

20    A.    Yeah.

21    Q.    All right, what all have you been arrested for?

22    A.    What was it, improper -- well, disorderly

23    conduct for passing out fliers at the mall.

24    Q.    All right, let me ask you this.  If you would,

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

18

 1    take your hand away from your mouth and speak up so I

 2    can understand what you're saying, okay?

 3        A.    Disorderly conduct.

 4        Q.    All right, disorderly conduct?

 5        A.    Yeah.

 6        Q.    All right.  You were arrested for that?

 7        A.    Right.

 8        Q.    And when were you arrested for disorderly

 9    conduct?

10        A.    I don't remember.

11        Q.    Was it after February of 2006?

12        A.    Right, yeah, right.

13        Q.    Was it in 2006 or 2007?

14        A.    2006.

15        Q.    All right.  Where were you arrested?

16        A.    In Newark, Delaware.

17        Q.    All right.  What did they say you did?

18        A.    Disorderly conduct, passing out fliers at the

19    mall.  I was passing out fliers.

20        Q.    You were doing what?

21        A.    Passing out fliers at the mall, fliers.

22        Q.    Passing out fliers?

23        A.    Business cards.

24        Q.    Passing out fliers.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

19

1    A.    Yeah.

2    Q.    What are the circumstances about you passing

3    out fliers?

4    A.    I didn't have a -- what was that? -- a license

5    or something, a permit or something to be doing that.

6    Q.    You were at a mall somewhere?

7    A.    Right.

8    Q.    In Newark?

9    A.    Right.

10    Q.    Is that how you say it, "Newark"?

11    A.    Yeah, in Newark.

12    Q.    All right.

13    A.    Yeah, Newark.

14    Q.    Do you pronounce Newark, New Jersey, or is

15    there a town, Newark, New Jersey?  I've just heard

16    Newark.  Do you pronounce the two differently, or

17    that's just how you say it?

18    A.    That's just how I say it, "Newark."

19    Q.    All right.  So you were passing out fliers at

20    the mall in Newark, Delaware.  What did the fliers

21    say?

22    A.    It was, it was like party fliers, like pretty

23    much, yeah.

24    Q.    Party fliers?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

20

1     A.    Yeah.  I don't remember what they said.

2     Q.    Were you getting paid to do that?

3     A.    Yeah.

4     Q.    Who was paying you?

5     A.    A friend of mine.

6     Q.    All right.  You were passing out fliers for

7  some party?

8     A.    Yeah.

9     Q.    For some friend?

10    A.    Yeah.

11    Q.    And then did somebody come up to you out at the

12 mall and tell you they didn't want you doing that?

13    A.    Right.

14    Q.    And then what did you say?

15    A.    I mean I, I just, I didn't say nothing.  I

16 just, I mean I stopped doing it.

17    Q.    Let me ask you this:  you didn't just leave

18 when they asked you to leave, did you?

19    A.    Yeah, I did.

20    Q.    Well, how come you got --

21    A.    I was put -- they put their hands on, the

22 officers, they pretty much attacked, came at me

23 because, I don't know, I guess because I'm a big

24 person, and they felt intimidated, and all they really

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 21 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

21

 1    had was, you know what I mean, a bottle of pepper

 2    spray.  But I mean, I don't know.

 3        Q.    So the police said that you had acted in a

 4    disorderly manner; is that right?

 5        A.    The security guards.

 6        Q.    Security guard.

 7        A.    Right.

 8        Q.    And they arrested you?

 9        A.    Right.

10        Q.    Did they put you in jail?

11        A.    No, in the back of a police car for about two

12    hours with pepper spray in my eyes.  I couldn't see

13    much.

14        Q.    They had to spray you with the pepper spray?

15        A.    Right.

16        Q.    Did you hit any of them?

17        A.    No.

18        Q.    Okay.  Did you cuss them?

19        A.    Yeah, at them and, of course.

20        Q.    All right.  Did they put the cuffs on you?

21        A.    Yeah.

22        Q.    How did that turn out?  What did the judge say

23    about it?

24        A.    Never made it to the court.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

22

1    Q.    All right, did you plead guilty?

2    A.    Yeah.

3    Q.    You agreed that you had done what they said you

4    did; is that right?

5    A.    Yeah, pretty much, yeah.

6    Q.    And what was the fine?

7    A.    What was it?  I'm not for sure.  I think it

8    was -- I don't remember the amount.

9    Q.    Did you pay it?

10   A.    Hmm?

11   Q.    Did you pay it?

12   A.    Yeah, I paid it.  Yeah, I paid it.

13   Q.    Was it more than $100?

14   A.    Yeah.

15   Q.    How much more?

16   A.    Not too much, probably about -- I don't

17   remember.  I just know it was over a hundred.

18   Q.    Okay.  Did you get any jail time?

19   A.    No.

20   Q.    Were you put on probation?

21   A.    No.  The judge laughed at it.

22   Q.    The judge laughed at it?

23   A.    "Nodded affirmatively."  He thought it was

24   humorous.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

23

1    Q.    What did you understand that the judge thought

2    was so funny about that?

3    A.    Nothing.

4    Q.    Really?

5    A.    Yeah.  Nothing.

6    Q.    But he laughed, and then he found you guilty

7    and then he fined you, right?

8    A.    Yeah, pretty much.

9    Q.    All right.  Now, have you had any other arrests

10   or convictions since February of '06?

11   A.    Oh, yeah, yeah, yeah.

12   Q.    All right, tell me about it.

13   A.    Me and my step-pop got into an argument.

14   Q.    What's his name?

15   A.    Calvin Mills.

16   Q.    He's your step-pop?

17   A.    Right.

18   Q.    He lives in the same house that you do?

19   A.    Um-hum.

20   Q.    "Um-hum," meaning yes?

21   A.    Yes.

22   Q.    All right.  When did that occur?

23   A.    That was in -- what was that?  I don't

24   remember.  Probably like October or something.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 24 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

24

1    October, August, or one of them, August, somewhere

2    August, September, somewhere around there.  I don't

3    remember.

4        Q.   August or September of '06?

5        A.   '07.

6        Q.   '07?

7        A.   This is recent, yeah.

8        Q.   All right.  Were you arrested?

9        A.   Yeah.

10       Q.   What police force arrested you?

11       A.   To be honest, I don't -- I think it was the

12   county, yeah, county, county, county, yeah.

13       Q.   County?

14       A.   Yeah.  I was terrorized.

15       Q.   All right.  Did they put the cuffs on you?

16       A.   Yeah.

17       Q.   Did they have to use the pepper spray too?

18       A.   No.

19       Q.   Did you slap the police around?

20       A.   No, I was just waking up.

21       Q.   Okay.  What did the judge say about that?

22       A.   I ain't go to court yet.  I go to court soon.

23       Q.   What are you charged with?

24       A.   I'm being charged with terror threat, terror

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

25

1    threat or something.

2    Q.    Terror threat?

3    A.    Yeah, terroristic threat or something.

4    Q.    Terroristic threat?

5    A.    Yeah.

6    Q.    What do they say you did?

7    A.    They saying that I -- they didn't say, they're

8    not saying I did anything.

9    Q.    Well, what are they charging you with?  What

10   are the facts underlying the terroristic threat?

11   A.    Yeah, right.

12   Q.    What are the facts?  What are they saying you

13   did that was terroristic?

14   A.    They said nothing.  They didn't -- they never

15   even told me.  I mean they just saying I guess because

16   we got into an argument.  Wasn't no hands being

17   touched, you know what I mean, wasn't none of that.

18   Q.    Did you tell Calvin Mills you were going to do

19   something to him?

20   A.    I -- not necessarily, not necessarily, no, I

21   didn't.

22   Q.    Did you tell him you're going to blow him up or

23   something?

24   A.    No, none of that, nothing on that.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

26

1    Q.    Wonder why the police charged you with

2   terrorism?

3    A.    I'm not for sure.  I'm not for sure.  I don't

4   know why the police or my mother would even put me

5   through a situation like that.

6    Q.    You just don't feel like that's fair, do you?

7    A.    No.  But I was like --

8    Q.    What county is that?  What county is that where

9   they got this terrorism charge against you?

10   A.    New Castle.

11   Q.    New Castle?

12   A.    Yeah.

13   Q.    All right.  You got you a lawyer in that?

14   A.    No.

15   Q.    You don't have a lawyer?

16   A.    Not yet, not yet.

17   Q.    You going to get one?

18   A.    Yeah.

19   Q.    That terror deal, is that a felony or -- it's a

20   felony, isn't it?

21   A.    I don't know what it is.

22   Q.    Do you understand they can lock you up?

23   A.    Oh, yeah, I know.

24   Q.    Have they done told you that?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 27 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

27

1    A.   Yeah.

2    Q.   Okay, and you took it seriously?

3    A.   I haven't taken it serious yet.  I still

4    haven't been to court to even discuss the matters yet.

5    Q.   Have you been arraigned?

6    A.   No, none of that.

7    Q.   All right.  When is your arraignment?

8    A.   Monday.

9    Q.   Okay.  This coming Monday?

10   A.   Right.

11   Q.   You out on bond right now?

12   A.   Yeah, right.

13   Q.   What was your bond?

14   A.   I don't even remember.  It was unsecured.  I

15   had to just -- I signed myself out.

16   Q.   How much was it, even though you didn't have to

17   put up security?

18   A.   I don't remember.

19   Q.   All right.  And New Castle, is that in Delaware

20   or Pennsylvania?

21   A.   Delaware.

22   Q.   Delaware.  New Castle, Delaware.  So that would

23   be the county, New Castle County, is that the

24   jurisdiction you're being charged in?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

28

1   A.   Yeah, New Castle County.

2   Q.   Okay.

3        MR. RICHMOND:  You want some more water?

4        THE WITNESS:  Yeah.

5   Q.   Tell me, with regard to Calvin Mills, what kind

6   of spat did you all have that caused somebody to call

7   the law?

8   A.   My -- it was just, I don't know.  I was lifting

9   weights in the basement, minding my own business.

10  Q.   Okay.

11  A.   And he -- I mean I came upstairs and he asked

12  me to turn the radio down because I was lifting

13  weights.  And I mean, I'm like out of breath and tired

14  and stuff.  I mean I told, asked him -- well, I told

15  him to turn the radio down if he had a problem with

16  it, you know what I mean.  Nothing, it wasn't nothing

17  real serious, you know what I mean?  He took it to

18  offense.  He, he got, he got big head like, you know

19  what I mean?

20  Q.   Really?

21  A.   Yeah, so like, he got the being charged, you

22  know what I mean, and everything.  And I mean I just

23  pretty much told him, I mean humble yourself, you know

24  what I mean, calm yourself down some, you know what I

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

29

1   mean?

2      Q.    Yeah.  Did you pop him upside the head?

3      A.    Oh, no.

4      Q.    Did he pop you upside the head?

5      A.    No.

6      Q.    Did not?  Was there any shoving?

7      A.    No, none of that, just a bunch of --

8      Q.    Who called the law?

9      A.    I don't know.  That that's what I said, I woke

10   up next -- I'm thinking everything was, you know what

11   I mean, hunky-dory after that, you know what I mean?

12   He left, I mean got some fresh air, I left, got some

13   fresh air.

14     Q.    Okay, and that's all there was to it?

15     A.    Yeah, because I'm thinking, you know, time goes

16   forward, it don't go backward.

17     Q.    Let me see if I got this right.  You lifting

18   weights --

19     A.    Right.

20     Q.    -- minding your own business, Calvin Mills

21   asked you to cut down the radio?

22     A.    Yeah, right.

23     Q.    And you tell him to calm down, and then you go

24   on about your business?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

30

1    A.    Right.

2    Q.    And then the next day, the county sheriff, was

3    it the sheriff?

4    A.    I guess, County Police.

5    Q.    The County Police --

6    A.    Yeah, right.

7    Q.    -- they come and arrest you and charge you with

8    something to do with terrorism.  Have I got it right?

9    A.    Yeah, they wake me up, yeah.

10   Q.    They woke you up?

11   A.    Yeah, out of my sleep.

12   Q.    Did they tell you you were charged with

13   something to do with terrorism?

14   A.    Yeah, a female told me.

15   Q.    All right.  And then did you have to go with

16   them at that time?

17   A.    Yeah.

18   Q.    They carried you to the police station?

19   A.    Yeah.

20   Q.    And as you sit here today, you don't have a

21   clue what kind of terrorism you threatened or if you

22   threatened anybody with terrorism, you don't know why

23   they charged you with terrorism?

24   A.    Nope.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

31

1    Q.    That's just a complete mystery?

2    A.    Right.

3    Q.    All right, but you're going to be arraigned

4    tomorrow, and you're going to get you a lawyer; is

5    that right?

6    A.    Yeah.

7    Q.    Is that right?  All right.

8          Now, have you told me about all the

9    arrests or convictions that you've had since February

10   of '06?

11   A.    Right.

12   Q.    All right.  Are there any charges pending

13   against you right now other than the terrorism charge?

14   A.    No, that's it.

15   Q.    All right.  Have you told me about all of the

16   jobs you've had since you got fired from USA Truck?

17   A.    Right.

18   Q.    All right.  While you were working for USA

19   Truck, did you apply for a job at Knight's

20   Transportation?

21   A.    Right, Knight's.

22   Q.    Did they ever offer you a job?

23   A.    Yeah.

24   Q.    Why didn't you take it?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

32

1      A.    He told me he had to, I don't know, fax some

2    paper over, some paperwork or something over there.   I

3    faxed it over, and after that I pretty much ain't hear

4    too much about him.   I was still driving for USA at

5    the time.

6      Q.    Still driving for USA?

7      A.    Yeah.

8      Q.    All right.   And then this wreck happened in

9    Montgomery?

10     A.    Right.

11     Q.    And that was the end of your driving with USA?

12     A.    Right.

13     Q.    Did you go back and check with Knight's again?

14     A.    Yeah, after the fact, yeah.

15     Q.    Did they offer you a job after you had the

16   wreck in Montgomery?

17     A.    He did, he just said I had, I had, I had to

18   wait till I had got some stuff off my driving report,

19   some incidents.

20     Q.    All right.   Was the stuff on your driving

21   report that Knight's Transportation had to wait on,

22   did that include the Montgomery wreck or was that not

23   on there?

24     A.    No, that's not on there.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

33

1    Q.    The Montgomery wreck wasn't on there?

2    A.    No.  Ain't got no reason to be.

3    Q.    All right.  The stuff that was on the driving

4    record that Knight's Transportation was concerned

5    about, that was things that happened before the

6    Montgomery wreck February 20th of '06; is that right?

7    A.    Right.

8    Q.    Okay.  Who did you deal with at Knight's

9    Transportation about your job application?

10   A.    I forget his name.

11   Q.    What town was he in?

12   A.    I don't know.

13   Q.    How did you get up with Knight's

14   Transportation?

15   A.    Cell phone.

16   Q.    You don't even know what town they were in?

17   A.    Uh-uh, no.

18   Q.    But the long and short of it was that they

19   wouldn't hire you because of your driving record; is

20   that right?

21   A.    Right.

22   Q.    Said they needed to wait until some things got

23   off of it?

24   A.    Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

34

1    Q.    All right.  You started for USA Truck August

2    the 1st of '05; is that right?

3    A.    Yeah.  Actually, it was seventh -- 7, 7-05.

4    Q.    July of '05?

5    A.    End of '07, yeah, end of seventh, beginning of

6    August.

7    Q.    I noticed some documents in your file that were

8    dated as early as March of '05.  Did you apply for a

9    job back in March of '05 with USA Truck?

10   A.    If I did, I don't remember.

11   Q.    Okay.  Do you know how any documents would get

12   in their file on that date, "August of '05"?

13   A.    Other than the fact of me applying, yeah.

14   That's about it.

15   Q.    Okay.  But you started August 1st of '05?

16   A.    Right.

17   Q.    All right.

18   A.    August beginning; end of July.

19   Q.    All right, now, there's been some documents

20   that have been produced in this case.  Let me refer

21   you to documents 292 through 298, if I could.  I want

22   to ask you some questions about those.

23           MR. OLIVER:  I didn't bring those with me

24   since they were USA stuff.  You got them where you can

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 35 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

35

1    show them to him?

2      Q.    All right.  I'm going to have to come around

3    now, I don't want to upset you now.  Don't feel like

4    you got to pop me upside the head.

5      A.    No, ain't, ain't no larceny in my heart right

6    now.

7      Q.    All right.  This is your application for

8    employment with USA Truck; is that right?

9      A.    Right.

10     Q.    Is that your writing on there?

11     A.    Yeah, that's right.

12     Q.    And you dated it July the 28th of '05.

13     A.    Right.

14     Q.    All right, and that number 2 Canoe Court, New

15   Castle, Newark, Delaware --

16     A.    Right.

17     Q.    -- that's your mama's address?

18     A.    Right.

19     Q.    Has she always been able to get up with you?

20     A.    Right.

21     Q.    I mean since July of '05 at least, she could

22   find you if she wanted to?

23     A.    Yeah, she still can.

24     Q.    And you had given this number here and address.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

36

1   Is that her number right there, that 738-0652?

2   A.   That's --

3   Q.   That's your mama's number?

4   A.   That's old, old number.

5   Q.   Sir?

6   A.   Yeah, that's her old number.

7   Q.   All right, when did that number change?

8   A.   I'm not for sure, I don't remember.  She

9   handles all that.

10   Q.   All right.  And you gave them some companies

11   that you had worked for; is that right?

12   A.   Right.

13   Q.   Now, this Tri-State Grouting in Bear, Delaware,

14   that's listed on there from April of '03 to June of

15   '04.  Is that the sewer cleaning company?

16   A.   Yeah, yeah, I back went back with them, I went

17   back, I went back.

18   Q.   Okay.  You listed there --

19   A.   Right.

20   Q.   -- on the application driver --

21   A.   Yeah.

22   Q.   -- and laborer.

23   A.   Right.

24   Q.   Were you a driver back then in April of '03 to

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

37

1   June of '04, driver and a laborer?

2   A.   Right, yeah, I was a driver then.  It was, they

3   only got straight trucks, though.

4   Q.   All right.  They don't let you drive the truck

5   in your job you do now, though, is that right?

6   A.   No, because my license and everything wasn't

7   straight.

8   Q.   Your license is what?

9   A.   I got to get my license straight.  Suspended.

10  Q.   Is your license suspended now?

11  A.   Right.

12  Q.   All right.  Well, let me make a note of that so

13  I don't forget it, and I'll ask you about it next.

14  But let's go ahead and go through that application.

15          That's your signature on 296?

16  A.   Um-hum.

17  Q.   Is that right?  "Um-hum" meaning yes?

18  A.   Yes.

19  Q.   All right.  And that's your signature on 298;

20  is that right?

21  A.   Yeah, yeah, yeah, that's my signature.

22  Q.   July the 28th of '05; is that right?

23  A.   Right, right, right.

24  Q.   Okay.  Then you filled out some more documents.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

38

1    And this one here, is this your writing on 302?

2    A.    Right, yeah.

3    Q.    And they said, "Have you been convicted of a

4    felony?"

5    A.    Right.

6    Q.    You checked "Yes."  Did you fill this 302 out

7    about the same date you did the application, July the

8    28th of '05, you think, or close in time to the

9    application?

10    A.    It was after the fact.  It was 8-01.

11    Q.    Yeah, but what you're seeing there, August of

12    2001, is when you were convicted of the felony, wasn't

13    it?

14    A.    Yeah, okay, all right.

15    Q.    See, there's no -- I don't see a date on this,

16    that's the reason I'm asking you these questions.  But

17    I think you would have filled that out when you did

18    the application; is that right?

19    A.    Yeah, I believe, I guess.  I'm not for sure, I

20    don't remember.

21    Q.    All right.  Well, it's true, you've been

22    convicted of a felony?

23    A.    Right, right, right, right, right.

24    Q.    And it was about in August of '01?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

39

1    A.    Right, right, right.

2    Q.    Was it in Federal Court?

3    A.    Yeah.

4    Q.    And was it the Federal Court for the District

5    of Delaware?

6    A.    Yeah, yeah, it's, whatever it's called, I don't

7    know.

8    Q.    And they put you on probation?

9    A.    Right.

10    Q.    For two years?

11    A.    Right.

12    Q.    You didn't go to jail?

13    A.    No, no.

14    Q.    Didn't go to prison?

15    A.    No.

16    Q.    But you paid -- let's see, you didn't pay a

17    fine.

18    A.    Yeah, I did.  I'm still in the process of

19    taking care of that.

20    Q.    All right.  What was the fine?

21    A.    Like, like 4,000, something like that.

22    Q.    All right.  And with regard to your Federal

23    Court conviction, didn't they say that you were

24    untruthful on your income tax return?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 40 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

40

```
 1    A.    Not me, but yeah, yeah.  I was -- yeah, I

 2    was -- that's what I was -- you know what I mean?

 3    Q.    Well, you signed it and turned it in to the

 4    government.

 5    A.    Right, right, right, right, right.

 6    Q.    And it turned out what was on that income tax

 7    return was not true; is that correct?

 8    A.    Right, right.

 9    Q.    And that's what you got charged with and

10    convicted of; is that right?

11    A.    Right.

12    Q.    Did you plead guilty to that?

13    A.    Yeah, I pled guilty.

14    Q.    In other words, what the government charged you

15    with, you said that you did it?

16    A.    Right.

17    Q.    All right.  And you're still paying the fine?

18    A.    Right.

19    Q.    And then you filled this document here out with

20    the application, or close in time, didn't you, number

21    303?  Is this your writing on this one?

22    A.    Yeah.

23    Q.    All right.

24    A.    Yeah, that's me.
```

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

41

1    Q.    They asked you had you any accidents in the

2    last three years, and did you check no?

3    A.    Right -- hold on.

4    Q.    This would have been in July of '05.  July or

5    August of '05 when you're making the application.

6    A.    Oh, okay, yeah.  I guess, you know what I mean,

7    yeah.

8    Q.    Did you write that, did you put that check mark

9    there, any accidents in the last three years?  Did you

10   put no?

11   A.    Oh, yeah, yeah, yeah, yeah, yeah, I put that,

12   yeah.  Right, right.

13   Q.    Then, "Have you ever been convicted of a felony

14   or a criminal offense?"  You said, you checked "Yes."

15   A.    Right.

16   Q.    And you said "Explain," and you put "2001,

17   theft, no jail, two years' suspension."  That's that

18   Federal Court thing, the income tax thing we're

19   talking about?

20   A.    Right, right, right, right, right.

21   Q.    And you wrote down that was a theft offense,

22   didn't you?

23   A.    Right.

24   Q.    All right.  The American Driver Training that's

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

42

1   shown on 320, you've got on here from October of '02

2   to 11-02, you got "Student."

3      A.   Right.

4      Q.   And then September '02 to October '02, you put

5   down something.  Is that your writing on that

6   document?

7      A.   No, don't look like mine.  That's a female.

8      Q.   Did you go to this American Driver Training --

9      A.   Right, right, right.

10     Q.   -- back in '02?

11     A.   Right.

12     Q.   Did you graduate at that time?

13     A.   Yeah.

14     Q.   Look at this driving record information that's

15   shown on 334 and 335.  And down here where it shows

16   these charges and convictions, let's see, let me get

17   the terminology correct.  The violations, violations,

18   suspensions and the conviction reinstatements.  Was

19   that your driving record?  The date that it shows on

20   here is July the 19th of '05.  Do you see that?  Would

21   you look at that just a minute, tell me if that's your

22   driving record in July of '05?

23     A.   Right.

24     Q.   All right.  Here's another one that USA ran on

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

43

1   you June 27th of '05, so apparently you had been

2   talking with them a little bit before you filled out

3   the application, hadn't you?  This is on page 338.

4       A.   Oh, this is more?

5       Q.   Well, this looks like a lot of the same thing.

6       A.   Okay.

7       Q.   Tell you the truth, I hadn't really compared

8   them, the two.

9       A.   Okay.

10      Q.   But this one looks like it's filled out a

11  little bit earlier.  The other one was in July, this

12  one is in June of '05.  So apparently you were talking

13  to USA sometime in June of '05?

14      A.   I guess, yeah.  I don't remember, you know what

15  I mean, if it's there.

16      Q.   Okay.  And then when you're filling out your

17  application, No. 359 is a document that says, "Have

18  you ever tested positive on any D.O.T. drug or alcohol

19  test, including preemployment, within the past three

20  years?"  And you checked "No."  Is that right?

21      A.   Right.

22      Q.   That's your handwriting on that document; is

23  that correct?

24      A.   Right.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 44 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

44

1     Q.    And you did that, you put your hand on there

2     and you checked that "no" box on July the 28th, 2005?

3     A.    Right.

4     Q.    Didn't you have a positive drug test in late

5     2002 or 2003?

6     A.    Right.

7     Q.    Early 2003?

8     A.    Right, right, right, right, right, right.

9     Q.    And you told the Montgomery Police Department

10    after Mr. Britt was killed in Montgomery that you had

11    had that positive test, didn't you?

12    A.    Right.

13    Q.    So when you wrote this down here on document

14    359 on July 28th of '05, you put your hand on that

15    piece of paper and you said no, you hadn't had a

16    positive test, that was false, wasn't it?

17    A.    Yeah, that was false, yeah.

18    Q.    All right.  So you falsified that document

19    there, 359, you falsified your response to USA, didn't

20    you?

21    A.    Right.

22    Q.    All right.

23    A.    In order to work, yeah.

24    Q.    In order to get you a job.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 45 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

45

1    A.    Right.

2    Q.    All right.  You didn't want them to find out

3    about that, did you?

4    A.    You know what I mean, if they didn't we

5    wouldn't be here today.

6    Q.    All right.  Then there's another document here

7    with regard -- this is number 370.  After you started

8    working for USA --

9    A.    Right.

10    Q.    -- you got some documentation from them saying

11    that you were falsifying your logbooks, didn't you?

12                MR. RICHMOND:  Object to the form.

13                MR. OLIVER:  Object to the form.

14                THE WITNESS:  Hmm?

15                MR. ALLRED:  Sir?

16                MR. RICHMOND:  You can answer.

17                MR. OLIVER:  We're making an objection for

18    the record.  You can answer his question.

19    Q.    It says, "Due to log falsifications or errors."

20    A.    Yeah.

21    Q.    See, so I'm not making up that term

22    falsifications, am I?

23    A.    Right, no, you're not, you're not.

24    Q.    This is a USA Truck form, isn't it, this number

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 46 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

46

1    370?

2    A.    Right, right, right, right.

3    Q.    And they're saying, they're telling you, due to

4    log falsifications or errors, they moved you back to

5    Phase I in their program.  Is that right?

6    A.    Right.

7    Q.    All right.

8    A.    Yeah, that was -- yeah, that's in the beginning

9    when I first started.

10    Q.    Your error rate at that time that's covered on

11    document 370 was a 26.67 percent on your logbooks.

12    A.    Right.  I don't know nothing about that,

13    though.

14    Q.    All right.

15    A.    Just don't know.

16    Q.    When this wreck happened, this is number 393,

17    you had picked up a load of fiberglass in Amsterdam,

18    New York, and you were going to Houston, Texas; is

19    that right?

20    A.    Right.

21    Q.    And you were working for USA Truck, and you

22    were acting as their employee; is that right?

23    A.    Right.

24    Q.    Has anybody from USA Truck ever said anything

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

47

1    like you weren't acting for their better interests or

2    you weren't driving for them or you had deviated from

3    your route, anything like that?

4        A.    No.

5        Q.    Can you look at this Exhibit 393 and tell me

6    when you were supposed to be in Houston?

7        A.    2-22, 6 a.m.

8        Q.    All right.  Right there in the center it says,

9    "Delivery instructions:  2-22 at 6 a.m."  Is that

10   right?

11       A.    Yeah.

12       Q.    And the fiberglass weighed 40,328 pounds; is

13   that right?

14       A.    Right.

15       Q.    It was on 18 pallets?

16       A.    I'm not for sure.  It was already sealed.

17       Q.    Did you ever look inside the van?

18       A.    No.

19       Q.    Okay.  When you worked for USA Truck, how did

20   they pay you?  And I want to show you 398 and 399, and

21   you tell me, how did they calculate your pay?  Did you

22   get paid by the mile, by the load?

23       A.    By the mile.

24       Q.    Okay.  And somebody has marked 29 cents a mile

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

48

1   up there on the top of that 398.  Do you see that?

2    A.   Right.

3    Q.   How did that work?  Explain that to me.  Like,

4   and if you will, take this load here that's shown on

5   the bill of lading for the fiberglass, No. 393.  If

6   you picked it up in Amsterdam and you're going to

7   Houston, tell me how you would get paid on that load.

8    A.   How I would get paid?

9    Q.   Yeah.  How much a mile would you get?

10   A.   On the Houston -- I mean the Amsterdam to

11  Houston load?

12   Q.   Yeah, on the load you had.

13   A.   Oh, 36 cents, 36 cents a mile.  This is old.

14   Q.   That document there, what's the number on that,

15  398, it's old?

16   A.   Yeah.

17   Q.   All right, let me move it out of the way.

18   A.   Yeah.

19   Q.   Tell me how you were going to get paid on the

20  load from Amsterdam, New York, to Houston, Texas.

21   A.   How I was going to get paid?

22   Q.   Right.

23   A.   By the mile.

24   Q.   And how much were you getting a mile?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

49

1    A.    Thirty-six.

2    Q.    Thirty cents?

3    A.    Thirty-six cents.

4    Q.    Thirty-six cents, all right.

5    A.    Right.

6    Q.    How did you figure your miles?

7    A.    Through the Qualcomm, Qualcomm.  Well, they

8    pretty much took care of all that.

9    Q.    All right, so you were going to get 36 cents a

10   mile.

11   A.    Yeah.

12   Q.    So the sooner you can get to Houston --

13   A.    Yeah.

14   Q.    -- and get that unloaded, you can go do another

15   load?

16   A.    Right.

17   Q.    Because you get 36 cents a mile to go to

18   Houston, then if you could get that load unloaded --

19   A.    Right.

20   Q.    -- before the 22nd --

21   A.    Right.

22   Q.    -- the 22nd at 6:00 was just your deadline.

23   A.    Right.

24   Q.    Right?  But you could be there earlier if

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 50 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

50

1    they'd accept it?

2    A.   Right, right.

3    Q.   All right.  If you could get to Houston and

4    unload, you could go do another load, right?

5    A.   Right.

6    Q.   All right.  How was it determined how many

7    miles it was?  You mentioned something about Qualcomm?

8    A.   Yeah.

9    Q.   How did that work?  How did you expect USA to

10   determine how many miles it was to Houston?

11   A.   Doing the math.

12   Q.   All right.  And tell me what your understanding

13   of how the math would work.

14   A.   Thirty-six times -- what was the thing?

15   Throwing me off.

16   Q.   However how many miles it was to Houston?

17   A.   Yeah, however many miles, 36 times that, yeah.

18   Q.   All right.  Then who would come up with the

19   miles to Houston?  Would you do that and turn it in to

20   USA, or would they do it and tell you?

21   A.   No, they do it.  They tell me, tell me how many

22   loaded miles I get paid.

23   Q.   All right.  So USA Truck, they would tell you

24   on this load that you had the wreck on, they were

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

1    going to tell you how many miles you had driven from

2    Amsterdam to Houston?

3      A.   Yeah.

4      Q.   Right?

5      A.   Yeah.

6      Q.   All right.  And then however many that was,

7    they'd multiply it by 36 cents?

8      A.   Right.

9      Q.   And then that's what you would get, that would

10   be your gross pay?

11     A.   Right.

12     Q.   All right.  So that wasn't figured off of your

13   logbooks, was it?

14     A.   Uh-uh.

15     Q.   The mileage was not figured off your logbooks?

16     A.   No, none whatsoever.

17     Q.   Did that Qualcomm, would it keep your miles,

18   would it keep it accurately?

19     A.   Qualcomm?

20     Q.   Yeah.

21     A.   No, no.

22     Q.   Well, you told me that they used Qualcomm to

23   figure your miles --

24     A.   Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

52

1    Q.    -- unless I misunderstood.  How did they do

2    that with Qualcomm?

3               MR. OLIVER:  Object to the form.

4               THE WITNESS:  What you saying?

5               MR. OLIVER:  I'm just objecting to the

6    form of the question.

7               THE WITNESS:  Oh.

8               MR. OLIVER:  I think he misstated what you

9    said.  But you tell him how it worked.

10              THE WITNESS:  What was you saying?  I

11   don't know.

12   Q.    You started talking about Qualcomm when you

13   were telling me how you got paid.

14   A.    Right.

15   Q.    How did Qualcomm fit in the picture of how you

16   got paid?

17   A.    Because they would send, they would send a

18   message on the computer, you know what I mean, and the

19   computer would, it would tell me how many empty miles

20   I would get paid and how many loaded miles.  It never

21   really added up to how much total I was getting, but I

22   mean, it is what it is.  They're the employer, I'm the

23   employee.

24   Q.    So you'd get messages on the computer in the

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

53

1    tractor?

2    A.    Right.

3    Q.    And it would tell you how many miles you were

4    going to get paid?

5    A.    Right.

6    Q.    And what was your understanding of where USA

7    got that information?

8    A.    I'm not for sure.

9    Q.    All right.  That computer that you're talking

10   about, was that the Qualcomm system?

11   A.    Right.

12   Q.    Did you have any system other than Qualcomm in

13   the tractor?

14   A.    Uh-uh.  TV.

15   Q.    Beg your pardon?

16   A.    A TV.  That's about it.  Well, if you want

17   to -- I don't know what that got to do with the

18   situation at hand.

19   Q.    All right.  Did you have a TV in the tractor?

20   A.    Yeah.

21   Q.    All right.  All right, after this wreck in

22   which John Britt was killed, they inspected your

23   tractor.  I'm showing you No. 532.  And you had a

24   cracked windshield.  Is that right?  See that right

54

 1   there:  "Cracked, damaged or discolored windshield"?

 2   A.   No, that ain't the truck number, but --

 3   Q.   Do what now?

 4   A.   I said that's not the -- that ain't the truck

 5   number.

 6   Q.   What's not the truck number?

 7   A.   Right there.

 8   Q.   No, let me go over this since you mentioned

 9   that, so there won't be any confusion.

10   A.   Right.

11   Q.   This document was produced to me by USA Truck.

12   A.   Okay.

13   Q.   And it's marked "Britt/USA Truck 00532."

14   A.   Okay.

15   Q.   Nobody contends that what I just read is your

16   truck number.

17   A.   Okay, all right.

18   Q.   So the truck up here, see they've got the VIN

19   number up here for the unit.

20   A.   Right.

21   Q.   And they got the license number and the company

22   number.  You see these company numbers up here?

23   A.   Um-hum.

24   Q.   "Um-hum," meaning yes?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

55

1    A.    Yes, yes.

2    Q.    Wasn't your truck tractor, wasn't it No. 7695?

3    Wasn't that the tractor you were driving when this

4    wreck happened?

5    A.    I believe so.  I don't quite remember the

6    number.

7    Q.    All right.  Well, I'm going to tell you this is

8    where the police inspected your tractor after John

9    Britt was killed, and they wrote on here that you had

10   a damaged or discolored windshield, cracked.

11   A.    Okay, all right.

12   Q.    Now, you did not hit the windshield with your

13   head or any part of your body during this wreck, did

14   you?

15   A.    No.

16   Q.    That windshield was cracked before this wreck,

17   wasn't it?

18   A.    Right.

19   Q.    How long had it been cracked?

20   A.    I don't remember.  I don't remember.  It was

21   for awhile, though.

22   Q.    All right.  You had busted it in New York, you

23   had gotten some snow on your windshield, isn't that

24   right?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

56

1    A.    Yeah.

2    Q.    And you had been banging on it and you cracked

3    it, didn't you?

4    A.    Right, right.  I tried to knock the, because my

5    windshield wipers was frozen, I tried to knock it off.

6    Q.    Right, you were trying to knock it off.  And if

7    you do something like that on one of USA's trucks and

8    it's your fault, they'll make you pay for the

9    windshield, won't they?

10   A.    No, not necessarily.

11   Q.    You don't think they would?

12   A.    No.

13   Q.    Did you ever ask them to fix it?

14   A.    Plenty of times.

15   Q.    How many times did you ask them to fix it?

16   A.    I don't remember.  I know it was a bunch of

17   times.

18   Q.    And what do you mean by a bunch, more than a

19   dozen?

20   A.    Yeah.

21   Q.    And who would you ask to fix it?

22   A.    I would type it up to the maintenance, the

23   machine thing.

24   Q.    On that computer in the --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

57

1    A.    Qualcomm, yeah.

2    Q.    In the Qualcomm thing.  And you'd send that in

3    to USA Truck?

4    A.    Right.

5    Q.    And that's how you're supposed to do if you

6    want to get something fixed on your truck?

7    A.    Right.

8    Q.    You knew that having a cracked windshield was a

9    D.O.T. violation?

10   A.    Yeah, I knew that, I knew that.

11   Q.    And you were trying to get them to fix it?

12   A.    Right.

13   Q.    And they just wouldn't do it?

14          MR. RICHMOND:  Object to the form.

15   A.    No.

16   Q.    Did you do everything you knew how to do to get

17   that windshield fixed?

18   A.    No, not necessarily.  Not necessarily.

19   Q.    When you kept sending it in, that was the

20   procedure?

21   A.    Right, I kept sending it in but he would

22   like -- they were really just more persist on me just

23   taking the load and just keep going, like it wasn't

24   really major, a major problem.  But I knew it was a

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 58 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

58

1    problem.

2        Q.    Okay.  They just blew it off?

3        A.    Yeah.

4                MR. RICHMOND:  Object to form.

5        Q.    All right.  And when you say they wanted you to

6    just keep taking loads, they wanted you to keep

7    pulling loads even though they knew you had a cracked

8    windshield?

9                MR. RICHMOND:  Object to form.

10       A.    Right.

11       Q.    They didn't want to take that tractor out of

12   service because it wouldn't be producing any revenue;

13   isn't that right?

14               MR. RICHMOND:  Object to the form.

15               MR. OLIVER:  Object to the form.

16       Q.    Sir?

17       A.    Yeah, I guess, yeah.  I don't -- right.

18       Q.    All right.

19               THE WITNESS:  I had too much -- can I use

20   the bathroom?

21               MR. ALLRED:  Oh, yeah, absolutely.  It's

22   on the first floor.

23               THE WITNESS:  Thank you.

24               (A brief recess was taken.)

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

59

```
 1   BY MR. ALLRED:

 2     Q.   Mr. Johnson, with regard to your messages that

 3   you sent in on Qualcomm, or on the computer, whatever

 4   name it is, you said you thought you had sent about a

 5   dozen or so trying to get your windshield fixed?

 6     A.   Right.

 7     Q.   I've asked for some documents from USA Truck,

 8   and unless I'm mistaken, I haven't seen any in there

 9   about the windshield.  Do you know why those would not

10   have been produced to us?

11     A.   Nah.

12     Q.   Okay.

13     A.   No, I mean no, my fault.

14     Q.   But you did, you did what you could do, you put

15   it in the computer and you sent it in?

16     A.   Right.

17     Q.   All right.  And you're sure of that?

18     A.   Yeah.  I'm pretty much sure, yeah.

19     Q.   All right.  When you had -- wait, let me ask

20   you about this first.  Let me show you some Answers to

21   Interrogatories that I've been given copies of, and

22   this is Responses of Theodore Leverne Johnson to

23   Plaintiff's First Interrogatories.  That's you, right?

24     A.   Right.
```

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

60

1    Q.   Have you ever seen these before?

2    A.   Yes, correct.

3    Q.   All right.  Is this your signature on the back?

4    A.   Right, right.

5    Q.   When did you sign that?

6    A.   The 20th day, 20th day of --

7    Q.   Of October?

8    A.   Yeah.

9    Q.   Here about a week or so, ten days ago?

10   A.   Right.

11   Q.   Why are there two signatures on there?  You see

12   that?

13   A.   Yeah, yeah, yeah.  I ain't -- I never did this

14   before.  I signed it before I went to the thing.  I

15   filled it out, and then they told me to sign it as I

16   got there, that I wasn't really supposed to do that.

17   Q.   All right.  Did you go somewhere where -- there

18   is a person on here named Emery Gholston, it says

19   she's a notary public.  Did you go meet with Miss

20   Gholston?

21   A.   Yeah.

22   Q.   Where was she when you signed that?

23   A.   The bank.

24   Q.   Was she there when you were there?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

61

1    A.    Right.

2    Q.    All right.  Now, this is all typed up.  Did you

3    type this up?

4    A.    No.

5    Q.    Was this sent to you and then you took it to

6    Ms. Gholston and you signed it in her presence; is

7    that right?

8    A.    Right.

9    Q.    All right.  Well, who prepared this?

10    A.    I'm not for sure.

11    Q.    All right.  One of those questions is they want

12    to know, No. 3, "For each traffic violation you've had

13    for 10 years before this collision" -- this collision

14    is the one that John Britt was killed in, February the

15    20th of '06.

16    A.    Right.

17    Q.    -- "give the date and location of the alleged

18    violation and the result."  And you've mentioned

19    several in there.  I don't see one in there where you

20    were cited for running through the weigh station in

21    Tennessee.  That's not on there, is it?

22    A.    No, that wouldn't be on the driving report, no.

23    Q.    Okay.  For each traffic violation you've had

24    for 10 years, traffic violation, you ran past a weigh

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 62 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

62

1   station in Tennessee and they stopped you for that.

2   A.   Right, right, I forgot about that one.

3   Q.   That's not on there, correct?

4   A.   Right, right.

5   Q.   And then there's another time that you got

6   stopped in Missouri, wasn't it, you were driving a USA

7   Truck and you didn't even have a driver's license;

8   your driver's license was suspended.  That's not on

9   there either, is it?

10            MR. OLIVER:  Objection to form.

11            MR. RICHMOND:  Same thing.

12   A.   Yes, it should be on there.

13   Q.   Do you see it?

14   A.   No.  But no, that's not even everything that's

15   on there, no.

16   Q.   This, on No. 3, did your lawyers fill this out?

17   A.   I'm not for sure, I don't know.

18   Q.   You didn't?

19   A.   No, I know I didn't.

20   Q.   They sent it to you.  Who did you get it from?

21   A.   The mail, mailing system.

22   Q.   Who mailed it to you?

23   A.   I forget the name.  I forget.

24   Q.   Was it Tom Oliver and Lea Richmond, these

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

63

1    lawyers here?

2              MR. OLIVER:  I'm going to object to the

3    form.  Not allowed to go over attorney-client

4    privileged information.

5              MR. ALLRED:  Oh, I'm not asking any

6    attorney-client privileged information.

7              MR. OLIVER:  You're asking if he

8    communicated with us about it.  I think that is a

9    privileged communication.

10   BY MR. ALLRED:

11    Q.   Did you get this document from your lawyers?

12             MR. OLIVER:  I'm going to object to the

13   form and instruct him not to answer.

14             MR. ALLRED:  That's not privileged,

15   whether or not he got it.

16             MR. OLIVER:  Absolutely it is.  You asked

17   him did he get it from us.

18             THE WITNESS:  I don't know.  I know I

19   received it in the mail.

20    Q.   Have you gotten documents like this, like these

21   interrogatory answers from anybody other than your

22   lawyers?

23    A.   No.

24    Q.   All right.  Do you know why they wouldn't

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 64 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

64

1    include your other traffic violations in that response

2    there?

3            MR. RICHMOND:  Object to the form.

4            MR. OLIVER:  Objection.

5    Q.   Do you know why that's not on there?

6    A.   I sent -- hold on.  I don't know.  I don't

7    know.

8    Q.   I don't either.

9    A.   Not necessarily.  I don't know.

10   Q.   You sure have those violations, didn't you?

11   A.   Right.

12   Q.   They're not on that piece of paper you signed,

13   are they?

14   A.   I didn't --

15   Q.   So this answer to No. 3, that's actually false,

16   isn't it?

17           MR. OLIVER:  Object to the form.

18           MR. RICHMOND:  Objection.

19   Q.   Sir?

20   A.   That's a, that's not the -- that's not even,

21   that's not -- all this stuff shouldn't even be,

22   wouldn't even be on the driving report anyway, my

23   Delaware driving report.

24   Q.   This doesn't say anything about driving report.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

65

1    It says traffic violation.  That's pretty

2    straightforward, isn't it?

3    A.    Oh, yeah, okay.

4    Q.    And it wants to know for 10 years.

5    A.    All right, okay.

6    Q.    And you had this running up and down the road

7    with USA's truck and you didn't even have a driver

8    license, you got stopped for that.

9    A.    Oh --

10   Q.    You got stopped for running through the weigh

11   station in Tennessee, you got stopped for that.

12   A.    Right.

13   Q.    Those were traffic violations, weren't they?

14            MR. RICHMOND:  Object to the form.

15   A.    Right, right.

16   Q.    And they're not on there, so this response here

17   is false, isn't it?

18            MR. OLIVER:  Object to the form.

19   Q.    To No. 3?

20   A.    I mean, they were on there, but I mean these, I

21   mean, I remember these, but I didn't remember them at

22   the period of time.  I'm remembering them now --

23   Q.    Okay.

24   A.    -- as we're speaking.  But I'm not --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

66

1    Q.    Okay, so this answer to No. 3, regardless of

2    when you remember them, this is false, it's not

3    correct, is it?

4                 MR. OLIVER:  Object to the form.

5                 MR. RICHMOND:  Object to the form.

6    Q.    Sir?

7                 THE WITNESS:  What does that mean?

8    Q.    That means when that shoe starts getting

9    tight --

10   A.    Yeah.

11   Q.    -- they start saying, "I object to the form."

12                MR. OLIVER:  Objection.

13   Q.    What you're required to do is just tell the

14   truth.

15                MR. OLIVER:  I object to the form of that

16   question.

17   Q.    Okay.

18   A.    Go ahead, I don't understand what you're

19   saying.

20   Q.    What I'm saying is this.

21   A.    Go ahead.

22   Q.    That answer to No. 3 is incorrect, isn't it?

23                MR. OLIVER:  Object to the form.

24   A.    At the period of time, I mean it was, it was

Wilcox and Fetzer, Ltd.   Registered Professional Reporters        302-655-0477

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

67

1    incorrect because I don't -- I don't remember.  I mean

2    I ain't remembering all of them at the period of time

3    that I was being asked these questions.

4       Q.    Now, here you also have -- well, let me ask you

5    this:  before signing those and swearing to those

6    answers, did you have every opportunity to meet with

7    anybody that you wanted to that's helping you with

8    this case?

9       A.    Yeah.

10      Q.    All right.  And talk with them about anything

11   you wanted to talk to them about; isn't that right?

12      A.    Right.

13      Q.    All right.  Now, another one of those questions

14   is No. 6, "If your driver license has ever been

15   suspended or revoked, please give date, state and

16   reason."  And you got one, two, three suspensions

17   listed.  And then February of '06 it's listed, this

18   one, February the 2nd of '06, that's what got your CDL

19   suspended, wasn't it?

20      A.    That was February 2nd of '06, yeah, that's for

21   the, for when I was driving, I was driving for USA.

22      Q.    Yeah.

23      A.    Yeah.

24      Q.    "Failure to maintain insurance, Delaware,

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

68

1    personal vehicle."  Then you got a ticket for that and

2    you didn't get that taken care of so they suspended

3    your driver license, didn't they?

4    A.   Yeah, I didn't even know nothing about it.  I

5    was driving up the road.  I was in Kansas City.

6    Q.   Yeah, all right.  And they suspended your

7    driver license, and then you got caught in Missouri

8    for not having a driver license when you were driving

9    the USA Truck; isn't that correct?

10   A.   Right.

11   Q.   I'm sorry?

12   A.   Well, hold -- I got -- repeat the question?

13   Q.   You got caught in Missouri for not having a

14   driver license?

15   A.   Right, right, right, right, right.

16   Q.   And you were driving a USA Truck without a

17   license at that time, weren't you?

18   A.   Right, right.

19   Q.   And No. 20, the question is asked you:  "State

20   each activity you were performing for the entire

21   seven-day period leading up to the accident, including

22   the amount of time for each such activity."  And

23   somebody wrote in here, "The defendant contends that

24   the term 'activity' is vague and ambiguous."  Is that

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

69

1   your position?

2   A.   I don't even know what that means.

3   Q.   I don't either.  I'm just asking you.

4   A.   No, I don't, I don't believe that --

5   Q.   Do you think, let me ask you this:  I represent

6   this man's widow that was killed in that wreck.

7   A.   Um-hum.

8   Q.   And one of the things we want to know is what

9   you were doing for a week before John Britt was

10  killed.

11  A.   Driving.

12  Q.   Does that sound like a reasonable request to

13  you?

14  A.   What, that I was being vague?

15  Q.   To find out what you'd been doing.

16  A.   Oh, okay, yeah, yeah, yeah, right, that's --

17  Q.   Now, as far as activity is concerned, you had

18  been driving a truck for USA Truck for that week.

19  A.   Right.

20  Q.   Isn't that right?

21  A.   Right.

22  Q.   And your logbooks would show what you were

23  doing for that week before this wreck, wouldn't it?

24  A.   Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

70

1    Q.   That's not a hard question, is it?

2    A.   No.

3    Q.   Now, have you ever given a statement to anybody

4    about how this wreck happened where they asked you --

5    I don't mean if there is a lady like this lady here.

6    But somebody is in your presence and they say, "Tell

7    me how this wreck happened."  Have you ever done that?

8    A.   Yeah.

9    Q.   All right.  You gave one statement to the

10   Montgomery Police Department; isn't that right?

11   A.   Right.

12   Q.   And that was the night that John Britt was

13   killed; is that correct?

14   A.   Right.

15   Q.   Sir?

16   A.   Right.

17   Q.   And you went down to the police station with

18   Officer Gann and another officer in order to give that

19   statement; is that right?

20   A.   Right.

21   Q.   When you gave that statement, the facts of the

22   accident were very fresh on your mind; is that

23   correct?

24   A.   It's -- to a certain extent.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 71 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

71

1    Q.   Well, were you fuzzy from the dope you'd been

2    smoking or was there --

3              MR. RICHMOND:  Object to the form.

4    Q.   -- was there a reason you wouldn't remember?

5    A.   No, I was more like, like in, like stressed out

6    pretty much.  Distraught from the accident that just

7    occurred.

8    Q.   And you went down there and you spoke to

9    Corporal Bradley and Officer Gann at the Montgomery

10   Police Department; isn't that right?

11   A.   Right.

12   Q.   Two policemen?

13   A.   Yeah, right, just --

14   Q.   And you knew what they wanted to know was what

15   happened.  Is that right?

16   A.   Right.

17   Q.   Okay.  And you did your best to tell them what

18   happened.  Is that right?

19   A.   Right.

20   Q.   And you gave them a statement that night that

21   started about 2350 Mean Time, whatever that is, I

22   think that's 11:30 that night, and it went on for

23   about 67 pages.  Is that correct?

24   A.   I --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

72

1    Q.    Went on a long time?

2    A.    Yeah, right.

3    Q.    I've read that in there, and have you ever read

4    it?

5    A.    What, the statement?

6    Q.    The statement to the police?

7    A.    Oh, yeah, yeah, yeah, I read it.

8    Q.    All right.  When did you first read it?

9    A.    When was it?  Last night.

10    Q.    All right.

11    A.    Yeah.

12    Q.    Had you seen it before last night?

13    A.    No.

14    Q.    But you had a chance to go over it last night?

15    A.    Right.

16    Q.    Who else was present when you went over it?

17    A.    My lawyers.

18    Q.    Tom Oliver and Lea Richmond?

19    A.    No, Lea Richmond.

20    Q.    Lea Richmond?

21    A.    Right.

22    Q.    All right.  And you read it from start to

23    finish, all 67 pages?

24    A.    No.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

73

1    Q.   You did not?

2    A.   Uh-uh.

3    Q.   What part did you read?

4    A.   The first couple.

5    Q.   First couple pages?

6    A.   Yeah.

7    Q.   All right.  Other than pages 1 and 2, did you

8    read any other part of the 67-page statement?

9    A.   No, not really.  I just pretty much skimmed

10   through it.

11   Q.   You say not really, what?

12   A.   No, I just skimmed through it, like just looked

13   through it.  I ain't read the whole joint, the

14   whole --

15   Q.   Tell me why you didn't read past page 2.

16   A.   I got tired.

17   Q.   Did you?

18   A.   Yeah.

19   Q.   All right.  Were you given a copy of your own,

20   your own personal copy?

21   A.   Of the statements?  What, the police report?

22   Q.   Right.

23   A.   Yeah.

24   Q.   And last night you were given a copy?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

74

1     A.    Right.

2     Q.    Were you given a copy before last night by the

3     police or anybody?

4     A.    No.

5     Q.    You had not, all right.  But you read through

6     page 2; is that right?

7     A.    Right.

8     Q.    Okay.  Well, the two pages that you read,

9     that's what you told the police the night John Britt

10    was killed, wasn't it?

11    A.    Right.

12    Q.    You weren't trying to mislead them, were you?

13    A.    No, I was just so like, you know what I mean,

14    my head was just so messed up.

15    Q.    Your head was messed up?

16    A.    Yeah, my head was spinning from the accident,

17    you know what I mean?

18    Q.    All right.  Was it spinning from the marijuana?

19    A.    Oh, no.

20          MR. RICHMOND:  Object to the form.

21    A.    No, I doubt that.

22    Q.    All right.

23    A.    That was --

24    Q.    I didn't ask you when we started the

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 75 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

75

1   deposition, but you told the police that night John

2   Britt was killed that you smoked marijuana.

3       A.   Right.

4       Q.   Had you smoked any marijuana before this

5   deposition?

6       A.   No.

7       Q.   When is the last time you smoked?

8       A.   Man, damn, shit, awhile ago.  It's --

9       Q.   Awhile ago?

10      A.   Yeah.  It's awhile ago.

11      Q.   Have you smoked some since John Britt was

12  killed?

13      A.   No, not to my knowledge.  I pretty much made a

14  vow to leave that alone, if you really want to get

15  technical.

16      Q.   All right.  Now, when you had this wreck, you

17  were turning left into the truck stop; is that

18  correct?

19      A.   Right.

20      Q.   And there was three lanes of traffic meeting

21  you; is that right?

22      A.   Right.

23      Q.   So you were on, really you were on a seven-lane

24  highway; is that correct?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

76

1    A.    Right.  Six, I believe it was six.  Was it six?

2    If you want to count the turning lane, yeah, seven.

3    Q.    Let's look at the report that Officer Gann and

4    the Montgomery Police Department did up.  Have you

5    seen this before?

6    A.    Yeah, I seen this.

7    Q.    All right.  So that's three lanes going each

8    way, you see them:  1, 2, 3, 1, 2, 3, do you see that?

9    A.    Right.

10    Q.    And then there's a center lane, turn lane, so

11    there's seven lanes, right?

12    A.    Right.

13    Q.    Now, this says "To I-65," so I-65 is over

14    toward this side of the sheet.

15    A.    Right.

16    Q.    Over to the west side of where you had the

17    wreck.

18    A.    Okay, right.

19    Q.    So you got off the interstate and you came down

20    to the Southern bypass.

21    A.    Right.

22    Q.    Which is the Southern Boulevard, that's what

23    this wreck happened on.

24    A.    Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

77

1    Q.    And you came under the I-65 overpass, and then

2    you were going to go in the truck stop; is that

3    correct?

4    A.    Right.

5    Q.    When is the last time you had stopped to get

6    out of the tractor before this wreck?  Was it in South

7    Carolina?

8    A.    It might -- I don't remember.  It probably was.

9    I know I used the bathroom somewhere.

10    Q.    Had you stopped --

11    A.    Used the bathroom and I got something to eat.

12    Q.    Had you stopped in Alabama before you got to

13    the truck stop where the wreck happened?

14    A.    Uh-uh, no.

15    Q.    All right.  So this is about 8:40 or 8:50 at

16    night; is that correct?

17    A.    I don't remember the time.

18    Q.    All right.  Let's look over here to see what

19    the policeman says.  He says 2050, that would be about

20    8:50.  Do you dispute that, that's what time it was?

21    A.    I guess, yeah, I said that military time throw

22    me off, yeah.

23    Q.    You take 12 off of it is the easiest thing to

24    do.  If you take 12 off the 20, that's 8:50, you see?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 78 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

78

1    A.    Okay, yeah.

2    Q.    You dispute that's when the wreck happened?

3    A.    I guess, yeah.  I guess.

4    Q.    All right.  And then you came up here to this
5    turn lane, and what you wanted to do was get over
6    there in that truck stop.  Is that right?

7    A.    Right.

8    Q.    The TA Truck Stop.  Is that right?

9    A.    Right.

10    Q.    And was this boulevard, was it lighted?  Did it
11    have street lights on it?

12    A.    Right.

13    Q.    Now, I'm not asking you about traffic yet, I'll
14    ask you that in a minute.  You see that arrow that's
15    just below where John Britt's truck wound up after he
16    was killed, from that arrow back to the east, which
17    would be the direction you're pointed, how far could
18    you see from that arrow back to the east?  How far did
19    you have a clear view?

20    A.    A clear view?

21    Q.    Right.

22    A.    I could see everything.  I could see oncoming
23    traffic.

24    Q.    Yeah.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 79 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

79

1    A.    Everything that's coming at me.

2    Q.    Right.

3    A.    Within my peripheral view.

4    Q.    Do you know how far back that road was, that

5    boulevard was that you had a clear line of sight?

6    A.    How far back?

7    Q.    Back to the east, to the east in the direction

8    you were going before you turned.

9    A.    No, not to my knowledge.

10   Q.    Don't have any judgment?

11   A.    No.

12   Q.    All right.  Then did you have your lights on?

13   A.    Right.

14   Q.    How do you know that?

15   A.    Because, outside driving, it was nighttime.  I

16   had to have my lights on in order to see.

17   Q.    Okay.  And when you came up under the bridge on

18   the boulevard, did you get over in that median lane

19   there intending to turn off into the truck stop?

20   A.    Right.

21   Q.    And I think you told gross weight on that

22   vehicle was something like 72,000 pounds, 72,280.

23   A.    Right.

24   Q.    Is that about what it weighed?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

80

1    A.    Yeah, that's about right.

2    Q.    All right.  So you had about 40,000 pounds of

3  freight on there, didn't you?

4    A.    Right.

5    Q.    Could you tell, could you feel it loaded?  I

6  mean did it drive different loaded?

7    A.    Did it drive different loaded?

8    Q.    Yeah.  Take you a little longer to start off

9  from a stop --

10    A.    Of course.

11    Q.    -- than if you were empty?

12    A.    Yeah, of course.

13    Q.    All right.  So when you got up here in this

14  median lane here, isn't it true that you saw some

15  traffic meeting you, some oncoming traffic, meeting

16  you, and that traffic would have been going west back

17  toward I-65?

18    A.    Right, I seen a bunch of traffic.

19    Q.    And you saw at least three vehicles, didn't

20  you?

21    A.    I seen more than three.

22    Q.    More than three.

23    A.    Yeah, before I turned.

24    Q.    Now, if you're going to turn across into the

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

81

1    truck stop, and this traffic meeting you, this

2    oncoming traffic, who has the right-of-way there?  Do

3    you have the right-of-way?  Can you turn in front of

4    them, or do they have the right-of-way, you're

5    supposed to stop and let them clear?

6    A.   Stop and let them clear.  They got the

7    right-of-way.

8    Q.   All right.  When you got up here to this center

9    lane, you observed traffic in all three of these

10   lanes, oncoming lanes?

11   A.   Right.

12   Q.   Did you see any vehicles that did not have

13   their lights on?

14   A.   No, I didn't.

15   Q.   The truck that John Britt -- I say truck, he

16   was in a little old Mazda pickup truck, it had its

17   lights on, didn't it?

18   A.   Yeah, all three of the trucks that was in that

19   lane had their lights on, yeah, all three of the

20   occupants, yeah.

21   Q.   The three vehicles that you saw before you

22   started your turn --

23   A.   Right.

24   Q.   -- all three of them had their lights on?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

82

1    A.    Right.

2    Q.    You don't claim you didn't see John Britt

3    because he didn't have his lights on; is that right?

4    A.    Right.

5    Q.    And then even though you saw him coming, you

6    started your turn anyway into that truck stop, didn't

7    you?

8    A.    Right.

9    Q.    And then when you got started into your turn,

10   you were trying to shift your truck without using the

11   clutch, weren't you?

12   A.    Right.

13   Q.    And you were trying to go from third gear to

14   fourth gear, weren't you?

15   A.    Right, that's how I drive.

16   Q.    And then you missed fourth gear, didn't you?

17   A.    Right.

18   Q.    So then you saw that you had turned in front of

19   John Britt, and the other vehicles there -- the other

20   vehicles were slowing down, weren't they?

21   A.    Yeah, yeah, they were slowing down, yeah.

22   Q.    No indication that John Britt had seen you; is

23   that right?

24   A.    Yeah, to my knowledge, all three were slowing

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

83

1   down.

2      Q.    All three of them were slowing down?

3      A.    Yeah.

4      Q.    Did you see John Britt slowing down, too?

5      A.    I didn't -- once I got in the middle of the

6   road, I didn't see him.

7      Q.    But it looked like all three of them were

8   slowing down when you were turning; is that right?

9      A.    Right.

10     Q.    Okay, and then you missed fourth gear.  Well,

11  let me ask you this:  What gear were you in when you

12  realized there was fixing to be a collision?

13             MR. OLIVER:  Object to the form.

14     A.    I didn't realize there was going to be a

15  collision.

16     Q.    All right.  You were in third gear when you

17  went across this median line to go intruding into

18  those lanes; is that right?  You're in third gear --

19     A.    Right.

20     Q.    -- when you get started in there; is that

21  right?

22     A.    Right, right, right, I'm rolling, yeah.

23     Q.    All right.  Did you ever come to a stop in that

24  median lane?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

84

1    A.    No.

2    Q.    Okay.  And then you're in third gear, you're

3    rolling, so you try -- what did you do?  How do you do

4    that when you shift without the clutch, you just let

5    off the accelerator a little bit and get the gears

6    synced up?

7    A.    Right, right, right, right.

8    Q.    And then sometimes it will jump right into

9    fourth gear, right?

10    A.    Right, right, right.

11    Q.    Sometimes it won't; is that right?

12    A.    Yeah, sometimes you got to use the clutch.

13    Q.    Had you missed fourth gear before?

14    A.    Yeah, plenty of times.

15    Q.    All right.  And then when you got started in

16    there and you missed fourth gear, did you use the

17    clutch then?

18    A.    Hold on, repeat the question.

19    Q.    When you missed fourth gear, then you're out

20    here in front of this traffic, this traffic is coming

21    down, you said it looked like all of them were slowing

22    down.  But you knew that you were out blocking their

23    path then, didn't you?

24    A.    Right.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 85 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

85

 1   Q.   And you knew if you didn't get that truck out

 2   of the way, some people could be injured that were

 3   approaching you; is that right?

 4          MR. OLIVER:  Object to the form.

 5   A.   No.

 6   Q.   You did not realize that?

 7   A.   I mean I'm not going to sit up here and say I'm

 8   thinking that -- I mean they are aware, fully aware

 9   and I mean can see what's going on, that there is a

10   truck making a turn, a left-hand turn.  So they would

11   have, you know what I mean, slowed down.  That's what

12   I'm thinking.

13   Q.   Okay, all right.  So what you expected them to

14   do was to slow down and let you get out of their way.

15   Is that right?

16   A.   Right.  Well, which I almost was.

17   Q.   And you would agree with me, wouldn't you, that

18   from the time you started that turn where that traffic

19   was, you could not have gotten out of the way unless

20   that oncoming traffic either slowed down or stopped.

21   Isn't that right?

22   A.   Repeat the question?

23   Q.   From the time you got out into this lane here,

24   this first lane, until you would have gotten out of

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

86

1    the way up there, you could not have made that turn

2    without this oncoming traffic either slowing down or

3    stopping.  Isn't that correct?

4        A.    Right.

5        Q.    All right.  And what you expected them to do,

6    you're driving a big old truck, you've been on the

7    road for a number of hours, you're fixing to get fuel,

8    then go on down to the rest area down the road and

9    stop for the night, so you want to get on in there and

10   get through with your business.  So you wanted to turn

11   on in front of that traffic, just let them slow down,

12   big old truck, lighted highway, and then after you

13   pass, they can go on by; isn't that right?

14            MR. RICHMOND:  Object to the form of the

15   question.

16       Q.    Isn't that what you intended to do?

17       A.    I intended to -- actually I really intended to

18   get gas and go to sleep for the night.

19       Q.    Well, you told the policeman that you were

20   going to go to the rest area on down the interstate.

21   Was that not true?

22       A.    I mean if, if -- this is normally an occupied

23   truck stop, you know what I mean, it's a normal stop

24   for me, if there was a parking spot available.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 87 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

87

1    Q.    You were going to stop at the truck stop?

2    A.    Either or, either or.  It really didn't, you

3  know what I mean?  So I'm thinking ahead, you know

4  what I mean?

5    Q.    So you've been on the road all those hours.

6    A.    Right.

7    Q.    You want to get on in there, get your fuel,

8  stop for the night.  You're about to max out on your

9  hours.  So you saw that traffic, big old truck, you

10 want to turn that truck in there.  They can see it,

11 slow down for you, and then you can pull on into the

12 truck stop, then they can pass after you get out of

13 the way.  Isn't that right?

14            MR. OLIVER:  Object to the form.

15            MR. RICHMOND:  Object to the form of the

16 question.

17   A.    Repeat the question.  I just, phew, blacked

18 out.

19   Q.    You blacked out?

20   A.    Yeah, repeat the question.  Go ahead.

21   Q.    All right.  When you're making that turn

22 there --

23   A.    Um-hum.

24   Q.    -- what you wanted to do -- because there's no

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

88

1    question that you saw this traffic coming, is there?

2    This oncoming traffic, there's no question you saw

3    that?

4       A.   Yeah, yeah, I seen it, right, right, yeah.

5       Q.   And you knew if you turned in front of this

6    oncoming traffic and they didn't get stopped for you,

7    you knew there could be a wreck, didn't you?

8                MR. OLIVER:  Object to the form.

9                MR. RICHMOND:  Object.

10      A.   No, no.  Not to my knowledge.  I made a

11   judgment, a judgment, you know what I mean, I figured

12   my judgment was good.  I had enough time, I knew I had

13   enough time to make the turn.

14      Q.   You knew if you didn't have enough time and

15   people didn't get stopped or they didn't see you, that

16   somebody could get hurt.  You knew that, didn't you?

17               MR. OLIVER:  Object to the form.

18               MR. RICHMOND:  Object to the form.

19      A.   Hold on.

20      Q.   Sir?

21      A.   Repeat the question.  Repeat it?

22      Q.   All right, listen to me now.

23      A.   Yeah, I'm listening, I'm trying to listen,

24   trying to listening.  There's too much stuff going on.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

89

1    Q.   Well, the lawyers, when the shoe gets tight,

2    they going to chime in.  So don't let them bother you.

3    A.   Right.

4    Q.   You just tell the truth.

5    A.   Um-hum.

6    Q.   You knew, isn't it true, now you knew when you

7    got started making this turn that this traffic that's

8    coming, if they didn't see you or get stopped, that

9    somebody could get hurt if you were still in the way?

10             MR. OLIVER:  Object to the form.

11   Q.   You knew that, didn't you?

12   A.   No.

13             MR. OLIVER:  Object to the form.

14   Q.   Why didn't you know that?  What would have kept

15   you from knowing that?

16   A.   Due to the fact that I was almost into the

17   truck stop, and it's a big, big white truck that I'm

18   driving, you know what I mean?

19   Q.   Easy to see it?

20   A.   Right.

21   Q.   All right.

22   A.   Especially at nighttime.

23   Q.   Especially at night, okay.

24   A.   Yeah.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

90

1    Q.    Was it raining?

2    A.    I don't remember.

3    Q.    Was the road wet?

4    A.    Yeah.

5    Q.    All right.  Did you have your wipers on?

6    A.    Right.

7    Q.    All right.  I'm not talking about when you got

8    up in the truck stop.  I'm talking about when you're

9    back here in this median lane, and you're fixing to

10   turn the wheel in that tractor to direct that rig

11   across those three oncoming lanes, are you telling me

12   that at the time you started that turn, you didn't

13   know that if there's traffic coming and you turn in

14   front of them, that you could cause a wreck?  You

15   didn't know that?

16   A.    No, I mean --

17            MR. RICHMOND:  Object to form.

18   Q.    That's not what you're trying to tell me, is

19   it?

20   A.    No, I ain't -- I didn't think that a wreck

21   would come about from this.

22   Q.    I understand that.

23   A.    Yeah.

24   Q.    But you knew that if the traffic didn't see you

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

91

1    or if the traffic didn't get stopped, since you're

2    putting that big old white truck out there blocking

3    all three of those lanes, a wreck could occur if you

4    didn't get out of the way?

5              MR. RICHMOND:  Object to form.  Calls for

6    speculation.

7    Q.   You knew that, didn't you?

8    A.   I knew I had enough time to make that turn.

9    Q.   Turned out you were wrong, didn't it?

10             MR. RICHMOND:  Object to form.

11   Q.   Sir?

12   A.   As we could see, yeah.

13   Q.   All right.  And before we leave this issue, are

14   you telling me that you did not realize that if you

15   turned your rig across oncoming lanes in front of

16   oncoming traffic, you didn't realize that if they

17   didn't see you or stop, that there would be a wreck?

18             MR. RICHMOND:  Object to the form.

19   A.   No.

20   Q.   All right.  Does that make any sense to you,

21   the answer that you just gave?

22   A.   That if I'm making this, if I'm making a good

23   judgment, making a left-hand turn, that there's going

24   to be a wreck, no.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

92

1    Q.    I'm not talking about a good judgment.  I'm
2    talking about --
3    A.    You're talking about a wreck, I know.
4    Q.    I'm asking you, you knew that if you didn't
5    make this turn, get out of the way before that traffic
6    got up there, and if it didn't see you and stop or
7    slow down, there could be a wreck, you realized that,
8    didn't you?
9             MR. OLIVER:  Object to the form.
10   A.    No.
11            MR. OLIVER:  Asked and answered.
12   Q.    Well then why, why were you in such a hurry to
13   get across the road then?
14            MR. OLIVER:  Object to the form.
15   A.    Why was -- hold on.  Repeat that?
16   Q.    Why were you in such a hurry -- were you in a
17   hurry, let me ask you this way.
18            MR. OLIVER:  There you go.
19   Q.    From when you left the median lane to when John
20   Britt ran under your truck and was killed, did you
21   ever get in a hurry trying to get across that lane?
22   A.    No, not really.
23   Q.    Okay.  You're just making just a normal turn?
24   A.    Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

93

1    Q.    And you knew there's traffic coming.  You'd

2    already seen all that traffic, you saw all those

3    headlights, didn't you?

4    A.    Right, right.

5    Q.    All right.  Did you look back there at any time

6    back to your right to see if the traffic was still

7    coming or if they had gotten stopped?

8    A.    Yeah, once I was in the middle.

9    Q.    All right.  In the middle of --

10   A.    The middle.

11   Q.    Where would your tractor be, would it be in the

12   center most lane, middle lane or the outside lane when

13   you're coming across there --

14   A.    The outside.

15   Q.    -- when you look back to your right?

16   A.    The outside.

17   Q.    The outside, that was the first time you looked

18   back to your right again?

19   A.    Right.

20   Q.    Was some of the traffic stopping or slowing

21   down?

22   A.    Right.

23   Q.    And were they stopping and slowing down for

24   you?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

94

1    A.    I'm guessing, yeah.  I didn't -- I couldn't

2    see --

3    Q.    Well, what else out there --

4    A.    I'm pretty much, you know what I mean, turned,

5    so I couldn't really see what was --

6    Q.    Yeah.

7    A.    -- see what was behind me.

8    Q.    Was there anything else out there that you saw

9    that would cause this oncoming traffic to stop, other

10   than you putting that tractor-trailer rig across their

11   lane of traffic?

12   A.    No.

13   Q.    Lane of travel?

14   A.    No.

15   Q.    All right.  Where was --

16   A.    To the best of my knowledge.

17   Q.    Excuse me, go ahead.

18   A.    No, to the best of my knowledge, no.

19   Q.    All right.  At least two of them got stopped,

20   but John Britt didn't get stopped and he ran under

21   your trailer about right there in that outside lane.

22   Is that right?

23   A.    Right, I guess.  I don't know, I don't

24   really -- I didn't realize what lane he was in.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

95

1    Q.    Okay.  You said you saw a bunch of traffic.

2  Now, there was traffic in all three of these lanes

3  before you started making your turn; is that right?

4    A.    Right.

5    Q.    The two that were able to get stopped for you

6  and John Britt, was there some more traffic in front

7  of them or some more traffic behind them?

8    A.    Before I made the turn?

9    Q.    Right.

10   A.    Yeah.  It was traffic -- I waited.  I mean it

11  was, I mean I had to wait.  It wasn't no hop in there

12  and just turn, no.

13   Q.    All right.  You're idling in here, going slow

14  in the median lane?

15   A.    Stopped.

16   Q.    You're stopped?

17   A.    Right.

18   Q.    You're sure about that?

19   A.    Yeah.

20   Q.    And you started off in third gear?

21   A.    Right.

22   Q.    With 70 however how many pounds you had on

23  there?

24   A.    Right, right, right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

96

1    Q.    Thirty-six tons.

2    A.    Right.

3    Q.    All right.  Then was there some traffic behind

4    the three vehicles that were coming that you turned in

5    front of?

6    A.    I can't remember.

7    Q.    All right.  Now, when you talked to the

8    policeman that night, you told him that that traffic

9    was about 250 feet away, didn't you?

10    A.    Right.

11    Q.    Before you started into your turn?

12    A.    Right.

13    Q.    And you were trying to be truthful?

14    A.    I made an estimate.

15    Q.    Right.

16    A.    A rough judgment, as he says it.

17    Q.    Did you tell him it was a rough judgment?

18    A.    No, I didn't tell him nothing.  He pretty

19    much --

20          MR. OLIVER:  Want some more water?

21          THE WITNESS:  Yeah.

22    Q.    Let me show you some of the parts you've got

23    here of your statement.  You said you didn't bother

24    reading this last night, right?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

97

1    A.    No, not too much.

2    Q.    You say you were just tired last night?

3    A.    Yeah, I was tired.

4    Q.    All right.  Did you work yesterday?

5    A.    Worked, yeah.

6    Q.    Beg pardon?

7    A.    Yeah, yeah.  Worked out.

8    Q.    How many hours did you work yesterday?

9    A.    I wasn't counting.  Wasn't counting.  I ain't

10   do no, no, no work to get paid for.  I worked, though.

11   Q.    All right.  Look on this right here.  This is

12   one of the pages you didn't read.  You say you didn't.

13   And that night, didn't the policeman talk to you

14   about -- and this is on page 19 -- he's talking about

15   the traffic, one in the outside, one in the inside

16   lane about 250 feet, the third one in the center lane

17   probably about 300 feet back, and when he's got

18   "um-hum" in there, you're meaning yes?

19   A.    Yeah, I guess, yeah.

20   Q.    Hmm?

21   A.    Yes, yes.

22   Q.    Well, you're laughing.  Is that "um-hum,"

23   you're meaning yes?

24   A.    Yeah, I was -- I mean I was like, like I said,

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

98

1   my head was messed up that night.  I was --

2      Q.   Well, did you --

3      A.   -- being bombarded by a bunch of questions

4   after a fatal accident.

5      Q.   Yeah.  Did you ever tell him, "I don't really

6   want to answer these questions"?

7      A.   No.

8      Q.   Did you tell him anything like that?

9      A.   I tried to cooperate as much as possible in the

10  situation.

11     Q.   As a matter of fact, before they got started,

12  he made you read a statement that you could talk to a

13  lawyer before he gave you your Miranda warnings,

14  didn't he?

15     A.   Right.

16     Q.   You read that last night?

17     A.   Right.

18     Q.   He wouldn't even talk to you unless you read

19  that to him.

20     A.   Right.

21     Q.   And you didn't, you didn't tell him, "Wait a

22  minute, my head is messed up, I don't want to give you

23  a statement."  You didn't say anything like that, did

24  you?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

99

1    A.    No.

2    Q.    When did you decide your head was messed up

3    with regard to the statement?

4    A.    It was -- when did I decide?

5    Q.    Yeah.

6    A.    It's not a decision that I made.

7    Q.    Is that --

8    A.    You know what I mean?

9    Q.    Is that your position today?

10    A.    What?

11    Q.    When you gave a statement to the police your

12    head was messed up?

13    A.    No.  I don't even know what you're saying.  I

14    don't even know how you -- I mean I don't --

15    Q.    Well, is this, this right here -- I'm trying to

16    find the part where you first said 250 feet.  I'll get

17    it here in a minute.

18          Have you ever called up Officer Gann and

19    told him that you didn't think that that statement was

20    correct?

21    A.    No.  I never knew his number.

22    Q.    Have you ever met with some lawyers, not these

23    lawyers, but any lawyers, about the prospects of being

24    indicted down in Montgomery --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

100

1    A.    No.

2    Q.    -- for this wreck?

3    A.    No.

4    Q.    You have not?

5    A.    No.

6    Q.    All right.  Now, on page 7 after you read the

7    Miranda warnings, you actually read that.  Let me show

8    you that, because you read it last night too, didn't

9    you?

10   A.    What?  What's that?

11   Q.    Page 1 and 2.  See, when he's getting started

12   with it, he says, "Mr. Johnson, will you please read

13   the first paragraph to me."  And then all that, the A

14   on there, the Q is where the policeman is asking you

15   things.

16   A.    Right.

17   Q.    And then the A is where you're giving your

18   answers; is that right?

19   A.    Right.

20   Q.    And then you read what lawyers call the Miranda

21   warnings.  Is that right?

22   A.    I guess so.

23   Q.    Well, you read that where it says "A" on page

24   1, didn't you?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

101

1    A.    Right, right.  I guess those are my statements.

2    Q.    And then he wanted you to read the second

3    paragraph, and it says, you read this, "I fully

4    understand the foregoing statement and do so willingly

5    agree to answer questions.  I understand and know what

6    I'm doing.  No promises or threats have been made by

7    anyone, and no pressure of any kind has been made

8    against me by anyone."  Then the officer, policeman

9    says, "Do you understand that statement?"  And was

10   your answer "Yes"?

11   A.    Yeah, yes.

12   Q.    All right.  And then you signed, we've got a

13   copy of it from the police department, but they made

14   you sign something saying you understood it.  Isn't

15   that right?

16   A.    Yes.

17   Q.    And then he asked you as part of that statement

18   to tell him exactly what happened.  He says,

19   "Mr. Johnson, tonight on the west South Boulevard, in

20   your own words, tell me what happened."  He asked you

21   that question, didn't he?

22   A.    Right.

23   Q.    Isn't that right?

24   A.    Right, right, right, right, right.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 102 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

102

1    Q.    And then you start telling him about it.  And

2    then you go on down here several pages, and if I'm

3    looking at the right page, and he asked you on page 7

4    that night -- well, wait a minute.  Before I ask you

5    that.

6              Wouldn't this -- back on page 2 -- have

7    been a real good opportunity for you to tell, like up

8    at the top, for you to tell Corporal Gann, "Wait a

9    minute, Corporal Gann.  My head is all messed up.  I

10   don't really want to be answering these questions."

11   Wouldn't that have been a good spot to tell him if

12   that's your position, wouldn't it?

13   A.    Right.

14   Q.    You didn't tell him that, did you?

15   A.    No, I wouldn't, I wouldn't, would have been a

16   good time to tell him, but in the same process, it

17   wouldn't have been, I don't believe that would have

18   been a good -- made the situation any better at the

19   time.

20   Q.    You don't believe that would have been a good

21   situation?

22   A.    Yeah, right.

23   Q.    You didn't even ask him to put it off, did you?

24   A.    No.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 103 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

103

1     Q.    Then he says, over on page 7, he says, "Do you

2     remember, did you see the Mazda truck?"  And you said,

3     "No, I did not."  And then he asked you a question,

4     "How far back at distance wise, a rough estimate, tell

5     me how far back was the truck?"  You said you had

6     plenty of room to make the truck, or turn.  And your

7     answer at that time, you said, "I was probably about

8     250 feet."  That's what you told him.

9     A.    Right, rough estimate, yeah.

10    Q.    And they've typed that up on that piece of

11    paper.  You didn't type that up, but they typed up

12    what you told them at the police department; isn't

13    that right?

14    A.    Right.

15    Q.    All right.  And then he asked you, "Is that the

16    distance you need to make your turn safely?"  And then

17    your answer was, "I'll say I had a good 200, 200 to

18    250 feet."  That's what you told him; isn't that

19    right?  See it?

20    A.    Yeah, yeah.  That's what I told him.

21    Q.    You didn't --

22    A.    However, my head was messed up that night, so I

23    don't, you know what I mean, I was so distraught.  But

24    that's what I told him.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 104 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

104

1    Q.    There's nowhere in that 67-page statement that

2    you said, "My head is messed up and I don't think I'm

3    getting this information right to you"?

4    A.    Right, right.  I already know that.  I already

5    know that.

6    Q.    Beg your pardon?

7    A.    I already know that.

8    Q.    You already know that's not in that statement

9    anywhere?

10   A.    Yeah, I already know I ain't tell him that.

11   Q.    All right.  And you told him -- that 250 feet

12   came up several times.  Then over on page 10 of 67, he

13   says, "And you figure 250 feet with traffic coming

14   towards you while making a left-hand turn, you had

15   enough time to make a turn?"  "Correct."  That was

16   your answer, "Correct."  That's what you told him, is

17   that right?

18   A.    Repeat the question?

19   Q.    Well, read it.  Read it out loud.

20   A.    "And you figured 250 feet with traffic coming

21   towards you while making a left-hand turn, you had

22   enough time to make a turn?"  Answer was, "Correct."

23   Q.    Your answer was "Correct"?

24   A.    Yeah, my answer was "Correct" at the time,

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

105

1    yeah.

2       Q.    All right.   Okay.   "Now, you started to make

3    your turn?"   And you said "Um-Hum," that's meaning yes

4    there on page 10; is that correct?

5       A.    Yeah.

6       Q.    Um-hum.   Then another time you all talk about

7    how far away you were.   They're asking you, he says on

8    page 14, "Now how far back were the two in the inside

9    and outside lane?   Were they 250 feet or were they

10   further back?"

11              "ANSWER:   The two, the two in the out,

12   yeah, about 250 feet.   Yeah.   The one in the third

13   lane I would say about 'cause that one would have been

14   about, about 300 feet.   Another 50 feet, maybe 25

15   feet."   That's what you told him the night of the

16   wreck; is that right?

17      A.    Yeah.   That's, I mean you've got the

18   information right there, so --

19      Q.    Beg your pardon?

20      A.    I said you got it in writing right there, so --

21      Q.    Well, the way they wrote it down is what you

22   told the police that night; isn't that correct?

23              MR. RICHMOND:   Object to the form.

24      A.    Correct.   But I mean that's, I don't, I don't

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

106

1   really remember too much, I mean about the, the feet

2   and all that stuff.

3      Q.   Let me ask you this:  Do you dispute that these

4   things I'm reading to you -- you said you've not read

5   all this statement.  The parts that you've read or the

6   parts I'm reading to you, do you dispute and say that

7   the police department got it wrong, that they wrote it

8   down wrong?

9           MR. OLIVER:  Object to the form.  I think

10  the recording would be the proper method for using the

11  statement.

12     A.   No, are you asking, are you talking to me or

13  are you talking to him?

14     Q.   I'm talking to you.  I don't know what he's

15  talking about.

16     A.   I don't know what he talking about.  And I

17  ain't even hear you.  I mean --

18     Q.   It is disruptive, isn't it?

19     A.   That's part of it.

20     Q.   Do you say that this statement is incorrect?

21     A.   What, that right there?

22     Q.   Any of it that I read to you or that you've

23  read.

24     A.   I mean I wouldn't say it's incorrect.  But I

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

107

1    mean I would say that it was, it was, being held at

2    the, it was being taken at an improper time for the

3    situation.  That's what I would say.

4        Q.    But you agree that the things that they wrote

5    down at the police department, that they accurately

6    put down what you told them?

7              MR. OLIVER:  Object to the form.

8              MR. RICHMOND:  Object to the form.

9        A.    That they accurately -- hold on, run that by me

10   again?

11       Q.    Are you saying you didn't really tell them 250

12   feet?

13       A.    Oh, no, I'm not saying that.

14       Q.    You're just saying your head was all messed up,

15   now you want to change your story --

16       A.    No, not necessarily.

17       Q.    -- but you didn't tell them that that night,

18   right?

19             MR. RICHMOND:  Object to the form.

20       A.    I was being bombarded by a bunch of questions

21   at a bad time.

22       Q.    All right.  You knew John Britt was dead at

23   that time too, didn't you?

24       A.    Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

108

1    Q.   You knew you'd just turned in front of a fellow

2    and killed him, didn't you?

3    A.   Right.

4         MR. RICHMOND:  Object to the form.

5         MR. OLIVER:  Objection.

6    Q.   Now, do you claim that where they wrote down

7    this information where it says "A" in here and what

8    I've read to you, is it your position that they wrote

9    that down incorrectly, that they recorded it

10   incorrectly?

11   A.   Repeat that again?

12   Q.   Do you say that they wrote this down

13   incorrectly where they put down the 250 feet?

14        MR. OLIVER:  Same objection.

15   A.   I'd say it was a bad judgment.

16   Q.   I'm sorry?

17   A.   I'd say it was a bad judgment on --

18   Q.   What was bad judgment, for you to turn with 250

19   feet?

20   A.   He told me to give a rough estimate, and I said

21   it was a too rough estimate.  That's what I say.

22   Q.   I understand, I understand that you want to

23   change your story now, and I'm going to let you

24   explain that in a minute.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

109

1    A.    Right.

2    Q.    But what I want to go over with you right now

3  is, see, they put it down like you told them that

4  night.  That's my understanding.

5    A.    Okay.

6    Q.    And are you saying they didn't put it down like

7  you told them, is what I want to know first?

8    A.    Oh, no, I ain't saying that.  I ain't saying

9  that.

10    Q.    So this is accurate where they put down that

11  you said 250 feet?

12    A.    Yeah, that night.

13    Q.    And the other things?

14    A.    Yeah, that night.

15          MR. RICHMOND:  Object to form.

16    Q.    All right, now, did you ever, did you ever

17  return Officer Gann's calls when he was trying to get

18  up with you after that night?

19    A.    That night?

20    Q.    Right.

21    A.    The night he called?  What, that same night?  I

22  don't recall him calling --

23    Q.    No, wait a minute, hold it, hold it.  After you

24  get through giving the statement and you leave the

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

110

1    police department, it's my understanding that Officer

2    Gann was trying to get up with you to talk with you

3    some more.  Did you ever return his calls?  That's the

4    question before you.

5              MR. OLIVER:  Object to the form.

6    A.    No.  No, I didn't.

7    Q.    Why not?

8    A.    I had cell phone problems.

9    Q.    You had what?

10   A.    Cell phone problems.

11   Q.    You had cell phone problems.

12   A.    Right.

13   Q.    All right.  Now, it is my understanding that at

14   this time it's your position that you want to change

15   your story that you gave to the police.  Is that

16   correct?

17             MR. OLIVER:  Object to the form.

18             MR. RICHMOND:  Object to the form.

19   A.    No, not necessarily.

20   Q.    Sir?

21   A.    Not necessarily.

22   Q.    All right, so you stand by the 250 feet?

23   A.    No.

24   Q.    You do not?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

111

1    A.   No, I don't stand by that.

2    Q.   You want to change the 250 feet information; is

3    that right?

4    A.   I want to make it a little bit more accurate.

5    Q.   All right.

6    A.   Other than being an estimate.

7    Q.   When did you come to a mind that you felt like

8    you needed to make your information, as you say, a

9    little more accurate?  When did you realize you needed

10   to do that?

11   A.   The following day when I, when I went out to

12   the, to look at the scene, the truck stop.

13   Q.   Okay.  So the following day after the wreck you

14   make the decision that you need to change your 250

15   feet estimate?

16   A.   Right.

17   Q.   Is that right?

18   A.   Right.

19   Q.   All right.  Was there anything else that you

20   decided you needed to change?

21   A.   Other than that, no.  Everything else was

22   straight.

23   Q.   All right.  Now, the night of the wreck, where

24   did you spend the night?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

112

1    A.    A Motel 6.

2    Q.    In Montgomery?

3    A.    I believe so.  I don't know.  I believe so.

4    Q.    All right.  Who paid for the room?

5    A.    USA Truck, I think.  I don't know.  I know, I

6    don't think I came up with it.

7    Q.    All right.  Then the next day, if John Britt

8    was killed on February the 20th of '06, when did you

9    meet with the USA Truck folks?

10    A.    When?  I would say, I would say the following

11    day, the following day I met with -- I don't know, I

12    don't even know the name.  I don't remember his name.

13    Q.    The wreck happened, if the 20th is on a Monday,

14    so you have the wreck at 8:40 that night, and you knew

15    before you left the scene of where the wreck was that

16    John Britt was dead; is that right?

17    A.    Right.

18    Q.    And then you spend the night at the Motel 6?

19    A.    Right.

20    Q.    Apparently in Montgomery.

21    A.    Right.

22    Q.    You've already talked to the USA Truck folks

23    one time that night.  Is that correct?

24    A.    Right.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 113 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

113

1    Q.    And then what time -- was it the day after the

2    wreck that you got with the USA Truck folks in person?

3    A.    Actually, I think it was that same night, later

4    on that night somebody -- I don't even remember his

5    name.

6    Q.    All right.  Was there somebody from USA Truck?

7    A.    I think so, yeah.  Had to be.

8    Q.    All right.  But then that night, meeting with

9    the USA Truck person, was that before or after you met

10    with the police?

11    A.    That was after.

12    Q.    After the police.

13    A.    Right.

14    Q.    All right.  It looks like the statement ended

15    pretty late.  Looks like it started just before

16    midnight.  How long were you at the police department?

17    A.    I don't remember.

18    Q.    Okay.  But then you actually met with someone

19    in person from USA Truck that night?

20    A.    Right.

21    Q.    It would have actually been early morning on

22    Tuesday.

23    A.    Right, right, right, right.

24    Q.    All right.  What all did you all do?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 114 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

114

1    A.    Pretty much nothing, really.  He came out, I

2    think he came out and talked to me and gave me a ride

3    to the Motel 6.  That's it.  And put me in the room.

4    Q.    What was that person's name?

5    A.    I don't remember.

6    Q.    Did he ever ask you how the wreck happened?

7    A.    Not to my knowledge.  I mean no.  I mean I

8    think he was pretty much already aware of that.

9    Q.    How would he have gotten that information?

10   A.    I don't know.  I guess -- I don't know.  I

11   called in to the company, called the company after the

12   accident happened.

13   Q.    Talked to Larry Hammonds?

14   A.    I guess, I don't know.

15   Q.    All right.  I'll get that, I'll get to that in

16   a minute.

17          You talked to Larry Hammonds before you

18   met with the police.

19          MR. RICHMOND:  Object to the form.

20   Q.    Right?

21   A.    What do you say?

22   Q.    You talked to Larry Hammonds before you met

23   with the police?

24          MR. RICHMOND:  Object.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

115

1    A.    Right, right, right, right, right.

2    Q.    And you meet with the police --

3    A.    Well, whatever his name is.  I don't know his

4    name, but --

5    Q.    All right.  Then you meet with the police, you

6    give them the statement, then you meet with somebody

7    else that night from USA Truck?

8    A.    Right.

9    Q.    Where did they pick you up?

10    A.    At the police station.

11    Q.    Okay.  Were they in there with you when you

12    were giving the statement?

13    A.    No, uh-uh.  I mean no, my fault.

14    Q.    Don't know that person's name.

15    A.    Uh-uh.

16    Q.    How do you know they were from USA Truck?

17    A.    That's what he said.  He said I'm from --

18    Q.    What did he say to you when you first met him?

19    A.    "Hi," you know what I mean, "I'm from USA

20    Truck."  I mean I guess, I guess that's what he said.

21    I don't remember.  I was like, you know what I mean?

22    I just, I just knew I made a phone call and I mean

23    they called, somebody came back, took me to the motel.

24    Q.    That person, that was a male?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 116 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

116

1    A.    Yeah, male.

2    Q.    White person?

3    A.    Right.

4    Q.    Black -- white person?

5    A.    Right.

6    Q.    How tall, what kind of weight?

7    A.    I don't know, I don't remember.

8    Q.    But he told you specifically he was from USA

9    Truck?

10   A.    Right.

11   Q.    What else did he say?

12   A.    I don't remember too much else other about what

13   he said.

14   Q.    But you rode with that person from the

15   Montgomery Police Department to the Motel 6?

16   A.    Right.

17   Q.    When you got to the Motel 6, what did that

18   person do?

19   A.    Put me in the room.

20   Q.    What do you mean, put you in the room?

21   A.    Put me in a hotel room.

22   Q.    Did he just walk with you to the room?

23   A.    I don't remember, but I know he, he pretty much

24   paid for a room, I guess, yeah.  Whatever, whatever.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

117

1    Same ordeal, situation.

2       Q.   Did you see that person again after that night?

3       A.   Yeah, I think the following morning, following

4    morning.

5       Q.   All right.  That night did that USA Truck

6    person ever ask you how the wreck happened?

7       A.   No, not to my knowledge.  I don't really

8    remember, I don't remember.  I don't think he did.  I

9    don't think so.

10      Q.   But you said he already knew how it happened --

11      A.   I guess, yeah.

12      Q.   -- when he first got you.

13      A.   Yeah, right.  He picking me up from the police

14   station, I pretty much assumed.

15      Q.   What did you do when you got to the Motel 6,

16   did you go to sleep?

17      A.   Right.

18      Q.   All right.  And then next day would have been

19   Tuesday.  What did you do on Tuesday?  Let me ask you

20   this before we get there:  When you were dropped off

21   at the motel, how did you leave it with this USA Truck

22   person?  Did he say, "I'll be here in the morning?"

23   What did he say?

24      A.   I don't remember.  I just know the next morning

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

118

1    I had to take a piss test, whatever.  I don't remember

2    what he said.

3      Q.   All right.  So Tuesday, how did you get from

4    the Motel 6 to wherever you took the urine test?

5      A.   Oh, he drove me.  He drove me.

6              THE WITNESS:  About time for a bathroom

7    break, isn't it?

8              MR. ALLRED:  I'm sorry, the last of what

9    you said?

10             THE WITNESS:  Yeah, the bathroom.

11             MR. ALLRED:  Oh, go ahead.

12             (A brief recess was taken.)

13   BY MR. ALLRED:

14     Q.   So that Tuesday morning this USA Truck fellow,

15   he picks you up at Motel 6; is that right?

16     A.   Right.

17     Q.   What kind of vehicle were you all in?

18     A.   An Impala.

19     Q.   I'm sorry?

20     A.   An Impala, Chevy Impala.

21     Q.   Chevrolet Impala automobile?

22     A.   Right.

23     Q.   That's the same vehicle he picked you up in

24   from the police department?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

119

1    A.    Right.

2    Q.    Did it have "USA Truck" on the outside of it?

3    A.    No.

4    Q.    Don't know that fellow's name?

5    A.    I don't remember it, no.

6    Q.    All right, so where did you go Tuesday morning?

7    A.    To the, somewhere, one of those places down

8    there to take a urine test.

9    Q.    Speak up now so I can hear you.

10   A.    It was like a small little clinic or something.

11   Q.    Okay.  Did you go to American Family Care in

12   Montgomery?

13   A.    I guess.  I don't remember the name of it.

14   Q.    Did you submit a urine sample at that time?

15   A.    Right.

16   Q.    All right.  And the USA Truck company, they

17   suspended you right at the accident, at the time of

18   the accident.  You didn't drive a truck anymore for

19   them; is that right?

20   A.    Uh-uh.

21   Q.    "Uh-uh," meaning no?

22   A.    Yeah, no.

23   Q.    Okay, yeah.  So then the specimen, it says it

24   came back positive dilute for marijuana, and it was

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 120 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

120

 1   verified on February the 24th of '06 at 9:50 and 39

 2   seconds that morning of the 24th.  Have you seen that

 3   document?

 4      A.    (Indicated negative response.)

 5      Q.    Let me show you 964.  And do you dispute that

 6   that document is accurate?

 7      A.    Nah, no.  I mean no, my fault.

 8      Q.    You don't dispute that?

 9      A.    No.

10      Q.    Where it says on there that you had marijuana

11   in you on Tuesday morning, that's correct, isn't it?

12      A.    Right.

13      Q.    All right.  When you gave this sample, did you

14   go in a room by yourself when you gave the urine

15   sample?

16      A.    Yeah, right.  Yeah.

17      Q.    I'm sorry?

18      A.    Yeah, yes, yes, yes.

19      Q.    You were alone giving the urine sample; is that

20   correct?

21      A.    Yes, to the best of my knowledge.

22      Q.    No one was watching you; is that correct?

23      A.    No.

24      Q.    All right.  And when you got the result back --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

121

1    or when did you learn of this result?  It says on

2    there February 24th of '06.  When did you learn about

3    it?  You gave it on the 21st, that would be Tuesday.

4    So the 24th I guess would be Wednesday, Thursday,

5    Friday.  Looks like that's Friday, if I'm doing it

6    right.  I'm not good at math, but it looks like the

7    24th is Friday.  When did you learn that you had a

8    positive marijuana test?

9       A.   I don't even remember.  I don't even remember

10   that.

11      Q.   All right.

12      A.   It has, it was a couple days after the fact of

13   the incident.

14      Q.   A couple of days after the wreck?

15      A.   Yeah, I believe so.

16      Q.   It wasn't long, you don't think?

17      A.   No, not long at all.

18      Q.   All right.  And how did you find out?

19      A.   Damn, how did I -- I received a call, a phone

20   call.

21      Q.   I'm sorry?

22      A.   I received a phone call from USA.

23      Q.   Who called you?

24      A.   I don't -- I forget his name.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

122

1    Q.    But it was a person from USA?

2    A.    Right.

3    Q.    Where were you when you received the call?

4    A.    I was in, I think -- was I in the hotel?  No, I

5    was -- I received it on my cell phone, I think, yeah.

6    Q.    Same cell phone you'd had all along?

7    A.    Yeah, right.

8    Q.    All right.  Had you had anything done to the

9    cell phone?

10   A.    Like what?

11   Q.    Anything repaired on it or anything like that?

12   A.    No.

13   Q.    All right.  So you got a call on your cell

14   phone.

15   A.    Right.

16   Q.    By the way, how long did you have that same

17   cell phone?

18   A.    Not that long.  Not that long after the fact,

19   the accident.

20   Q.    On February the 20th when the wreck happened,

21   how long had you had that cell phone?

22   A.    On February 20th?

23   Q.    Right.

24   A.    I had it the whole day.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 123 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

123

1    Q.    How long had you had it before that day?

2    A.    Oh, before.  Oh, I don't remember.  Probably

3    like, I don't remember.

4    Q.    Long time?

5    A.    Yeah.

6    Q.    All right.  Did you ever have any trouble with

7    it?

8    A.    Yeah.

9    Q.    All right.  But a few days after the drug test,

10   you get a call on your cell phone number?

11   A.    Right.

12   Q.    Correct?  And that was the number you had given

13   USA Truck; is that right?

14   A.    Right.

15   Q.    And somebody from USA Truck called you about

16   the marijuana test?

17   A.    Right.

18   Q.    What did they say to you and what did you say

19   to them?

20   A.    I don't remember.  I just know I got a positive

21   result, that's all I remember.

22   Q.    All right.  Did you ever contest that result to

23   say no, that's not correct?

24   A.    No.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

124

1    Q.   All right.  Did you get a call from anybody

2    from the testing lab, somebody outside USA called you

3    about the marijuana test?

4    A.   Not to my knowledge, no.

5    Q.   Did not?  All right.  This person with USA

6    Truck, then he calls you a few days after the test,

7    and he says you had a positive marijuana test.

8    A.   Right.

9    Q.   And did he say anything else to you?

10    A.   Not that I can remember.  That's the only

11    pretty much thing I remember.

12    Q.   All right.  But you never contested it, and you

13    agree this result that's shown on 964, that's valid

14    and that's correct?

15    A.   Right.

16    Q.   Weren't you fired from USA Truck for using

17    marijuana?

18    A.   Yes.  I guess that had something to do with it.

19    Q.   All right.  And didn't you tell Officer Gann

20    and Officer Bradley at the Montgomery Police

21    Department that you smoked marijuana?

22    A.   Right, I told --

23    Q.   And you told -- I'm sorry, go ahead.

24    A.   I told them I smoked it that weekend --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

125

1    Q.   All right.

2    A.   -- before the accident.

3    Q.   All right.  Well, that's the reason your test

4    turned up positive.

5    A.   Right.

6    Q.   Because you had actually smoked.

7         MR. RICHMOND:  Object to the form.

8    Q.   And you knew you had, right?

9    A.   Yeah, right, I guess.

10   Q.   And you smoked marijuana the Saturday night

11   before John Britt was killed, and you also drank some

12   beer along with it and you drank some hard liquor,

13   didn't you?

14   A.   Right.

15   Q.   And then the next day you got in USA's truck

16   and you started driving their truck on this Amsterdam

17   to Houston load, didn't you?

18   A.   Right -- no, not the next day.  It was --

19   Q.   Sunday?

20   A.   I guess it was like a 24-hour period, pretty

21   much, yeah, Sunday.

22   Q.   You started driving on a Sunday.

23   A.   Yeah, almost --

24   Q.   Which would be the next day after Saturday?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 126 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

126

1    A.    Yeah, right, right, right, right, right.

2    Q.    And Saturday is when you smoked the dope,

3  right?

4    A.    Yeah, Saturday night, yeah, Saturday night,

5  yeah.

6    Q.    All right.  And that Saturday when you smoked

7  that dope, that wasn't the first time you had ever

8  smoked, was it?

9    A.    No, no.

10    Q.    As a matter of fact, you had had that positive

11  test back in the end of '02, early '03, right?

12    A.    Right.

13    Q.    Okay.  Now, on your marijuana test, on 964, it

14  also has something on there that says "positive

15  dilute."  Let me show you that.  You see that right

16  there?  Wait a minute, I'm looking at it upside down.

17  "Positive dilute."  You see that on 964?

18    A.    Right.

19    Q.    Okay.  Now, when you were in there giving that

20  urine sample by yourself, did you put some tap water

21  in there to see if you could get your test down to see

22  if you could pass your test?

23    A.    No, I drink water, as you can see.  No.  I'm

24  not going to sit up here and say that, I mean.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

127

1    Q.    You didn't put any water in that, you didn't

2    add any water and dilute the sample, did you?

3    A.    I mean if I did, I don't remember, you know

4    what I mean?

5    Q.    All right.  Might you have done that and you

6    just don't remember today?

7    A.    I wouldn't say that.  I just don't remember.  I

8    mean who doesn't drink water?

9    Q.    Well, you knew when you were giving the sample,

10   you knew you had been smoking Saturday night.  You

11   knew that.

12   A.    Right, right.

13   Q.    And obviously you knew John Britt had been

14   killed.  You knew that?

15   A.    Right.

16   Q.    And you knew there could be some criminal

17   trouble coming out of that.  You knew that, didn't

18   you?

19   A.    Right.  My mouth still get dried up.

20   Q.    Beg pardon?

21   A.    I said my mouth still gets dried up.

22   Q.    Okay, so you're saying this dilute, where the

23   lab determines that your urine sample was diluted,

24   that's not because you diluted it with tap water or

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

128

1    anything else, it's why now?

2      A.    It's what?  You said --

3      Q.    Why did you say it showed up diluted?  Dilute?

4      A.    I don't know, I guess because I have water or

5    whatever.  Water, soda or whatever in my system, I

6    guess.  I don't know.  I'm not for sure.

7      Q.    So you just figure it's because you were

8    drinking a lot of liquids that morning?

9      A.    Probably that whole period in time.  I drink a

10   lot of fluid.  I always kept water in my truck.

11     Q.    All right.  But you're sure when you're in

12   there by yourself giving that urine sample you didn't

13   put any water in, you didn't add any water to it?

14     A.    Oh, no, I didn't do nothing like that.

15     Q.    All right.  Were you concerned when you were

16   giving that sample that what was going in that

17   specimen might get you indicted for John Britt's

18   death?

19     A.    Not really.  I mean I knew, I already knew my

20   urine was dirty, so you know what I mean.  I didn't

21   really think nothing of it, you know what I mean.

22     Q.    When you were in there giving that sample, you

23   knew that what was going in that specimen cup was

24   going to be a dirty sample, as you say, it was going

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

129

1    to show marijuana?

2       A.    Oh, yeah, I knew that.

3       Q.    All right.  Was there a lavatory with a faucet

4    in that bathroom?

5       A.    I don't remember.  I just remember using --

6       Q.    Were you in a bathroom, in a restroom?

7       A.    Right, right, right.

8       Q.    Okay.  Be unusual if it didn't have a place to

9    wash your hands in there, wouldn't it?

10      A.    Right.

11      Q.    Have you ever learned or do you know what your

12   level of marijuana actually was that Tuesday morning?

13      A.    No.

14      Q.    And then it says 50 nanograms per milliliter,

15   that's just, that's just the cutoff.  That's where

16   they start -- that's the threshold, that's where they

17   start gauging it.  But you don't know what level it

18   was above that; is that correct?

19      A.    No.

20      Q.    All right.  When you smoke that marijuana, how

21   does it make you feel?

22      A.    I don't know, I couldn't tell you.

23      Q.    All right.  Why do you smoke it?  Does it relax

24   you?  Make you feel good?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 130 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

130

1    A.    No.  I mean, I don't know.

2    Q.    You don't know?

3    A.    Uh-uh.

4    Q.    Let me ask you this question:  Would it be a

5    dangerous activity in your opinion to drive a

6    tractor-trailer truck if you'd been smoking marijuana?

7              MR. OLIVER:  Object to the form.

8    A.    I would say, I would say so, but I mean I

9    wasn't driving a tractor-trailer at the time.

10   Q.    All right.  You weren't driving Saturday night?

11   A.    Right.

12   Q.    Okay.  You drove it the next day.

13   A.    Right.

14   Q.    In your best judgment, before that Saturday

15   night when you smoked, when was the last time you had

16   smoked before that night?

17   A.    Before that night?

18   Q.    Right.

19   A.    I don't remember.  Probably about, I'm

20   guessing, I don't remember.  I'm guessing, how you all

21   tell it, 2000 and whatever, you know what I mean,

22   2002, whatever you all got on information.

23   Q.    Well, that's just the last time you got caught.

24   I'm talking about when is the last time you smoked?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

131

1    A.    Oh, I don't remember.  I don't remember.

2    Q.    Okay.  Would you smoke kind of just at home, as

3    I understand what you told the police --

4    A.    Right.

5    Q.    You just smoke when you come in at home, and

6    you went home about every other week; is that right?

7    A.    Yeah.

8    Q.    Okay.  All right, now tell me, you go to the

9    medical place and you give the urine sample that

10   Tuesday morning, and then what did you do?

11   A.    What, hold on.  Repeat the question?

12   Q.    Okay.  I want to pick up, kind of changing

13   gears here.  That Tuesday morning a fellow from USA

14   Truck picks you up, takes you out there to American

15   Family Care on Marty Lane in Montgomery.

16   A.    Um-hum.

17   Q.    You go in a room by yourself, you give a urine

18   sample.

19   A.    Right.

20   Q.    Then you leave American Family Care.

21   A.    Right.

22   Q.    How did you leave there?

23   A.    The same --

24   Q.    Riding with him?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

132

1    A.    Yeah, same way, yeah.

2    Q.    Where did you go?

3    A.    To a hotel.

4    Q.    To the Motel 6?

5    A.    Right.

6    Q.    What did you do?

7    A.    Pretty much fell back for the rest of the day.

8    Q.    What do you say?  Fell back?

9    A.    Pretty much laid, I mean stopped, I mean

10   like -- how can I explain it?  Like just watch TV or

11   whatever, you know what I mean.

12   Q.    Okay, so you watch much TV at the Motel 6.

13   A.    Yeah, right.

14   Q.    Was there a phone in the room?

15   A.    Right.

16   Q.    Did you have your cell phone with you?

17   A.    Right.

18   Q.    Was it working?

19   A.    Right.

20   Q.    All right.  Then that would have been Tuesday.

21   Did you do anything else Tuesday with the USA Truck

22   people?

23   A.    To the best of my knowledge, no -- oh, yeah,

24   yeah, yeah, went to the, back to the, to the accident,

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

133

1   the crime scene, whatever you want to call it.

2      Q.   Went back out to the crime scene?

3      A.   Yeah, if that's what you want to call it.

4      Q.   All right.  And when you got there, what time

5   of the day or night was it?

6      A.   I don't remember.

7      Q.   Okay.  How did you get from the Motel 6 back

8   out to the crime scene?

9      A.   I think it was the same guy, yeah, same, yeah,

10  same guy with the Impala.

11     Q.   I'm sorry, same fellow?

12     A.   Yeah.

13     Q.   In the Chevrolet Impala?

14     A.   Yeah, to the best of my knowledge.

15     Q.   Okay.  When you got back out there, what time

16  do you think it was?

17     A.   I don't remember.

18     Q.   Still daylight?

19     A.   Yeah, daylight.

20     Q.   Was the sun shining or was it raining?

21     A.   Sun -- yeah, it was a nice day I remember.

22     Q.   How many people were there?

23     A.   I don't remember.

24     Q.   All right, so this fellow brings you in the

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 134 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

134

1    Chevrolet Impala.  You go back out there to where you

2    turned in front of John Britt, and it's still

3    daylight, correct?

4       A.   Right.

5       Q.   What did you do?

6       A.   Pretty much explained what happened, retraced

7    my steps what happened.

8       Q.   Explain what happened, what now?

9       A.   Yeah, explained what happened.  Retrace,

10   retrace my steps, explain what happened to the, to --

11      Q.   All right, who did you explain it to?

12      A.   To the, to the other people that was out there.

13      Q.   All right.

14      A.   From USA.

15      Q.   Tell me who those other people were.

16      A.   It was Tom, Tom was out there.

17      Q.   Tom Oliver?

18      A.   Right, I remember him.  And there was somebody

19   else, I don't quite, a couple other people, I don't

20   quite remember.  Somebody else.

21      Q.   All right.  Well, Tom Oliver is there, and then

22   you say that fellow that drove you, he was there.  Is

23   that right?

24      A.   Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

135

1    Q.    And then how many people in addition to those

2    two were there?

3    A.    I think it was one, one other, one -- yeah, I

4    think it might have been one other person.

5    Q.    Was he from USA Truck?

6    A.    Not for sure.

7    Q.    Was that Casey Hanson?  Do you remember that

8    name?

9    A.    No, I don't remember too many names.

10    Q.    Was he from USA Truck?

11    A.    Yeah, right.

12    Q.    Describe him to me.  Big, heavyset fellow?

13    A.    I guess.  I'm not for sure.  I don't, no, I

14    don't think he was.  I don't remember.

15    Q.    White fellow, black fellow?

16    A.    White.

17    Q.    When you got out there that morning, did

18    anybody ask you how the wreck happened?

19    A.    Yeah.

20    Q.    Who asked you?

21    A.    I'm not for sure.  I don't remember.  I just

22    was -- I just -- they asked me and I explained it to

23    them.

24    Q.    What did you tell them?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 136 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

136

1    A.    The exact same thing, other than the distance

2    that I told the police was a little off.

3    Q.    All right.  You told them the exact same thing,

4    so you're talking about the same thing you told

5    Officer Gann and Officer Bradley?

6    A.    Right.

7    Q.    Except you say you told them a different

8    distance.

9    A.    Right, right.  My eyes was -- I was a little

10   bit more brighter to the situation, you know what I

11   mean, I could see like, instead of me making a rough

12   estimate.

13   Q.    Your eyes were brighter to the situation.

14   A.    Yeah.  I had some rest and my head was starting

15   to feel a little bit better, you know what I mean.

16   Q.    Were you real tired when the wreck happened?

17   A.    No.

18   Q.    Were you real tired when you gave the statement

19   to the police?

20   A.    Yeah.

21   Q.    So you got tired between the time the wreck

22   happened and the time you gave the statement?

23   A.    Right.

24   Q.    Is that right?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 137 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

137

1    A.    Right.

2    Q.    Wonder what made you tired?

3    A.    I was driving all day.

4    Q.    Driving all day will make you tired, won't it?

5    A.    Driving all day, the wreck, and sitting out

6    there, it was -- I ain't have too much time left and I

7    was, man, I was in the statement room for a period of

8    time.

9    Q.    All right.  So when you meet with these people

10   down there on the scene, then you decide then that the

11   250 feet, you wanted to change that; is that right?

12              MR. OLIVER:  Object to the form.

13   Q.    Sir?

14   A.    What, hold on.  Run that back?

15   Q.    Beg your pardon?

16   A.    I said run that -- I was thinking something

17   else.

18   Q.    You met with these people --

19   A.    Yeah.

20   Q.    -- that you told me about.  And you go out

21   there to the scene the next day, you meet with them,

22   you do whatever you do.  And then you decide after

23   meeting with them that you want to change the 250-foot

24   part of the statement that you had given the police.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 138 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

138

1          MR. OLIVER:  Object to the form.

2     Q.   Is that right?

3     A.   Not necessarily.

4     Q.   All right.  Well, tell me what is correct then

5 if that's not right.

6     A.   I realized that what I had told them that was a

7 little bit off at the time, at that time right there.

8     Q.   Had you explained to anybody after you left the

9 police department that you told the police you turned

10 in front of these people and they were 250 feet away?

11    A.   No, not that I -- not to my knowledge, no.

12    Q.   But you decide after talking with the folks on

13 Tuesday that the 250 feet was really not right.

14         MR. OLIVER:  Object to the form.

15    Q.   You feel like that wasn't correct.  Is that how

16 it is?

17         MR. OLIVER:  Object to the form.  Asked

18 and answered.

19    A.   Yeah, it was a, it was a bad estimate, I

20 realized.

21    Q.   And that realization came to you after you met

22 with people that you've described to me on the day

23 after the wreck.  Is that correct?

24         MR. OLIVER:  Object to the form.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

139

1    A.    As I seen, as I seen the, the -- as I seen it

2    while I was at the, whatever, crime scene, whatever

3    you want to call it.

4    Q.    Yeah.  And that's during a meeting with these

5    folks you've described to me.

6    A.    Right.

7    Q.    Isn't that correct?

8    A.    Right.

9    Q.    You had not made that decision that the 250

10   feet was incorrect before going out there that next

11   day, had you?

12   A.    Run that by me again?  Repeat that?  What did

13   you say?

14   Q.    You had not decided that 250 feet was incorrect

15   before you went out to the scene the next day, had

16   you?

17   A.    No, no, I didn't.

18   Q.    Okay.  Now, what did you determine to be the

19   correct number after going out there the next day?

20            MR. OLIVER:  Object to the form.

21   A.    I really don't even want to estimate a number.

22   I mean I could show you better than I could tell you.

23   Q.    All right.  Did you ever tell anybody how far

24   you thought it was the next day when you went out

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

140

1    there that next day?  Did you say, it was X distance,

2    whatever that number is, did you tell anybody?

3      A.    Right.

4      Q.    What number did you tell them?

5      A.    I showed them, I showed them.  I didn't tell

6    them, I showed them.

7      Q.    All right.  What did you show them?

8      A.    I showed them a group of signs.

9      Q.    Okay.  What do those signs say?

10      A.    I don't know.  They look like interstate signs

11    that I believe, I wasn't aware at the time.

12      Q.    Have you ever seen a picture of those signs?

13      A.    Recently, yeah.

14      Q.    When did you see them?

15      A.    Yesterday.

16      Q.    How far are those signs from where you turned

17    in front of these folks?

18      A.    I'm not for sure.  I'm not -- if you're trying

19    to estimate the numbers.

20      Q.    Well, knowing what you know now, how far do you

21    say that the oncoming traffic was away from you when

22    you turned?

23      A.    I can't say.  I could show you pretty much

24    better than I could tell you.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

141

1    Q.    Well, we're in Wilmington, Delaware.

2    A.    Right, exactly.

3    Q.    And you had this wreck in Montgomery, Alabama.

4    So we ain't going to be able to do that, are we?

5    A.    Years ago.

6              MR. OLIVER:  David?

7              MR. ALLRED:  Yes?

8              MR. OLIVER:  Let me help you.  Pull the

9    pictures from the trooper or the officer.

10             MR. ALLRED:  What number do you say it is?

11             MR. OLIVER:  I don't know.  I'll have to

12   look and tell you, tell you what he's talking about.

13             (Discussion held off the record.)

14   BY MR. ALLRED:

15   Q.    While we're looking for that picture, look at

16   this 802, and that shows, does the road look wet to

17   you on there?

18   A.    Right.

19   Q.    Was the road wet at the time this wreck

20   happened?

21   A.    Yeah, I guess so.  You could say so.

22   Q.    All right.

23   A.    If it's got it on the picture, yeah.

24   Q.    All right.  You were talking about some signs.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

142

1    A.    Right.

2    Q.    Look at these pictures here.  When you went out

3    there the next day, are those the signs you're talking

4    about?

5    A.    Yeah.

6    Q.    And you're saying that these signs are where

7    the oncoming traffic was when you started your turn;

8    is that correct?

9    A.    Well, it's a little further back, a little bit

10   further back from these signs.

11   Q.    How far back?

12   A.    I wouldn't say.  I would just say it was like,

13   you know what I mean.

14   Q.    Speak up now so we can hear you.

15   A.    I would say it was like -- I can't really say

16   looking at a picture.  But I mean I don't even -- I'm

17   not even trying to thumb up numbers out, you know what

18   I mean.  I would say that he was, I mean back, like

19   behind these signs.

20   Q.    How far behind them?

21   A.    I can't say.  I don't remember.

22   Q.    So those signs are what you're using to say

23   where the oncoming traffic was, you're using that as a

24   mark --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

143

1    A.    Right, landmark, right.

2    Q.    -- a landmark --

3    A.    Right.

4    Q.    -- and you're saying that they were at those

5    signs or before those signs?

6    A.    Before.

7    Q.    And you can't say how far before?

8    A.    Right.

9    Q.    Can you describe it in car lengths, one car

10   length, two car lengths, or was it that far?

11   A.    No.

12   Q.    Wasn't that far?

13   A.    Uh-uh.

14   Q.    Okay.  So within one or two car lengths of

15   these signs that are shown in 827 and 828, that's

16   where the oncoming traffic was when you turned across

17   their lane; is that correct?

18   A.    They was a little bit behind that.

19   Q.    I understand.  I said based on your answer, you

20   said between one and two car lengths behind these

21   signs, meaning east of them, this picture is looking

22   west.  That's I-65.

23   A.    Right.

24   Q.    So behind, I mean that to mean before.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

144

1    A.    Right.

2    Q.    Okay, make sure we're clear.

3    A.    You're saying one or two before these.

4    Q.    Before the signs.  What you're telling me,

5    because I'm trying to find out what you're saying how

6    far it was, it's one or two car lengths before these

7    signs that are shown in 827 and 828; is that right?

8    A.    Right.

9    Q.    Okay.

10    A.    I would say that, yeah.

11    Q.    All right, I got you.  And that truck that's

12    shown in there, in both of these pictures, that's your

13    truck that was involved in the wreck; is that right?

14    A.    Right, right.

15    Q.    Okay.  Did you look around that next day?  When

16    you were out there, what did you do, walk up that

17    shoulder that's shown on 828?  Did you walk up that

18    shoulder?

19    A.    Right.

20    Q.    And was anybody walking with you?

21    A.    Yeah, everybody, everybody who was out there.

22    Q.    All right.  Was Van Calhoun there?

23    A.    I don't remember no names.  I don't remember.

24    All I remember is --

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

145

1     Q.     Engineering fellow from Tallahassee?

2     A.     I guess, yeah, yeah, it was an engineer there,

3  yeah.

4     Q.     All right.  Did you ever stand on a spot where

5  you thought the vehicles were when you turned across

6  their path?

7     A.     Yeah, yeah, I did, yeah.

8     Q.     All right.  Would that spot be one or two car

9  lengths before these signs that are shown on 827 and

10  828?

11     A.     I don't remember.

12     Q.     When you finished whatever you did the day

13  after the wreck, did you ever call Officer Gann and

14  Officer Bradley and tell them that you wanted to

15  change what you had told them about the 250 feet?

16     A.     No.

17     Q.     Why not?

18     A.     I didn't know if they -- I didn't know the

19  situation would even get this far.

20     Q.     What do you mean by that?

21     A.     I didn't think it would be this, this, you know

22  what I mean?  I didn't think it would lead up to this,

23  you know what I mean?

24     Q.     You just thought it would go away?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 146 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

146

1    A.    Yeah, I thought it would be taken care of

2  already.

3    Q.    Yeah.  Even now, after you got involved in

4  litigation with it, have you called to this day to the

5  police department and told them you wanted to change

6  that distance?

7    A.    No.

8    Q.    Okay.  What else did you all do out there on

9  the scene on Tuesday?  You went and you tried to

10  figure out where the oncoming vehicles were.

11    A.    Right.

12    Q.    That's one thing you did.

13    A.    Right.

14    Q.    Well, your vehicle was disabled and it was

15  impounded, so it wasn't out there, was it?

16    A.    Right, right, right.

17    Q.    Did they bring a tractor and trailer out there

18  for you to drive and show them what you did?

19    A.    No, we didn't do that.

20    Q.    All right.  What else did you do?

21    A.    I don't, pretty much show them that, and I was

22  just pretty much standing there.

23    Q.    Was it in the afternoon?

24    A.    I don't remember the time.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

147

1    Q.    Still daylight, though?

2    A.    Yeah, yeah, it had been to be afternoon.

3    Q.    How long do you think you were out there?

4    A.    I don't even remember.

5    Q.    Then what happened after you left?  I mean when

6    you get through what you're doing, where did you go?

7    A.    On, I went it the bus station.

8    Q.    Who took you?

9    A.    Tom did, took me.

10   Q.    All right.  Was that the bus station on the

11   Boulevard?

12   A.    I guess, yeah.

13   Q.    Right down from where the wreck happened?

14   A.    Yeah, I guess, yeah.  If that's where it's at,

15   I don't know.

16   Q.    And where did you go from the bus station?

17   A.    Home, went home.

18   Q.    All right.  So they got you a room, you think.

19   Do you think USA paid for the room the night the wreck

20   happened; is that right?

21   A.    Right.

22   Q.    And then you go and meet with them on the scene

23   there, and then you're taken to the bus station.  Did

24   you pay for the ticket, the bus ticket?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

148

1    A.    No.

2    Q.    I saw something in some of the documents there

3    where they deducted $141 for a bus ticket.  Did they

4    make you pay, when they finally settled up with you

5    after they fired you, did they charge you on your

6    final settlement for a bus ticket?

7    A.    That was from, from, from when I had to go back

8    home from Missouri when I had the license suspended.

9    Q.    You had to go back home what now?

10   A.    From Missouri, from Missouri, Kansas City or

11   wherever, when I had my license suspended.

12   Q.    That was a different trip?

13   A.    Yeah.

14   Q.    What was that bus ticket about then?

15   A.    Shit.

16         MR. OLIVER:  Which one, Dave?

17         MR. ALLRED:  The one he's talking about,

18   the $141 that's shown on one of the documents.

19   Q.    On your final settlement, if I've got the

20   figure right, there's $141 deducted for a bus ticket.

21   Was that not for the ticket from Montgomery back to

22   your home?

23   A.    (Indicated negative response.)

24   Q.    Are you saying no?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 149 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

149

1    A.    Oh, yeah, no.

2              MR. RICHMOND:    You have to answer out

3    loud.

4    Q.    Answer out loud.

5    A.    Oh, no, no.

6    Q.    What was that bus ticket for?

7    A.    It was for driving -- I mean transportation

8    from Kansas City, Missouri, to home.

9    Q.    All right.    Why were you charged for a bus

10   ticket from Kansas City, Missouri, to home?

11   A.    I guess because I didn't -- I don't know.    I

12   didn't -- I wasn't aware of the fact that my license

13   was suspended for uninsured motor vehicle.    That was

14   parked at my house.

15   Q.    Oh, okay.    Let me see if I got it straight.    So

16   when you got caught in Missouri driving a USA Truck

17   without a driver license, you had to take a bus from

18   Kansas City home?

19   A.    Right, to take care of the problem, yeah.

20   Q.    And USA made you pay them back for that bus

21   ticket?

22   A.    Right.

23   Q.    When they fired you, right?    When they did the

24   final settlement?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 150 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

150

1    A.    Right.

2    Q.    Okay.  And there's also $300 I think is the

3    figure that's shown on there for a wrecker.  They made

4    you pay for the wrecker after you had this wreck when

5    John Britt was killed, didn't they?

6              MR. OLIVER:  Object to the form.

7    A.    I'm not for sure.

8    Q.    Well, there's a wrecker charge on there.

9    A.    Right.

10    Q.    Did you have any wrecker charges with USA other

11    than for this wreck with John Britt?

12    A.    In the past, yeah, I believe I did.

13    Q.    You had had a wrecker charge?

14    A.    Yeah, yeah.

15    Q.    What was that about?

16    A.    What was it?  For, for, I had a flat tire at

17    the house when I was parked home, I believe.

18    Q.    What is your understanding of why USA Truck

19    would charge you $300 for a wrecker charge if you had

20    a flat tire at home?

21    A.    I'm not for sure.  I guess that's their policy.

22    Q.    But you think that $300 for the wrecker charge,

23    you think that's a flat tire that occurred at your

24    house --

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 151 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

151

1    A.   Right.

2    Q.   -- on a USA Truck vehicle?

3    A.   Right.

4    Q.   And that's not for the wrecker for this wreck

5    when John Britt was killed; is that correct?

6    A.   Right.

7    Q.   Okay.

8    A.   To my knowledge, yeah.

9    Q.   All right.  Is your license suspended now?

10   A.   Right.

11   Q.   Why is it suspended now?

12   A.   Driving under, under a traffic light camera,

13   camera on a traffic, they took a picture of me.  I

14   ain't paid the fine yet.

15   Q.   Well, what do they say you did wrong by driving

16   under the traffic camera?

17   A.   I guess I ain't, I -- the light was yellow.

18   Q.   Oh, you ran a red light.

19   A.   You can say that, yeah.

20   Q.   Well, that's what they say.  I'm sure you don't

21   agree with it.

22   A.   Right.

23   Q.   But they've charged you with running a red

24   light.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

152

1    A.    Right.

2    Q.    All right.  Now, where were you charged with

3    that?

4    A.    That was in Newark, Delaware, Route 40.

5    Q.    And when they charged you with that, just to

6    move along here, I take it you didn't go to court to

7    take care of it?

8    A.    No.

9    Q.    Did you?

10   A.    No, no.

11   Q.    You just ignored it?

12   A.    Yeah.

13   Q.    And then they suspended your license?

14   A.    Right.

15   Q.    Is that how it happened?

16   A.    Right.  I kept brushing it off, brushing it

17   off.

18   Q.    Just hoping it would go away.

19   A.    Yeah, I guess.

20   Q.    All right.  Now, how long has your license been

21   suspended?

22   A.    I don't remember.  I don't know.

23   Q.    All right.  How did you get here today?

24   A.    I drove; a friend of mine dropped me off.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

153

1    Q.    Have you been driving since your license is

2   suspended?

3    A.    What you talking about?

4    Q.    Driving a motor vehicle.

5    A.    Yeah.

6    Q.    All right.  Have you driven any of your

7   employer's vehicles without a license --

8    A.    No.

9    Q.    -- since you got suspended this last time?

10    A.    Nope.

11    Q.    All right.  Tell me about the TV in your

12   tractor.  Where was it?

13    A.    It was in the shelf.  I haven't received it

14   back yet.

15    Q.    I'm sorry?

16    A.    I said I haven't even received that back yet.

17   It was in the shelf, though.

18    Q.    All right.  What kind of TV was it?

19    A.    Like a little small 19-inch TV.  Little small

20   TV.

21    Q.    Did you own that?

22    A.    Right.

23    Q.    Was it all right with USA Truck for you to have

24   a TV in the tractor?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

154

1     A.    I guess, yeah, yeah.

2     Q.    They ever tell you you could not have a TV in

3  there?

4     A.    No.  Not to my knowledge, no.

5     Q.    And I take it when they fired you, they didn't

6  give your TV back?

7     A.    I couldn't -- actually, I couldn't carry a

8  bunch of stuff on the bus with me, so I had to leave

9  some stuff.

10    Q.    All right.  But you've not gotten your TV back?

11    A.    Right.

12    Q.    Did you ask them for it?

13    A.    No.  I just...

14    Q.    All right.  Now, other than -- well, let me

15  back up here.  Larry Hammonds, when you had the wreck,

16  you're there on the scene that night, you call USA

17  Truck's accident number; is that correct?

18    A.    Right.

19    Q.    And in a few minutes you got a call from Larry

20  Hammonds, didn't you?

21    A.    Yeah, I guess that was his name, yeah.

22    Q.    Tell me what you told Larry Hammonds when he

23  called you.

24    A.    I don't quite remember.  I just know I told him

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

155

1    it was an accident occurred.

2    Q.    All right.  It's fresh on your mind, it's been

3    just a few minutes; isn't that correct?

4    A.    Right, right, right, right, right.

5    Q.    All right.  And wouldn't you have told him that

6    you turned in front of some people that were coming

7    and there was a wreck because one of them ran under

8    your van?

9            MR. OLIVER:  Object to the form.

10   A.    Something similar.  I would say something

11   similar to that.

12   Q.    All right.  Wouldn't you have told him that you

13   had miss judged how far away they were?

14           MR. OLIVER:  Object to the form.

15   A.    No, I wouldn't say that.  I don't remember

16   telling him that on the phone.

17   Q.    Did he ask you, "How did this happen?"

18   A.    Yeah, yeah.

19   Q.    And you would have told him the truth, wouldn't

20   you?

21   A.    Right.

22   Q.    How many minutes after the wreck do you think

23   it was that you had a conversation with Larry

24   Hammonds?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

156

 1    A.    I don't remember.  It wasn't too long.

 2    Q.    Was it less than an hour?

 3    A.    After the wreck?

 4    Q.    Yes.

 5    A.    Yeah, of course.

 6    Q.    Okay.  Less than 30 minutes?

 7    A.    Of course, yeah.

 8    Q.    Less than 15 minutes?

 9    A.    Of course, yeah.

10    Q.    Okay.  How long did that conversation with

11   Larry Hammonds last?

12    A.    I'm not for sure.  I wasn't timing it.

13    Q.    Do you know whether that conversation was

14   recorded?

15    A.    No.

16    Q.    But he did ask you how did the wreck happen?

17    A.    Right.

18    Q.    And you told him; you were truthful?

19    A.    Right.

20    Q.    Do you feel like you gave him a complete answer

21   when he asked you?

22    A.    Right, to the best of my knowledge, yeah.  When

23   he asked me.

24    Q.    Larry Hammonds, did he come down the day after

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

157

1    the wreck and meet with you?  Was he one of the ones

2    that met with you?

3       A.   I don't even know -- I don't even remember his

4    name.  I just remember the car, the car that came

5    down.

6       Q.   Besides Officer Gann, have you given a

7    statement to anybody where it was taken down, somebody

8    said, "I'm going to record your statement"?

9       A.   No, not to my -- not that I can recall.  I

10   don't remember.  I don't remember.

11      Q.   So nobody's ever sat you down and said, "Okay.

12   Now, Mr. Johnson, I want you to start at the beginning

13   and tell me everything that happened and we want to

14   take this down so that we'll know later."

15      A.   Okay, yeah, other than the lawyers, yeah, after

16   the fact, yeah.

17      Q.   All right.  Was that statement recorded?

18      A.   I don't know.  I don't know if it was recorded

19   or written down or what.  I don't remember.  I just

20   remember telling them.

21      Q.   All right.  Have you ever seen a written

22   statement?

23      A.   No.

24      Q.   Have you ever written out a statement --

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 158 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

158

1    A.   No.

2    Q.   -- where you gave your side of what happened?

3    A.   No, not that I know of or remember, no.

4    Q.   With regard to your using the, or shifting the

5    truck -- a little bit different subject -- were you

6    supposed to use the clutch or not use the clutch?  Or

7    did that really make any difference?

8    A.   I don't think it made any difference.  Whatever

9    was more -- whatever is more "accommatable" for the

10   driver or made him more comfortable.

11   Q.   As far as you know, was it a common practice

12   for USA trucks to shift without using the clutch?

13   A.   Right.

14   Q.   And there would be a greater danger of missing

15   a gear if you're not using a clutch, though, wouldn't

16   it?

17   A.   Yeah, right, yeah.

18   Q.   All right.  Now, let me ask you about the

19   logbooks.  When you filled out these logbooks, what

20   did you do with the sheets?

21   A.   What did you say?  I ain't hear you.

22   Q.   The logbook sheets themselves, what did you do

23   with them?  Did you turn them in to USA?

24   A.   Oh, the logbooks, the whole logbooks?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 159 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

159

1    Q.    Yeah.

2    A.    Oh, yeah, yeah, yeah, yeah, I turned them in.

3    Yes, my fault.

4    Q.    All right.  And did anybody look at them as far

5    as you know?

6    A.    Other than the lawyer, yeah.  Other than a

7    lawyer, my lawyer.

8    Q.    Before you had the wreck when John Britt was

9    killed, did anybody look at them?

10              MR. OLIVER:  He's talking about when

11   you're driving for USA, back while you're working for

12   them.

13              THE WITNESS:  Oh, my fault.  I blacked out

14   for a second.  No.

15   Q.    Beg your pardon?

16   A.    No, I mean could you repeat the question?

17   Repeat the question, yeah.

18   Q.    To your knowledge did anybody at USA Truck ever

19   look at your logbooks before you had the wreck when

20   John Britt was killed?

21   A.    Had any -- no, no, other than law enforcement.

22   Q.    Well, there's the one time where they said --

23   A.    Yeah, right, the law enforcement, you know what

24   I mean.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

160

1    Q.    Wait a minute.  It would be the one time where

2    they said you were falsifying the logs back in

3    September of '05.  Do you remember that, on the

4    70-hour rule?

5                MR. OLIVER:  Object to the form.

6    Q.    USA put on there falsification or errors.

7    That's something we went over awhile ago.  You

8    remember that?

9    A.    Right.

10   Q.    That would be one time they looked at them.

11   From September of '05, are you aware of any other time

12   that USA looked at your logbooks?

13   A.    No, I'm not aware of it, no.

14   Q.    All right.  And logbooks are kind of a pain to

15   keep up with, aren't they?

16   A.    Right.

17   Q.    And you don't really get paid anything for

18   writing down in the logbook, do you?

19   A.    I don't know.  I guess so.

20   Q.    Well, you get paid, what is it, 36 cents a

21   mile?

22   A.    Right.

23   Q.    And if your wheels are not turning, you're not

24   getting paid, are you?

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 161 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

161

1    A.    Right.

2    Q.    If you're sitting there filling out a logbook,

3    you're not making any money, right?

4    A.    Right.

5    Q.    So, but if you didn't turn them in, they'd ask

6    you how come you hadn't turn them in.

7    A.    Right.

8    Q.    So you just need to turn in something, don't

9    you?

10    A.    Right, right, right.

11    Q.    Now, we looked at the logbooks that you did

12    turn in and found some things out about them, but let

13    me ask you this:  Was there any speed limit, did USA

14    have any speed limit they wanted you to drive?

15    A.    Any speed limit that they wanted --

16    Q.    Right.

17    A.    No.

18    Q.    Did they have any average they wanted you to

19    make?

20    A.    No, not that I can -- not that I know of.

21    Q.    Did you have any quota that you needed to drive

22    that USA wanted you to drive?

23    A.    No.  Trucks wouldn't allow you to go that fast.

24    Q.    Why not?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

162

1    A.    They were governed at a certain speed.

2    Q.    What speed was it set at?

3    A.    Sixty-two, 63.

4    Q.    All right.  Was there any quota of number of

5    miles that they wanted you to drive in a day?

6    A.    No, it was a, it was more of an hour, if you're

7    talking about the logbooks.

8    Q.    All right.  In these logbooks where you filled

9    out -- let me see if I can find an example here that

10   would be a good example.  Here is one.  Number 87,

11   page 87, did you fill that out?  Let me show it to you

12   there.

13   A.    Right.

14   Q.    When you put the information on it, how did you

15   figure your miles to put on there?

16   A.    I would zero them out every morning.

17   Q.    Zero them out?

18   A.    Yeah, on the dashboard.

19   Q.    On the dashboard?

20   A.    Right.

21   Q.    You zero them out.

22   A.    Right.

23   Q.    And what kind of thing did you have on the

24   dashboard to keep up with your miles?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

163

1    A.    The meter, the mile meter.

2    Q.    You had a trip odometer?

3    A.    Yeah, you got it.

4    Q.    All right.  And so this day here, which is

5    November 29th of '05, you happened to drive an even

6    660 miles on that day.  Is that correct?

7    A.    Right.

8    Q.    And on your trip meter did it register each

9    mile or did it have tenths on it too or what?

10   A.    It had "temps" on it, points, the points, yeah.

11   Q.    All right.  So what you would do is if it had a

12   point something, you would just round it off to the

13   next mile.  Is that how you'd do?

14   A.    Right.

15   Q.    But did you try to, did you just round them off

16   by tens or fives or anything, did you ever do that?

17   A.    Yeah, sometimes.

18   Q.    You did?

19   A.    Yeah.

20   Q.    All right.  Was that all right with USA Truck

21   to do that?

22   A.    Right, you're supposed to round up.

23   Q.    Round up?

24   A.    Yeah.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

164

1    Q.    Did they tell you to do that?

2    A.    Not necessarily.  That's how my trainer, one of

3    my trainers showed me how to do it.

4    Q.    Was he a USA Truck trainer?

5    A.    Right.

6    Q.    All right.  Told you to round it up?

7    A.    Right.

8    Q.    All right.  And then so you, this particular

9    day here on 87, you put 660 miles on there.  Then how

10   did you get the hours?  How did you know how many

11   hours you drove?

12   A.    I would, I would times 660 by the -- 660 by

13   the, how fast I was going.

14   Q.    All right.  How could you tell how fast you

15   were going?

16   A.    You couldn't, really.  But I mean if you want,

17   if you're driving, pretty much driving all day on the

18   interstate, you're going about an average speed, you

19   know what I mean?

20   Q.    All right.  What would you generally average on

21   the interstate?

22   A.    I would say 55, 60.

23   Q.    Fifty-five or 60?

24   A.    Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

165

1    Q.    In order to average 60, if you've got a

2  governor on there at 62 or 63, you've got to keep

3  rolling all the time, don't you?

4    A.    Right, right, right.

5    Q.    You can't stop, go to the bathroom, get

6  something to eat.  You couldn't do that and average

7  60, could you?

8    A.    I mean you can.  It's possible.

9    Q.    Well, the fastest you can go is 62 or 63.

10   A.    Right.  It's possible to do that, though.

11   Q.    It's possible to stop and go to the bathroom or

12  eat and still average 60?

13   A.    Not eat, not eat, but you could use the

14  bathroom, yeah.

15   Q.    Okay.

16   A.    Yeah.

17   Q.    All right.  Then did you try to get these logs,

18  did you try to get them correct, or do you just write

19  down something to turn in?

20            MR. RICHMOND:  Object to the form.

21   A.    No, I try to keep them up to date, law abiding,

22  you know what I mean.

23   Q.    Well, we had, out of 127 days of log we looked

24  at that you wrote, did you know you had 78 days that

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

166

1   were exactly 60 miles an hour even?  Did you know

2   that?

3     A.    No, I wasn't aware of that, but I mean yes.

4     Q.    Does that sound strange to you that it's

5   exactly, I don't mean 60.1 or 58.7 or anything like

6   that, it's exactly 60 miles an hour.  Does that sound

7   strange to you?

8     A.    No, not really.

9     Q.    That does not?

10    A.    Uh-uh.

11    Q.    Okay.  So you think on those 78 days out of 127

12  days that you drove exactly 60 miles an hour?

13              MR. OLIVER:  Object to form.

14    Q.    You averaged exactly 60 miles an hour; is that

15  right?

16    A.    Yeah, I'd say so, yeah.

17    Q.    And like on this one here that we're looking

18  at, page 87, November the 29th of '05, you drove

19  exactly 660 miles that day, not 661, not 659, right?

20    A.    I mean I averaged -- I mean, like you said, I

21  averaged sometime, I rounded up.

22    Q.    So that figure there might be a false figure,

23  the 660?

24    A.    Yeah, it's not going to be too far from it.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

167

1    But yeah, it could be off a little bit.

2        Q.    How far could it be off one way or the other?

3        A.    Five, 10 miles, if that.

4        Q.    Okay.  So really what you're putting on these

5    logs is just an approximation; is that right?

6        A.    Right.

7        Q.    And then where you put down the hours over

8    there, you put down 11.0 hours, and if you divide 11

9    into 660, that gives you 60 miles an hour exactly.

10       A.    Right.

11       Q.    The 11 hours, it's not 11 hours and 15 minutes,

12   it's not 10 hours and 45 minutes, it's 11 exactly.

13   Did you round that number off too?

14       A.    Right, yeah.

15       Q.    Okay, so that's just an approximation as well?

16       A.    Right.

17       Q.    So these logs that you filled out, when we were

18   looking at them and we find 78 days that are exactly

19   60 miles an hour, you would agree that the mileage

20   driven on there and the times written down, neither

21   one of them are accurate?

22            MR. OLIVER:  Object to the form.

23       A.    I would say that they're pretty much accurate,

24   but they may be off just a little bit.  Nothing too

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

168

1    serious.

2       Q.    Do you feel like they were good enough for what

3    USA Truck wanted you to do?

4                    MR. OLIVER:   Object to the form.

5       A.    Right.

6       Q.    And when you were turning these logbooks in to

7    USA Truck, did you ever get any complaint or criticism

8    from USA Truck about these logbooks?

9       A.    Yeah, I did, yeah.

10      Q.    The September --

11      A.    Right.

12      Q.    All right, about the 70-hour rule.

13      A.    Right.

14      Q.    And they sent you a notice and said you needed

15   to do something to work around that, didn't they?

16      A.    Right.

17                   MR. RICHMOND:   Object to the form.

18      Q.    And then you worked around it and you didn't

19   get that 70-hour violation again, did you?

20                   MR. RICHMOND:   Object to the form.

21      A.    No, not necessarily.

22      Q.    Sir?

23      A.    Nah, no.  My fault.

24      Q.    All right, that happened in September of '05.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

169

1    After that's over with and you figure out how to work

2    around that and you're turning these other logs in,

3    like number 87 is in November of '05, you didn't get

4    any complaints or criticisms from USA Truck about your

5    logs, did you?

6              MR. RICHMOND:  Object to form.

7    A.    Uh-uh, no.

8    Q.    "Uh-uh," meaning no; is that correct?

9    A.    No, no, right.

10   Q.    So as far as you were concerned, you were doing

11   it just like USA Truck wanted it done; is that right?

12             MR. OLIVER:  Object to form.

13   A.    Right.

14   Q.    Mr. Johnson, didn't you get this letter here

15   that's marked 214, you got that from USA Truck; is

16   that right?

17   A.    Where?

18   Q.    It's dated November 29th of '05, but it says on

19   11-7-05 you failed to deliver a shipment on PRO as

20   scheduled.  What's PRO?

21   A.    PRO number.

22   Q.    What does that mean?

23   A.    PRO number.  That's a load, a delivery.

24   Q.    All right, and it says that you failed to

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 170 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

170

1    deliver it as scheduled.  Is that right?

2    A.    I don't believe so.  I'm not -- I don't even

3    remember that.

4    Q.    You don't remember that happening?

5    A.    No.  I don't remember my receiving that or my

6    signature being on it.

7    Q.    Well, the USA Truck people yesterday said they

8    sent it to you and then they presented this document,

9    produced this document to us.  You just say you don't

10   remember; is that right?

11   A.    Yeah, I don't remember that.  I don't know

12   nothing about that.

13   Q.    All right.  What about this, you remember being

14   due back to work on Friday, November the 4th, but you

15   didn't come back until Sunday, November the 6th.  And

16   you never contacted your fleet manager about being

17   late to return to work.  Do you remember that coming

18   up?

19   A.    Yeah.

20           MR. OLIVER:  What's that number, Dave?

21           MR. ALLRED:  215.

22   A.    I remember that, that coincident -- that

23   incident.

24   Q.    Brannon Thompson was your fleet manager?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 171 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

171

1    A.    Right.

2    Q.    Fleet manager of fleet No. 6?

3    A.    Right.

4    Q.    What did you do, did you just take off and

5    you're supposed to have been back Friday the 4th and

6    you didn't come back until Sunday the 6th?  Did you do

7    that?

8    A.    Yeah, right.

9    Q.    Why didn't you come back?

10   A.    I was home relaxing too much.

11   Q.    You weren't smoking dope, were you?

12   A.    No.

13   Q.    Sir?

14   A.    No.

15   Q.    All right.  And then after you get this letter

16   over here where you failed to deliver the shipment, or

17   rather, after you failed to deliver the shipment,

18   November the 7th, and you had that problem about

19   November the 4th and November the 6th about not

20   showing up for work, letting them know you're not

21   coming, didn't you get some praise and a pay increase

22   from USA Truck because they're so tickled with how

23   your job performance is?

24   A.    Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

172

1    Q.    And that was on November the 15th of '05, they

2    sent you something saying, "Because of your dedicated

3    service with this company, you'll be eligible for an

4    increase in your mileage rate on December the 2nd."

5    And they sent you that memorandum.

6    A.    Right.

7    Q.    I said letter, it's a memorandum.  You got this

8    one, didn't you?  This memorandum?

9    A.    Yeah, right, right, right, yeah, I received

10   that.

11   Q.    "This pay increase is awarded to you because

12   you have demonstrated the desire and efforts to

13   represent our company as we strive to meet the needs

14   of our customers."

15   A.    Right.

16   Q.    And that's within a couple weeks, week or so of

17   when you laid out and failed to deliver a load.  Isn't

18   that right?

19   A.    Right, a couple.

20   Q.    Brannon Thompson knew about your problem about

21   November the 4th and November the 6th and failing to

22   deliver the load on November the 7th, didn't he?

23   A.    Right.

24   Q.    And then when they increased your rate, what

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

173

1    did they increase it to?  Was that when they put it at

2    the 36 cents?

3      A.   I'm not for sure.

4      Q.   All right.  But they increased it anyway.

5      A.   Right.

6      Q.   This No. 216 talks about a HAZMAT endorsement

7    on your CDL.  Did you ever have one?

8      A.   No.

9      Q.   Did they know that when they hired you?

10     A.   Yeah, yeah, they did.

11     Q.   Okay.  All right, looking at No. 231 here, it

12   talks about February the 2nd, 2006, that's 18 days

13   before John Britt's killed, you got caught up in

14   Missouri driving a USA Truck while you didn't even

15   have a license.  Isn't that right?

16     A.   Right.

17     Q.   And you were caught up there at 11:36 in the

18   morning.  Did a D.O.T. officer catch you?

19     A.   Yeah, if that's what you want to call it, yeah.

20     Q.   Well, I don't want to call it anything.  How

21   did you get stopped?

22     A.   Weigh station.

23     Q.   All right.  And they asked you for your

24   license?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

174

1    A.    Right.

2    Q.    And what did they do?  Did you have your

3  physical license with you?

4    A.    Right.

5    Q.    And they took it and run the number?

6    A.    Right.

7    Q.    And it came back it was suspended?

8    A.    Right.

9    Q.    What did they tell you?

10    A.    They told me to park the truck, park the truck.

11  I wasn't eligible to drive the truck.

12    Q.    So that's when you had to take the bus from

13  Kansas City home?

14    A.    Right.

15    Q.    And USA Truck knew about that happening, didn't

16  they?

17    A.    Knew about what?

18    Q.    About you getting stopped up there, you had to

19  leave their rig at the weigh station.

20    A.    Yeah, right, right, right, yeah.  They knew

21  about that, yeah.

22    Q.    USA Truck had to send somebody up there to get

23  the rig and deliver the load, didn't they?

24    A.    Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

175

1      Q.    And then after that happened, they turned

2    around and put you right back to driving a truck,

3    didn't they?

4      A.    Right.

5      Q.    Now, you got on here January the 2nd of '06 in

6    New York.  That's where there was an inspection,

7    D.O.T., New York, 10:30 in the morning.  They made you

8    stop the truck right there, didn't they?

9      A.    Right.

10     Q.    And what was that, an air leak?

11     A.    Yeah, air problems.

12     Q.    Air problem.

13     A.    Right.

14     Q.    Before we leave 231, up on the top there,

15    February 14th of '06, it says, "Fax verification and

16    drug/alcohol to Knight."  That's Knight

17    Transportation?  Is that right?

18     A.    Right.

19     Q.    Were you looking for a job February the 14th of

20    '06?

21     A.    Right.

22     Q.    Why?

23     A.    You say why?

24     Q.    Why were you looking for a job?  You were

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 176 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

176

1    working for USA Truck.

2      A.    Oh, no, I was trying to, trying for something

3    more regional, get me home more.

4      Q.    More regional?

5      A.    Yeah, to get me home more, a more regional,

6    local run.

7      Q.    You had made an application to Knight; is that

8    correct?

9      A.    Right.

10     Q.    Then on 232, this is -- well, let's look over

11   here.  November the 10th of '05, D.O.T. inspection in

12   Texas at 7:06 in the morning, you had a write-up for a

13   defective mud flap.  Do you remember that?

14     A.    Yeah, I remember that.

15     Q.    And USA Truck knew about that, didn't they?

16     A.    Right.

17     Q.    Then October the 10th of '05, you got caught up

18   in Tennessee by the D.O.T. people for running through

19   the inspection point, didn't you?

20             MR. OLIVER:  Object to the form.

21     A.    Yeah, I didn't see that.

22     Q.    Well, you see it on this piece of paper, don't

23   you?

24     A.    Oh, I'm thinking, you know what I mean?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

177

1    Q.    Beg your pardon?

2    A.    I'm talking about the weigh station.  But yeah,

3    yeah, yeah, go ahead.

4    Q.    You mean as big as a weigh station was --

5    A.    No, it was a --

6    Q.    -- and you didn't see?

7    A.    It was a back entrance.  It was a back

8    entrance.

9    Q.    All right.  Well, you know that you have to

10   stop at these weigh stations if you're a truck driver,

11   don't you?

12   A.    Right, right, right.

13   Q.    And you say the reason you had this problem

14   with these folks up in Tennessee is you just didn't

15   see it.

16   A.    Right.  No, actually, my, my destination was

17   about a half a mile right up the road from it.  And I

18   didn't, I didn't see the -- I really, I really didn't

19   see the sign for it.  But my destination was a half a

20   mile up.  So you know what I mean?  I didn't know if I

21   had to stop there because it was a back entrance that,

22   you know what I mean?  I pretty much missed the turn

23   anyway.

24   Q.    So you feel like that that was unjustified

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

178

1    there where you got stopped for bypassing the weigh

2    station; is that correct?

3      A.    Right, right, but it's in the past.

4      Q.    All right.  And but you did, though, get

5    stopped by the D.O.T. people?

6      A.    Right.

7      Q.    They said you were bypassing the weigh station.

8    Right?

9      A.    Right.

10     Q.    And then when they ran the registration on the

11   USA truck, USA Truck had left their license

12   registration expire on the vehicle, hadn't they?

13     A.    I guess so.  I guess, yeah.

14     Q.    That's not up to you to keep that up, is it?

15     A.    No.

16     Q.    USA Truck had let that expire, hadn't it?

17     A.    Right.

18     Q.    Now, let me refer you to 265.  This is on part

19   of the application that you filled out, changing gears

20   here.  When it asks on here, one of the questions, No.

21   17, "Have you ever used any type of drugs in your

22   lifetime?"  That's a pretty broad question, isn't it?

23   And you put on there, "No."  You checked that, check

24   marked "No" on there, didn't you?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

179

1    A.    Right.

2    Q.    So that answer to No. 17 on 265, that's false,

3    isn't it?

4    A.    Right.

5    Q.    You knew it was false when you put it down,

6    didn't you?

7    A.    Yeah, right.

8    Q.    Then you got, on page 268, "Have you ever

9    tested positive or refused a D.O.T. drug screen or

10   alcohol test including preemployment?"  And your hand

11   and your pen put "No" on that piece of paper that's

12   the original of this, didn't you?

13   A.    Right, right.

14   Q.    And that's a false answer, isn't it?

15   A.    Right.

16   Q.    And you knew it was false when you put it down,

17   didn't you?

18   A.    Right.

19   Q.    Now, didn't you give the information to USA

20   Truck that's shown on 291 that from September of '02

21   to July of '05, you had been, had one, two, three,

22   four, five, six, seven jobs in that two years and 10

23   months, and that you had been unemployed two times

24   during that period of time?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

180

```
 1              MR. OLIVER:  Object to the form.

 2      A.   Right.  It's true, I did write that, I put

 3   that --

 4      Q.   Did you write this down on this No. 291?

 5      A.   Oh, no, I ain't write that -- I don't recall

 6   writing that down.

 7      Q.   Did you give them the information?

 8      A.   Right, I gave them the information.

 9      Q.   Is that information correct that's on 291?

10      A.   Yeah, to a certain extent, yeah.

11      Q.   Well, to what extent is it not correct?

12      A.   That I didn't finish.

13      Q.   Oh, there's some more?

14      A.   It was more jobs before '02.

15      Q.   Before '02.

16      A.   Right.

17      Q.   All right.  But just from September of '02 to

18   July of '05, there are nine entries on there.

19      A.   Right.

20      Q.   Those nine entries, are they correct?

21      A.   Right.

22      Q.   On the day of the wreck, had you had some kind

23   of problem with your Comdata card?

24      A.   Right.
```

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

181

1    Q.    And did that happen up in South Carolina?

2    A.    No.

3    Q.    Where did it happen?

4    A.    Hall River, North Carolina.

5    Q.    North Carolina?

6    A.    Yeah.

7    Q.    All right.  What happened?

8    A.    I don't know.  I was -- I don't know.  They

9    wouldn't let me -- I don't know.  It wouldn't approve

10   me for gas, for fuel.

11   Q.    All right.  So you got up that morning in Hall

12   River, North Carolina?

13   A.    Yeah.

14   Q.    And that morning would be February the 20th of

15   '06 that I'm talking about.

16   A.    Right.

17   Q.    And then you started driving your truck going

18   toward Houston; is that correct?

19   A.    Right, right.

20   Q.    And when you tried to get fuel, were you going

21   to use a Comdata card?

22   A.    Right.

23   Q.    And it wouldn't let you use it, it wouldn't let

24   you buy fuel on it?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

182

1    A.    Right.

2    Q.    What is your understanding of what the problem

3    was?

4    A.    I don't know.  I don't know.

5    Q.    Did it ever get straightened out?

6    A.    Yeah.  Took a while, took me a while.

7    Q.    How long did it take you?

8    A.    About three hours, two, three hours.

9    Q.    All right.  What all did you have to do to get

10   it straightened out?

11   A.    Wait.

12   Q.    Did you call USA Truck about it?

13   A.    Right.

14   Q.    What did you tell them?

15   A.    I was having problems with the card.

16   Q.    Who did you talk to?

17   A.    My fleet manager, yeah, my fleet manager.

18   Q.    Brannon Thompson?

19   A.    Yeah, I believe so, yeah.

20   Q.    What did he say?

21   A.    I don't even remember.  He typed -- well,

22   actually I ain't talked to him, typed, typed.

23   Q.    On your Qualcomm?

24   A.    Yeah, right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

183

1    Q.    Okay.  And did you tell him that you were

2    having trouble with your Comdata card?

3    A.    Right.

4    Q.    And what was your understanding of what was

5    being done to get it straightened out?  I mean did you

6    get a reply?

7    A.    I believe I did, yeah.

8    Q.    All right.  But that took two or three hours?

9    A.    The reply?

10   Q.    To get it straightened out.

11   A.    Oh, would it have taken two or three hours?  Is

12   that what you asked me?

13   Q.    Did it take, did it take two or three hours to

14   get that straightened out?

15   A.    Oh, yeah, yeah, yeah.  Right, right, right.

16          MR. OLIVER:  Do you want more water or

17   anything?

18          THE WITNESS:  I'm good right now.  I got

19   to use the bathroom, though.  I do got to use the

20   bathroom.

21          MR. OLIVER:  You want to take a break for

22   bathroom?

23          THE WITNESS:  Yeah.

24          MR. ALLRED:  Go ahead.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 184 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

184

 1                (A brief recess was taken.)

 2    BY MR. ALLRED:

 3     Q.    When you were working for USA Truck, didn't

 4    they require you to sign this agreement shown on 205

 5    that you had had some training with American Truck

 6    Training and if you didn't work for them a certain

 7    length of time, or whatever that agreement says, you'd

 8    have to pay that back?  Is that right?

 9               MR. OLIVER:  Object to the form.

10     A.    No, that's not right.

11     Q.    What's your understanding of what your

12    arrangement was?  That's probably not what it says.

13    What's your understanding of what you're supposed to

14    do with your American Truck Training issue?

15     A.    To my understanding, I was supposed to be paid,

16    paid that money back.

17     Q.    Did they ever pay you back?

18     A.    No.

19     Q.    All right.  And then did you sign this 204 on

20    here right there where it's got signature?  Did you

21    sign that?

22     A.    Yeah, right.

23     Q.    See, that's the same, $1,399, so USA Truck

24    there, that's the amount financed right there.  They

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

185

1   required you to agree to pay that back --

2   A.   Right.

3          MR. OLIVER:  Object, object to form.

4   Q.   And then they arranged for you to -- did USA

5   Truck set all this up that we're looking at, this 204

6   and 205?

7   A.   I'm not even sure.

8   Q.   Did you go out somewhere and get you a loan

9   outside USA Truck for this?

10  A.   Oh, no, uh-uh.

11  Q.   So you were paying 18 percent interest on the

12  1,399, you were going to pay that, total payments

13  $1,4073.36?

14  A.   Right.

15  Q.   Total sale price if you paid it, making all the

16  payments, you're going to wind up paying about

17  $1,600 --

18  A.   Right.

19  Q.   -- for your training?

20  A.   Right.

21  Q.   What were the monthly payments on that?

22  $245.56 cents a month, is that right?

23  A.   Right.

24  Q.   Did that get paid off or you still owe it?

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 186 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

186

1   A.   No, it got paid off.

2   Q.   So you had to pay for your own training.  Is

3   that right?

4   A.   Yeah, pretty -- it came out of my check.

5   Q.   All right.  And here is 202.  That's a loan on

6   that 1,399, $75 a week times 19 weeks.  That's your

7   training you had to pay for; is that right?

8   A.   Right.

9   Q.   Okay.  Are you being paid to be here today?

10  A.   (Nodded affirmatively.)

11  Q.   How much are they paying you?

12  A.   For me being out of work, the time of period

13  I'm being out of work.

14  Q.   All right, how much are they paying you?

15  A.   $11 an hour, for the hours between 7 and 4.

16  Q.   $11 an hour?

17  A.   Yeah, that's to the best of my knowledge, yeah.

18  Q.   All right.  Have you been paid for any of your

19  time that you spent working on this case before today?

20  A.   No.

21  Q.   You have not?  But you're going to get paid $11

22  an hour for your work today?

23  A.   Right, for me being off -- well, not today.

24  For, for me being here at this hotel.

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 187 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

187

1    Q.    Okay.  What about meeting with your lawyers

2    before the deposition, are you going to get paid for

3    that?

4    A.    I'm not for sure.

5    Q.    All right.  Are you going to come to Montgomery

6    for the trial of this case in January of '08?

7    A.    I mean if required, yeah.

8    Q.    All right.  Are you going to expect USA Truck

9    to pay your way?

10    A.    I would, yeah, I would hope so, yeah.

11    Q.    Okay.  If you had wanted to come to Alabama to

12    give a deposition in this case before today, they

13    would have paid your way, wouldn't they?

14             MR. OLIVER:  Object to the form.

15    A.    I don't --

16    Q.    If you had wanted to come to Alabama to give a

17    deposition before today, they would have paid, USA

18    Truck would have paid your transportation and your

19    expenses to do that, wouldn't they?

20             MR. OLIVER:  Object to the form.  If you

21    know, answer.

22    A.    I would hope so, yeah.

23    Q.    All right.  Was that ever discussed with you,

24    to come to Alabama and give a deposition?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

188

1    A.    Yes, yeah, yeah.

2    Q.    All right.  Did you ever refuse to go to

3    Alabama and give a deposition?

4          MR. OLIVER:  Object.  Object to form.  I

5    think that invokes attorney-client privilege.

6    Q.    You're not going to answer that question?

7          MR. OLIVER:  I'm going to instruct him not

8    to answer.  That's between attorney-client.

9    Q.    All right.  There's been some depositions that

10   were set earlier.  Was it ever your position that you

11   wouldn't come, give a deposition because you were

12   driving a truck somewhere, you were a professional

13   truck driver?

14   A.    Run that by me again?

15   Q.    Have you ever said that you wouldn't come to

16   Alabama to give a deposition because you were a

17   professional truck driver?

18         MR. OLIVER:  I'm going to object, same

19   thing.  This deals with attorney-client privilege.

20         MR. ALLRED:  Well, that's one of those

21   issues that the judge is going to have to rule on.  We

22   really need to have that answered.

23         MR. OLIVER:  Well, I'm going to instruct

24   him not to answer.  If the judge thinks that doesn't

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

189

1    invoke --

2              MR. ALLRED:  I don't mean if he's told

3    you.  I'm just asking him if that was ever his

4    position.  I don't mean what he's told you or Lea

5    Richmond or any of the lawyers.

6    Q.    Have you ever been prevented from giving a

7    deposition because of being a truck driver?

8    A.    No, no.  Not that I can recall.  I don't know.

9    Q.    All right.

10   A.    I don't even understand the question.

11   Q.    Well, what is it you don't understand about it?

12   Have you ever not come to Alabama to give a deposition

13   because of being a truck driver and that interfered

14   with your giving a deposition?

15   A.    No, no, no.

16   Q.    Okay.  Did you go to John Britt's funeral?

17   A.    No, no.

18   Q.    Why not?

19   A.    I ain't think nothing --

20   Q.    Think what?

21   A.    I didn't even know it occurred, his --

22   Q.    You didn't know --

23   A.    I didn't know nothing about it.  I wasn't

24   invited.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 190 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

190

1    Q.    Okay.  Well, you knew he had been killed --

2    A.    Right.

3    Q.    -- there on the scene.  You knew that.

4    A.    Right.

5    Q.    Within a few minutes, right?

6    A.    Right, right, right, right.

7    Q.    You say you didn't know it occurred, you mean

8    you didn't know a funeral occurred?

9    A.    I mean not necessarily, I ain't mean to say

10   that.  But I mean I didn't know, like what I mean, I

11   was eligible to go to his funeral.

12   Q.    Did you ever contact the family and try to find

13   out about the funeral arrangements?

14   A.    No, I never -- no, I wasn't given no numbers,

15   nothing like that, no.

16   Q.    Did you ever try to contact them?

17   A.    No, I didn't know how.

18   Q.    Did you ever make any effort to find out how to

19   contact them?

20   A.    No, not to my knowledge, no.

21   Q.    Did you ever send the family any sympathy

22   cards?

23   A.    No, I wasn't given an address.  I ain't know

24   nothing about it.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

191

1    Q.   You didn't try to get the address to send them

2    a card; is that right?

3    A.   No.

4    Q.   Did you ask the USA people that were there,

5    just about when the smoke cleared, did you ask them

6    how to contact the family?

7    A.   No, I didn't.

8    Q.   All right.  Let's take a few minutes and see if

9    I'm not about through.

10             Have you got, have you got a tattoo on

11   your arm?

12   A.   Oh, yeah, yeah.

13   Q.   What does it say?

14   A.   Delaware, State of Delaware.

15   Q.   Delaware?

16   A.   Yeah.

17   Q.   How far does it go up your arm?

18   A.   From here to here.  You want to see it?  Want

19   to take a peek?

20   Q.   Do you have any other tattoos?

21   A.   Yeah, I got four of them.

22   Q.   What do they say?

23   A.   I don't -- I forget.

24             MR. OLIVER:  Just tell him what they say.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

192

1    A.    "Strength missing to take losses."

2    Q.    Wait a minute.  I'm not understanding that.

3   Let me see it.

4    A.    I can show you better than I could tell you.

5   Make your own interpretation.

6    Q.    Okay.  Which way do you read it?  This way?

7    A.    Top to the bottom, yeah.

8    Q.    "Strength missing to take losses by the

9   hardest" --

10    A.    "Be."

11    Q.    "The ones" -- wait a minute.  Let me start

12   over.

13          "Strength missing to take losses be the

14   hardest, the ones that overcome be the calmest, strive

15   regardless."

16          What does that mean?

17    A.    I mean, I don't know.

18    Q.    Why did you get it put on there?

19    A.    I don't know, I was young.

20    Q.    All right.  Who came up with whatever it says

21   there?  Did you do that?

22    A.    Yeah.

23    Q.    All right.  You don't know what that means?

24    A.    No, I mean I -- I make my own interpretation of

Case 2:06-cv-00868-TMH-CSC    Document 40-10    Filed 11/13/2007    Page 193 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

193

1    it.

2      Q.    What is your interpretation of it?

3      A.    It means that, you know what I mean, that I'm

4    going to strive regardless, no matter what the

5    situation may be.

6      Q.    Okay.

7      A.    All right.

8      Q.    All right.  What else does it mean?  Anything

9    else?

10     A.    No.  I mean you got to take losses to, you know

11   what I mean, to get somewhere, you know what I mean.

12   Like it ain't no, that ain't no, no cake walk out

13   here.  Do you follow me?

14     Q.    All right.  What other tattoos do you have?

15     A.    I got my dad name right here.

16     Q.    All right.  What's his name?

17     A.    Ted L. Thompson.

18     Q.    All right, what other tattoos do you have?

19     A.    I got a cartoon character right here.

20     Q.    Who is the cartoon character?

21     A.    Dragon Ball Z character.

22     Q.    All right.  So the, whatever that last one was,

23   that's on your right bicep, this upper part of your

24   arm, correct?  Right, now.

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 194 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

194

1    A.   Oh, right, the cartoon, yeah, right, the

2    cartoon, yeah.

3    Q.   All right.  And then you've got Delaware on

4    your right forearm.

5    A.   Right.

6    Q.   Correct?

7    A.   Right.

8    Q.   And then on the your left upper arm you've got

9    your father's name?

10    A.   Right.

11    Q.   And then on your -- I mean left upper arm, I'm

12    sorry, you got your father's name.

13    A.   Right.

14    Q.   And then your left forearm you got that,

15    whatever that saying was.

16    A.   Right, right, right, right.

17         MR. ALLRED:  Let me take a break here and

18    let's see, see if we're not through.

19    Q.   Have you ever, Mr. Johnson, before you went to

20    work for USA Truck, had you ever driven, worked as an

21    18-wheeler driver prior to working for, going to work

22    for USA Truck?

23    A.   No.

24    Q.   Had not.  And then you first started, the

195

1    logbooks that you had the 70-hour violation, that was

2    starting with September the 1st of '05, but you

3    actually, your employment date was August 1st of '05.

4    Was that right?

5       A.    I don't even remember.

6       Q.    Okay.  Well, if that's what the records show.

7       A.    Right.

8       Q.    When did you first start driving?  Was it

9    August 1st or September the 1st of '05?

10      A.    Oh, August 1st, August 1st, right, right.

11      Q.    So you had been working a little bit less than

12   six months when this wreck happened with USA Truck.

13   Is that correct?

14      A.    I would say about six months.  That was my

15   interpretation, was six months.

16      Q.    Okay.  And then you had applied with Knight's

17   Transportation because you wanted to leave USA Truck's

18   employment and work for Knight's.  Is that right?

19      A.    Right.

20      Q.    Did you fill out a form when you left USA Truck

21   and tell them in there that you wanted to be closer to

22   home?

23      A.    Right.

24      Q.    Did you do that?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

196

1     A.    Right, right, right.

2     Q.    And also on that form I think you said that you

3   felt like that USA Truck needed to treat their drivers

4   with more respect.  Do you remember putting that on

5   there?

6     A.    I remember it.  I was playing, though.

7     Q.    You were what?

8     A.    I said I was playing.  I thought it was a piece

9   of junk mail.  I ain't actually know it was going to

10  keep it.

11    Q.    Did you actually write that out?

12    A.    Yeah, I wrote that, yeah.

13    Q.    Okay.  What did you mean by that, treat with

14  more respect?

15    A.    I ain't mean nothing behind that, really.

16    Q.    Beg your pardon?

17    A.    I said I really ain't mean nothing behind it,

18  you know what I mean?  I just, I was playing with

19  them.  I was upset, you know what I mean, I got

20  terminated.

21    Q.    You were mad at them for being terminated?

22    A.    Yeah, right.

23    Q.    You're still mad at them?

24    A.    No, not necessarily.  It's in the past, you

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 197 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

197

1   know what I mean?

2       Q.   All right.  Knowing what you know now, do you

3   feel like this wreck was your fault?

4               MR. OLIVER:  Object to the form.

5               MR. RICHMOND:  Object to the form.

6       A.   No.

7       Q.   You do not?

8       A.   No.

9       Q.   Not any way it could have been your fault?

10      A.   No, no, none whatsoever.

11      Q.   And if you had it to do over again, even

12  knowing what you know now, would you do anything any

13  different?

14              MR. OLIVER:  Object to the form.

15      A.   I know I wouldn't have gotten high that

16  Saturday.

17      Q.   You wouldn't have gotten high that Saturday?

18      A.   Right.

19      Q.   All right.  Would you have done anything else

20  any different?

21      A.   No.

22      Q.   All right.  So if you could turn back time, and

23  if John Britt was still living --

24      A.   Right.

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

1    Q.    -- and you're driving that truck, the only

2    thing you'd change about it is you wouldn't have got

3    high that Saturday?

4    A.    Right.

5    Q.    Is that right?

6    A.    Because I know my decision that I made was

7    right, you know what I mean?  I know I made a good

8    judgment.

9    Q.    All right.  But you feel like getting high that

10   Saturday made your judgment different --

11   A.    No.

12   Q.    -- at the time of the wreck?

13   A.    No, uh-uh.

14   Q.    All right.  Why do you say that you wouldn't

15   have got high that Saturday?

16   A.    We wouldn't be sitting here right now.

17   Q.    You think we're sitting here now because you

18   got high Saturday?

19   A.    Exactly, right.

20   Q.    Okay.  All right.  Then when you got fired, did

21   you make an application for unemployment compensation?

22   A.    Right.

23   Q.    And how did that turn out?  Did you get paid?

24   Did you get unemployment?

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

199

1    A.   No, I got denied.

2    Q.   You were denied?

3    A.   Right.

4    Q.   What's your understanding of why it was denied?

5    A.   I don't know.

6            MR. ALLRED:  All right.  Thank you.

7            THE WITNESS:  That's it?

8            MR. OLIVER:  Yep, that's it.

9            (Discussion held off the record.)

10   BY MR. ALLRED:

11   Q.   Did I ask you about this, Mr. Johnson, 295?

12           MR. OLIVER:  Yeah, you went through it.

13   Q.   Look at that right there.

14   A.   Right.

15           MR. ALLRED:  Did I ask him or did not?

16           MR. OLIVER:  Yeah.

17   Q.   I did.  Did you write all those down?

18   A.   Right.

19   Q.   That's your handwriting on that No. 295?

20   A.   Right.

21           MR. ALLRED:  Okay, fine.

22           (The deposition concluded at 1:25 p.m.)

23

24

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

200

1

2

3

4

5

6                    Replace this page

7                 with the Errata Sheet

8                    after it has been

9                 completed and signed

10                   by the Deponent

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Case 2:06-cv-00868-TMH-CSC   Document 40-10   Filed 11/13/2007   Page 201 of 201
Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.

201

```
 1                          CERTIFICATE
 2    STATE OF DELAWARE)
                       )
 3    NEW CASTLE COUNTY)
 4                   CERTIFICATE OF REPORTER
 5         I, Julie H. Parrack, Registered Professional
      Reporter and Notary Public, do hereby certify that
 6    there came before me on the 3rd day of November, 2007,
      the deponent herein, THEODORE LEVERNE JOHNSON, who was
 7    duly sworn by me and thereafter examined by counsel
      for the respective parties; that the questions asked
 8    of said deponent and the answers given were taken down
      by me in Stenotype notes and thereafter transcribed by
 9    use of computer-aided transcription and computer
      printer under my direction.
10
           I further certify that the foregoing is a true
11    and correct transcript of the testimony given at said
      examination of said witness.
12
           I further certify that I am not counsel,
13    attorney, or relative of either party, or otherwise
      interested in the event of this suit.
14
15                        _____

                          Julie H. Parrack, RMR, CRR
16                        Certification No. 102-RPR
                          (Expires January 31, 2008)
17
18
      DATED:_____
19
20
21
22
23
24
```

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


LANDRIA BRITT, as Administratrix          Plaintiff
of the Estate of JOHN W. BRITT,
Deceased


          vs.          Case No. 2:06cv868-ID-CSC


USA TRUCK, INC.; THEODORE LEVERNE          Defendants
JOHNSON; et al.
_____


DEPOSITION OF ERIC MCCONNELL

TAKEN ON THE 2ND OF NOVEMBER, 2007

2:10 P.M.

_____

APPEARANCES:                              ON BEHALF OF:
Mr. David E. Allred                       Plaintiff
Attorney at Law
7030 Fain Park Drive, Suite 9
P.O. Box 241594
Montgomery, AL  36124-1594
Mr. Thomas L. Oliver, II                  Defendants
CARR ALLISON
100 Vestavia Parkway
Birmingham, AL  35216


Also present:
Mr. Claude Lochner

1      Deposition of ERIC MCCONNELL was taken on November 2,

2    2007 at the Law Offices of Smith, Maurras, Cohen, Redd &

3    Horan, 1120 Garrison Avenue, Suite 200, City of Fort Smith,

4    County of Sebastian, State of Arkansas.

5                          STIPULATION

6      IT IS HEREBY STIPULATED AND AGREED by and between

7    counsel for the parties hereto that the deposition

8    testimony of ERIC MCCONNELL may be taken before Veronica R.

9    Lane, a Certified Court Reporter and Notary Public, at the

10   above captioned time and place.

11     Said deposition is taken pursuant to Rule 32(a)(3),

12   Arkansas Rules of Civil Procedure, (Rule 30, Federal Rules

13   of Civil Procedure), with the specific understanding that

14   any objections as to relevance, immateriality, or

15   incompetency are reserved and may be made at the time the

16   deposition is first offered into evidence.  Objections as

17   to form of questions are to be noted at the time of taking

18   of the deposition.  All formalities with reference to

19   taking, transcribing, forwarding and filing of said

20   deposition are waived.

21

22   *REPORTER'S NOTE:  "Uh-huh" denotes an affirmative response;

23    "Huh-uh" denotes a negative response.

24

25

1      ERIC MCCONNELL, the witness herein named, having been

2    first duly sworn, testified under oath as follows:

3                           DIRECT EXAMINATION

4    BY MR. ALLRED:

5    Q    Tell us your name, please, sir.

6    A    James Eric McConnell.

7    Q    You go by Eric?

8    A    I do.

9    Q    And we are taking this deposition in Federal Court in

10    the Middle District of Alabama, and I think I forgot to ask

11    the last witness, but the judges want you to state on the

12    record if you want to read and sign the deposition or waive

13    that.  Do you want to read and sign?

14    A    I would like to.

15    Q    You would like to read and sign?

16    A    I would like to read and sign.

17    Q    All right.  Tell this lady where she can send you the

18    transcript so that you can read and sign.

19    A    The information there on my card, 3200 Industrial Park

20    Road in Van Buren, Arkansas 72957.

21           MR. ALLRED:  I would like for you to go ahead,

22    please, ma'am, and send me the transcript prior to signing

23    so there won't be a delay.

24    Q    [BY MR. ALLRED]:  What do you do, Mr. McConnell?

25    A    I am the manager of the risk management department.

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

4

1    Q     At USA Truck?

2    A     That is correct.

3    Q     How long have you held that position?

4    A     For about five years now.

5    Q     Where are you in the corporate hierarchy with regard to

6    Claude Lochner?

7    A     I am his supervisor.

8    Q     You are his supervisor?

9    A     Yes.

10   Q     You are the head man in the risk management department;

11   is that right?

12   A     I am the manager, yes.

13   Q     Have you been deposed before?

14   A     I have.

15   Q     How many times do you think?

16   A     Probably six, maybe seven times.

17   Q     All in conjunction with USA Truck wrecks?

18   A     Yes, sir.

19   Q     We have been given some information about the liability

20   insurance coverage on USA Truck, and you are familiar with

21   that, aren't you?

22   A     I am.

23   Q     And this wreck in which my client's husband was killed

24   was February the 20th of 2006, and let me show you what I

25   have been given.  Are these the policies that were in

1   effect on that date?

2   A    Yes, it is.

3   Q    And let me have those back, if I can, because those are

4   the only ones that I have got.  We may have to look at them

5   together here.

6   A    Okay.

7   Q    Are there any coverage questions or coverage disputes

8   between USA Truck and any of these liability carriers with

9   regard to whether they will cover USA Truck or Theodore

10  Leverne Johnson for this wreck?

11  A    Not that I am aware of.

12  Q    There has not been any kind of reservation of rights or

13  anything of that issue; is that correct?

14  A    No, there has not.

15  Q    Is it your understanding that Mr. Johnson was on the

16  job for USA Truck when this wreck happened?

17  A    He was.

18  Q    There has not been any dispute about that; is that

19  right?

20  A    Not to my knowledge.

21  Q    All right.  Now, in looking at this so that I can have

22  some understanding of it, the SIR is a million dollars; is

23  that right?

24  A    That is correct.

25  Q    And then on top of that, the next level of coverage is

1    four million with Great West; is that right?

2    A    That is correct.

3    Q    And then what -- I couldn't tell readily what the

4    coverage is after that.  Can you tell me what it is?

5    A    There is a five million dollar layer with CNA.

6    Q    So that would go from five to ten, right?

7    A    That is correct.

8    Q    Five to ten million.  And then do you have coverage

9    above ten million?

10   A    There is coverage above ten million.

11   Q    Who is that with?

12   A    Off the top of my head, I can't remember, but there is

13   a ten million X of ten million dollar layer.

14   Q    What does it go to?

15   A    To 20 million.  And then there is a layer of 25 million

16   above that that goes to 45 million, and again, off the top

17   of my head, I can remember who the carrier is.

18   Q    Are you self-insured from 20 million to 25 million?

19   A    No.  There is a --

20   Q    Let me back up a minute.  When you get to the

21   10 million to 20 million, you said you have liability

22   coverage, but you don't know the name of the carrier?

23   A    I can't recall who it is.

24   Q    All right.  Then from the -- then you picked up and you

25   said 25 million, I thought.

```
 1   A    I misspoke.  I should have said 20 million.

 2   Q    20 million to?

 3   A    To 45 million.

 4   Q    That carrier, do you know the name of it?

 5   A    I can't recall the name of that carrier.

 6   Q    All right.  Do you have coverage above 45 million?

 7   A    No.

 8   Q    Have all of these companies been notified of this; two

 9    things, of this accident; and the second thing is of this

10    lawsuit?

11   A    To my knowledge, they have.

12   Q    They all have been given notice of loss; is that right?

13   A    To my knowledge, they have.

14   Q    All right.  In this case, has there been a

15    determination made, changing of gears, a different subject,

16    and I apologize, as to whether or not this wreck involving

17    Mr. Johnson and John Britt, whether this was a preventable

18    or nonpreventable accident?

19   A    I don't know if there was ever a determination of

20    preventability made or not.

21   Q    Do you do that when you have truck wrecks at USA?

22   A    I'm sorry, what was that end of your question, does USA

23    Truck do that?

24   Q    Right.

25   A    We quit going through preventability and
```

8

1    nonpreventability at some point.  I don't remember exactly

2    when that was, maybe the beginning of '06, and we rely on a

3    point system.  So I don't know if the safety department

4    would have determined if this was a preventable or a

5    nonpreventable.  I can't recall.

6    Q    Why did you change or quit doing the preventability or

7    nonpreventability?

8    A    It was kind of a technical -- I guess a technical

9    question.  We have a point system in place to every

10    accident.

11    Q    Was the technicality that caused problems if you got

12    sued?

13    A    No, sir, that wasn't the problem.  It was more of a

14    computer type issue to where there was a point system, and

15    whenever we were doing preventability and

16    nonpreventability, we had an extra step in there of adding

17    that, so it just made sense if there was a zero points

18    assigned, it was a nonpreventable, I guess you could look

19    at it that way.

20    Q    Do you know how many points were assigned for this

21    accident?

22    A    I don't think there has been any points assigned to it

23    yet.

24    Q    Do you know why not?

25    A    We are kind of awaiting the outcome of this matter to

1    determine if there was liability or not.

2    Q    Are you going to wait to see what the jury does before

3    you determine how many points?

4    A    I guess we could look at it that way.

5    Q    All right.  Have you looked at the Montgomery police

6    report investigative file in this case?

7    A    I have.

8    Q    And you have read Mr. Johnson's statement?

9    A    I have read the majority of it, yes.

10   Q    Well, there is 67 pages in there.  The one thing that I

11   have a question about is if he told the investigating

12   officer that he smoked marijuana on Saturday before the

13   wreck and then he tested positive for marijuana, and he is

14   involved in a fatality accident in Montgomery, do you have

15   any understanding yourself as to how come he has not been

16   indicted for some criminal offense?

17   A    I do not.

18   Q    Do not.  Have you discussed that issue with anybody?

19   A    I have not, no.

20   Q    Well, do you know whether USA, because it is my

21   understanding that -- let me show you this Page 964 that

22   has been produced to us, USA has been notified that this

23   wreck, Mr. Johnson did a urine test and he tested positive

24   for marijuana.  And then that information was sent to USA.

25   Do you know if anybody at USA provided that information on

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

10

1    964 to the Montgomery Police Department?

2    A    No, sir, I don't know if they have or not.

3    Q    What is USA Truck's policy, and let me say this first

4    and then I will ask you a question and you tell me if I am

5    saying this right.

6    A    Okay.

7    Q    Is it correct that when one of your drivers is in a DOT

8    recordable wreck they have to -- within 32 hours, he has to

9    do a urine test?

10   A    That is correct.

11   Q    Or if he is in a wreck and the policeman takes him

12   somewhere and he does a urine test, that would comply with

13   the DOT regulations?

14   A    I believe that is correct.

15   Q    In this case it is my understanding the policeman --

16   and I don't know whether he did or not.  I don't know if

17   the policeman ever did a urine test.  I think the only one

18   that I know about is this one that you all did.  So if that

19   is so, do you know of any way the police department in

20   Montgomery could find out about his positive marijuana test

21   if you all don't tell them about it?

22   A    I have no idea.

23   Q    Do you have any procedure in place where you send --

24   when you know you are doing the test and you get back a

25   positive result, do you have any procedure in place where

1    you send that result to the investigating authorities where

2    the wreck happened?

3    A    No, there is no procedure in place.  I don't think that

4    there is any type of -- no, we do not have a procedure in

5    place such as that.

6    Q    Do you know whether that is required?

7    A    That is what I was trying to get at.  Thank you.  I

8    don't believe that there is any requirement of that to my

9    knowledge.

10    Q    Let me ask you this, when you say requirement, would

11    that be like a DOT requirement?

12    A    There is no DOT requirement that I am aware of that we

13    do that, but I am not aware of any other requirements.

14    Q    Let's assume for purposes of this question that there

15    is not, and to tell you the truth, I don't know whether you

16    are required to do it or not, but if you are not required

17    to do it, do you think that you ought to do it as a

18    corporate citizen, USA Truck should send that kind of

19    information to the investigating authorities?

20         MR. OLIVER:  Object to the form.  You can answer,

21    if you know.

22         THE WITNESS:  I have forgotten the question.  I'm

23    sorry, what was the question?

24    Q    [BY MR. ALLRED]:  Should USA Truck as a corporate

25    citizen send that kind of information to the investigating

1    authorities?

2         MR. OLIVER:  Object to the form.  Same objection.

3         THE WITNESS:  If the investigating authorities

4    were to request that, we would obviously oblige them and

5    provide that to them.

6    Q    [BY MR. ALLRED]:  What about if they don't request it?

7    A    I can't say whether we should or we shouldn't.  I would

8    want to cooperate with them fully and provide it if they

9    requested it.

10   Q    When did you get ahold of the Montgomery Police

11   Department investigative file?  When did you get it?

12   A    I don't recall when the exact date was.

13   Q    Well, today is November the 2nd, 2007.  How long before

14   today was it that you reviewed the Montgomery Police

15   Department file?

16   A    It has probably been maybe two months.

17   Q    All right.

18   A    Something along those lines.

19   Q    And was a copy of it sent to you by USA's lawyer?

20   A    I don't recall how we got it.

21   Q    Okay.  Do you know of any reason or why that file was

22   not produced to us until October the 24th of 2007?

23   A    Quite honestly, that may have been when we received it.

24   Two months ago may be completely outside of the time frame.

25   It has been several weeks since I have looked at it, so I

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

13

1    am going to say several weeks.

2    Q    It has been several weeks since you looked at it?

3    A    I can't remember when it was that I looked at it.    It

4    has been a couple of weeks, maybe three, maybe four.    I

5    don't recall.

6    Q    Do you have a system where you stamp your mail in when

7    you receive it?

8    A    Yes, we do.

9    Q    All right.    You don't have any access to that as we sit

10    here, do you?

11    A    No, I don't.

12    Q    But your first recollection was that it was about two

13    months, and then you feel like it may have been somewhat

14    shorter than that when you saw it; is that right?

15    A    I can't remember when it was when I actually looked at

16    it.

17    Q    When you read it, and read that statement, was there

18    any doubt in your mind that your driver turned in front of

19    John Britt?

20    A    No, I don't think that there is any question that there

21    was a -- that our driver made a left-hand turn.

22    Q    In front of the path of John Britt or into the path of

23    John Britt?

24    A    I don't know if I can classify it into the path of.

25    Q    Well, wasn't John Britt going straight?

1    A    I believe that he was, yes.

2    Q    On a seven-lane highway, three going each way?

3    A    I don't remember how many lanes there were, to be

4     honest with you.

5    Q    There is three lanes going each way and then one is a

6     turning lane.

7    A    I will trust that.

8    Q    Okay.  And then your fellow turned across three of

9     those lanes to go into a truck stop; is that right?

10   A    That is correct.

11   Q    And then John Britt is coming the other way; is that

12    right?

13   A    Yes.

14   Q    You have never been given any information that he

15    didn't have his lights on or anything like that; is that

16    right?

17   A    Not that I can remember.

18   Q    Okay.  And when you saw that, when you read that

19    statement of Theodore Johnson, in there do you remember

20    where he said it was 250 feet away when he made his turn?

21   A    I do remember that.

22   Q    Have you ever done the math on that and see if that

23    will work?

24   A    I personally have not.

25   Q    Have you asked anybody to do it?

1  A    I believe that I have looked at some calculations on

2   that.  Who did that, I don't recall.

3  Q    The calculations don't work out where your truck could

4   have completed that turn without the oncoming traffic

5   having to stop, do they?

6  A    No.

7  Q    Is it your company's policy that it is all right for

8   the drivers to turn in front of oncoming traffic and the

9   traffic just has have stop and let them get on out of the

10  way?

11           MR. OLIVER:  Object to the form.  It is

12   insufficient and improper hypothetical.

13           THE WITNESS:  That is not a policy.  We want our

14   drivers to make sure that -- we would like for them to be

15   able to ensure that they can turn with a clear distance.

16   And I think in the police report that maybe he

17   underestimated the amount of space that there was.

18   Whatever he listed, 200 feet, I think maybe there was more.

19   There was more feet in between there somewhere.

20  Q    [BY MR. ALLRED]:  When you say he underestimated, the

21   he you are talking about is Theodore Johnson?

22  A    I think in his statement to the police officers,

23   whenever he said 200 feet.

24  Q    Oh, you don't believe his statement, the 250 feet.  You

25   don't want to believe that; is that what you are saying?

Case 2:06-cv-00868-TMH-CSC    Document 40-11    Filed 11/13/2007    Page 16 of 52
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

16

1    A    I think that from other things when talking -- I think

2    there is other information out there that suggests that he

3    may have miscalculated in giving that to the police

4    officers.

5    Q    What is that information?

6    A    Just in conversations that I have heard that some other

7    folks have had with Mr. Johnson.

8    Q    Who has had conversations with him?

9    A    Well, I know that our attorney has.

10   Q    Who else has had conversations with him?

11   A    I am not sure of that.

12   Q    Sir?

13   A    I am not sure of that.

14   Q    So your information is that night right after John

15   Britt is killed and he is there talking to that policeman,

16   that he got it wrong about the distance, the 250 feet; is

17   that correct?

18   A    I would believe that, yes.

19   Q    You would believe that that is not correct, the

20   250 feet is not correct?

21   A    That is correct.

22   Q    All right.  Well, then, what do you believe?  What do

23   you believe is the correct distance?

24   A    My understanding of it is it was about 500 feet.

25   Q    About 500 feet.  And 250 won't work, will it?  I mean,

 1   that is too close, not enough time for your truck to clear

 2   those lanes, is it?

 3   A    Not that I am aware of.

 4   Q    And then so 500 feet, will the math work out on that?

 5   Will that give your truck enough time to get across?

 6   A    I am not sure.  I haven't done that math.

 7   Q    The 500 feet, if you do that, and regardless of what

 8   the distance was, should your truck have turned in front of

 9   the oncoming traffic in such a manner that he could not

10   clear those lanes without the other traffic having to stop

11   or slow down?  Should he have done that?

12   A    He should have waited until he felt that he had

13   sufficient distance to turn.

14   Q    To go all the way across without the oncoming traffic

15   having to either to stop or slow down?

16   A    That is correct.

17   Q    Now, who can testify about the 500 feet?

18   A    I don't know.

19   Q    So you think when Mr. Johnson told the policeman that

20   night 250 feet that he was incorrect?

21   A    I think that, yes.

22   Q    Do you think that he lied to him?

23   A    No, sir.

24   Q    You just think he is incorrect?

25   A    I think he was probably a little scared, probably a

1    little bewildered from everything that had gone on, and,

2    you know, he may have underestimated how far the distance

3    was.

4    Q    Now, has he given a statement to anybody where he said

5    500 feet and it has been written down or recorded on

6    anything?

7    A    Quite honestly, I am not sure.

8    Q    Have you seen a statement?

9    A    I have not seen a written statement.

10   Q    But the number -- your understanding is that after

11   having the wreck, talking with the policeman, gives the

12   policeman a 67-page statement, he tells him 250 feet, that

13   he has now been able to get with your lawyers and all of a

14   sudden he has decided it is really 500 feet; is that right?

15           MR. OLIVER:  Object to the form.

16           THE WITNESS:  I don't know if I would classify it

17   quite like that.

18   Q    [BY MR. ALLRED]:  You tell me what about what I just

19   said is not correct.

20   A    I think, again, that he was probably -- I think he was

21   bewildered, and he had police officers, you know,

22   questioning him late at night.  The events he had just gone

23   through, I think that he may have been off in his

24   calculations of the amount of feet that was between he and

25   the other vehicles whenever he began his turn.

1   Q    So after meeting with the policeman, and then he has

2   met with the lawyers, then he comes up with the 500 feet;

3   is that right?

4              MR. OLIVER:  Object to the form.

5              THE WITNESS:  I think that after he had a chance

6   to go back out to the scene and take a look at some of

7   the -- maybe what I will call as a marker, maybe a road

8   sign, maybe take a second look at the roadway, that he may

9   have said the vehicles -- the oncoming vehicles were there

10  whenever I began my turn, and I think that that footage was

11  probably more than 250 feet.

12  Q    [BY MR. ALLRED]:  Who was a witness to Mr. Johnson

13  doing this?

14  A    I don't know.

15  Q    Sir?

16  A    I don't know.

17  Q    Do you know if he ever called the policeman and said,

18  hey, I got that wrong when I told you 250 feet; it is

19  really 500 feet?

20  A    I don't know that he did.  I doubt that he did.

21  Q    Was there anything else other than meeting with the

22  lawyers that made him go from 250 feet to 500 feet?

23             MR. OLIVER:  Object to the form.

24             THE WITNESS:  I think that as I explained a moment

25  ago that once he had a chance to take a second look at the

1    scene in the area, that may have given him a little better

2    assessment of it.

3    Q    [BY MR. ALLRED]:  Were the lawyers there when he looked

4    at the scene?

5    A    I don't know if they were or not.

6    Q    When did he look at the scene?

7    A    That, again, I am not sure when it was.

8    Q    But the report is that he has this experience, and then

9    all of a sudden the distance is double; is that right?

10    A    He has this experience of getting --

11    Q    Of what you just described?

12    A    I think that is correct, yes.

13    Q    Have you, yourself, ever talked to Mr. Johnson?

14    A    No, I don't think that I did.

15    Q    Okay.  Have you ever talked to somebody named Van

16    Calhoun, the accident reconstruction fellow?

17    A    No, I haven't.

18    Q    Okay.  Do you know why Mr. Calhoun was never given the

19    Montgomery Police Department investigation to do his work?

20    A    The only reason I could think of is if it was just

21    given to us by the police department.  I think you

22    mentioned a date of October 27th is when it was produced to

23    you.

24    Q    I will tell you straight up, your lawyers withheld it

25    from me.  They had it for a long time.  They sent it to you

Case 2:06-cv-00868-TMH-CSC    Document 40-11    Filed 11/13/2007    Page 21 of 52
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

21

1    like you said two months ago.  They gave it to me a week

2    ago.

3    A    I don't --

4    Q    There wasn't any problem in getting it.

5    A    I don't know if that is true or not.

6    Q    Well, we can get past that, but they didn't give it to

7    Van Calhoun.  Do you know why it was not given to him?

8    A    I do not.

9    Q    Does it make any sense to you that your company could

10   hire an accident reconstruction fellow and get him to give

11   opinions about a wreck and how it happened and what his

12   opinions are about it and they don't even give him the

13   statement from the driver, and don't even give him the

14   police department's investigation?  Does that make any

15   sense to you?

16   A    Does it makes sense to me?

17   Q    Right.

18   A    I am sure that that information will be provided to him

19   at some point.

20   Q    It should be, shouldn't it?

21   A    I am sure it will be.

22   Q    Okay.  Well, for Mr. Calhoun to give accurate opinions

23   about this accident, you would think that he needs to know

24   what the driver said and what the investigating officer

25   found the night of the wreck and during his investigation,

(479) 471-0665      Veronica R. Lane, CCR veronicalane@cox.net

 1   wouldn't you?

 2           MR. OLIVER:  Object to the form.

 3           THE WITNESS:  I don't know if I could agree with

 4   that or not.  He could probably give fairly accurate --

 5   Q   [BY MR. ALLRED]:  Well, what do you disagree about

 6   that?

 7   A   He could probably get fairly accurate.  I am sure he

 8   could get accurate information just by taking measurements

 9   from the scene and doing those type of things.

10   Q   Well, would it be of any importance, do you think it

11   would be of any relevance for an accident reconstructionist

12   to know what your driver says happened?

13   A   Yes, and I don't know that he hasn't spoken with our

14   driver.

15   Q   All right.  Well, I took his deposition and he says he

16   hadn't.

17   A   Okay.

18   Q   And when I took his deposition, he also says he hadn't

19   been provided with the Montgomery Police Department

20   investigation.

21   A   Okay.

22   Q   So he would need that information in order to give an

23   accurate opinion, wouldn't he?

24           MR. OLIVER:  Object to the form.

25           THE WITNESS:  Again, I think that will be provided

1    to him so that he can give his final assessment.

2  Q   [BY MR. ALLRED]:  Between today and the trial?

3  A   Yes.

4  Q   And he would need that in order to give an accurate

5    opinion, wouldn't he?

6          MR. ALLRED:  Object to the form.

7          THE WITNESS:  Again, I don't know if it would be

8    relevant to him or not.  I can't testify to what he needs

9    or what he doesn't need.

10  Q   [BY MR. ALLRED]:  Even what the driver says, you don't

11    know whether that would be relevant or not?

12  A   I think that he would need to talk with the driver.

13  Q   One of the first things you would want to know in the

14    risk management department if you have a fatality in any

15    kind of wreck, isn't one of the first questions out of you

16    mouth is, what happened or how did this happen?  Isn't that

17    one of the first things you would want to know?

18  A   Yes.

19  Q   Do you know of any way Mr. Calhoun or any accident

20    investigative reconstructionist could give an opinion

21    without having that information?

22          MR. ALLRED:  Object to the form.  Same objection.

23    Asked and answered.

24          THE WITNESS:  I don't know.  What was the question

25    again?

1   Q    [BY MR. ALLRED]:  Do you know of any way Van Calhoun or

2    any accident reconstructionist could give an opinion

3    without knowing how the wreck happened?

4           MR. OLIVER:  Same objection.

5           THE WITNESS:  I think that, again, I think that he

6    will need to speak to the driver at some point.

7           MR. ALLRED:  Okay.

8           THE WITNESS:  But I believe we probably gave him

9    an accurate assessment of what the driver had relayed to us

10   as to what happened and that type of thing.

11  Q    [BY MR. ALLRED]:  So what you are saying is you are not

12   going to give him that statement where he says, the night

13   of the wreck I was 250 feet away because you don't like

14   that, do you?

15  A    No, sir, that is not what I said at all.  In fact, I

16   said that we would probably provide him with that at some

17   point.  I am not sure when we received the copy of his

18   statement.

19  Q    To be fair with it, you would want him to have the

20   police department statement, wouldn't you, that 67-page

21   statement?

22  A    Again, I am sure we will provide that to him.

23  Q    And then you would want him to have whatever

24   information the driver says, wouldn't you?

25  A    Yes.

1   Q    Have you seen this Exhibit 964 there?

2   A    I believe that I have seen it before, yes.

3   Q    Do you know what the -- was there any follow-up testing

4    and do you know what the actual level was for your driver's

5    marijuana?

6   A    I do not.

7   Q    Do you follow up and try to quantify to see the level,

8    the actual level itself?

9   A    At times we do, yes.

10   Q    Was that done in this case?

11   A    I don't remember if it was or not.

12   Q    If it was done, do you know of any reason those

13    documents would not have been produced?

14   A    No.

15   Q    Has there ever been any situation in your working on

16    this case here where something happened and you all had

17    trouble finding documents, locating documents or producing

18    documents to your lawyers?  Anything like that?

19   A    I am not sure I understand the question.

20   Q    Example --

21          MR. OLIVER:  I am going to object to the question.

22    I think that involves attorney-client privilege.

23          MR. ALLRED:  I think it is very important.  I need

24    to know that.

25          MR. OLIVER:  To the extent you are asking him to

1     talk about attorney-client privilege, I am going to

2     instruct him not to answer.

3           MR. ALLRED:  Do what you are going to do.

4     Q   [BY MR. ALLRED]:  Is there any issue to come up in this

5     case where you have had trouble in your office finding

6     documents to send to your lawyer?

7           MR. OLIVER:  I am going to object and instruct you

8     not to answer.  That deals with attorney-client privilege

9     and that is a privilege between the two of us.

10    Q   [BY MR. ALLRED]:  Well, let me tell you something, we

11    are going to be talking about this with the judge, and I

12    will tell you this, your lawyer is off in the ditch with

13    the judge about withholding documents.  There is going to

14    be a hearing about it.  And while I am here talking to you,

15    I want to know from you if there has ever been any problem

16    on your end where there was just some reason you couldn't

17    find something, and you had actually sent things to the

18    lawyer -- or you could not find things, excuse me, to send

19    to the lawyer?  Did anything like that come up?

20          MR. OLIVER:  I think that involves attorney-client

21    privilege and we will instruct him not to answer.

22          MR. ALLRED:  All right.  I hear you.  I don't

23    agree with you.

24    Q   [BY MR. ALLRED]:  Can you tell me about any reason that

25    any part of this file would be withheld from me because of

1    a request filed?  In September of 2006, I asked him for

2    these documents, and then we don't get some of them until

3    October 24th of 2007, and then we get others on October the

4    30th of 2007.  Do you have any information that you could

5    explain why there was that kind of delay?

6         MR. OLIVER:  Same objection.

7         THE WITNESS:  No, I don't.  I personally don't

8    have any knowledge of why that would happen.

9    Q    [BY MR. ALLRED]:  All right.  One of the documents that

10   was withheld from us until the first of this week after the

11   request had been pending for over a year is this man's,

12   your driver's dope test that you are looking at there.

13   A    The drug screen results?

14   Q    Right.  Was that in your file all along in the USA file

15   from the time that the test was done in February of '06 up

16   until now?

17   A    I don't know when it was placed in our file to be

18   honest with you.

19   Q    Sir?

20   A    I don't know when it was placed in our file.

21   Q    Well, what would be the normal course for a document

22   like that to be produced, come in to USA Truck's possession

23   from the laboratory?

24   A    I think typically that would be sent in from -- I think

25   it would be sent to the MRO, which is the medical review

(479) 471-0665     Veronica R. Lane, CCR veronicalane@cox.net

1     officer from the laboratory.

2     Q     How long would that take, do you think?

3     A     I don't know how long it takes, a few days or something

4     like that.  And then at some point I think they contact the

5     driver.  To my knowledge, they contact the driver.  And

6     they will contact the company via telephone and letting

7     them know they had a DOT disqualifying drug test.  And then

8     to fully answer your question --

9     Q     Yes.

10    A     -- at some point after that they will send a letter

11    with the results to the company, and I don't how long that

12    usually takes.  It may take a few days.  It may take

13    several months.  I am not sure.

14    Q     Casey Hansen, I think it was Casey Hansen, told us a

15    while ago that sometimes you get a telephone report that is

16    positive, they will call and give you a telephone report,

17    and then they go through this process, a protocol about

18    contacting the driver and that kind of thing, and the

19    telephone report comes within a few days of when the test

20    is made if it was positive, isn't it?

21    A     To my knowledge, yes.

22    Q     And we will be talking about this later, but this May

23    31st of '06, No. 964, it is dated May 31st of '06, but that

24    is just when the doctor finishes all of the telephone

25    calling to the truck driver and doing that DOT protocol,

1    isn't it?

2    A    I have no idea.

3    Q    All right.  But even if USA learned nothing about this

4    test until May 31st of '06 -- which is not the way I

5    understand anyway -- but you still would have had it in

6    your file from shortly after May 31st of '06 when it is

7    mailed until now; is that right?

8    A    I don't know if it would be in our file or not.  It

9    looks like it was delivered to the company at that point,

10    though.

11    Q    Well, it was produced to me, but it wasn't produced

12    until October the 30th of '07.  Can you shed any light on

13    how come it was withheld from me until October 30, 2007?

14    A    I have no idea.

15    Q    Tell me about Mike Neal.  What is your understanding of

16    why he is no longer working there?

17    A    I think the understanding I have is that he resigned

18    from the company.

19    Q    And he had been there for a number of years, I believe;

20    is that right?

21    A    Maybe four years.

22    Q    All right.  Why did he resign?

23    A    I am not aware of what the details were.

24    Q    He was the director of safety; is that right?

25    A    He was the director of safety.

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

30

1  Q    Are you a corporate officer?

2  A    No, sir.

3  Q    Do you have any information about why Mike Neal left?

4  A    I know that he was -- well, there is personality

5   conflicts.

6  Q    I'm sorry?

7  A    Personality conflicts, mainly.  I think that my

8   understanding was that his administrative skills weren't

9   the best as far as delegating his staff to do certain

10  functions and that type of thing.

11 Q    Who fired him?

12 A    I don't think he was fired.  I think he resigned.

13 Q    All right.  Who is the fellow, Rodney, what is his

14  name?

15 A    There are four or five Rodneys that work at the

16  company.

17 Q    Rodney Mills?

18 A    You are talking about Rodney Mills, he is the corporate

19  counsel, vice-president.

20 Q    All right.  Did Mike Neal meet with Rodney Mills and

21  then he decides he wants to go do something else?  Is that

22  the way it was?

23 A    I am sure he met with Rodney on several occasions.

24 Q    I am talking about when he left?

25 A    I don't know.

1   Q   Do you know how to get in touch with Mike Neal?

2   A   No, I don't.

3   Q   Do you know where he lives?

4   A   He lives in Fort Smith here somewhere, but I am not

5    sure where.

6   Q   Do you know who he works for?

7   A   I do not.

8   Q   If you wanted to find him today, how would you go about

9    doing it?

10  A   We probably have a last known address, phone number in

11   our computer system.  That is probably where I would start.

12  Q   USA Truck?

13  A   Correct.

14  Q   Did Mike Neal, did he leave USA Truck because of this

15   Johnson matter?

16  A   No.

17  Q   You are sure of that?

18  A   Yes.

19  Q   Look at No. 198 and 199, if you will.

20  A   Okay.

21  Q   If you look at that, and isn't that the driving record

22   on Mr. Johnson?

23  A   I think it is a MVR, motor vehicle report.

24  Q   Is that his driving record?

25  A   It may be classified that.  I have always referred to

1   them as MVRs.

2   Q    Do see that on 198 down there near the bottom, what

3   does that say?  About six lines up from the bottom, what

4   does that say?

5   A    Type VS date --

6   Q    Right up above that line, what does it say?

7   A    Driving record information.

8   Q    All right.  That is his driving record information,

9   isn't it?

10  A    Okay.

11  Q    Then he has got -- you see the driving record

12  information that is listed on the 198 and then on 199?  Do

13  you see that?

14  A    I do.

15  Q    Is that about the worst driving record information that

16  you have ever seen on any driver at USA Truck?

17        MR. OLIVER:  Object to the form.

18        THE WITNESS:  I would say it is not the best.

19  Q    [BY MR. ALLRED]:  All right.  Is it about the worst one

20  that you have ever seen?

21        MR. OLIVER:  Same objection.

22        THE WITNESS:  I can't say if it is the worst one

23  or not.  I mean --

24  Q    [BY MR. ALLRED]:  Do you think it is -- do you think

25  there may be drivers working for USA Truck today that have

1    a worse driving record information than what is shown on

2    198 and 199?

3                MR. OLIVER:  Object to the form.

4                THE WITNESS:  Without looking at every line of

5    this, I can't say that this is just awful, but I am sure

6    there are other drivers out there that have more

7    classifications than this one there.

8    Q    [BY MR. ALLRED]:  Well, look at it and see if you think

9     that Mr. Johnson met the qualifications of USA Truck to be

10    driving a truck in February of '06?

11   A    I think that he met our qualification in February of

12    '06.

13   Q    You think what, now?

14   A    That he met our qualifications in February of '06.

15   Q    So this would be a, quote, qualified driver?  Looking

16    at 198 and 199, this is the kind of driver that USA Truck

17    wants on the road?

18   A    He is qualified -- I'm sorry?

19   Q    I understand you say he is qualified, but I am asking

20    you something different.

21   A    Okay.

22   Q    Looking at 198 and 199, is this the kind of driver that

23    USA Truck wants on the road driving its equipment?

24   A    I think he is a qualified driver under DOT regulations.

25   Q    Is that a "yes" or a "no"?

 1    A     I think it is a "yes."

 2    Q     Okay.  Now, do you have a point system at the USA Truck

 3     place for drivers?

 4    A     We do have a point system.

 5    Q     And at what point level do you have to get where you

 6     are not qualified?

 7    A     Seven points.

 8    Q     And how many points does he have on his MVR that is

 9     shown on 198?

10    A     The point system we have only takes into account any

11     accidents while employed at USA Truck.

12    Q     All right.  If it turns out that Mr. Johnson is liable

13     for killing John Britt, then how many points are you going

14     to give him, because you all said you haven't decided or

15     determined whether this is a preventable or nonpreventable,

16     but you said that doesn't have anything to do with

17     lawsuits.  Then you are going to wait and see what the jury

18     is going to do with this.  So if the case turns out in

19     favor of Landria, his widow, and you go back in there and

20     you say, well, a jury has now determined what they are

21     going to determine, and so I will put down -- one thing you

22     put down is that it was preventable; would that be correct?

23    A     No, sir.

24    Q     You wouldn't?

25    A     We would say it was a seven-point accident.

1    Q     You still wouldn't put down preventable or

2    nonpreventable?

3    A     Again, the way our system works, it may have been a

4    preventable accident, but we don't do that just because of

5    our computer system.

6    Q     But for killing John Britt, you would assess seven

7    points; is that right?

8              MR. OLIVER:  Object to the form.

9              THE WITNESS:  For the accident, it would be seven

10   points.

11   Q     [BY MR. ALLRED]:  So tell me again, seven points is the

12   cut off level for driving USA equipment?  Seven points and

13   you don't qualify?

14   A     Yes.

15   Q     So, really, what you are saying if he is driving some

16   other vehicle, if it is not a USA equipment, you don't even

17   count it?

18   A     If while he was employed at the time of that accident,

19   then we look at it, yes.

20   Q     So if he is driving some other vehicle, but he is

21   employed at USA, you would count it?

22   A     We would not count it into that accident point system,

23   but we would take a look at it, if it came out on his MVR.

24   Q     But anything in there, he started working on August 1st

25   of '05, I will tell you, so the only thing, really, that

1    you all look at on assessing whether to put him on the road

2    is just whatever happened after August 1st of '05; is that

3    correct?

4    A    No, he has to meet our hiring qualifications and he has

5    to meet DOT qualifications, which he does.

6    Q    As far as driving record information, though, would you

7    consider -- in hiring him, would you consider anything that

8    occurred before August 1st of 2005?

9    A    Our human resources department would take a look at

10    that and make sure that he met the qualifications that we

11    had.

12    Q    And what are those qualifications with regard to the

13    driving record information?

14    A    I don't know those off the top of my head.

15    Q    Do you think four moving violations and four

16    suspensions of his license, would that be something that

17    would still make him qualified to be a driver at USA Truck?

18    A    I think that they, they being the human resources

19    department, took a look at that and they said that he did

20    meet the qualifications.  He was hired.

21    Q    Okay.  One of them -- one of the violations was a

22    Federal Motor Carrier violation, and it has up there, see

23    on 199, it has on there 5/26/04, and as I read that, it

24    says, accident Y.  What does that mean to you?

25    A    It must have been an accident.

1    Q    So did that indicate that he violated the Federal Motor

2    Carrier regulations and had been involved in a wreck before

3    he went to work for you?

4    A    I can't say it was a violation of -- I mean, it says

5    Federal Motor Carrier violation, accident; that is what it

6    says.

7    Q    That is what it says, isn't it?

8    A    I won't argue with what it says.

9    Q    Okay.  Did you see that in the statement that

10    Mr. Johnson gave to the Montgomery police that he had had a

11    positive drug test in late '02 or early '03?  Did you see

12    that?

13    A    It seems like I recall seeing something about that.

14    Q    If you had known about that at USA Truck, would he have

15    met the USA Truck's qualifications to be a driver?

16    A    Again, I can't recall what the qualifications are off

17    the top of my head.  And I don't know if he -- if he would

18    have listed them, I am sure they would have talked to him

19    about them.

20    Q    Well, he put on the application information that he had

21    not had any tests, so if he has told the policeman that he

22    failed a test or had a positive test, then that would be

23    contrary to what he was telling you at USA Truck; is that

24    correct?

25    A    If he didn't list those on the application, yes.

1    Q    But you don't know whether he would have met the

2    qualifications if he has a positive test within three years

3    of when he has applied to you, to USA Truck for work?  You

4    don't know whether that would disqualify him?

5    A    I personally don't know what the qualifications are.  I

6    am assuming that he would have met those, he was hired.

7    Q    Do you have any understanding of what was wrong with

8    Mr. Johnson's fuel card?  I remember seeing that in a

9    statement.  He was telling the police that he had -- he

10    said he at one time waited five hours, and one time he

11    waited three hours to get his fuel card straightened out.

12    Do you know what happened there?

13    A    I don't.

14    Q    Have you discussed that with anybody?

15    A    I have not.

16    Q    What is your understanding of why Mr. Johnson was fired

17    from USA Truck?

18    A    He violated a company policy.

19    Q    And what is that company policy?

20    A    He was DOT disqualified because of a positive drug

21    screen.

22    Q    Why does USA Truck not allow drivers to drive if they

23    have a positive drug test?

24    A    It is against DOT regulation.

25    Q    Aside from that, if you leave that alone, if you leave

1    the DOT regulations out of it, is having used drugs, can

2    that cause your driving to be impaired?

3    A    If he is using them at the time that he is driving,

4    yes.

5    Q    Okay.  What about is that one of the reasons that he

6    was fired?

7    A    He was fired because of the violation of company

8    policy, meaning that he failed a DOT drug test.  That is

9    why he was fired.

10   Q    Did you know he says he smoked marijuana the Saturday

11   night before the wreck?  Did you know that he had driven a

12   truck the next day, a USA Truck the next day?

13   A    I believe that is correct, yes.

14           MR. OLIVER:  The question is did you know that?

15           THE WITNESS:  No, I didn't know that.

16   Q    [BY MR. ALLRED]:  Do you know it now?  You didn't know

17    it at the time obviously, did you?

18   A    What are asking me?

19   Q    February 18th -- John Britt is killed on February 20th

20    of 2006.

21   A    Right, I knew that.

22   Q    Johnson says he smoked marijuana on the 18th, Saturday

23    night.

24   A    Right.

25   Q    And then you know now, and you know from reading the

1    statement, that that is when he smoked the marijuana, the

2    statement being the Montgomery Police Department statement?

3    A    I think I knew about that before that, but, yes.

4    Q    All right.  Before you read the Montgomery Police

5    Department statement, you knew that Johnson had smoked

6    marijuana on Saturday night?

7    A    I think that is what -- I don't know who I know that

8    from, but he had told somebody throughout the course of the

9    investigation of this accident that that was the case.

10   Q    Who had he told that?

11   A    I don't know.

12   Q    Well, one of the things that is going to be important

13   in this case, among others, is we need to see the

14   statements he has given.  Sometimes those statements are

15   privileged.  Sometimes they are not.  You are the head of

16   risk management.  I need to know who all took statements

17   from Mr. Johnson so that we can let the judge look at them

18   and see whether I am entitled to have them.  Who all took

19   statements?

20   A    The only statements that I am aware of is the one with

21   the Montgomery Police Department.  Now, I think you deposed

22   Larry Hammond earlier who took a statement over the

23   telephone from him, and that is the only one internally

24   that I am aware of.

25   Q    Did you assign this case, USA Truck, did you assign it

1    to an adjuster in Montgomery?

2    A    I believe we did.  I can't remember.  I am sure we did.

3    Q    Would your adjuster go and get with the driver and say,

4    okay, what happened, and get a statement?

5    A    He wouldn't have taken a statement from him.

6    Q    Would not have taken a statement?

7    A    No.

8    Q    And what is your protocol for getting driver's

9    statements when they have a fatality wreck?

10   A    They are asked to call in to the accident hotline and

11   we take one over the telephone.

12   Q    Well, that is not really a statement.  A statement, you

13   know, what I am calling a statement is like the police

14   department statement?

15   A    To finish answering your question, if there is police

16   officers involved, then we will get a copy of that, also.

17   Q    All right.  Well, you are not saying that you waited

18   from February of '06 until a couple of months ago to get

19   the statement from the police department, are you?

20   A    We have had to wait longer from time to time.

21   Q    But you don't take a statement from your driver, or

22   tell me what all happened?

23   A    On the telephone, yes.

24   Q    That is just -- that is really Larry Hammond's version.

25   That is not the driver writing it down.  That is not a

1     verbatim statement from the driver, is it?

2          MR. OLIVER:  Object to the form.

3          THE WITNESS:  Larry is going to write down or

4     whoever takes the accident report is going to write down

5     whatever they are told.

6     Q    [BY MR. ALLRED]:  If the driver, if Mr. Johnson told

7      him I turned in front of this man, and I thought I had

8      time, but I really -- but it turned out I misjudged it and

9      he ran under my truck and was killed, is Larry going to

10    write that down?

11    A    Larry is going to write down whatever he is told, I am

12     assuming.

13    Q    But there is no statements anywhere, then, except the

14     Montgomery Police Department's statement from Theodore

15     Johnson; is that right?

16    A    I am not aware of any other written statements from

17     Mr. Johnson.

18    Q    Now, if he smoked a joint or smoked some marijuana on

19     Saturday night before John Britt is killed on Monday, if

20     you had known about that -- I am not saying you did back in

21     February of '06.

22    A    Okay.

23    Q    But if you had known about it, somehow it had come to

24     your attention, would you have permitted Johnson to drive a

25     USA Truck?

1    A    No, we wouldn't have.

2    Q    Why not?

3    A    Because he would have been possibly under the

4    influence.

5    Q    Okay.  We were talking about that marijuana test there

6    a little while ago, 964, and there is another document that

7    I couldn't read and I was going to try to get that.  It

8    looks like that is going to be the best copy that you all

9    would have, but was there -- do you know for a fact one way

10    or the other whether there was a follow-up test or a

11    confirmation test done on this?

12    A    I don't know.

13    Q    You just don't know?

14    A    No, I do not know.

15    Q    If it was done, should it have been kept in the same

16    file as 964, No. 964?

17    A    I assume it would be, but I don't know.  I don't know

18    whether there was one done or not.

19    Q    Okay.  Are you aware of any speed limit on USA trucks?

20    A    Any speed limit?

21    Q    Yes, sir.

22    A    Like a governor?

23    Q    Okay.  Is there?

24    A    Yes, there is a governor that limits the speed to

25    63 miles per hour.

1  Q    Okay.  And what about do you have any quota for the

2    drivers to drive a certain number of miles, a certain

3    number of hours per day or whatever?

4  A    Not that I'm aware of.

5  Q    What do you desire that they do?  What would you like

6    for them to do as far as their production is concerned?

7  A    I don't know that information.

8  Q    Do not?  Do you have anything to do with logbooks,

9    auditing logbooks and looking at them?

10  A    No, I don't.

11  Q    Have you looked at the logbooks in this case here

12    involving Mr. Johnson?

13  A    I think that I have glanced at them at one point, but

14    to go over them in detail, I have not.

15  Q    Do you think they are falsified or do you think they

16    are right?

17  A    I didn't look at them long enough to determine if they

18    were falsified or right.

19  Q    Well, if there is -- I think the number is 61 and

20    something percent that say exactly 60 miles an hour.  Would

21    that raise any question in your mind as to whether they are

22    accurate or not?

23        MR. OLIVER:  Object to the form.

24        THE WITNESS:  I don't know how you calculate that.

25  Q    [BY MR. ALLRED]:  With a calculator.  Like 660 miles in

1    11 hours, and it is going to be 60 miles an hour.  There is

2    other numbers.  But between documents 5 and 169, if there

3    is 78 days that show exactly 60 miles an hour, that is

4    61.4 percent of the logs, does that raise any question in

5    your mind as to whether they are --

6    A    You are saying that 61 percent -- 61.4 percent, is that

7    what you said, of the logs that you looked at?

8    Q    Right.

9    A    Were 60 miles per hour?

10   Q    Exactly 60 miles an hour.  I don't mean 60.1 or 57.4 or

11   anything like that, I mean it is just exactly 60 miles an

12   hour, do you think that is just a coincidence or do you

13   think they may be falsified?

14        MR. OLIVER:  Object to the form.

15        THE WITNESS:  It could be a coincidence.  I mean,

16   the majority of their miles are driven on the interstate.

17   I don't know if you are taking some stop and go traffic.

18   Q    [BY MR. ALLRED]:  That doesn't raise any red flag in

19   you mind to make you want to look any further into it?

20   A    Again, I am not a log expert.  I don't claim to be.

21   Q    Well, as a risk manager, one of the issues in this case

22   is whether or not USA Truck and your drivers kept their

23   logs up and done what they are supposed to do.

24   A    Okay.

25   Q    I mean, isn't that usually an issue in these kinds of

1   cases?

2   A    It is at times and at times it is not.

3   Q    Because it is a requirement on the Federal Motor

4   Carrier Safety Regulations to keep those logs and keep them

5   right; isn't that right?

6   A    Yes.

7   Q    And they are supposed to be correct, not just guesses

8   and estimates or anything like that.  They are supposed to

9   be correct; is that right?

10   A    That is correct.

11   Q    But in doing your work in the risk management

12   department, that doesn't raise any suspicion in your mind

13   that 61.4 percent of them are exactly 60 miles an hour,

14   they may be falsified?

15   A    If we want to spread them out and look over the table

16   or spread them out over the table and look over all of them

17   and try to calculate that or something, we can.

18   Q    You are welcome to calculate from here to Baghdad.

19   A    Again, I am not an expert, and I may come out

20   completely wrong.

21   Q    Okay.

22   A    Do you have a calculator?

23   Q    Yes.  When you look at these, I can tell you that we

24   have been through them and we found 78 days at exactly 60.

25   A    Okay.

1   Q     And then you got --

2   A     How many was there again?

3   Q     Seventy-eight.

4   A     This may take a while.

5   Q     So what you are saying is you are doubting my math?

6   A     Well, I am not going to doubt you.

7   Q     Let me ask you this, if you look at one of these, here

8    is one that is an example, and it is No. 82.  And you see

9    that has got 660 miles, and then you go down here to

10   driving and he has 11 hours.  That is how we did it on our

11   side of the case, that is how we figured that, and it comes

12   out to be -- we marked that one 60 miles an hour.

13  A     Okay.

14  Q     That is the correct way of doing that, isn't it, you

15   take the miles and you divide the hours into it and it

16   tells you how many miles an hour?

17  A     I guess it is.  I don't know.  That is definitely --

18  Q     I demonstrated earlier today that I am not into math,

19   but wouldn't that be how you would do it?

20  A     I assume it is, yes.

21  Q     I am just telling you, and I don't want to put you to

22   some task here, but I am just telling you we did that, and

23   here is another one, No. 86, do you see there, that is

24   450 miles and he says it took him 7.5 hours.  See what that

25   is?

1    A    Sixty.

2    Q    See, they come out just exactly 60 miles an hour.

3    A    Okay.

4    Q    You see that he doesn't have like 452 miles, and he

5    doesn't have 7.6 hours or anything like that or whatever.

6    He has 660 exactly, and he has 11.0 exactly, and what you

7    are saying is that doesn't raise any suspicion with you

8    whatsoever?

9         MR. OLIVER:  Object to the form.  Asked and

10    answered.

11   Q    [BY MR. ALLRED]:  Is that right?

12   A    Again, our safety department does the auditing of the

13    logs.  I am going to trust that they are doing that

14    appropriately.

15   Q    Well, they are supposed to do it appropriately, aren't

16    they?

17   A    I'm sorry, was that a question?

18   Q    Are they supposed to do it appropriately?

19   A    Yes.

20   Q    Do you know whether any of these logs were even looked

21    at by your safety department?

22   A    I do not know that.  Yes, every log, all of the logs

23    are looked at through the system, so, yes.

24   Q    How long has it been that way?

25   A    Since January of '06.

(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

49

1   Q      What about before then?

2   A      They were looked at -- they were looked at -- I think

3    it was like 90 percent of all of the logs were looked at.

4   Q      All right.  Thank you, sir.

5   A      You are welcome.

6                        (Off the record.)

7              MR. ALLRED:  We are about to leave Fort Smith at

8    this time.  It is about 3:15 central on the 2nd, and we are

9    going to Wilmington, Delaware to take the deposition of

10   Theodore Leverne Johnson, and if he is not going to be

11   there, I think you all ought to let me know before we go up

12   there.

13             MR. OLIVER:  You have asked that question.  It is

14   an appropriate question to ask.  And we have all

15   indications that he is going to be there.  I don't have any

16   indication that he is not, so I am going to make the trip,

17   too.  And we will plan, hope, and pray that he is there and

18   you can get his deposition taken.  I don't have any

19   indication at this point in time that he is not going to be

20   there.  How about that?  Is that better?

21             MR. ALLRED:  The deposition has ended.

22                 (Witness excused at 3:15 p.m.)

23                      * * * * *

24

25

```
 1                        CORRECTION PAGE

 2     PAGE      LINE       DELETION, ADDITION or CHANGE AND REASON:

 3     _____

 4     _____

 5     _____

 6     _____

 7     _____

 8     _____

 9     _____

10     _____

11     _____

12     _____

13     _____

14     _____

15     _____

16     _____

17     _____

18     _____

19     _____

20     _____

21     _____

22     _____

23     _____

24     _____

25     _____
```

1                        SIGNATURE PAGE

2

3        Now, on the _____ day of _____, 2007, I

4    have had submitted to me for examination a transcription

5    of testimony given by me under deposition; and after

6    having read same, I hereby certify that the foregoing

7    transcription is true and correct, with the exception

8    of the corrections as noted, if any.

9

10

11                                    _____

                                     ERIC MCCONNELL

12

13

14

15

16

17

18

19

20

21

22

23

24

25

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

52

```
 1                        CERTIFICATE
 2   STATE OF ARKANSAS      )
 3   COUNTY OF SEBASTIAN    ) ss
 4
         I, Veronica Lane, a Certified Court Reporter, a notary
 5   public in and for the aforesaid county and state, do hereby
     certify that the witness, ERIC MCCONNELL, was duly sworn by
 6   me prior to the taking of testimony as to the truth of the
     matters attested to and contained therein; that the
 7   testimony of said witness was taken by me stenographically
     and was thereafter reduced to typewritten form by me or
 8   under my direction and supervision; that the foregoing
     transcript is a true and accurate record of the testimony
 9   given to the best of my understanding and ability.
10       I FURTHER CERTIFY that I am neither counsel for,
     related to, nor employed by any of the parties to the
11   action in which this proceeding was taken; and, further,
     that I am not a relative or employee of any attorney or
12   counsel employed by the parties hereto, nor financially
     interested, or otherwise, in the outcome of this action;
13   and that I have no contract with the parties, attorneys, or
     persons with an interest in the action that affects or has
14   a substantial tendency to affect impartiality, that
     requires me to relinquish control of an original deposition
15   transcript or copies of the transcript before it is
     certified and delivered to the custodial attorney, or that
16   requires me to provide any service not made available to
     all parties to the action.
17
18                              _____
                                VERONICA LANE, CCR
19                              Certified Court Reporter
                                and Notary Public
20                              State Certificate No. 462
21   My Commission Expires:
     June 28, 2015
22
23
24
25
```

(479) 471-0665   Veronica R. Lane, CCR veronicalane@cox.net

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


LANDRIA BRITT, as Administratrix          Plaintiff
of the Estate of JOHN W. BRITT,
Deceased


    vs.          Case No. 2:06cv868-ID-CSC


USA TRUCK, INC.; THEODORE LEVERNE          Defendants
JOHNSON; et al.

_____


DEPOSITION OF MICHAEL R. WEINDEL

TAKEN ON THE 2ND OF NOVEMBER, 2007

9:00 A.M.


_____

APPEARANCES:                    ON BEHALF OF:
Mr. David E. Allred             Plaintiff
Attorney at Law
7030 Fain Park Drive, Suite 9
P.O. Box 241594
Montgomery, AL  36124-1594
Mr. Thomas L. Oliver, II        Defendants
CARR ALLISON
100 Vestavia Parkway
Birmingham, AL  35216


Also present:
Mr. Claude Lochner


Veronica R. Lane, CCR
1304 Lovers Lane, Van Buren, Arkansas 72956
(479) 471-0665

(479) 471-0665     Veronica R. Lane, CCR veronicalane@cox.net

2

1        Deposition of MICHAEL R. WEINDEL was taken on November

2     2, 2007 at the Law Offices of Smith, Maurras, Cohen, Redd &

3     Horan, 1120 Garrison Avenue, Suite 200, City of Fort Smith,

4     County of Sebastian, State of Arkansas.

5                           STIPULATION

6        IT IS HEREBY STIPULATED AND AGREED by and between

7     counsel for the parties hereto that the deposition

8     testimony of MICHAEL R. WEINDEL may be taken before

9     Veronica R. Lane, a Certified Court Reporter and Notary

10    Public, at the above captioned time and place.

11       Said deposition is taken pursuant to Rule 32(a)(3),

12    Arkansas Rules of Civil Procedure, (Rule 30, Federal Rules

13    of Civil Procedure), with the specific understanding that

14    any objections as to relevance, immateriality, or

15    incompetency are reserved and may be made at the time the

16    deposition is first offered into evidence.  Objections as

17    to form of questions are to be noted at the time of taking

18    of the deposition.  All formalities with reference to

19    taking, transcribing, forwarding and filing of said

20    deposition are waived.

21

22    *REPORTER'S NOTE:  "Uh-huh" denotes an affirmative response;

23     "Huh-uh" denotes a negative response.

24

25

 1      MICHAEL R. WEINDEL, the witness herein named, having

 2    been first duly sworn, testified under oath as follows:

 3                          DIRECT EXAMINATION

 4    BY MR. ALLRED:

 5    Q    Tell us your full name, please, sir.

 6    A    Michael Ray Weindel, Jr.

 7    Q    All right.  And where do you live?

 8    A    Fort Smith, Arkansas.

 9    Q    Where do you work, Mr. Weindel?

10    A    USA Truck, Incorporated.

11    Q    And what do you do there?

12    A    My job title is vice-president of human resources,

13     recruiting and training.

14    Q    How long have you held that position?

15    A    Three years, I believe.

16    Q    What did you do before that position?

17    A    I was director of human resources, recruiting and

18     training.

19    Q    At USA Truck?

20    A    Yes, at USA Truck.

21    Q    And how long have you been with USA Truck all total?

22    A    A little over 16 years.

23    Q    What did you start out as?

24    A    August of 1991, I started out as management trainee.

25    Q    Tell me about your educational background.  Did you

Case 2:06-cv-00868-TMH-CSC     Document 40-12     Filed 11/13/2007     Page 4 of 103
(479) 471-0665     Veronica R. Lane, CCR veronicalane@cox.net

4

1    graduate from college?

2    A    I did.

3    Q    What is your degree in?

4    A    I have a BA just in business, marketing emphasis.

5    Q    All right.  Where is it from?

6    A    University of Arkansas at Little Rock.

7    Q    You are a Razorback.

8    A    I am a Razorback fan, but the University of Little Rock

9     is in Little Rock, and the University of Arkansas where the

10    Razorbacks are is in Fayetteville.

11   Q    Oh, is that right?  I didn't know there was difference.

12        Do you have any postgraduate training?

13   A    I have received my Associate in claims, my Associate in

14    risk management, and my Professional in human resources,

15    certificates.

16   Q    Where did you get those?

17   A    The Professional human resources is essentially a

18    program offered through the National Society of Human

19    Resource Management.  There is actually -- I don't know the

20    name of the institution that actually grades that, but it

21    is essentially a National Society for Human Resources.

22   Q    Are both of those correspondence type courses?

23   A    They were a self study and exam, by exam.

24   Q    Okay.  Do you have a CDL?

25   A    No, sir.

1    Q    Have you ever had one?

2    A    I never had a CDL.  I have held a permit.

3    Q    Okay.  What is the difference between a CDL and a

4    permit?

5    A    A permit is similar to a driver's license permit in

6    which you can drive in a commercial vehicle, but you must

7    have a licensed commercial vehicle person with you.

8    Q    Are you the head man in charge of hiring and firing at

9    USA Truck?

10   A    I am responsible for the human resource activities at

11   USA Truck, yes, sir.

12   Q    And would there be anybody that is higher up in the

13   hierarchy for that human resources function other than you?

14   A    No, sir.

15   Q    I failed to ask you when we started this deposition,

16   but we are taking this in the Middle District of Alabama

17   and the judges want us to ask you if you want to waive your

18   signature or if you want to read and sign it or if you want

19   to waive reading and signing.  They would like for you to

20   state that on the record.  What do you want to do?

21        THE WITNESS:  Does it matter to you?

22        MR. OLIVER:  It doesn't matter to me.  Whatever

23   you want to do.

24        THE WITNESS:  Waive.

25   Q    [BY MR. ALLRED]:  Okay.  With regard to USA Truck, and

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 6 of 103
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

6

1    you have worked for them for 16 years, that is a publicly

2    traded company; is that right?

3    A    It has been since 1992.

4    Q    Okay.  And before then, what was it, ABF?  Did you have

5    an affiliation?

6    A    Prior to 1992 it was a privately held company, from

7    December 31st of 1988 until the spring of 1992 privately

8    held.  Prior to December 31, 1988, it was a fully owned

9    subsidiary of Arkansas Best Corporation.

10   Q    Is that what ABF -- when you see ABF Freight Systems

11   running up and down the road, is that Arkansas Best

12   Freight?

13   A    Arkansas Best Corporation is the holding company, and

14   Arkansas Best Corporation would have been the owner of USA

15   Truck.  But Arkansas Best Freightways, the company that you

16   are referring, would have been the largest known company

17   out of that holding.

18   Q    Where is ABF or Arkansas Best, whatever the name of it

19   was, where is it headquartered?

20   A    Fort Smith, Arkansas.

21   Q    Is it still in existence?

22   A    Yes, sir.

23   Q    What is its affiliation, if anything, with USA Truck?

24        MR. OLIVER:  You mean now?

25        MR. ALLRED:  Now.

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 7 of 103
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

7

1          THE WITNESS:  Currently there is no affiliation.

2    Q    [BY MR. ALLRED]:  None whatsoever?

3    A    We do have agreements with Arkansas Best Freightways,

4     facilities for renting spaces.

5    Q    Just some kind of business arrangement, but not any

6     ownership arrangement?

7    A    Correct.

8    Q    How many drivers does USA Truck have today?

9    A    Approximately 2,800.

10   Q    How many did they have in February of '06?

11   A    Between 2,500 and 2,800.

12   Q    How many trucks does USA have on the road?  And the

13    same question today and in February of '06.

14   A    We own a little under 2,600 tractors, and we have an

15    additional 50, approximately 50 owner-operator tractors.

16    And in 2006, it would have been between 2,400 and 2,550 on

17    tractors owned by the company, and probably 20 or less

18    owner-operators.

19   Q    All right, sir.  How many terminals does USA Truck

20    have?

21   A    I believe the number is eight.

22   Q    Eight terminals.  Is there any part of the country in

23    the continental United States that you all don't run in?

24   A    We are a 48 state and Canada authorized carrier, but we

25    do not necessarily run in all 48 states all the time.

1  Q    Are there any particular states that you do not do

2   regular hauling in?

3  A    I believe to answer your question, trying to understand

4   it would be we have the authority to run in all 48 states,

5   so we can run in all 48 states.

6  Q    Do you, though?  Are there any that you just don't haul

7   in that necessarily come to mind?

8  A    No, sir, none that come to mind that we would not haul

9   in.

10  Q    How many miles a year does USA drive?  USA Truck

11   drivers, how many miles on the average do they drive a

12   year?

13  A    I don't know if I could actually answer that today.

14  Q    Let me ask you this, would a driver run about 125,

15   150,000 miles a year?  Would that be an average?

16  A    A single driver?

17  Q    Right.

18  A    One person could run between 120 and 140.  It is

19   possible to run between 120- to 140,000 miles a year.

20   Obviously individuals, you know, would vary, but that is a

21   possibility, yes, sir.

22  Q    How many fatality wrecks was USA involved in, say, in

23   the year 2005, in the year 2006, and so forth, and 2007?

24  A    I do not have that answer, sir.

25  Q    Who would have that information?

1    A    A representative from the safety area of the company.

2    Q    We are going to talk to Casey Hansen in a little while.

3    Do you think he ought to know that?

4    A    I think there is a possibility that he would know that.

5    He would be more familiar with fatality accidents

6    count-wise than I would, but I do not know if he knows.

7    Q    Let me ask you this, between these three choices, who

8    do you think most likely to know it:  Casey Hansen, Eric

9    McConnell and Claude Lochner?

10   A    I would believe that Eric McConnell would know that

11   answer.

12   Q    Okay.  Would the same answer hold true for preventable

13   fatalities or drug-related fatalities?

14   A    I would believe that Eric would know that answer out of

15   those choices.

16   Q    Is USA Truck, are they subject to the Federal Motor

17   Carrier Safety Regulations?

18   A    Yes.

19   Q    As being a truck driver, I think the phrase they use is

20   safety conscious function.  As a truck driver, does he

21   perform in a safety conscious -- if I have the term right,

22   does he perform in a safety conscious function?

23   A    Yes.

24   Q    Okay.  Is there somebody at USA Truck whose only job it

25   is is to see that USA complies with the Federal Motor

1    Carrier Safety Regulations?

2    A    There are several functions of regulations, and there

3    is a process that I am responsible for in the hiring

4    process, but once the hiring process is complete, then the

5    safety department is responsible for the continuation of

6    the safety.

7    Q    Is there anybody that is like, okay, here is Sam Smith,

8    just picking a name, here is Sam Smith and he is the

9    Federal Motor Carrier Safety Regulations' compliance

10    officer or something like that.  Do you have anybody like

11    that?

12    A    We have had a director of safety.

13    Q    Do you have one whose title is the Federal Motor

14    Carrier Safety Regulations' compliance officer?

15    A    No, sir.

16    Q    And then you have had Mike Neal.  Did he used to work

17    for USA Truck?

18    A    Yes, sir, he did.

19    Q    And what was his title?

20    A    He was director of safety.

21    Q    When did you last talk to him?

22    A    Probably around the beginning of August or the middle

23    to end of July.

24    Q    What is he doing now?

25    A    I do not -- I have not spoke with him since he left the

1    company, so I do not have that answer.

2    Q    When did he leave the company?

3    A    I said my answer was the beginning of August.  It may

4    have been the beginning of September.

5    Q    Of '07?

6    A    Yes, sir.  I would have spoke to him prior to his

7    leaving, you know, within maybe a couple of days.

8    Q    And what was that conversation about?

9    A    Oh, it would have been at passing, sir.

10   Q    Just, hello, see you later, something like that?

11   A    (The witness nods his head in the affirmative.)

12   Q    Have you ever talked to Mike Neal about the Theodore

13   Johnson fatality wreck or about Theodore Johnson?

14   A    I have not.

15   Q    Okay.  Do you know why Mike Neal left the company?

16   A    I was not present when he resigned from the employment,

17   so I do not know exactly what was said, but I am under the

18   impression he left to pursue a career outside of USA Truck.

19   Q    Who at the company would know the particulars about why

20   Mike Neal left USA Truck?

21   A    Well, obviously Mike Neal, but he is not with the

22   company.  I believe that that conversation may have taken

23   place with Rodney Mills.

24   Q    Rodney who?

25   A    Mills.

1    Q    What does Rodney Mills do?

2    A    Rodney Mills is the general counsel and the

3    vice-president of safety.

4    Q    Why do you say that Rodney Mills would know why Mike

5    Neal left?

6    A    It is my understanding that the conversation happened

7    between Mike Neal and Rodney Mills.

8    Q    Did Mike Neal resign or was he terminated?

9    A    I believe that Mike Neal and Rodney had a conversation,

10    and in that conversation I believe Mike Neal resigned.

11    Q    Do you know what that conversation was about?

12    A    No, sir.

13    Q    How long had Mike Neal been there, do you think?

14    A    Mike Neal began his employment in the beginning of

15    2003.

16    Q    And then he stayed until August or September of '07?

17    A    Correct.

18    Q    Was he in the -- as far as the hierarchy, corporate

19    hierarchy goes, if you are the human resources director and

20    he is the safety director, were either of you all in a

21    supervisory position over the other?

22    A    No, sir.

23    Q    Were you all contemporaries in the management

24    hierarchy?

25    A    In 2003, we would have shared a similar title, when I

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 13 of 103
(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

13

1    was the director of human resources, recruiting and

2    training, but essentially whenever I received the title

3    vice-president of human resources, recruiting and training,

4    I at that point in time would have been an executive

5    officer.

6    Q    All right.  Now, who is the safety director now, today?

7    A    Today, that position has not been filled since the

8    resignation of Mike Neal.

9    Q    Do you have any understanding of why Mike Neal -- you

10   say he met with Rodney Mills, they had a meeting, and then

11   after that meeting your understanding is that Mike Neal

12   resigned?

13   A    Correct.

14   Q    Do you have any understanding of why he resigned?

15   A    Again, I believe that Mike Neal chose to pursue

16   interests outside of USA Truck.

17   Q    Do you know what those interests are?

18   A    No, sir.

19   Q    Do you know whether if he hadn't resigned if he would

20   have been terminated?

21   A    I was not privy to that conversation going into it.

22   Q    Were you a corporate officer in September of '07?

23   A    Yes.

24   Q    Was there ever any discussion among or between you and

25   anybody else with regard to Mike Neal and the continuation

1    of his relationship with USA Truck?

2    A    No, not as far as the discussing of that meeting or

3    what his continuation was going to be, no.

4    Q    Well, I don't want to limit it and leave anything out,

5    but did you have any conversation with anybody in your

6    function as a corporate officer about any complaint,

7    criticism, shortcoming or anything to do with Mike Neal

8    that may have had an effect of his employment relationship

9    with USA Truck?

10              MR. OLIVER:  Object to the form.

11              THE WITNESS:  I did not have a specific

12    conversation in regards to the termination of Mike Neal as

13    it was in the process.  Or as the conversation with Mike

14    and Rodney went, I was not involved in anything leading up

15    to that.  I mean, it is vaguely, broadly, you know, I can

16    get into conversations about several employees at different

17    times with different officers of the company.  But as far

18    as leading up to the resignation of Mike, at this point in

19    time I did not have any specific dealings with anything

20    leading up to that as far as that conversation.

21    Q    I understand your position, but I don't want to limit

22    it to that.  I want to know if you ever had any

23    conversations with anybody in your function as a corporate

24    officer about any complaint, criticism or shortcoming in

25    Mike Neal's work?

1   A    I have had conversations with individuals about Mike

2    Neal at times.

3   Q    Did that have something to do with any complaint of

4    criticism or shortcoming in his work?

5   A    It had more to do with his personality as opposed to

6    his work ability.

7   Q    And what about his personality?

8   A    Just his communication skills amongst other individuals

9    within the company.

10  Q    Did he have good communication skills with others in

11   the company or bad or mediocre from your perspective as a

12   corporate officer?

13  A    They were fine, but as anybody, they could always --

14   everybody can have an opinion, but they were not poor.

15  Q    Let me ask you this.  I asked you a while ago who can

16   tell me how come Mike Neal is not there anymore, and you

17   told me Rodney Mills.  He is apparently a lawyer if he is

18   general counsel.  And I suspect if I sat him down to take

19   his deposition he is going to say, well, that is a

20   privileged conversation.  Lawyers are bad about doing that.

21   So if I wanted to find out from somebody, hey, I just want

22   to know how come Mike Neal left USA Truck, want some

23   details about that, and if I wasn't going to ask Rodney

24   Mills because he is just going to say, well, that is

25   attorney-client privileged information, whatever, then who

1    else could I ask?

2    A    I think the answer to that question, you would have to

3    ask Mike Neal.

4    Q    How do you get up with him?

5    A    It is my understanding that he lives in the Fort Smith

6    area.

7    Q    As the vice-president in charge of human resources,

8    either you or somebody in your department would have some

9    information on; for example, at the end of this year you

10   all are going to have send him a W-2 and that kind of

11   thing.

12   A    Correct.

13   Q    And you all have to send him correspondence about his

14   COBRA and that kind of thing from leaving employment at USA

15   Truck; is that right?

16   A    That is correct.

17   Q    And if you just need to get in touch with him, there is

18   somebody in your office that knows how to find Mike Neal;

19   is that right?

20   A    There is someone in our office who can provide you the

21   information that you described on how we will make those

22   contacts.

23   Q    Who is that person?

24   A    That person is just a lady by the name of Misty Kleck.

25   Q    Misty Kleck?

1    A    Right.

2    Q    Misty Kleck.  Like if I said Mr. Weindel, during the

3    break I want you to find out how to contact Mike Neal, you

4    could call Wendy Kleck and get that information; is that

5    right?

6            MR. OLIVER:  Misty Kleck.

7    Q    [BY MR. ALLRED]:  Misty?  Did I say Wendy?

8    A    That is okay, but Misty Kleck, yes, sir.  The answer to

9    your question is she could tell me the last known

10    information that we have.

11    Q    All right.  But he still is around as far as you know?

12    A    I have not had contact with Mike since his employment

13    terminated.

14    Q    About a month ago?

15    A    Or so, month or two.  But I have -- I have not heard

16    that he has left the area.

17    Q    You told me a while ago, besides Rodney Mills, if I

18    wanted to find out how come Mike Neal left, I need to ask

19    him.  Then I started asking you some questions about how to

20    find him.  But what about somebody with USA Truck, would

21    there be somebody besides a lawyer out there that could be

22    asked about why he left?

23    A    Well, I mean, the conversation took place between the

24    two of those individuals.

25    Q    I don't want to limit it to the conversation, but I

1    will bet you a cold Coca-Cola this, I bet you every

2    secretary out there knows how come Mike Neal left.  And I

3    think they knew it within two minutes of when he left that

4    building.  I am just asking you who is somebody besides

5    this lawyer, Rodney Mills, that I can ask?  You are the

6    head of human resources.  You say you don't know; I need to

7    ask him.  Who is somebody else out there at USA Truck who

8    could answer that question for me?

9        MR. OLIVER:  Object to the form.

10       THE WITNESS:  Well, I mean, as far as the details

11   of the termination, I have given you that answer.  As far

12   as if anybody else has an opinion, then, I mean, there are

13   several people that work at USA Truck and they all may have

14   an opinion.

15   Q   [BY MR. ALLRED]:  I am not really looking for people's

16   opinions, and I differ with you.  You say you have given me

17   that information.  You have not.  You said he met with

18   Rodney Mills.  You weren't in the meeting, so you don't

19   know what was said.

20   A   Correct.

21   Q   Then he came out and all of a sudden he has decided to

22   pursue other things.  But you don't really know -- you are

23   telling me you don't know why he decided to pursue other

24   things, right?

25   A   I am telling you I was not in that conversation.

1   Q    And you don't know why he decided to pursue other

2    things, right?

3   A    I do not know the conversation that took place; that is

4    correct.

5   Q    So are you saying the only person at USA Truck who has

6    any knowledge about why Mike Neal all of a sudden decides

7    to go do something else is just this Rodney Mills fellow?

8   A    I would say that Rodney Mills is the individual that

9    had the conversation and would have the information of why

10   Mike Neal left.

11   Q    Is there anybody else who would know about the reasons

12    for Mike Neal leaving?

13   A    I do not believe that there is anyone that would know

14    the specific reasons for Mike Neal leaving.

15   Q    Did Rodney Mills every share with you as a

16    vice-president of human resources what the problem was that

17    he was talking to him about?

18   A    Rodney informed me that he would be having a

19    conversation with Mike, at which time they had a

20    conversation, and when the conversation ended, Mike just

21    ended up resigning.  It was my understanding that they were

22    talking about Mike Neal and the direction things were

23    headed, and Mike chose to leave the company.

24   Q    Was there a problem with Mike Neal's performance about

25    the safety record of USA Truck?  Is that what the problem

```
 1   was?

 2   A    I do not believe that that was the problem.

 3   Q    Well, from your perspective as a corporate officer of

 4   USA Truck, under Mike Neal's leadership as the director of

 5   safety, did the company have a good safety record, a bad

 6   safety record, or medium -- mediocre safety record or

 7   however you want to describe it?

 8            MR. OLIVER:  Object to the form.

 9            THE WITNESS:  I believe that we had a good safety

10   record under Mike Neal.

11   Q    [BY MR. ALLRED]:  Why do you say that?

12   A    I mean, I say it because that would be my opinion of

13   what our safety record is at USA Truck based off --

14   Q    Well, what were the issues or the problems, whatever

15   you want to call them, about the direction of things were

16   going that led up to Mike Neal's leaving?  What kind of

17   things were going in what direction that you are talking

18   about?

19   A    I don't understand the question.  Maybe if I can have

20   you ask it one more time so I can hear it again.

21   Q    You told me the conversation with Rodney Mills

22   concerning the direction of how things were going, and he

23   is the director of safety.  And then based on that

24   conversation, your understanding is that Mike Neal decided,

25   well, he is just going to do other things.  He is not going
```

1    to work there anymore.  Well, what things are you talking

2    about and what direction are you saying they were going in?

3    A    My opinion is that there was a personality conflict.

4    Q    Between who?

5    A    Rodney Mills and Mike Neal.

6    Q    They just didn't like each other?

7         MR. OLIVER:  Object to the form.

8         THE WITNESS:  I don't know if they liked each

9    other or not.  I think there was a personality conflict.

10   Q    [BY MR. ALLRED]:  Was that situation between Rodney

11   Mills and Mike Neal, was that getting worse as time went

12   on?

13   A    I don't know that I would say that that was the case,

14   but I think if there was just a -- as I said, I think there

15   was a personality conflict, and as a result of the meeting,

16   Mike chose to pursue interests elsewhere.

17   Q    The meeting that Mike Neal had with Rodney Mills, he is

18   the vice-president of safety, where did Rodney Mills fit in

19   the corporate hierarchy with regard to Mike Neal?  Was he

20   -- well, Rodney Mills is a corporate officer like you,

21   correct?

22   A    That is correct.

23   Q    All right.  And was he a supervisor of Mike Neal?

24   A    Yes.

25   Q    Okay.  So in the meeting with Mike Neal, Rodney Mills

1    is meeting with him in his function as vice-president of

2    safety is your understanding; is that right?

3    A    He met with him as the fact that Mike reported to him.

4    Q    In the safety department?

5    A    Well, in safety.  I mean, Rodney's job encompasses

6    safety and a few other areas, including general counsel,

7    but he was meeting with him as the director.

8    Q    Before we leave today, we will be taking a break, can

9    you call this lady, Misty Kleck, and get that information

10   for me so I will have it when I leave Fort Smith today and

11   find out how to contact Mike Neal?

12   A    Such as address?

13   Q    Such as any kind of contact?

14   A    I can do that.

15   Q    Okay.  What are the qualifications or the requirements

16   for a driver with USA Truck?

17   A    Well, they obviously have to possess a commercial

18   driver's license.  They have to live in a geographical area

19   in which we do a majority of our operations.  They have to

20   be able to pass a DOT physical and a DOT preemployment drug

21   screen.  Then they become in our system to maintain their

22   DOT compliance status.  They can either be an experienced

23   driver in which they have previous over-the-road experience

24   and they will go out or they could be a student driver,

25   which means they would have come out of a truck driving

1    school, at which point in time they would go through a

2    finishing program at USA Truck before they were assigned an

3    individual power unit, tractor for themselves.

4    Q    Anything else?

5    A    That is the generalization of it.  I mean, there is

6    specifics, yes.  I mean, we will verify their present

7    employment and verify the past driving record in the

8    process.

9    Q    All right.  Can they have more than one driver's

10   license?

11   A    Excuse me?

12   Q    Can they have more than one driver's license?

13   A    They need to have one driver's license.

14   Q    Do you have any drivers for USA Truck who have driver's

15   licenses from more than one state?

16   A    I do not believe so.

17   Q    Have you checked to see?

18   A    I mean, I have not run a check to see on all of it.

19   There are occasions when something will show that they

20   possess more than one and they will have to surrender one.

21   Q    And what do you do when you find out that they have

22   more than one?

23   A    They would have to surrender a driver's license, you

24   know.

25   Q    But you don't have any system in place to see how many

1    they have or to verify or check that they have more than

2    one; is that right?

3            MR. OLIVER:  Object to the form.

4            THE WITNESS:  That is ran.

5    Q    [BY MR. ALLRED]:  That is ran?

6    A    Right.

7    Q    What is the geographical area that you are talking

8    about that you want your drivers to be in?

9    A    It is essentially east of Oklahoma City, Dallas, San

10   Antonio and Laredo, North of Orlando, south of New England,

11   south of Detroit, kind of a big -- if you can imagine that

12   as a big, huge circle, essentially that area.

13   Q    Okay.  And you say pass a DOT physical.  And then you

14   said a drug screen.  What are you talking about there?

15   A    Preemployment urine drug screen that meets DOT

16   standards.

17   Q    All right.  And what are the cut off levels for the

18   preemployment drug screen?

19   A    I do not know that specifically.

20   Q    Okay.  What is USA Truck's drug tolerance policy for

21   over-the-road truck drivers?

22   A    Well, I mean they have to be DOT compliant, which is

23   the fact they cannot, in fact, have failed the

24   preemployment -- in this case at the hiring cannot fail the

25   preemployment drug screen.

1   Q    Let's say they pass the preemployment drug screen.

2   Then what is USA Truck's drug tolerance policy after you

3   hire them?

4   A    They fall into a random drug sampling that is dictated

5   by the Department of Transportation.  Go ahead.  I think I

6   answered your question.

7   Q    Okay.  When you say they fall into a drug sampling that

8   is dictated by the Department of Transportation, what is

9   USA Truck's policy about drug screens, drug testing or drug

10   tolerance after you have hired a driver?

11   A    The policy is to continue to comply with the Department

12   of Transportation regulations, which all of these drivers

13   fall into this pool, I guess, for lack of a better word

14   they are called, in which they are randomly selected to

15   take a urinalysis, continued drug screens.

16       I believe there is also a random drug or alcohol

17   screening in the process.  And they are required to submit

18   to the screening whenever they are randomly chosen.  And

19   they must submit the sample upon that.

20   Q    How often will drivers -- there is a random drug

21   sampling policy at USA Truck; is that right?

22   A    Yes.

23   Q    Okay.  How often were drivers tested in 2005, and I

24   will ask you in 2006 while you are thinking?

25   A    That is fine.  My understanding how the program works

1    is that 25 percent of the work force is randomly drug

2    screened.

3    Q    Do you know if that was done in 2005 and in 2006?

4    A    I believe it was done in 2005 and 2006, yes.

5    Q    Who would have those records?  Who is the custodian of

6    the results of those records?

7    A    That would fall under the safety area.

8    Q    That was under Mike Neal's supervision?

9    A    It was, yes, sir.

10   Q    Was Mike Neal every criticized about the drug testing

11   policy and any drug testing issue?

12   A    No, sir.

13   Q    If you test drivers regardless of how you figure out

14   who you are going to test, whether it is random or

15   whatever, what is USA Truck's policy with regard to if you

16   find drugs on a driver, what do you do?

17   A    What we do is if they fail a drug screen, then their

18   employment is -- on preemployment, they are not continued

19   with through the process.  And if they are a current

20   employee, they would be terminated.

21   Q    They would be fired?

22   A    Correct.

23   Q    Why does USA Truck not permit drivers to operate these

24   trucks if they are using drugs?

25   A    The simple answer is it is DOT compliance.

1   Q    Aside from that, just aside that somebody at some

2    federal outfit made a rule, what is your understanding why

3    people shouldn't drive trucks if they are taking drugs?

4   A    Well, I mean, the simple answer is compliance issues,

5    so you are -- the driver has to be DOT compliant, and that

6    is part of the compliance.  I mean, it is cut and dry, so

7    anything else is really irrelevant because we are required

8    to do the drug screens.  They are required to be clean by

9    the federal government and we comply with those

10   regulations.

11  Q    Do you know whether taking drugs can impair one of your

12   18-wheeler drivers?

13  A    Personally, I am under the impression that taking drugs

14   can impair people's ability.

15  Q    Including your drivers?

16  A    It would include anybody.

17  Q    All right.  Would it be a dangerous activity to operate

18   one of your trucks if you are taking drugs?

19          MR. OLIVER:  Object to the form.

20          THE WITNESS:  It could be.

21  Q    [BY MR. ALLRED]:  Do you have any particular lab that

22   you use for your drug screening, either preemployment or

23   post accident?

24  A    Yes, sir.

25  Q    Do you handle that in your department, in the human

1    resources department?

2    A    No, sir.  Not really.

3    Q    Who at USA truck handles the drug issues?

4    A    Again, that falls under the safety area.  And as far as

5    compliance is concerned, that is a very confidential

6    record, so it is kept within just a little safety area.

7    Q    Let me ask you this since Mike Neal is not there, there

8    is somebody out there that is handling that this morning,

9    isn't there?

10    A    Yes, sir, there is.

11    Q    Who is that?

12    A    I specifically cannot tell you, but you mentioned a

13    name earlier, Casey Hansen would have the knowledge of who

14    that individual is.

15    Q    He would know who is handling the drug testing issues

16    or how the labs are selected and what relationship that you

17    have with the labs; is that right?

18    A    He would know who is handling that.  He should know the

19    lab.

20    Q    Okay.  When you hire drivers, do you have some training

21    that you send them to, and specifically I am talking about

22    Mr. Johnson.  When he was hired, I think he was hired in

23    August of 2005, and he went and did some schooling at USA

24    Truck.  Have you looked at his file before this deposition?

25    A    I have looked at his file, yes, sir.

1   Q    Is that what you found from the file; that he was hired

2    around about August the 1st of '05?

3   A    On or about August the 1st of '05, yes, sir.

4   Q    And he went to some kind of school, and I forget the

5    name of it in there, but what is the name of that school?

6    American -- what is the name of it?

7   A    Prior to coming to USA Truck, yes, sir, I believe it

8    was approximately July of '05, American Truck Training.

9   Q    American what?

10   A    Truck Training.

11   Q    Does USA Truck have any ownership or other interest

12    with American Truck Training?

13   A    We have no ownership, just a business interest as they

14    supply individuals to go through a truck driver training in

15    which we hire some of those individuals.

16   Q    All right.  And did Johnson, did Mr. Johnson pay for

17    his own training or did USA Truck pay for that?

18   A    As I looked through the file, it appeared that he had a

19    note, too.

20   Q    That is what I wanted to ask about, what is that note

21    about?

22   A    It appeared that he had a note to repay his training.

23   Q    How did that work?  He starts work on August 1st of

24    '05, but yet there is a note in there that he signed some

25    agreement that if he doesn't stay a certain amount of time,

1    he has to pay a certain amount is one of the documents.

2    A    Correct.

3    Q    How did that work?

4    A    He would be eligible in addition to normal pay --

5    Q    Okay.

6    A    -- for what we call a tuition reimbursement, which

7    essentially the company will pay up to an -- up to thirty

8    dollars a week, in additional pay more or less, towards

9    paying off any outstanding loan.

10        There are also times in which the individual has to

11    contribute more than that amount.  If their note called for

12    forty dollars a week, then they would have to pay ten

13    dollars out of their own paycheck in addition to that.  And

14    that money would be submitted on a monthly basis to the

15    lender, and there are several lenders.  It is not just one

16    lender that had this program.  In the course of this

17    situation at eight months, he would have paid back all that

18    he had owed, essentially.

19    Q    He had paid it back?

20    A    No, sir.  The eight months that you asked about earlier

21    would have been the time frame it would have taken for him

22    to fulfill his obligation for his note.

23    Q    All right.  So he goes to school or he went to school

24    before he started his employment on August 1st of '05?

25    A    Correct.

(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

31

1    Q    All right.  And then who paid the school, USA or did he

2    pay the school?

3    A    We would make the check available.  The part of the

4    payment would come from the tuition reimbursement, which is

5    essentially additional pay.  Some of it may have come out

6    of his own personal paycheck which we may have held out of

7    his paycheck.  We mail the check once a month on his

8    behalf.

9    Q    Is that his money that is being paid to the tuition

10   people?

11            MR. OLIVER:  Object to the form.

12   Q    [BY MR. ALLRED]:  Or USA's money?

13   A    Well, let me try to say it again.  He was eligible upon

14   hire for pay, obviously, of course, has some sort of

15   compensation.  As part of his compensation package, he was

16   eligible for tuition reimbursement, and that is limited to

17   thirty dollars per week in most cases.  Sometimes

18   twenty-five dollars a week, but I believe it was thirty

19   dollars a week, probably, for this gentleman.  Anything

20   above that additional compensation that would be paid

21   towards tuition reimbursement could have been payroll

22   deducted out of his settlement, also, and the check would

23   have been paid once a month on his behalf.

24   Q    All right.  You said you have read his file?

25   A    I have looked through his file.

1  Q    Okay.  Let me refer you to Document 191.  I want to ask

2   you some questions about that.  Do you have that one?

3  A    Well, I have one.  I don't see a number.

4         MR. OLIVER:  Can we take a quick break?

5         MR. ALLRED:  Sure.

6                    (Off the record.)

7  Q    [BY MR. ALLRED]:  We were talking about Document 191 on

8   there.  And that is a USA form; is that right?

9  A    Yes, it is a USA form.

10  Q    And that is the one that Mr. Johnson was involved in

11   this wreck; is that right?

12  A    That is correct.

13  Q    And what are the circumstances about filling something

14   like that out?  Is that absence or a status change report?

15  A    It is an absence/status change, correct.

16  Q    And on there it has the comment, CDL suspended.  What

17   does that mean?

18  A    Well, as you go through the form, it has a place for

19   employee name, which it does have Theodore Johnson.  The

20   reason it says for absence, so essentially this was saying

21   that his status had changed.  And it says, other, and then

22   there is a comment that says, CDL suspended, which in turn

23   would mean that his current license was suspended for a

24   reason in which he would not be able to drive a commercial

25   vehicle while his license was suspended.

1    Q    Do you know when his license was suspended?

2    A    Well, it says the first day absent being February 2,

3    2006, which would make me believe that is the date that it

4    was discovered, at least.

5    Q    Had he been driving a USA Truck on a suspended CDL

6    license?

7    A    This form does not indicate that.

8    Q    Based on your review of the file, is that what he had

9    been doing?

10    A    I would have to look at it, the file again, to be able

11    to give you specifics on that.

12    Q    If he didn't have a CDL, a valid CDL, would he have met

13    the qualifications of USA Truck?

14    A    He must have a valid CDL to be an over-the-road driver.

15    Q    So he would not; is that correct?

16    A    If he would not if -- the question again.

17    Q    If he didn't have a valid CDL, he wouldn't meet the

18    qualifications?

19    A    To be driving at that time?

20    Q    Right.

21    A    Yes.

22    Q    Okay.  Who signed that?

23    A    I can't read the signature, but it is the supervisor,

24    the fleet manager's signature.

25    Q    Do you know how long he had been driving a USA Truck

(479) 471-0665       Veronica R. Lane, CCR veronicalane@cox.net

34

1    with a suspended CDL just looking at that form there?

2            MR. OLIVER:  Object to the form.

3            THE WITNESS:  Looking at this form, it doesn't

4    indicate that he was driving on a suspended license.  This

5    form indicates that as of February 2, 2006, he was taken

6    off work because of a CDL suspension.

7    Q    [BY MR. ALLRED]:  Do you know why, based on your review

8    of the file, do you know why it was suspended or how long

9    it was suspended?

10   A    Generally, I do not have that answer.

11   Q    Okay.  Look at 198 and 199, if you would, please.

12   A    Okay.

13   Q    And what is that?  That is an MVR on Mr. Johnson; is

14   that right?

15   A    That is correct.

16   Q    Was that document in the files of USA Truck when

17   Mr. Johnson was hired?

18   A    This one was not in the file at the time of his hire.

19   Q    And when did this one come to be?  Are you able to

20   tell?

21   A    I haven't found the request date.

22   Q    Let me ask you this while you are looking.

23   A    Okay.

24   Q    Does USA Truck use this, whatever the name of the

25   services is, to pull MVRs on drivers?

1    A    Yes.

2    Q    Is an MVR a motor vehicle record?

3    A    It is.

4    Q    And is that what shows the driver's history and what

5     tickets and wrecks they have had and stuff like that?

6    A    It shows their tickets, correct.  I found the date of

7     this one.

8    Q    And what is it?

9    A    It shows to be February 2, 2006.

10    Q    Okay.  And it was in the USA Truck's files at least on

11     February 2nd of '06; is that right?

12    A    This one, yes.

13    Q    Okay.  You see those driving record information on

14     there, and it has several entries that are shown on 198 and

15     199.  Is that about the worst driving record you have ever

16     seen on a driver at USA Truck?

17    A    No, sir.

18    Q    You have got some that are worse than that?

19    A    Well, I mean, I don't know how you are grading it.  I

20     mean, I am looking at an MVR, and I would not say this is

21     the worst MVR that I have ever seen.  It would not mean

22     they worked at USA Truck, but we see MVRs all the time.

23    Q    So you would have people right now driving USA Trucks,

24     18-wheeler trucks that would have more violations than are

25     shown on 198 and 199; is that correct?

1          MR. OLIVER:  Object to the form.

2          THE WITNESS:  I do not know that we have any

3     drivers with more or not.

4     Q    [BY MR. ALLRED]:  Well, what I had asked about is that

5     about the worst one you had ever seen, and you said you

6     didn't think so.  So the follow up was if you think you

7     have got drivers that have even more than that?

8     A    I don't know if we have more than that, but in the

9     process of recruiting people, we receive thousands upon

10    thousands of applications and MVRs, so I have seen MVRs

11    that look different than this in the process.

12    Q    You changed my question.  What about your drivers that

13    are working there, though?  Is there somebody that is

14    working there as a driver at USA Truck that has one any

15    worse than that that you can think of or that you can

16    remember?

17    A    I do not know.

18    Q    You don't know one way or the other?

19    A    Correct.

20    Q    Looking at 198 and 199, is it all right in your opinion

21    as the human resources director to put somebody on the road

22    driving an 18-wheeler for USA Truck with a driving record

23    like that?

24    A    Well, the one I am looking at, which was ran on

25    February 2, 2006, shows that his current license is

1    suspended, which would mean that he should stop driving as

2    soon as we found out he had a suspended license.

3        I think the action that was taken that we discussed

4    earlier changing his status due to a suspended license was

5    appropriate.

6    Q    What about where you have the suspensions, does it

7    concern you, does it concern USA Truck that one of your

8    drivers would let his CDL or his CDL would get suspended

9    for whatever reason?

10   A    CDLs, driver's licenses can be suspended for

11   numerous --

12   Q    Does it concern you?  That is what the question is

13   before you.

14   A    It would concern me on the reason for the suspensions.

15   The suspensions themselves are --

16   Q    Can you look on this report and tell why that

17   suspension was done?

18   A    It says, failed to answer summons, and which would

19   probably be reflective of the fact that maybe something was

20   not paid by the individual.

21   Q    Well, based on your review of the file, is there

22   anything in that file where USA Truck looked into this,

23   after you got notification that his CDL had been suspended

24   that is referred to on 191, where USA looked in to why the

25   suspension was done so that you would understand the

1    details?

2    A    Well, the MVR says that it was suspended for failure to

3    answer summons, which default in a fine which would

4    indicate that he did not pay a fine.

5    Q    Okay.  Well, then, with this information here that is

6    shown on 197, 98, and 199, at some point after Document

7    191, you put Mr. Johnson back on the road, didn't you?  USA

8    did.

9    A    He did return to work.

10   Q    All right.  So it was all right with USA Truck that

11   even though he had these violations and the suspension

12   shown on 198 and 199, it was all right for him to go back

13   on the road driving an 18-wheeler; is that correct?

14   A    Once his CDL was valid again for paying what appears to

15   be a fine, then he was eligible to be put back if his CDL

16   was current, yes.

17   Q    Is it your understanding that USA's policy is as long

18   as the DOT will let you, you will put a driver on the road

19   just as long as he meets the minimum requirements of DOT?

20          MR. OLIVER:  Object.

21          THE WITNESS:  No.

22   Q    [BY MR. ALLRED]:  Well, just because he had his CDL

23   back, you know and agree and acknowledge that USA Truck

24   could still have made the decision not to put Mr. Johnson

25   back on the road.  Do you agree with that?

1    A    Is that a possibility?

2    Q    No.  I am asking you -- well, okay, is it a

3    possibility?  Is that a possibility, then?

4    A    It's a possibility that a decision could have been made

5    on anybody on whether or not they were in a truck, yes.

6    Q    Okay.  Who made the decision at USA Truck, who made the

7    decision to let Mr. Johnson start back to driving a truck

8    for USA after the information came to USA Truck that is

9    shown on 198 and 199?

10    A    It is apparent that the fleet manager.

11    Q    And who is that?

12    A    I apologize, but I can't read the writing.

13    Q    You can't read the writing on it?  Mr. Johnson was in

14    Fleet 6; is that right?

15    A    That is correct.

16    Q    Do you know who the fleet manager for Fleet 6 was in

17    February of '06?

18    A    Off the top of my head, I do not.  I do recognize

19    initials on 2/8 of '06 to be a Mark Sterling,

20    S-T-E-R-L-I-N-G.

21    Q    And what is that name again?

22    A    Mark Sterling, S-T-E-R-L-I-N-G.

23    Q    Mark Sterling.  Where are those initials that you are

24    talking about?

25    A    I don't know what number this form is.

1    Q    It will be down on the bottom.

2    A    194, at the very top.

3    Q    194?

4    A    Yes, sir.

5    Q    Okay.  Let me see what you are looking at.  I think

6    mine is out of order.

7        Okay.  So Document 194 shows that Mark Sterling

8    initialed it.  And to you that indicates that Mr. Sterling

9    approved Theodore Johnson going back on the road?

10   A    Correct.

11   Q    Do you know what day he went back on the road?

12   A    February 9, 2006.

13   Q    Knowing what you know now, after all is said and done,

14   did Mr. Johnson meet the qualifications of USA Truck to

15   drive an 18-wheeler on February 9th of '06?

16   A    With the information that is at hand that we knew on

17   February 9, 2006, yes.

18   Q    That is not what I asked.  I asked you knowing what you

19   know now after all is said and done, did he meet the

20   qualifications on February the 9th of 2006?

21   A    The indications that I would know on February 6th -- or

22   February 9th is it is apparent at that time that he met the

23   qualifications.

24   Q    You told me that twice.  I asked you a different

25   question.

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 41 of 103
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

41

1    A    Okay.

2    Q    The question before you is knowing what you know today,

3    after all is said and done, including everything that

4    happened from that time to today, did Theodore Johnson meet

5    the qualifications of USA Truck to drive a truck when he

6    was put back on the road on February the 9th of '06?

7    A    When he was put back on the truck on February 9th, it

8    is apparent that he met the qualifications.

9    Q    That is three times you have answered that.  I will ask

10    you one more time because we will be talking about it in

11    front of the jury.

12        Will you tell me whether after all is said and done,

13    taken what you know today about Theodore Johnson, did he

14    meet the requirements of USA Truck to be put back on the

15    road to drive an 18-wheeler February the 9th of 06?

16        MR. OLIVER:  Object to the form.  I think he has

17    been asked and answered it, but tell him one more time.

18        THE WITNESS:  I mean, my answer would be the same,

19    that on February 9th, he met the standards to get back into

20    the truck at that time.

21        MR. OLIVER:  Is that based on what you know today?

22        THE WITNESS:  The information I know today, on

23    February 9th, he met the criteria.

24    Q    [BY MR. ALLRED]:  What about things that you know today

25    that may have occurred prior to February 9th, on or before

1    February 9, 2006, would that change your answer in any way?

2         MR. OLIVER:  Object to the form.

3         THE WITNESS:  I don't know anything prior -- I

4    mean, specifically, I don't think I have enough information

5    to try to answer the question that you are asking because

6    the information that I know is right in front of us.

7    Q    [BY MR. ALLRED]:  Would it be correct that if you had

8    it to do over again, USA Truck had it to do over again with

9    regard to Theodore Johnson, you wouldn't do anything

10   different about the way you hired him, trained him or

11   supervised him or terminated him; is that correct?  You

12   would do it just like you did; is that right?

13   A    I think the information provided in the files shows

14   that everything was followed and he was a qualified driver

15   at the time of his hire, and I think that the processes

16   that were taken were accurate.

17   Q    Would you do anything different?  If you had to do it

18   over again, would you do anything different?

19   A    I think the process was followed properly.

20   Q    Does that mean, no, you wouldn't do anything different

21   or, yes, I would do something different?

22   A    I think the only thing that I can logically do is put

23   myself into the situation and the process that was followed

24   for him at the time and say all of the process was followed

25   properly.

1    Q    I understand that is your position, but if you had to

2    do it over again, would you do anything -- and conceding

3    and agreeing with you that you say the process was followed

4    properly based on what you say was before you at that time,

5    but looking back on it, if you had to do it over again, is

6    there anything about it that you would change?  And you are

7    welcome to say, no, I would do it the same as I did it.  Or

8    if there is something about the way you treated Theodore

9    Johnson with his hiring, training, supervision, or his

10   termination, you are welcome to say you would do it a

11   little bit different.  I am not trying to get you to do

12   either one either way.  I just want to know what your

13   position is.

14   A    I believe the process was followed the way it should

15   have been followed on this situation as far as his hire,

16   training and termination.

17   Q    Does that mean no changes?

18   A    It means -- I don't see anything that was inaccurate in

19   the process.  I don't know that there would have been any

20   changes.

21   Q    Okay.  Now let me refer you to 214 in there.  What is

22   that?  What do you call those in the human resources

23   department?

24   A    Well, this is just a letter to Theodore.

25   Q    Do you send drivers letters when they do something

1    incorrect?

2    A    This letter was sent by his fleet manager in reference

3    to it looks like a delivery on November 7th of 2005.

4    Q    And that is signed by Brandon Thompson?

5    A    That is correct.

6    Q    Isn't that the name that we were trying to find on

7    Document 191 a little while ago, supervisor or fleet

8    manager?  See that signature.  Isn't that Brian Thompson on

9    there?

10            MR. OLIVER:  What number did you want him to look

11    at?

12            MR. ALLRED:  191.  He said he couldn't read the

13    signature.

14            THE WITNESS:  Is 191 the same as 194?  Yes, I

15    would believe that would be the same signature.

16    Q    [BY MR. ALLRED]:  It is Brandon Thompson who was the

17    fleet manager?

18    A    Correct.

19    Q    He is the one that signed 191.  Go to 214 on there and

20    it says, on 11/7/05, you failed to deliver a shipment.  So

21    what was it?  Did he have a schedule that he just didn't

22    comply with?  Is that what that is?

23    A    That would be a delivery time that was not met or

24    apparently not met.

25    Q    All right.  Do you call this a DUN letter?  Do you have

1    any particular name for it in the human resources

2    department?

3    A    No.

4    Q    Do you put these letters in driver's files so that you

5    will have a record of when they do things that they are not

6    supposed to do?

7    A    We put it in the file so we have a record of the fact

8    that they were noticed of a delivery failure.

9    Q    Well, was he meeting the requirements of USA Truck on

10   11/7/05?

11            MR. OLIVER:  Object to the form.

12            THE WITNESS:  It is apparent he had a late

13   delivery, and obviously it was Brandon Thompson's opinion

14   that Mr. Johnson contributed to that late delivery.

15   Q    [BY MR. ALLRED]:  Well, that is obvious from the

16   letter.  That is not what I asked you.  Did he meet the

17   requirements of USA Truck on November the 7th of 2005 with

18   regard to his work performance?

19   A    Well, I think it is obvious that the company would have

20   preferred he delivered that shipment as scheduled as

21   opposed to not.

22   Q    So he didn't meet the requirements, did he?

23   A    He had a failed delivery on that particular shipment.

24   Q    Is delivery on time, is that one of the requirements of

25   USA Truck?

1    A    It is something that we do ask our drivers to do, yes.

2    Q    And he failed to do that on November the 7th of 2005;

3    is that correct?

4    A    It is apparent, that is correct, yes.

5    Q    All right.  And look at 215.  And what is the date on

6    that?

7    A    Monday, November 7th.

8    Q    And that is from Brandon Thompson, the fleet manager to

9    -- who is Vickie Palmer?

10    A    Vickie Palmer would have been basically an

11    administrative assistant in the operations department.

12    Q    All right.  What is going on in that e-mail there?

13    A    It is just a note to the personnel file from Brandon

14    Thompson in regards to Theodore Johnson.

15    Q    All right.  It says down on the bottom two lines, MSC,

16    is that for miscellaneous?  What does that mean?

17    Miscellaneous driver was due back?

18    A    That is apparent that would have been the title to that

19    subsection.

20    Q    That would have been the title of what?

21    A    That would have been, for instance, it says down here,

22    late on delivery or pick up, check one.  That would have

23    just been miscellaneous.  It is really not in reference to

24    the actual comment.

25    Q    That is the subject matter or category?

1   A    Correct.

2   Q    Miscellaneous, driver was due back on Friday the 4th.

3   Apparently November the 4th.  Did not come back until

4   Sunday the 6th.  He never contacted the fleet manager about

5   being late and returning to work.  That is what Brandon

6   Thompson put in that e-mail; is that right?

7   A    That is correct.

8   Q    Did Theodore Johnson meet the requirements of USA Truck

9   in that time period, Friday the 4th through Sunday the 6th?

10  A    Well, it is apparent that he was on time off, scheduled

11  off, and did not come back as scheduled.

12  Q    Did he meet the requirements of USA Truck, according to

13  his fleet manager?

14  A    According to his fleet manager, he did not return as

15  scheduled, which was part of his responsibility.

16  Q    All right.  And then look at 217 there, if you will.

17  And that is a -- that is a memorandum to Mr. Johnson from

18  your department.  Personnel, that is your department, isn't

19  it?

20  A    Yes.

21  Q    So after he has done what he did, and then he failed to

22  deliver the load on November the 7th of '07, and then he

23  laid out that is referred to in Document 215, you all sent

24  him his letter and gave him a pat on the back and an

25  increase in pay, didn't you?

(479) 471-0665       Veronica R. Lane, CCR veronicalane@cox.net

1          MR. OLIVER:  Object to the form.

2          THE WITNESS:  He was on a schedule for a pay

3    increase, which is basically in reference to his time as a

4    driver, and that was a scheduled pay increase in which he

5    was being informed that his rate would be increased on

6    December 2nd of 2005.

7    Q    [BY MR. ALLRED]:  All right.  Did you make the decision

8     to do that or did somebody else in the personnel department

9     do that?

10   A    That is automated.  Every driver's pay is based off the

11    months -- on a monthly basis.

12   Q    The information in Documents 214 and 215 were available

13    to USA Truck when the action taken to increase it and

14    praise him on 2/17 was done.  You would agree with that,

15    wouldn't you?

16   A    Yes.

17   Q    Do you think looking at that now in retrospect that he

18    was really entitled to a merit raise on November 15th in

19    light of what he was doing?

20   A    Yes.

21   Q    You do?

22   A    Yes.

23   Q    And you wouldn't do that any different if you had to do

24    it over again today; is that right?

25   A    Correct.

1    Q    All right.  216, there is a HAZMAT endorsement, and the

2    date on that is January 1st of '06.  Did he ever have a

3    hazardous material endorsement based on your review of the

4    file?

5    A    I don't know, but I would tell you that if he did not

6    have one on January 6th, then obviously he probably didn't

7    have one at the time of his hire would be my assumption.

8    Q    Look at 229, if you would, please, sir.  Is that the

9    suspension that we were talking about earlier?

10   A    Yes.

11   Q    Does it show on that document the reason for the

12   suspension?

13   A    No.

14   Q    This document here or this information, whether it was

15   in electronic form or paper form, it was in the file and

16   USA Truck knew about it when the decision was made to put

17   him back on the road after the suspension in February of

18   '06; is that correct?

19   A    This screen, this is an electronic screen, is

20   essentially referred to at the top as personnel master, and

21   it would be the indication of whether or not he was an

22   active employee or inactive employee.  This is a result of

23   pieces of paper that we discussed earlier on the

24   absence/status change.

25   Q    What is your answer to my question about whether that

1    was in the file of USA Truck, either in electronic form or

2    paper form, at the time the decision was made to put him

3    back on the road?  Did you have that information?

4    A    This information is directly from the electronic

5    screen, so, yes, that information was placed in at the time

6    that it was -- those dates, or in the proximity of those

7    dates, February 2nd to February 9th.

8    Q    Look at 230 right down in the middle of the page, it

9    says DOT inspection, 2/2/06?

10   A    Okay.

11   Q    Is that where his suspension was discovered in a DOT

12   inspection?

13   A    That would indicate that that is probably the reason.

14   Q    All right.  Look at 231, and that says personnel

15   information.

16   A    Correct.

17   Q    Up at the top -- well, what do you call that Document

18   231?  What do you call that?

19   A    Well, that is essentially an electronic form of some

20   notes in reference to the personnel master.

21   Q    All right.  And it says fax version and DA to Knight.

22   What does that mean?

23   A    That is verification and drug and alcohol to Knight

24   Transportation.

25   Q    Was there a drug and alcohol test done on Mr. Johnson

1    February 14th of '06?

2    A    That would have been reflective of Knight

3    Transportation inquiring about Mr. Johnson.

4    Q    All right.  Tell me what that means.  Now, who is

5    Knight Transportation?

6    A    Knight is another trucking company.

7    Q    So he was out looking for a job; is that right?

8    A    There is a possibility of that.  That would be

9    reflective of the possibility of them verifying his

10   employment.

11   Q    And what would be the a reason that you know of that on

12   February 14th of '06 your getting an inquiry from Knight

13   Transportation, another trucking company, about

14   verification of employment for Theodore Johnson and drug

15   and alcohol testing?

16   A    That would be my impression that he had applied for

17   employment for Knight Transportation.

18   Q    Where is Knight Transportation located?

19   A    Their headquarters or their home office is in Phoenix,

20   Arizona.

21   Q    Do you and Knight compete for driver personnel in this

22   area?  I mean, do they have a presence in this area?

23   A    Yes, sir.

24   Q    What percent of the market do they have in the areas

25   that you have your biggest presence?

1    A    Oh, I don't know that I can answer that.  Knight has

2    facilities throughout the whole country.  They have more

3    west than what we have west, but they have facilities in

4    the same area that we operate in such as Indianapolis and

5    Dallas and Houston and other areas, too.  I mean, they do

6    hire drivers out of the same region that we hire drivers,

7    but I don't know what their numbers are.

8    Q    Who is CS?  Is that somebody in your department?

9    A    It is, I am sure.

10   Q    Do you know who that is?

11   A    I am not for sure.  It might be a lady by the name of

12   Cindy Sabin.

13   Q    Cindy Sabin?

14   A    Right.

15   Q    Is she still with you?

16   A    Yes.

17   Q    Under your direction, do your personnel people have

18   standing orders to comply with these kind of requests like

19   is being made here by Knight Transportation, to send them

20   the information?

21   A    We do verify the information, yes.

22   Q    All right.  As far as you know, that was sent to Knight

23   Transportation; is that right?

24   A    Yes.

25   Q    All right.  Then looking on 231 there, it says,

1   February 2nd of '06, DOT M, that is Missouri, isn't it?

2   A    Yes, that would be Missouri.

3   Q    11:36, didn't they do a DOT test and found that he was

4   driving a commercial motor vehicle while he was

5   disqualified?

6   A    It is apparent that he had a DOT inspection in Missouri

7   at about 11:36, and at which time it was determined that

8   his CDL was suspended.

9   Q    Was he driving a USA Truck when he got stopped?

10  A    Yes.

11  Q    And.  And the DOT said that he wasn't qualified to be

12  driving that truck, didn't it?

13  A    Yes, because of his license suspension.

14  Q    All right.  Did you have any procedure in place to keep

15  a driver like Johnson from driving a USA Truck while his

16  CDL was suspended in February of 2006?

17  A    Our procedure is there are annual motor vehicle reports

18  ran on an annual basis.

19  Q    Anything else?

20  A    That would have been our check.  He had a MVR ran at

21  employment, which he was valid.  Then we would annually run

22  one, also.

23  Q    Okay.  Now, you say see that on 232, October the 10th

24  of '05, a DOT stopped him in Tennessee, didn't it?

25  A    Texas.  October 10th, yes, I'm sorry.  I was looking at

1    the other one.  DOT, Tennessee.

2    Q    In Texas, they did stop him in Texas at 7:06 in the

3    morning, and he had a defective mudflap, didn't he?

4    A    Correct.

5    Q    Do they give him tickets for that or how does that

6    work?

7    A    They could give a ticket or they could just give a

8    warning.

9    Q    All right.  But ever what they do, this information

10    that is on 232, it is reported back to USA Truck, and you

11    know which driver did it and when and where and what time;

12    is that correct?

13    A    Correct.

14    Q    All right.  And then on October the 10th of '05, the

15    DOT pulled him over in Tennessee at 2:00 o'clock in the

16    afternoon, didn't they?

17    A    Yes.

18    Q    And that time he run through a weigh station, just

19    bypassed the weigh station, didn't he?

20    A    It says bypassing, yes.

21    Q    Is that what that means to you?

22    A    That is what it would be reflective to me.

23    Q    All right.  And then expired single state registration.

24    What does that mean?

25    A    That would have been the registration that USA Truck

1    would have on that tractor or trailer.

2    Q    So there he tries to bypasses a weigh station.  They

3     stop him.  Did they give him a citation?

4    A    It is noted as being cited, yes.

5    Q    All right.  Who paid that fine?  Did he pay it or do

6     you all pay those?

7    A    For expired registration would have been a company

8     fine.

9    Q    And what about the failure to stop for an inspection,

10    who paid that?

11         MR. OLIVER:  Object to the form.

12         THE WITNESS:  I don't know that he was cited for

13    failure to -- it says cited.  It doesn't refer to being

14    what the citation was for in this note.

15   Q    [BY MR. ALLRED]:  What if he got cited for failure to

16    stop?

17   A    He would have to be responsible for that.

18   Q    Did the DOT people -- I mean, I go up and down the

19    interstate sometimes, and if I am riding and I will see a

20    weigh station there, that is a DOT run outfit.  Am I

21    thinking about what that is?

22   A    There are some as you have described.  There are some

23    that are temporary that are set up in rest areas or

24    different places.

25   Q    Don't the DOT people get kind of upset if the trucks

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 56 of 103
(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

56

1    just go past and don't come in there and weigh?  I mean,

2    they expect the trucks and notify them to come to the weigh

3    stations, don't they?

4              MR. OLIVER:  Object to the form.

5              THE WITNESS:  There are circumstances where weigh

6    stations are open and crowded, and the rules that I am not

7    as familiar with, that they let trucks bypass them on an

8    hourly basis due to different circumstances, and I don't

9    have all of them, but there are in cab transponders, some

10   carriers have those, and sometimes I am under the

11   impression that if the line is backed up all the way up to

12   the interstate, that they are supposed to pass.  I don't

13   have -- obviously on this situation, I have no information

14   other than what is noted, but . . .

15   Q    What do you all tell your drivers about whether they

16   should stop for a weigh station?  Do you tell them to stop

17   or just go on by if you don't feel like it or what?

18   A    No, I mean, it is the individual driver's

19   responsibility to comply.

20   Q    Well, would you agree with me in this deposition that

21   if they put down they cited him for failure to stop for an

22   inspection, bypassing, that they didn't agree with him just

23   going past and ignoring the weigh station?  Would you agree

24   with me there?

25             MR. OLIVER:  Object to the form.

1         THE WITNESS:  I am not sure if this refers to

2    citing of bypassing that, but if the DOT cited him for

3    bypassing, obviously --

4    Q    [BY MR. ALLRED]:  If you are not clear as the human

5    resource director, was there any effort made to look into

6    this and see what really happened up there in Tennessee

7    that day; whether Mr. Johnson just ignored the law and went

8    around the weigh station or if he really was justified in

9    just going on by?  Did you do anything to find out the

10   details?

11   A    We did not in human resources.  The DOT inspections

12   fall into the safety arena.

13   Q    And when you reviewed the file, did you see anything in

14   there to the effect of, well, where he ran around that

15   weigh station in Tennessee in October of 2005, he didn't

16   have to stop, that didn't count.  Did you see anything in

17   there like that when you reviewed the file?

18   A    This is the first I have seen of this.  This is the

19   only knowledge I have of this incident.  I have looked at

20   this file some, but my only information, and I did not see

21   this page.

22   Q    You told me you read it, and it sounds to me like you

23   really don't take that real seriously, that 232.  That

24   could have just been they might just have put that down.

25   You don't really know whether they cited him for it?

1    A    I don't have the information.  That is gathered through

2    the safety department on the compliance end.

3    Q    As the human resources director, you wouldn't put much

4    credence in a report like that coming from the DOT that one

5    of your drivers failed to stop for an inspection, would

6    you?

7         MR. OLIVER:  Object to the form.

8         THE WITNESS:  I did not say that.

9    Q    [BY MR. ALLRED]:  Well, would you put much credence in

10   it or would you take it seriously?

11   A    I would take it serious.

12   Q    All right.  Based on information that you know about,

13   is there any reason that USA Truck should not have taken

14   that failure to stop shown on 232 seriously?

15   A    I do not know of any reason in reference to this

16   situation on the October 10th stop.

17   Q    All right.  Let me refer you to 237, if I could,

18   please, sir.  I am trying to look at these in the order

19   they were given to me.  It might make it a little bit less

20   confusing.  What do you call that?

21   A    Are you looking to the settlement account?

22   Q    Okay.  All right.  And there is a -- I have looked at

23   that and I don't see a date on it.  Do you see up there

24   where it has a blank date, what date is that?

25   A    That would have been after the termination.

1   Q    All right.  And you have got bus ticket, 42.50?

2   A    Correct.

3   Q    And then there is some stuff written in there, USA --

4    motel, USA, 4050 Meaders 81.  What does that mean?

5   A    Whenever the employment was began, several expenses

6    were put out by the company.  And so the information here

7    is if -- upon termination, if we will try to recover some

8    of the expenses that we put out on the front end.

9   Q    Already.  So you all set up, and I read in the employee

10   manual, you start an escrow and funds and get to a certain

11   amount?

12  A    Correct.

13  Q    And then when Johnson was terminated, you all charged

14   him for some of those charges?

15  A    For some of those, correct.

16  Q    And then the bus ticket, where is that from and to?

17  A    I do not have that information.  Very possibly could

18   have been whenever he took a bus ride home.

19  Q    From the wreck?

20  A    This information doesn't give me that, but that is a

21   possibility.

22  Q    If you have a driver, say, if he is in a wreck and

23   somebody else causes a wreck and his truck is torn up and

24   not drivable, and it is not even his fault, do you make him

25   pay his bus ticket back to Van Buren?

1    A    No.  And this could have been a bus ticket to

2    orientation, the expense that the company put up to it, so

3    I am not really sure on that 42.50 on where that came from.

4    Q    Look at 259, if you would.  You hire drivers -- does

5    USA hire drivers with felony convictions?

6    A    We do hire based on some drivers have been convicted of

7    felonies or other criminal charges.

8    Q    Does it make any difference what the felony is?

9    A    Yes.

10   Q    As the human resources director, what is the difference

11   on what felonies you will let them have and what felonies

12   they can't have?

13   A    The term felony is generically used because not all of

14   the criminal charges are felony charges, but sometimes they

15   are generically used.  Violent crimes and crimes of

16   narcotic trafficking are disqualifying.

17   Q    Any others?

18   A    Physical in nature, I mean, serious physical in nature

19   is considered.

20   Q    Okay.  You knew or did you know at the time that you

21   hired Mr. Johnson that he had a felony conviction?

22   A    Yes.

23   Q    That was all right with USA Truck?

24   A    The information was known prior to hire, and his

25   criminal conviction was approved upon hire.

1   Q    Look at 302.  That is a USA form, isn't it?

2   A    Yes, it is.

3   Q    And on there, did you draft that form?

4   A    I mean, the form itself is -- we have it, yes.

5   Q    Did you draft the form, you, yourself?

6   A    No.

7   Q    But it says on there, have been convicted of a felony

8    or misdemeanor, and you have two choices and he checked

9    felony, or somebody checked felony; is that right?

10  A    Correct.

11  Q    In August of '01, put on probation for two years; is

12   that right?

13  A    Yes.

14  Q    USA had that information when you hired Mr. Johnson; is

15   that right?

16  A    Yes.

17  Q    And then he clarified that a little bit over on 303, he

18   says on the USA express application down there, my copy is

19   cut off, but it says, have you ever been convicted of a

20   felony or a criminal offense, and it is checked "yes".  And

21   then over there where it says explain, 2001, theft.  '01,

22   no jail.  Two years probation.  So USA had that information

23   when you decided to hire Theodore Johnson; is that right?

24  A    Yes.

25  Q    And that was all right with you as the human resources

1    manager?

2    A    It was not disqualifying.

3    Q    So that means it was all right with you; is that right?

4    A    Yes.

5    Q    You wouldn't do that any differently; is that right?

6    A    I think the process was followed properly, yes.

7    Q    And another document over there on 265, let me get you

8    to look at that, please, sir.  It says No. 17 on 265, have

9    you ever used any type of drugs in your lifetime, and he

10    checked, "no", on there.  Have you read his statement that

11    he gave to the police department?

12    A    No, sir, I have not.

13    Q    You have not.  Well, he says in there that he actually

14    had a positive drug test in 2002 or 2003.  So if that is

15    the situation, if that is what he told the Montgomery

16    Police Department, then what he was telling USA Truck in

17    that on 265 on No. 17, that would be incorrect, wouldn't

18    it?

19    A    Well, I mean, on Document 265, he did check, "no", have

20    you ever used any type of drugs in your lifetime, and that

21    would contradict the statement that you just made, yes.

22    Q    Then over here on the 268, July the 20th of '05, one of

23    the questions, No. 2 is, have you ever tested positive or

24    refused a DOT drug screen or alcohol test, including

25    preemployment, and he checks, "no".  If he told the

1    Montgomery Police Department that he smokes marijuana and

2    that he had a positive drug test in 2002, either late 2002

3    or early 2003, then that answer that he gave USA Truck to

4    No. 2 would be incorrect; is that right?

5    A    Based off your statement, yes.

6    Q    Are you familiar with the different -- different

7    subject here.  I apologize for skipping around.

8         Are you familiar with the shifting procedure in the

9    kind of tractor that he was driving when this wreck

10   happened?

11   A    You mean on the transmission?

12   Q    Yes.

13   A    Vaguely.

14   Q    If you are going to shift, just take me through if you

15   are going to shift from first gear starting off from a dead

16   stop to fifth gear, tell me what you would do?  I know you

17   are not a CDL driver, but you can drive a manual

18   transmission vehicle, can't you?

19   A    Correct.

20   Q    Well, I can, too, but I am not a CDL driver, but how

21   would you do that?  What is the proper way to do it?

22   A    Well, to start off, again, I will state I have not

23   driven an 18-wheeler, but on a manual transmission,

24   obviously, to get going as you release the clutch, you

25   would accelerate until your RPM's reached the optimal

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 64 of 103
(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

64

1    number of, you know, then apply the clutch and shift the

2    transmission all the way to whatever gear you are going to.

3    Q    All right.  Would it be improper to shift without the

4    clutch, especially loaded?

5    A    Well, in a tractor, I am aware, just a basic

6    understanding, that you can float the gears and move them

7    without applying the clutch.  I am not familiar with how to

8    do that, but I am aware that there is an opportunity to

9    shift the gears without engaging the clutch.

10   Q    Is that an acceptable way to operate the truck?

11   A    I believe so, but that would be more -- I mean, I do

12   not believe that there is anything that would say that that

13   is not acceptable.

14   Q    All right.  Look at 291, if you would, please.  Is that

15   a list of some previous jobs that Johnson has had when he

16   came to apply to USA for a job?

17   A    It is, you know, as well as a truck driving school that

18   he attended and some unemployment.

19   Q    All right.  Was it of any concern or did it raise any

20   kind of red flag with USA Truck in the human resources

21   department that he has got nine previous employers in the

22   last three years -- well, a little bit less than three

23   years before he came to see you?  Was that of any concern

24   to USA Truck?

25   A    Well, these are not nine jobs.  There are two instances

1    where he was in between jobs indicated by "UE", which would

2    mean unemployment.

3  Q    He had actually been unemployed for a while in there,

4    too, hadn't he?

5  A    Right, in between jobs, and two of those are truck

6    driving schools, so there is an indication that there were

7    five employers in that time frame.

8  Q    Would it be true as the human resources director of USA

9    Truck, the different employment experiences and

10   unemployment periods that are shown on 291, that would be

11   acceptable with you and that would meet the requirements of

12   USA Truck; is that right?

13 A    Yes.

14 Q    All right.  Let me refer you to 295, if you would.  You

15   see those traffic violations that Mr. Johnson listed on

16   there and then he signed his name on the bottom.  Do you

17   see that?

18 A    Yes.

19 Q    At USA, you knew about all of these violations at the

20   time that you made the decision to hire him and to put him

21   back on the road after he was suspended in February of '06;

22   is that right?

23 A    Yes.

24 Q    Did anybody check to see what this was about concerning

25   the failure to appear in court, how come he wouldn't show

1    up in court?

2    A    That would have been reflected with the motor vehicle

3    report that was run at the time of his hire.

4    Q    Do you know what those offenses were?

5    A    It appears, or my understanding, and I would have to

6    look at the MVR again, that he didn't pay a fine.

7    Q    All right.  So when this wreck happened on February the

8    20th of 2006, USA Truck had actual knowledge that he had

9    been convicted of improper passing; inattentive driving;

10   speeding, going 74 in a 65; improper lane direction; and

11   for those last four he had been fined.  Then he had failed

12   to appear in court three times.  And then he had done those

13   things that we talked about where he ran through the weigh

14   station in Tennessee, and he had the other DOT violation,

15   and yet USA Truck put him back on the road and he was

16   driving one of your trucks February the 20th of 2006.  No

17   doubt that you knew about all of that?

18   A    That is correct.

19   Q    And you are telling me that that is not even the worst

20   record that you know about with USA Truck; that there may

21   be drivers that would be worse than that that are still

22   running today for USA Truck; is that right?

23   A    That is not the statement that I made, but I do not

24   know specifically the individual who is in the fleet have.

25   Q    Let me ask it this way so it will be clear.  Without

1    repeating all of those violations and going up to February

2    the 20th of 2006, is that the worst record you have ever

3    seen for any USA Truck driver?

4    A    You know, again, that is a question that is really hard

5    to answer because I don't know what the -- I can't even

6    remember what the driving record of an individual driver is

7    at this point in time to compare that to.  I would tell you

8    that this individual met the criteria at the time of hire,

9    and they were qualified to drive during their tenure and

10   everything was addressed.  And whenever he was suspended

11   for a license, he was taken off the road until that was

12   taken care of.

13   Q    Knowing about all of those violations and all of those

14   suspensions, failure to appear in court, speeding,

15   inattentive driving, running through the -- ignoring the

16   DOT weigh station, you still feel like he was -- and

17   driving with an expired CDL, you still feel like as the

18   human resources director that on February 20, 2006, he met

19   the qualifications of USA Truck to drive an 18-wheeler; is

20   that your position?

21   A    I do not know that he had an expired license.

22   Q    Well, his CDL had been suspended.  You all were letting

23   him drive a USA Truck with a suspended license.  We talked

24   about that a few minutes ago.

25   A    Right, but I don't know the reason for the suspension.

1    Q    Does it make a difference what the reason for the

2    suspension would be?  Does it make much difference?

3    A    It does.

4    Q    Well, let's put that over to the side.  Just take all

5    of those violations that you know about.  You got this in

6    his application that he makes back in July and August of

7    '05, improper passing, inattentive driver, speeding,

8    improper lane change, doesn't show up in court three times.

9    Then he runs through the weigh station.  Doesn't stop for

10   the weigh station.  Leave the CDL suspension out.  Ignore

11   the fact that you all let him drive with that CDL for a

12   while because that doesn't seem to make a difference to you

13   and I will ask you about it in a minute.  Is it your

14   position that he met the qualifications of USA Truck on

15   February the 20th of 2006?

16           MR. OLIVER:  Object to the form.

17           THE WITNESS:  Yes.

18   Q    [BY MR. ALLRED]:  All right.  Now, is it your position,

19   is it USA Truck's position that if a driver has a CDL that

20   is suspended, that that really may be something to be

21   concerned with or it may not, it just depends on why it is

22   suspended?  Is that what that boils down to?

23   A    That is correct.

24   Q    So if it is a suspension that is just some technical

25   thing, then that really may not make any difference to USA

1    Truck, right?

2    A    Well, I mean it will make a difference while it is

3    suspended.  Knowledge of a suspended license, obviously,

4    you can't drive on it.  But once he was able to get it

5    reinstated, it would depend on the circumstances of why it

6    was suspended.

7    Q    What percentage of your drivers, in your best judgment,

8    have had their CDL suspended for any reason, good reason,

9    bad reason or any kind of reason?

10    A    I couldn't even guess.  I don't know.

11    Q    All right.  Has it happened before?

12    A    Yes.

13    Q    Have you put out any kind of memorandum or note to the

14    folks at USA Truck that if you have drivers that don't have

15    a CDL, they have a CDL that is suspended, that they should

16    not be driving, that they should be removed from the driver

17    pool right then?

18    A    I didn't put out a memo, but that is monitored by the

19    safety department in which it is understood.

20    Q    All right.  Look at 311, if you would, please.  While

21    you are looking there, I will go ahead and ask the

22    question.  Apparently Mr. Johnson worked as a driver for

23    Tri-State Grouting and you all sent an employment

24    verification.  You get it back and they don't check the

25    reason for leaving, would you reemploy, or his accident

1    record.

2    A    This is a telephone verification, but the information

3    that you are referring to was they did not share all the

4    information.  I mean, the information that you have which

5    says the reason for leaving, I believe you said, and they

6    did not share that.

7    Q    Well, there is 6, 7, and 8, you wanted to know not just

8    reason for leaving, you wanted to know would you reemploy

9    him and what his accident rate was.  Wouldn't you think it

10    would be important if he was working for these people as a

11    driver what kind of accident record that he had?

12    A    Again, on the verification, we call and try to get the

13    information from them, and there are several companies that

14    will only share limited information about dates.

15    Q    Is that important information, the applicant's accident

16    record?

17    A    Yes.

18    Q    And it doesn't say on the form Page 311 that they

19    wouldn't share it, it just says N/A, not applicable,

20    doesn't it?

21    A    Well, it says N/A, yes.  It is in reference to the fact

22    they got the information that was given.

23    Q    All right.  Do you know if there was any follow up made

24    to Tri-State Grouting to try to find out what kind of

25    experience they he had with Mr. Theodore Johnson?

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 71 of 103
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

71

1    A    There was an additional verification.

2    Q    What page are you looking at?

3    A    354.

4    Q    All right.  Well, that is a different form, isn't it?

5    A    Yes.

6    Q    Well, where does it show on 354 about his wrecks,

7     whether they would rehire him and that kind of thing?

8    A    It doesn't.  This is more verification in reference to

9     the request consent form for previous employer for alcohol

10    controlled substance testing.

11    Q    That is a different form than what we were looking at

12    earlier, isn't it?

13    A    Yes.

14    Q    It doesn't ask the reason for leaving, would you

15    reemploy, or accident record like on 308; is that correct?

16    A    That is correct.

17    Q    All right.  And there is no follow up made about those

18    three issues, was there, to Tri-State Grouting; is that

19    right?

20    A    Not on this form, correct.

21    Q    All right.  Now, look over there at 334, if you would,

22    please.  Now, this is another MVR from that same outside

23    company, and this one on 335 shows a date of July the 19th

24    of '05.  So with documents 334 and 335, does that confirm

25    in your mind that all of this driver information that we

1  have been talking about, that USA had that at the time you

2  were making the decision to hire Mr. Johnson?

3  A    Yes.

4  Q    And you had it in your file all along from the time he

5  was hired until the time of the wreck of February the 20th

6  of '06 when John Britt was killed; is that correct?

7  A    This information was available from July 19th of '05,

8  correct.

9  Q    Do you see that on 334, there is a -- you know how to

10  read these things, don't you?

11  A    I can read.

12  Q    And what are those dates because there is a date on the

13  left and there is date on the right and there is no heading

14  on 335?

15  A    335 is just a continuation of --

16  Q    What is a VS date and a CR date?

17  A    Typically, the date on the left is the date of the

18  occurrence, and the date on the right is the date of

19  resolution, say, if a fine was paid.

20  Q    Is that CR, is that conviction?

21  A    I am not sure exactly if that is what it is referenced

22  to.  But it would mean, again, the date on the left is the

23  date of the occurrence and then the resolution would be the

24  date on the right.

25  Q    And V, would that be violation?  The type where it says

(479) 471-0665      Veronica R. Lane, CCR veronicalane@cox.net

1    VS, would that be violation?

2    A    You know, I don't know specifically, but that would

3    make sense.

4    Q    Well, let my ask you this, do you have any doubt in

5    your mind that Mr. Johnson was convicted of all of these

6    things that are shown on 334 and 335?

7    A    It appears to be an accurate MVR.  There is nothing to

8    tell me that there is anything in here that is not --

9    Q    Here they are down at the bottom.  I am sorry.  VS date

10   means violation/suspension date, and CR date means

11   conviction/reinstatement date, so that is what those are.

12   A    Correct.

13   Q    All right.  So that second date there, that is when he

14   was convicted of these things; is that right?

15   A    Or reinstated, yes.

16   Q    Is it USA Truck's position that if they are convicted

17   of something, but if they are reinstated that this

18   conviction just doesn't count as to whether or not you

19   allow them to drive a truck if they are reinstated?

20   A    No.  My understanding of this would be if he received a

21   violation, that that would probably be the time that the

22   record was indicated that if a fine was made, that it was

23   paid.

24   Q    Would there be a circumstance where you could look at

25   an MVR at USA Truck and you could say this driver doesn't

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 74 of 103
(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

74

1    meet our qualifications because of his driving record?

2    A    Yes.

3    Q    And are you saying this one here that is shown on 334

4    and 335, that is okay, and this is just -- this passes

5    freely for the kind of drivers you want to hire at USA

6    Truck?

7              MR. OLIVER:  Object to the form.

8              THE WITNESS:  He met the qualifications.

9    Q    [BY MR. ALLRED]:  You have told me repeatedly.  I want

10    you to tell me whether that passes freely for the kind of

11    driver that you want to hire at USA Truck?

12              MR. OLIVER:  Object to the form.  Same objection.

13              THE WITNESS:  I would say that looking at this

14    MVR, he would meet the qualifications.

15    Q    [BY MR. ALLRED]:  You are just going to fall back on

16    that same answer?

17              MR. OLIVER:  If that answers the question, it

18    answers the question.

19    Q    [BY MR. ALLRED]:  As long as he meets the DOT

20    qualifications, it doesn't make any difference what the

21    driving record is; is that right?

22    A    No.

23    Q    Oh, okay.  That is the way that USA Truck hires drivers

24    and that is the way you keep drivers, retain drivers; is

25    that right?

1   A     I don't understand that question.

2   Q     As long as they meet the DOT qualifications, it doesn't

3    make any difference what the driving record is?

4   A     No.

5   Q     And that has not changed and you don't plan to change

6    it; is that correct?

7   A     Well, I mean, DOT compliance is one portion of the

8    requirements, yes.

9   Q     All right.  What other portions of the requirements

10    with regard to driving record, because you told me as long

11    as they meet the DOT requirements that USA Truck doesn't

12    care what the driving record is, and I am going to accept

13    your answer.  Is there something else?

14   A     I answered, "no", to those questions; that that is not

15    the only thing that is required.

16   Q     Well, what else is required about the driving record

17    besides meeting the DOT requirements?

18   A     Well, they must have a situation to where they have --

19    their license has to be valid.  We look at their moving

20    violations and their accident history as well as their

21    employment history; their drug and alcohol conviction with

22    previous employees.

23   Q     Let's talk about driving record because that is what I

24    am interested in right now.  What kind of driving record

25    would a driver have to have in order for USA Truck to, say,

1    well, I am not going to hire them?

2    A    We have a standard in the recruiting process to where

3    if they have three moving violations in the past three

4    years or three accidents in the past three years, that that

5    would be an opportunity to come in and we look at their

6    employment verifications on the information that is given.

7         On experienced drivers, there is a little more

8    information available.  This gentleman came to us as a

9    student driver as opposed to an experienced driver where he

10   had to go out with a finishing -- in a finishing program,

11   so, typically, his prior work experience was not

12   over-the-road tractor-trailer experience.

13   Q    Well, let's look at the three moving violations that

14   you talked about, then.  Look at 334, if you will, and he

15   has a conviction for improper passing on the right in

16   October of 2002.  That is a moving violation, isn't it?

17   A    Yes.

18   Q    And then he has a conviction in December of 2004 of

19   inattentive driving, and that is a moving violation, isn't

20   it?

21   A    Yes.

22   Q    Then he has a conviction for speeding, going 74 in a

23   65, and that is a moving violation, isn't it?

24   A    Correct.

25   Q    Then he has a conviction for improper lane direction,

1    something, in May of '05, and that is a moving violation,

2    isn't it?

3    A    In April of '05, right.

4    Q    So he had four moving violations within the past three

5    years that he was telling you all about, didn't he?

6    A    Correct.

7    Q    So he exceeded your three moving violation rule by a

8    conviction, didn't he?

9    A    In the generalization of it, yes.

10    Q    But you hired him anyway?

11    A    This gentleman was hired in August of '05 as a student

12    driver, and he was upgraded in September of '05 to become

13    an individual driver.

14    Q    Do you know what that Federal Motor Carrier violation

15    was in December of '04 that he was convicted of?  Do you

16    see that up there?

17    A    It is apparent that is one -- he did not pay a fine.

18    Q    And it says fine, 0028, what does that mean?

19    A    I don't see that, but let me see if I can find it.

20    Q    It is on 335.  See where is says fine, colon, 0028.  As

21    a matter of fact, somebody put a checkmark by it.  Was that

22    somebody at your office that did that?

23    A    Yes.  I don't see that.  Oh, fine, 0029?

24    Q    See the checkmark up there?

25    A    Oh, fine, 0028, yes.

1  Q    Do you know what a fine, 0028, is?

2  A    No, sir.

3  Q    When your people in your department check on these MVR

4     reports, do they check and see what a fine is for a Federal

5     Motor Carrier violation?

6  A    Well, I mean, a fine in reference to the Federal Motor

7     Carrier violation itself, I don't know what the 0028 is

8     referring to, but a fine would be like a citation or a

9     ticket.

10  Q    Does that indicate to you since it says fine, 0028,

11     does that indicate to you that Mr. Johnson was convicted of

12     some kind of Federal Motor Carrier violation and he was

13     fined in December of '04?

14  A    Well, I think the conviction took place in May of '04

15     and that is when it was resolved was December of '04.

16  Q    Well, does that makes a difference to you when the

17     conviction was and when it was resolved if you are deciding

18     on whether or not to hire him as a driver?

19  A    The resolution, obviously, is whenever he paid the

20     fine.

21  Q    Does that make a difference to you?

22  A    Not when it was paid, but the fact that we look at the

23     conviction date as far as the date.  The 5/26/04 would have

24     been the date that would have been looked at as far as when

25     he actually --

1   Q    Okay.  And what is the significance of the date, the

2   5/26/04?  Explain to me what your thinking is there?  I

3   think he came and applied to you in July, maybe prior, in

4   '05.  So that is just about a year before he applied to

5   you, he actually has gotten a Federal Motor Carrier

6   violation and was fined for it.  Was that of any

7   significance to you on when you decide whether or not to

8   hire him?

9   A    That particular one was not --

10  Q    Why not?

11  A    Those are typically, as you mentioned earlier, about a

12  mudflap or something on a -- you mentioned a mudflap or a

13  different type of equipment situation where sometimes,

14  obviously, it goes on the record of the individual, but if

15  it is a Federal Motor Carrier violation, then it would be

16  more of a situation where it was a company fine for the

17  most part.  And it took that long to get resolved, which

18  may have been out of this gentleman's control or it may not

19  have been.

20  Q    Do you know as you sit here today what that was about?

21  A    No, sir.

22  Q    And you don't know if it was a mudflap or if it was

23  something to do with the company and not the driver?

24  A    I do not know what it is about.

25  Q    All right.  But you agree with me that he had at least

1    three moving violations within the past three years when he

2    comes to apply for a job at USA Truck to drive an

3    18-wheeler?

4    A    Yes.

5    Q    And you knew about that?

6    A    Yes.

7    Q    Look at 359, if you will.  It says on there while you

8    are looking for it, in accord with Federal Motor Carrier

9    Safety Regulations, you are supposed to ask him if he has

10   ever tested positive for a drug test.  Apparently, the way

11   you interpret that at USA Truck is you have got to have a

12   specific form for that specific question; is that right?

13   A    Correct.

14   Q    And on July 28th of '05, Mr. Johnson, what did he

15   answer to you?

16   A    He checked an "X" in the box that says, "no".

17   Q    All right.  If he has told the Montgomery Police

18   Department that he smoked marijuana and he tested positive

19   in late '02, early '03, then that would be untrue?  What he

20   is telling you on 359 would be untrue, wouldn't it?

21   A    I mean, if your statement, yes -- the statement that

22   you said was made and him indicating, "no", are two

23   different things, yes.

24        MR. OLIVER:  Can I interrupt you?  How much longer

25   do you have with him?  We need to give the next guy 30

1    minutes to get over here.  It looks like you are getting

2    down toward the end of this group of documents.  If you are

3    not within 30 minutes, we don't need to call him, but I

4    just want to bring that up.

5              MR. ALLRED:  Let me see if I can figure that out.

6                        (Off the record.)

7    Q    [BY MR. ALLRED]:  Let me refer you to 363 and 361, and

8     you all were using a company called Quest, whatever it is.

9     What is the name of that company?

10   A    Quest Diagnostics.

11   Q    Okay.  When you get these tests results in from Quest,

12    do you rely on them and use them in making employment

13    decisions?

14   A    Yes.

15   Q    Have you ever had any trouble with them, any inaccurate

16    results or anything like that?

17   A    Not that I am aware of.

18   Q    Do you still use them?

19   A    I don't know.

20   Q    Let me refer you to 370, please.  That document there

21    has been available to USA Truck and was in its files

22    regarding Mr. Johnson; is that right?

23   A    Yes, I mean, it appears to be some sort of an

24    electronic version.

25   Q    That information, I want to make sure it is clear that

1    just because some data or information is in an electronic

2    version, it is still available to USA Truck and the safety

3    department and the human resources department and whatever

4    department needs it, right?

5    A    This is available to the safety department, yes, sir.

6    But it is available, yes.

7    Q    All right.  And is that for the period of 9/1 through

8    10/1 of '05?

9    A    Correct.

10   Q    And does that indicate that there was some log

11   falsifications on the part of Mr. Johnson?

12          MR. OLIVER:  Object to the form.

13          THE WITNESS:  It refers to exceeding the 70-hour

14   rule.

15   Q    [BY MR. ALLRED]:  What does it say up there about --

16   doesn't it say due to log falsifications or errors, you

17   have been moved to Phase I?

18   A    Yes, it does.

19   Q    Falsifications is not something I just pulled out of

20   the air.  That is what USA Truck put down in Mr. Johnson's

21   personnel record; isn't that right?

22   A    Yes, the statement that you just read is on this.

23   Q    Okay.  And do you have any reason to believe that that

24   is untrue; that what is in that report on 370 is not

25   correct?

1  A    I have no reason not to believe that it is true.

2  Q    And he had an error rate at that time of 26.67

3   according to USA's figures; is that right?

4  A    That is correct.

5  Q    Is that acceptable for a USA driver to have an error

6   rate of little bit over one-fourth?

7  A    Well, that is a question for safety to answer.

8  Q    What do you think about it as the human resources

9   director?

10  A    I think that, obviously, that this was the indication

11   that they were trying to inform Mr. Johnson that we need to

12   work on his understanding of the logging procedures.

13  Q    Was it acceptable to you?

14  A    My vague understanding would be that this says he is in

15   Phase I which means that they would try to teach him how to

16   comply with those rules at that point in time.

17  Q    Was it acceptable to you?  Was that an acceptable error

18   rate?

19  A    It is acceptable on a short-term, if he can work on

20   getting it corrected.

21  Q    Was he driving a truck on the road for USA Truck while

22   he had that error rate on his logbooks?

23  A    He was driving for USA Truck during this time period,

24   yes.

25  Q    And USA Truck obviously had that information available

1    to them because it was either in electronic form, and now

2    it has been printed in paper form so it was available; is

3    that right?

4    A    That is correct.

5    Q    Okay.  Do you know if Mr. Johnson was ever tested for

6    marijuana after you hired him and before the wreck in which

7    John Britt was killed?

8    A    I do not, no.

9    Q    All right.  Why was Mr. Johnson fired?

10   A    Termination reflects a violation of company policy.

11   Q    What company policy did he violate?

12   A    It does not -- it is not reflective on the termination

13   report.  It does say, personnel contact requested before

14   rehire is considered.  Driver has been on a leave since

15   2/20 pending investigation.

16   Q    And what document are you looking at?

17   A    I am looking at 729.

18   Q    729?

19   A    Yes, sir.

20   Q    Okay.  Let me get that.  Now, 729, that is a USA form

21   that you do when folks leave you or you fire them or quit;

22   is that right?

23   A    When an employment terminates, this is the form that is

24   used, yes.

25   Q    Okay.  As the personnel human resources director, you

1    can't tell me why USA fired Mr. Theodore Johnson; is that

2    what you are telling me?

3    A    No.  As I look through the file, I will tell you that

4    the termination report says that.  Again, there is -- if

5    you look at the file, it says, personnel contact requested,

6    which would indicate that you have to contact safety as a

7    result of verifying anything on his employment.  And as I

8    look through the termination record details, it notes that

9    he had a DOT recordable accident on 2/20/06.  And since

10   that was the last day that he had worked, it would be -- it

11   would show that there was an accident involved and his

12   employment was terminated for violation of company policy.

13   Q    To make sure this is clear, the 2/20/06 accident, that

14   is when he turned in front of John Britt and killed him; is

15   that the one?

16            MR. OLIVER:  Object to the form.

17            THE WITNESS:  That is my understanding.

18   Q    [BY MR. ALLRED]:  Then you have got on 730, it shows

19   over there, eligible for rehire, "no".  No. 8 says,

20   discharged, 101.  You have some categories there.  Is there

21   a ledger or something at USA Truck that has what these

22   things mean?

23   A    This is to report -- if you look at the top left where

24   it says DAC Services.

25   Q    What is DAC Services?

1   A    DAC is the company that we discussed earlier where we

2   receive our MVRs, and they also keep employment records for

3   drivers that are in the transportation industry, so this

4   information is commonly referred to as a DAC report, which

5   is actually reflective on 732.  The input on 730 ends up

6   with the result of 732 being the termination record through

7   DAC Services.

8   Q    Okay.  Then on 731, accident, DOT, yes, 2/20/06,

9   Montgomery, one fatality.  Then it has a description code

10   and it has 03, and down there under the accident

11   description code that is a left turn; is that right?

12   A    That is correct.

13   Q    And when USA Truck made the decision to terminate

14   Theodore Johnson, had you made a full investigation of what

15   happened in the accident?

16   A    This termination process was handled through the safety

17   department, so by looking at the record, the driver was on

18   leave from 2/20.  The date of the termination report was

19   March 23rd, so my assumption is that the time frame between

20   2/20 and 3/23 is what came to the determination that the

21   employment would be terminated.

22   Q    That is would be after the company has made a full

23   investigation of the facts of the accident, wouldn't it?

24   A    I don't know if they made a full investigation of the

25   facts, but I would anticipate the investigation to the

1   facts of the accident were conducted during that time

2   frame.

3   Q    Would you determine, I mean, would you terminate a

4   driver before you completed the investigation of an

5   accident or would you wait until you finished with it?

6   A    Both of those are circumstances that could apply.

7   Q    You might terminate somebody before?

8   A    It could apply.

9   Q    Before it is complete?

10  A    I don't know about Mr. Johnson, and I was not involved

11  in the accident investigation part of it, but I mean --

12  Q    The human resources director, though, and a corporate

13  officer, Theodore Johnson has driven a truck in Montgomery

14  and turned in front of John Britt and he was killed and

15  then you all fired him, and you can't tell me why you fired

16  him?  Is that your answer?

17  A    That is not my answer.

18  Q    Why did you fire him?

19  A    The company policy violation.

20  Q    What company policy did he violate?

21  A    It is not reflective on that.  I would tell you that in

22  this circumstance based off the signatures on the

23  termination, it was handled in safety.

24  Q    Let me ask you this way, if his widow wants to know

25  what is going on, and I go back and tell her, well,

1    Landria, I went off to Fort Smith and I took the head

2    fellow's deposition in the personnel department, and he

3    said they fired Mr. Johnson for turning in front of John.

4    And he said they fired him for violating -- for a company

5    policy violation, a company policy violation, but they

6    don't know what company policy he violated.  Is that what

7    you want me to tell her?

8         MR. OLIVER:  Object to the form.

9         THE WITNESS:  I am telling you that this

10   termination was handled through the safety department and

11   that the information I have given you is reflective of what

12   is in the file.

13   Q    [BY MR. ALLRED]:  But you are the head man in the human

14   resources department, and before you leave here from your

15   deposition, your answer is you don't know; is that right?

16   A    I am familiar with, vaguely familiar with the

17   circumstances.

18   Q    Then how come you fired him?

19   A    Because he violated the company policy.

20   Q    And you don't know which company policy he violated?

21   A    I am understanding, but I have never read any

22   results --

23   Q    Tell me your understanding.  Tell me your understanding

24   of which company policy Mr. Theodore Johnson violated?

25   A    It is my understanding that Mr. Johnson violated the

1    drug policy.

2    Q    Okay.  And how did he violate?

3    A    Again, my vague understanding is that the drug screen

4     results after the accident showed that he tested positive.

5    Q    All right.  Is that against company policy?

6    A    Yes.

7    Q    To have a positive drug screen?

8    A    Yes.

9    Q    All right.  And the result that you got back on the

10     drug test, is that Document 964?  I may have an extra copy.

11     964.

12   A    That would be the report.

13   Q    Now, has your company relied on this report 964 from

14     Quest Diagnostics?  Has your company USA Truck relied on

15     that in making the employment decision with regard to

16     Mr. Theodore Johnson?

17   A    This was considered in that, yes.

18   Q    Not --

19   A    I believe this to be an accurate statement, and, yes,

20     that information was used.

21   Q    That is what I wanted to make sure.  There is not

22     anybody in your company that has questioned whether this

23     result was correct or not; is that right?

24   A    Not to my knowledge.

25   Q    All right.  And that says on there -- well, it says,

1    attention, DER.  Isn't that some officer with USA Truck

2    company?  What is DER?

3    A    I am not sure what they are referring to, but all of

4    our drug screen information is usually directed through one

5    or two individuals due to the confidentiality nature of any

6    drug screens; that we are required to keep all of this

7    information.  And that would be in reference to -- I am not

8    sure, I don't know what they are referring to, but just our

9    drug supervisor --

10   Q    Let me ask you this question because I want to find

11   out.  With regard to all of this confidentiality business,

12   you would agree with me that if Ms. Britt wants to find out

13   about what kind of condition Theodore Johnson was in when

14   her husband was killed and the father of her children was

15   killed, you are not saying USA raises some objection to her

16   having that information because of some confidentiality?

17          MR. OLIVER:  Object to form.  Requires a legal

18   conclusion.

19   Q    [BY MR. ALLRED]:  Are you?

20   A    I would think that my intent is not to say that this

21   information is confidential to where it can't be discussed

22   in this situation.  But the confidentiality is within the

23   company; that it is not distributed among other than a

24   short number of people.  And that would be in reference to

25   the person in the company in the safety department that

1    handled drug screening.

2    Q    This DER, you don't know who that is?

3            MR. OLIVER:  Object to the form.

4            THE WITNESS:  I don't know what DER refers to.  I

5    think at the time of this accident the individual that was

6    handling drug screens was a gentleman by the name of Tommy

7    Gage.

8    Q    [BY MR. ALLRED]:  Tommy?

9    A    Tommy Gage.

10   Q    How do you spell his last name?

11   A    G-A-G-E.

12   Q    And he was handling the drug screens?

13   A    At this time, yes.

14   Q    Where is he now?

15   A    He, I believe, is a safety director for a company in

16   Fort Smith called C. Bean.

17   Q    When did he leave?

18   A    Within the last couple of months.

19   Q    Did he quit or get fired?

20   A    He left voluntarily.

21   Q    Do you know why he left?

22   A    I do not know the circumstances.  I do know that he had

23   an opportunity with this C. Bean Transportation, which is

24   in Fort Smith.

25   Q    C.B.?

1    A    Bean, B-E-A-N.

2    Q    All right.  But you don't know who DER is on 964?

3    A    I imagine that is their code for drug enforcement

4      representative or something similar to that.

5    Q    That is what I thought.

6    A    I mean, I can only make that assumption, but that is

7      not an individual of the company, and it would have gone to

8      Tommy Gage.

9    Q    So that probably came to Tommy Gage; is that right?

10   A    My understanding that it would have went to Tommy Gage,

11     and I did see Tommy Gage's name on one of the forms that we

12     have discussed here.

13   Q    There is a letter, if I can find it.  Here it is.  Look

14     at 706.  Do you see that -- does that have that sticky note

15     on it on the front?

16   A    This is a photocopy, but probably, and it could have

17     been a sticky note.

18   Q    Doesn't that say, that sticky note say, tested

19     positive, pos, for positive marijuana?

20   A    Yes, in the middle of the page.

21   Q    Do you know who wrote that note and put it on there?

22   A    No, sir.

23   Q    And do you know who Shannon King is?

24   A    I do not know who Shannon King is.  It appears to be a

25     telephone number that is not in Arkansas.

1  Q    Is that the Quest Lab?

2  A    Oh, sir, I don't know.  I am not sure what Area Code

3   302 is in reference to.

4  Q    Does that indicate to you on 706 that somebody at USA

5   got the information that Mr. Theodore Johnson had tested

6   positive on the marijuana test?

7  A    There would be reason to believe that there is a note

8   here that says tested positive marijuana, and it was on

9   this form, or at least a sticky note on this form on 706.

10  Q    All right.  Do you know whether the amount of marijuana

11   in Mr. Johnson was ever quantified?

12  A    No more than looking at the report.

13  Q    Well, all this says is positive, the specimen was

14   positive, and it was diluted.  Then it has some numbers

15   over there.  Do you know if there was ever a specific

16   number given as to how much it actually was?

17  A    I am not aware of any, sir.

18  Q    All right.  When you get those things back in your

19   personnel department and you get a test that says dilute,

20   what does that mean to you?

21  A    Well, all the drug screens go back to safety, but to me

22   what the word means dilute, that it is apparent that there

23   is a hint of something, but it may not be enough to test.

24   I mean, dilute is kind of an all encompassing word for

25   sometimes -- sometimes people have to drink a lot of water

1    to urinate, which then seems to sometimes come back as

2    diluted because they actually had to drink two glasses of

3    water to -- but in general it just means that there is --

4    it is not a strong test.

5    Q    The 2,600 or however many drivers you've got, and you

6    do these drug tests on every one of them, don't you, before

7    you start?

8    A    Preemployment, yes.

9    Q    And then they have a DOT reportable wreck and they have

10    to take another drug test, another urine test?

11    A    That is DOT compliance.

12    Q    Has it ever occurred to you that sometimes when these

13    drivers take these tests and they have got a concern that

14    it is going to test positive, that they will try to dilute

15    it with tap water?  Has that ever occurred to you?

16    A    With tap water?

17    Q    Or some other liquid to make it diluted.  Is that what

18    that diluted means?

19    A    My impression would mean that that would be detected in

20    the test itself.

21    Q    When they detect it in the test, do they report it back

22    as dilute?  Is that what that means?

23    A    That would not be my understanding of the word dilute.

24    My understanding would be that someone had to drink a lot

25    of water just so they could urinate and that may --

1   Q     And so as the human resources manager of USA Truck,

2    that result where it says, dilute, that doesn't indicate to

3    you that Mr. Johnson tried to dilute the urine sample out

4    of his concern about his marijuana content?

5   A     That to me doesn't say that.  To the safety

6    representative who does this on a daily basis may have a

7    different opinion, but that doesn't necessarily indicate

8    that to me.

9   Q     Well, you look at a lot of those tests, don't you, test

10    results?

11   A     Well, actually, all of those results go through safety,

12    the confidential person in safety.  We administer them and

13    we make sure that the results are back, but as far as

14    looking at them, that actually goes through that same

15    person that would have done this one.

16   Q     All right.  Your department would handle unemployment

17    compensation, wouldn't it?

18   A     Yes.

19   Q     Okay.  All right.  Did you have some correspondence

20    with the unemployment people?

21   A     I believe we did, yes.

22   Q     And what did you tell them with regard to whether

23    Mr. Johnson was eligible for employment, rehire, or whether

24    he terminated or voluntarily left?

25   A     I know that there is one correspondence, at least, that

 1    says that he was discharged.

 2    Q    What document are you looking at?

 3    A    723.  It says, discharge, fatal accident, and that was

 4    dated March 23, '07.

 5    Q    Okay.  And 723 is signed by Redman O'Neal?

 6    A    Yes, it is.

 7    Q    HR supervisor?

 8    A    Yes.

 9    Q    And you know him pretty good, don't you?

10    A    Yes.

11    Q    And on March 23, '07, that would have been written

12    after USA Truck had conducted its investigation; is that

13    right?

14            MR. OLIVER:  Object to the form.

15            THE WITNESS:  Again, as far as the investigation

16    of the accident, I don't know when it ended or has ended or

17    not, but the determination to terminate this gentlemen's

18    employment had happened at that time; however, he filed the

19    claim on March 4th of '07.

20    Q    [BY MR. ALLRED]:  Let me ask you this, if one of your

21    drivers is in a fatal accident and they are completely not

22    at fault whatsoever, would there be any reason for you to

23    fire them?  If they had just not done anything and somebody

24    got in a wreck with them and it is all the other side's

25    fault, would there be any reason for USA Truck to fire

1    them?

2    A    Typically on -- a fatal accident does not automatically

3    mean you would be terminated, no.

4    Q    Okay.  And would the same be true if they had been

5    involved in a fatal accident and the other side was

6    completely at fault, your driver didn't have anything to do

7    with it, would there be any reason for you to report to the

8    unemployment compensation people that the driver was

9    discharged because of a fatal accident?

10          MR. OLIVER:  Object to the form.

11          THE WITNESS:  The response would not be that,

12    obviously, if they were not terminated --

13    Q    [BY MR. ALLRED]:  I am sorry.  I can't hear you.

14    A    We would not respond to the unemployment if the person

15    wasn't terminated.  If they are still employed, obviously,

16    there wouldn't be unemployment.

17    Q    Let's do it this way.  Let's say one of your drivers is

18    involved in a fatality accident and your driver is

19    completely free from guilt, had nothing to do with it, it

20    is completely the other side's fault, but the driver just

21    quits on his own, and then he turns around and files for

22    unemployment compensation, would you notify the

23    unemployment people that he had left because of a fatal

24    accident?

25    A    We may, but we would not say discharged.

(479) 471-0665       Veronica R. Lane, CCR veronicalane@cox.net

98

1    Q    All right.  Now, you see that Document 724?

2    A    Yes.

3    Q    What is that about?

4    A    That is a just a standard form letter that goes out on

5     any terminated driver/employee.

6    Q    So you are sending it to Mr. Johnson; is that right?

7    A    That is correct.

8    Q    And who wrote that up, Redman O'Neal?

9    A    No, this letter was mailed out on March 27th, which

10    would have been a few days after his termination.  Again,

11    it was a form letter and it came back filled out by

12    Theodore Johnson.

13   Q    Did he actually write these things in that are shown in

14    handwriting on it on 724?

15   A    That would be our belief.  It was mailed to him blank

16    where the handwritten notes that you are referring to are,

17    and it came back to us in a prepaid envelope with those

18    remarks written in it, so it would be our belief that

19    Theodore Johnson is the one that wrote in the information.

20   Q    All right.  So he is telling you there, he doesn't say

21    anything about getting fired.  He says that he wanted a

22    dedicated account to be home more.  Had he ever discussed

23    that with you or anybody in the human resources department?

24   A    No, sir.

25   Q    Do you know if he ever discussed that with anybody at

1    USA Truck?

2    A    I am not aware of that.

3    Q    Is that the first time you have been aware of that when

4    you looked at 724 today or had you seen that before?

5    A    No, this is the first time I have seen it today, yes.

6    Q    Is that a surprise to you?

7    A    The comments that he makes?

8    Q    Right.

9    A    No, sir.  This particular individual I have not met,

10    but to see this letter and to have the words wanted a

11    dedicated account to be home more is not necessarily a

12    surprise from a terminated driver.

13    Q    Was it a surprise that you fired him for being caught

14    with dope, and then he sends you back a letter, and where

15    it says, reason for leaving, he says he wanted a dedicated

16    account, that to me looks like he resigned.  Is that what

17    it looks like to you?

18            MR. OLIVER:  Object to the form.

19            THE WITNESS:   No, to me it looks like just his

20    opinion off of a survey questionnaire.  This is really

21    intended just to get a perspective from former drivers on a

22    few areas such as pay and benefits and equipment, and I

23    don't read more into than that.

24    Q    [BY MR. ALLRED]:  But there is no question that he

25    didn't leave on his own because he wanted to be home more.

1    You all fired him?

2    A    His reason for termination was discharged for a company

3    policy violation.

4    Q    And that was the dope test, the marijuana test that we

5    talked about?

6    A    That would be my understanding of it, yes.

7    Q    All right.  Look a 681, if you would, please.  Is that

8    where he is involved in another type of wreck or incident

9    or something involving some damage?

10   A    Yes.

11   Q    What is the date on that?

12   A    January 20, '06, I believe.

13   Q    All right.  And even though this was in the electronic

14   form, that incident was in the files of USA Truck starting

15   on that date there, January 20th of '06; is that right?

16   A    That is correct.

17   Q    Would you see if you could get that information for me,

18   please, sir, about that fellow Mike Neal?

19          MR. OLIVER:  Have you all asked in discovery for

20   Neal's address?  We are not going to conduct discovery

21   here.  If you have asked for it through written discovery

22   or written production, I will certainly produce it.

23          MR. ALLRED:  What we would like to do to make sure

24   it is clear, this witness says that he can call his lady

25   that he supervises, Misty Kleck, and he can get me the

Case 2:06-cv-00868-TMH-CSC   Document 40-12   Filed 11/13/2007   Page 101 of 103
(479) 471-0665      Veronica R. Lane, CCR veronicalane@cox.net
101

1    contact information on Mike Neal.  I just want to make sure

2    it is real clear because we will be talking to the judge

3    about this, I want to contact Mr. Neal and I want talk to

4    him, and I am probably going to want to take his

5    deposition, so I want to get up with him right away because

6    there is not much time, and I understand that Mr. Weindel

7    can get that information to me within minutes without any

8    trouble.

9    Q    [BY MR. ALLRED]:  Is that correct, Mr. Weindel?

10   A    I can call Misty and get his last known address and

11   phone number.

12   Q    Do you know of any reason why you would have any

13   problem getting that information?

14   A    No, sir.

15          MR. ALLRED:  And then Mr. Oliver says he is not

16   going to do that and give it to me.  If that is your

17   position, that is your position, but I would like to have

18   it as soon as I can get it.  And if you want some formal

19   discovery request, I am making one now.  I don't have any

20   way to type it up and get it to you today.  It seems to me

21   like it would be real practical to get it and let

22   Mr. Weindel give it to you, and then if you can give it to

23   me.  But I would like to have that information.

24          MR. OLIVER:  All right.

25          MR. ALLRED:  I don't have any further questions of

1    this witness.

2                     (Witness excused at 11:50 a.m.)

3                          * * * * *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:06-cv-00868-TMH-CSC    Document 40-12    Filed 11/13/2007    Page 103 of 103
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net
103

```
 1                        CERTIFICATE
 2   STATE OF ARKANSAS      )
 3   COUNTY OF SEBASTIAN    ) ss
 4
           I, Veronica Lane, a Certified Court Reporter, a notary
 5   public in and for the aforesaid county and state, do hereby
     certify that the witness, MICHAEL R. WEINDEL, was duly
 6   sworn by me prior to the taking of testimony as to the
     truth of the matters attested to and contained therein;
 7   that the testimony of said witness was taken by me
     stenographically and was thereafter reduced to typewritten
 8   form by me or under my direction and supervision; that the
     foregoing transcript is a true and accurate record of the
 9   testimony given to the best of my understanding and
     ability.
10
           I FURTHER CERTIFY that I am neither counsel for,
11   related to, nor employed by any of the parties to the
     action in which this proceeding was taken; and, further,
12   that I am not a relative or employee of any attorney or
     counsel employed by the parties hereto, nor financially
13   interested, or otherwise, in the outcome of this action;
     and that I have no contract with the parties, attorneys, or
14   persons with an interest in the action that affects or has
     a substantial tendency to affect impartiality, that
15   requires me to relinquish control of an original deposition
     transcript or copies of the transcript before it is
16   certified and delivered to the custodial attorney, or that
     requires me to provide any service not made available to
17   all parties to the action.
18
19                              _____
                                VERONICA LANE, CCR
20                              Certified Court Reporter
                                and Notary Public
21                              State Certificate No. 462
22   My Commission Expires:
     June 28, 2015
23
24
25
```

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


LANDRIA BRITT, as Administratrix          Plaintiff
of the Estate of JOHN W. BRITT,
Deceased


      vs.          Case No. 2:06cv868-ID-CSC


USA TRUCK, INC.; THEODORE LEVERNE          Defendants
JOHNSON; et al.
_____


DEPOSITION OF CASEY HANSEN

TAKEN ON THE 2ND OF NOVEMBER, 2007

12:02 P.M.


_____

APPEARANCES:                          ON BEHALF OF:
Mr. David E. Allred                   Plaintiff
Attorney at Law
7030 Fain Park Drive, Suite 9
P.O. Box 241594
Montgomery, AL  36124-1594
Mr. Thomas L. Oliver, II              Defendants
CARR ALLISON
100 Vestavia Parkway
Birmingham, AL  35216


Also present:
Mr. Claude Lochner


Veronica R. Lane, CCR
1304 Lovers Lane, Van Buren, Arkansas 72956
(479) 471-0665

1       Deposition of CASEY HANSEN was taken on November 2,

2   2007 at the Law Offices of Smith, Maurras, Cohen, Redd &

3   Horan, 1120 Garrison Avenue, Suite 200, City of Fort Smith,

4   County of Sebastian, State of Arkansas.

5                           STIPULATION

6       IT IS HEREBY STIPULATED AND AGREED by and between

7   counsel for the parties hereto that the deposition

8   testimony of CASEY HANSEN may be taken before Veronica R.

9   Lane, a Certified Court Reporter and Notary Public, at the

10  above captioned time and place.

11      Said deposition is taken pursuant to Rule 32(a)(3),

12  Arkansas Rules of Civil Procedure, (Rule 30, Federal Rules

13  of Civil Procedure), with the specific understanding that

14  any objections as to relevance, immateriality, or

15  incompetency are reserved and may be made at the time the

16  deposition is first offered into evidence.  Objections as

17  to form of questions are to be noted at the time of taking

18  of the deposition.  All formalities with reference to

19  taking, transcribing, forwarding and filing of said

20  deposition are waived.

21

22  *REPORTER'S NOTE:  "Uh-huh" denotes an affirmative response;

23   "Huh-uh" denotes a negative response.

24

25

3

1      CASEY HANSEN, the witness herein named, having been

2    first duly sworn, testified under oath as follows:

3                         DIRECT EXAMINATION

4    BY MR. ALLRED:

5    Q    Tell us your name, please, sir?

6    A    Casey Lewis Hansen.

7    Q    And what do you do?

8    A    I am a senior safety supervisor a USA Truck, Inc.

9    Q    How long have you held that position?

10   A    I have held that position approximately, I don't really

11    know, I would say maybe close to a year.

12   Q    How long have you worked for USA?

13   A    Approximately three years, November 4, 2004.

14   Q    Why does Mike Neal no longer work for USA?

15   A    That I couldn't tell you.

16   Q    Did you know him when he worked there?

17   A    Yes, sir, I did.

18   Q    Was he your supervisor?

19   A    Yes, he was.

20   Q    Did you see him on a day-to-day basis?

21   A    When he was at work and I was at work, yes, sir.

22   Q    When did he leave?

23   A    I don't know the exact time frame when he left.  It

24    seems to be in the area the end of August.

25   Q    Of '07?

1   A      Yes, sir.

2   Q      Do you know whether he quit or did he get fired?

3   A      That I am not aware of.

4   Q      Were you ever curious as to why he was the safety --

5    what was he, the safety manager, director, safety director?

6   A      Your question was again?

7   Q      Were you curious as to why he was the safety director

8    one day and then the next day he is gone?

9   A      There would be curiosity there; however, it didn't

10   really have anything to do with my position there at USA

11   Truck.

12   Q      You don't have a clue as to why he doesn't work there?

13   A      I don't know the circumstances, no, sir.

14   Q      You don't have a clue.  You don't know anything about

15    it; is that right?

16   A      I don't know anything firsthand.

17   Q      What have you heard?

18   A      Well, with some changes in the department, there was

19    some changes being made, and he might not be a fit.

20   Q      Changes in what?

21   A      We had just recently about a year before that had a new

22    safety VP, Rodney Mills.

23   Q      Did they get along?

24   A      The best of my knowledge, they did.

25   Q      Did Rodney Mills fire him?

1    A    I am not aware of that.

2    Q    Did Mike Neal ever say anything to you about having any

3    problems getting along with Rodney Mills?

4    A    No, sir.

5    Q    Or having any conflict with him?

6    A    No, sir.

7    Q    Any dispute with him?

8    A    Not that I am aware of, no, sir.

9    Q    All right.  Where can Mike Neal be contacted today?

10    A    That I am unaware of.

11    Q    Does he live in Fort Smith?

12    A    At the time he worked at USA Truck, he lived in Fort

13    Smith.

14    Q    Do you know where he works now?

15    A    No, sir.

16    Q    Do you know of anybody that could tell me where he

17    works now, how to find him?

18    A    No, sir, I really don't.

19    Q    So when Mike Neal, all of a sudden he is not there

20    anymore, and then you become the safety supervisor?

21    A    No, sir, I was the safety supervisor.

22    Q    So you have got the same position?

23    A    No, sir, I do not have that position.

24    Q    Tell me how that worked, Mike Neal is there one day in

25    August and the next day he is just gone.  Then what

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

1    happened with your job?

2    A    Nothing happened with my job.  Mike Neal was there one

3    day.  I was out of town in Little Rock to a meeting, and

4    when I came back the next day, he is no longer there.  My

5    position had not changed.

6    Q    So you have had the same position, safety supervisor,

7    before and after Mike Neal left?

8    A    That is correct.

9    Q    Okay.  Then who is the safety director now?

10   A    There is no safety director at this time.

11   Q    Is there anybody doing Mike Neal's job?

12   A    Directly as that position, I would say, no.  Many of us

13   in the safety department are doing parts of that job until

14   a replacement is hired.

15   Q    Is there a search on now for a new safety director?

16   A    Yes, sir.

17   Q    Have some people been interviewed?

18   A    I believe that is correct.

19   Q    Have you interviewed for that job?

20   A    No, sir.

21   Q    All right.  Are you familiar with the matter of the

22   wreck down in Montgomery, Alabama involving your driver,

23   Theodore Leverne Johnson, and Mr. John Britt who was

24   killed?

25   A    I have some limited knowledge to that case, yes, sir.

1   Q    All right.  At the time that this happened, Mike Neal

2    was the safety director, and he would have a lot more

3    knowledge than you about that; is that correct?

4   A    That is correct.

5   Q    What did Mike Neal do with regard to the matter of the

6    investigation and the issues related to the Theodore

7    Johnson fatality wreck?

8   A    What did he do with the investigation itself?

9   Q    Was he in charge of it?

10  A    Yes, sir, he was in charge of the investigation.

11  Q    Did he get fired because of the John Britt fatality?

12  A    I could not answer that.

13  Q    Do you know for a fact that he was not fired because of

14   this wreck?  I mean, can you exclude it?

15  A    I can't exclude that; however, I don't think that was

16   the basis for it.

17  Q    Was Mike Neal criticized after this Johnson wreck in

18   which John Britt was killed?

19  A    I don't believe he was.

20  Q    If he had been criticized about this wreck, would that

21   have come to your attention?

22  A    I really don't know if it would come to my attention.

23  Q    Well, do you consider yourself a management person?

24  A    No, sir.

25  Q    Where are you in the hierarchy of things with USA

1    Truck?  Who is your supervisor?

2    A    Right now my immediate supervisor is Rodney Mills, the

3    VP of safety.

4    Q    I put my list and it has gotten under some other

5    papers, but I have a list of what folks were going to

6    testify about.  What are you going to testify about under

7    the 30(b)(6) designation?

8            MR. OLIVER:  He is here to talk about the safety

9    issues.  They are No. 5 and No. 9.  You noticed him

10   individually, too, but as far as the 30(b) issues, he is 5

11   and 9.

12   Q    [BY MR. ALLRED]:  Okay.  Have you ever given a

13   deposition before?

14   A    No, sir.

15   Q    Does Mike Neal have any kind of litigation against USA

16   Truck?

17   A    I am not aware of any, sir.

18   Q    Have you talked to him since he left?

19   A    No, sir.

20   Q    As far as whoever at USA was in charge of making sure

21   that the drivers complied with the Federal Motor Carrier

22   Safety Regulations and rules of the road, is that you?

23   A    No, sir, that would ultimately be the director of

24   safety, Mike Neal.

25   Q    We really don't have the person who really was in

1    charge.  He is no longer there.

2    A    Yes, sir.

3    Q    Do you know anything about that subject?

4    A    I have a general knowledge of that subject, yes, sir.

5    Q    In February of '06, Mike Neal was the person who was in

6     charge of that job function; is that correct?

7    A    That is correct.

8    Q    So you have Mike Neal, he is in charge.  And then who

9     was under him?

10   A    There is several safety personnel under him.  I would

11    be one of the safety personnel that was under him.

12   Q    And you are a senior safety supervisor?

13   A    Yes, sir.

14   Q    Did you report directly to Mike Neal?

15   A    Yes, sir.

16   Q    Who else reported to Mike Neal?

17   A    Tommy Gage.

18   Q    All right.  Who else?

19   A    At the time of the accident?

20   Q    February of '06.  Excuse me.  At the time I am more

21    interested in is I think Mr. Johnson applied for a job with

22    USA sometime in the summer of '05, and then the wreck

23    happened February the 20th of '06, so that is the time

24    period I am interested in.

25   A    Okay.  The next person would be Jennifer Phillips.

1   Q    Jennifer, and what is her last name?

2   A    Phillips.

3   Q    All right.  Who else reported to Mike Neal?

4   A    Larry Mitchell.

5   Q    How many more?

6   A    That is it for our safety supervising staff.

7   Q    So you are a senior safety supervisor.  What was Tommy

8    Gage?

9   A    He was also a senior safety supervisor.

10  Q    Did you all just have different territories or what?

11  A    No, sir.  I believe the senior safety supervisor was no

12   more than really a promotion for how long you have been

13   with the department.

14  Q    Seniority?

15  A    Yes, sir.

16  Q    All right.  And what was Jennifer Phillips?

17  A    She was a safety supervisor.

18  Q    Not a senior to you or Tommy Gage?

19  A    That is correct.

20  Q    What about Larry Mitchell?

21  A    He was a safety supervisor.

22  Q    Do you know who the person was at USA who decided that

23   they would hire -- USA would hire Mr. Johnson?

24  A    I don't know one person who would make that decision

25   that they would hire Mr. Johnson, no, sir.

1    Q      Is there any way to tell?

2    A      I don't believe there is any way to tell.

3    Q      Okay.  And based -- have you read his file?

4    A      No, sir.

5    Q      For this case?

6    A      No, sir.

7    Q      You have not.  If I asked you to just describe to me

8     what you do as a senior safety supervisor, tell me what you

9     do?

10    A      Basically, what I am responsible for being a senior

11     safety supervisor is the day-to-day dealings with

12     operations and what occurs.  My primary function is to

13     oversee the DOT inspections.  If another supervisor or a

14     clerk would have an issue or a situation and would want

15     some information, they would sometimes request that at my

16     direction.

17    Q      You just do DOT inspections?

18    A      That is my primary function, yes.

19    Q      All right.  Is USA Truck, are you all subject to the

20     Federal Motor Carrier Safety Regulations?

21    A      That is correct.

22    Q      And truck drivers, are they involved in the DOT safety

23     sensitive function?

24    A      Yes, sir, they are.

25    Q      What is USA Truck's drug tolerance policy?

1    A    We have a zero drug tolerance policy.

2    Q    What does that mean?

3    A    That means if a driver, if we knowingly know that a

4    driver had used or currently using or under the influence,

5    they would be terminated based on not only company policy,

6    but probably DOT regulation.

7    Q    Even if it didn't violation DOT regulations, would you

8    terminate the driver anyway if you found out that they had

9    used, let's say, marijuana?

10   A    Yes, sir, that would be a policy violation.

11   Q    So when you say a zero to -- did you say a zero

12   tolerance policy?

13   A    Yes, sir.

14   Q    And when you say that, you are not talking about some

15   threshold level or some minimum level, you are talking

16   about zero, if there is any at all; is that right?

17   A    It is not defined as a threshold.  It is stated as

18   zero.  I don't know about threshold in there.

19   Q    Okay.  Would there be any acceptable level of marijuana

20   that one of your drivers could have and still operate a USA

21   Truck?

22   A    Repeat that one more time.

23   Q    Would there be any acceptable level of marijuana that

24   one of your drivers could have and still operate a USA

25   Truck?

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

1    A    Knowingly, no.

2    Q    What do you mean by knowingly?

3    A    If it was brought to safety's attention, then the

4    answer to that question would be, no.  If I did not know,

5    obviously I couldn't --

6    Q    All right.  Would there be anyway to identify the

7    person who made the decision to keep Johnson as a driver at

8    USA after he was hired?

9    A    I don't know if there would be a way of knowing.  The

10   knowledge I have, he was not doing a driving function;

11   therefore, after the time of the accident he was not

12   allowed in a driving function.

13   Q    I didn't mean it that way.  Apparently you

14   misunderstood me.  After he was hired on August 1st of '05,

15   somebody would have made the decision to hire him, and you

16   said you couldn't tell who really actually hired him.  But

17   then after he is hired, he is working on August 1st of '05

18   through February the 20th of '06 when he had the wreck,

19   would there be somebody who is supposed to be looking to

20   see if he is complying with your company rules and

21   regulations and with the DOT rules and regulations?

22   A    Yes.

23   Q    Who is that?

24   A    That would ultimately be Mike Neal.

25   Q    Okay.  And how did Mike Neal carry out or discharge

1    those duties?

2    A    The duties were discharged in areas such as hours of

3    service, DOT compliances.

4    Q    Well, those were items or issues that were looked into,

5    but how was it looked into?

6    A    They were actually divided up by personnel.  One person

7    would mainly be over the logging.  Another would oversee

8    DOT inspections.

9    Q    What part did you handle?

10    A    I ultimately handle the DOT inspection part.

11    Q    DOT inspection?

12    A    Yes.  That includes some hours of service.

13    Q    All right.  Do you agree with me that there should be

14    someone or some group of people at USA who should look into

15    each driver's performance record and how they are doing

16    their job, and how they are driving, and whether they get

17    tickets on an ongoing basis?  You would agree with me

18    there, wouldn't you?

19    A    I would agree that there is a process for that, yes,

20    sir.

21    Q    And USA has a duty and an obligation to do that; you

22    would agree with that?

23    A    Yes, sir.

24    Q    You said you had not read Mr. Johnson's file?

25    A    That is correct.

1    Q    Let me ask you this, look at this Exhibit 295, and

2    USA's lawyer has got these exhibits over there.  He can

3    show you his copies.  If you would look at 295, please,

4    sir.  Is that about the worst driving record that you have

5    ever seen on an application for a USA driver?

6         MR. OLIVER:  Object to the form.  You can answer,

7    if you know.  I just put in an objection.

8         THE WITNESS:  The question again was?

9    Q    [BY MR. ALLRED]:  Is that about the worst driving

10   record that you have ever seen on an application for a USA

11   driver?

12   A    On an application, no, sir.

13   Q    What about is that about the worst driving record you

14   have ever seen for a driver, one that was hired by USA

15   Truck?

16        MR. OLIVER:  Object to the form.

17        THE WITNESS:  Again, I typically wouldn't see this

18   information.

19   Q    [BY MR. ALLRED]:  Well, you are seeing it now.

20   A    Yes, sir.

21   Q    And as a safety, whatever you do as senior safety

22   supervisor, wouldn't it be of interest to you to know what

23   kind of accident record and driving record one of your

24   drivers has?

25   A    If I was in that position, I think it would be.

1  Q    Okay.  Well, you see, I am going to represent to you

2  that my understanding is Mr. Johnson filled that thing out,

3  295, and he signed it down there at the bottom when he was

4  making his application.  And he wrote all those things in

5  there.  Then, obviously, he was hired August 1, '05 or

6  thereabouts, and then he was kept on around to

7  February 20th of 2006, at least.  Do you know of any

8  driver, a USA Truck driver that would have a worst record

9  than this that is shown on this document here?  Because,

10  you see, he has one, two, three, four, five, six, seven

11  entries, and you all don't have but six spaces on the

12  application.  He has one more entry than the spaces

13  available.  Do you see that?

14  A    Yes, sir, I see that.

15  Q    Do you think that is about the worst one you have ever

16  seen or do you think there may be some that are worse than

17  that?

18          MR. OLIVER:  Object to the form.

19          THE WITNESS:  What I see in this sheet here is

20  improper passing.

21  Q    [BY MR. ALLRED]:  Well, I can read it.

22  A    I only see, really, four violations.

23  Q    Okay.  Are all of them moving violations?

24  A    I know of three that are moving violations.

25  Q    Which ones?

Case 2:06-cv-00868-TMH-CSC    Document 40-13    Filed 11/13/2007    Page 17 of 62
(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

17

1    A    Improper passing, speeding, and improper lane

2     direction.

3    Q    What about inattentive driver, wouldn't you have to be

4     moving to be inattentive when you are driving?

5    A    Based on what you are saying, it could be.

6    Q    Tell me what you think of how you could --

7    A    Without knowing what Delaware's requirements are.

8    Q    Well, let's just think about it a minute.

9    A    Okay.

10    Q    Inattentive driving, how could you be driving

11     inattentively if you are not moving?

12    A    That is correct.  I would remove what I said there.

13    Q    So you have four -- USA Truck knew about four moving

14     violations from the application; isn't that right?

15    A    What we have here, that is correct.

16    Q    And then in addition to that, he has got three times he

17     failed to show up in court, apparently, right?

18    A    Yes, sir.

19    Q    And then you knew he had had his driver's license

20     suspended three times.  That is all on your application,

21     isn't it?

22    A    That is shown on this.

23    Q    All right.  Shouldn't somebody at USA Truck look and

24     see about the driving record of people that want to drive

25     18-wheelers for your company?

1    A    Yes, sir.

2    Q    And do you know of any criteria or cut-offs there are

3    about how many tickets that somebody can have or how many

4    moving violations they can have in order to work at USA

5    Truck?

6    A    Yes, sir, I believe that is three moving violations in

7    the severe category is how it is broke down.

8    Q    And he had four, isn't that right?

9    A    It is showing four; however, I don't know what severity

10   category they fell under.

11   Q    What would you call severe, something to be severe?

12   A    I don't have that in front of me, the DOT breakdown of

13   it.  My general knowledge would be that they break down a

14   category of what they determine would be a violation that

15   falls under the three areas.  I am not sure inattentive

16   driving is under that category.

17   Q    All right.  So would that be of any concern to you in

18   the safety department of USA Truck that somebody is showing

19   up wanting a job running an 18-wheeler and they have this

20   kind of driving record that is showing on 295?  Would that

21   be of any concern to you?

22   A    That would be a concern.

23   Q    Okay.  Do you think there may be somebody that has

24   actually been hired in addition to Mr. Johnson that had a

25   record like this or maybe even worse than this?  Do you

1    think you all have one worse than that?

2         MR. OLIVER:  Object to the form.

3         THE WITNESS:  I wouldn't have any knowledge of it.

4    Q    [BY MR. ALLRED]:  Can you think -- and you have been

5    there for a while, can you think of any driver that you

6    have come in contact with in your position in the safety

7    department that has had any worse record than this one that

8    you see on 295?  Can you think of one that you have seen

9    worse?

10        MR. OLIVER:  Objection.

11        THE WITNESS:  I can't think of anything.

12   Q    [BY MR. ALLRED]:  All right.  Do you have to do with

13   driver logs?

14   A    I have a working knowledge of driver's logs, yes, sir.

15   Q    Is that something the safety department does?

16   A    Yes.

17   Q    Do you all monitor the drivers to see if they are

18   writing up their logs and doing them right?

19   A    Yes, sir.

20   Q    Why do the drivers have to keep logs?

21   A    The drivers keep logs in order to -- a regulation of

22   Federal Motor Carrier that requires them to keep the logs

23   so that they only drive certain periods of times and

24   receive adequate rest.

25   Q    All right.  Is that something that the DOT requires?

1    A    Yes, it is.

2    Q    And do you have any criteria with regard to the logs as

3     to what percentage of them can be errors or faults and what

4     percentage can be valid?

5    A    The last part you said?

6    Q    And what percentage can be valid?

7    A    It is not broke down in a percentage invalid or valid.

8    Q    Okay.  How do you monitor the logs in the safety

9     department?

10   A    We monitor the logs based on the hours of service, the

11    11-hour rule.

12   Q    All right.

13   A    The 14-hour rule.

14   Q    All right.

15   A    And the 70-hour rule.

16   Q    Okay.  And how did you do that?  I mean, how does it

17    work on a day-to-day basis?

18   A    On a day-to-day basis, driver's logs are scanned into a

19    system called AIRE.  AIRE is just an agency or a company

20    that takes the database that we have of our logs.

21   Q    Spell it for me?

22   A    AIRE, it is I believe --

23   Q    Is that an acronym?

24   A    Yes, it is A-I-R-E.

25   Q    A-I-R-E.  And what does that system do?

1    A    That is a system that takes the logs in and they scan

2    them and they check the logs for any mistakes, an auditing

3    type of company where we audit 100 percent of our logs.

4    Q    100 percent of them, right?

5    A    Yes, sir.

6    Q    How long have you been using AIRE?

7    A    Since January 1st.

8    Q    Of '07?

9    A    '06.

10   Q    And what did you use before AIRE?

11   A    We used a system called I believe it is TSMD.

12   Q    And what do those initials stand for?

13   A    I don't know.

14   Q    How long had you used TSMD?

15   A    I don't know how long they have used it.

16   Q    Why did you change from TSMD to AIRE?

17   A    To my knowledge is that it was an efficiency issue.

18   Q    Was it cheaper?

19   A    No, sir.

20   Q    And what specifically about efficiency was the reason

21   for the change?

22   A    We went from auditing what you call event drivers to

23   100 percent drivers.

24   Q    And what is an event driver?

25   A    An event driver would be driver who either had an

1    accident, a DOT accident, a DOT inspection, or had a random

2    drug screen.

3    Q    A what kind of drug screen?

4    A    Random.

5    Q    Were you told by the DOT to change from one of these

6    systems to the other?

7    A    No, sir.

8    Q    Were you told to do a better job, told by DOT to do a

9    better job of monitoring the logbooks?

10    A    No, sir.

11    Q    So it was an efficiency issue.  What is more efficient

12    about the AIRE system than the TSMD system?

13    A    The limited knowledge I have on the TSMD system was

14    that we were only checking drivers under the event drivers

15    and 10 percent of the rest of the fleet compared to we

16    could check logs on 100 percent.

17    Q    All right.

18    A    It actually limited the amount of people that worked

19    the TSMD, and there were several.  There would be -- I

20    don't know the exact number -- probably eight or nine

21    personnel working in the system before AIRE.

22    Q    How many people work the system with AIRE?

23    A    It all just gets sent to AIRE, so that eliminated all

24    of those people.

25    Q    So you outsourced it is what you did?

1    A    Absolutely.

2    Q    You eliminated the eight or nine employees?

3    A    Yes, sir.

4    Q    And that started January 1st of '06, right?

5    A    Yes, sir.

6    Q    Then you got before that date, then, you would check

7     about 10 percent of the logs or you would audit the event

8     drivers?

9    A    That is correct.

10    Q    Okay.  Do you know whether Theodore Johnson's logs were

11     ever audited between January 1st of '06?

12    A    Before January 1st of '06, yes, my knowledge is that he

13     had one, at least one log audit.

14    Q    Is that the one where he was violating the 70-hour

15     rule?

16    A    I would have to see that.

17    Q    I think there is one in there where he had a write up

18     for a violation of the 70-hour rule, if that is what you

19     are referring to.  Let me see if I can find it.  I don't

20     know if I can find it.  We talked about it just a minute

21     ago.  But you recall one or being told about one or seeing

22     one?

23    A    Johnson was a student, so he would automatically be

24     audited for an upgrade.

25    Q    Okay.  All right.  Other than that one document, do you

1    know of any other times that Mr. Johnson was specifically

2    audited for his logs?

3    A    No, sir.

4    Q    What is the speed limit for USA Truck?

5    A    USA Truck does not have a speed limit.

6    Q    Okay.  Is there anything in any of your written

7    materials that you give drivers about how fast you want

8    them to drive?

9    A    We would want them to drive the speed limit or under.

10    I am not aware of anything written.

11    Q    Okay.  Is there a 60-mile-an-hour speed limit for the

12    drivers?

13    A    I would not be aware of that.

14    Q    Who would know about that?  Are you saying that you

15    know about this speed issue and there is not a

16    60-mile-per-hour limit or there is not any limit or are you

17    saying I just don't know whether there is a speed limit or

18    not?

19    A    My knowledge would be that there is not a speed limit

20    on USA trucks.

21    Q    Would anybody, is there any reason that there would be

22    a speed limit and you just wouldn't know about it?  Do you

23    think that is something that just wouldn't come to your

24    attention or in the safety department do you think you

25    would pretty much know about that?

1    A    Again, I don't know of a speed limit.  I know our

2    trucks are governed.  I don't know the exact mark that they

3    are governed.  My knowledge is they are governed at 62 or

4    63; however, I wouldn't call that a speed limit.

5    Q    Okay.  Is there any particular quota for miles or hours

6    that you want drivers to drive per day?

7    A    There is no quota that I am aware of.

8    Q    In filling out these logs, do you want the drivers to

9    put down their exact miles that they drove and the exact

10   hours that they took to travel or should it just be an

11   estimate, guesstimate, or just some figure pulled out of

12   the air?

13   A    The safety department would want them to log it like

14   they did it.

15   Q    So if you drove 553 miles one day, you want them to put

16   down that figure instead of putting down 550 or 560?

17   A    We want them to put exactly what they did.

18   Q    Okay.  And then from the summer of '05 up until you

19   went on to the new system, have you found any indication

20   that Johnson's logs were audited other than the one time

21   where you had the 70-hour violation?  And I will represent

22   to you that is the only one I know about.  I think you and

23   I are talking about the same one.  To your knowledge, is

24   that the only one that you know about that he was audited?

25   A    To my knowledge, that would be correct.  I am not aware

1    of any audits that he was under.

2    Q    Did you have any criteria other than what you have told

3    me about, like event drivers, that would make you audit a

4    driver's logs?

5    A    The system when, prior to 2006?

6    Q    Right, prior to January of '06?

7    A    The system was set up on event drivers and it was set

8    up on 10 percent.  I wouldn't know of any other system why

9    they would be audited.

10    Q    Okay.  For example, would you have any particular issue

11    that would make you want to audit the logs, say, if they

12    showed an exact speed several times, would that make you

13    want to look further to see if they are correct?

14    A    Logs don't have speed.  Logs aren't based on speed.

15    Q    Yes, but you can figure out the speed by looking at the

16    log, can't you?

17    A    Not how they graph it.  No.  You can just assume what

18    the speed is if you did a point by point.

19    Q    Well, let me see if I can find one.  Pages 5 through 69

20    were provided to us and they show logbooks, and let me ask

21    you to look at it.  For example, No. 109, on that one,

22    doesn't it show how many miles he went?

23    A    The driver here put down that he traveled 75 miles;

24    that is correct.

25    Q    And then he has how long it took him to go that?

1    A    It looks like he has an hour logged.

2    Q    It looks to me --

3    A    Actually, it might be three-quarters -- he is actually

4     showing driving, that looks like --

5    Q    You are looking at 109?

6    A    I am looking at Page 109 dated 12/21/05.

7    Q    Right.  How long does he say he took him to drive that?

8    A    His actual driving time is at 6:15 to 7:30.

9    Q    Which is an hour and a half?

10    A    An hour and a half, that is correct.

11    Q    So he goes 75 miles in an hour and a half, and it is

12     just math, isn't it?

13         MR. OLIVER:  I object to the form.  6:15 to 7:30

14     is not an hour and a half.

15    Q    [BY MR. ALLRED]:  An hour and 15 minutes.  It is just

16     math, isn't it?

17    A    It is math based on what he recorded on the log.

18    Q    That particular log there, is that filled out right --

19     because over there on the side, he has got 1. -- he has

20     1.25, right?

21    A    That is what he is showing; that is correct.

22    Q    Isn't that 60 miles an hour?  Here is a calculator.

23    A    Okay.

24    Q    And then the next one there is No. 110.  How many miles

25     did he go that day?

1    A    He showed he went 630 miles.

2    Q    How long did he say it took him?

3    A    If I am reading this right, he's showing ten and a

4    half.

5    Q    So take 630, divided by 10.5, and that is 60 miles an

6    hour?

7    A    That is correct.

8    Q    Dead on.  Let me tell you, we went through these

9    documents, and out of 127 days, on 78 days he went exactly

10    60 miles an hour.  61.4 percent of the time he went exactly

11    60 miles an hour.  It is not a fraction, it is 60.  Does

12    that raise a red flag to you that you needed to go back and

13    see is he putting it down right?  Is he falsifying his logs

14    or not?

15    A    Is your question does it throw a red flag?

16    Q    Raise a red flag?

17    A    The question would be, yes, if it was brought to the

18    attention.

19    Q    All right.  Should somebody at USA Truck have been

20    looking at those logs when he is turning them in to see if

21    there is something in there that looks like it is not

22    correct, it looks like it may be falsified?

23    A    Again, his logs would not be audited unless he was an

24    event driver.

25    Q    I understand you weren't doing it unless he was an

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

29

1    event driver.  Like if he had had a wreck and killed

2    somebody, you would have audited his logs?

3    A    That is correct.

4    Q    But should somebody, whether you were doing it or not,

5    should USA have been auditing those logs to see -- for

6    instance, he is turning in 78 days here, that it is exactly

7    60 miles an hour, this can't be right.  I don't think this

8    fellow is doing it right.  Should somebody have been

9    checking on that?

10        MR. OLIVER:  Object to the form.

11        THE WITNESS:  Again, that is open.  Should someone

12    have been checking on it?

13    Q    [BY MR. ALLRED]:  Right, to see if he is doing it right

14    or to see if he is falsifying?

15    A    I would agree with that; however, the system was unless

16    he was 10 percent or an event driver, it wouldn't have been

17    brought to the attention most likely.

18    Q    You didn't have the system to do it at the time?

19    A    At the time.

20    Q    Now, if you looked at it and it says 60 miles an hour

21    on there on 61.4 percent of the logs that were given to us

22    out of that group, Pages 5 through 169, would that indicate

23    to you that those logs had been falsified or do you think

24    that it just -- it is just a pure coincidence that

25    61.4 percent of them are exactly 60 miles an hour?

1          MR. OLIVER:  Object to the form.

2          THE WITNESS:  Without looking at the logs

3    specifically, I wouldn't say it would be a coincidence.  It

4    looks like it is easier to add 60 than it would be 62 miles

5    an hour.

6    Q    [BY MR. ALLRED]:  Well, if he puts 60 instead of 62,

7     and it is supposed to be the right answer, 62 miles an hour

8     or whatever.

9    A    The right answer would be exactly how he did it.

10   Q    He should have put it down exactly how he did it?

11   A    That is correct.

12   Q    But since he has got exactly 60 miles an hour, you

13    don't feel like that is correct, do you?  That is too much

14    of a coincidence, don't you think?

15         MR. OLIVER:  Object to the form.

16         THE WITNESS:  I would have to look at each

17    individual log and see if he did.  Because he put the

18    mileage doesn't reflect exactly maybe what he did.

19   Q    [BY MR. ALLRED]:  Well, if he is putting it down like

20    that and not reflecting exactly what he did, he is

21    falsifying his log, isn't he?

22   A    Again, I don't know unless I looked at all the logs.

23    To answer your question, you are asking me to give a

24    generalization of a question, would that appear to be.

25   Q    A falsification of the logs?

1  A    Again, I wouldn't know unless -- I wouldn't go out

2   there and say that unless I looked at the logs

3   individually.

4  Q    If you looked at them, and the logs say what they say,

5   and you have got them just like we do.  And we looked at

6   them.  And there is 78 days out of that group, 5 through

7   169, that it is exactly 60 miles an hour.

8  A    Are you saying that all 78 days show 60 miles an hour?

9  Q    60 miles an hour.  It is no fraction.  It is not 60.1

10  or 59.8.  If you divide it out and you take the miles and

11  divide it by the hours, it comes out exactly.  For example,

12  there are several in there that are 660 miles, and guess

13  how many hours it took.  It took 11.  So that is 60 miles

14  an hour.

15             MR. OLIVER:  On average.

16             MR. ALLRED:  That is what is on the log.

17             MR. OLIVER:  Every day he is averaging 60 miles an

18  hour based on his time and the miles.

19  Q    [BY MR. ALLRED]:  Well, on those 78 days there.  That

20  is too much to be just a coincidence, isn't it?

21             MR. OLIVER:  Object to the form.

22  Q    [BY MR. ALLRED]:  To have 78 of them out of 127 to be

23  exactly 60 miles an hour?  You don't think that happened by

24  coincidence, do you?

25  A    I don't know how that happened.  I could say that it

1    could be coincidental or it could not be coincidental.  I

2    don't know.

3    Q    If it is a coincidence, it would be pretty darn

4    strange, wouldn't it?

5          MR. OLIVER:  Object to form.

6    Q    [BY MR. ALLRED]:  Very unusual, wouldn't it?

7          MR. OLIVER:  Same objection.

8          THE WITNESS:  It would appear to be unusual.

9    Q    [BY MR. ALLRED]:  Have you done some figures in the

10    safety department to see what the speed drivers are

11    averaging?

12    A    One, we don't tell drivers to average speed.  We tell

13    them to log it like they did it.  We don't audit logs based

14    on the speed.  We audit logs based on the hours of service.

15    All of their 11-hour rule violations; all of their 14-hour

16    rule violations, all of their 70-hour rule violations.

17    Q    If that had come to your attention and you had looked

18    at that, and you got these day after day after day, log

19    after log after log, 60 miles an hour exactly, you would

20    have looked into that to see, and probably talked with

21    Mr. Johnson, to see whether he falsified his logs, wouldn't

22    you?

23    A    What would have been brought to my attention is if was

24    in violation of the 11, 14 or 70 before I would even look

25    at a log.  And if it wasn't a violation, then I probably

1    would not see the 60 mile an hour because it wouldn't be

2    unreasonable to have 60-mile-an-hour traveling.

3    Q    All right.  So if you had somebody to come in and they

4    said, you know, I was looking at Theodore Johnson's logs,

5    log sheets, and he has got 78 days that is exactly 60 miles

6    an hour.  I just don't think that he is putting it down,

7    what did you say, log it like you do it.  I just don't

8    think he is logging it like he does it.  Would you have

9    said, well, we need to look into that to see if he is

10   falsifying his logs?

11            MR. OLIVER:  Object to the form.

12            THE WITNESS:  I don't know what I would say in

13   that situation like that.  It has never been brought to my

14   attention where a driver would have an "X" amount of days

15   showing the same mileage or the same speed in a log.  What

16   I would ask is, what are the violations?

17   Q    [BY MR. ALLRED]:  If it is 60 miles an hour every day,

18   and you tell me if I have got it right, at the safety

19   department at USA Truck, if it is exactly 60 miles an hour

20   every day, it raises no red flag with you whatsoever, no

21   suspicion whatsoever as long as it doesn't violate the

22   11-hour rule, the 14-hour rule, or the 70-hour rule; is

23   that right?

24   A    That is not what I am saying.

25   Q    What are you saying?

1   A     I am saying the suspicion would not be raised because

2    that would be a reasonable amount of time for a speed.

3   Q     Even though they are exactly 60?

4   A     That is correct.  Sixty would not be a factor.

5   Q     And there is an element of trust involved in this where

6    the driver just has to put it down, you know, and you say

7    put it down like you do it.  Write it down like you drive

8    it.  And then it is up to him to put down what that -- what

9    those miles are and what the hours are, isn't that right?

10  A     Again, what you said, it is a matter of trust, you are

11   relying on what the driver is putting on the log sheet;

12   that is correct.

13  Q     And you know that sometimes drivers falsify logs.  You

14   realize that, don't you?

15  A     I realize there is falsifications, yes.

16  Q     And 60 miles an hour, exactly 60 miles in 78 days, you

17   are saying that wouldn't raise any kind of red flag with

18   you as long as it is not over the 11-hour rule, the 14-hour

19   rule, or the 70-hour rule; is that right?

20         MR. OLIVER:  Object to the form.  Asked and

21   answered.

22         THE WITNESS:  That would not raise a red flag on

23   its own, no, sir.

24  Q   [BY MR. ALLRED]:  All right.  How was Mr. Johnson paid?

25   What was his basis of pay?

Case 2:06-cv-00868-TMH-CSC    Document 40-13    Filed 11/13/2007    Page 35 of 62
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

35

1    A    I am not aware of his pay.

2    Q    How are USA Truck drivers paid?

3    A    Again, that is not my department.  I don't know exactly

4    how the pay is broke down.

5    Q    Do they get paid by the miles or the load, hours or

6    what?

7    A    They get paid a mile, a mile pay.  Again, I wouldn't

8    know exactly what the breakdown is.

9    Q    Did you have a system called Qualcomm in this tractor,

10    in Johnson's tractor?

11    A    We do have a system called Qualcomm.

12    Q    The Qualcomm system, does that track every move it

13    makes with a satellite?

14    A    It does not track every move.  It tracks on an hourly

15    basis or a message basis and tells where that location is;

16    that is correct.

17    Q    All right.  Well, can you look at that Qualcomm

18    information and can you tell how many miles that truck

19    drove that day or was moved that day on a specific day?

20    A    You cannot tell the miles that they travel based on

21    Qualcomm.

22    Q    Can you tell where the tractor started that morning and

23    then where it ended up at the end of the day?

24    A    You can get a location where the tractor started and a

25    location where the tractor ended at the end of the day;

1    that is correct.

2    Q    Has USA Truck, have you ever made any effort to compare

3    the Qualcomm information with the logbook information to

4    reconcile them to see if they are anywhere close to being

5    the same?

6    A    No, sir.

7    Q    But you are saying you couldn't do that; that the

8    Qualcomm information wouldn't show you the correct amount

9    of miles that are driven in a day; is that right?

10   A    The Qualcomm does not show the miles from locations.

11   Q    All right.  Is the odometer reading entered on those

12   logbooks anywhere?

13   A    The odometer?  No, it is not, that I am aware of on the

14   log sheet, no.

15   Q    Is there anywhere in the logbook or any information

16   that is turned in to USA Truck about the beginning odometer

17   reading and the ending odometer reading?

18   A    Not that I am aware of, no, sir.

19   Q    What is shown on the back of those logbooks, those

20   logbook sheets?  I mean, those are blank, those are copies.

21   I am just wondering on the original.

22   A    There is nothing shown on an original log sheet on the

23   back.

24   Q    They are just blank?

25   A    Yes.

1    Q    Okay.  You said a while ago that your tractors are

2    governed.  Does that mean that there is something -- what

3    about the tractor that Mr. Johnson was driving, is that

4    where it wouldn't go over a certain speed?

5    A    That I don't know exactly.  When I say governed, it is

6    general that our tractors are governed.  I am not a

7    mechanic, so I don't know how they govern it.

8    Q    Tell me what you understand in the safety department

9    how that works, I mean, what speed?  I don't mean

10    mechanically.

11    A    I don't know what the exact speed would be.  What I

12    know secondhand, between 60 and 63 is the generally

13    accepted speed of the tractors.

14    Q    And it just won't go any faster than that?

15    A    My understanding it is set for in that area.

16    Q    Were you, yourself, involved in the investigation of

17    this wreck involved in John Britt's death?

18    A    I had some knowledge of the accident investigation,

19    yes.

20    Q    Based on your knowledge of the accident and of the

21    investigation, have you reviewed the Montgomery police

22    report file?

23    A    No, sir.

24    Q    Have you ever seen it?

25    A    No, sir.

Case 2:06-cv-00868-TMH-CSC    Document 40-13    Filed 11/13/2007    Page 38 of 62
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

38

1    Q    Did you get any statements from the driver,

2     Mr. Johnson?

3    A    No, sir.

4    Q    Do you know or did anybody at USA get any statements

5     from him?

6    A    I am not aware of any statements except for maybe --

7     and I am not aware of what was said, if anyone talked to

8     the driver, it would probably be when the call came in

9     about the accident.

10    Q    Larry Hammond?

11    A    Yes, if he spoke to him.  I don't know if Larry Hammond

12     got the call from the driver.

13    Q    He did.

14    A    He would be the only one I know that would have spoke

15     to that driver at the time.

16    Q    You never spoken to Mr. Johnson about this wreck?

17    A    No, sir.

18    Q    Have you and Mike Neal talked about this wreck?

19    A    No, sir.

20    Q    Haven't discussed it?

21    A    Haven't discussed any details.  We had a discussion

22     about that the accident had occurred.

23    Q    All right.  Have you ever been in any kind of meeting

24     with Mr. Neal or with anybody elsewhere where there was

25     some discussion to the effect that this was not your

1    driver's fault; that he really didn't turn in front of John

2    Britt?

3    A    I am not aware of a discussion like that.

4    Q    Did you know that Mr. Johnson had told the Montgomery

5    Police Department that he had smoked marijuana?

6    A    I am not aware of what Mr. Johnson told the police

7    department.

8    Q    I believe you told me a minute ago you have not seen a

9    Montgomery Police Department report?

10   A    No, sir, I don't believe I have seen the report, no.

11   Q    Did you see -- well, the file, there was a statement in

12   this 67-page statement.  You haven't seen that?

13   A    No, sir.

14   Q    What about the report itself, the police report from

15   the Montgomery Police department that is -- you know how

16   police departments write up accidents.  You have not seen

17   that?

18   A    I have not seen that report.

19   Q    Okay.  Whose job was it at USA Truck to investigate the

20   accident and determine whose fault it was and that kind of

21   thing?

22   A    I would say that would have been under Mike Neal, the

23   exact who is responsible for the exact investigation part

24   of it.

25   Q    He was solely in charge of it?

1    A    He would have been the head man in charge of I guess

2    the preliminary investigation.  I don't know how far that

3    would have went.

4    Q    Was there ever any delay or I will use the word hold up

5    or any problem about getting documents or anything from

6    Mike Neal's standpoint?  Did he ever mention anything to

7    you, I am unable to complete my investigation because of

8    blank?  Did anything like that ever occur?

9    A    I am not aware of anything.

10    Q    Okay.  Have you ever talked to Van Calhoun yourself, a

11    person named Van Calhoun?

12    A    The name doesn't ring a bell.  Could you tell me who he

13    is associated with?

14    Q    He is an accident investigator that USA Truck has hired

15    in this case.

16    A    I have not spoken to him.

17    Q    Have you ever worked on other fatality cases for USA

18    Truck?

19    A    Have I worked on other fatality cases?  I have been

20    involved in other fatality cases, yes.

21    Q    Did they have expert accident reconstruction people

22    involved in them?

23    A    I would have limited knowledge of who they would be.

24    Q    I mean, did you discuss the accident with an accident

25    reconstructionist in some other case?

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

41

1    A    No, sir.

2    Q    Do you think it is a good idea -- from your

3    standpoint of being a senior safety person, do you think it

4    would be a good idea for USA Truck to share the statement

5    from your driver, Theodore Johnson, with the accident

6    reconstructionist to let him know about what he says how it

7    happened?

8    A    I don't know what his statement would be.

9    Q    Well, would that be something that you think would be

10   of interest to an accident investigator to know what your

11   driver said?

12        MR. OLIVER:  Object to form.

13   Q    [BY MR. ALLRED]:  Does that make sense to you?

14   A    The question is does it make sense to me that our

15   driver should share information with a reconstructionist?

16   Q    No, not really.  Let me tell you something.  I went

17   down to Tallahassee and I took that fellow's deposition,

18   and he ain't never seen this statement that your driver

19   gave to the police department.  And my question to you is

20   does that seem kind of strange to you that USA Truck didn't

21   even give its own expert the statement that your driver

22   gave the police for his work?  Does that seem kind of

23   strange to you?

24        MR. OLIVER:  Object to the form.

25        THE WITNESS:  I really don't have an opinion

Case 2:06-cv-00868-TMH-CSC    Document 40-13    Filed 11/13/2007    Page 42 of 62
(479) 471-0665        Veronica R. Lane, CCR veronicalane@cox.net

42

1    either way.

2    Q    [BY MR. ALLRED]:  Let me ask you this, being in the

3    safety department at USA Truck, do you think that would be

4    important information for somebody trying to determine the

5    cause of a wreck?  Do you think it would be important

6    information to know what your driver says about how it

7    happened?

8    A    I don't think a reconstructionist needs to know what a

9    statement was said based on what evidence he can get while

10   reconstructing an accident.  I don't think the statement

11   would have any bearing to it.

12   Q    So the statement wouldn't even be relevant.  Whatever

13   your driver says, that wouldn't even be relevant, would it?

14   A    Again, I am not a reconstructionist, so I don't,

15   really --

16   Q    From a safety standpoint, would that be relevant to

17   you?  Let me ask it this way.  Just scratch that question.

18       If you are in the safety department and you get a call,

19   a call comes in, I know you don't take those calls, but

20   let's say a call comes in from a driver and he says, I have

21   had a wreck in Montgomery and I have killed somebody.

22   Wouldn't one of the first things you would want to know

23   from your driver is, how did it happen?  Wouldn't you ask

24   that question?

25   A    Myself?

(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

43

1   Q    Yourself.

2   A    It would be reasonable to want to know how it happened.

3   Q    Wouldn't that be about the first thing you say, well,

4    what happened?

5   A    The first thing I would ask is, are you okay?  And

6    then, were are you at?

7   Q    The next is, did it hurt my truck?  And then you want

8    to know, how did it happen; is that right?

9   A    Again, I would want to know -- yes, I would want to

10    know somewhere some details on what took place.

11  Q    Okay.  Look at 964, if you will, please, sir.

12  A    (Witness complies.)

13  Q    Do you know who DER is on that document there?

14  A    Yes, well, the DER would be the clinic that did the

15    test, the person that administered the drug test.

16  Q    You see that is addressed to USA Truck in Van Buren,

17    right?

18  A    Yes, sir.

19  Q    And it is to the attention of DER?

20  A    Yes, sir.

21  Q    So that would be somebody at USA Truck, wouldn't it?

22  A    This one would be, a DER.  I am a DER.

23  Q    And what is a DER?

24  A    A drug -- I am trying to determine what the acronym

25    stands for right now.  What it is is we administer the drug

Case 2:06-cv-00868-TMH-CSC    Document 40-13    Filed 11/13/2007    Page 44 of 62
(479) 471-0665       Veronica R. Lane, CCR veronicalane@cox.net

44

1    screen and it goes through a person that can administer the

2    drug screen after being able to do it for a year.

3    Q    All right.  So you all get this document in from a

4    testing company, and it says that Mr. Johnson is positive

5    for marijuana after this wreck; is that right?

6    A    This statement here says that, to the DER, that it does

7    show a positive dilute for marijuana.

8    Q    All right.  And do you have any reason to doubt that

9    report or to think it is inaccurate?

10   A    The report -- we would not see this report until MRO

11   would notify us of the report.

12   Q    Well, I don't know anything about an MRO, but do you

13   know of any reason that this thing is not accurate, this

14   report?

15   A    I have no knowledge of why it wouldn't -- if it is

16   accurate.  I would have no knowledge of it not being

17   accurate.

18   Q    You all depend on these in the safety department?

19   A    Yes, sir.

20   Q    Did Mr. Johnson contest this report and say he wanted

21   another test or he wanted to test a split sample or

22   anything like that?

23   A    I am not aware of him objecting to this test.

24   Q    Do you know why Mr. Johnson was fired?

25   A    I am not aware of why Mr. Johnson was fired.

1  Q    What is your understanding of how this wreck happened?

2  A    My understanding, my general understanding is the

3   driver was turning into a truck stop.

4  Q    Okay.  And?

5  A    And a vehicle had ran under the trailer.

6  Q    All right.  Whose fault was this wreck?

7  A    I have not seen the report.

8  Q    Are you talking about the police report?

9  A    Yes.

10  Q    If the police report says your driver was at fault for

11   failure to yield to John Britt, do you dispute that?

12  A    Your question who is at fault.  I really don't know who

13   was at fault in this accident.

14  Q    You told me you hadn't seen the report?

15  A    Well, I hadn't seen the report.

16  Q    Even to this minute you have not seen it?

17  A    No, sir.

18  Q    Okay.  Well, do you go by what the report says if you

19   are determining who is at fault?

20  A    No, sir.

21  Q    Well, since you said that, no, I haven't seen the

22   report, if it says that your driver is at fault for failing

23   to yield, do you dispute that?

24  A    Yes, I would dispute that.  I would want to look at

25   everything.

Case 2:06-cv-00868-TMH-CSC    Document 40-13    Filed 11/13/2007    Page 46 of 62
(479) 471-0665    Veronica R. Lane, CCR veronicalane@cox.net

46

1    Q    What else would you want to look at?

2    A    First of all, I didn't investigate the accident.  I

3    don't -- I don't investigate the accidents at USA Truck,

4    so, I mean, I don't know what I would want to see

5    altogether to make a conclusion.

6    Q    All right.  Let me ask you this, being in the

7    management in the safety department at USA Truck, is it

8    USA's policy and position that your drivers, they can turn

9    in front of oncoming traffic and the oncoming traffic just

10   has to watch out for them and get stopped; is that your

11   position?

12            MR. OLIVER:  Object to the form.

13            THE WITNESS:  I have no knowledge of any policy

14   regarding a situation like that.

15   Q    [BY MR. ALLRED]:  So that is not something that you

16   tell your driver's to do, just turn in front of people,

17   they will stop.  You don't want them to do that, do you?

18   A    I would say you do not want them to turn in front of

19   oncoming traffic.

20   Q    As far as since you hadn't even looked at Mr. Johnson's

21   statement, and you have not looked to see whatever his

22   explanation is whether he could have made his turn safely?

23   A    I have no knowledge of his statement at the accident.

24   Q    At all?

25   A    At all.

1   Q    Would you like to know what he says about it?

2   A    I really have no need to know what he said.

3   Q    From the safety -- from the standpoint of being in the

4    safety department at USA Truck, and this fellow has been

5    killed out in Montgomery by one of your drivers, you

6    understand he is making a turn in front of him, aren't you

7    at least curious as to what the driver says?  Just as a

8    human being, don't you just have some curiosity about that?

9   A    I really have no curiosity what this driver says.  I

10   would rather see the facts to draw my conclusion of what

11   happened.

12  Q    Would one of those facts that you would want to draw

13   your conclusion, would that be what your driver says?  I

14   mean, he is the one driving your truck.

15  A    Your question was as a human being would I want to.  As

16   a human being away from USA Truck, I would think -- or even

17   with USA Truck, there is more than just a statement of what

18   happened, I would say.

19  Q    You want to see the facts of what happened, but

20   wouldn't that include finding out what your driver says?

21  A    A statement on what the driver said could play a part

22   in the overall picture, yes.

23  Q    Okay.  Let me show you this while I am looking at these

24   papers here.  This is a report from the Montgomery Police

25   Department.  Are you telling me that you have never seen

1    that before right this minute?  Haven't seen or even looked

2    at it?

3    A    I don't recall seeing this report at all.

4    Q    See where he charges your driver with failing to yield

5    on the front up at the top.  See they have got a 21?

6    A    Okay.  You have to look through here, 21.

7    Q    I am sorry, 21 is down there.

8    A    Failure to yield to right-of-way.

9    Q    Yes.

10    A    Okay.

11    Q    Do you dispute that Mr. Johnson failed to yield the

12    right-of-way to John Britt?

13    A    I don't dispute that.  Based on this report, it shows

14    that the officer stated that he did.

15    Q    If you have -- just between us since you hadn't seen

16    that before, if you got -- if I tell you, and there is a

17    drawing you are looking at that the officer drew, that is a

18    seven-lane highway, three going each way and a turning lane

19    in the middle.

20    A    Okay.

21    Q    Your fellow is turning across three lanes in front of

22    several oncoming vehicles, one of which is John Britt.  Who

23    would have the right-of-way in that situation, your fellow

24    or the oncoming traffic?

25          MR. OLIVER:  Object to the form.

1          THE WITNESS:  I see one vehicle.  I don't see

2     several.

3     Q    [BY MR. ALLRED]:  Well, I am asking you.

4     A    Okay.

5     Q    Let's just leave out the other cars.  I will tell you

6      there were other cars coming.

7     A    Okay.

8     Q    And I will also tell you that in addition to saying

9      that he smoked marijuana, your driver said that he saw

10      three vehicles coming and turned in front of them.  Now,

11      with that information, who would have the right-of-way in

12      that situation, your driver or the oncoming vehicles?

13          MR. OLIVER:  Object to the form.  There is no

14      evidence indicating how far away the other oncoming

15      vehicles were.

16          THE WITNESS:  That is what I was just about to

17      say, how far was the oncoming traffic?

18     Q    [BY MR. ALLRED]:  Let's say it is 250 feet away

19      according to your driver, and the speed limit on that

20      highway is 55 miles an hour.

21     A    Okay.

22     Q    Who would have the right-of-way?

23     A    Again, how far away was he?

24     Q    I just told you, 250 feet.  That is what your driver

25      said.

1   A    Okay.

2   Q    Nobody has told you that before right this minute; is

3    that correct?

4   A    That is correct.

5   Q    Now, who would have the right-of-way if your driver

6    says he is 250 feet from this traffic that he sees, and he

7    is going to turn across three lanes to go into a truck

8    stop, that is what that was right there, a truck stop, who

9    would have the right-of-way in this situation?

10  A    You are saying the speed is 55-mile-an-hour; however,

11   you don't know the speed of the other cars.  You just know

12   that they are 250 feet away.

13  Q    For your purposes, assume that they're going 55.

14  A    Based on the diagram, you would conclude or concur that

15   the oncoming traffic may have the right-of-way.

16  Q    May have the right-of-way.  That is the rules of the

17   road all over the country, isn't it?  If you are going to

18   turn in front of somebody, you want to make sure it is

19   clear and the straight traffic has the right-of-way as

20   opposed to the traffic cutting across in front.

21  A    That is correct; however, I wasn't there.  I don't

22   know, 250 feet away, was traffic stopped for some reason

23   and you begin to make a turn.

24  Q    Your driver said it was 250 feet away and he saw it.

25  A    And he saw the vehicle?

(479) 471-0665     Veronica R. Lane, CCR veronicalane@cox.net

51

1   Q     Yeah.

2   A     Okay.

3   Q     They all had their lights on and he turned in front of

4   them anyway.  Now, if he was to call you up and say, hey, I

5   am down here in Montgomery and I am fixing to cut into this

6   truck stop here and there is traffic coming, it is heavy

7   traffic, but I am just going to cut out there when I find a

8   place I can stick my nose in and just let them stop.  I am

9   going to do it anyway because I need to get in here and get

10  fuel.  What would you have told him to do?

11            MR. OLIVER:  Object to the form.

12            THE WITNESS:  Based on what you said, the obvious

13  answer would be you would want to make sure that the way is

14  clear.

15  Q   [BY MR. ALLRED]:  You would tell him not to do that,

16  wouldn't you?

17  A     Make sure you are clear before you turn is what I would

18  tell him.

19  Q     All right.  Is a broken windshield, is that something

20  that can impair a driver's vision?

21  A     There is a DOT regulation that says a cracked

22  windshield is a violation.  Whether it impaired his vision,

23  I don't know.  I would want to see where the crack was.

24  Was it in his vision?  Was it in the passenger's side.  I

25  can't answer that question because I don't know.

1   Q    But a cracked windshield would be a DOT violation?

2   A    It is a DOT violation.

3   Q    And you are not supposed to have a cracked windshield

4    on a tractor; is that right?

5   A    The violation that you should not have a cracked

6    windshield.

7   Q    Do you know the details about Mr. Johnson's marijuana

8    testing after this accident?

9   A    No, sir.

10   Q    Who would know about that?

11   A    I don't really know who would know about it, but the

12    safety supervisor that would have been on call to arrange

13    for the post accident drug test to be administered would

14    know.

15   Q    Who was that?

16   A    I don't know who it was.

17   Q    If Larry Hammond took the call, who would have made the

18    arrangement for the marijuana testing?

19   A    A safety supervisor who was on call would have.

20   Q    Would that be somebody here in Van Buren?

21   A    Not necessarily.  It would be a safety supervisor that

22    was on the call list to handle that call for that week.

23   Q    How would that work if your driver has a wreck in

24    Montgomery?  And I think the place that was used was

25    American Family Care on Marti Lane in Montgomery.  Do you

(479) 471-0665     Veronica R. Lane, CCR veronicalane@cox.net

53

1    all have standard agreements with places?

2    A    We use a company called Safety Compliance that handles

3    the -- that have an agreement with clinics that we would

4    send a driver to to be administered a post accident drug

5    screen.

6    Q    You don't know who handled that for USA?

7    A    No, sir.

8    Q    Okay.  All right.  Are there any records anywhere that

9    would say -- we subpoenaed these documents from American

10   Family Care, but I don't have them yet, but do you have

11   anything from American Family Care other that this 964 that

12   you know about?

13   A    We wouldn't have anything from American Family Care

14   except for the chain of custody.

15   Q    Okay.  Do you have this chain of custody, 965?

16   A    That is it right here.

17   Q    I can't read that, can you?

18   A    I can't read it very well either.  I can tell you what

19   it says.

20   Q    Okay.  How are you going to do that if you can't read

21   it?

22   A    Well, I know that this is USA Truck's information

23   because this is a standard DOT form, and they put USA

24   Truck's information here.

25   Q    Let me ask you this, I would just like to get ahold of

1    a copy that I can read.  Where can I get one?

2              MR. OLIVER:  Do you know where?

3              THE WITNESS:  I could try to locate one at USA

4    Truck.  I know we have one.  It would be in the file.  I

5    can't guarantee I can get it better for you to read, but I

6    can produce it.

7              MR. ALLRED:  I would like to get a legible copy of

8    No. 964.

9              MR. LOCHNER:  It is not going to get any clearer

10   than that.  It is just an image.

11             THE WITNESS:  Did you say you had contacted the

12   clinic?

13             MR. ALLRED:  I subpoenaed their records.

14             THE WITNESS:  They should be able to provide you

15   with the original copy of that.  The standard is to send a

16   fax copy.

17   Q   [BY MR. ALLRED]:  Can you look at that 964 and tell me

18    what time the sample was taken?

19   A   It appears to be 11:15 a.m.

20   Q   On what date?

21   A   The date is showing 1/23 of '0 -- I'm sorry.

22   Q   Is it 2/23?

23   A   It is showing 2/21/06 is the day he put down.  2/21/06

24    is the correct date.

25   Q   2/21/06 at 11:15?

1    A    Yes, sir.

2    Q    When there is a DOT reportable wreck, don't you have a

3    certain number of hours for the driver to take a urine

4    test?

5    A    Yes, sir, you have 32 hours.

6    Q    All right.  And this was done within that time span; is

7    that right?

8    A    That is correct.

9    Q    And then once that is reported to USA Truck, what is

10   done with it?  What do you do with it?

11   A    It would be reported by the MRO, who is a doctor.

12   Q    A medical review officer?

13   A    Yes, sir.

14   Q    And that is that fellow that signed it down at the

15   bottom?

16   A    That is correct.

17   Q    Okay.

18   A    He would make contact, and then the driver would be

19   disqualified from driving.

20   Q    Now, this fellow down at the bottom listed Dr. Flug

21   (phonetic), he works for Quest; is that right?

22   A    That is correct.

23   Q    Or he has a contract with them or something?

24   A    It is a contract, yes.

25   Q    Then he reviews the test and they go through their

1   protocol, and then he sends this to USA Truck, right?

2   A    After the driver has been contacted.

3   Q    Okay.  Well, one think I am concerned with, this shows

4    a date of May the 31st of '06 --

5   A    Okay.

6   Q    -- on the letter, but that is after all the driver

7    contact and all of that kind of thing has been done; is

8    that right?

9   A    If they can contact the driver in a reasonable time.  I

10   can't tell you what that time is.

11   Q    But there is some records in there that shows

12   Mr. Johnson was fired shortly after the wreck for violating

13   company policy, and the company policy violated was using

14   marijuana.  So somebody at USA got information about the

15   test being positive before May the 31st of '06, didn't

16   they?

17   A    That is not the only means on how they make

18   notification.

19   Q    That is what I am trying to find out from you, how do

20   you get that information?

21   A    That information would be given by the MRO to USA

22   Truck, either by phone or by the company safety compliance.

23   Q    How did the information on Mr. Johnson about his drug

24   test come to USA Truck after the test was done on the 21st,

25   February the 21st of '06?

1    A    I am not aware of that.

2    Q    Well, that is the only document that I have been

3    produced by USA.  Would it come to you in a document or

4    would there be a note somewhere?  Is there an electronic or

5    is there an e-mail?

6    A    Typically it is a phone call.

7    Q    Any record made of it?

8    A    Not that I am aware of.

9    Q    All right.  Let me see if I can find that document.

10    Somebody made a note in there about testing positive for

11    marijuana.  I may not be able to find it, just a

12    handwritten note.  Would that indicate to you that -- here

13    it is.  Look at 706.  Can you see that note on there, when

14    you get there, that sticky note, tested pos, marijuana,

15    would that be how the information would be recorded if you

16    got a telephone call?

17    A    Again, I am not -- I wouldn't say that.  I don't know.

18    The sticky note, are you saying this part right here is a

19    sticky note?

20    Q    Right.

21    A    Does it have a date on that sticky note?

22    Q    I don't see one.

23    A    Do we know who wrote the sticky note?

24    Q    No.  Nobody has been able to tell me yet.  Do you know

25    who wrote it?

1    A    No, sir.

2    Q    Are you familiar -- well, let's see, let me do it this

3    way, have you had drivers in the past to have positive

4    tests for marijuana?

5    A    Your question again was?

6    Q    Have you had drivers in the past who have had positive

7    tests for marijuana?

8    A    Who tested positive for marijuana in the past, yes.

9    Q    When you get that information initially before they

10    do -- go through the protocol and send this letter and all

11    that kind of thing, and you get notified, because you told

12    me sometimes you get notified by phone first.

13    A    Yes, sir.

14    Q    What is the procedure for the recording of that

15    information in the driver's file?

16    A    The procedure would be you would get notification,

17    either by phone or an e-mail, that the driver in particular

18    would have to contact the doctor because the doctor --

19    Q    How would USA write it down?  Would it be something

20    like that sticky note?

21    A    I have never seen this document before.

22    Q    That form?

23    A    That is correct.

24    Q    You don't know what that form is?

25    A    It looks like it goes to the personnel department.

1    Q    All right.  Do you have a form in the safety department

2    that you put that information down when you get a positive

3    test for marijuana?

4    A    A form like this, no.

5    Q    Do you have any particular way that you record it?

6    A    We record a positive drug screen on a SAP form.

7    Q    Say that again.

8    A    It is the Substance Abuse Professional form.  It is a

9    form notifying the driver that he tested positive after

10   notification from an MRO, and what it does, it brings an

11   awareness to the driver that he has basically just a couple

12   options.

13   Q    Do you know whether that was done with Johnson?

14   A    I have no knowledge of that.

15   Q    One way or the other?

16   A    No knowledge of it, no, sir.

17   Q    Do you know what the diver turnover rate is at USA

18   Truck?

19   A    I do not know what the turnover rate is.

20   Q    Let me look at -- let's look at 708 through 711.  That

21   is not the ones I was looking for.  Look at 712.  Didn't

22   you all charge Mr. Johnson, didn't you all charge him the

23   wrecker for you all's rig for this wreck?  Do you see down

24   there at the bottom?

25   A    It appears to be that.  That doesn't fall under the

1    safety department, though.

2    Q    Who does that fall under?

3    A    I would say that would be under the breakdown or

4    maintenance department.

5    Q    All right.  What is USA's policy if one of your

6    driver's has a wreck, and let's say if they have a wreck

7    and they don't have anything to do with fault, it is just a

8    wreck, somebody else just causes it completely.  Do you

9    know of any reason USA would charge them for the wrecker

10    for the USA rig?

11    A    I don't have any knowledge of that or policy that would

12    say they do or they don't.

13    Q    All right.  And then over there its also $140.50.  Did

14    you all make him pay his own bus ticket from Montgomery?

15    A    I don't know if we made him pay that.  It says here

16    that he had a $300 wrecker, plus 140.50 for a bus ticket

17    equals $440.50.  I don't know who paid that.

18    Q    Looking at this, this says operations to payroll form,

19    on 772, and doesn't it indicate that after Mr. Johnson has

20    this wreck, before you settle up with him on the last

21    check, USA Truck charged Mr. Johnson for the wrecker; then

22    you charged him for his bus ticket from Montgomery back to

23    wherever he was going.  Isn't that what that indicates?

24    A    Again, I don't really know what this form really says

25    and what it doesn't say.  I see what is written in there,

1    but I don't know if that is what it means, no.

2    Q    Do you know what this truck weighed at the time of the

3    wreck?

4    A    No, sir.

5    Q    Do you know what the maximum it could weigh was?

6    A    The maximum legal weight would be 80,000 pounds.

7              MR. ALLRED:  All right.  Thank you, sir.

8              MR. OLIVER:  Is that all you have for him?

9              MR. ALLRED:  Yes.

10             MR. OLIVER:  So we can let him go?

11             MR. ALLRED:  Yes.

12                  (Witness excused at 1:40 p.m.)

13                       * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE
 2   STATE OF ARKANSAS       )
 3   COUNTY OF SEBASTIAN     ) ss
 4
         I, Veronica Lane, a Certified Court Reporter, a notary
 5   public in and for the aforesaid county and state, do hereby
     certify that the witness, CASEY HANSEN, was duly sworn by
 6   me prior to the taking of testimony as to the truth of the
     matters attested to and contained therein; that the
 7   testimony of said witness was taken by me stenographically
     and was thereafter reduced to typewritten form by me or
 8   under my direction and supervision; that the foregoing
     transcript is a true and accurate record of the testimony
 9   given to the best of my understanding and ability.
10       I FURTHER CERTIFY that I am neither counsel for,
     related to, nor employed by any of the parties to the
11   action in which this proceeding was taken; and, further,
     that I am not a relative or employee of any attorney or
12   counsel employed by the parties hereto, nor financially
     interested, or otherwise, in the outcome of this action;
13   and that I have no contract with the parties, attorneys, or
     persons with an interest in the action that affects or has
14   a substantial tendency to affect impartiality, that
     requires me to relinquish control of an original deposition
15   transcript or copies of the transcript before it is
     certified and delivered to the custodial attorney, or that
16   requires me to provide any service not made available to
     all parties to the action.
17
18                              _____
                                VERONICA LANE, CCR
19                              Certified Court Reporter
                                and Notary Public
20                              State Certificate No. 462
21   My Commission Expires:
     June 28, 2015
22
23
24
25
```