Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION
CIVIL ACTION NO. 2:06cv868-ID-CSC

LANDRIA BRITT, as Administratrix
of the Estate of JOHN W. BRITT,
Deceased,

Plaintiff,

vs.

U S A TRUCK, INC.; THEODORE
LEVERNE JOHNSON, et al.,
Defendants.

DEPOSITION OF
DR. ANDREW MASON

9:15    At BOONE, North Carolina
October 26, 2007
9:15 A.M.

Reported by: AMY CHAWNE HOLSCLAW

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 3

TABLE OF CONTENTS

EXAMINATIONS

| EXAMINATION | | PAGE |
|---|---|---|
| Direct Examination by MR. ALLRED | | 6 |

EXHIBITS

| EXHIBIT | DESCRIPTION | MARKED |
|---|---|---|
| 1 | NOTICE OF DEPOSITION | 6 |
| 2A | CASE FILE NOTES | 11 |
| 2B | LITIGATION PACKET | 11 |
| 3 | CV FOR ANDREW P. MASON | 11 |
| 4 | DIAGRAM | 61 |
| 5 | ARTICLE FROM FORENSIC SCIENCE INTERNATIONAL | 80 |
| 6 | BATCH WORKLIST FOR CANNABINOIDS | 132 |
| 7 | DIAGRAM | 145 |
| 8 | CALCULATIONS FROM MODELS | |

2A  11

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 2

APPEARANCES

For the Plaintiffs:
DAVID E. ALLRED, P.C.
7030 FRAIN PARK DRIVE
SUITE 9 (36117)
MONTGOMERY, ALABAMA 36124-1594
334.396.9200

For the Defendants:
LEA RICHMOND, IV, Esq.
CARR ALLISON
100 VESTAVIA PARKWAY
BIRMINGHAM, ALABAMA 35216
205.822.2006

**EXHIBIT**

**B**

tabbies

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 4

STIPULATIONS

It is hereby stipulated and agreed and agreed
between the parties to this action, through their respective
counsel of record:

(1)   That the deposition of DR. ANDREW MASON, may be
taken on October 26TH, 2007, beginning at 9:08 AM, at
184 NORTH WATER STREET, BOONE, North Carolina, before
Amy Chawne Holsclaw, Court Reporter.

(2)   That the deposition shall be taken and used as
permitted by the applicable Alabama Rules of Civil
Procedure.

(3)   That any objections of any party hereto as to notice
of the taking of said deposition or as to the time or
place hereof, or as to the competency of the person
before whom the same shall be taken, are deemed to have
been met.

(4)   Objections to questions and motions to strike
answers need not be made during the taking of this
deposition, but may be made for the first time during
the taking of this deposition, but may be made for the
first time during the progress of the trial of this
case, or at any pretrial hearing held before any judge
of competent jurisdiction for the purpose of ruling
thereon, or at any other hearing of said case at which
said deposition might be used, except that an objection

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 5

1    as to the form of a question must be made at the time
2    such question is asked, or objection is waived as to
3    the forum of the question.
4    (5)    That the witness reserves the right to read and sign
5    the deposition prior to filing.
6    (6)    That the sealed original transcript of this
7    deposition shall be mailed first-class or
8    hand-delivered to the party taking the deposition for
9    preservation and delivery to the Court, if and when
10   necessary.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 7

1    Q.   All right.  And is that near the campus of Appalachian
2         State?
3    A.   I don't know -- quarter of a mile away.
4    Q.   Okay.  What -- Are you with an organization called
5         ToxicoLogics?  How do you pronounce that?
6    A.   ToxicoLogics.
7    Q.   Okay.  ToxicoLogics.  All right.  What is ToxicoLogics?
8    A.   The firm I founded in 1998, roughly.
9    Q.   Okay.
10   A.   July of 1998.
11   Q.   All right.  And is it a corporation, partnership, or what?
12
13   A.   It's an Esquire, incorporated in North Carolina.
14   Q.   Are there any other shareholders other than you?
15   A.   My wife.
16   Q.   And what is her name?
17   A.   Lynne L-y-n-n-e Mason.
18   Q.   Is she a toxicologist?
19   A.   No.
20   Q.   What do you do for a living?  What do you put on your
21        income tax return where it says occupation?
22   A.   Forensic Toxicologist.
23   Q.   Okay.  And are you employed at Appalachian State?
24   A.   Currently, no.
25   Q.   Have you ever been?

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 6

1         P R O C E E D I N G S
2         (ON THE RECORD 9:15 A.M.)
3    THEREUPON,
4         DR. ANDREW MASON
5    Having first been duly
6    Sworn, was examined and
7    Testified as follows:
8    DIRECT EXAMINATION BY MR. ALLRED:
9         MR. ALLRED:  I don't have the notice of deposition.
10        MR. RICHMOND:  There's one right over there.
11        MR. ALLRED:  Okay.  Good.  That will be Exhibit 1.
12   Let's go ahead and get started.
13        (THEREUPON, EXHIBIT NO. 1 WAS MARKED FOR
14   IDENTIFICATION.)
15        MR. ALLRED:  All right.  I'm ready when you are.
16        MR. RICHMOND:  Would you like to read and sign?
17        THE WITNESS:  Let's make that decision at the end of
18   it.
19        MR. RICHMOND:  Okay.
20   BY MR. ALLRED:
21   Q.   Tell us your full name, please.
22   A.   Andrew Paul Mason.  My last name is spelled M-a-s-o-n.
23   Q.   All right.  And what is your business address, please?
24   A.   184 -- Physical address is 184 North Water Street, Suite
25        12, Boone, North Carolina, 28607.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 8

1    A.   Yes.
2    Q.   When were you last employed there?
3    A.   Several years ago.
4    Q.   Okay.  Do you make a living doing anything else other than
5         ToxicoLogics?
6    A.   Currently, no.
7    Q.   Okay.  Have you ever?
8    A.   Yes.
9    Q.   Since 1997, has ToxicoLogics been the only --
10   A.   1998.
11   Q.   -- '98, been the exclusive income for you?
12   A.   Almost completely.
13   Q.   Okay.  Was any other income you had -- was that from doing
14        toxicology work, or teaching?
15   A.   The only other thing would be teaching part-time at ASU.
16   Q.   All right.  When you taught at Appalachian State, what did
17        you teach?
18   A.   A course entitled Forensic Chemistry and Toxicology.
19   Q.   Okay.  And you have some letters after your name; PhD.
20        What is your PhD in?
21   A.   Medicinal Chemistry.
22   Q.   Okay.  But you're not licensed to practice medicine in any
23        state?
24   A.   I'm not a physician.
25   Q.   Okay.  And what is DABFT mean?

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 9

1   A.   Diplomate of the American Board of Forensic Toxicology.
2   Q.   All right. And what does DABCC mean?
3   A.   That is the Diplomate of the American Board of Clinical
4        Chemistry.
5   Q.   Okay. You issued, didn't you, a report to Lea Richmond
6        about this case involving John Britt. Is that right?
7   A.   That's correct.
8   Q.   And is that dated May 7th of '07?
9   A.   Sounds consistent.
10  Q.   Okay. When -- Have you made any different -- have you
11       done any additional work on this case since May 7th of
12       '07?
13  A.   Yes.
14  Q.   What additional work have you done?
15  A.   I reviewed the litigation package.
16  Q.   Okay.
17  A.   From Professional Medical Services.
18  Q.   All right.
19  A.   Reviewed case files.
20  Q.   Reviewed what?
21  A.   Case files.
22  Q.   Case files?
23  A.   Yes.
24  Q.   Okay. What is that?
25  A.   My notes here.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 10

1   Q.   Okay.
2   A.   The information that I received.
3   Q.   Okay.
4   A.   I did some additional calculations based on information I
5        found in the litigation packet.
6   Q.   All right.
7   A.   That would be it.
8   Q.   Okay. Do you have any different or additional opinions or
9        conclusions, other than the ones stated in the May 7, '07
10       letter?
11  A.   Essentially, no.
12  Q.   Okay. When did you first get into this case?
13  A.   It was not all that long before that.
14  Q.   So --
15  A.   I don't think.
16  Q.   You don't think?
17  A.   I started my file on May 2nd, 2007.
18  Q.   All right.
19  A.   Yes.
20  Q.   And when you started your file, how do you keep up with
21       your time? Do you have like a time log that you keep? Do
22       you keep notes on it, or put it in the computer, or what?
23  A.   It's in my directory. It's in my case file.
24  Q.   We would like to get a copy of your case file.
25       Exhibit 1, we'd like to make the deposition notice.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 11

1        And then we'd like to get a copy of your case file as
2        Exhibit 2.
3        (THEREUPON, EXHIBIT NO. 2 WAS MARKED FOR
4        IDENTIFICATION.)
5   A.   Okay.
6   Q.   Okay. And this is -- you handed me --
7   A.   -- Curriculum Vita.
8   Q.   -- Your CV. All right. Well, we will make this Exhibit
9        3. Is it current?
10  A.   It is.
11       (THEREUPON, EXHIBIT NO. 3 WAS MARKED FOR
12       IDENTIFICATION.)
13  Q.   Okay. Let's go ahead and put these markers on here, so
14       we'll remember what we're talking about.
15  A.   Sounds like a good idea.
16  Q.   Okay. And 2 is going to be a composite Exhibit. Is it
17       okay to put the sticker on your file?
18  A.   Please, do.
19  Q.   All right. This is it right here?
20  A.   Right.
21  Q.   Okay.
22  A.   Two volumes.
23  Q.   Okay. And this blue volume, how do you describe it?
24  A.   Well, this is -- both of these are the case files. The
25       first volume here, on the left hand side, is the business

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 12

1        records related to this case.
2   Q.   Is that your billing records and that kind of things
3        there?
4   A.   Billing records, engagement letters, those kinds of
5        issues.
6   Q.   Okay.
7   A.   The right hand side has, essentially, attorney
8        communications, work product and all that other kind of
9        stuff.
10  Q.   Okay. And what is the manila file folder?
11  A.   Litigation package from National Medical Services.
12  Q.   Okay. So, if we do it in stead of, can we make this one
13       2A, the blue file, and then can we make the NMS file 2B?
14  A.   Please, do so.
15  Q.   2B, Mason.
16  A.   There you go.
17  Q.   Okay. And those are going to be composite exhibits.
18       Okay. Now, then.
19       So, you got in the file, or you got in the case May
20       2nd of '07, and what were you provided with?
21  A.   I was provided with the information that was contained, or
22       listed in my report.
23  Q.   Okay. On page 7?
24  A.   Could be. Let me check real quick.
25  Q.   Okay.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 13

1   A.   That would be correct. And then, of course --
2   Q.   All right.
3   A.   -- I think the one document that's not there, because I
4        received it after that time, would be the National Medical
5        Services Litigation Package.
6   Q.   Okay.
7   A.   Which is now Exhibit 2B.
8   Q.   2B. When did you get the NMS package?
9   A.   Let me think.
10  Q.   What date did you receive it?
11  A.   I don't know.
12  Q.   Do you have any notes in your time records there?
13  A.   No. I didn't -- I don't have an exact date when I
14       received it. I do have a letter from Mr. Richmond saying
15       June 18th, 2007.
16  Q.   June 18th, 2007. So, you got the NMS information by
17       letter dated June 18th of '07?
18  A.   Correct.
19  Q.   So, it follows you had not reviewed it when you wrote
20       the May 7th, 2007 report?
21  A.   Correct.
22  Q.   Okay. And you don't -- you said your opinions are
23       essentially the same in your May 7th, '07 letter. Is that
24       right?
25  A.   That would be true.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 15

1   Q.   Okay. So you -- so --
2   A.   -- it contains a copy of that report.
3   Q.   Right. So, you would differentiate it then --
4   A.   -- Well --
5   Q.   -- The toxicology report is the toxicology report, and
6        then the litigation package is the toxicology report, plus
7        some other documents?
8   A.   Right.
9   Q.   Is that correct?
10  A.   A bunch of them.
11  Q.   Okay.
12  A.   A bunch other stuff. That's correct.
13  Q.   I got you. And then you have -- you also have -- you have
14       listed a Report of Autopsy for the Alabama Department of
15       Forensic Sciences, that's five pages. We have that.
16  A.   Yes.
17  Q.   And that's included within 2A.
18  A.   Right.
19  Q.   Exhibit 2A.
20  A.   That's correct.
21  Q.   And then you reviewed Alabama Uniform Traffic Accident
22       Report, which is also within 2A, and it is 4 pages.
23       Right?
24  A.   Right.
25  Q.   Do you have any other written documents that you reviewed

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 14

1   Q.   Okay. All right. So, you got these documents, and then
2        listed on page 7 there, the Lab report from NMS. And that
3        is the -- which specific sheets are you talking about? On
4        this copy I have, I'm not sure I have the -- I'm on the
5        same page with -- when it says; A. Lab Report NMS, 4
6        pages, which 4 pages are you talking about that you
7        reviewed?
8        (PURSUES DOCUMENTS.)
9   A.   Those right there.
10  Q.   Okay. And that would be the -- says Toxicology Report
11       104, and that -- how do you differentiate that if we're
12       looking for it -- is this also included in the NMS records
13       that you got later?
14  A.   Yes.
15  Q.   Okay. How do you differentiate it between what you would
16       use for use in the letter, and what you got later?
17  A.   Well --
18  Q.   -- Is this a summary? --
19  A.   -- I believe it's --
20  Q.   -- of the report? --
21  A.   -- I believe it's identical.
22  Q.   But this is -- this says Toxicology Report, then the other
23       record -- what do you call the other one? What do you
24       call the other record?
25  A.   Well, this is from the litigation package.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 16

1        before you wrote your letter -- your opinion letter?
2   A.   Not to my knowledge.
3   Q.   Date May 7th of '07?
4   A.   No.
5   Q.   Okay. Do you ever talk to the driver of the tractor
6        trailer?
7   A.   No, sir.
8   Q.   Do you know who he is? Do you know his name?
9   A.   I remember it was listed in the documentation I reviewed.
10       I don't remember it off hand.
11  Q.   Okay. Did you get any statements about what the tractor
12       trailer driver said?
13  A.   No, sir.
14  Q.   Okay.
15  A.   Other than what is contained in the documents I reviewed,
16       no.
17  Q.   All right. Was there any document that you reviewed that
18       had anything to say about what the driver of the tractor
19       trailer said about how the accident happened?
20  A.   Not to my knowledge, other than what was stated in the
21       document that I reviewed, and I don't remember anything
22       particular there, either.
23  Q.   Okay. Did you get any information from anyone about what
24       the tractor trailer driver said? The guy driving the
25       tractor trailer truck?

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 17

1   A.   I -- I don't have any memory of that at this time.
2   Q.   Okay. How did you go about formulating your opinions and
3        conclusions? Just take me through the process that you
4        used with deriving your opinions and conclusions as stated
5        in your May 7th, '07 letter.
6   A.   Reviewing the documentation. Synthesis of it. I try to
7        obviously look for items that -- that corroborate other
8        information. Try and tie the physical findings together
9        with the pharmacology.
10        Research related to pharmacology drugs and
11        understanding the properties and materials that are, that
12        are detected.
13        Review scientific literature with respect to those
14        materials. Synthesis of those effects with the physical
15        findings and descriptions, et certera.
16   Q.   All right. And you went through that process. You
17        started it on May 2nd, and on May 7th, you wrote this
18        letter. Five days later. Did you have any drafts of that
19        letter that you sent to anybody, and that you got back
20        some comments, and you did another draft?
21   A.   I don't believe so.
22   Q.   Was this your final opinion?
23   A.   I believe so.
24   Q.   Okay. did you have notes or drafts of any, or any working
25        papers that you had in any exhibit, like Exhibit 2A -- the

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607     (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 18

1        blue folder -- that you used to draft your letter?
2   A.   I'm sorry. Come at me again.
3   Q.   Did you have any notes or drafts in Exhibit 2, Exhibit 2A?
4
5   A.   No.
6   Q.   Did not?
7   A.   No.
8   Q.   Okay. Did you speak with anyone, or collaborate, I guess
9        is what the word I'm looking for, and discuss this case
10        with them, and try to -- to arrive at your opinions and
11        conclusions?
12   A.   Not at the time I wrote the letter. No.
13   Q.   Okay. What was your understanding of how this        automobile
14   wreck happened?
15
16   A.   General description would be that a tractor trailer
17        turning left into a parking area from the center lane. It
18        was a seven lane road way. And that a truck, coming from
19        the opposite direction, in the outside lane, ran
20        underneath the trailer of this eighteen wheel,
21        semi-tractor combination. Which resulted in fatal
22        injuries to the driver of the pick-up truck.
23   Q.   All right. And where did you get that information?
24   A.   From the Alabama Uniform Traffic Accident Report --
25   Q.   -- Okay. --

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607     (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 19

1   A.   -- Information.
2   Q.   Who does that report find to be the prime contributing
3        unit?
4        MR. RICHMOND:  Object to the form.
5        MR. ALLRED:  I beg your pardon?
6        THE WITNESS:  I didn't say anything.
7        MR. ALLRED:  Who does that report find to be the
8        prime contributing unit of the accident?
9        MR. RICHMOND:  Same objection.
10        THE WITNESS:  I don't know.
11  BY MR. ALLRED:
12   Q.   Have you looked on it to see what the investigating
13        officer's opinion was?
14   A.   I reviewed it very carefully, yes. I don't remember.
15        Is there something you'd like to point out to me?
16   Q.   On -- your client is Mr. Johnson. Does that reflect your
17        recollection?
18        MR. RICHMOND:  Object to the form.
19        THE WITNESS:   Well, my client is not Mr.
20        Johnson. My client is Mr. Richmond and his firm.
21  BY MR. ALLRED:
22   Q.   Okay. And Mr. Richmond's client is Mr. Johnson. Does
23        that refresh your recollection?
24   A.   That is my understanding.
25   Q.   Okay. And he's unit one. Did you notice that on the

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607     (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 20

1        report?
2   A.   That would be correct.
3   Q.   All right. And did you notice where the investigating
4        officer put him down prime contributing unit number, and
5        he put number one. Do you see that on there?
6   A.   Where do you see --
7   Q.   -- up at the top. Right along in here.
8   A.   I'm looking.
9   Q.   Okay.
10   A.   No. No. I didn't note that.
11   Q.   Okay. And you see right next to that number one, where it
12        says Mr. Richmond's client was the prime contributing
13        unit, you see in that box where they put 21?
14   A.   I do.
15   Q.   And you see down at the bottom for the codes, it says 21,
16        and that says failure to yield to right of way. Do you
17        see that on there?
18   A.   Under contributing circumstances?
19   Q.   Right.
20   A.   Yes. I do.
21   Q.   Is there any particular reason you didn't include that in
22        your report?
23   A.   No, sir.
24   Q.   Okay. Do you think that's an important factor?
25   A.   It certainly could be.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607     (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 21

1   Q.   Okay. All right. Well, I notice in here you've given a
2        history, and you went through and you've got history,
3        analysis and opinions, and then you go through and you
4        have summary and conclusions, and we'll talk about these
5        in due course, but one thing I want to ask about is with
6        regards to -- to the analysis and opinions.
7             You've got several references in here -- like on
8        page 2 of your report, and it says; you've got in brackets
9        1-9, and those are for Footnotes. Is that right?
10  A.   That's for references.
11  Q.   Okay. And is that these references back here?        1-4?
12
13  A.   That'd be correct.
14  Q.   Which would be on page 6.
15  A.   This is true.
16  Q.   And you say these are scientific references. What does
17       that mean? What am I supposed to take from that when you
18       put on that report in brackets, you've got 1-4, and then
19       you've listed scientific references. What does that mean.
20
21  A.   In scientific publications, when you cite a particular
22       fact, or particular conclusion based on previous
23       publications, you can -- you can cite the particular
24       source of information and where that information may be
25       derived.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 23

1   A.   -- You can cite that publication for -- as a particular
2        source where someone can go find that information.
3   Q.   Are you saying that these cites -- these citations, these
4        references, these serve for one of a better word,
5        authority, for what you're saying?
6   A.   They serve in a form of authority, yes.
7   Q.   Okay. And are they -- tell me about these publications.
8        Are they -- are they generally accepted publications in
9        the field of pharmacology?
10  A.   Forensic Toxicology.
11  Q.   Forensic Toxicology.
12  A.   Yes. Correct.
13  Q.   And when I use that term, that's my term, not yours, but,
14       it is generally accepted in the field of Forensic
15       Toxicology. What does that mean?
16  A.   It would mean generally that these are materials relied
17       upon by people in our field, that are determined, that are
18       believed to be --
19  Q.   Okay.
20  A.   To represent facts and opinions related to the properties
21       related to these two materials, which are generally agreed
22       upon.
23  Q.   All right. When you get in a case like this one,
24       involving the USA Truck Company, and your hired by a
25       lawyer, like Mr. Richmond and his firm, do you -- do you

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 22

1   Q.   Okay. Is that -- did you use a scientific method in
2        coming to your opinions and conclusions?
3   A.   I'd like to think so.
4   Q.   And describe to me how you went about it. With regard to
5        the scientific method aspect.
6   A.   Having been involved in Forensic Toxicology for many
7        years, I understand very well the pharmacology, physiology
8        toxicology and their affects of these materials.
9             One attempts to look at the properties of the
10       materials and the effects that they produce, and of
11       course, their bio-chemistry. How the body affects them,
12       how they affect the body, and use that information to
13       support your opinions and conclusions.
14  Q.   I understand that's what -- that's what you say you did,
15       but I want to know how you went about doing it. You took
16       these materials that were given to you by Mr. Richmond --
17  A.   I'm not sure -- I'm not real sure I understand what you're
18       asking.
19  Q.   And then how do the -- how -- how do the scientific
20       references -- why do you put those -- why do you refer to
21       scientific references in your report?
22  A.   Again, because when you make a particular point that is
23       unaccepted fact to conclusion that has been published in
24       these publications --
25  Q.   -- Okay. --

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 24

1        see your role as being an advocate for their position?
2   A.   No, sir. I don't.
3   Q.   Well, you answered that quickly, and I want to -- I want
4        to ask you this. In your role in this case, do you feel
5        like it would be improper for you to be an advocate for
6        one side or the other?
7   A.   I feel the -- the -- you know as well as I do when you get
8        in the court room, there are only two advocates present in
9        the court room. The represent the attorneys who advocate
10       for their clients.
11  Q.   But what I'm talking about is you.
12  A.   I'd like to finish my answer.
13  Q.   Yeah. And how do you see -- how do you see your role?
14
15  A.   As an advisor and a teacher.
16  Q.   Okay. And when you testify in a case like this, or any
17       other case, do you try to slant the scientific evidence,
18       or the scientific publications in favor of your client, as
19       an advocate, or do you see your role as being a scientist
20       in search of the truth?
21  A.   Obviously the later, I'd like to believe.
22  Q.   Okay. Do you feel like it would be improper if you would
23       approach a case from any stand point other than being a
24       scientist in search of the truth?
25  A.   I don't know how to answer that. The answer is, I guess

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

17e93923-21ac-47f7-b7d4-307d6191bae4

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 25

1    that -- that I would like to believe that I'm a
2    dispassionate reviewer of the materials and try not to
3    take sides.
4  Q.  Okay.  The -- the articles that you've mentioned here, are
5    they -- did you seek out just articles or publications
6    that would be favorable to your side of this case?
7      MR. RICHMOND:      Object to the form.
8      THE WITNESS:  No.
9  BY MR. ALLRED:
10  Q.  Okay.  And what -- these articles here, how do you find
11    them?  How are they available?  Are they generally
12    available to people?
13  A.  They are peer-reviewed, open source publications.  They
14    are available to anybody.
15  Q.  Can people get them off the internet?
16  A.  You might be able to, some of them.  You can get them at
17    any well stocked scientific library.
18  Q.  Okay.
19  A.  They're -- these are peer-reviewed, scientific journal
20    articles.
21  Q.  Okay.  And if some of them -- can you get them on websites
22    like pubmed?  Have you ever heard of that one?
23  A.  I have, and the answer is maybe you could get them from
24    that source.  Yes.
25  Q.  And pay a fee and get them, maybe?

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 27

1  Q.  All right.  Have you cited them in other cases, and relied
2    on them in the past in forming your opinions and
3    conclusions in Forensic Toxicology cases?
4  A.  Some of them, yes.
5  Q.  Okay.  Let me refer you to page one in your report there.
6
7  A.  Okay.
8  Q.  If I could, please.
9  A.  Sure.
10  Q.  The information there that's given in the history, did you
11    take this off what I call AUTAR; Alabama Uniform Traffic
12    Accident Report?
13  A.  Yes, sir.  I did.
14  Q.  Okay.  And you put on there that -- down at the bottom;
15    (READING.) The crash investigation documents -- this is
16    the last sentence in the first paragraph under history --
17    (READING.) reviewed did not indicated whether any skid
18    marks were present on the surface of the roadway before
19    the point of impact.  And you've got skid marks in
20    quotation marks.  Why did you put that reference in the
21    report to the skid marks?
22  A.  As a normal part of review of the documents, I try and
23    include that kind of information in cases that include
24    motor vehicle related crashes.
25  Q.  Was it of any significance or use to you in forming your

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 26

1  A.  Maybe.
2  Q.  The -- you mentioned 10 articles -- publications, lets
3    call them.  Did you review these 10 articles for purposes
4    of this case?  Did you sit down and read them?
5  A.  I have read all of them at times.  And I've --
6  Q.  -- At some point --
7  A.  And I've read portions of them in preparation for this.
8  Q.  Okay.
9  A.  -- For this case, yes.
10  Q.  I would think -- have you give a lot of depositions --
11    you've testified a whole lot in court, haven't you?
12  A.  Correct.
13  Q.  And you didn't go back and re-read every one of these
14    articles just for this case.  Is that right?  Or am I
15    wrong?
16  A.  No.  I re-read -- I re-read each of them for this case,
17    but there are obviously certain parts of those, parts of
18    some of those references that may not be directly
19    implicable (sic), so I --
20  Q.  Okay.
21  A.  So, I read the parts that I felt were appropriate to read.
22
23  Q.  Okay.  Would it be true that you are very familiar with
24    these articles?
25  A.  Reasonably, yes.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 28

1    opinions and conclusions?
2  A.  It was.
3  Q.  How?
4  A.  It made an indication of awareness of the individual of an
5    impending impact.  It shows reaction to that impact in
6    preparation.
7  Q.  Okay.  So, you just mention in here -- just -- that --
8    that -- that is a negative finding, I will call it.  You
9    tell me if I'm wrong.  But you reviewed the AUTAR report,
10    and there's just not any reference in it to skid marks.
11  A.  You're correct.
12  Q.  So, you assume from the lack of reference that there were
13    no skid marks.  Is that correct?
14  A.  The indication there is that there is no indication
15    whether they were present or not.
16  Q.  I understand that.  And did you take that lack of
17    information to mean that there were no skid marks, and
18    maybe the next question I am going to ask you -- did that
19    mean that there was no indication of awareness that you'd
20    talked about and slowing down on Mr. Britt?
21  A.  The answer is that later on in my report, I indicated that
22    that may have indicated or did indicate that there were no
23    skid marks, and I will tell you that that is an
24    inappropriate assumption to make on my part.
25  Q.  Okay.  Well, in -- what I am getting to is this.  Did you

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

# Dr. Andrew Mason 10/26/2007

Page 29

1  assume for the purposes of your report that Mr. Britt did
2  not react to the truck turning in front of him?
3      (PAUSE.)
4  A.  I may have.
5  Q.  Okay.
6  A.  What I can tell you is when looking over the documents,
7      there is no indication whether he -- whether he did or did
8      not.
9  Q.  Okay.
10 A.  In other words, no information is no information.
11 Q.  I understand.
12 A.  Okay.
13 Q.  We got past that, and I understand there is no information
14     about that, but when you did your report, and your
15     thinking about this and your using your education,
16     training and experience, and the knowledge of these
17     articles that you cited, did you -- did you assume that he
18     didn't react to the truck turning in front of him is what
19     my question is.
20 A.  I don't know.
21 Q.  Okay.
22 A.  I don't know.
23 Q.  Well, would it also be correct that you can't say that the
24     presence of marijuana in John Britt had anything to do
25     with him reacting or not reacting to the truck turning in

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

# Dr. Andrew Mason 10/26/2007

Page 31

1  critical capacity and capabilities that are required for
2  the safe operation of a motor vehicle.
3  Q.  Do you have an opinion whether John Britt slowed when the
4      truck turned in front of him, or not?
5  A.  I believe I have insufficient information to reach that
6      conclusion at this time.
7  Q.  Okay.  What other information would you need at this time?
8
9  A.  More information from the scene, information from
10     witnesses, other people that were present at the time of
11     the crash, could bring to light other information
12     related to what they observed that would certainly be
13     useful.
14         There may be other information available from
15     accident reconstruction specialists who can examine scene
16     -- examine information related to the vehicles, and how
17     they behaved in the crash.  That may be brought to bear on
18     this.
19         That would be the kind of information that would be
20     appropriate to view.
21 Q.  All right, sir.  Do you know whether there's an accident
22     reconstructionist involved in this case?
23 A.  I have no direct knowledge of that.
24 Q.  If an accident reconstructionist in this case says that he
25     did not -- that he did not slow down, would that be an

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

# Dr. Andrew Mason 10/26/2007

Page 30

1  front of him.
2  A.  No.
3  Q.  Okay.
4  A.  No.
5  Q.  Does that mean no, you can't say?
6  A.  No.  I can say, because --
7  Q.  Okay.
8  A.  -- The effects of marijuana include certain kinds of
9      effects, especially on attention of executive functioning,
10     et certera.  It can certainly affect those properties, or
11     affect one's capabilities to react to those circumstances.
12
13 Q.  Well, you're just citing some words here that your aware
14     of.  Some medical publications and so forth?
15 A.  I'm citing my knowledge as related to pharmacological
16     effects of marijuana.
17 Q.  Apply that to this case, and whether or not you say that
18     John Britt slowed or didn't slow when the truck turned in
19     front of him.
20 A.  Well, to the degree that he slowed or didn't slow wasn't
21     effective, because he ran under the truck.
22 Q.  All right.
23 A.  And certainly, the effects of marijuana relate to
24     decreasing ones capability to react to sudden alterations
25     and conditions that appear on the highway.  It affects

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

# Dr. Andrew Mason 10/26/2007

Page 32

1  important factor for you to know in forming your opinions
2  or verifying or confirming your opinions or conclusions?
3  A.  Hypothetically?
4  Q.  Hypothetically.
5  A.  The answer would be yes.
6  Q.  Okay.  And would it follow that if the accident
7      reconstructist says that he did not slow down, that that
8      would confirm your opinion that perhaps marijuana impaired
9      John Britt?
10     MR. RICHMOND:  Object to form
11     MR. ALLRED:  Would that be correct?
12     THE WITNESS:  Hypothetically wouldn't confirm it,
13     but it would corroborate it, or tell it -- corroborate it.
14
15 BY MR. ALLRED:
16 Q.  So, confirm was too strong a term.  Is that it?  It would
17     help to corroborate it.  Is that right?
18 A.  It would be consistent, would help to corroborate that
19     finding.
20 Q.  Okay.  Would the inverse be true as well if the accident
21     reconstructionist says that he did slow down, would that
22     lessen the corroborative effect concerning your opinion?
23 A.  Not necessarily.  No.
24 Q.  Why not?
25 A.  Again, like I said before, whatever actions it took before

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 33

1  out of avoiding the collision and the way that marijuana
2  works is it is not sufficiently effective generally
3  speaking to produce a state of unresponsiveness or
4  incapacity to respond.
5      But it does modify perception, and modifies the
6  coordination and integration to synthesis of information
7  to produce responses in an effective manner.
8      It interferes significantly with divided attention,
9  information processing, et cetera. And in that way, it
10 has a significant affect on reaction speed, reaction time,
11 et cetera.
12 Q. Does marijuana, in your opinion, does it affect a driver
13    like alcohol?
14 A. Pharmacologically, they are very different.
15 Q. Okay.
16 A. Marijuana does have effects on psychomotor functions,
17    psychomotor efforts, coordination, et cetera. But,
18    pharmacologically, it is very different in that it does
19    not produce the same degree of gross central nervous
20    system depression as alcohol does.
21        Pharmacologically, they are quite distant.
22 Q. Let me ask you to go to page 4 on your opinion there under
23    roman numeral three; summary and conclusions. You said in
24    that second paragraph; (READING.) No other potentially
25    causative or contributory factors were noted during the

## Dr. Andrew Mason 10/26/2007

Page 34

1  investigation of Mr. Britt's crash, and then you mention
2  several in there. What about the fact that the tractor
3  trailer driver turned across three lanes of traffic in
4  front of him --
5      MR. RICHMOND: Objection to form.
6      MR. ALLRED: Was there any particular reason you
7  didn't mention that in that -- that summary?
8      THE WITNESS: The only reason I can state that, sir,
9  is that I didn't see that block up there, and the reason I
10 didn't see that, the one you alluded to earlier, where he
11 was the primary cause, and that's because I am not
12 familiar with this form. I am very familiar with North
13 Carolina forms, but I had to work real hard to -- I had to
14 work real hard to review this on.
15 BY MR. ALLRED:
16 Q. Knowing it now, knowing that the investigating officer
17    found the tractor trailer driver to be the prime
18    contributing unit, would you want to change that sentence
19    there, or are you -- do you want to stick with what that
20    says there about no other potentially causative or
21    contributory factor were noted.
22 A. No. I would --
23     MR. RICHMOND: Objection to form.
24     MR. ALLRED: I'm sorry.
25     THE WITNESS: Sir?

## Dr. Andrew Mason 10/26/2007

Page 35

1      MR. ALLRED: I'm sorry.
2      THE WITNESS: May I speak?
3      MR. ALLRED: Go ahead.
4      THE WITNESS: Thank you. I didn't want to step on
5  anybody.
6      MR. ALLRED: Oh, he said object to the form, I
7  thought you were talking.
8      THE WITNESS: No. I couldn't figure out what was
9  going on.
10     MR. ALLRED: Go ahead.
11     THE WITNESS: Thank you. I'm sorry.
12     MR. ALLRED: Go ahead.
13     THE WITNESS: No, I would include that in there.
14 BY MR. ALLRED:
15 Q. Would you?
16 A. Yeah.
17 Q. And would you -- there were other potentially causative or
18    contributory factors.
19 A. There were --
20     MR. RICHMOND: Objection to form.
21     THE WITNESS:    I'm sorry. You --
22     MR. RICHMOND: You can speak over my objections,
23  that's fine. As long as they are noted.
24     THE WITNESS: Very rarely in Mobil is there a crash
25  involving more than one vehicle is there total fault

## Dr. Andrew Mason 10/26/2007

Page 36

1  related to one particular individual or another. Of
2  course, that can occur. Very often, there are a
3  multiplicity of factors that are involved.
4  BY MR. ALLRED:
5  Q. Would the information that we talked about this morning,
6     about the truck, the tractor trailer truck being the prime
7     contributing unit, how would you change that summons, if
8     you would, in that in on page four under the roman numeral
9     three?
10 A. I'm not sure. I'd like the opportunity to think about
11    that.
12 Q. All right. Now, were you given any information on John
13    Britt's speed?
14 A. None. In the report, in that block it said 999, it wasn't
15    directly indicated. Obviously having some knowledge of
16    mechanics, physics, although I am not an accident
17    reconstructionist, its clear that the collision occurred
18    at a significant rate of speed. It wasn't a very slow
19    crash.
20        Obviously, there was enough momentum in the truck to
21    carry completely underneath the pick-up truck, to carry
22    completely underneath the eighteen wheeler and some ways
23    down the line.
24        So, it's obvious that it occurred at -- at a -- it
25    didn't occur at a very slow rate of speed. Beyond that, I

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 37

1 really can't tell.
2 Q. When you say a significant rate of speed, and you use that
3 in making up your mind about your opinions and
4 conclusions. Is that right?
5 (PAUSE)
6 A. I don't know.
7 Q. All right.
8 A. It might have, it might not have.
9 Q. You --
10 A. -- I'm not sure when impact, what impact that had on this
11 in particular.
12 Q. Okay. When you say a significant rate of    speed, what -- what
13 does that mean?
14
15 A. Well --
16 Q. -- Because, that -- that -- can you give a range of speed?
17
18 A. I am not an accident reconstructionist. I don't have the
19 specific capabilities to do that.
20 Q. All right. In significant -- in -- coming to your
21 opinions and conclusions, you assume then that he was
22 going fast enough to go under the truck, and come out the
23 other side?
24 A. Well, that's clear from the way the motor vehicle crash
25 documents.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 39

1 A. That is true.
2 Q. And it was raining? That's information you had.
3
4 A. Right.
5 Q. Is that true?
6 A. True.
7 Q. And these other -- the other vehicles that were coming,
8 they would have their lights on as well. Wouldn't they?
9 A. At night, during the rain, it would be appropriate for
10 them to have their lights on. Yes.
11 Q. It would be unusual if they didn't, wouldn't it?
12 A. It certainly wouldn't be what I would consider
13 appropriate, safe practice.
14 Q. And the view of the accident scene for the tractor trailer
15 driver would have been straight and level, and it says
16 that on the AUTAR report that you looked at, does it?
17 A. True.
18 Q. Have you been provided with any information as to why the
19 tractor trailer driver would have turned in front of John
20 Britt and the other oncoming traffic?
21 MR. RICHMOND: Object to form.
22 THE WITNESS: My understanding is that the place
23 that he turned into is a truck park. That's the only
24 information that I have.
25 BY MR. ALLRED:

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 38

1 Q. All right. And you -- you utilized that in forming your
2 opinions and conclusions. Is that right?
3 A. It was a factor that I considered. Yes.
4 Q. Okay. When you did your work, did you -- were you given
5 any information, or did you learn of any information that
6 the tractor trailer driver, Mr. Johnson, that there was
7 anything to keep him from seeing John Britt coming?
8 A. My understanding comes from the motor vehicle crash
9 documents, which indicates that -- that the sight views
10 from neither vehicle was obstructed.
11 Q. Was there any information given to you, for example, that
12 John Britt didn't have his lights on?
13 A. No.
14 Q. Anything like that?
15 A. I am not aware of anything like that.
16 Q. Okay. Were you given any information about any other
17 traffic that was coming in the same direction as John
18 Britt?
19 A. Not from the documentation.
20 Q. Were you told anything about that?
21 A. My understanding is that there may have been other vehicle
22 traffic in the area, although I don't have specific
23 information on that.
24 Q. Okay. And this accident happened at night. Is that
25 correct?

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 40

1 Q. Okay.
2 A. Or somewhere that large trucks may be parked.
3 Q. Okay. Were you -- well, lets see, you looked at this
4 diagram that on the AUTAR report? Right?
5 A. I did.
6 Q. And that's the -- there's a reference in your report to
7 seven lanes. That's the seven, they cross three on each
8 side, and a turning lane. Right?
9 A. That is my understanding.
10 Q. Okay. And then, where Mr. Johnson would have turned
11 in would have been the truck stop that's down there where
12 my finger is at where the truck is. Is that right?
13 A. That would be my understanding.
14 Q. Okay. Were you given any information that there was a
15 traffic control device, meaning a red light or anything
16 like that out there where this happened?
17 A. I don't think so. No.
18 Q. I think the report says it was not intersection related.
19 I could be wrong about that. I've wondered if that meant
20 that there was not a light?
21 A. I did not see -- I don't remember seeing any information
22 in that regarding the presence of a light.
23 Q. All right. You also mentioned in your report that the --
24 the tractor trailer driver was not given a citation in
25 that. Why -- why is that of significance to you?

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

1   A.  It's not really. It's just standard part of the report.
2   Q.  Does that mean that the tractor trailer driver was not at
3      fault in the accident?
4   A.  It could, but not necessarily. Then it goes to more of
5      the thinking of the investigators.
6   Q.  And -- and in the course of your work, you have worked on
7      several cases and criminal cases and testified in court a
8      lot. You've given a lot of depositions. You know that
9      officers can't give a ticket, a citation to somebody
10     unless they observe the offense.
11   A.  I don't know.
12   Q.  Is that correct?
13   A.  I don't know that.
14   Q.  Okay. Well, I am telling you that this morning. That's
15     why he didn't get a ticket. They didn't see it. So --
16        MR. RICHMOND: Objection to form.
17        THE WITNESS: I think that -- well, my understanding
18     is that the police in North Carolina make -- operate
19     differently.
20   BY MR. ALLRED:
21   Q.  Okay. But did you equate the lack of the ticket to lack
22     of fault? Lack of a citation to a lack of fault?
23   A.  No.
24   Q.  Okay.
25   A.  I would say that is a standard part of the report, if I

1     noted on the report, it goes to the thinking of the
2     officers, but what they are actually thinking, I can't
3     tell.
4   Q.  The issue about the driver's perception and reaction time,
5     I want to ask you something about that. You said you're
6     not an accident investigator.
7   A.  Correct.
8   Q.  Have you done work in -- of course you do work on these
9     types of cases involving motor vehicle frequently. But
10     have you done some reading on unimpaired, lets call them,
11     drivers that are not drinking any alcohol and they are not
12     using any kind of marijuana or anything like that. Have
13     you done any work on how long it takes, or the issues
14     regarding recognition and reaction for, let's call them
15     unimpaired drivers?
16   A.  To some degree, yes.
17   Q.  All right. Tell me what you found in that regard.
18   A.  Well --
19   Q.  That's probably not a very good question, but just -- say
20     on a twelve o'clock noon on a sunny day in some emergency
21     event occurs, like a truck turning in front of somebody.
22     If you take an unimpaired driver, does that driver -- does
23     it take a while to recognize the danger and to react to
24     the -- what are the perimeters of recognition and reaction
25     in an -- for an unimpaired, just a normal driver, everyday

1     Joe Smith type guy.
2   A.  Define perimeters. I'm not sure I know what you want.
3   Q.  What -- from how quick this person, this normal person
4     would recognize the danger, and how quickly they would
5     react to the danger.
6   A.  It depends a lot on the individual and their capabilities
7     and capacity.
8   Q.  (INDICATES AFFIRMATIVE.)
9   A.  To some degree, it's individualized.
10   Q.  Okay.
11   A.  The answer is that to my understanding -- my understanding
12     is that -- that recognition, that perception of a danger
13     usually takes on the order of several tenths of a second.
14     And that reaction time too, it may take as much as a
15     second or maybe more. Depending on the individual.
16   Q.  Okay. And from two tenths of a second to a second?
17   A.  That would be fair as a general range.
18   Q.  General -- general perimeter, I'm calling it. General
19     range, general perimeter.
20   A.  If you will -- I would -- I would state though, that's my
21     understanding. If I wanted to give you a definitive
22     opinion regarding that, I'd like the opportunity to go
23     back and look at the scientific literature.
24   Q.  That's fine.
25   A.  I did not --

1   Q.  -- That's fine.
2   A.  I did review that specifically in preparation for this
3     deposition.
4   Q.  I understand. But my point is a broad version. It's very
5     simply that -- that "unimpaired drivers don't have
6     lighting fast reactions and recognition to events on the
7     roadway anyway". Do they?
8   A.  Of course not.
9   Q.  And I would think -- and I am a lay person -- but I would
10     think that's a useful concept in comparing their reaction
11     and recognition times to those of drivers who are presumed
12     or accused of being impaired. Would that -- would that --
13     would that be correct?
14   A.  I mean in order -- try your question again, please.
15   Q.  Yeah. I would think that it would be useful to look at
16     the unimpaired reaction recognition time as compared to
17     the "impaired" reaction recognition time.
18   A.  That is true.
19   Q.  Okay.
20   A.  And that is useful. And the studies that are generally
21     done with respect to drug related effects, these would be
22     studies particularly related to laboratory studies.
23   Q.  Okay.
24   A.  Either on where specific -- specific operative
25     capabilities are examined, or specific capabilities and

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 45

1    capacities are examined in a laboratory setting, so you're
2    measuring reaction time, your measuring tracking
3    capability.
4         Our -- of course -- both in the drugged and
5    non-drugged state, in order to determine statically
6    whether in fact there is a difference or not. So, when I
7    say the literature reflects a certain pro0perty of the
8    particular compound, it is, of course related as in
9    studies back to the non-drug state.
10   Q.   In the -- the -- the generality with regard to the use of
11       the drugs is that reaction and perception time is
12       generally longer.
13   A.   Increased, yes.
14   Q.   Okay. You've done a lot of research -- well, have you
15       done research with regard to marijuana?
16   A.   Yes.
17   Q.   Have you done any writing about it?
18   A.   Yes.
19   Q.   You've done a bunch of reading about it?
20   A.   Yes.
21   Q.   I think.
22   A.   Yes.
23   Q.   All right. Have you ever tried it to see how it affects
24       you?
25            MR. RICHMOND: Objection to form.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 47

1    national -- what's the name of that company?
2    A.   National --
3    Q.   -- National Medical Services?
4    A.   Yes.
5    Q.   Is that it?
6    A.   True.
7    Q.   NMS Labs?
8    A.   True.
9    Q.   And they did some testing on some blood fluid -- body
10       fluids that include blood of John Britt. Is that right?
11   A.   Blood and urine.
12   Q.   Okay. The blood sample that was tested, was that
13       post-mortem blood?
14   A.   True.
15   Q.   Were any test done on -- ante -- is that how you say it?
16       Ante mortem. Is that the correct term?
17   A.   It is.
18   Q.   Were their any testing done on ante-mortem blood of John
19       Britt?
20   A.   He was killed at the scene.
21   Q.   Okay.
22   A.   No.
23   Q.   Okay.
24   A.   I'm sorry.
25   Q.   Excuse me?

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 46

1            THE WITNESS: I participated in clinical studies as
2        a graduate student.
3    BY MR. ALLRED:
4    Q.   Okay. And that was -- and I'm not saying that you did
5        anything illegal, but it's just -- that was some
6        supervised research issue. Is that right?
7    A.   True.
8    Q.   Have you ever done any testing -- have you tried it or
9        used it since you were a graduate student?
10   A.   No.
11   Q.   What you did your research as a graduate student, how --
12       did that have anything to do with like where you tried to
13       drive a simulator, or anything like that?
14   A.   No. That was so long ago that at that point we were still
15       trying to figure out the basic pharmacology.
16            (PAUSE.)
17   Q.   Do you do any testing now where you do research where
18       students or volunteers use marijuana and you study them to
19       see what their reaction or perception time is?
20   A.   No.
21   Q.   Do you participate in any such studies yourself, even if
22       you didn't -- even if you weren't in charge of it, but you
23       participate in it as a research?
24   A.   No.
25   Q.   For the purposes of your work, did you utilize the

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 48

1    A.   He was declared dead at the scene would be the proper
2        phrase. There was no ante mortem specimens collected, to
3        my knowledge.
4    Q.   Okay. So, all of the opinions and conclusions that you
5        have would be based on the NMS lab reports and results.
6        Is that right?
7    A.   (NO RESPONSE.)
8    Q.   I mean as far as the blood tests are concerned.
9    A.   My opinion is founded under data.
10   Q.   Well, let's talk about the blood. I just want to narrow
11       it to the blood.
12   A.   Okay.
13   Q.   All of -- any opinions that you have where you utilized
14       the blood. All of that blood from John Britt was tested
15       at NMS labs?
16   A.   True.
17   Q.   And all of that blood was postmortem blood?
18   A.   Yes.
19   Q.   Is that right?
20   A.   Yes.
21   Q.   And I believe the test showed no alcohol in John Britt at
22       all. Is that right?
23   A.   Not unless detected.
24   Q.   Okay. For purposes of your opinions and conclusions, did
25       you assume that the was not impaired at all from alcohol?

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

1   A.   I assumed that I had no information at all related to
2        alcohol related impairment.
3   Q.   I think that would mean that you didn't feel alcohol
4        played a factor?
5   A.   I had no information on it.  None was detected and it
6        wasn't a consideration.
7   Q.   Okay.  All right, then.  Okay.  Take me through this and
8        you got on page two in your report, you say (READING.)
9        Postmortem blood and urine samples were obtained from Mr.
10       Britt at autopsy.  Do you know how those samples were
11       extracted from Mr. Britt's body?
12            (PAUSE.)
13   A.   It is not in my notes.  Can I look at the autopsy report,
14        please?  If you don't mind, I'd like to look at that.
15   Q.   Did you say that you want to look at it?
16   A.   I said if you don't mind, I'd like to look at the autopsy
17        report.
18   Q.   Do you have it?
19   A.   Well --
20   Q.   Go ahead.  Go ahead and look at anything you want to look
21        at.
22            (WITNESS PURSUES DOCUMENTS.)
23   A.   I can answer your question in a general sense.  I cannot
24        answer it in a specific sense because I was not present.
25   Q.   Go ahead and tell me your answer, then tell me what you

1        base it on.
2   A.   Okay.  The National Medical Services Laboratory Report
3        indicates the sample that was analyzed was femoral blood,
4        the specimen source.  That would be blood from the femoral
5        artery, or femoral vein.  The other specimen that was
6        analyzed was urine.
7             Both of those materials are generally obtained in an
8        autopsy setting using a syringe that would be inserted
9        into a vessel or cavity of the organ drawing a little
10       fluid, which then would be placed in a specimen vile and
11       labeled. That is the information that I have.
12   Q.   Okay.  But, like you said, you don't have any personal
13        knowledge, besides how it was done.
14   A.   It wasn't there, sir.
15   Q.   Okay.  And then, as far as how the sample -- do you happen
16        to know were the autopsy was performed?
17   A.   (NO RESPONSE.)
18   Q.   Assuming it was performed in Montgomery, Alabama.
19   A.   I --
20   Q.   -- Do you know how it was handled from the point of
21        collection to how it got to National Medical Services?
22   A.   My understanding is that they submitted it directly to
23        National Medical Services as a normal part of their
24        business.
25   Q.   Do you have any personal knowledge of how it was handled?

1   A.   No.
2   Q.   Okay.  How is it that there is any particular or special
3        type container what these specimens should be put in when
4        they are collected?
5   A.   (NO RESPONSE.)
6   Q.   And is there any particular or special type handling that
7        they should be subjected to when their shipped?
8   A.   Well, if I can narrow the focus of your question a little
9        bit, I think I can answer it.  I assume we are talking
10       about marijuana related materials here, in particular --
11   Q.   -- We're talking about --
12   A.   -- Or forensic specimens in general?
13   Q.   Let's talk about John Britt's blood sample that was sent
14        to NMS for purposed of doing the testing they did, NMS
15        did, and that you utilized in forming your opinions and
16        conclusions.
17   A.   Okay.  The report indicates that the container type was a
18        grey top tube.  Gray top tube is usually contained sodium
19        oxalate, which is an anticoagulant as well as sodium
20        fluoride, which is a blood preservative, and antibacterial
21        compound.  So that would be, that is an appropriate
22        container type for that particular specimen.
23   Q.   Okay.
24   A.   Those specimens should be submitted to the laboratory by
25        -- under the chain of custody control.

1   Q.   All right.  Should they be refrigerated?
2   A.   It would be helpful if they are, although one way that it
3        can be done is be put them with cold packs, or freezer
4        packs in with the specimens and ship them over night.
5   Q.   Do you know if that was done with John Britt's blood
6        specimen?
7   A.   I have no information on that.
8   Q.   One way or the other?
9   A.   One way or the other.
10   Q.   Okay.  What kind of problems can it cause if the specimen
11        is not refrigerated?
12   A.   I think that -- with respect to cannabinoids in
13        particular, the main thing you would be worried about
14        would be specimen and compound stability.  Generally
15        cannabinoids and blood tend to be relatively stable.  They
16        bind to lipoproteins in the blood and in doing so, they
17        tend to be stabilized.
18   Q.   Can it affect the results of the test with regard to the
19        presence of -- and your saying cannabinoids?
20   A.   Cannabinoids.  Marijuana related materials.
21   Q.   Can it affect the results of the test if it's not
22        refrigerated?
23   A.   Potentially, it could.  But I don't have the capability to
24        determine what that might would be.  It may be very
25        limited.

1   Q.   Okay.

2   A.   In other words -- in other words, I'm not sure if you

3        would use a difference or not.

4   Q.   All right.  So, going back to your report there, it says;

5        (READING.) The specimens were analyzed by NMS Labs, Willow

6        Grove, Pennsylvania, and there again, that's the four page

7        report that's Exhibit 2B that our refereeing to in the

8        letter?

9   A.   Well, the lab report is in 2B. That's correct.

10  Q.   What -- I mean that's the one your referring to in your

11       opinion letter that's marked Exhibit 2A, and that's the

12       one that's dated May 7th.  Right?

13  A.   True.

14  Q.   Says (READING.) As a screening test of his blood for

15       cannabinoids was positive at a reporting limit of 10 -- is

16       that nanograms per milliliter?

17  A.   Yes.

18  Q.   All right.  Then you go through and talk about a, what you

19       call, quantitative confirmatory in blood tests are done

20       and you mention a lot of terms in there.  Tell me, for

21       purposes of our discussion, what is the psychoactive

22       component in cannabinoids?  Is that THC?

23  A.   It is.

24  Q.   Okay.  How -- that's this right here?

25  A.   Yes. It is.

1   A.   Okay.  Let's call them left, right, central.  Just to make

2        it easy.

3   Q.   All right.

4   A.   Obviously, this diagram proceeds left to right.  In the

5        far left hand column, you have precursor materials found

6        in marijuana, and their name is given, significance is

7        given for each of these.  Where they are found is given,

8        their psychoactive capabilities is indicated on the report

9        for each of these three columns.

10       The column in the left hand side are THC-Acids, A and

11       B, which are found in the plant material.  These are THC

12       Precursors.  When these materials are heated or are on long

13       term storage, or are on pyrolysis; burning or smoking, et

14       certera, these Acids A and B are de-carboxilated.

15       They lose the COOH group right there, next to the

16       stars to form THC.  This is a quantitative process that

17       concerns -- it proceeds fastly, easily at relatively low

18       temperatures.

19       The primary psychoactive principle in marijuana

20       which is called THC.  Now, there are a large number of

21       other materials that have some psychoactive capabilities

22       in marijuana.  However, either the psycho activity

23       relative to that of THC is greatly reduced, or they're

24       present in such a minor quantities that most scientists

25       regard THC itself as being the only active principle in

1   Q.   Okay.  Lets mark this -- what's our next number?  Four?

2        (THEREUPON, EXHIBIT NO. 4 WAS MARKED FOR

3        IDENTIFICATION.)

4   A.   Yes.

5   Q.   Now, you've handed me a diagram, because I suspect you've

6        had this come up before in a deposition or at a trial.  Is

7        that right?

8   A.   Yes.

9   Q.   What are the psychoactive ingredients?

10  A.   I don't think that this was originally deposition or trial

11       related.

12  Q.   Okay.

13  A.   I think this was a diagram I prepared for presentation

14       many, many, many, many, many years ago.

15  Q.   All right.  Let me ask you about Exhibit 4.  And tell me,

16       first of all, what -- what are the psychoactive substances

17       that you've got listed there?

18  A.   Well --

19  Q.   -- Maybe it would be better if I ask you this way -- and I

20       am trying to get to that question there, but, explain to

21       me what that Exhibit 4 is.

22  A.   Sure.  Thank you.

23  Q.   You're welcome.

24  A.   We have three columns on this page.

25  Q.   Okay.

1        marijuana.  So, for all intents and purposes, that is

2        true.

3   Q.   Okay.

4   A.   There are other little bits in there that has some

5        capabilities, but this is the guy that's present,

6        overwhelmingly in the greatest concentration, and has the

7        greatest capability.  That is correct.

8   Q.   THC?

9   A.   THC.

10  Q.   Okay.

11  A.   Correct.

12  Q.   All right.

13  A.   That would be the central column.  THC is active material

14       formed on stored, headed or aged cannabis.  Cannabis is

15       the genis, cannabis is the setiva genis in marijuana.  And

16       it is the psychoactive principle.

17       The right hand column describes what we call

18       Carboxylic Acid, which has a much more complicated name,

19       which I wont bother to get into right now, but it is

20       actually a secondary or tertiary -- primary, secondary,

21       tertiary metabolite of THC.  It is THC breakdown product.

22       It is formed naturally in the body.

23       Primarily, it is formed in the liver, although there

24       are a number of other organs that can produce this

25       material in very small amounts.  It is found in blood,

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 57

1    it's found in urine, it's found in those tissues after
2    marijuana or cannabis exposure that is after exposure to
3    THC. It is -- it has been determined by direct
4    administration to humans to be a non-psychoactive
5    material.
6    Q.   Okay.
7    A.   -- in psychoactive properties.
8    Q.   Sure.
9    A.   One other thing I wanted to point out here is that --
10   Q.   -- Go ahead.
11   A.   Is the difference in THC and this THC Carboxylic Acid
12        relates to the modification of this CH-3 group. At this
13        position, this eleven position, from a methyl group to a
14        COOH, carbon - oxygen - oxygen - hydrogen --
15   Q.   -- When you say --
16   A.   -- At that point --
17   Q.   -- In reference, and when you look at some of, if your
18        reading on marijuana, and you see THC, and it may be COOH.
19        Is that really the THC Carboxy?
20   A.   It is.
21   Q.   It is that?
22   A.   It is.
23   Q.   Is that a convenient term to refer to the metabolite of
24        THC? Just call it THC Carboxy?
25   A.   Or THC Acid, if you will.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 58

1    Q.   THC Acid.
2    A.   Sure.
3    Q.   Okay.
4    A.   It's a short hand.
5    Q.   But THC Acid is not psychoactive and would not impair a
6         driver?
7    A.   If it is given by itself --
8    Q.   -- by itself --
9    A.   -- it is not psychoactive.
10   Q.   Right.
11   A.   Okay.
12   Q.   And if it's given by itself, it would not impair a driver.
13
14   A.   That's correct.
15   Q.   Okay. It does not -- it does -- it has no psychoactive
16        capability itself.
17   A.   Okay.
18   Q.   Now, take me on through here and tell me what your opinion
19        is. Do you have an opinion as to whether or not you think
20        John Britt was impaired at the time this wreck happened?
21   A.   I do.
22   Q.   And if so, what is that opinion?
23   A.   My opinion is that he was.
24   Q.   And explain to me what you -- how you came to that
25        opinion.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 59

1    A.   Sure. My opinion was that he was impaired by, and under
2         the influence of the effects of marijuana about the time
3         of the crash.
4    Q.   I missed a couple of words there. He was impaired and
5         what?
6    A.   Under the influence.
7    Q.   Okay.
8    A.   Of the effects of marijuana.
9    Q.   Okay.
10   A.   At and about the time of the crash.
11   Q.   Okay.
12   A.   The thinking is as follows.
13   Q.   Okay. (PAUSE.) Go ahead.
14   A.   It's a -- I am. I am just trying to frame --
15   Q.   -- Oh, I'm sorry. I thought you were waiting on me --
16   A.   Nope.
17   Q.   -- To write --
18   A.   -- I am just --
19   Q.   -- I will stop.
20   A.   Nope.
21   Q.   I will stop writing and listen.
22   A.   I just try to think about what I am going to say before I
23        say it.
24   Q.   Okay.
25   A.   It's evident from the information that he survived for

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 60

1    only a relatively short time after the crash occurred.
2    Certainly he did not survive for a long term -- a long
3    time.
4         That would, of course be based on the severity of
5    the injuries that he received. And also, it indicates
6    that he was declared dead at the scene. When the heart
7    stopped pumping blood, and blood stops perfusing through
8    the organs in the body, specifically the liver, the
9    metabolism stops. So, the breakdown of the THC into its
10   metabolite stops as well.
11        Therefore, the distribution of the material and
12   sample should be consistent with what was present in his
13   blood at and about the time that he died, which is of
14   course very close in time to the time the accident
15   occurred.
16        The conclusion would be that the concentration of
17   those materials should be reflective of what was
18   circulating in his body on and about the time that the
19   crash occurred and the time of death.
20        The second, primary factor would be based on the
21   analysis of the materials found in his blood and the
22   results were. He has present in his blood a very
23   significant, quite high concentration of THC, the major
24   psychoactive principle in marijuana, as well as its
25   metabolite.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

Dr. Andrew Mason10/26/2007

Page 61

1       There is something unique about this in particular
2   in that it is extremely rare to find the distribution of
3   materials in his blood in samples submitted for Forensic
4   Toxicology investigation purposes. What's unique about it
5   is that in this case, the THC concentration, the active
6   principle, was greater than the concentration found for
7   the metabolite.
8       We know from many, many, many different studies
9   where metabolite in parent concentrations measured in
10  blood that this occurs first only very early after the
11  administration of marijuana. And it also occurs after and
12  about the time of peak effects.
13      The other thing would be, of course, the
14  mathematical analysis of those concentrations. Those
15  outlined in Dr. Huestis' papers.
16  Q.  Who is that now?
17  A.  Marilyn Huestis.
18  Q.  Okay.
19  A.  H-u-e-s-t-i-s.
20  Q.  All right.
21  A.  Those references are cited in my report.
22  Q.  Okay.
23  A.  Who developed and published several different papers on
24  pharmacology of marijuana and mathematical models for the
25  prediction of the time since the last use of those

Dr. Andrew Mason10/26/2007

Page 62

1   materials.
2   Q.  Okay.
3   A.  Now, I can tell by looking at those concentrations and by
4   looking -- by my knowledge of the pharmacology of these
5   materials, and literally reading papers related to the
6   concentration distributions that occur in blood and plasma
7   for years and years and years and years and years that
8   this was very early on in the pharmacology profile after
9   exposure.
10      She actually took a large number of different
11  studies and analyzed them and developed the models that
12  can be used to predict to 95% probability what the range
13  is. Range of times are after the last exposure based on,
14  again, analysis of these studies.
15      She published them using a wide number of different
16  studies that looked at marijuana that is THCTC metabolite
17  concentrations and compared her models back to those
18  studies for validation. T
19      They later extended those and tested those models
20  against lower concentrations of THC and THC Carbolic Acid
21  to -- tested them against other studies published in the
22  scientific literature using a wide variety of different
23  analytical techniques, compared them also to
24  concentrations found in blood after individual has not
25  only smoked marijuana, but consume it orally, et certera.

Dr. Andrew Mason10/26/2007

Page 63

1
2       Those papers, again, are cited in my report. I have
3   not been able to find a single report in the scientific
4   literature that challenges these papers or their
5   conclusions in a significant way. And I have looked.
6   Q.  When you say that you relied on some models, and that's
7   over on page three I see you talk about some models, is
8   that the Dr. Huestis models?
9   A.  Yes.
10  Q.  And are those -- you say you cited in your report, I see
11  one is a Footnote to cannabis effects -- which one of
12  these references, because she apparently -- apparently she
13  is a well known researcher and authority on this field.
14  You've cited her on one, two, three, four, five times.
15  A.  Correct.
16  Q.  Which one of those reference, scientific references,
17  contains the models that you used in formulating your
18  opinions and conclusions?
19  A.  Six, seven, eight --
20  Q.  -- Okay. --
21  A.  -- And nine.
22  Q.  Okay. Four of the articles?
23  A.  True.
24  Q.  All right. It is the time for ingestion of marijuana is
25  that a significance in a forensic application because

Dr. Andrew Mason10/26/2007

Page 64

1   there would be an interest in knowing whether the person
2   was "impaired" at the time of an event?
3   A.  That's one reason. Yes.
4   Q.  Okay. And so, would it be true that Ms. Huestis -- is she
5   a -- well, doctor Huestis, she's a PhD?
6   A.  Correct.
7   Q.  Do you know her?
8   A.  Yes.
9   Q.  Have you ever corroborated with her about research?
10  A.  Informally.
11  Q.  Okay.
12  A.  Not formally.
13  Q.  Has she ever been a student of yours, or you of hers?
14  A.  I would consider it remarkable if I were student of hers,
15  or she was a student of mine. No. In neither case.
16  However, I have known her for many years and talked with
17  her about marijuana related issues on a number of
18  different occasions. She is a professional colleague.
19  Q.  Okay. Is she a recognized authority in the field of
20  Forensic Toxicology about marijuana issues?
21  A.  Particularly, yes.
22  Q.  And in particular in this test about how to figure out if
23  somebody -- when you try to go back from the point of the
24  event and go back to -- I mean to the point of the test
25  being taken, the test being taken, and try to go back to

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 65

1    the event and see if there was impairment from marijuana.
2    Is she a recognized authority in that area?
3  A. She is the one who primarily developed the models.
4  Q. All right.
5  A. The answer is yes.
6  Q. Is she -- well, let me ask you this; if she developed the
7    models, then is she, as far as you know, the most
8    recognized authority in the whole country on this issue?
9  A. Well --
10 Q. -- Do you know of anybody that's more of an authority than
11    her?
12 A. That's a little difficult to say. There are a number of
13    people who are extremely knowledgeable in this area. She
14    is one of them. I really can't characterize whether one
15    person is maybe more of an authority --
16 Q. If you put -- if you put -- that's a fair answer. If you
17    had several people then -- I assume these are colleagues
18    of yours, because you -- you've done this work in this
19    area for a number of years, is that right?
20 A. True.
21 Q. There would be several people who are authorities, and she
22    would be in the group in the top tier.
23 A. She
24 Q. Would that be a fair statement?
25 A. No question, she is one of the best and one of the most

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 66

1    knowledgeable.
2  Q. Okay.
3  A. Absolutely true.
4  Q. All right.
5  A. Yes.
6  Q. The --
7    MR. RICHMOND: Can we take a quick break?
8    MR. ALLRED: Sure.
9    MR. RICHMOND: We've been going a little bit longer
10    than an hour, so --
11    MR. ALLRED: Sure.
12    (OFF THE RECORD 10:37 A.M.)
13    (ON THE RECORD 10:42 A.M.)
14 BY MR. ALLRED:
15 Q. Let me ask you Doctor Mason, do you agree that although
16    the use of ethanol, marijuana and other drugs may be
17    detrimental to driving safety, this has been established
18    by direct epidemiological evidence only for ethanol. Do
19    you agree with that statement?
20 A. Yes and no. Conclusively yes. Particularly for marijuana
21    there is large amount of evidence out there that may point
22    in that direction. For instance, marijuana is probably
23    the most commonly encountered substance in drugs and
24.    driving studies other than alcohol.
25    That is of a forensic concern but you have to also

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 67

1    understand that statement is given in the context that
2    epidemiologic studies related to drug abuse and driving
3    are very difficult to perform, because it's very difficult
4    to establish information from an appropriate control
5    population.
6    Obviously, there are certain civil rights types and
7    legal rights types of concerns in gathering that kind of
8    drug exposure information from a proper control. That's
9    the reason why primarily that these kinds of or that kind
10    of information epidemiologic studies in particular.
11    Epidemiologic information related to drug abuse and
12    drivers is difficult to establish. That is in contrast,
13    of course, too many other kinds of investigations related
14    to drugs and driving.
15    Particularly those kinds of studies that are
16    performed in the laboratory that look at either global or
17    discreet capabilities or capacities related to the drug
18    and non drug state which can be compared or actual driving
19    related experiences which can be examined as well.
20 Q. Do you know a person named A.J. McBay?
21 A. I worked for Dr. McBay for many years.
22 Q. Okay.
23 A. He was my mentor.
24 Q. Did you write an article that appeared in the Journal of
25    Forensic Science in October of 1984? That -- that's the

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 68

1    first sentence in that article?
2  A. Would you like to read it to me?
3  Q. I just did. (READING.) Although the use of ethanol,
4    marijuana and other drugs may be detrimental to driving
5    safety, this has been established by direct
6    epidemiological evidence only for ethanol.
7  A. Great quote. And I would say certainly that is
8    appropriate for language for 1984.
9  Q. All right. And the name of that article is Ethanol,
10    Marijuana and Other Drug Use in 600 Drivers Killed in
11    Single Vehicle Crashes in North Carolina 1978 to 1981.
12    You and Dr. McBay wrote that article. Is that right?
13 A. I wrote it primarily.
14 Q. Okay. When you do these tests, make these formulated
15    opinions -- going back from an event, I mean the time that
16    the blood is taken from the person's body, and trying to
17    go back to the event and determine whether or not there
18    was impairment. Is one of the dangers of doing that is
19    that if you underestimate the time it increases the
20    potential for falsely accusing an individual of being
21    impaired at the time of the accident? Is that one of the
22    dangers?
23 A. It can be.
24 Q. Okay. Dr. Huestis' report -- isn't that Footnote number 6
25    in your reference? Is that the one that's got about the

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 69

```
 1    studies in it?
 2  A.  One of them, yes.
 3  Q.  All right.  And when you do those studies based on
 4      postmortem blood, try to use those models based on
 5      postmortem blood as opposed to ante mortem blood, does
 6      that make any difference?
 7  A.  It does.
 8  Q.  All right.  And in one of Doctor Huestis' articles --
 9  A.  -- May I revise that?
10  Q.  Yeah.  Go ahead.  It does.  Go ahead.
11  A.  I revised to say it can.
12  Q.  It can?
13  A.  It can.
14  Q.  Alright and in one of Doctor Huestis' articles she refers
15      to a test.  Oh, I'm sorry to another article by Doctor
16      Christian G-I-R-O-U-D.  How do you pronounce that?
17      Christian Giroud?
18  A.  Maybe.  I don't have it in front of me so I can't tell
19      you.
20  Q.  Have you ever heard of that fellow's name?
21  A.  I have.
22  Q.  Okay.  Isn't it true that you're not supposed to use the
23      models that you used if you just got postmortem blood?
24  A.  I would disagree.
25  Q.  Sir?
```

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 71

```
 1  Q.  -- Well, let me ask you this.  Where I got that thing from
 2      --
 3  A.  Excuse me can I finish my answer, please?
 4  Q.  Yeah.  Go ahead.  Finish.
 5  A.  I'd like a little more time to look at this before I give
 6      you a definitive opinion on that.
 7  Q.  All right.  Because these articles that you cited here, if
 8      you pull them up, in one of them here is number 8, Dr.
 9      Huestis' article with Barnes and Smith; Estimating the
10      Time of Last Cannabis Use, and she's got some more big
11      words in there from TH plasma THC and THCCOOH.  That's
12      the THC Carboxy Acid, which is the non- psychoactive part.
13      Is that right?
14  A.  Correct.
15  Q.  Okay.
16  A.  My understanding.
17  Q.  And then see, she cites in there, I mean that's the
18      article you said you relied on.  And then she cites the
19      Giroud article as number 21 in there.  In the last
20      sentence of her articles it has this sentence; and she's
21      talking about the use of postmortem blood.  And she talks
22      about citing this very ability.
23  A.  (INDICATES AFFIRMATIVE.)
24  Q.  The authors, that means Doctor Huestis' and her
25      contemporaries, did not advocate using the models with
```

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 70

```
 1  A.  I would disagree.
 2  Q.  Why do you disagree?
 3  A.  Because the answer is that it is certainly true that there
 4      may be some concerns with respect to postmortem blood but,
 5      I'm not sure of a definitive body of work that says that
 6      those concerns are validated.
 7  Q.  Well, look at this article here we'll mark this as Exhibit
 8      5.  And this is Giroud -- I hope for one of a better
 9      pronunciation of the man's name that's how I'll do it.
10      And down at the bottom in there what does that last
11      sentence say in the bottom?
12      (THEREUPON, EXHIBIT NO. 5 WAS MARKED FOR
13      IDENTIFICATION.)
14  A.  The abstract?
15  Q.  The abstract, right.
16  A.  Would you like me to read it?
17  Q.  Sure.
18  A.  I would say, oh, I'm sorry.  Just the last sentence?
19  Q.  Yes sir.
20  A.  (READING.) In the case of blood samples taken after death
21      the use of these models to assess the time of cannabis use
22      is not recommended.
23  Q.  All right.  I would take it then you disagree with that?
24  A.  Yes.  I want a little more time to study this particular
25      paper and --
```

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 72

```
 1      postmortem blood concentrations.  This is an article you
 2      cited to us as authoritive to saying that you should use
 3      the postmortem blood samples.
 4  A.  Well, what I can tell you is; I went ahead and completed
 5      the calculations.  I believe those calculations to be
 6      generally reflective and appropriate for predicting a time
 7      after death.
 8      Certainly, there could be some variance but what I
 9      will also say is this.  You could take those calculations
10      out of my report and I'd have the same opinion based on
11      the fact that the THC concentration is higher than the THC
12      Carboxylic Acid concentrations and based on my knowledge
13      and experience in Forensic Toxicology, based on literally
14      20 plus years of review of papers related to pharmacology
15      of marijuana.  My understanding the effects that are
16      produced and the times over which those effects are
17      produced.
18      I think the numbers that are in the report and the
19      numbers that are produced via the calculations are
20      reflective.  Generally, of a broad range of times over
21      which the exposure may have occurred.
22      They certainly show, or corroborate my assertion
23      that the exposure was relatively recent prior to the time
24      of death.  But the analytical results themselves alone
25      reflect that as well without use of the models at all.
```

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 73

1   Q.  So, really it would be inappropriate to use these Dr.
2      Huestis models?
3   A.  No. I think -- I think using them is appropriate. I
4      think relying on them as a sole source of information
5      might not be the best practice, but I don't think we are
6      doing that here. I think we are looking at everything
7      related to the case and as I said, obviously that the
8      distribution of materials alone, the analytical results
9      clearly reflect in my opinion approximate exposure to the
10     drug.
11   Q.  Okay --
12   A.  -- And an exposure consistent with near the time of peak
13      effects.
14   Q.  Okay. Let's talk about the models and Dr. Huestis
15      articles. You would agree that you're using this article
16      on Footnote 9. That article in Footnote 9 does not
17      support your using the test on John Britt's blood which
18      was postmortem blood. That article does not support that.
19
20   A.  I don't know exactly what you are referring to. Can you
21      give me more information, please?
22   Q.  All right. See this right here where she says; (READING.)
23      The authors do not advocate using the models with
24      postmortem blood concentrations.
25   A.  That's what that says. They don't advocate it but they

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 74

1      don't say that you shouldn't either.
2   Q.  All right. Well, when you say you go these three authors
3      and you told me a awhile ago Dr. Huestis is one of the
4      best in the country. She wouldn't corroborate with any
5      light weights would she? I mean these other people are
6      recognized folks too. Aren't they?
7   A.  Who are you talking about sir?
8   Q.  Well, there's Doctor -- that fellow there -- I can't
9      pronounce his name.
10   A.  Dr. ElSohly.
11   Q.  You're familiar with him?
12   A.  Yes. I'm familiar with him.
13   Q.  And Doctor Nebro. Are you familiar with him?
14   A.  No. I'm not.
15   Q.  And she's got some others there. What about these other
16      gentlemen or ladies? I think they are all gentlemen.
17   A.  Don't know.
18   Q.  Don't know? Okay. Well she's got 1, 2, 3, 4, 5, 6. So,
19      there are 5 people with Dr. Huestis and she's saying the
20      authors did not advocate -- that means they don't
21      recommend, doesn't it? Using the models with post mortem
22      blood concentration --
23      MR. RICHMOND: -- Objection to form.
24      MR. ALLRED: -- Isn't that what that means to you?
25      THE WITNESS:  I would ask them what that means.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 75

1
2   BY MR. ALLRED:
3   Q.  Well, this is your article. You said you relied on this
4      --
5   A.  Sir.
6   Q.  -- And you cited it to us, and you called it a scientific
7      reference.
8   A.  It is a scientific reference.
9   Q.  But it's not a scientific reference to support your use of
10     these models in postmortem blood, is it?
11   A.  Again, I think that it's illustrative and demonstrates, or
12      corroborates a recent exposure, but it's not it does not
13      stand in and of itself.
14   Q.  Okay. So, it does not support this one article here,
15      Footnote 9, this article here, does not support use of
16      those models, does it?
17   A.  I'm going to say that they expressed an opinion there,
18      which they have every right to express. I'm going to say
19      that I believe that this study and other information has
20      broader applicability's --
21   Q.  Let's just talk about the article.
22   A.  Sure. It says what it says. I agree.
23   Q.  And you said that this is authority to use those models.
24      Dr. Huestis' models.
25   A.  Yes. It is one source of information. That's right.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 76

1   Q.  That's right. But Dr. Huestis and 5 of her contemporaries
2      who wrote the article say they don't recommend doing that.
3
4   A.  That's what that says.
5   Q.  All right. But you cited it to us as a scientific
6      reference for you doing what you did.
7   A.  I did.
8   Q.  Do you want to take that out of your scientific references
9      or do you want to leave it in there?
10   A.  I'm going to leave it in there for the time being. I'm
11      going to go back and think about it again.
12   Q.  All right.
13   A.  I'm not going to tell you I'd do anything right at the
14      moment.
15   Q.  Well -- and you see not only do those people say don't
16      use those models on postmortem blood concentrations, but
17      they cite references and down on that one there is this
18      fellow, Giroud. What did we do with his article? And
19      he's saying down there that; (READING.) In the case of
20      blood samples taken after death the use of these models,
21      he's talking about Dr. Huestis' models, to assess the
22      time of cannabis use is not recommended. He doesn't
23      recommend it either, does he?
24   A.  I would agree with that.
25   Q.  Okay.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 77

1    A.   That's what he says.  And I would say again that you could
2         take that model completely out of my report whatsoever and
3         I'd still have the same --
4    Q.   Let's just talk about the models.  I'm going to give you
5         for purposes of this deposition that you're still going to
6         have an opinion.  And you're entitled to your opinion.
7         I'm just asking you about the models.
8    A.   Understandable.
9    Q.   Now show me, or tell me where there is a scientific
10        reference or paper that supports the use of the Huestis
11        models with postmortem blood.
12   A.   I don't have it right at the moment.  I will provide it to
13        you if I can find it.
14   Q.   All right.  Would you agree with me, that for purposes of
15        your report, which is exhibit what is included in 2-A --
16        the May 7, of '07 report -- and these 10 references here
17        that you cited in the May 7, of '07 report, none of those
18        references serve as scientific authority to utilize the
19        Huestis models if you're dealing with postmortem blood.
20   A.   I wouldn't say that.
21   Q.   All right.
22   A.   What I would say would be; I'd be happy to go back and
23        look at those articles again and provide you with
24        information related to that.
25   Q.   But I thought --

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 78

1    A.   I can not give you --
2    Q.   Yeah.
3    A.   -- I can not or will not answer that question directly at
4         this time without going back and having a chance to review
5         those articles again.
6    Q.   Well, I thought that when you got this matter in that you
7         approached it as a scientist.
8    A.   You're asking me -- you're asking me a question.
9    Q.   Yeah.
10   A.   You're asking me to reconsider my opinions and the answer
11        is; I'm certainly happy to reconsider them but I won't do
12        it on the spot right here.
13   Q.   I'm not -- No.  I'm not necessarily asking you to
14        reconsider you're opinions.  I'm just asking you to back
15        up what you say and right here in this deposition you
16        can't do it.  Can you?
17              MR. RICHMOND:  Object to form.
18              MR. ALLRED:  Can you?
19              THE WITNESS:  You've asked me a question that I
20        would like the answer to formulate an answer to before I
21        give it to you without giving you a snap answer.
22   BY MR. ALLRED:
23   Q.   Alright well did you give a snap opinion when you wrote
24        the May 7, of '07 letter?
25   A.   No, sir. I don't believe so.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 79

1    Q.   But you cite these articles in here and what you
2         anticipate and expected people to do that are reading
3         this, is to say well he's saying up what he's saying with
4         scientific references and these articles back up his
5         opinions.  Is that right?
6    A.   Please, repeat your question.
7    Q.   Yeah. When you wrote the May 7th of '07 letter and you put
8         these scientific references in there.
9    A.   Correct.
10   Q.   What you expected people to do reading that opinion
11        letter, and see that it is backed up by scientific
12        references, you expected them to conclude that what he's
13        given these opinions and he's based it on these scientific
14        references -- these papers here.  And those papers back up
15        what he's done.  Right?
16   A.   True.
17   Q.   Okay. Now you're welcome to do whatever research you want
18        to do later, but I just want to make sure it's clear in
19        this deposition -- you can't point to any of these
20        articles that support using the Huestis models and if
21        you're dealing with postmortem blood.
22   A.   My answer is that -- that my understanding is, or my
23        remembrance is that the second article there by Huestis
24        has information in it related to there -- I believe that
25        she discusses that phenomenon.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 80

1    Q.   Okay.  Can you tell me, just sitting in the deposition,
2         can you tell me?
3    A.   Tell you what sir?
4    Q.   That this Footnote Number 2 Article supports what you're
5         trying to do.
6    A.   No. I can't because I remember it discusses it and I
7         remember reading it, but again, before I gave you an
8         opinion, I'd like a chance to go look at it.
9    Q.   All right.  Well since you mentioned the Footnote Number 2
10        Article, Dr. Huestis article, in there it says; (READING).
11        Epidemiological studies reveal that cannabis is the most
12        common illicit drug worldwide in impaired drivers and in
13        motor vehicle injuries and fatalities.  Driving simulator
14        studies also indicate performance impairment following
15        cannabis use, however, the results of opened and closed
16        road driving studies and culpability studies do not
17        consistently document increased driving risk.  Do you
18        agree with that statement?
19   A.   I do.
20   Q.   Does frequent or infrequent marijuana use -- does that
21        have anything to do with THC or THC Carboxy Acid levels?
22   A.   It does.
23   Q.   And how does it affect it?
24   A.   Levels are probably affected by prior use and prior use
25        history.

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 81

1  Q.  Okay. Is it true that THC can be detectable for up to six
2      days after smoking cannabis in frequent users, and less
3      than a day for infrequent users? Do you agree with that
4      statement?
5  A.  That is information from one particular study. The answer
6      is yes.
7  Q.  This is a study you cited in your report and that you say
8      that you relied on.
9  A.  Yes. But you have to understand that there are many, many
10     studies that looked at that particular question. I agree
11     with it. That's what those authors found in that study
12 Q.  Okay. When you have -- Do you agree that when you're
13     trying to determine -- you're trying to interpret the
14     significance of cannaboid concentrations in blood
15     specimens from individuals involved in accidences that
16     relevant facts would include the amount of drug use, the
17     route of administration, and the history of use. Would --
18     Would those be relevant facts?
19 A.  Yes.
20 Q.  Do you agree that a practical, presumptive concentration
21     of blood THC can not be related to a measurable level of
22     impairment such as the situation with blood ethanol
23     concentrations. Do you agree with that statement?
24 A.  I do.
25 Q.  All right. Do you agree that due to the chemical I can't

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 82

1      pronounce this word -- pharmacokinetic -- how do you
2      pronounce it?
3  A.  Pharmacokinetic.
4  Q.  Pharmacokinetic differences between cannabis and ethanol,
5      we can not use ethanol as a model for relating drug
6      concentrations to effects?
7  A.  Absolutely true.
8  Q.  Okay. In this article here, which is referred to under
9      Footnote 2 I think, I think it said --yeah, that's Huestis
10     article. She mentions in here that it says (READING.)
11     Huestis et al, developed 2 mathematical models for the
12     prediction of time of cannabis use from the analysis of a
13     single plasma specimen for cannaboids. That's the
14     mathematical models you used and that we've been talking
15     about. Is that right?
16 A.  Correct.
17 Q.  Okay. Is there a difference in the postmortem blood
18     sample that was taken of John Britt's blood and they are
19     talking about a single plasma specimen here. Is that the
20     same thing or is there a difference?
21 A.  There is a difference.
22 Q.  What is the difference?
23 A.  Hematocrit.
24 Q.  And how does that affect the reliability of the results
25     test with regards to THC or the metabolites?

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 83

1  A.  The big issue is; what's the relationship between
2      concentrations in plasma and concentrations in whole
3      blood.
4  Q.  Okay. And is that is one of them just as reliable as the
5      other? I mean, the test as to one of them just as
6      reliable as to the other?
7  A.  Yes. The analysis of blood is every bit as reliable as
8      the analysis of serum or plasma.
9  Q.  Would you have -- do you do tests differently if you're
10     talking about serum versus plasma?
11 A.  No.
12 Q.  What -- How did you get the serum do you spin the sample
13     down?
14 A.  From whole blood, the answer is yes. Generally by
15     centrifugation.
16 Q.  You mentioned in your report here about something to do
17     with 95 percent confidence, on page 3 of 9 of your report.
18 A.  Yes.
19 Q.  Since Dr. Huestis and colleagues don't recommend use of
20     that -- those models with postmortem blood, wouldn't it be
21     improper to say that you have a 95 percent confidence
22     level that your use of the models is correct with regards
23     to John Britt?
24 A.  That's not what I said.
25 Q.  So, your opinions are not within a 95 percent degree of

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 84

1      confidence anyway? Is that right? You're just saying
2      that the models are within 95 percent confidence.
3  A.  The models were designed to construct a 95 percent
4      confidence level.
5  Q.  Do you have an opinion as to what degree of confidence
6      your opinions are, as correct versus incorrect?
7  A.  I have complete confidence in my opinion that it's correct
8      based on the pharmacology, the metabolite distributions,
9      in my knowledge and experience, in training, and in
10     Forensic Toxicology.
11 Q.  Can you put a percentage level on it?
12 A.  Not without reflection.
13 Q.  Okay. Can you reflect on it the deposition and tell me?
14 A.  I don't have an opinion on it at this time. I'm confident
15     in my opinion. I don't know if I can give you a
16     mathematical number.
17 Q.  But where -- for purposes for later discussions, we need
18     to discount and disregard this 95 percent confidence
19     number. Would that be correct?
20 A.  No. I think that 95 percent confidence, again, that's the
21     confidence that was designed in the model. That's the--
22     the -- the window that's utilized in her -- in her
23     prediction intervals.
24 Q.  Let me ask you, Dr. Huestis' article, she also says;
25     (READING.) It would be helpful if driver's drug

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

### Page 85

1    concentration in blood were directly related to a specific
2    degree of driving impairment. And that -- that is really
3    what were looking for. That's in the quote, and then I
4    will ask you this; that is really what we are looking for
5    in this case with regard to John Britt. That's what
6    you're attempting to do. Is that correct? Related the --
7    the level of drugs to any impairment, if any. Is that
8    right?
9  A.  Correct.
10 Q.  And she says; (READING.) However, the relationship between
11   drug concentrations and physiological behavioral
12   impairment is complex. Do you agree with that?
13 A.  True.
14 Q.  What about with the exception to ethanol. Few
15   experimental data are available correlating drug
16   concentrations in blood to driving impairment. Do you
17   agree with that statement?
18 A.  I do.
19 Q.  And then she says; (READING.) Interpretation of contribute
20   -- contribution of drug use to accident causation in
21   termination of the relative and importance of drugs
22   quantitative and concentration in plasma or whole blood is
23   complicated by multitude of factors including, and she
24   list, drug interactions, drug tolerance, driving
25   experience, road and weather conditions, and the age and

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

### Page 86

1    health of the driver. Do you agree with that statement?
2  A.  I do.
3  Q.  What do you know with regard to John Britt. Were there
4    any other drugs in his body that had any affect on the
5    accident, in your opinion?
6  A.  No.
7  Q.  What about drug tolerance? Do you have any information
8    with regard to John Britt's drug tolerance?
9  A.  No.
10 Q.  Would, in your opinion, if he was a frequent user, would
11   that make him able to tolerate the effects of THC better?
12 A.  No. It wouldn't.
13 Q.  Okay.
14 A.  In other words, would it make a functional difference if
15   -- with respect to his impairment? The answer is no.
16 Q.  What about Dr. Huestis statement? What is she talking
17   about when she says drug tolerance? She says that --
18   that's an important factor.
19 A.  Sure.
20 Q.  What does that mean?
21 A.  Well -- well, there are various different kinds of
22   tolerance, and she could be relating to a number of
23   different things there. There is pharmacokinetic, or
24   pharmacological tolerance, where the body adapts to the
25   way that it handles the drug.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

### Page 87

1      Or another kind is behavioral tolerance, where
2    people develop certain kinds of compensatory mechanisms.
3  Q.  So, she's talking about under roman numeral nine, it says
4    impairment.
5  A.  Sure.
6  Q.  So, relate -- I mean, this is your article. You said you
7    read it, used for your opinions. What is she talking
8    about there with regard to drug tolerance, and --
9  A.  Well, I am trying to explain to you that -- that -- that
10   tolerance -- here are many different kinds of tolerance,
11   and all of them may effect impairment to some degree or
12   another.
13 Q.  Okay. Anything else on that issue?
14 A.  No.
15 Q.  What about driving experience? Do you have any
16   information on John Britt's driving experience?
17 A.  No. My understanding is that he was a middle aged man, I
18   think 44 years old. And therefore, I expect him to be
19   reasonably -- reasonably experienced as a driver. He's
20   not a new driver.
21 Q.  Okay. What is she talking about when she says that road
22   and weather conditions is an important factor?
23 A.  Motor vehicle crashes are almost always multi-factorial.
24   There are many, many inputs that can come together to
25   bring about a motor vehicle crash. And what she's saying

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

### Page 88

1    is consider all the aspects. Consider weather and road
2    conditions as well. Which, according to motor vehicle
3    crash report, the AUTAR report, it didn't have an impact.
4
5  Q.  Do you limit yourself to only what the AUTAR report shows?
6    The officers report?
7  A.  No. I try not to.
8  Q.  Okay. Well, are you taking into consideration that maybe
9    it was raining, it was dark the night that John Britt was
10   killed?
11 A.  I understand that.
12 Q.  Would that make him make it more difficult for any driver,
13   impaired or not impaired, to recognize the hazard and
14   react to it -- to a truck turning in front of them?
15 A.  It potentially could. I don't know that it did.
16 Q.  Okay. What about John Britt's heath? Do you have any
17   information about his heath?
18 A.  I don't.
19 Q.  Okay.
20 A.  The last information we got as far as his heath goes,
21   comes from his autopsy. And my understanding is that
22   there were not significant health related, or disease
23   process indicated on his autopsy report that I remember
24   seeing.
25 Q.  Okay. Did you utilize the urine test in any manner in

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 89

1    forming your opinions and conclusions? And if so, how?
2    A.   Yes. To some degree, but it -- it tends to -- Okay.
3         There was a presumptive preliminary test performed on the
4         urine sample which indicated a high probability that
5         cannabis material was present. That's consistent with
6         and corroborative with the blood findings. However, that
7         was not confirmed by a second, definitive test. It tends
8         to support it. It is not conclusive.
9    Q.   Was it -- what was the level in the urine?
10   A.   Sufficient to cause a positive in a test.
11   Q.   All right. And the cut off is -- for the reporting limit
12        is 50?
13   A.   Should be 50 nanograms per mil.
14   Q.   All right. And then no -- that was an unconfirmed screen,
15        and it says conformation by a more definitive technique
16        such as -- is that the gas from -- however you say that
17        machine -- some fancy machine?
18   A.   It's a Gas chromatograph and mass spectrometry.
19   Q.   GC/MS?
20   A.   Correct.
21   Q.   All right. So, the NMS data recommends to do another test
22        on the urine?
23   A.   Standard. That is a standard forensic practice.
24   Q.   All right. With regard to the urine test, isn't it
25        difficult to lie on that test in any way and making a

REPORTED BY: Amy Chawne Holsclaw

## Dr. Andrew Mason 10/26/2007

Page 91

1    A.   It goes to the difficulties of epidemiologic studies I've
2         indicated before.
3    Q.   Do you agree with Dr. Huestis' statement that; (READING.)
4         Also, tasks that are well practiced, such as driving, tend
5         to be more resistant to drug effects. Do you agree with
6         that statement?
7    A.   Absolutely true.
8    Q.   Dr. Huestis did some -- apparently did some tests with a
9         driving on an open or closed course, and with a flight
10        simulator in one of the articles that you relied on.
11   A.   I don't know if she did them, but --
12   Q.   -- Well, somebody did.
13   A.   -- Well --
14   Q.   -- Because she mentioned --
15   A.   -- Sure. Those studies have been done.
16   Q.   And she says that she's got a table in there, and she
17        says; (READING.) The degree of performance impairment
18        observed in driving simulator task an open and closed
19        driving courses following cannabis is not consistent
20        between the studies. Do you agree with that?
21   A.   Yeah. And that goes particularly to the way that an
22        individual study is designed. Which has a big impact on
23        the results. And obviously after realizing you're looking
24        at numerous studies across the board, that different
25        investigators don't automatically conduct their studies in

REPORTED BY: Amy Chawne Holsclaw

## Dr. Andrew Mason 10/26/2007

Page 90

1    determination of the level of what the THC was?
2    A.   Well, you -- you classically don't. That's the point.
3    Q.   Do you agree with this, that Dr. Huestis says; (READING.)
4         The law and elimination half life of cannaboids makes a
5         relationship between a positive urine test and accident
6         risk difficult to determine. Do you agree with that
7         statement?
8    A.   Of course.
9    Q.   Okay.
10   A.   All I can say is that -- that again, no definitive
11        determination was made. You don't have the concentration.
12        The positive finding in the urine is consistent in the
13        positive findings in the blood. It, to some degree,
14        corroborates that, but it's not definitive.
15             And in any case, the concentrations in the urine are
16        generally not for a positive findings in urine are
17        generally not held to be related to the presence of
18        impairment.
19   Q.   Do you agree with Dr. Huestis' statement that; (READING.)
20        Although laboratory performance measures in driving
21        behavior have shown alterations following cannabis, few
22        studies, unequivocally linked and increased accident rates
23        with cannabis. Do you agree with that statement?
24   A.   Its true.
25   Q.   Okay.

REPORTED BY: Amy Chawne Holsclaw

## Dr. Andrew Mason 10/26/2007

Page 92

1    the exact same way. Use the same criteria, use different
2    tasks that may vary in complexity, in difficulty. T
3         The point being that positivity in a test that
4    relates to impairment is much easier to produce in a task
5    that is quite difficult. Even the most sensitive test of
6    the criteria than it is in a test that is necessarily
7    easier.
8    Q.   You couldn't take a -- take her findings that she's cited
9         on this table for you in the article to support the
10        proposition that marijuana always causes impairment to
11        drivers? It -- It would not support that concept, would
12        it?
13   A.   I -- I think you would have to go back, go back and look
14        at the individual studies. My opinion is --
15   Q.   I'm talking about table three.
16   A.   I --
17   Q.   The one that she cites here.
18   A.   I would have to look at table three. My opinion is that
19        marijuana is an impairing substance, and produces
20        characteristic effects that are dangerous for drivers.
21   Q.   My question is with regard to the one test here that I
22        read you, the sentence; (READING.) That the degree of
23        performance impaired observed in driving simulator test,
24        open and closed driving courses following marijuana is not
25        consistent between studies. You couldn't take that one

REPORTED BY: Amy Chawne Holsclaw

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 93

1    table there and say okay, this means if you have THC
2    present in your system, you're impaired.
3    A.  Well, you know, I agree.  You don't rely on any one thing.
4
5    Q.  All right.  Do you agree with Dr. Huestis cites in her
6        article that you relied on, it says; (READING.)  In a 1986
7        review of seven driving simulators performance studies,
8        and six on road driving performance studies, Smiley, and
9        he's an author.  Are you familiar with Smiley?
10   A.  I've read his papers.
11   Q.  Okay.  (READING.)  Concluded that after cannabis, drivers
12       tend to reduce speed, are less likely to pass, and
13       increased their following distance in an attempt to
14       compensate for their perceived impairment.  Do you -- do
15       you agree with that statement?
16   A.  I certainly do.  They can do all of those things.
17   Q.  Do you also agree that their, meaning after cannabis
18       drivers, their comprehension of potential impairment and
19       added concentration could have accounted for the
20       improvement in driving performance observed in some
21       subjects in low dose cannabis studies.  Cannabis -- well,
22       first of all, do you agree with that statement?
23   A.  I do.  Under certain circumstances, especially when
24       drivers know that they are being examined, they can modify
25       their -- their attention and their concentration on the

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 95

1    time, 1984 -- 1985.  Is that right?
2    A.  That is true.
3    Q.  In there, your article says -- well, first of all, let me
4        ask you this; this is an 1984 article.  Have you changed
5        your mind about some of it?  Is it different now, or --
6        you don't still have the opinions that are in this 1984
7        article?
8    A.  Well, to some degree yes, and to some degree, no.  It
9        depends exactly what you want to ask me about, but I don't
10       think that if I just form my opinions back in 1984 and
11       didn't continue to reflect on them in time, as I learned
12       more, I don't think that would be a very appropriate
13       practice.  Let me put it to you that way.
14   Q.  What about your opinion in the article in 1984.  That it
15       would be very difficult, if not impossible to establish
16       cut off concentrations of THC in plasma that is
17       presumptive of significant effects.  Do you still hold to
18       that opinion?
19   A.  Yes.  I do, pretty much.  There are other authors who
20       profoundly disagree with me on that.  As a matter of the
21       fact, I know a lot of jurisdictions believe that a 1
22       nanogram per ml concentration of THC in serum applies, but
23       is an appropriate per say concentration at which there
24       ought to be a presumption of impairment.
25           I don't quite agree with that, because I wouldn't go

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 94

1    tasks at hand, which modifies their performance.
2    Q.  Do you agree with her statement also she says; (READING.)
3        Cannabis reduces a number of attempts at passing other
4        cars, or at risk behavior and contrast that ethanol that
5        increased risk taking.  Do you agree with that statement?
6    A.  It certainly can have that affect on some individuals.
7    Q.  Okay.  She actually cites two articles that you and Dr.
8        McBay -- but you said that you wrote that article.  She
9        cites a lot of references in there.  Numbers 279 and 280
10       are you and Dr. McBay.  She relies on some articles that
11       you wrote.  Now, did you know that?
12   A.  (INDICATES AFFIRMATIVE.)
13   Q.  Excuse me?
14   A.  Yes.  I did.
15   Q.  You wrote an article with Dr. McBay in 1985, July 1985,
16       and its Cannabis Pharmacology and Interpretation of
17       Effects.  What was the -- let me read the abstract on it.
18
19           (READING.)  A selective introductory review of the
20       Cannabis literature is presented.  Subjects reviewed
21       include the relative psychoactivities of cannabis
22       constituents, the disposition and distribution of the THC
23       and its metabolites, and the last sentence says
24       pharmacology of cannabinoids in humans is emphasized.
25           Apparently, you were a graduate student at that

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 96

1    that low.
2    Q.  Do you have -- do you have an opinion today as to what
3        level is a cut off concentration of THC that is
4        presumptive of significant effects?
5    A.  I have not formed an opinion on that question.
6    Q.  You do not have an opinion -- you do not have an opinion
7        on that?
8    A.  I have not -- I have not yet seen information that I
9        consider -- let's just put it this way; remain unconvinced
10       on that question.
11   Q.  Okay.  In your own observations, and in your own work,
12       have you seen people with varying or different levels of
13       concentration of THC could have different impairment
14       issues?
15   A.  People do vary from person to person.  That answer is
16       true.
17   Q.  And that would be -- that would have to do with all those
18       factors that we were talking about earlier?  The drug
19       tolerance, driving history, driving experience, health,
20       that -- that kind of thing?
21   A.  And others.
22   Q.  And more factors.  What are some more factors that can
23       make a difference with what -- what other THC
24       concentrations actually impairs a driver, besides the ones
25       we already talked about?

REPORTED BY: Amy Chawne Holsclaw

High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

17e93923-21ac-47f7-b7d4-307d6191bae4

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 97

1  A.  Goodness gracious. Age, race, sex, health, other
2      medications, a large body of work, developing
3      co-pharmacogenomics, which talks about individuals and
4      their genetic makeup and how the distribution of enzymes
5      in their body that break down drugs can cause different
6      drug concentrations to be elevated or not. All of those
7      kinds of things can have an impact.
8  Q.  All right.
9  A.  One of the biggest things is setting and expectations of
10     the user.
11 Q.  Would that have to do with whether they are an experienced
12     user, or first time user?
13 A.  No. It has more to do -- well, it could. But, what I'm
14     talking about more is a circumstance here of what's going
15     on. Is somebody sitting back at a party some place, are
16     they in a situation where they actively have to pay
17     attention. Our expectations about what effects produced
18     or modified by our environment and what's going on around
19     us. That's all I am trying to say.
20 Q.  One of the articles you cited in your report is number
21     three.
22 A.  And it's a study. Sure.
23 Q.  Huh?
24 A.  It's a National Highway Transportation Safety Article.
25 Q.  Okay.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 98

1  A.  Yeah.
2  Q.  It says in there with regard to interpretation to blood
3      concentrations; (READING.) It's difficult to establish a
4      relationship between a persons THC, blood or plasma
5      concentration in performance impairing effects. You agree
6      with that statement?
7  A.  Yep.
8  Q.  It also says it is inadvisable to try and predict effects
9      based on blood THC concentrations alone.
10 A.  I do. I agree.
11 Q.  Okay. And it's currently impossible to predict specific
12     effects based on THC - COOH concentrations. Now, that
13     last thing is the THC Carboxy Acid. Is that right?
14 A.  Carboxylic Acid.
15 Q.  Okay.
16 A.  Sure.
17 Q.  So, do you agree with that statement? It is currently
18     impossible to predict specific effects based on THC -
19     Carboxylic Acid concentrations.
20 A.  Alone, yeah. It's a non-psychoactive material. Why would
21     you presume that a non-psychoactive material would produce
22     effects?
23 Q.  Okay. Do you agree -- you've already answered that.
24 A.  I am glad I finally answered something.
25 Q.  What is -- there's a substance that was mentioned in one

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 99

1      of your -- one of the articles that you referred to. It's
2      the same article that we're talking about, which is
3      Footnote 3. And it says; (READING.) Merit is refers to
4      Marinol. Is that a prescription with the THC component in
5      it?
6  A.  Its true.
7  Q.  Okay. Are there other names for it?
8  A.  No. That's the trade name.
9  Q.  Well, that's a bad question. Are there other drugs or
10     prescription drugs that have the THC ingredient?
11 A.  Yeah. As a matter of the fact, there is one. But, I'm
12     not sure it's marketed in the United States.
13 Q.  Okay.
14 A.  I know it's marketed in Canada.
15 Q.  Okay.
16 A.  That's the only one that I know of that is marketed in the
17     United States currently.
18 Q.  Okay. In your documents there, which I have not looked
19     at. Your working file, your blue folder.
20 A.  (INDICATES AFFIRMATIVE.)
21 Q.  Do you have your calculations in there?
22 A.  They are also in my report. Yes, sir.
23 Q.  Okay. I mean as far as a sheet with pencil to paper
24     calculations where you would get those numbers put
25     together --

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 100

1  A.  -- Spread --
2  Q.  Are they in there?
3  A.  Spread sheet.
4  Q.  Spread sheet?
5  A.  (INDICATES AFFIRMATIVE.)
6  Q.  Okay.
7  A.  It's in the report.
8  Q.  This Footnote 6 is one of the articles, the Huestis
9      articles that said concerns the models. And if you --
10     I'm not asking you about the -- the postmortem blood
11     issue, because we talked about that pretty extensively a
12     while ago.
13 A.  (INDICATES AFFIRMATIVE.)
14 Q.  But, in there, Dr. Huestis says that overall, models 1 and
15     2, and that's the two models that you'd used, I'm
16     assuming. Is that right?
17 A.  True.
18 Q.  Said they accurately predicted a lapse time after drug
19     use, but they tended to underestimate the actual time of
20     use at later times. If that's what she's saying in that
21     article, wouldn't that mean that you would have a bigger
22     danger if you had that model, you'd have a bigger danger
23     of accusing somebody of being impaired at the time of an
24     event, because your underestimating the time?
25 A.  Yeah. But it specifically says that at a later time, so

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 101

1　you're talking about much further back. If you're much
2　further back, it may predict a time that is much closer,
3　in which case, you'd be in the window. But that's not
4　what we're talking about here. We're talking about
5　predicting an effect on concentration very close to the
6　time of exposure.
7　Q.　So, you don't think that sentence that I just read you
8　　　there --
9　A.　-- No. It makes --
10　Q.　-- makes any difference about using the models?
11　A.　Not really. It predicts that later time. It says there's
12　　　a danger at a later time that you would predict earlier,
13　　　but here, you're talking about earlier times. You're
14　　　talking about times very close to the time of exposure,
15　　　clearly.
16　Q.　Okay. I take it from reading some of these articles that
17　　　-- that the task of determining when an individual used
18　　　marijuana can be pretty difficult. Is that right?
19　A.　That is true.
20　Q.　And it is the subject of a lot of work by Dr. Huestis and
21　　　a lot of people that -- one of the articles that you cited
22　　　in Footnote 7, written in 1993, she says that although
23　　　numerous behavioral and pharmacokinetic studies of
24　　　marijuana has been reported, and the answers to these
25　　　questions have not been read and forthcoming. You would

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 102

1　agree with that, wouldn't you?
2　A.　Sure. It's a very difficult study. Very difficult
3　　　phenomenon to study. It's been investigated for many,
4　　　many years. We still don't know a lot about it.
5　Q.　And the time of use is made difficult a lot of times
6　　　because the toxicologists is often faced with the task
7　　　interpretation of time of marijuana exposure based on a
8　　　single THC blood concentration. Will you agree with that
9　　　statement?
10　A.　I do.
11　Q.　That's what your dealing with here in this case, is a
12　　　single THC blood concentration. Is that right?
13　A.　That is true.
14　Q.　Okay. Dr. Huestis -- apparently, you hold her in pretty
15　　　high esteem. Is that right?
16　A.　I do.
17　Q.　Okay. In your Footnote 8, she says, and there again,
18　　　she's talking about the time the cannabis was last used
19　　　for determining impairment. She says; in accident
20　　　investigations, so, and she's talking about the models
21　　　that you used. She says in there, she's talking about
22　　　some studies; (READING.) These and similar studies have
23　　　demonstrated a connection between accidents in cannabis
24　　　use. But if not established causation by cannabis despite
25　　　the knowledge that individuals that use cannabis have

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 103

1　impaired performance at driving a simulator and on the
2　road tests. Do you agree with her statement there?
3　A.　Generally, yeah. I would like to go back and look at that
4　　　context a little bit better, but generally, I think that
5　　　goes back to the whole issue of capability and some of the
6　　　other variables that relate to a motor vehicle crashes et
7　　　cetera. We know that marijuana does cause impairment. We
8　　　know that can be a factor.
9　Q.　She also cites that; (READING.) Unlike cases involving
10　　　uses of alcohol impairment in the form of cannabis use is
11　　　not easily correlated to blood or plasma concentrations of
12　　　THC or its metabolites. Do you agree with that statement?
13
14　A.　I agree with it completely. The fact that we're here today
15　　　is a reflection of that.
16　Q.　Girard also says the maximum drug effects may occur later
17　　　than the peak blood concentrations of THC, or its active
18　　　metabolites. Effects on the -- my hole puncher took my
19　　　words out -- Continue as blood concentrations of active,
20　　　as active drug -- here let me let you read this. See if
21　　　you can supply the missing words.
22　A.　Let me try. I'd be happy to help you if I can.
23　Q.　Down here. That sentence. Wherever that sentence starts.
24
25　A.　Yeah.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 104

1　Q.　Effects on the --
2　A.　-- effects on the --
3　Q.　Right there.
4　Q.　Something. Continue as blood concentrations of active
5　　　drug decreases.
6　Q.　What is --
7　A.　-- Oh, I think that might be -- I think that might be --
8　Q.　-- What?
9　A.　Wait a minute. Let me read this sentence before --
10　Q.　Go ahead.
11　A.　If you don't mind.
12　Q.　Sure.
13　　　　(WITNESS PURSUES DOCUMENTS.)
14　A.　I can tell you what she's talking about here, but I don't
15　　　know specifically what she's making reference to.
16　Q.　Okay.
17　A.　Is that if you apply effects versus time for THC in blood
18　　　serum plasma, that plot would look like a loop. It will
19　　　actually curve back on its own. And that process is known
20　　　as hysteresis. And the hysteresis, they way it behaves in
21　　　that manner is related to the fact that there's a delay
22　　　between the distribution of the drug from the vascular
23　　　compartment, from the blood to the point where it produces
24　　　its effects in the brain.
25　　　　In other words --

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 105

1  Q.  Okay.
2  A.  -- There's not an instantaneous production of effects with
3      marijuana.
4  Q.  Okay.
5  A.  Its run on the THC concentrations peak, even while and
6      ruing someone smokes marijuana, but at the peak effects
7      occur at a slightly later time, they actually occur at the
8      time that THC and THC Carboxylic Acid concentrations are
9      equal.
10 Q.  Okay.
11 A.  That doesn't happen -- that doesn't occur -- that occurs
12     after the concentration.
13 Q.  It's not a linear progression?  It's the level of THC is
14     not linear with the drugs --
15 A.  No.  And that's obviously the major cause of -- of all
16     this hand-waving and other problems with respect to
17     interpretation.
18 Q.  (INDICATES AFFIRMATIVE.)
19 A.  If it were very simple, I mean, you read several quotes
20     before about comparing the pharmacology of marijuana with
21     the pharmacology of alcohol.  Alcohol is fairly concise
22     linear relationship between drug concentrations and the
23     degree of impairment that's produced.
24     And I --
25 Q.  Marijuana is not?

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 106

1  A.  No.  Marijuana is not.
2  Q.  Okay.
3  A.  Now, what I will say, though, is one of the things that --
4      that Huestis and many other investigators have shown is
5      that after that initial drop, it peaks and then it drops,
6      and after that drug drop occurs, that primary drug
7      distribution, then there is a relatively good correlation
8      between concentrations and effects.
9  Q.  So, the -- what you take from that, and the rule there --
10     if you want to call it one -- is that you cant extrapolate
11     from the level of THC in the blood to a specific
12     impairment level in an individual like you could with
13     alcohol?
14 A.  The answer is that -- that it becomes much more difficult
15     to do so.  Because of the complexities of the pharmacology
16     and the pharmacokinetics -- the -- the way the
17     concentrations change over time.  Your exactly correct and
18     that's one of the reasons why scientists have attempted to
19     look at other ways of trying to determine how long it's
20     been since somebody used et cetera.
21     To get a better understanding of what we're dealing
22     with, under the specific circumstances, if there were a
23     direct correlation between the concentrations and effects,
24     it'd be case closed.  Why bother going through all this
25     stuff, right?  If that were the case.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 107

1  Q.  The bottom line is that you just don't know about the
2      level of impairment?
3  A.  The answer is that -- that people who have been looking at
4      these questions for a long time know that when you have a
5      very high concentration of THC in your blood or your
6      plasma, that assume you're likely to have a significant
7      degree of effects.
8      We know what the characteristics are and we know
9      what the effects are.  Saying that a particular effect
10     occurred in a given individual, at a particular time and a
11     particular concentration is problematic.  No questions
12     about it.
13     But I would -- I would say that that phenomenon not
14     only relates to marijuana, but relates to most other
15     drugs, other than alcohol as well.  It's a very common
16     problem in Forensic Toxicology to have that kind of
17     situation.
18 Q.  She says also in her article; (READING.) In fatal cases
19     the important variables are the concentration of drugs,
20     and metabolites in ante mortem plasma.  Estimating these
21     from postmortem blood has not been well documented.  Do
22     you agree with that statement?
23 A.  I do.
24 Q.  And she cites the Girard article that we were talking
25     about earlier.   And as we discussed earlier, Dr.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 108

1      Girard says that; (READING.) In the case of blood samples
2      taken after death, the use of these models, meaning the
3      Huestis models, to assess the time of cannabis use is not
4      recommended.
5  A.  That's what that says.
6  Q.  And that's the article that she referring to there.  I can
7      show you --
8  A.  I -- I will take your word for it.  I'm not -- what I'm
9      saying is --
10 Q.  36.
11 A.  -- I'm not --
12 Q.  36.  See, there's 36 right after it.
13 A.  Okay.
14 Q.  And I pulled -- that's it right there.  It's Exhibit 5.
15 A.  Sure.  And I am going to take a good look at that after
16     this deposition is over with.
17 Q.  Would it be true that prior to this deposition, you had
18     not gone back and looked at the Giroud article?
19 A.  I remember seeing the article.  I don't remember it in
20     detail.
21 Q.  For purposes of this case?
22 A.  I did not look at that in preparation for this        case.
23
24 Q.  Did you assess what Dr. Huestis is saying in these
25     articles in making a determination whether it would be

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 109

1    appropriate for you to use these models in this John Britt
2    case?
3  A.  I considered it.
4  Q.  I assume -- here's my dilemma. If you considered it, and
5    the articles, none of these articles that you've cited
6    recommend using the models that you've relied on.
7  A.  Well, the recommend --
8  Q.  Right?
9  A.  Well -- the recommended models -- the question is the
10   applicability of postmortem blood. I would say --
11
12  Q.  -- Wait a minute. I want to ask the question, and then
13    you're welcome to say what you want to say.
14  A.  Please, do.
15  Q.  But I am the lay person here. And I go through and I read
16    these articles and they say that using those models is not
17    recommended. And then, it refers to Dr. Giroud, and it
18    says that it's not recommended. Would he -- yet, he says
19    its not recommended and you say that you considered these
20    articles, not the Giroud article, but the Huestis articles
21    -- and then you use the models and I want you to explain
22    to me why you did that if your citing these very articles
23    for authority for doing it.
24  A.  And in other cases, it says that these models have been
25    applied to forensic situations in many, many other

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 110

1    countries and received acceptability by many other authors
2    and many other jurisdictions. And it seems a general tool
3    that can be used. Is it a definitive tool? No.
4      The answer is there is no single thing that is
5    definitive. The answer is that it is a tool that can be
6    applied to the problem to provide information.
7      I'm not relying solely on that for my information.
8    I am also relying on my knowledge of the pharmacology of
9    the materials, the concentrations that are involved. All
10   of that information comes to -- if that were the only
11   thing I considered, yes. It would be an issue. It's not
12   the only thing I considered. I don't consider it to be an
13   issue.
14  Q.  Okay. But I am just talking about the models themselves.
15    And their -- to make sure we are clear on this. There's
16    nothing that you can refer me to in this deposition today
17    with regard to these articles that says it's appropriate
18    or recommended to use the models with postmortem blood?
19    Would that -- would that be correct?
20  A.  The answer is no. Not sitting here at this moment. I am
21    going to go back and look at those papers again and
22    consider my opinion on that question.
23  Q.  Okay. And I want to -- also, the Giroud article, and I am
24    probably really butchering that mans name, but it is
25    mentioned in one of Dr. Huestis' articles that is Footnote

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 111

1    9, it is mentioned in there, and she is talking about the
2    models in there, and it also says not recommended for
3    postmortem blood.
4      All right now. Take me through -- you've got some
5    more stuff from -- excuse me, I didn't mean stuff. You've
6    got some more documents from NMS after you did your
7    opinion letter. And that's in Exhibit 2B. And what is it
8    in there that had any significance, either by way of
9    confirming or making you re-think or re-look at any of
10   your opinions?
11  A.  Nothing.
12  Q.  Okay. Is there anything in Exhibit 2B that is of any
13    significance with regard to your opinions and conclusions?
14
15  A.  Only one thing.
16  Q.  What is it?
17  A.  In reviewing the documents that National Medical Services
18    provided, I found out that the analytical tests that was
19    done for THC and THC Carboxylic was not only performed
20    once, but it was performed twice.
21  Q.  Okay. Show me that document so we can mark it as a sub --
22    if you have it available there.
23  A.  Well, I can tell you its on page 180.
24  Q.  180?
25  A.  Well --

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 112

1  Q.  Okay.
2  A.  The reason why the test was done is on page 180.
3  Q.  The reason it was done twice?
4  A.  The reason why it was done a second time.
5  Q.  Okay.
6  A.  Correct.
7  Q.  Why was it done a second time?
8  A.  Because the analyst questioned the results because the THC
9    concentration was so high with regard to the THC
10   Carboxylic.
11  Q.  Why --
12  A.  -- It was that unusual that she question -- she questioned
13    it. I don't know if it was male or female.
14  Q.  Do you have that document that we can -- because I will be
15    looking for it later.
16  A.  Page 180.
17  Q.  Are those numbered some where?
18  A.  They are.
19  Q.  All right.
20  A.  I don't know what that's doing in there.
21  Q.  There's 180.
22  A.  Yeah.
23  Q.  All right. Explain to me the significance of page 180.
24    Explain it to a lay person.
25  A.  Sure. What it says is -- okay, we've got the results on

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 505 D West King Street, Boone, NC 28607   (828) 262-3603

17e93923-21ac-47f7-b7d4-307d6191bae4

## Dr. Andrew Mason 10/26/2007

Page 113

1    this test. I want you to go ahead -- let me see if I can
2    show you --
3  Q.  (INDICATES AFFIRMATIVE.)
4  A.  That's the analite Delta 9 THC, that's the test code.
5    That's the test that was performed. This RS I believe is
6    re-sample 1.0 ml to confirm THC = 7.01 > THC Carboxylic
7    Acid.
8  Q.  Okay. THCC?
9  A.  Correct.
10  Q.  Okay.
11  A.  Initials and date.
12  Q.  All right. The initials MMS, that's the technician?
13  A.  It would either be the technician that performed the test,
14    or the person who reviewed it.
15  Q.  All right. And what's the significance of that -- what
16    you just read?
17  A.  Again, what the analyst is questioning here is why is the
18    THC concentration greater than the THCC?
19  Q.  Okay.
20  A.  That's a very unusual finding.
21  Q.  Okay.
22  A.  Its very rare that you find that distribution.
23  Q.  What could be some reasons for having a reading like that?
24
25  A.  Proximity to the time of use.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 114

1  Q.  All right. Is that's what you think?
2  A.  It's the only --
3  Q.  -- in this case. Right?
4  A.  Correct.
5  Q.  Okay.
6  A.  It's the only reason I know of.
7  Q.  What could be some other ways that you could get a reading
8    like that?
9  A.  I don't know of any others.
10  Q.  All right. Well, why would they do another test if -- if
11    they thought the test was correct?
12  A.  The only answer I can give you is that they wanted to make
13    sure that was actually what they were seeing.
14  Q.  Okay.
15  A.  I don't think that they had any indication that the test
16    was faulty there. Or that it was just -- this is very
17    usual. Let's just repeat this and make sure that the
18    numbers are consistent when we re-run this test.
19  Q.  Okay. All right. Are there any other documents in that
20    Exhibit 2B that you feel like are significant, or that you
21    feel like you used in your opinions and conclusions?
22  A.  No.
23  Q.  Okay.
24  A.  Other than the results themselves. But the answer is no.
25  Q.  Okay. But they are included in --

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 115

1  A.  -- It's all in 2A.
2  Q.  2A?
3  A.  Correct.
4  Q.  All right. In this -- is there anything else on page 180
5    that is of any significance?
6  A.  Not that I know of.
7  Q.  That's going to be -- let's mark that as sub Exhibit 6, I
8    think.
9    (THEREUPON, EXHIBIT NO. 6 WAS MARKED FOR
10    IDENTIFICATION.)
11    MR. RICHMOND: what has this been marked right here?
12    Right now?
13    MR. ALLRED: Its 2B.
14    MR. MR. RICHMOND: 2B.
15    MR. ALLRED: And then we're going to have 6 -- will
16    be a page in there. Let's flag it so the court reporter
17    can find it.
18    MR. RICHMOND:    Another short break? Good
19    stopping point?
20    MR. ALLRED: If you want to.
21    (OFF THE RECORD 11:56 A.M.)
22    (ON THE RECORD 11:59 A.M.)
23  A.  This would be page 174. Do you want to put a sticky on
24    this?
25  Q.  All right. What is the page 174? Let's see there's the

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

## Dr. Andrew Mason 10/26/2007

Page 116

1    number. Okay. I think it will be easier to go by the
2    numbers. All right. Page 174 -- what does that say?
3  A.  It shows the results to the tests. From the first set of
4    tests that you asked me about.
5  Q.  All right. And that's got 7.01 Nanograms per milliliter.
6  A.  Correct.
7  Q.  But yet, it's reported on here 6.5. Was their another one
8    that showed 6.5?
9  A.  There was.
10  Q.  Okay. Where is that?
11  A.  In the second -- in the sec -- in the documents below this
12    -- remember we talked about page 180?
13  Q.  Right.
14  A.  If you will note in the comment on page 180 they reference
15    (READING.) Resampled 1.0 ml confirm THC equals 7.01
16    greater than THCC.
17  Q.  Right.
18  A.  You will note that the result from the fist test was 7.01
19    as indicated in that comment.
20  Q.  Okay.
21  A.  See what I am saying?
22  Q.  Right.
23  A.  The initial result of the Carboxylic acid was 5.3.
24  Q.  Okay.
25  A.  Evidentially when they resampled, they went ahead and

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 117

1   locked in that Carboxylic acid result into the system.
2   They accepted that result. All right.
3   Q.   The THCC?
4   A.   Correct.
5   Q.   Okay.
6   A.   And resampled from THC to test for that again.
7   Q.   All right.
8   A.   Okay.
9   Q.   So they only resampled THC?
10  A.   Well, they resampled the blood and they tested for THC.
11  Q.   THC.
12  A.   Okay.
13  Q.   All right.
14  A.   Let me -- I want to make sure I put this back, if you
15       don't mind. So, you are going to keep them in numerical
16       order?
17  Q.   Sure. That's good.
18  A.   We'll try.
19  Q.   I will try -- you want to put a note on that?
20  A.   Sure. If you will go ahead and look at page 233.
21  Q.   All right.
22  A.   And you will see that --
23  A.   That's the second test?
24  Q.   That's the results from the second test.
25  A.   And the results that they released of her THC were 6.54.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 118

1   Q.   Okay.
2   A.   So those results come from -- the results listed on the
3        report -- they took the THC from the first run -- THCC
4        from the first run, and the THC from the second run.
5   Q.   Okay. Then the -- that -- this next one, the Carboxy
6        whatever is reported at 530 that what you just explained.
7   Q.   Correct.
8   A.   Okay.
9   Q.   What is the other one down here?
10  A.   THC -- 11 Hydroxy THC?
11  Q.   What does that mean?
12  A.   Okay. Remember when we went to Exhibit 4, and I said
13       there were a number of different steps between here,
14       between THC and THC Carboxy steps.
15  Q.   Okay.
16  A.   THC and THC Carboxylic acid. There actually two steps
17       in there, okay? From THC to this; 11 Hydroxy THC, okay.
18       To another compound and then this compound. Okay.
19  Q.   Okay. Let me ask you this question. Is the 11 Hydroxy
20       Delta 9 THC -- ever how you say that -- psychoactive?
21  A.   You did a good job, and the answer is yes. It is.
22  Q.   It is psychoactive?
23  A.   Yes. It is.
24  Q.   Okay. And there was none detected in that sample?
25  A.   That's correct.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 119

1   Q.   And what does that mean?
2   A.   It means that there was insufficient evidence from the
3        anatomical run to demonstrate that is was present at or
4        above the concentration indicated, which would be the
5        report in mine.
6   Q.   Okay. So, does that mean that there was none of the 11
7        Hydroxy Delta 9 THC detected when this test was run twice,
8        and if it's a psychoactive component of marijuana, then
9        there was no Delta 9 Hydroxy THC that could have caused
10       impairment?
11  A.   Well, none detected literally means none detected. It
12       means it did not meet the analytical perimeters for
13       demonstrating that -- that it was present at or above that
14       level. Essentially you can regard that as meaning that
15       the compound is not present. Regardless if it was or was
16       not.
17  Q.   Since none was detected, whatever the perimeter detection
18       reporting limit was, it would be improper to infer that if
19       any of the 11 Hydroxy Delta 9 THC caused impairment.
20       Would that be correct?
21  A.   That is correct. You can't infer present -- confirm
22       something that is not present.
23  Q.   Take me through the metabolism process. If that is how
24       this 11 Hydroxy Delta 9 THC is generated, and where does
25       it come up -- what point of time can you -- on Exhibit 4

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 120

1        can you show me?
2   A.   I am going to use a red pen to kind of mark this.
3   Q.   Go ahead.
4   A.   I am going to mark this one one carbon right here at the
5        11 position.
6   Q.   Okay.
7   A.   All right. Mark that guy right here. And the steps that
8        go from here to here would be, and I am saying the rest of
9        the molecule stays the same. Okay. I am only talking
10       about changes at this position.
11  Q.   Okay. That is fine. Go ahead.
12  A.   Okay. This gores from a compound that looks like this, to
13       a compound that looks like this. Okay? CH2OOH -- That is
14       the 11 position, the 11 Hydroxy Delta 9
15       Tetrahydrocannabinol. Okay.
16       From there, it goes to another compound, which is
17       very short lived, and probably the only present for a very
18       short time period, which would be 11 OXO compound, which
19       would be C and a double bond to an oxygen like that, and a
20       single bond to a hydrogen.
21       Okay, so this is 11 Hydroxy -- this would be the 11
22       OXO. And then finally down to this guy. The 11 Carboxy.
23
24  Q.   All right. Tell me how that related to John Britt.
25  A.   It doesn't. They didn't find it.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607   (828) 262-3603

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 121

1  Q.  Okay.  And the fact that it was not detected, what does
2      that mean?
3  A.  Doesn't allow you to reach a conclusion regarding that.
4  Q.  Can you have -- if you had found, or if there had been a
5      detection of 11 Hydroxy Delta 9 THC, what would that have
6      meant?
7  A.  Potentially an increased affect due to the presence of the
8      material.
9  Q.  And how so -- I mean is that actually a metabolite?  The
10     11 Hydroxy to Delta 9 THC -- when you get over here on
11     your drawing where the red is, does that -- is that the
12     metabolization process?
13 A.  Yes.
14 Q.  You also have to realize that this guy here not only goes
15     --
16
17 Q.  -- The one in the center?
18 A.  Correct.  It not only goes to this guy over on the right,
19     through these steps, but it goes many, many different
20     directions.  This is only one metabolic --
21 Q.  -- Is it --
22 A.  -- It is the one with most concern, however.
23 Q.  That 11 Hydroxy Delta 9 THC could -- if you found the
24     presence of it, could that shed any light on the timing of
25     use of marijuana?

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 122

1  A.  Don't know.
2  Q.  Okay.
3  A.  It would be most consistent with administration per the
4      oral route.
5  Q.  Okay.
6  A.  When you find it, because --
7  Q.  -- Like in brownies or something?
8  A.  Correct.
9  Q.  Well --
10 A.  Unfortunately, I have seen cases like that.  But the
11     answer is that -- that when you find -- in cases of oral
12     ingestion, 11 Hydroxy THC concentration usually are equal
13     or maybe even greater than THC concentrations in broader
14     plasma.  Okay?
15          So -- because the body handles it in a different
16     manner.  You have to realize that when you smoke it --
17     when you smoke marijuana, the THC goes directly in the
18     lungs and is distributed throughout the body, without the
19     filter -- the physiologic filter produced by the liver.
20     Whereas, of course, in cases of oral ingestion.  The way
21     it works is it goes into the stomach, it goes into the
22     small intestines and is absorbed; those drugs go via the
23     portal vein directly to the liver.
24          The liver is the organ in the body that is primarily
25     responsible for breaking down drugs.  You get what's

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 123

1      called a first pass effect, i.e. first the drugs pass
2      though the liver, so, you find differences in metabolic
3      patterns whether the drug is absorbed through the lungs,
4      or whether it's absorbed in the gastrointestinal system.
5  Q.  If this Delta 9 Carboxy THC -- the one we called THC
6      Carboxy Acid on Exhibit 4, that's the same thing as on
7      page two of five in this center right here?
8  A.  Correct.
9  Q.  Okay.  If that had been below 5 nanograms per milliliter,
10     then it would have shown over here none detected.  Is that
11     right?
12 A.  Potentially, yes.
13 Q.  What --
14 A.  -- It depends. --
15 Q.  -- Excuse me? --
16 A.  -- it depends --
17 Q.  Excuse me.  Go ahead.
18 A.  It depends on how the standard operating procedure reads.
19 Q.  All right.
20 A.  They could have reported as none detected.  It may be
21     liable under some circumstances to report it is present or
22     trace.
23 Q.  Okay.
24 A.  Et cetera.
25 Q.  Now, this doesn't show -- and by this, I mean the Carboxy

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 124

1      Acid, THC -- is not showing higher than the THC.  I
2      thought you said a while ago their was one of these that
3      was unusual?
4  A.  Yeah.  The THC is high.
5  Q.  High?
6  A.  Higher.
7  Q.  And so you think the THC -- or in a lot of cases you've
8      seen, the THC limit is less than the Carboxy Acid?
9  A.  No.  The concentration detected is a lot less than the
10     acid commonly, because you are looking way far out in the
11     distribution -- in the distribution involved.  You want
12     give me a blank piece of paper here and I will be happy to
13     illustrate -- I will just draw a very simple concentration
14     time profile for these drugs.  Serum, plasma and blood.  I
15     have concentration, increasing on the vertical line.  I
16     have time, increasing on the right of the horizontal axis.
17
18 Q.  Okay.
19 A.  You let somebody start smoking at time zero, okay, and
20     their concentration of THC increases very, very quickly.
21     Even, in fact, peak time begins to decline even before
22     they stop smoking.
23          Remember I talked about that titration effect?  They
24     modify their smoking behavior once they've achieved a
25     level of -- the level effect, the degree of effect, the

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

1  type of effect they wish to receive. Okay. They wish to
2  produce.
3      In any case, the concentration of THC declines very,
4  very rapidly. And then, once it gets distributed out of
5  the vascular compartment, the blood, into the organs in
6  the body, the concentration -- the slope changes, and you
7  find that it actually -- it's a curve. You find it
8  declines and approaches zero at long time periods.
9  Q. Okay.
10 A. Okay?
11 Q. That's the THC level?
12 A. That's THC.
13 Q. THC?
14 A. Correct.
15 Q. Okay.
16 A. THC Carboxylic acid. This is a person who has no residual
17    THCC. No THC Carboxylic acid. Again, we'll start at
18    zero. Okay. And we'll decline -- pardon me -- we'll
19    increase slowly -- never reaches as high as THC, and this
20    of course indicates that somebody who is smoking, and
21    tends to look something like this.
22 Q. Okay.
23 A. Normally, when you get an individual blood in a forensic
24    situation, you're out here. The normal pattern you see is
25    a THCC concentration is much higher than THC. It's very

1  rare that you find someone this close to the time of
2  smoking, such that you have THC concentrations greater
3  than THCC.
4  Q. Okay.
5  A. That would mean you're in that area.
6  Q. Show -- oh, okay. You put the -- right in there. We will
7     make that number seven.
8        (THEREUPON, EXHIBIT NO. 7 WAS MARKED FOR
9     IDENTIFICATION.)
10       Were their any test results from NMS that were done
11    and then discarded, or not reported?
12 A. Only with relation to the THC that I described.
13 Q. That first test?
14 A. Correct.
15 Q. Okay. Should -- should a laboratory report all test
16    results?
17 A. There is probably not a good blanket answer to that
18    statement. What is really more important is what is their
19    standard operating procedure.
20 Q. Should the standard operating procedure include reporting
21    all results, including false positive or false negatives?
22 A. No. it's not either a false positive or a false negative.
23    So that part of the question does not pertain.
24 Q. Okay.
25 A. I think -- I think that really depends on the laboratory

1  and the application in particular, and what is their
2  standard operating procedure says. If they abide by the
3  standard operating procedure, then they are doing their
4  job appropriately.
5  Q. Well, you worked for them, didn't you?
6  A. Some number of years ago, I did.
7  Q. How many years did you work for them?
8  A. From 1992 - 1995 up there.
9  Q. Okay. What was the procedure at that time?
10 A. It would be similar to what would have been done here.
11 Q. Would that include reporting all test results?
12 A. Not necessarily.
13 Q. What would be circumstances under which the NMS lab would
14    withhold a lab result or test result and not report it?
15 A. I would ask them.
16 Q. Well, was that done when you were there?
17 A. It may have been.
18 Q. And what would be some circumstances that you can remember
19    when that was done?
20 A. On a retest like this.
21 Q. Okay. But this one was reported. I am talking about one
22    that was withheld and not reported.
23 A. I can't answer that question.
24 Q. Okay.
25 A. I don't know what you're talking about.

1  Q. Well, does that mean it didn't happen while you were
2     working there?
3  A. I have no knowledge whether it did or didn't happen. I'm
4     not sure what you're talking about.
5  Q. What is this -- if you have a result that is given --
6     let's say if you're testing for THC, and you have a test
7     that's negative; none detected. And then you have another
8     test that may show within the reporting limit, should the
9     lab report both of those test results?
10 A. Well, you've got a pretty serious discrepancy here. In
11    one case, you've got essentially -- are you talking about
12    no evidence related to tests? Are you talking about below
13    or above administrative cut off?
14 Q. No. I'm talking about just in general with regard to lab
15    protocol.
16 A. Yeah.
17 Q. If you have a test that shows, you know, below the cut
18    off, and another shows that it is detected, should a lab
19    report both of those test results?
20 A. That would be one way of handling it. I'm not sure I have
21    an opinion on that. I think that -- that under the
22    circumstances you better get with the client and figure
23    out what to do. What is proper.
24 Q. If a client says don't report the one that is, lets say
25    negative --

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 129

```
 1   A.  Right.
 2   Q.  Would it be appropriate for the lab to only report the
 3       positive, or should the lab say; we ran this twice, we got
 4       this negative result here, we got this detectable result
 5       over here. Here they are.
 6   A.  Okay. I think that's going to depend particularly on the
 7       circumstances of the case. Let me try and explain one
 8       thing here. If you've got a situation where it may be
 9       below an administration cut off, but you have evidence
10       that the drug is present, Okay?
11   Q.  Okay.
12   A.  Then it would be appropriate to report the positive. In
13       other words, let's say that you have a cut off at 5.0 and
14       its 4.9. See what I'm saying?
15   Q.  Okay.
16   A.  And then you re-run the test and you get 5.1, all right.
17       And you have evidence that the drug is present. All the
18       characteristics are present. Clearly the drug is there.
19       Then I think you've got to get together with the client
20       and -- and talk to the client about exactly how they want
21       to handle it. I mean I am not sure I can make a blanket
22       statement as to what ought to be done under those
23       circumstances. Depends on what their standard operating
24       procedure read.
25   Q.  Okay. So the answer is get with the client and see what
```

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 131

```
 1   Q.  A court actually found that your testing was invalid?
 2   A.  That my testing was invalid?
 3   Q.  Your testing in particular.
 4   A.  Not that I know of.
 5   Q.  Okay. What -- do you remember being involved in a case in
 6       Hawaii?
 7   A.  (NO RESPONSE.)
 8   Q.  A cocaine test that you did.
 9   A.  I do.
10   Q.  And isn't it true that in that case that the court found
11       that your test results were invalid?
12   A.  I don't remember the language they used.
13   Q.  They did --
14   A.  My answer is --
15   Q.  -- They did --
16   A.  -- The answer is --
17   Q.  -- Excuse me --
18   A.  I would like --
19   Q.  Go ahead.
20   A.  They choose not to accept the test results.
21   Q.  And in that case, I think the name -- who were you working
22       for in that case?
23   A.  I don't remember.
24   Q.  There was a Cassaru, looks like -- were you working for
25       that person?
```

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 130

```
 1       the client wants done?
 2   A.  Pretty much, but tailor -- tailor your response in your
 3       laboratory protocol for reporting for what the client
 4       needs are and what the circumstances are.
 5   Q.  Were you the director of labs at NMS for a while?
 6   A.  No.
 7   Q.  Did you work for Dr. Millerburg?
 8   A.  I did.
 9   Q.  Did you work under him?
10   A.  With him.
11   Q.  Were you contemporaries?
12   A.  Correct.
13   Q.  All right. Neither of you were in supervision of the
14       other?
15   A.  Correct.
16   Q.  What was the reason you left NMS?
17   A.  I wanted to come back to North Carolina.
18   Q.  You from here?
19   A.  I grew up in upstate New York. My wife is from Chapel
20       Hill.
21   Q.  All right. So you -- you voluntarily left NMS?
22   A.  Yes.
23   Q.  Okay. You ever been involved in a case where a court
24       found that your testing was invalid?
25   Q.  Huh?
```

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.   2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 132

```
 1   A.  Its been so long, sir, I can't remember.
 2   Q.  Okay.
 3   A.  One of the parties.
 4   Q.  All right. And that was in, I think, 1997. So, that
 5       would be before you started this company, toxicologists?
 6   A.  Toxicologists.
 7   Q.  Toxicologists. I'm sorry.
 8   A.  That's correct.
 9   Q.  And they refer to you as a Forensic Toxicologist was
10       retained by NMS to verify the results of this test
11       performed. This involved cocaine. Do you remember?
12   A.  That's not strictly correct. At the time, I still had an
13       association with the laboratory. I was an independent
14       contractor for them. I worked for them under contract.
15   Q.  It says --
16   A.  -- I wasn't retained by them.
17   Q.  Dr. Mason, until several years ago was a director for
18       laboratory at NMS. That's -- that's not correct?
19   A.  Nope. I was a director for laboratories. I was not the
20       director of the laboratory.
21   Q.  Okay. And it says you set up the laboratory and tested
22       protocol for NMS.
23   A.  That not --
24   Q.  -- did you do that?
25   A.  That's not true.
```

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

1   Q.   You did not?
2   A.   No. I did not.
3   Q.   Okay.
4   A.   I worked for them.
5   Q.   All right. They -- what do you recall about how come the
6        court rejected your findings?
7   A.   What I recall was that there was a discrepancy with
8        respect to the application of the standard for laboratory
9        testing from one type of testing to another. The court
10       applied standards for forensic urine drug testing to
11       postmortem -- pardon me, not postmortem, to behavior
12       toxicology, and there was a difference in opinions with
13       respect to the presence of a particular compound as per
14       National Medical Services tests.
15  Q.   Wasn't the compound cocaine?
16  A.   It may have been.
17  Q.   Okay.
18  A.   Strictly with the respect of the presence of one of the
19       materials that was present, and I don't remember which one
20       right off hand at this time. There was one too, one mass
21       fragment, which was outside of specification on the
22       script, 20 percent window. Slightly outside the range
23       plus or minus.
24       My opinion as a Forensic Toxicologist was that they
25       never left, even regardless of that -- that ion ration

1        being slightly outside the window, which is the standard
2        for urine testing, that that specimen, excuse me, that
3        compound nevertheless was present.
4   Q.   All right.
5   A.   And I think that was an appropriate interpretation in my
6        mind, on my part.
7   Q.   Do you remember that they did several samples? And they
8        were testing, and one of them apparently was a sample, a
9        known sample contained no cocaine and you still said
10       that there was cocaine in that sample. Do you remember
11       that being an issue?
12  A.   I disagree. No. I don't remember that.
13  Q.   That's what the judge says.
14  A.   Well --
15  Q.   He says if one were to follow Dr. Mason's reasoning the
16       only conclusion that could be reached from the thumb print
17       is the presence of cocaine. But we know that there was no
18       cocaine in the sample. You don't remember that being an
19       issue?
20  A.   No. I don't.
21  Q.   Well, the judge rejected your findings and if he had
22       accepted them, then you had wrongfully accused that person
23       of using cocaine, wouldn't you?
24       MR. RICHMOND: Objection to form.
25       MR. ALLRED: Based on your testing.

1        MR. RICHMOND:        Objection to form.
2        THE WITNESS: My opinion is that cocaine was present
3        in that specimen. He chose to disagree with me.
4   BY MR. ALLRED:
5   Q.   Okay.
6   A.   And that was within his right to do so.
7   Q.   All right. Well, the judge felt like you had wrongfully
8        accused that person of using cocaine.
9        MR. RICHMOND: Objection to form.
10       MR. ALLRED: Would you agree with that?
11       THE WITNESS: I would say that the judge is entitled
12       to his opinion, sir. I would say that I had a different
13       opinion.
14  BY MR. ALLRED:
15  Q.   Can you explain how you could find, you and NMS could find
16       a thumbprint of cocaine in a sample that they knew,
17       apparently it's a test sample, or a control sample that
18       they knew there was no cocaine in it.
19  A.   I have no memory of that whatsoever.
20  A.   Well --
21  A.   And quite frankly, I think there must have been a
22       misinterpretation of that. I'm sorry, but no. I have no
23       memory of that whatsoever.
24  Q.   Okay.
25  A.   That's not the way I remember that case.

1   Q.   Okay.
2   A.   The sample that was in question in that case was in fact a
3        -- a sample with a known amount of cocaine in it.
4   Q.   Do you recall talking with a lawyer that had gotten you --
5        I assume a lawyer had gotten you involved in that case --
6        about what the judge had found and why -- about his
7        explanation of those findings?
8   A.   No.
9   Q.   Do you know that apparently there was some Dr. Brennan
10       involved in that case?
11  A.   Well, I --
12  Q.   But he withdrew his opinion, or changed his opinion,
13       because he said he was misinformed, apparently by you, as
14       to what a positive test result signified. Did you know --
15       was that ever discussed with you? Do you remember?
16  A.   No, sir.
17  Q.   Okay.
18  A.   I have no memory of that whatsoever.
19  Q.   Okay.
20  A.   Nobody ever told me that.
21  Q.   All right. Well --
22  A.   I don't remember Dr. Brennan, other that there was another
23       expert there, and I don't ever remember ever talking to
24       him.
25  Q.   In any of these cases involving drugs, you agree that

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 137

1   there is a danger of wrongfully accusing somebody of
2   using, or being impaired by drugs?
3   A.   Of course.
4   Q.   Were you the director of a lab, however you want to say
5   it, along with Dr. Middleburg in about 1993, up at
6   National Medical Services, NMS?
7   A.   I believe I was there at that time. Yes, sir.
8   Q.   You remember a case from Montgomery, Alabama involving
9   carbon monoxide poisoning?  Were you involved in that, or
10  was that just Dr. Middleburg?
11  A.   Not to my knowledge, sir.
12  Q.   Let me give you some names and see -- Sierra Whatley and
13  the person that was killed was Clinty Seymore, and Emmy
14  Seymour.  It was against Registered Propane Gas.  Does
15  that help you recollection?
16  A.   I don't --
17  Q.   Do you remember working on that case?
18  A.   I have no memory of that case whatsoever.
19  Q.   What --
20  A.   No memory.
21  Q.   Well if you don't remember the names --
22  A.   I have never even heard of them.
23  Q.   Okay. If you don't remember the names, do you remember
24  the -- that what happened in the case, the NMS lab had
25  withheld some negative test results --

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 139

1   A.   1993.
2   Q.   Yeah.
3   A.   Sure.
4   Q.   '92 - '95.  Would that have been an inappropriate activity
5   to occur in the NMS lab if they were withholding some of
6   the test results?
7   A.   Well, of course.
8   Q.   Okay.
9   A.   But what I can say is -- what I can say is that I'm -- I'm
10  not familiar with that case.  I don't know anything about
11  that case, Okay.
12       What I can say is that -- is that the information on
13  cases may come form a different number of sources.  You
14  know, maybe multiple submissions from different agencies.
15  Even on the same case without their knowledge.
16       And I don't know whether this is an issue in this
17  case or not, but what I can say is that very often they
18  may not even know when they ask for information on a case,
19  all the information that is available to them.  Because it
20  may be under different accounts, it may have been
21  submitted by different people, et cetera.
22       I don't know if that has any bearing on this case or
23  not.  But I can understand how somebody can not have
24  complete information. Right now, again, because I am not
25  familiar with this particular case, I don't know what

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 138

1   A.   -- Sir, I have no knowledge of that case whatsoever.  In
2   any way.
3   Q.   You don't remember that coming up?
4   A.   No.  I have never even heard of it.
5   Q.   Okay.
6   A.   Period.
7   Q.   And that the judge granted a new trial because NMS and
8   they mentioned Dr. Middleburg in here, had withheld test
9   results.  Meaning -- and as I recall, that -- that what
10  happened was NMS did some testing that showed -- that
11  would have been favorable to the Whatley side of the case,
12  but they didn't turn that over.  They just turned over the
13  information that would have been favorable for the other
14  side.  You don't remember that being discussed in the
15  office up there?
16  A.   I've never even heard of that case.
17  Q.   Okay.
18  A.   I've never heard of that case.  I've never heard of
19  anything even associated with that case.  I have no
20  knowledge of that law suit.  I have no connection with
21  that whatsoever.
22  Q.   Dr. Middleburg didn't discuss it with you?
23  A.   I've never discussed that.  I've never heard of it.
24  Q.   Okay.  Would that have been an inappropriate activity on
25  the part of NMS, and you were there in 1993.

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC

## Dr. Andrew Mason 10/26/2007

Page 140

1   happened.
2   Q.   Well, the judge says in there that Dr. Middleburg admitted
3   that he did not produce the computer printouts from
4   spectrophotomometer -- is that what you test carbon
5   monoxide with?
6   A.   That's one way.
7   Q.   Despite the court order.  Apparently, he was -- was -- he
8   was ordered by the court to produce it.  So, there
9   wouldn't be any issue about what you described.  They
10  didn't know if they were supposed to produce it, would
11  they?
12  A.   Well, again.  I have no knowledge about that case, and to
13  that regard, then, I would ask you to refer that question
14  to Dr. Middleburg.  I don't have any knowledge of it, and
15  I cannot comment on it.
16  Q.   If you had known about that going on back in 1993 or
17  between '92 and '95 when you were there, and you were a
18  lab director, what would you have done about it?
19  A.   Well, that's a good question.  I would have started an
20  appropriate investigation and tried to establish what the
21  facts were.  I think that's the first thing I would have
22  done.
23  Q.   Okay.
24  A.   What I would have done after that point is I would have
25  looked up what the facts were related to the investigation

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

1   were.
2   Q.   Okay.
3   A.   I would have started asking a lot of questions.
4   Q.   If they had asked you -- they meaning the lab people --
5        with regard to the Whatley and the, I'm sorry, the Seymour
6        case, if they had asked you; should you report all of
7        these results including the negative results, would you
8        have told them that they should be reported or they should
9        be withheld?
10  A.   I don't know anything about the case.
11  Q.   You've told me that.  I am just asking you a hypothetical
12       question.  If they had asked you; should we produce these,
13       we got this court order here --
14  A.   -- If you've got -- if you've got a court order, you'd
15       produce them.
16  Q.   Okay.  We got this court order from the judge --
17  A.   -- Was it a subpoena duces tecum?
18  Q.   Excuse me?
19  A.   Was it a subpoena for everything you've got?  Then you
20       turn over everything you've got.
21  Q.   It was an order from a judge.
22  A.   Okay.
23  Q.   That said turn it over.
24  A.   Then you turn it over.
25  Q.   Would you have told them that they need to turn it over?

1   A.   I can't imagine why I wouldn't.
2   Q.   Okay.  What was the relation, because you say you were a
3        director, and you say that Middleburg was -- was he a
4        director?
5   A.   He was a director as well.
6   Q.   Now explain that to me.
7   A.   There were a couple of people who were involved in
8        operation.  A forensic side of the laboratory during that
9        time period.  Myself, Dr. Middleburg, and another
10       individual named Dr. Selavka had co-joined
11       responsibilities in those areas.  We each handled
12       different aspects of those areas, worked collaboratively.
13       I'm not sure when this case came to light.  It may
14       have came to light after in fact I left.  But I had no
15       knowledge of this while it was going on.
16  Q.   Well, the order that is signed by the judge is September
17       of 1994.
18  A.   I was still there.
19  Q.   You were then.
20  A.   I was still there at that time, but I don't know why I
21       didn't hear about it.
22  Q.   All right.  Who was the head man, or woman, at NMS labs
23       when you and Middleburg were doing what you were doing
24       between '92 and '94?
25  A.   There may have been various people involved.

1   Q.   Who was the person, the head person in charge, I guess is
2        what I am trying to ask.
3   A.   There were several different people who were involved
4        during that time period.
5   Q.   Okay.  Who are -- who are they?  Can you remember any of
6        them?
7   A.   No.
8   Q.   Let me take a few minutes here, and see if I'm not
9        through.  Have you told me about all your opinions and
10       conclusions?
11  A.   Yes, sir.
12  Q.   One thing I will criticize you about at trial is that if
13       you testify to something different or something in
14       addition to what you told me today, I will criticize you.
15  A.   Sure.
16  Q.   And you said you wanted to go back and do some more
17       reading about Dr. Girard article and maybe some of these
18       other articles you cited, but after you do that, if you
19       change your opinions, I am going to ask you to let you
20       lawyer know and they have a duty to let me know.
21  A.   I understand that.
22  Q.   Okay.  And I may want to take your deposition again.
23  A.   I understand that completely.
24  Q.   Okay.  You've never testified in Alabama, have you?  I
25       didn't see it in the last four years.

1   A.   Not in the last four year. I don't -- I may have, but --
2        I don't remember.
3   Q.   To be clear on your report here, let me refer to my marked
4        copy, because it is part of 2A.  When you do your
5        calculations, which is shown as page eight of nine.  And
6        these are based on the Huestis models --
7   A.   True.
8   Q.   -- That we discussed.  Is that correct?
9   A.   True.
10           (PURSUES DOCUMENTS.)
11  Q.   I think that's all I have.  Thank you.
12  A.   You're welcome.
13           (OFF THE RECORD 12:46 P.M.)
14
15
16
17
18
19
20
21
22
23
24
25

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 145

```
 1              CHANGES AND SIGNATURE
 2    WITNESS NAME:  DR. ANDREW MASON,      OCTOBER 26, 2007
 3    PAGE  LINE  CHANGE        REASON
 4         _____
 5         _____
 6         _____
 7         _____
 8         _____
 9         _____
10         _____
11         _____
12         _____
13         _____
14         _____
15         _____
16         _____
17         _____
18         _____
19         _____
20         _____
21         _____
22         _____
23         _____
24         _____
25         _____
```

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 147

```
 1    NORTH CAROLINA
 2    CALDWELL COUNTY
 3         C E R T I F I C A T E
 4         I, AMY CHAWNE HOLSCLAW, Court Reporter and Notary Public,
 5    the officer before whom the foregoing proceeding was conducted,
 6    do hereby certify that the witness(es) whose testimony appears
 7    in the foregoing proceeding were duly sworn by me; that the
 8    testimony of said witness(es) were taken by me to the best of my
 9    ability and thereafter transcribed under my supervision; and
10    that the foregoing pages, inclusive, constitute a true and
11    accurate transcription of the testimony of the witness(es).
12         I do further certify that I am neither counsel for,
13    related to, nor employed by any of the parties to this action in
14    which this proceeding was conducted, and further, that I am not
15    a relative or employee of any attorney or counsel employed by
16    the parties thereof, nor financially or otherwise interested in
17    the outcome of the action.
18         IN WITNESS WHEREOF, I have hereunto subscribed my name
19    this 23rd day of September, 2005.
20
21              _____
22              AMY CHAWNE HOLSCLAW
23              Notary Public
24    My commission expires:
25    November 07, 2011
```

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603

---

Landria Britt, et al. v. USA Truck, Inc., et al.    2:06cv868-ID-CSC
## Dr. Andrew Mason 10/26/2007

Page 146

```
 1
 2         I, DR. ANDREW MASON, have read the foregoing
 3    deposition and hereby affix my signature that same is
 4    true and correct, except as noted above.
 5
 6         _____
 7         DR. ANDREW MASON
 8
 9
10    Sworn to and Subscribed before me
11    _____, Notary Public.
12    This_____day of _____, 20____.
13    My Commission Expires:
14
15
16
17
18
19
20
21
22
23
24
25
```

REPORTED BY: Amy Chawne Holsclaw
High Country Court Reporting, 585 D West King Street, Boone, NC 28607    (828) 262-3603