## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| LANDRIA BRITT, as | ) | |
| ADMINISTRATRIX of the | ) | |
| ESTATE OF JOHN W. BRITT, | ) | |
| deceased, | ) | Case No. 2:06cv868-ID-CSC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| U S A TRUCK, Inc.; THEODORE | ) | |
| LEVERNE JOHNSON; et al., | ) | |
| | ) | |
| Defendants. | ) | |

---

### DEFENDANTS' MEMORANDUM BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE*/MOTION TO EXCLUDE EXPERT TESTIMONY OF DR. ANDREW MASON, PURSUANT TO *DAUBERT*

---

COME NOW the Defendants, **Theodore L. Johnson** and **USA Truck, Inc.**, (hereinafter "Defendants"), files this memorandum of law in support of their opposition to the Plaintiff's motion *in limine*/to exclude the expert testimony of Dr. Andrew Mason.  The Defendants provide the following points of fact and law:

## I.  Introduction

This wrongful death litigation is based upon a commercial motor vehicle accident that occurred on the evening of February 20, 2006, at the intersection of West

South Boulevard and Sassafras Circle in Montgomery, Alabama.    At the aforementioned time and place, Mr. Johnson attempted to turn his tractor-trailer left across West South Boulevard into a private parking lot when Mr. Britt inexplicably drove his Mazda pick-up truck under Mr. Johnson's trailer.  While performing Mr. Britt's autopsy, the Alabama Department of Forensic Sciences extracted bodily fluids from Mr. Britt's body and shipped them to National Medical Services, Inc., ("NMS, Inc.") for toxicological testing.  The independent laboratory's testing detected quantitative levels of marijuana in Mr. Britts' femoral blood.  (See Toxicology Report, attached hereto as "Exhibit 1").

In light of those laboratory results, the Defendants retained Andrew Mason, PhD., DABFT, DABCC-TC to review NMS, Inc.'s toxicology report and access whether the positive readings for marijuana therein indicated that Mr. Britt operated his vehicle under the influence of marijuana at or near the time he ran under Mr. Johnson's trailer.  Thereafter, Dr. Mason offered the opinion that Mr. Britt indeed operated his vehicle under the influence of marijuana at or near the time of the subject crash.  (See Rule 26 Expert Report of Dr. Andrew Mason, attached hereto as "Exhibit 2").

On November 21, 2007, the Plaintiff filed a motion *in limine*/to exclude the expert testimony of Dr. Andrew Mason.  Therein, the Plaintiff argues that Dr. Mason's

opinions should be excluded because he applied mathematical models created by Dr. Marilyn Huestis ("the Huestis models"), which can calculate an individual's last exposure to marijuana, to Mr. Britt's post-mortem blood instead of ante-mortem blood.[1]  The Plaintiff's argument is misguided because Dr. Mason only used the Huestis models as a secondary tool while developing his opinion.  The independent scientific basis for Dr. Mason's opinion is the distribution of THC and Carboxylic acids concentrations in Mr. Britt's femoral blood.  Even if Dr. Mason's use of the Huestis models as a secondary tool is ignored, he can still reliably opine that Mr. Britt operated his vehicle under the influence of marijuana by applying scientific toxicological principles to the data at hand.  The Defendants submit this Brief in Opposition to the Plaintiff's Motion, showing that Dr. Mason's proposed opinions are both reliable and relevant to the material issues of this case and are due to be admitted into evidence.

## II. <u>STATEMENT OF RELEVANT FACTS</u>

The toxicology report generated by NMS, Inc., analyzed Mr. Britt's femoral blood by using Gas Chromatography/ Mass Spectrometry ("GC/MS") testing.  The testing detected 5.3 ng/mL of **Delta-9 Carboxy THC,** with the reporting limit being

---

[1]Of note, Mr. Britt died at the accident scene, so only post-mortem blood samples were preserved for toxicology testing.

5.0.   Additional GC/MS testing of Mr. Britt's femoral blood revealed 6.5 ng/mL of **Delta-9 THC**, with the reporting limit being 1.0. (Exhibit 1).  Dr. Mason testified that THC is the primary, psychoactive principle in marijuana.  (Deposition of Dr. Andrew Mason, attached hereto as Exhibit 3, at 55).  Carboxylic acid is the tertiary metabolite of THC.  The human body natural produces the Carboxylic acid via the liver while processing THC.  (Mason depo at 56).  Thus, Carboxylic acid or "THC acid" is the metabolic byproduct of THC.  (Mason depo at 58).  Dr. Mason testified that the distribution of THC versus Carboxylic acid in Mr. Britt's blood indicates that Mr. Britt operated his vehicle under the influence of marijuana at the time of the subject crash.

> Q:   Do you have an opinion as to whether or not you think John Britt was impaired at the time this wreck happened?
>
> A:   I do.
>
> Q:   And if so, what is that opinion?
>
> A:   My opinion is that he was.

(Mason depo at 58).

Dr. Mason explained that when Mr. Britt's heart stopped pumping and perfusing blood through his liver, his metabolism quit.  At that same moment, the metabolic breakdown of the THC into Carboxylic acid ended as well.  As a result, the concentration of those materials (THC and Carboxylic acid) in Mr. Britt's post-

mortem blood reflected the concentrations that circulated in his body at the time of his

death.  Mr. Britt died at the scene of the accident.  Mr. Britt's post-mortem blood had

a high concentration of THC  (6.5 ng/mL with a reporting limit of 1.0 ng/mL), which

is extremely rare.  Usually, GC/MS testing finds a higher concentration of metabolite

than THC.  Dr. Mason explained as follows:

> Q:    I will stop writing and listen.
>
> ***
>
> A:    **What's unique about it is that in this case, the
> THC concentration, the active principle, was
> greater than the concentration found for the
> metabolite**.  We know from many, many, many
> different studies that where metabolite in parent
> concentrations measured in blood that **this occurs
> first only very early after the administration of
> marijuana. And it also occurs after and about the
> time of peak effects.**

(Mason depo at 61)(emphasis added).

In addition to the foregoing analytical findings, Dr. Mason also utilized the

Huestis models as a secondary basis for his opinion.  (Mason depo at 61).  Dr. Mason

acknowledged that using the Huestis models on post-mortem blood as opposed to

ante-mortem blood **can** make a difference, but he disagrees that the Huestis models

should absolutely not be used to evaluate post-mortem blood.  (Mason depo at 69).

The Plaintiff takes great issue with Dr. Mason's overall opinion because the author of

the Huestis models does not advocate the use of the models with post-mortem blood samples. However, as Dr. Mason clearly explained, and the Plaintiff failed to mention to the Court, the Huestis models are only a secondary tool and their use is not necessary for Dr. Mason to reach his scientific conclusions. On that point, Dr. Mason explained as follows:

> Q:    The authors, that means Dr. Huestis and her contemporaries, did not advocate using the models with postmortem blood concentrations. This is an article that you cited to us as authoritative to saying that you should use the post-mortem blood samples.
>
> A:    Well, what I can tell you is; I went ahead and completed the calculations. I believe those calculations to be generally reflective and appropriate for predicting a time after death. Certainly, there could be some variance but what I will say is this. **You could take those calculations out of my report and I'd have the same opinion based on the fact that the THC concentration is higher than the THC Carboxylic Acid concentrations**...
>
>                              ***
>
> A:    ...the analytical results themselves alone reflect that as well **without use of the models at all**.

(Mason depo at 72)(emphasis added).

Dr. Mason explained that he only used the Huestis models as a tool.

> Q:    So, really it would be inappropriate to use these Dr. Huestis models?

-6-

> A:    No. I think – using them is appropriate. **I think relying on them as a sole source of information might not be the best practice, but I don't think we are doing that here.** I think we are looking at everything related to the case and as I said, obviously that the distribution of the materials alone, the analytical results clearly reflect in my opinion approximate exposure to the drug.

(Mason depo at 73)(emphasis added).

In fact, Dr. Mason was not the only professional reviewing Mr. Britt's marijuana concentrations that found them to be unusual. Dr. Mason explained that the analyst at NMS, Inc., ran the GC/MS test on Mr. Britt's blood twice because "the THC concentration was so high with regard to the THC Carboxylic." (Mason depo at 112). Dr. Mason testified that the only reason for a reading such as that found in Mr. Britt's blood is **"proximity to the time of use**." The normal pattern seen is a person having a much higher concentration of Carboxylic acid as compared to the THC. (Mason depo at 125). Mr. Britt's blood contained just the opposite, i.e., a high concentration of THC rather than its metabolite.

### III. <u>ARGUMENT</u>

**A.    DAUBERT AND ITS PROGENY DO NOT JUSTIFY EXCLUSION OF EDWARDS' OPINIONS.**

In 2005, the United States Court of Appeals for the Eleventh Circuit published an opinion providing an in-depth analysis of <u>Daubert v. Merrell Dow Pharmaceuticals, Inc</u>., <u>Kumho Tire Co. v. Carmichael</u>, and their practical applications.  <u>See</u> <u>United States v. Brown</u>, 415 F.3d 1257 (11th Cir. 2005).  In <u>Brown</u>, two defendants appealed drug convictions challenging the sufficiency of the prosecution's evidence and, more specifically, the legitimacy of the prosecution's expert witnesses.  <u>Brown</u>, at 1163.  At issue was whether the controlled substance that the defendants were accused of distributing, a chemical compound called 1, 4-butanediol, could be considered a "controlled substance analog" for purposes of a "Possession with Intent to Distribute" conviction.  <u>Id</u>. at 1261-62.  The prosecution called two experts to show that the substance at issue was virtually identical to a Schedule I narcotic known as GHB.  <u>Id</u>. at 1262.  At the conclusion of the evidence, the defendants moved to have the experts' testimony excluded "under <u>Daubert</u> and Rule 702."  The district court found the expert testimony to be relevant and reliable and denied the defendants' motion.  <u>Id</u>. at 1264.  On appeal, the Court of Appeals for the Eleventh Circuit affirmed the district court's conclusion.

In its analysis, the Eleventh Circuit began by citing extensive support for the proposition that the decision of whether to allow expert testimony is to be left to the discretion of the district courts. The court noted, "we need to explain why it is difficult to persuade a court of appeals to reverse a district court's judgment on Daubert grounds. The theme that shapes appellate review in this area is the limited nature of it. All evidentiary decisions are reviewed under an abuse-of-discretion standard." Brown, at 1264-65 (internal citations omitted). The Eleventh Circuit went on to state, "[w]e recognize a significant range of choice for the district court on evidentiary issues, which is to say we defer to its decisions to a considerable extent." Id. at 1265. "What is true about the review of evidentiary issues in general applies with equal or even greater force to Daubert issues in particular, an area where the abuse of discretion standard thrives." Id. at 1265-66 (citations omitted). Essentially, the district courts are to decide Daubert issues based on "case-specific detailed factual circumstances," as no pre-fabricated formula exists that will accurately consider each of the particulars in a given case. "All of this explains why the task of evaluating the reliability of expert testimony is uniquely entrusted to the district court under Daubert, and why [the Eleventh Circuit gives] the district court considerable leeway in the execution of its duty." Id. at 1266 (internal quotations omitted).

While keeping the aforementioned roles in mind, the Eleventh Circuit described <u>Daubert</u> as a case that "set out a list of 'general observations' for determining whether expert testimony is sufficiently reliable to be admitted under Rule 702." <u>Id.</u> at 1267 (quoting <u>Daubert</u>, 509 U.S. at 593, 113 S. Ct. at 2769. The court then noted that "**expert testimony that does not meet all or most of <u>Daubert</u> factors may sometimes be admissible.**" <u>Id.</u> at 1268 (emphasis added). The court then explained that principle by noting that even though the prosecution's expert opinions in <u>Brown</u> failed to satisfy several of the <u>Daubert</u> prongs, they were nonetheless admissible:

> The. . . method used by the government's witnesses only met one of the four <u>Daubert</u> factors. [The experts] **conceded that their method and conclusions were not quantitative or testable by the scientific method. Instead, they were based on visual comparisons of.** . . molecular models combined with expert knowledge of chemistry. During cross-examination, **[one expert] characterized his opinion as being a "gut level thing" and based on intuition, but he later explained that he used those terms to refer to the knowledge and experience he had gained from thirty years as a chemist.** The government produced no papers or studies in which the methodology or opinions of [the experts] were subjected to peer review. . .

<u>Brown</u>, at 1267 (emphasis added). Despite the apparent <u>Daubert</u> deficiencies raised by the defendants in <u>Brown</u>, the Eleventh Circuit found that the experts'

-10-

testimony/opinions were reliable, based primarily on the experts' experience. The

court further explained its decision by noting,

> **The Supreme Court made clear in its <u>Daubert</u> opinion
> that the factors it set out there were not to be rigidly
> applied, but were instead to serve as guidelines for
> federal district courts applying Rule 702**. The Court said,
> "the inquiry envisioned by Rule 702 is, we emphasize, a
> flexible one. . . many factors will bear on the inquiry, and
> we do not presume to set out a definitive checklist or test.
> . ."
>
> The decision in <u>Kumho Tire</u> elaborated on the flexible
> nature of the inquiry. There the Court pointed out that
> <u>Daubert's</u> list of specific factors neither necessarily nor
> exclusively applies to all experts or in every case.
> **Whether the <u>Daubert</u> opinion factors are even pertinent
> to assessing reliability in a given case will depend on the
> nature of the issue, the expert's particular expertise,
> and the subject of his testimony**. Because the
> applicability of the <u>Daubert</u> factors depends on the
> individual facts in a particular case, the Court said that it
> could:
>
> neither rule out, nor rule in, for all cases and for all time
> the applicability of the factors mentioned in <u>Daubert</u>, nor
> [could it] now do so for subsets of cases categorized by
> category of expert or by kind of evidence. Too much
> depends upon the particular circumstances of the particular
> case at issue.
>
> **This means that expert testimony that does not meet all
> or most of the Daubert factors may sometimes be
> admissible.**

<u>Brown</u>, at 1267-68 (emphasis added).

-11-

Finally, the Eleventh Circuit explained that its decision to allow the evidence was consistent with "**the liberal thrust of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony.**" Id. at 1268 (quoting Daubert, 509 U.S. at 588, 113 S. Ct. at 1294). "The Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under Frye..." Id. (citation omitted).

The Plaintiff's argument that Dr. Mason's proffered opinion should be excluded is misguided. Essentially, the Plaintiff contends that because Dr. Mason applied the Huestis models to Mr. Britt's post-mortem blood sample when the author of the Huestis models does not advocate doing so, Dr. Mason's opinions are entirely unreliable. This is flawed reasoning because the Huestis models served only as a secondary tool for Dr. Mason's assessment, not the sole basis for his ultimate opinion. The Plaintiff would have the Court throw the baby out with the bath water. The "proverbial baby" would be the analytical GC/MS test results produced by NMS, Inc., which reveal that Mr. Britt ingested marijuana near the time of his death because his THC concentration far exceeded his "THC acid" or metabolite concentration. The Huestis models are the bath water inasmuch as they are not necessary for Dr. Mason to render his opinion.

Dr. Mason can explain to the jury, as he did to counsel during his deposition, that because of the metabolic process, a THC concentration higher than its corresponding metabolite is scientific evidence that marijuana impaired Mr. Britt at or near the time of his death. Dr. Mason's opinion will assist the jury in understanding the metabolic process and the distribution of materials found in Mr. Britt's blood by an independent laboratory. Such an opinion "will have a tendency to make the existence of [Mr. Britt's impairment] more or less probable," which clearly makes the evidence relevant in accordance with Rule 401, Fed. R. Evid. If the prosecution's experts in <u>Brown</u> were able to give a toxicology-type opinion based upon their chemistry experience, then surely Dr. Mason should be allowed to explain the metabolic process, as well as toxicology and pharmacology principles to this case's jury.

## B.  PLAINTIFF'S CONCERNS GO TO THE WEIGHT OF THE EVIDENCE, NOT ITS ADMISSIBILITY.

Plaintiff contends that Dr. Mason failed to adequately support his opinions because he applied the Huestis models to post-mortem blood. Even if one were to assume, *arguendo*, that the Plaintiff's allegations were true, those allegations go to the weight of the opinion evidence, not its admissibility.

-13-

"[C]aselaw plainly establishes that one may be considered an expert but still offer unreliable testimony." Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1342 (11th Cir. 2003) (noting, "the qualification and reliability inquiries are distinct"). In Quiet Tech, the United States Court of Appeals for the Eleventh Circuit considered many of the same arguments now advanced by the Plaintiff. "At its core, [Quiet Tech addressed the issue of] whether the district court abused its discretion by admitting, and subsequently rejecting a post-trial challenge to, the testimony of. . . an expert in computational fluid dynamics (CFD)." Quiet Tech, at 1335. The plaintiffs in Quiet Tech argued that the opinion of the defendants' CFD expert should be excluded. Id. at 1342. The plaintiffs challenged the admissibility of the expert's opinions primarily on the contention that he technically botched the tests that he performed, because:

1.  Failed to distinguish between engine pressure ratio and fan pressure ratio;
2.  He performed an analysis of the old leading ejector edge rather than the droop snoop;
3.  He used incomplete and inappropriate flight test data to validate his Fluent results; and
4.  He used improper boundary conditions.

Id. While these contentions are highly technical and seem very case specific, they are directly analogous to the Plaintiff's contentions in the instant case. The Plaintiff's attack on Dr. Mason's opinion focuses on the fact that Dr. Mason applied post-mortem

blood to the Huestis models.  As in <u>Quiet Tech</u>, the Plaintiff's primary contention is that Dr. Mason did not perform his test correctly.

The district court in <u>Quiet Tech</u> found the plaintiffs' expert to be properly qualified and that the evidence he offered was reliable and helpful.  In affirming the district court, the Eleventh Circuit began by noting, "it is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence. . . **vigorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."** <u>Quiet Tech</u>, at 1341(emphasis added). The Eleventh Circuit then cited extensive authority for the proposition that the aforementioned principle of law specifically applies to <u>Daubert</u> inquiries:

> The identification of [testing or study] flaws in generally reliable scientific evidence is precisely the role of cross-examination. <u>See generally</u> <u>Daubert</u>, 509 U.S. at 596, 113 S. Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); <u>Maiz</u>, 253 F.3d at 667. Indeed, "**in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.**" <u>Hemmings v. Tidyman's Inc.</u>, 285 F.3d 1174, 1188 (9th Cir. 2002); *See also Id*. ("**Vigorous cross-examination of a study's inadequacies allows the jury to appropriately weigh the alleged defects and reduces the possibility of**

-15-

prejudice."); <u>Cummings v. Standard Register Co.</u>, 265 F.3d 56, 65 (1st Cir. 2002) (holding that "**whatever shortcomings existed in [the expert's] calculations went to the weight, not the admissibility, of the testimony**); <u>In re TMI Litig.</u>, 193 F.3d 613, 692 (3d Cir. 1999) ("'**So long as the expert's testimony rests upon "good grounds," it should be tested by the adversary process--competing expert testimony and active cross-examination -- rather than excluded from jurors['] scrutiny for fear that they will not grasp its complexities or satisfactory [sic.] weigh its inadequacies.**'" (quoting <u>Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.</u>, 161 F.3d 77, 85 (1st Cir. 1998))); <u>Wilmington v. J.I. Case Co.</u>, 793 F.2d 909, 920 (8th Cir. 1986) ("Virtually all the inadequacies in the expert's testimony urged here by [the defendant] were brought out forcefully at trial . . . . [T]hese matters go to the weight of the expert's testimony rather than to its admissibility.").

\*\*\*

"**Normally, failure to include variables will affect the analysis' probativeness, not its admissibility**." <u>Bazemore v. Friday</u>, 478 U.S. 385, 400, 106 S. Ct. 3000, 3009, 92 L. Ed. 2d 315 (1986).

<u>Id.</u> at 1345-46 (quotations in original) (emphasis added).

When the Eleventh Circuit applied the principles referenced above to the <u>Daubert</u> challenge in <u>Quiet Tech</u>, they concluded that the experts' methods and results were ultimately questioned vigorously by the defendants. "Accordingly, [<u>Quiet Tech</u> was] not a case where the jury was likely to be swayed by facially authoritative but substantively unsound, unassailable expert evidence." <u>Id.</u> at 1346.

-16-

The issue now before the Court is essentially the same issue presented by Quiet Tech. To the extent that the Plaintiff may be able to prove that Dr. Mason's use of the Huestis models was unsound, she will be allowed to challenge those methods on cross-examination. More specifically, the Plaintiff will be able to challenge Dr. Mason on the fact that he used the Huestis models as a secondary tool in arriving at his ultimate opinion. Such an attack might somehow undermine the value of Dr. Mason's opinion. However, that is a determination that must be left to the jury, as "objections to the inadequacies of [Dr. Mason's study] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." Therefore, even if Dr. Mason's analysis and resultant opinion are technically deficient, such a finding does not support excluding those opinions from evidence.

## IV. CONCLUSION

The Plaintiff incredibly argues that Dr. Mason has somehow misled counsel and the Court. This is simply untrue. Dr. Mason testified that the Huestis models can be applied to post-mortem blood samples as a tool for evaluating a decedent's last exposure to marijuana. That is exactly how Dr. Mason used the Huestis models - as a secondary tool. The primary basis of his opinion is rooted in the sound application of toxicology and pharmacology principles. Specifically, **Dr. Mason explained during his deposition that, in his opinion, marijuana impaired Mr. Britt at or**

**near the time of his death because the THC concentration in his blood far exceeded the corresponding metabolite, which is extremely rare**.  In fact, the distribution of those materials was so unusual that NMS, Inc., performed the GC/MS test twice.  Even if the Court decides that Dr. Mason's use of the Huestis models in conjunction with post-mortem blood was improper and renders that portion of his analysis technically flawed, he should still be permitted to testify because use of the Huestis models was not and is not necessary for him to reach his ultimate opinion.  What is more, the Plaintiff's objection as to any alleged technical insufficiencies should go to the weight Dr. Mason's opinion, not to its admissibility.

WHEREFORE, PREMISES CONSIDERED, the Defendants respectfully request that the Court DENY the Plaintiff's Motion.


s/ Lea Richmond, IV
Thomas L. Oliver, II (ASB-3153-r53t)
Lea Richmond, IV (ASB-8479-l74r)
Attorneys for Defendants

**OF COUNSEL:**

**CARR ALLISON**
100 Vestavia Parkway
Birmingham, Alabama 35216
Telephone: (205) 822-2006
Facsimile: (205) 822-2057

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby Certify that on the 4th day of December, 2007, a true and correct copy of the foregoing has been furnished by electronic mail using the CM/ECF system which will send notification of such filing to the following:

Kenneth J. Mendelsohn, Esq.
**JEMISON, MENDELSOHN & JAMES**
1772 Platt Place
Post Office Box 241566
Montgomery, Alabama 36124

David E. Allred, Esq.
**Law Offices of David E. Allred**
Post Office Box 241594
Montgomery, AL 36124-1594


s/ Lea Richmond, IV
**OF COUNSEL**

-19-

 **ational Medical Services Inc.**          )          **CONFIDENTIAL**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

**Toxicology Report**

Report Issued  03/03/2006 10:00

| | |
|---|---|
| **Patient Name**  BRITT, JOHN W. | |
| **Patient ID**  06MM00269 | |
| **Chain**  10581674 | |
| **Age**  44 Y       **Gender**  M | |

10235
Montgomery Medical Examiners Office
Attn: Ordering Pathologist
P.O. Box 240591
Montgomery, AL 36124

**Workorder**    06393988

**Received**   2/24/2006

This analysis was performed under chain of custody. The chain of custody documentation is on file at National Medical Services.
Unless alternate arrangements are made by you, the remainder of the submitted specimens will be discarded six (6) weeks from the date of this report; and generated data will be discarded five (5) years from the date of this report.

---

**Lab Sample ID: 06393988-001     Patient Name: BRITT, JOHN W.**          **Matrix: Blood**

| Collect Date/Time | Container Type | Approx Volume/Weight |
|---|---|---|
| 02/22/06 | Gray Top Tube | 6 mL |

Receipt Notes  None Entered

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| Specimen Source: Femoral Blood | | | | |
| **8094B Rapid Tox Panel I, Blood (Forensic)** | | | | |
| Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) | | | | |
| Opiates | None Detected | ng/mL | 20 | |
| Cocaine Metabolites | None Detected | ng/mL | 20 | |
| Benzodiazepines | None Detected | ng/mL | 100 | |
| Cannabinoids | See Comment | ng/mL | 10 | |
| Comment:  This screening result indicates that further testing is required. Refer to the confirmation test for the final result(s). | | | | |
| Amphetamines | None Detected | ng/mL | 20 | |
| Barbiturates | None Detected | mcg/mL | 0.040 | |
| Methadone | None Detected | ng/mL | 25 | |
| Phencyclidine | None Detected | ng/mL | 10 | |

**CERT**
**SENT**



**)ational Medical Services Inc.**                         CONFIDENTIAL

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

---

Lab Sample ID: 06393988-001     Patient Name: BRITT, JOHN W.                    Matrix: Blood

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| Propoxyphene | None Detected | ng/mL | 50 | |
| | | | | |
| Analysis by Headspace Gas Chromatography (GC) | | | | |
| Ethanol | None Detected | mg/dL | 10 | |
| Synonym(s): Ethyl Alcohol | | | | |
| | | | | |
| Methanol | None Detected | mg/dL | 5.0 | |
| Synonym(s): Methyl Alcohol | | | | |
| | | | | |
| Isopropanol | None Detected | mg/dL | 1.0 | |
| Synonym(s): Isopropyl Alcohol | | | | |
| | | | | |
| Acetone | None Detected | mg/dL | 1.0 | |

**6724B Cannabinoids Quantitation/Confirmation, Blood (Forensic)**
Analysis by Gas Chromatography/Mass Spectrometry (GC/MS)

| | | | | |
|---|---|---|---|---|
| Delta-9 Carboxy THC | 5.3 | ng/mL | 5.0 | |

Synonym(s): Inactive Metabolite

Usual peak levels in Serum for 1.75% or 3.55% THC
marijuana cigarettes: 10 - 101 ng/mL about 32 to 240 minutes after
beginning smoking, with a slow decline.
Usually not detectable after passive inhalation.

| | | | | |
|---|---|---|---|---|
| 11-Hydroxy Delta-9 THC | None Detected | ng/mL | 5.0 | |

Usual peak levels: Less than 10% of THC levels after smoking.

Analysis by Gas Chromatography/Mass Spectrometry (GC/MS)

| | | | | |
|---|---|---|---|---|
| Delta-9 THC | 6.5 | ng/mL | 1.0 | |

The concentrations in Blood are usually about
one-half of Serum/Plasma concentrations.
Usual peak levels in Serum for 1.75% or 3.55% THC
marijuana cigarettes:
50 - 270 ng/mL at 6 to 9 minutes after beginning
smoking, decreasing to less than 5 ng/mL by 2 hours.
Passive inhalation: Up to 2 ng/mL.

CERT
SENT

**ational Medical Services Inc.**

)     CONFIDENTIAL

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

| Lab Sample ID: 06393988-001 | Patient Name: BRITT, JOHN W. | | Matrix: Blood | |
|---|---|---|---|---|
| Analysis and Comments | Result | Units | Reporting Limit | Notes |

CERT
SENT

 **ational Medical Services Inc.**          CONFIDENTIAL
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900   Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg. PhD, DABFT, DABCC, Laboratory Director

---

**Lab Sample ID: 06393988-004     Patient Name: BRITT, JOHN W.**          **Matrix: Urine**

| Collect Date/Time | Container Type | Approx Volume/Weight |
|---|---|---|
| 02/22/06 | Clear Plastic Container | 30 mL |

Receipt Notes  None Entered

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| **8094U Rapid Tox Panel I, Urine (Forensic)** | | | | |
| Analysis by Enzyme Immunoassay (EIA) | | | | |
| Opiates | None Detected | ng/mL | 300 | |
| Cocaine/Metabolites | None Detected | ng/mL | 300 | |
| Benzodiazepines | None Detected | ng/mL | 300 | |
| Cannabinoids | Presump Pos | ng/mL | 50 | |

Comment:  This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended.

| | | | | |
|---|---|---|---|---|
| Amphetamines | None Detected | ng/mL | 1000 | |
| Barbiturates | None Detected | mcg/mL | 0.30 | |
| Methadone | None Detected | ng/mL | 300 | |
| Phencyclidine | None Detected | ng/mL | 25 | |
| Propoxyphene | None Detected | ng/mL | 300 | |

CERT
SENT






# *Toxico☠Logics*

*Specializing in Forensic Toxicology Services*

# Est. of John William Britt
# v.
# USA Truck, Inc.

TLL CASE NO.
2007T-0026

Andrew P. Mason, Ph.D., DABFT, DABCC-TC
Forensic Toxicologist
ToxicoLogics, Ltd.

May 7, 2007

# *Toxico☠Logics*

*Specializing in Forensic Toxicology Services*

Andrew P. Mason, Ph.D., DABFT, DABCC-TC
Forensic Toxicologist

ToxicoLogics, Ltd.
P.O. Box 614, Boone, NC 28607
Phone:  828-865-1144
FAX:  828-265-3506
Email:  forn6tox@aol.com

## TABLE OF CONTENTS

| No. | SECTION | PAGE |
|---|---|---|
| 1. | REPORT | 1 |
| 2. | SCIENTIFIC REFERENCES | 6 |
| 3. | DOCUMENTS RECEIVED AND REVIEWED | 7 |
| 4. | ESTIMATION OF TIME SINCE LAST MARIJUANA USE | 8 |
| 5. | CURRICULUM VITA OF ANDREW P. MASON, Ph.D., DABFT, DABCC-TC | 9 |

Andrew P. Mason, Ph.D., DABFT, DABCC-TC
President, ToxicoLogics, Ltd.
Forensic Toxicologist

# *Toxico☠Logics*
*Specializing in Forensic Toxicology Services*

ToxicoLogics, Ltd.
P.O. Box 614
Boone, NC 28607
(828) 265-1144 (PH)
(828) 265-3506 (FX)
ForN6Tox@aol.com (Email)

BY U.S. MAIL

May 7, 2007

Lea Richmond, IV, Attorney at Law
Carr, Allison Law Firm
100 Vestavia Parkway
Birmingham, AL 35216

Re:     Estate of Britt v. USA Truck, Inc.
        TLL Case No. 2007T-0026

Dear Mr. Richmond,

You have retained ToxicoLogics, Ltd., represented by myself, Andrew P. Mason, Ph.D., DABFT, DABCC-TC, as consultants in forensic toxicology in the above captioned case. You have been furnished a copy of my *curriculum vita*, which contains my qualifications, and is attached herein. You have asked me to review information related to a motor-vehicle crash in which Mr. John William Britt (Mr. Britt) was killed. You have also asked me to provide opinions regarding the significance of results from forensic toxicology tests performed on postmortem specimens obtained from Mr. Britt. In order to formulate my opinions regarding this case, you have provided the records or documents described below. These records or documents are of a type or nature such that they are customarily relied upon by experts in the field of forensic toxicology in the development of their opinions, and I have reviewed and relied upon them in the formulation of my opinions regarding this case. The opinions provided below are also based on my knowledge, experience and training in forensic toxicology, based on my knowledge of the toxicology, pharmacology and effects of marijuana and other drugs, and they are derived, supported, and given to a reasonable degree of scientific certainty. Finally, the opinions provided here are based on information received to date. I reserve the option to modify my opinions if additional relevant information is provided for my consideration.

## I.      History:

On the date of the crash in question, Mr. Britt was a 44 year-old (DOB 04/20/61) white male. At approximately 8:50 PM on Monday, February 20, 2006, the 1993 Mazda pickup truck driven by Mr. Britt crashed into the side of the trailer in an 18-wheel tractor-semitrailer combination vehicle. The crash occurred as the tractor-trailer was making a left hand turn from the center turn lane of a US Highway, across three oncoming lanes, and into the private driveway of a business. Mr. Britt's vehicle was traveling in the outside opposing lane, and struck the trailer on its right-hand (passenger) side. Mr. Britt's truck passed completely underneath the trailer, rotated counter-clockwise an unknown number of times and came to rest in the roadway. The posted speed limit for the area of the crash was 55 mph. The speed of the tractor-trailer was estimated to be 10 mph at the time of the crash. The speed of the pickup truck is not clearly indicated – it was reported as being "999" mph. The crash investigation documents reviewed did not indicate whether any "skid marks" were present on the surface of the roadway before the point of impact.

The section of the roadway where the crash occurred, on West South Boulevard in Montgomery, AL, has 7 marked lanes (3 lanes each way plus a central turn lane) without other mechanical or electronic traffic control devices. The relevant section of the road is described as being straight and level. At the time of

*Toxico♨Logics*

the crash, the ambient light was described as "dark – roadway lighted" in this shopping or business district, but neither drivers' vision was believed to have been obscured. The weather was rainy, and the asphalt surface of the road was wet. Investigators concluded that the crash was neither intersection related, nor construction zone related. They found that there was no contribution to the production of the crash from material in the roadway. There were no contributing road defects, and no contributing mechanical defects were found for either vehicle. No information was found in the records to indicate that weather, roadway features or configuration, vehicle mechanical defects or any other non-driver-related cause contributed to the production of the crash.

The driver of the tractor-trailer truck was Theodore Leverne Johnson, a 24 y/o (DOB 01/25/82) black male. Investigators indicated they found no driver condition defects for Mr. Johnson, and in the Investigator's opinion he had no alcohol or drug involvement. He was given a breath alcohol test. The result of that test was reported to be 0.00 g/210 L of breath (negative). Mr. Johnson was not given a citation for any traffic offenses as a consequence of the crash.

The condition of the pickup truck driver, Mr. Britt, was reported to be "unknown," and his potential pre-crash alcohol and drug involvement was reported to be "unknown" as well. He apparently survived for only a brief time after the crash occurred, given the severity of his injuries, and was "pronounced deceased shortly after the collision on scene." The cause of Mr. Britt's death was reported to be due to "multiple blunt force injuries," particularly from massive head and neck injuries, and the manner of his death was reported as being an "accident."

Postmortem blood and urine samples were obtained from Mr. Britt at autopsy. These specimens were analyzed by NMS Labs, (Willow Grove, PA). Their report indicates that a screening test of his blood for cannabinoids (substances from *cannabis* or marijuana) was positive at a reporting limit of 10 ng/mL. Quantitative confirmatory GC/MS blood test results were reported as follows; Delta-9-THC was present at 6.5 ng/mL, 11-hydroxy-THC was not detected at a reporting limit of 5.0 ng/mL, and delta-9-carboxy-THC (another synonym for 9-carboxy-11-nor-delta-9-THC) was present at 5.3 ng/mL. Mr. Britt's urine specimen tested positive for cannabinoids as well (reporting limit 50 ng/mL), but no confirmatory tests were reported to have been performed. No alcohol was detected in Mr. Britt's blood specimen. No other positive test results were reported for either Mr. Britt's blood or urine specimens.

## II.    Analysis and Opinions:

Delta-9-THC (THC) is the primary psychoactive compound found in *Cannabis*, better known as marijuana [1-4]. 9-Carboxy-11-nor-delta-9-THC (carboxy-THC) is a metabolite (breakdown product) of THC, is found in both blood and urine after marijuana smoking, and is inactive with respect to the production of typical marijuana-related psychoactive effects [1]. Effects from marijuana generally start within minutes after beginning smoking and peak within an hour after smoking begins. Significant effects last for up to two hours [1-4]. Physiologic and behavioral effects indexes generally return to baseline levels within 3 to 5 hours after smoking begins, although some authors have reported measurable effects in laboratory studies for up to 24 hours after smoking [2-4], particularly for some cognitive functions and divided attention tasks. Typical effects produced by smoking recreational doses of THC in marijuana include "relaxation, euphoria, relaxed inhibitions, sense of well-being, disorientation, altered time and space perception, lack of concentration, impaired learning and memory, alterations in thought formation and expression, drowsiness, sedation, mood changes such as panic reactions and paranoia, and a more vivid sense of taste, sight, smell, and hearing. Stronger doses may intensify reactions and may cause fluctuating emotions, flights of fragmentary thoughts with disturbed associations, a dulling of

*Toxico Logics*

attention despite an illusion of heightened insight, image distortion, and (in extreme states) psychosis" [3]. Other important side effects can include "fatigue, paranoia, possible psychosis, memory problems, depersonalization, mood alterations, .... decreased motor coordination, lethargy, slurred speech, and dizziness" [3].

The effects of marijuana on skills performance have been summarized as follows: "The short term effects of marijuana use include problems with memory and learning, distorted perception, difficulty in thinking and problem-solving, and loss of coordination. Heavy users may have increased difficulty sustaining attention, shifting attention to meet the demands of changes in the environment, and in registering, processing and using information. In general, laboratory performance studies indicate that sensory functions are not highly impaired, but perceptual functions are significantly affected. The ability to concentrate and maintain attention is decreased during marijuana use, and impairment of hand-eye coordination is dose-related over a wide range of dosages. Impairment in retention time and tracking, subjective sleepiness, distortion of time and distance, vigilance, and loss of coordination in divided attention tasks have been reported. Note however, that subjects can often "pull themselves together" to concentrate on simple tasks for brief periods of time. Significant performance impairments are usually observed for at least 1-2 hours following marijuana use, and residual effects have been reported up to 24 hours" [3]. Other references describe similar effects [1, 2, 4].

The skills and capabilities or capacities that are impaired by marijuana are necessary for the safe operation of a motor vehicle. Driving requires a complex, coordinated, and integrated set of capabilities and responses. It is a time-sharing task that relies on tracking and visual search and recognition as its primary components. Marijuana use impairs these components and impairs their functioning in divided attention tasks. These alterations are noted in both driver-simulator and driving studies. "Epidemiology data from road traffic arrests and fatalities indicate that after alcohol, marijuana is the most frequently detected psychoactive substance among (persons in) driving populations. Marijuana has been shown to impair performance on driving simulator tasks and on open and closed driving courses for up to approximately 3 hours. Decreased car handling performance, increased reaction times, impaired time and distance estimation, inability to maintain headway, lateral travel, subjective sleepiness, motor incoordination, and impaired sustained vigilance have all been reported. Some drivers may actually be able to improve performance for brief periods by overcompensating for self-perceived impairment. The greater the demands placed on the driver, however, the more critical the likely impairment. Marijuana may particularly impair monotonous and prolonged driving. Decision times to evaluate situations and determine appropriate responses increase" [3]. Other references describe similar effects" [1, 2, 4]. A well-known marijuana researcher "summarized the difficult question of cannabis use and driving impairment by stating that 'any situation in which safety both for self and others depends on alertness and capability of control of man-machine interaction precludes the use of marijuana' " (from ref. 310, in [2]).

Researchers in forensic toxicology have developed models to determine, within 95% confidence, the range of times since the last use of marijuana, based on THC and carboxy-THC plasma concentrations [5-9]. These models were developed and validated using THC concentrations (Model I) and THC/carboxy-THC concentration ratios (Model II), from studies [5-7] where subjects smoked marijuana cigarettes of two different strengths, and blood THC and carboxy-THC concentrations were measured. Later, the models were tested against a much larger set of subject specimens, applied to lower concentrations of THC and carboxy-THC, and applied to situations where multiple doses were used [8]. Recently, the models were applied to THC and carboxy-THC concentrations detected after oral ingestion of marijuana [9]. In these studies, these validated models were found to accurately predict the time since last use of marijuana. The authors note that "Scientists in North America, Europe, Australia, and Canada have

*Toxico🖐Logics*

applied these predictive models in forensic and medical situations in which it is important to estimate the time of last cannabis use [8]. "The accuracy of the predictive models using postmortem blood has been substantiated in numerous legal cases in multiple international jurisdictions when the time of last cannabis use was independently verified" [9].

Mr. Britt's measured blood concentrations of THC (6.5 ng/mL) and carboxy-THC (5.3 ng/mL) can be converted to serum values [1, 5-9, 10] and that data can applied to the two models [5-9]. As cannabinoid metabolism is almost entirely hepatic [1], metabolism and elimination cease when circulation through the liver stops, at death. As Mr. Britt lived for only a brief time after the crash, the concentrations measured and the time estimates for prior smoking should relate to the time of death and to the crash in which Mr. Britt was killed. Model I, based on THC alone [5-9], predicts that the time of Mr. Britt's last use was 0.77 hr (~45 min), with a 95% confidence interval between 0.35 hr (21 min) and 1.7 hr (1 hr, 42min). Model II, based on THC/carboxy-THC ratios [5-9], predicts that the time of Mr. Britt's last use was 0.59 hr (36 min), with a 95% confidence interval between 0.23 hr (14 min) and 1.56 h (1 hr, 34 min). It should also be noted, that the two models provide estimates that overlap between 0.35 and 1.56 hr.

From the above it is clear that Mr. Britt was exposed to marijuana (most probably by smoking) shortly prior to the time of the crash and his death. This period (from smoking to crash and death) is also consistent with the time required for the production of near peak effects after smoking marijuana. As described above, smoking marijuana produces significant impairing effects on skills and capabilities required for the safe operation of a motor vehicle, especially attention (static or divided), perception, cognition (time and distance estimation) psychomotor skills and vigilance. Unfortunately, impairment of these skills would produce driving behavior consistent with that demonstrated in Mr. Britt's crash. This is pointedly illustrated by the lack of pre-crash skid marks, indicating an apparent failure to make a concerted and effective attempt to avoid the collision. It is consistent with impairment of attention and vigilance, perception, cognition and recognition, and psychomotor functioning, either individually or in concert. Finally, the concentrations of THC and carboxy-THC found in Mr. Britt's blood are consistent with those reported in subjects in clinical studies where marijuana-related impairment is investigated.

### III.    Summary and Conclusions:

Based on the above, my opinions are as follows: Mr. Britt was exposed to marijuana shortly prior to the crash in which he was killed, and the time between smoking and the crash is consistent with the time period for significant impairing effects after smoking marijuana. Smoking marijuana produces characteristic impairing effects on skills and capabilities required for the safe operation of a motor vehicle, especially on attention (static or divided), perception, cognition (time and distance estimation) psychomotor skills and vigilance. The driving behavior demonstrated by Mr. Britt appears to be consistent with that produced by an interruption of these skills. Finally, the concentrations of THC and carboxy-THC found in Mr. Britt's blood are consistent with those reported in subjects in studies of marijuana-related impairment. Therefore, my opinion is that at and about the time of the crash, Mr. Britt was impaired by his prior marijuana use.

No other potentially causative or contributory factors were noted during the investigation of Mr. Britt's crash, including weather, roadway features, conditions or configuration, vehicle mechanical defects or any other non-driver-related factors. No information was found that suggests that any of these factors caused or contributed to the production of the crash. Therefore, in the absence of a more competent and independent cause, my opinion is that Mr. Britt's marijuana related impairment was a direct and proximate factor in the causation of the crash in which he was killed.

***Toxico�ికుLogics***

I would be pleased to answer any additional questions you may have regarding this matter.

Sincerely yours,

Andrew P. Mason, Ph.D., DABFT, DABCC-TC
Forensic Toxicologist

**Toxico♆Logics**

## SCIENTIFIC REFERENCES

[1].  Mason AP, McBay AJ, "Cannabis: pharmacology and interpretation of effects", J Forensic Sci, 30/3: 615-631, (1985).

[2].  Huestis MA, "Cannabis (Marijuana) - Effects on human behavior and performance", Forensic Sci Rev, 14/1&2: 16-60, (2002).

[3].  Cooper FJ, Logan BK, "Cannabis/Marijuana", see http://www.nhtsa.dot.gov/people/injury/research/job185drugs/cannabis.htm, visited 8/2/2006.

[4].  Baselt RC, "Tetrahydrocannabinol", in Drug Effects on Psychomotor Performance, Biomedical Publications, Foster City CA, (2001) pp. 403-415.

[5].  Huestis MA, Henningfield JE, Cone EJ, "Blood cannabinoids.  I. Absorption of THC and formation of 11-OH-THC and THC-COOH during and after smoking marijuana", J Anal Toxicol, 16: 275-282, (1992).

[6]  Huestis MA, Henningfield JE, Cone EJ, "Blood cannabinoids. II. Models for the prediction of time of marijuana exposure from plasma concentrations of tetrahydrocannabinol (THC) and 11-nor-9-carboxy-tetrahydrocannabinol (THC-COOH)", J Anal Toxicol, 16: 282-290 (1992).

[7].  Cone EJ, Huestis MA, "Relating blood concentrations of tetrahydrocannabinol and metabolites to pharmacologic effects and time of marijuana usage", Therapeutic Drug Monitoring, 15/6: 527-532. (1993).

[8].  Huestis MA, Barnes A, Smith ML, "Estimating the time of last cannabis use from plasma-tetrahydrocannabinol and 11-nor-9-carboxy-tetrahydrocannabinol concentrations", Clinical Chemistry, 51/12: 2289-2295, (2005).

[9].  Huestis MA, ElSohly M, Nebro W, Barnes A, Gustafson RA, Smith ML, "Estimating time of last oral ingestion of cannabis from plasma THC and THC-COOH concentrations", Therapeutic Drug Monitoring, 28/4: 540-544, (2006).

[10].  Owens SA, McBay AJ, Reisner HM, Perez-Reyes M, "Radioimmunoassay of delta-9-tetrahydrocannabinol in blood and plasma with a solid-phase second-antibody separation method", Clin Chem, 27/4: 619-624, (1981).

**Toxico✙Logics**

## DOCUMENTS RECEIVED AND REVIEWED

I.      Documents related to the death of John William Britt.
        A.      Laboratory Report NMS Labs, Willow Grove, PA, reported 03/03/06, 4 pp.
        B.      Report of Autopsy Alabama Dept. of Forensic Sciences, 5 pp.
        C.      Alabama Uniform Traffic Accident Report, 4 pp.

***Toxico Logics***

## ESTIMATION OF TIME SINCE LAST MARIJUANA USE

**Case:** 2007T-0026, Mr. Richmond, Britt v, USA Trucks, Inc.
**Subject:** John Willarm Britt, 44 y/o WM

| | (ng/mL) |
|---|---|
| Blood THC: | 6.50 |
| Blood THCCOOH: | 5.30 |
| **(Conversion of Bld to Plasma) *** | |
| Plasma THC: | 14.13 |
| Plasma THCCOOH: | 11.52 |
| **(Plasma Ratio)** | |
| THCCOOH/THC: | 0.815 |
| **(Log Transformation)** | |
| Plasma THC: | 1.150 |
| Plasma THCCOOH: | 1.062 |
| THCCOOH/THC: | -0.089 |

\* Blood [] / 0.46 = Plasma []

**Model I:**

| Log THC (Log Hr) | Tm Elapsed (Log Hr) | Tm Elapsed (Mean -Hr) | PI Critical Value | PI Interval Lower (Hr) | PI Interval Upper (Hr) |
|---|---|---|---|---|---|
| 1.150 | -0.116 | 0.766 | 0.3431 | 0.348 | 1.688 |

**Model II:**

| Log Ratio (Log Hr) | Time Elapsed (Log Hr) | Time Elapsed (Mean -Hr) | PI Critical Value | PI Interval Lower (Hr) | PI Interval Upper (Hr) |
|---|---|---|---|---|---|
| -0.089 | -0.227 | 0.593 | 0.4204 | 0.225 | 1.561 |

**Mathematical models for Prediction:**

Model I: Time elapse after marijuana smoking
log hour = -0.698 log THC + 0.687

Model I: 95% C.I. = Log T +/- $1.975(0.030(1.006+((\log THC-0.996)^2)/89.937))^{0.5}$

Accurately predicts elapsed time after marijuana use for infrequent and frequent smokers. Less accurate for oral administration.

Model II: Time elapsed after marijuana smoking
log hour = 0.576 log THCCOOH/THC - 0.176

Model II: 95% C.I. = Log T +/- $1.975(0.045(1.006+((\log THCC/THC-0.283)^2)/123.42))^{0.5}$

Accurately predicts time of marijuana use for infrequent users and after marijuana ingestion. Less accurate than Model I for frequent users.

Ref: Cone & Heustis, TDM, 15:527-532, 1993

**Toxico💀Logics**

**CURRICULUM VITA OF**
**ANDREW P. MASON, Ph.D., DABFT, DABCC-TC**

## ANDREW P. MASON, Ph.D., DABFT, DABCC-TC
## FORENSIC TOXICOLOGIST

### ToxicoLogics, Ltd.

P.O. Box 614
Boone, NC, 28607
Phone: (828) 265-1144
FAX: (828)-265-3506
Email: ForN6Tox@aol.com

**PROFESSIONAL EXPERIENCE:**

| | |
|---|---|
| 02/99 - Present | **Adjunct Professor, Department of Chemistry, Appalachian State University**<br>The A. R. Smith Department of Chemistry, Appalachian State University<br>P.O. Box 32036, Boone, NC 28608-2036 |
| 07/98 – Present | **President - ToxicoLogics, Ltd., & Forensic Toxicologist**<br>ToxicoLogics, Ltd., P.O. Box 1614, Boone, NC 28607<br>ToxicoLogics, Ltd., Specializing In Forensic Toxicology Services |
| 07/95 - 06/98 | **Forensic Toxicologist – Expert Services Group**<br>**National Medical Services, Inc.**<br>3701 Welsh Rd., Willow Grove, PA. |
| 03/93 - 06/98 | **Director of Forensic Toxicology - National Medical Services**<br>3701 Welsh Rd., Willow Grove, PA. |
| 09/93 - 08/94 | **Scientific Director, Forensic Urine Drug Testing Laboratory (CAP)**<br>**National Medical Services,** 2300 Stratford Avenue, Willow Grove, PA. |
| 08/92 - 03/93 | **Forensic Toxicologist - National Medical Services**<br>2300 Stratford Avenue, Willow Grove, PA.<br>NMS is a private independent professional full-service laboratory, providing certified and licensed forensic toxicological and criminalistics analysis of evidence, body fluids and tissues for drugs and intoxicants, supported by expert opinion reporting and expert testimony. |
| 07/89 - 07/92 | **Chief Toxicologist - Office of the Chief Medical Examiner**<br>North Carolina Division of Postmortem Medicolegal Examination, Department of Environment, Health, and Natural Resources, Chapel Hill, NC. |
| 08/88 - 07/92 | **Clinical Assistant Professor - University of North Carolina**<br>Department of Pathology, School of Medicine, Chapel Hill, NC. |
| 02/88 - 06/89 | **Deputy Chief Toxicologist - Office of the Chief Medical Examiner**<br>North Carolina Division of Health Services, Department of Human Resources, Chapel Hill, NC, (Analytical Chemist II). |

ANDREW P. MASON, Ph.D., DABFT, DABCC                                    PAGE 2 of 13

| | |
|---|---|
| 09/87 - 01/88 | **Forensic Toxicologist - Office of the Chief Medical Examiner**<br>North Carolina Division of Health Services, Department of Human Resources, Chapel Hill, NC. |
| 01/85 - 08/87 | **Postdoctoral Fellow - University of North Carolina**<br>Department of Pathology, School of Medicine, Chapel Hill, NC. Development and Characterization of Monoclonal Antibodies to Conformer Dependent Epitopes on Immunoglobulins, and Their Use in Homogenous Immunoassay Technologies, under the direction of Howard M. Reisner, Ph.D. |
| 01/81 - 12/84 | **Graduate Research Assistant - University of North Carolina**<br>School of Pharmacy, Division of Medicinal Chemistry and Natural Products, Chapel Hill, NC. |
| 08/78 - 12/80 | **Graduate Teaching Assistant - University of North Carolina**<br>School of Pharmacy, Division of Medicinal Chemistry and Natural Products, Chapel Hill, NC. |
| 05/77 - 08/78 | **Research Scientist I - Norwich Eaton Pharmaceuticals, Inc.**<br>Analytical Methods Development Section, Pharmaceutical Research and Development Division, Norwich, NY. Development of control and stability assays for drugs in pharmaceutical formulations. |
| 02/77 - 04/77 | **Research Scientist I - Norwich Eaton Pharmaceuticals, Inc.**<br>Tissue Residue Group, Pharmacometrics Division, Norwich, NY. Development of analytical methods for anti-microbial agents and their metabolites in tissues and feeds. |

## EDUCATION:

| | |
|---|---|
| 08/78 - 05/86 | **Doctor of Philosophy - University of North Carolina**<br>Division of Medicinal Chemistry and Natural Products, School of Pharmacy, Chapel Hill, NC. Dissertation Title: Development of Fluoroimmunoassay Methods for Delta-9-Tetrahydrocannabinol, under the direction of Arthur J. McBay, Ph.D. |
| 08/73 - 12/76 | **Bachelor of Science, Chemistry - State University of New York**<br>Binghamton, NY. |
| 08/72 - 05/73 | **Mansfield State College**, Mansfield, PA. |

## LICENSURE AND CERTIFICATIONS:

| | |
|---|---|
| 1998 - Present | **Diplomate of the American Board of Clinical Chemistry (DABCC-TC)**<br>Certification in Toxicological Chemistry. American Board of Clinical Chemistry, 2101 L Street, NW, Suite 202, Washington, DC, 20037-1526, (1998 – 2003, 2003 – 2005). |
| 1995 | **Breath Alcohol Technician (BAT)**<br>Chemical Tests for Intoxication Training Program under 49 CFR Part 40 on Intoxilyzer Model 5000-R Breath Analysis Instrument, National Medical Services, Inc., June 12, 1995. |

ANDREW P. MASON, Ph.D., DABFT, DABCC                                    PAGE 3 of 13

| | |
|---|---|
| **1994 - 2009** | **Diplomate of the American Board of Forensic Toxicology (DABFT)**<br>American Board of Forensic Toxicology, Inc., c/o, the Forensic Sciences Foundation, Inc., P.O. Box 669, Colorado Springs, CO, 80901-0669, (1994 - 1999, 1999 – 2004, 2004 -2009). |
| **1993 - 2005** | **Certificate of Qualification, Laboratory Director**<br>New York State Department of Health, Certified in Forensic Toxicology, Therapeutic Substance Monitoring/Quantitative Toxicology, and Clinical Toxicology/Drug Analysis - Qualitative (1993 - 1995, 1995 - 1997, 1997 – 1999, 1999 – 2001, 2001 – 2003, 2003 – 2005, 2005 – 2007, 2007 – 2009) and Certified in Blood Lead and Erythrocyte Protoporphyrin (2/97 - 4/97, 1997 – 1999, 1999 – 2001, 2001 – 2003, 2003 – 2005). |
| **1992 - 1994** | **Certificate of Qualification, Laboratory Director**<br>Ohio Department of Health, Alcohol Testing Approval and Permit Program, Certified in ethyl alcohol analysis by gas chromatography, (10/92 - 10/94). |

**HONORS:**

Rho Chi Pharmaceutical Honor Society, 1982.

New York State Regents Scholarship, 1972.

**PROFESSIONAL ORGANIZATIONS:**

Full Member, Society of Forensic Toxicologists (SOFT), 1988 - Present.
SOFT Membership Committee, 01/94 - 01/97.

Fellow, American Academy of Forensic Sciences, 1997 - Present.
Full Member, American Academy of Forensic Sciences, 1993.
Provisional member, American Academy of Forensic Sciences, 1989.

Member, American Association for Clinical Chemistry, 1992 - Present.
Member, Therapeutic Drug Monitoring and Clinical Toxicology Division, American Association for Clinical Chemistry, 1993 - Present.

Full Member, The International Association of Forensic Toxicologists, 1993 - Present

**SPECIAL TRAINING:**

Particle Concentration Fluorescence Immunoassay Methods, Pandex Division, Baxter Healthcare Corp., Mundelein, IL, 11/04/86 -11/09/86.

Quadrupole Mass Spectrometric Techniques: Theory, Operation, Maintenance, and Applications, Extrel Corp., Pittsburgh, PA, 10/05/87 - 10/09/87.

Supervisory Skills Training Program, State Personnel Development Center, Office of State Personnel, North Carolina Department of Human Resources, Raleigh, NC, 07/08 - 12/88.

"Responsible Alcohol Service/Seller Program," North Carolina Alcohol Beverage Control Commission (NC-ABCC) , Boone, NC, 01/26/07.

ANDREW P. MASON, Ph.D., DABFT, DABCC                                              PAGE 4 of 13

**OTHER ACTIVITIES:**

Continuing Education Program Committee Coordinator, National Medical Services, Inc., 2300 Stratford Ave., Willow Grove PA, 1993 - 1995.

Guest Reviewer, Journal of Analytical Toxicology Annual Special Issue, for the Annual Meeting of the Society of Forensic Toxicologists, 4th Annual Special Issue, (Vol. 18, No. 6., Oct. 1994), 5th Annual Special Issue, (Vol. 19, No. 6, Oct. 1995), 8th Annual Special Issue, (Vol. 22, No. 6, Oct. 1998), 9th Annual Special Issue, (Vol. 23, No. 6, Oct. 1999), 14th Annual Special Issue, (Vol. 28, No. 6, Oct. 2004).

Laboratory Inspector, College of American Pathology (CAP), Forensic Urine Drug Testing Laboratory Certification Program, 1994 - 1999.

Member, Program Committee, AAFS Toxicology Section, 2000 Annual Meeting, Reno NV.

Testimony:  Since September 1993, Testimony At Trial Or In Deposition In Over 100 Cases, In At Least 17 States, In Federal, State, District, Local, And Administrative Courts, For Prosecution, Plaintiff, And Defense.

Instruction:   Chemistry 3530, Forensic Chemistry and Toxicology, Chemistry Department, Appalachian State University, Boone, NC.   Authored and presented advanced level course for undergraduate students in forensic chemistry and forensic toxicology. Presented spring semester, 2001, 2003.

Special Consultant, "OxyContin Abuse in the Carolinas," The Charlotte Observer, Charlotte, NC, July 7-10, 2002.

Moderator, Scientific Sessions, SOFT Annual Meeting, Detroit, MI, 10/2002, AAFS Annual Meeting, Chicago, IL, 2/2003.

Speaker:   Instructional Video; "What is Chemistry?," A.C. Smith Department of Chemistry, produced by the Learning Assistance Program, Appalachian State University, Boone, NC, 07/2003, viewable at http://www.chemistry.appatate.edu/.

Editorial Staff:   ToxTalk: The official publication of the Society of Forensic Toxicologists, Inc., Cave Creek, AZ, 03/2004 - 12/2005.

Drug Endangered Child (DEC) Program Advisory Board, Watauga County Dept. of Social Services Child Protective Services Program, Watauga County, Boone, NC, 2003-Present).

Methamphetamine Home Laboratory Workgroup, NC Division of Social Services, NC Dept. of Health and Human Services, Raleigh, NC, 2004.

Workshop Coordinator and Moderator; FBI Laboratory Symposium on Forensic Toxicology, Session 1C, "The Toxicological Hazards of Clandestine Methamphetamine Synthesis," Washington, DC, 08/29/04.

ANDREW P. MASON, Ph.D., DABFT, DABCC                                    **PAGE 5 of 13**

Coordinator, Student Academy, Society of Forensic Toxicologists (SOFT) Annual Meeting, Research Triangle Park, NC, 10/2007.

**PUBLICATIONS:**

1.  McBay AJ, Mason AP, "Drugs Found in 600 Single-Vehicle Operators Killed in North Carolina in 1978-1982," Bull Int Assoc Forensic Toxicol, 16/3: 19-21 (1982).

2.  Mason AP, Perez-Reyes M, McBay AJ, Foltz RL, "Cannabinoids in Plasma After Passive Inhalation of Marijuana Smoke," JAMA, 249/4: 475-476 (1983), Letter.

3.  Perez-Reyes M, Di Guiseppi S, Mason AP, Davis KH, "Passive Inhalation of Marijuana Smoke and Urinary Excretion of Cannabinoids," Clin Pharmacol Ther, 34/1: 36-41 (1983).

4.  Mason, AP, Perez-Reyes M, McBay AJ, Foltz RL, "Cannabinoid Concentrations in Plasma After Passive Inhalation of Marijuana Smoke," J Anal Toxicol, 7/4: 172-174 (1983).

5.  Mason AP, McBay AJ, "Ethanol, Marijuana, and Other Drug Use in 600 Drivers Killed in Single-Vehicle Crashes in North Carolina, 1978-1981," J Forensic Sci, 29/4: 987-1026 (1984).

6.  Mason AP, McBay AJ, "Cannabis: Pharmacology and Interpretation of Effects," J Forensic Sci, 30/3: 615-631 (1985).

7.  McBay AJ, Mason AP, "Marijuana and Driving: What is the Significance of Cannabinoid Concentrations?," in Alcohol Drugs and Traffic Safety, Proceedings of the Ninth International Conference on Alcohol, Drugs and Traffic Safety, San Juan, Puerto Rico, 1983, Kaye S, Meier GW, Eds., U.S. Department of Transportation, National Highway Traffic Safety Administration, U.S. Govt. Printing Off., DOT-HS-806-814, (1985), pp. 949-954.

8.  Mason AP, "Development of Fluoroimmunoassay Methods for Delta-9-Tetrahydrocannabinol," Ph.D. Dissertation, University of North Carolina, Chapel Hill, NC, 1986, 243 pp.

9.  Mason AP, Reisner HM, McBay AJ, de Serres M, "Development of a PCFIA Method for THC in Blood and Plasma," in Proceedings of the 1987 Pandex Symposium, Promises and Limitations of Particle Concentration Fluorescence Immunoassay Strategies, (Lincolnshire, IL, 11/7/87), TP&T Publications, Chicago, IL, 1988.

10. McBay AJ, Mason AP, "Forensic Science Identification of Unknowns by Gas Chromatography Mass Spectrometry," J Forensic Sci: 34/6, 1471-1476 (1989).

11. Mason, AP, "Case Notes: Morphine Poisoning or "Take the Money and Run," Tox Talk, Society of Forensic Toxicologists, Inc., Vol. 18, No. 3, September 1994, pp. 7.

12. Selavka CM, Mason AP, Riker CD, Crookham S, "Determination Of Fentanyl In Hair: The Case of the Crooked Criminalist," J Forensic Sci, 40/4: 681-685 (1995).

13. Mason AP, Selavka CM, "GC/MS Detection of a Single Exposure to Fentanyl in Hair?," Tox Talk, Society of Forensic Toxicologists, Inc., Vol. 19, No. 1, March 1995, pp. 3.

**ANDREW P. MASON, Ph.D., DABFT, DABCC**                                          **PAGE 6 of 13**

**PRESENTATIONS AND ABSTRACTS:**

1.  Mason AP, Perez-Reyes M, McBay AJ, Foltz RL.   "Cannabinoids in Plasma After Passive Inhalation of Marijuana Smoke," Cannabinoids '82', Satellite Meeting, American Society of Pharmacology and Experimental Therapeutics, Louisville, KY, 8/82.

2.  McBay AJ, Mason AP.   "Ethanol, Marijuana, and Other Drug Use in 600 Drivers Killed in Single-Vehicle Crashes in North Carolina, 1978-1981," Cannabinoids '82', Satellite Meeting, American Society of Pharmacology and Experimental Therapeutics, Louisville, KY, 8/82.

3.  Mason AP, Perez-Reyes M, McBay AJ, Foltz RL.   "Cannabinoids in Plasma After Passive Inhalation of Marijuana Smoke," Annual Meeting, Society of Forensic Toxicologists, Roslyn, VA, 10/82.

4.  Mason AP, McBay AJ, Reisner HM.   "Development of Fluoroimmunoassay Methods for Delta-9-Tetrahydrocannabinol," Environmental Diagnostics, Inc., Burlington, NC, 10/3/86.

5.  Mason AP, McBay AJ, Reisner HM.   "Development of Fluoroimmunoassay Methods for Delta-9-Tetrahydrocannabinol," Minority Access to Research Careers (MARC) Seminar, Department of Biology, Pembroke State University, Pembroke, NC, 10/7/86, (Invited Presentation).

6.  Mason AP, McBay AJ, Reisner HM.   "Development of Fluoroimmunoassay Methods for Delta-9-Tetrahydrocannabinol," Research Triangle Institute, Research Triangle Park, NC, 10/28/86.

7.  Mason AP, McBay AJ, Reisner HM.   "Development of Fluoroimmunoassay Methods for Delta-9-Tetrahydrocannabinol," Genetic Diagnostics, Inc., Great Neck, NY, 11/10/86.

8.  Mason AP, McBay AJ, Reisner HM.   "Development of Fluoroimmunoassay Methods for Delta-9-Tetrahydrocannabinol," St. Andrews Presbyterian College, Laurinburg, NC, 3/17/87 (Invited Presentation).

9.  Mason AP, Reisner HM.  "Immunoassay Technology:  Conformer Specific Monoclonal Antibodies to IgG, Their Use in Homogenous Immunoassays," Monoclonal Lymphocyte Technology Center Progress Report, Governor's Inn, Research Triangle Park, NC, 9/17/87.

10. Mason AP, Reisner HM, McBay AJ, de Serres M.  "Development of a PCFIA Method for THC in Blood and Plasma."  In Proceedings of the 1987 Pandex Symposium, Promises and Limitations of Particle Concentration Fluorescence Immunoassay Strategies, (Lincolnshire, IL, 11/7/87), TP&T Publications, Chicago, IL, 1988, (Invited Presentation).

11. Mason AP, "Forensic Toxicology," Lecture for Pathology 204, School of Medicine, University of North Carolina, Chapel Hill, NC, 10/12/88.

12. Mason AP, McBay AJ, "Delta-9-THC Fluoroligand:   Synthesis and Properties of a Ligand for Fluoroimmunoassay of Delta-9-THC in Plasma and Blood," Annual Meeting, Society of Forensic Toxicologists, Philadelphia, PA 10/29/88.

13. Mason AP.  "Pharmacology of Cocaine," Medicolegal Seminar, Office of the Chief Medical Examiner Chapel Hill, NC, 12/3/88.

14. Mason AP, McBay AJ.   "Fluoroimmunoassay of Delta-9-THC," Annual Meeting, American Academy of Forensic Sciences, Las Vegas, NV, 1/16/89.

**ANDREW P. MASON, Ph.D., DABFT, DABCC**                                         **PAGE 7 of 13**

15.     Mason AP. "Forensic Toxicology," Forensic Pathology Meeting, Duke University Medical Center, Durham, NC, 6/13/89.

16.     Mason AP, "Forensic Toxicology," Lecture for Pathology 204, School of Medicine, University of North Carolina, Chapel Hill, NC, 10/30/89.

17.     Mason AP. "Forensic Toxicology," Forensic Pathology Meeting, Duke University Medical Center, Durham, NC, 11/14/89.

18.     Mason AP. "Forensic Toxicology," Lecture for Forensic Medicine (DENT 1870), School of Dentistry, University of North Carolina, Chapel Hill, NC, 3/23/90.

19.     Mason AP.  "Death Investigation - Forensic Toxicology," Investigative Techniques in the Forensic Sciences, Appalachian State University, Boone, NC, 9/18/90, (Invited Presentation).

20.     Mason AP, "Forensic Toxicology," Lecture for Pathology 204, School of Medicine, University of North Carolina, Chapel Hill, NC, 10/23/90.

21.     Mason AP.  "Forensic Toxicology," Defense Investigators Training Conference, Institute of Government, University of North Carolina, Chapel Hill, NC, 3/14/91, (Invited Presentation).

22.     Mason AP. "Acute Ethanol Poisoning," Andrea Hunter Annual Memorial Lecture, Department of Pharmacology, School of Medicine, East Carolina School of Medicine, Greenville, NC, 3/27/91, (Invited Presentation).

23.     Mason AP. "Cocaine Related Fatalities in North Carolina 1989-1990," Department of Pharmacology, School of Medicine, East Carolina School of Medicine, Greenville, NC, 3/27/91, (Invited Presentation).

24.     Mason AP. "Forensic Toxicology," Lecture for Forensic Medicine (DENT 1870), School of Dentistry, University of North Carolina, Chapel Hill, NC, 4/12/91.

25.     Mason AP. "Blood Ethanol Concentrations in Motor Vehicle Fatalities in North Carolina," Fall State Meeting, Mothers Against Drunk Driving (MADD), Charlotte, NC, 9/14/91, (Invited Presentation).

26.     Mason AP.  "Pediatric Forensic Toxicology," in Child Abuse:  The Crime Scene, Western North Carolina Regional Child Abuse Center, Asheville, NC, 10/16/91, (Invited Presentation).

27.     Mason AP, "Forensic Toxicology," Lecture for Pathology 204, School of Medicine, University of North Carolina, Chapel Hill, NC, 11/8/91.

28.     Mason AP. "Drunken Driving Awareness," Keynote Speech, Red Ribbon Kickoff Campaign, Mothers Against Drunk Driving (MADD), Durham, NC, 11/22/91, (Invited Presentation).

29.     Mason AP.  "Fatal Acute Poisoning in North Carolina," Department of Pathology, School of Medicine, University of North Carolina, Chapel Hill, NC, 1/23/92.

30.     Butts JD, Mason AP. "Arsenic Still Slays Them Down in the South (II)," Annual Meeting, American Academy of Forensic Sciences, New Orleans, LA, 2/18/92.

31.     Mason AP. "Forensic Toxicology," Lecture for Forensic Medicine (DENT 1870), School of Dentistry, University of North Carolina, Chapel Hill, NC, 4/3/92.

**ANDREW P. MASON, Ph.D., DABFT, DABCC**                          PAGE 8 of 13

32.    Mason AP.   "Fluoroimmunoassay for Delta-9-THC," National Medical Services, Inc., Willow Grove, PA, 4/23/92.

33.    Mason AP.   "Forensic Toxicology:   North Carolina Poisoning Fatalities," Medicolegal Seminar, Office of the Chief Medical Examiner, Chapel Hill, NC, 5/30/92.

34.    Mason AP.   "Postmortem Forensic Toxicology Practice at National Medical Services," Death Investigators Workshop, National Medical Services, Inc., Willow Grove, PA, 3/4/93.

35.    Mason, AP.   "Basic Laboratory Chemistry and Calculations," National Medical Services Continuing Education Program Presentation, National Medical Services, Inc., Willow Grove, PA, 5/18/93.

36.    Mason, AP.   "Basic Laboratory Chemistry and Calculations," National Medical Services Continuing Education Program Presentation, National Medical Services, Inc., Willow Grove, PA, 5/20/93.

37.    Selavka CM, Riker CD, Klinger R, and Mason, AP.   "Discussion of Forensic Hair Testing Casework Results and Hair Rinsing Procedures," Workshop on Analysis of Hair for Drugs of Abuse, National Institute of Standards and Technology, Gaithersburg, MD, 5/21/93.

38.    Mason, AP.   "Basic Laboratory Chemistry and Calculations," National Medical Services Continuing Education Program Presentation, National Medical Services, Inc., Willow Grove, PA, 8/09/93.

39.    Mason AP, Selavka CM, Rieders F, Oertli E and Castorena J.   "Marijuana Tea, Toxicological Fact or Fiction?," Annual Meeting, Society of Forensic Toxicologists, Phoenix, AZ, 10/14/93.

40.    Mason AP, Selavka CM, Rieders F, Oertli E and Castorena J.   "Marijuana Tea, Toxicological Fact or Fiction?," NMS Seminar Presentation, National Medical Services, Inc., Willow Grove, PA, 10/27/93.

41.    Mason, AP.   "Basic Laboratory Chemistry and Calculations," National Medical Services Continuing Education Program Presentation, National Medical Services, Inc., Willow Grove, PA, 01/18/94.

42.    Mason, AP, "Forensic Hair Testing for Drugs: Possibilities and Pitfalls," Monthly Meeting, Lower Bucks Co./Philadelphia Claims Investigators Association, Willow Grove, PA, 9/21/94.

43.    Mason, AP, "Forensic Hair Testing for Drugs: Possibilities and Pitfalls," Monthly Meeting, South Jersey Claims Investigators Association, Pennsauken, NJ, 11/22/94.

44.    Mason, AP, "Forensic Hair Testing for Drugs: Possibilities and Pitfalls," Monthly Meeting, Delaware Claims Investigators Association, Wilmington, DE, 2/7/95.

45.    Mason, AP, "Forensic Hair Drug Testing as an Investigative Tool," Monthly Meeting, American Society for Industrial Security, Delaware Section, Wilmington, DE, 3/16/95.

46.    Mason, AP, "Forensic Hair Drug Testing for Attorneys," in Forensic Science for Attorneys: A Brief Introduction, A National Medical Services Breakfast Seminar, Philadelphia, PA, 4/21/95.

47.    Selavka CM, Freed JW, Mason AP, "Marijuana - And You Thought Smoking Was The Problem!," Annual Meeting, Mid-Atlantic Association of Forensic Scientists (MAAFS), Fairfax VA, 5/11/95.

48.    Selavka CM, Freed JW, Mason AP, "Marijuana at the Criminalistics/Toxicology Interface," 3rd Pan-American Chemical Conference, 3rd International Energy and Environmental Sciences Conference, 2nd Caribbean Forensic Sciences Conference, San Juan, Puerto Rico, 9/11/95.

49.   Jackson GF, Mason AP, Middleberg RA, Selavka CM, Fritch DF, Turk RF, "A Model For Postdoctoral Education in Forensic Toxicology," 25th Anniversary Meeting, Society of Forensic Toxicologists, Baltimore, MD, 10/12/95.

50.   Mason AP, "Forensic Hair Drug Testing," Fall Conference, North Carolina District Attorneys Association Meeting, Wrightsville Beach, NC, 11/3/95.

51.   Mason AP, "Introduction to Forensic Toxicology," in Introduction to the Forensic Sciences, A National Medical Services Breakfast Seminar, King of Prussia, PA, 11/8/95.

52.   Mason AP, "Introduction to the Forensic Sciences," Lecture for Introduction to Criminal Justice, (CJ 1100), Department of Criminal Justice/Political Science, Appalachian State University, Boone, NC, 10/24/96, (Invited Presentation).

53.   Mason AP, "Analytical Methods for Screening and Confirmation in Biological Specimens," Part III, in Looking Backward and Forward: Three Decades of Toxicological Adventure and Beyond, AAFS Toxicology Section Workshop #16, American Academy of Forensic Sciences Annual Meeting, New York, NY, 2/18/97.

54.   Mason AP, "Introduction to the Forensic Sciences," Lecture for Introduction to Criminal Justice, (CJ 1100), Department of Criminal Justice/Political Science, Appalachian State University, Boone, NC, 3/20/1997, (Invited Presentation).

55.   Mason AP, "Recent Advances in Forensic Hair Drug Testing," Departmental Seminar Series, Department of Chemistry, Appalachian State University, Boone, NC, 4/18/1997 (Invited Presentation).

56.   Mason AP, "Forensic Science & Forensic Toxicology," Career Descriptions Program, 8th Grade Science, Hardin Park School, Boone, NC, 5/30/97.

57.   Mason AP, "Alcohol & Drug Counseling Resources," Stephen Ministries Continuing Education Program, First Presbyterian Church, Boone, NC, 10/14/97.

58.   Selavka CS, Mason AP, "How Many Toxicologists Does It Take To Get The Same Opinion?," North East Association of Forensic Scientist (NEAFS) 1997 Annual Meeting, White Plains, NY, 10/16/97.

59.   Mason AP, "Introduction to the Forensic Sciences," Lecture for Introduction to Criminal Justice, (CJ 1100), Department of Criminal Justice/Political Science, Appalachian State University, Boone, NC, 10/20/97, (Invited Presentation).

60.   Mason AP, "Making Connections:  Toxicological Causation," North Carolina Criminal Justice Association 1998 Spring Meeting, North Carolina Justice Academy, Salemburg NC, 4/17/98 (Invited Presentation).

61.   Mason AP, "Convincing the Jury/Engaging the Media," Panel Presentation, North Carolina Criminal Justice Association 1998 Spring Meeting, North Carolina Justice Academy, Salemburg NC, 4/17/98 (Invited Presentation).

62.   Mason AP "Growing NMS's Forensic Toxicology Business," NMS Forensic Toxicology Strategic Planning Meeting, National Medical Services, Inc., Willow Grove, PA, 8/17/98 (Invited Presentation).

63.   Mason AP, "Making Connections:  Toxicological Causation," Client Education Seminar, Cranfill, Sumner & Hartzog, L.L.P., Charlotte, NC, 11/12/98 (Invited Presentation).

64.    Mason AP, "Making Connections:  Toxicological Causation," NC District Attorneys Annual Meeting, Boone, NC, 11/13/98 (Invited Presentation).

65.    Mason AP, "Making Connections:  Toxicological Causation," Client Education Seminar, Cranfill, Sumner & Hartzog, L.L.P., Raleigh, NC, 12/3/98 (Invited Presentation).

66.    Mason, AP, "False Positive Drug Testing Results:  What If It's Not What You Think You've Got?," A. R. Smith Department of Chemistry, Appalachian State University, Boone, NC, 3/12/99 (Invited Presentation).

67.    Mason AP, "Introduction to the Forensic Sciences," Lecture for Introduction to Criminal Justice, (CJ 1100), Department of Criminal Justice/Political Science, Appalachian State University, Boone, NC, 3/18/99 (Invited Presentation).

68.    Mason AP, "Analysis of GC/MS-SIM Data: Application To A Contested Case Concerning The Detection Of Cocaine," Forensic Chemistry Interest Group, Departments of Chemistry and Criminal Justice, Appalachian State University, Boone, NC 28607, 10/17/00, (Invited Presentation).

69.    Mason AP, "Analysis of "Alternative Specimens in Forensic Toxicology," ASU Sigma Xi Scientific Research Society Meeting, Appalachian State University, Boone, NC, 12/5/00, (Invited Presentation).

70.    Mason AP, "Arsenic Toxicology," North Carolina Homicide Investigators Association, Spring 2001 Working Group Meeting, Boone, NC, 4/18/01 (Invited Presentation).

71.    Mason AP, "Forensic Science & Forensic Toxicology," Freshman Seminar, Forensic Science Curriculum Students, Departments of Chemistry and Criminal Justice, Appalachian State University, Boone, NC 28607, 10/24/01, (Invited Presentation).

72.    Mason AP, "Forensic Toxicology in the Laboratory and in the Courtroom," Freshman Seminar, University Studies 1150, Appalachian State University, Boone, NC 28607, 11/06/01, (Invited Presentation).

73.    Mason AP, Winecker R, Ropero-Miller J, "Chemical Restraint Of An Infant Using Diphenhydramine Associated With A Fatality," Annual Meeting, Society of Forensic Toxicologists, Dearborn, MI, 10/15/02.  See also J Anal Toxicol, 27/1: 193, (2003).

74.    Mason AP, "Forensic Toxicology in the Laboratory and in the Courtroom," Freshman Seminar, University Studies 1150, Appalachian State University, Boone, NC 28607, 11/13/02, (Invited Presentation).

75.    Mason AP, "Methamphetamine (MAMP) v. Ecstasy (MDMA): What Do The Numbers Mean?," 4th Annual Western North Carolina Death Investigation Seminar, Wake Forest University Bowman Grey School of Medicine, Winston-Salem, NC, 03/27/03, (Invited Presentation).

76.    Mason AP, "Scientific Principles Use Of Warrants For Seizure Of Blood And Urine In Impairment Cases," Public Safety Center, Winston-Salem, NC, 04/11/03, (Invited Presentation).

77.    Mason AP, "Clandestine Methamphetamine (MAMP) Synthesis Using the HI – Red P Method:  Procedures, Hazards, and At-Risk Populations," Attorney Education Seminar, Boone, NC, 07/03/03.

78.    Mason AP, Cody JT, "Sympathomimetic Amines," Forensic Toxicology Review, SOFT Continuing Education Seminar, Durham - Research Triangle Park, NC, 08/18/03, (Invited Presentation).

79.    Mason AP, "Clandestine Methamphetamine Synthesis," Public Education Seminar on Substance Abuse, Sponsored by D.A.R.T. of Avery County, Inc., Newland, NC, 08/29/03, (Invited Presentation).

**ANDREW P. MASON, Ph.D., DABFT, DABCC**

80.    Mason AP, "Clandestine Methamphetamine (MA) Synthesis (Meth Labs)," Meth Lab response team for Children & Families: Signs and Safety Training for In-Home Workers, Watauga County Dept of Social Services, Boone, NC, 09/19/03.

81.    Mason AP, "Clandestine Methamphetamine (MA) Synthesis (Meth Labs)," Meth Lab Community Forum, Watauga County Sheriff's Office, Boone, NC, 09/23/03.

82.    Mason AP, "Recognizing Clandestine Methamphetamine Production Sites," Meth Lab Community Forum, Boone Area Chamber of Commerce, Boone, NC, 11/5/03, (Invited Presentation).

83.    Mason AP, "Recognizing Clandestine Methamphetamine Production Sites," Appalachian State University Forensic Science Club, A. R. Smith Department of Chemistry, Appalachian State University, Boone, NC, 11/5/03.

84.    Mason AP, "Protecting Our Children," in "Methlabs: Protecting Our Children from Methamphetamine," NC Association of County Directors of Social Services, Sponsored by the Governors Crime Commission, Asheville, NC, 12/4/03, (Invited Presentation).

85.    Mason AP, "Clandestine Methamphetamine Production," in "Methamphetamine Laboratories in Wilkes?," Sponsored by the Wilkes Community Child Protection Team, and the Wilkes Child Fatality Prevention Team, Wilkes Co. Health Department, Wilkesboro, NC, 02/10/04.

86.    Mason AP, "Clandestine Methamphetamine Production," monthly meeting, Watauga County Foster Parents Support and Training Program, Watauga Co. Dept. of Social Services, Boone, NC, 02/10/04.

87.    Mason AP, "Meth Labs: Protecting Our Children from Methamphetamine," Child Protective Services Team, Catawba County Department of Social Services, Lenoir, NC, 03/09/04.

88.    Mason AP, "Clandestine Methamphetamine Synthesis" Defense Attorney Education Seminar, Boone, NC, 03/10/04.

89.    Mason AP, "Clandestine Methamphetamine Synthesis – Hazards, Recognition, and Community Defenses," Meth Lab Community Forum, Watauga Co. Sheriff's Office, Boone, NC, 03/21/04, , (Invited Presentation).

90.    Mason AP, "Clandestine Methamphetamine Production: Process & Hazards," in "Children, Chaos & Chemicals: The dangers of living in a methamphetamine lab home," presented at "Spotlight on Young Children: Preventing and Treating Abuse and Neglect," sponsored by Preventing Child Abuse in North Caroline (PCANC), Durham, NC, 03/30/04, (Invited Presentation).

91.    Mason AP, "Clandestine Methamphetamine Lab Detection & Protection," in "Children, Chaos & Chemicals: The dangers of living in a methamphetamine lab home," presented at "Spotlight on Young Children: Preventing and Treating Abuse and Neglect," sponsored by Preventing Child Abuse in North Caroline (PCANC), Durham, NC, 03/30/04, (Invited Presentation).

92.    Mason AP, "Clandestine Methamphetamine Production: Process & Hazards," in "Children in Methlab Homes: Implications for DSS Services," Work Force and Children's Services Supervisors Meeting, Waynesville, NC, 04/26/04, (Invited Presentation).

93.    Mason AP, "Clandestine Methamphetamine Lab Detection & Protection," in "Children in Methlab Homes: Implications for DSS Services," Work Force and Children's Services Supervisors Meeting, Waynesville, NC, 04/26/04, (Invited Presentation).

94.   Mason AP, "Toxicological Hazards Associates with Gases and Other Waste Products," Part 3, in "The Toxicological Hazards of Clandestine Methamphetamine Synthesis," Session 1C in the FBI Laboratory Symposium on Forensic Toxicology, Washington, DC, 08/29/04.

95.   Mason AP, "Meth Labs: Process & Risks," Annual Meeting, North Carolina Adult Protective Services Association, Asheville, NC, 09/22/04, (Invited Presentation).

96.   Mason AP, "Meth Labs: Recognition & Protection," Annual Meeting, North Carolina Adult Protective Services Association, Asheville, NC, 09/22/04, (Invited Presentation).

97.   Mason AP, "Meth Labs: Clandestine Methamphetamine Synthesis, Hazards & Protection," Annual Meeting, North Carolina Family Based Services Association, Blowing Rock, NC, 11/17/04, (Invited Presentation).

98.   Mason AP, "Forensic Urine Drug Screening by Immunoassay," ASU Forensic Science Club Meeting, Dept. of Chemistry, Appalachian State University, Boone, NC, 03/31/05.

99.   Mason AP, "Clandestine Methamphetamine Synthesis & Use," Monthly Meeting, Catawba County Drug Endangered Child (DEC) Methamphetamine Task Force, Lenoir, NC, 07/12/05, (Invited Presentation).

100.  Mason AP, "Clandestine Methamphetamine Lab Detection & Protection," Monthly Meeting, Catawba County Drug Endangered Child (DEC) Methamphetamine Task Force, Lenoir, NC, 07/12/05, (Invited Presentation).

101.  Mason AP, "Clandestine Methamphetamine Synthesis & Use," Monthly Meeting, McDowell County Drug Endangered Child (DEC) Methamphetamine Task Force, Marion, NC, 08/10/05, (Invited Presentation).

102.  Mason AP, "Clandestine Methamphetamine Lab Detection & Protection," Monthly Meeting, McDowell County Drug Endangered Child (DEC) Methamphetamine Task Force, Marion, NC, 08/10/05, (Invited Presentation).

103.  Mason AP, "Ethanol Extrapolation and Expert Testimony", in Fighting the DWI Exception to the Constitution, NC Academy of Trial Lawyers, Criminal Law Section, CLE Presentation, Greensboro, NC 01/20/06, (Invited Presentation).

104.  Mason AP, et al., "Community Forum on Drug Endangered Children Teams", videotaped training presentation recorded for use and sponsored by the NC Division of Social Services, and the Family and Children's Resource Program, School of Social Work, UNC Chapel Hill, Recorded in Asheville, NC, 03/03/06, (Invited Presentation).

105.  Mason AP, "Alcohol and retrograde extrapolation issues: Facts and fantasies," Presentation and case-related discussions with attorneys, Salisbury, NC, 02/02/07, (Invited Presentation).

106.  Mason AP, "Dangers of methamphetamine synthesis, and understanding the State Drug Endangered Child (DEC) Protocol, in Defending a Meth Case in North Carolina, NC Academy of Trial Lawyers, Criminal Law Section, CLE Presentation, Asheville, NC, 03/16/07.

## INVENTION DISCLOSURES:

1.    Reisner HM, de Serres M, Scheil CD, McBay AJ, Mason AP.   "Monoclonal Antibodies Reactive with Tetrahydrocannabinols," University of North Carolina, Chapel Hill, NC, 6/84, (ORS84-8).

2.    Reisner HM, Mason AP, de Serres M.  "Monoclonal Murine Rheumatoid Factors with Anti-Contope Specificity," University of North Carolina, Chapel Hill, NC, 6/84, (ORS85-9); Patent Application.

**ANDREW P. MASON, Ph.D., DABFT, DABCC**                                    **PAGE 13 of 13**

3.    Reisner HM, Mason AP, de Serres M. "Anti-Contope Antibodies Used in Detection Systems in Immunoassays," University of North Carolina, Chapel Hill, NC, 6/85, (ORS85-10).

4.    Mason AP, Reisner HM, de Serres M, McBay AJ. "Fluoroimmunoassay for THC," University of North Carolina, Chapel Hill, NC, 5/87, (ORS87-12).

5.    Mason AP, McBay AJ. "Tetrahydrocannabinol Fluoroligand," University of North Carolina, Chapel Hill, NC, 5/87, (ORS87-13).

6.    Mason AP, McBay AJ. "Tetrahydrocannabinol Fluoroligand Fluorescence Enhancement," University of North Carolina, Chapel Hill, NC, 5/87, (ORS87-14).

7.    Mason AP, Reisner HM, de Serres M. "Improved Indirect Quenching Fluoroimmunoassay for Haptenic Antigens," University of North Carolina, Chapel Hill, NC, 5/87, (ORS87-15).

8.    Mason AP, "Improved Indirect Quenching Fluoroimmunoassay for Haptenic Antigens; Application to Tetrahydrocannabinol," University of North Carolina, Chapel Hill, NC, 5/87, (ORS87-16).

**CONSULTATION:**

1.    Evaluation of a microcomputer based program for on-line determinations of immunoglobulin binding affinity constants using Particle Concentration Fluorescence Immunoassay technologies; Pandex Division, Baxter Healthcare Corporation, Mundelein, IL, 7/87.

February 2007

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CIVIL ACTION NO. 2:06cv868-ID-CSC


LANDRIA BRITT, as Administratrix

of the Estate of JOHN W. BRITT,

Deceased,


          Plaintiff,


     vs.


U S A TRUCK, INC.; THEODORE

LEVERNE JOHNSON, et al.,

          Defendants.


                    DEPOSITION OF

                    DR. ANDREW MASON


9:15     At BOONE, North Carolina

         October 26, 2007

         9:15 A.M.

                                        ⒻⒸCOPY

Reported by: AMY CHAWNE HOLSCLAW

**Landria Britt, et al. v. USA Truck, Inc., et al.**
**Dr. Andrew Mason**

2:06cv868-ID-CSC
10/26/2007

2 (Pages 2 to 5)

---

**Page 2**

1   A P P E A R A N C E S
2
3
4   For the Plaintiffs:
5   DAVID E. ALLRED, P.C.
6   7030 FRAIN PARK DRIVE
7   SUITE 9 (36117)
8   MONTGOMERY, ALABAMA 36124-1594
9   334.396.9200
10
11
12   For the Defendants:
13   LEA RICHMOND, IV, Esq.
14   CARR ALLISON
15   100 VESTAVIA PARKWAY
16   BIRMINGHAM, ALABAMA 35216
17   205.822.2006
18
19
20
21
22
23
24
25

---

**Page 4**

1       STIPULATIONS
2       It is hereby stipulated and agreed and agreed
3   between the parties to this action, through their respective
4   counsel of record:
5   (1)    That the deposition of DR. ANDREW MASON, may be
6          taken on October 26TH, 2007, beginning at 9:08 AM, at
7          184 NORTH WATER STREET, BOONE, North Carolina, before
8          Amy Chawne Holsclaw, Court Reporter.
9   (2)    That the deposition shall be taken and used as
10         permitted by the applicable Alabama Rules of Civil
11         Procedure.
12  (3)    That any objections of any party hereto as to notice
13         of the taking of said deposition or as to the time or
14         place hereof, or as to the competency of the person
15         before whom the same shall be taken, are deemed to have
16         been met.
17  (4)    Objections to questions and motions to strike
18         answers need not be made during the taking of this
19         deposition, but may be made for the first time during
20         the taking of this deposition, but may be made for the
21         first time during the progress of the trial of this
22         case, or at any pretrial hearing held before any judge
23         of competent jurisdiction for the purpose of ruling
24         thereon, or at any other hearing of said case at which
25         said deposition might be used, except that an objection

---

**Page 3**

1   TABLE OF CONTENTS
2
3   E X A M I N A T I O N S
4
5   EXAMINATION                          PAGE
6      Direct Examination by MR. ALLRED        6
7
8   E X H I B I T S
9
10  EXHIBIT      DESCRIPTION          MARKED
11  1     NOTICE OF DEPOSITION          6
2A  12  2A    CASE FILE NOTES            11
13  2B    LITIGATION PACKET       11
14  3     CV FOR ANDREW P. MASON        11
15  4     DIAGRAM            61
16  5     ARTICLE  FROM FORENSIC SCIENCE    80
17        INTERNATIONAL
18  6     BATCH WORKLIST FOR CANNABINOIDS  132
19  7     DIAGRAM            145
20  8     CALCULATIONS FROM MODELS
21
22
23
24
25

---

**Page 5**

1       as to the form of a question must be made at the time
2       such question is asked, or objection is waived as to
3       the forum of the question.
4   (5)    That the witness reserves the right to read and sign
5          the deposition prior to filing.
6   (6)    That the sealed original transcript of this
7          deposition shall be mailed first-class or
8          hand-delivered to the party taking the deposition for
9          preservation and delivery to the Court, if and when
10         necessary.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**REPORTED BY: Amy Chawne Holsclaw**
**High Country Court Reporting, 585 D West King Street, Boone, NC 28607  (828) 262-3603**

**Landria Britt, et al. v. USA Truck, Inc., et al.**
**Dr. Andrew Mason**

2:06cv868-ID-CSC
10/26/2007

15 (Pages 54 to 57)

**Page 54**

1  Q.  Okay. Lets mark this -- what's our next number? Four?
2      (THEREUPON, EXHIBIT NO. 4 WAS MARKED FOR
3      IDENTIFICATION.)
4  A.  Yes.
5  Q.  Now, you've handed me a diagram, because I suspect you've
6      had this come up before in a deposition or at a trial. Is
7      that right?
8  A.  Yes.
9  Q.  What are the psychoactive ingredients?
10 A.  I don't think that this was originally deposition or trial
11     related.
12 Q.  Okay.
13 A.  I think this was a diagram I prepared for presentation
14     many, many, many, many, many years ago.
15 Q.  All right. Let me ask you about Exhibit 4. And tell me,
16     first of all, what -- what are the psychoactive substances
17     that you've got listed there?
18 A.  Well --
19 Q.  -- Maybe it would be better if I ask you this way -- and I
20     am trying to get to that question there, but, explain to
21     me what that Exhibit 4 is.
22 A.  Sure. Thank you.
23 Q.  You're welcome.
24 A.  We have three columns on this page.
25 Q.  Okay.

**Page 55**

1  A.  Okay. Let's call them left, right, central. Just to make
2      it easy.
3  Q.  All right.
4  A.  Obviously, this diagram proceeds left to right. In the
5      far left hand column, you have precursor materials found
6      in marijuana, and their name is given, significance is
7      given for each of these. Where they are found is given,
8      their psychoactive capabilities is indicated on the report
9      for each of these three columns.
10     The column in the left hand side are THC-Acids, A and
11     B, which are found in the plant material. These are THC
12     Precursors. When these materials are heated or are on long
13     term storage, or are on pyrolysis; burning or smoking, et
14     certera, these Acids A and B are de-carboxilated.
15     They lose the COOH group right there, next to the
16     stars to form THC. This is a quantitative process that
17     concerns -- it proceeds fastly, easily at relatively low
18     temperatures.
19     The primary psychoactive principle in marijuana
20     which is called THC. Now, there are a large number of
21     other materials that have some psychoactive capabilities
22     in marijuana. However, either the psycho activity
23     relative to that of THC is greatly reduced, or they're
24     present in such a minor quantities that most scientists
25     regard THC itself as being the only active principle in

**Page 56**

1      marijuana. So, for all intents and purposes, that is
2      true.
3  Q.  Okay.
4  A.  There are other little bits in there that have some
5      capabilities, but this is the guy that's present,
6      overwhelmingly in the greatest concentration, and has the
7      greatest capability. That is correct.
8  Q.  THC?
9  A.  THC.
10 Q.  Okay.
11 A.  Correct.
12 Q.  All right.
13 A.  That would be the central column. THC is active material
14     formed on stored, headed or aged cannabis. Cannabis is
15     the genis, cannabis is the setiva genis in marijuana. And
16     it is the psychoactive principle.
17     The right hand column describes what we call
18     Carboxylic Acid, which has a much more complicated name,
19     which I wont bother to get into right now, but it is
20     actually a secondary or tertiary -- primary, secondary,
21     tertiary metabolite of THC. It is THC breakdown product.
22     It is formed naturally in the body.
23     Primarily, it is formed in the liver, although there
24     are a number of other organs that can produce this
25     material in very small amounts. It is found in blood,

**Page 57**

1      it's found in urine, it's found in those tissues after
2      marijuana or cannabis exposure that is after exposure to
3      THC. It is -- it has been determined by direct
4      administration to humans to be a non-psychoactive
5      material.
6  Q.  Okay.
7  A.  -- in psychoactive properties.
8  Q.  Sure.
9  A.  One other thing I wanted to point out here is that --
10 Q.  -- Go ahead.
11 A.  Is the difference in THC and this THC Carboxylic Acid
12     relates to the modification of this CH-3 group. At this
13     position, this eleven position, from a methyl group to a
14     COOH, carbon - oxygen - oxygen - hydrogen --
15 Q.  -- When you say --
16 A.  -- At that point --
17 Q.  -- In reference, and when you look at some of, if your
18     reading on marijuana, and you see THC, and it may be COOH.
19     Is that really the THC Carboxy?
20 A.  It is.
21 Q.  It is that?
22 A.  It is.
23 Q.  Is that a convenient term to refer to the metabolite of
24     THC? Just call it THC Carboxy?
25 A.  Or THC Acid, if you will.

**REPORTED BY: Amy Chawne Holsclaw**
**High Country Court Reporting, 585 D West King Street, Boone, NC 28607 (828) 262-3603**

**Landria Britt, et al. v. USA Truck, Inc., et al.**
**Dr. Andrew Mason**

2:06cv868-ID-CSC
10/26/2007

**16 (Pages 58 to 61)**

**Page 58**

1  Q.  THC Acid.
2  A.  Sure.
3  Q.  Okay.
4  A.  It's a short hand.
5  Q.  But THC Acid is not psychoactive and would not impair a
6      driver?
7  A.  If it is given by itself --
8  Q.  -- by itself --
9  A.  -- it is not psychoactive.
10 Q.  Right.
11 A.  Okay.
12 Q.  And if it's given by itself, it would not impair a driver.
13
14 A.  That's correct.
15 Q.  Okay.  It does not -- it does -- it has no psychoactive
16     capability itself.
17 A.  Okay.
18 Q.  Now, take me on through here and tell me what your opinion
19     is.  Do you have an opinion as to whether or not you think
20     John Britt was impaired at the time this wreck happened?
21 A.  I do.
22 Q.  And if so, what is that opinion?
23 A.  My opinion is that he was.
24 Q.  And explain to me what you -- how you came to that
25     opinion.

**Page 59**

1  A.  Sure.  My opinion was that he was impaired by, and under
2      the influence of the effects of marijuana about the time
3      of the crash.
4  Q.  I missed a couple of words there.  He was impaired and
5      what?
6  A.  Under the influence.
7  Q.  Okay.
8  A.  Of the effects of marijuana.
9  Q.  Okay.
10 A.  At and about the time of the crash.
11 Q.  Okay.
12 A.  The thinking is as follows.
13 Q.  Okay.  (PAUSE.)  Go ahead.
14 A.  It's a -- I am.  I am just trying to frame --
15 Q.  -- Oh, I'm sorry.  I thought you were waiting on me --
16 A.  Nope.
17 Q.  -- To write --
18 A.  -- I am just --
19 Q.  -- I will stop.
20 A.  Nope.
21 Q.  I will stop writing and listen.
22 A.  I just try to think about what I am going to say before I
23     say it.
24 Q.  Okay.
25 A.  It's evident from the information that he survived for

**Page 60**

1  only a relatively short time after the crash occurred.
2  Certainly he did not survive for a long term -- a long
3  time.
4      That would, of course be based on the severity of
5  the injuries that he received.  And also, it indicates
6  that he was declared dead at the scene.  When the heart
7  stopped pumping blood, and blood stops perfusing through
8  the organs in the body, specifically the liver, the
9  metabolism stops.  So, the breakdown of the THC into its
10 metabolite stops as well.
11     Therefore, the distribution of the material and
12 sample should be consistent with what was present in his
13 blood at and about the time that he died, which is of
14 course very close in time to the time the accident
15 occurred.
16     The conclusion would be that the concentration of
17 those materials should be reflective of what was
18 circulating in his body on and about the time that the
19 crash occurred and the time of death.
20     The second, primary factor would be based on the
21 analysis of the materials found in his blood and the
22 results were.  He has present in his blood a very
23 significant, quite high concentration of THC, the major
24 psychoactive principle in marijuana, as well as its
25 metabolite.

**Page 61**

1      There is something unique about this in particular
2  in that it is extremely rare to find the distribution of
3  materials in his blood in samples submitted for Forensic
4  Toxicology investigation purposes.  What's unique about it
5  is that in this case, the THC concentration, the active
6  principle, was greater than the concentration found for
7  the metabolite.
8      We know from many, many, many different studies
9  where metabolite in parent concentrations measured in
10 blood that this occurs first only very early after the
11 administration of marijuana.  And it also occurs after and
12 about the time of peak effects.
13     The other thing would be, of course, the
14 mathematical analysis of those concentrations.  Those
15 outlined in Dr. Huestis' papers.
16 Q.  Who is that now?
17 A.  Marilyn Huestis.
18 Q.  Okay.
19 A.  H-u-e-s-t-i-s.
20 Q.  All right.
21 A.  Those references are cited in my report.
22 Q.  Okay.
23 A.  Who developed and published several different papers on
24     pharmacology of marijuana and mathematical models for the
25     prediction of the time since the last use of those

**Landria Britt, et al. v. USA Truck, Inc., et al.**
2:06cv868-ID-CSC
**Dr. Andrew Mason**
10/26/2007

**18 (Pages 66 to 69)**

Page 66

```
 1        knowledgeable.
 2   Q.   Okay.
 3   A.   Absolutely true.
 4   Q.   All right.
 5   A.   Yes.
 6   Q.   The --
 7        MR. RICHMOND:  Can we take a quick break?
 8        MR. ALLRED:  Sure.
 9        MR. ALLRED:  We've been going a little bit longer
10        than an hour, so --
11        MR. ALLRED:  Sure.
12        (OFF THE RECORD 10:37 A.M.)
13        (ON THE RECORD 10:42 A.M.)
14   BY MR. ALLRED:
15   Q.   Let me ask you Doctor Mason, do you agree that although
16        the use of ethanol, marijuana and other drugs may be
17        detrimental to driving safety, this has been established
18        by direct epidemiological evidence only for ethanol.  Do
19        you agree with that statement?
20   A.   Yes and no.  Conclusively yes.  Particularly for marijuana
21        there is large amount of evidence out there that may point
22        in that direction.  For instance, marijuana is probably
23        the most commonly encountered substance in drugs and
24        driving studies other than alcohol.
25             That is of a forensic concern but you have to also
```

Page 67

```
 1        understand that statement is given in the context that
 2        epidemiologic studies related to drug abuse and driving
 3        are very difficult to perform, because it's very difficult
 4        to establish information from an appropriate control
 5        population.
 6             Obviously, there are certain civil rights types and
 7        legal rights types of concerns in gathering that kind of
 8        drug exposure information from a proper control.  That's
 9        the reason why primarily that these kinds of or that kind
10        of information epidemiologic studies in particular.
11             Epidemiologic information related to drug abuse and
12        drivers is difficult to establish.  That is in contrast,
13        of course, too many other kinds of investigations related
14        to drugs and driving.
15             Particularly those kinds of studies that are
16        performed in the laboratory that look at either global or
17        discreet capabilities or capacities related to the drug
18        and non drug state which can be compared or actual driving
19        related experiences which can be examined as well.
20   Q.   Do you know a person named A.J. McBay?
21   A.   I worked for Dr. McBay for many years.
22   Q.   Okay.
23   A.   He was my mentor.
24   Q.   Did you write an article that appeared in the Journal of
25        Forensic Science in October of 1984?  That -- that's the
```

Page 68

```
 1        first sentence in that article?
 2   A.   Would you like to read it to me?
 3   Q.   I just did.  (READING.)  Although the use of ethanol,
 4        marijuana and other drugs may be detrimental to driving
 5        safety, this has been established by direct
 6        epidemiological evidence only for ethanol.
 7   A.   Great quote.  And I would say certainly that is
 8        appropriate for language for 1984.
 9   Q.   All right.  And the name of that article is Ethanol,
10        Marijuana and Other Drug Use in 600 Drivers Killed in
11        Single Vehicle Crashes in North Carolina 1978 to 1981.
12        You and Dr. McBay wrote that article.  Is that right?
13   A.   I wrote it primarily.
14   Q.   Okay.  When you do these tests, make these formulated
15        opinions -- going back from an event, I mean the time that
16        the blood is taken from the person's body, and trying to
17        go back to the event and determine whether or not there
18        was impairment.  Is one of the dangers of doing that is
19        that if you underestimate the time it increases the
20        potential for falsely accusing an individual of being
21        impaired at the time of the accident?  Is that one of the
22        dangers?
23   A.   It can be.
24   Q.   Okay.  Dr. Huestis' report -- isn't that Footnote number 6
25        in your reference?  Is that the one that's got about the
```

Page 69

```
 1        studies in it?
 2   A.   One of them, yes.
 3   Q.   All right.  And when you do those studies based on
 4        postmortem blood, try to use those models based on
 5        postmortem blood as opposed to ante mortem blood, does
 6        that make any difference?
 7   A.   It does.
 8   Q.   All right.  And in one of Doctor Huestis' articles --
 9   A.   -- May I revise that?
10   Q.   Yeah.  Go ahead.  It does.  Go ahead.
11   A.   I revised to say it can.
12   Q.   It can?
13   A.   It can.
14   Q.   Alright and in one of Doctor Huestis' articles she refers
15        to a test.  Oh, I'm sorry to another article by Doctor
16        Christian G-I-R-O-U-D.  How do you pronounce that?
17        Christian Giroud?
18   A.   Maybe.  I don't have it in front of me so I can't tell
19        you.
20   Q.   Have you ever heard of that fellow's name?
21   A.   I have.
22   Q.   Okay.  Isn't it true that you're not supposed to use the
23        models that you used if you just got postmortem blood?
24   A.   I would disagree.
25   Q.   Sir?
```

**REPORTED BY: Amy Chawne Holsclaw**
**High Country Court Reporting, 585 D West King Street, Boone, NC 28607  (828) 262-3603**

**Landria Britt, et al. v. USA Truck, Inc., et al.**          2:06cv868-ID-CSC
**Dr. Andrew Mason**                                          10/26/2007

19 (Pages 70 to 73)

---

### Page 70

1  A.  I would disagree.
2  Q.  Why do you disagree?
3  A.  Because the answer is that it is certainly true that there
4      may be some concerns with respect to postmortem blood but,
5      I'm not sure of a definitive body of work that says that
6      those concerns are validated.
7  Q.  Well, look at this article here we'll mark this as Exhibit
8      5. And this is Giroud -- I hope for one of a better
9      pronunciation of the man's name that's how I'll do it.
10     And down at the bottom in there what does that last
11     sentence say in the bottom?
12        (THEREUPON, EXHIBIT NO. 5 WAS MARKED FOR
13     IDENTIFICATION.)
14 A.  The abstract?
15 Q.  The abstract, right.
16 A.  Would you like me to read it?
17 Q.  Sure.
18 A.  I would say, oh, I'm sorry. Just the last sentence?
19 Q.  Yes sir.
20 A.  (READING.) In the case of blood samples taken after death
21     the use of these models to assess the time of cannabis use
22     is not recommended.
23 Q.  All right. I would take it then you disagree with that?
24 A.  Yes. I want a little more time to study this particular
25     paper and --

---

### Page 71

1  Q.  -- Well, let me ask you this. Where I got that thing from
2      --
3  A.  Excuse me can I finish my answer, please?
4  Q.  Yeah. Go ahead. Finish.
5  A.  I'd like a little more time to look at this before I give
6      you a definitive opinion on that.
7  Q.  All right. Because these articles that you cited here, if
8      you pull them up, in one of them here is number 8, Dr.
9      Huestis' article with Barnes and Smith; Estimating the
10     Time of Last Cannabis Use, and she's got some more big
11     words in there from TH plasma THC and THCCOOH. That's
12     the THC Carboxy Acid, which is the non- psychoactive part.
13     Is that right?
14 A.  Correct.
15 Q.  Okay.
16 A.  My understanding.
17 Q.  And then see, she cites in there, I mean that's the
18     article you said you relied on. And then she cites the
19     Giroud article as number 21 in there. In the last
20     sentence of her articles it has this sentence; and she's
21     talking about the use of postmortem blood. And she talks
22     about citing this very ability.
23 A.  (INDICATES AFFIRMATIVE.)
24 Q.  The authors, that means Doctor Huestis' and her
25     contemporaries, did not advocate using the models with

---

### Page 72

1      postmortem blood concentrations. This is an article you
2      cited to us as authoritive to saying that you should use
3      the postmortem blood samples.
4  A.  Well, what I can tell you is; I went ahead and completed
5      the calculations. I believe those calculations to be
6      generally reflective and appropriate for predicting a time
7      after death.
8         Certainly, there could be some variance but what I
9      will also say is this. You could take those calculations
10     out of my report and I'd have the same opinion based on
11     the fact that the THC concentration is higher than the THC
12     Carboxylic Acid concentrations and based on my knowledge
13     and experience in Forensic Toxicology, based on literally
14     20 plus years of review of papers related to pharmacology
15     of marijuana. My understanding the effects that are
16     produced and the times over which those effects are
17     produced.
18        I think the numbers that are in the report and the
19     numbers that are produced in the report are
20     reflective. Generally, of a broad range of times over
21     which the exposure may have occurred.
22        They certainly show, or corroborate my assertion
23     that the exposure was relatively recent prior to the time
24     of death. But the analytical results themselves alone
25     reflect that as well without use of the models at all.

---

### Page 73

1  Q.  So, really it would be inappropriate to use these Dr.
2      Huestis models?
3  A.  No. I think -- I think using them is appropriate. I
4      think relying on them as a sole source of information
5      might not be the best practice, but I don't think we are
6      doing that here. I think we are looking at everything
7      related to the case and as I said, obviously that the
8      distribution of materials alone, the analytical results
9      clearly reflect in my opinion approximate exposure to the
10     drug.
11 Q.  Okay --
12 A.  -- And an exposure consistent with near the time of peak
13     effects.
14 Q.  Okay. Let's talk about the models and Dr. Huestis
15     articles. You would agree that you're using this article
16     on Footnote 9. That article in Footnote 9 does not
17     support your using the test on John Britt's blood which
18     was postmortem blood. That article does not support that.
19
20 A.  I don't know exactly what you are referring to. Can you
21     give me more information, please?
22 Q.  All right. See this right here where she says; (READING.)
23     The authors do not advocate using the models with
24     postmortem blood concentrations.
25 A.  That's what that says. They don't advocate it but they

---

**Landria Britt, et al. v. USA Truck, Inc., et al.**
**Dr. Andrew Mason**

2:06cv868-ID-CSC
10/26/2007

29 (Pages 110 to 113)

## Page 110

1   countries and received acceptability by many other authors
2   and many other jurisdictions. And it seems a general tool
3   that can be used. Is it a definitive tool? No.
4        The answer is there is no single thing that is
5   definitive. The answer is that it is a tool that can be
6   applied to the problem to provide information.
7        I'm not relying solely on that for my information.
8   I am also relying on my knowledge of the pharmacology of
9   the materials, the concentrations that are involved. All
10  of that information comes to -- if that were the only
11  thing I considered, yes. It would be an issue. It's not
12  the only thing I considered. I don't consider it to be an
13  issue.
14  Q.   Okay. But I am just talking about the models themselves.
15       And their -- to make sure we are clear on this. There's
16       nothing that you can refer me to in this deposition today
17       with regard to these articles that says it's appropriate
18       or recommended to use the models with postmortem blood?
19       Would that -- would that be correct?
20  A.   The answer is no. Not sitting here at this moment. I am
21       going to go back and look at those papers again and
22       consider my opinion on that question.
23  Q.   Okay. And I want to -- also, the Giroud article, and I am
24       probably really butchering that mans name, but it is
25       mentioned in one of Dr. Huestis' articles that is Footnote

## Page 111

1   9, it is mentioned in there, and she is talking about the
2   models in there, and it also says not recommended for
3   postmortem blood.
4        All right now. Take me through -- you've got some
5   more stuff from -- excuse me, I didn't mean stuff. You've
6   got some more documents from NMS after you did your
7   opinion letter. And that's in Exhibit 2B. And what is it
8   in there that had any significance, either by way of
9   confirming or making you re-think or re-look at any of
10  your opinions?
11  A.   Nothing.
12  Q.   Okay. Is there anything in Exhibit 2B that is of any
13       significance with regard to your opinions and conclusions?
14
15  A.   Only one thing.
16  Q.   What is it?
17  A.   In reviewing the documents that National Medical Services
18       provided, I found out that the analytical tests that was
19       done for THC and THC Carboxylic was not only performed
20       once, but it was performed twice.
21  Q.   Okay. Show me that document so we can mark it as a sub --
22       if you have it available there.
23  A.   Well, I can tell you its on page 180.
24  Q.   180?
25  A.   Well --

## Page 112

1   Q.   Okay.
2   A.   The reason why the test was done is on page 180.
3   Q.   The reason it was done twice?
4   A.   The reason why it was done a second time.
5   Q.   Okay.
6   A.   Correct.
7   Q.   Why was it done a second time?
8   A.   Because the analyst questioned the results because the THC
9        concentration was so high with regard to the THC
10       Carboxylic.
11  Q.   Why --
12  A.   -- It was that unusual that she question -- she questioned
13       it. I don't know if it was male or female.
14  Q.   Do you have that document that we can -- because I will be
15       looking for it later.
16  A.   Page 180.
17  A.   Are those numbered some where?
18  A.   They are.
19  Q.   All right.
20  A.   I don't know what that's doing in there.
21  Q.   There's 180.
22  A.   Yeah.
23  Q.   All right. Explain to me the significance of page 180.
24       Explain it to a lay person.
25  A.   Sure. What it says is -- okay, we've got the results on

## Page 113

1   this test. I want you to go ahead -- let me see if I can
2   show you --
3   Q.   (INDICATES AFFIRMATIVE.)
4   A.   That's the analite Delta 9 THC, that's the test code.
5        That's the test that was performed. This RS I believe is
6        re-sample 1.0 ml to confirm THC = 7.01 > THC Carboxylic
7        Acid.
8   Q.   Okay. THCC?
9   A.   Correct.
10  Q.   Okay.
11  A.   Initials and date.
12  Q.   All right. The initials MMS, that's the technician?
13  A.   It would either be the technician that performed the test,
14       or the person who reviewed it.
15  Q.   All right. And what's the significance of that -- what
16       you just read?
17  A.   Again, what the analyst is questioning here is why is the
18       THC concentration greater than the THCC?
19  Q.   Okay.
20  A.   That's a very unusual finding.
21  Q.   Okay.
22  A.   Its very rare that you find that distribution.
23  Q.   What could be some reasons for having a reading like that?
24
25  A.   Proximity to the time of use.

**REPORTED BY: Amy Chawne Holsclaw**
**High Country Court Reporting, 585 D West King Street, Boone, NC 28607 (828) 262-3603**

**Landria Britt, et al. v. USA Truck, Inc., et al.**   2:06cv868-ID-CSC
**Dr. Andrew Mason**   10/26/2007

**32 (Pages 122 to 125)**

| Page 122 |
|---|

1  A.  Don't know.
2  Q.  Okay.
3  A.  It would be most consistent with administration per the
4      oral route.
5  Q.  Okay.
6  A.  When you find it, because --
7  Q.  -- Like in brownies or something?
8  A.  Correct.
9  Q.  Well --
10 A.  Unfortunately, I have seen cases like that.  But the
11     answer is that -- that when you find -- in cases of oral
12     ingestion, 11 Hydroxy THC concentration usually are equal
13     or maybe even greater than THC concentrations in broader
14     plasma.  Okay?
15         So -- because the body handles it in a different
16     manner.  You have to realize that when you smoke it --
17     when you smoke marijuana, the THC goes directly in the
18     lungs and is distributed throughout the body, without the
19     filter -- the physiologic filter produced by the liver.
20     Whereas, of course, in cases of oral ingestion.  The way
21     it works is it goes into the stomach, it goes into the
22     small intestines and is absorbed; those drugs go via the
23     portal vein directly to the liver.
24         The liver is the organ in the body that is primarily
25     responsible for breaking down drugs.  You get what's

| Page 123 |
|---|

1      called a first pass effect, i.e. first the drugs pass
2      though the liver, so, you find differences in metabolic
3      patterns whether the drug is absorbed through the lungs,
4      or whether it's absorbed in the gastrointestinal system.
5  Q.  If this Delta 9 Carboxy THC -- the one we called THC
6      Carboxy Acid on Exhibit 4, that's the same thing as on
7      page two of five in this center right here?
8  A.  Correct.
9  Q.  Okay.  If that had been below 5 nanograms per milliliter,
10     then it would have shown over here none detected.  Is that
11     right?
12 A.  Potentially, yes.
13 Q.  What --
14 A.  -- It depends. --
15 Q.  -- Excuse me? --
16 A.  -- it depends --
17 Q.  Excuse me.  Go ahead.
18 A.  It depends on how the standard operating procedure reads.
19 Q.  All right.
20 A.  They could have reported as none detected.  It may be
21     liable under some circumstances to report it is present or
22     trace.
23 Q.  Okay.
24 A.  Et cetera.
25 Q.  Now, this doesn't show -- and by this, I mean the Carboxy

| Page 124 |
|---|

1      Acid, THC -- is not showing higher than the THC.  I
2      thought you said a while ago their was one of these that
3      was unusual?
4  A.  Yeah.  The THC is high.
5  Q.  High?
6  A.  Higher.
7  Q.  And so you think the THC -- or in a lot of cases you've
8      seen, the THC limit is less than the Carboxy Acid?
9  A.  No.  The concentration detected is a lot less than the
10     acid commonly, because you are looking way far out in the
11     distribution -- in the distribution involved.  You want
12     give me a blank piece of paper here and I will be happy to
13     illustrate -- I will just draw a very simple concentration
14     time profile for these drugs.  Serum, plasma and blood.  I
15     have concentration, increasing on the vertical line.  I
16     have time, increasing on the right of the horizontal axis.
17
18 Q.  Okay.
19 A.  You let somebody start smoking at time zero, okay, and
20     their concentration of THC increases very, very quickly.
21     Even, in fact, peak time begins to decline even before
22     they stop smoking.
23         Remember I talked about that titration effect?  They
24     modify their smoking behavior once they've achieved a
25     level of -- the level effect, the degree of effect, the

| Page 125 |
|---|

1      type of effect they wish to receive.  Okay.  They wish to
2      produce.
3         In any case, the concentration of THC declines very,
4      very rapidly.  And then, once it gets distributed out of
5      the vascular compartment, the blood, into the organs in
6      the body, the concentration -- the slope changes, and you
7      find that it actually -- it's a curve.  You find it
8      declines and approaches zero at long time periods.
9  Q.  Okay.
10 A.  Okay?
11 Q.  That's the THC level?
12 A.  That's THC.
13 Q.  THC?
14 A.  Correct.
15 Q.  Okay.
16 A.  THC Carboxylic acid.  This is a person who has no residual
17     THCC.  No THC Carboxylic acid.  Again, we'll start at
18     zero.  Okay.  And we'll decline -- pardon me -- we'll
19     increase slowly -- never reaches as high as THC, and this
20     of course indicates that somebody who is smoking, and
21     tends to look something like this.
22 Q.  Okay.
23 A.  Normally, when you get an individual blood in a forensic
24     situation, you're out here.  The normal pattern you see is
25     a THCC concentration is much higher than THC.  It's very