**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **LANDRIA BRITT, as** | ) | |
| **ADMINISTRATRIX of the** | ) | |
| **ESTATE OF JOHN W. BRITT,** | ) | |
| **deceased,** | ) | **Case No. 2:06cv868-ID-CSC** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **U S A TRUCK, Inc.; THEODORE** | ) | |
| **LEVERNE JOHNSON; et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

**DEFENDANTS' THIRD MOTION IN LIMINE
(JOHNSON'S POST-ACCIDENT DRUG TEST)**

---

COME NOW the Defendants, **Theodore L. Johnson** and **USA Truck, Inc.**, (hereinafter "Defendants"), and move this Court, in limine, for an Order precluding any evidence and/or improper remarks relating to the post-accident drug test of Theodore Johnson.  In support thereof, the Defendants' state as follows:

### I.  STATEMENT OF FACTS

1.  As indicated by the Plaintiff's recent Court filings (see Doc. No. 68 and the exhibits thereto), the Defendants anticipate that the Plaintiff will attempt to offer

at trial evidence relating to Defendant Theodore Johnson's post-accident urine drug test, which allegedly was "positive" for marijuana.

2.    It is undisputed that said test was a test of a sample of Mr. Johnson's urine and not of his blood.

3.    Unlike Mr. Johnson's drug test, the post-accident drug test of the Plaintiff's decedent, John W. Britt, involved a sample his blood. Mr. Britt's post-accident blood test was "positive" for marijuana. [See Report of National Medical Services Inc., attached hereto as Exhibit 1].

4.    As discussed in the deposition of the Defendants' expert toxicologist, Dr. Andrew Mason, the difference between a urine test and a blood test is significant. Dr. Mason testified as follows:

> Q.    Do you agree with this, that Dr. Heustis says; (READING.) The law and elimination half-life of cannaboids makes a relationship between a positive urine test and accident risk difficult to determine. Do you agree with that statement?
>
> A.    Of course.
>
> Q.    Okay.
>
> A.    All I can say is that – that again, no definitive determination was made. You don't have the concentration. The positive finding in urine is consistent in the positive findings in the blood. It, to some degree, corroborates that, but it's not definitive.

2

And in any case, the concentrations in the urine are
generally not for a positive findings in urine are generally not held to be relate

[See Deposition of Dr. Andrew Mason, p. 90, a copy of which is attached hereto as

Exhibit 2].

5.    In his deposition, Defendant Johnson admitted to having consumed some

marijuana the evening of Saturday, February 18, 2006, which was approximately 48

hours prior to the subject accident. [See Deposition of Theodore Johnson, pp. 124-126,

a copy of which is attached hereto as Exhibit 3].  As a result, Mr. Johnson "knew [his]

urine was dirty" and was not surprised by the results of the post-accident test. [Ex. 3,

pp. 128-129].  However, Mr. Johnson was not driving a tractor-trailer at the time he

consumed the marijuana, and he did not begin driving until the following day. [Ex. 3,

p. 130].

6.    The Plaintiff has produced absolutely no evidence–whether by expert or

otherwise--that Mr. Johnson was impaired by marijuana at the time of the subject

accident.

7.    The subject accident was investigated by Corporal T.A. Bradley of the

Montgomery Police Department, who conducted an extensive interrogation of

Defendant Johnson on the night of the subject accident.   Regarding Defendant

Johnson's possible impairment (or lack thereof), Corporal Bradley testified as follows:

Q.    Did he [Johnson] appear to you, while speaking to him for an hour and a half, to be intoxicated in any way?

A.    No.

Q.    Did you, in speaking with Mr. Johnson from being on the scene, at any point in during the course of your investigation find any evidence that he was intoxicated, under the influence of drugs or alcohol at the time of the accident?

A.    No.

[See Deposition of Corporal T.A. Bradley, p. 60, a copy of which is attached hereto as Exhibit 4].

## II. ARGUMENT

### A.    ALL EVIDENCE RELATED TO THEODORE JOHNSON'S POST-ACCIDENT DRUG TEST IS DUE TO BE EXCLUDED FROM TRIAL BECAUSE A URINE-BASED TEST IS INSUFFICIENT EVIDENCE TO ESTABLISH IMPAIRMENT.

The only legitimate reason for the Plaintiff to offer evidence of Theodore Johnson's post-accident urine drug test would be to establish that Mr. Johnson was "impaired" by marijuana at the time of the subject accident.  This, however, is an inappropriate use of the test, as numerous federal courts have recognized that a urinalysis test, standing alone, does not measure impairment or intoxication from marijuana use.  See National Fed'n of Fed. Employees v. Cheney, 280 U.S. App. D.C.

164 (D.C. Cir. 1989); <u>Railway Labor Executives' Association v. Burnley</u>, 839 F.2d

575, 588 (9th Cir. 1988) ("tests cannot measure current drug intoxication or degree of

impairment"); <u>Jones v. McKenzie</u>, 833 F.2d 335, 339 (D.C. Cir. 1987) (trial court

found, and defendant conceded, tests did not show whether user is under influence at

time of test); <u>Schaill v. Tippecanoe County School Corp.</u>, 679 F. Supp. 833, 857 (N.D.

Ind. 1988) (witnesses testify without contradiction, and court concludes, that "little,

if anything, can be inferred relative to current impairment" from urinalysis testing);

<u>National Fed'n of Fed. Employees v. Cheney</u>, 884 F.2d 603, 609 (D.C. Cir. 1989)

("[A] single positive urine test result is silent as to when or how much of the drug was

taken, the pattern of the employee's drug use, or whether the employee was intoxicated

when the test was given"); and <u>Taylor v. O'Grady</u>, 669 F. Supp. 1422, 1431 (N.D. Ill.

1987) (no relationship between the positive urine test and impairment at the time of

testing).

     In <u>Harmon v. Meese</u>, the District of Columbia Court found that urinalysis does

not measure current impairment. 690 F. Supp. 65, 69 (D.D.C. 1988).  In <u>Harmon</u>, the

Court found that there was not a substantial nexus between the proposed random

urinalysis testing and fitness for the duty of the Department of Justice employees

because **urinalysis does not measure current impairment**. <u>Id.</u>  "Thus, the fact that

an employee tests positive does not necessarily indicate on-the-job impairment, very

recent drug use, or habitual drug use." <u>National Treasury Employees Union v.</u> <u>Yeutter</u>, 287 U.S. App. D.C. 28 (D.C. Cir. 1990).

It is commonly understood that the metabolites of marijuana may appear in a person's urine long after the effects/impairment of the drug have disappeared. In <u>Nat'l</u> <u>Treasury Employees Union v. Von Raab</u>, 109 S. Ct. 1384, 1396 (U.S. 1989), the United States Supreme Court noted evidence that "the time it takes for particular drugs to become undetectable in urine can vary widely depending on the individual, and may extend for as long as 22 days." In Illinois, a district court recognized that the presence of marijuana metabolites in the urine can be present for long after the impairing period ends. <u>Taylor v. O'Grady</u>, 669 F. Supp. 1422, 1431 (N.D. Ill. 1987). The Seventh Circuit noted that "in chronic marijuana users, cannabinoids may be detected for three weeks or longer" after the impairing effects of the drug cease. <u>United States v.</u> <u>Dawson</u>, 52 F.3d 631, 633 (7th Cir. 1995); <u>see also</u> <u>Anable v. Ford</u>, 663 F. Supp. 149, 153 (W.D. Ark. 1985) ("The utmost that the most precise of urine tests can reveal is that a student has ingested marijuana at some time in the preceding days or weeks.").

Regarding the difference between <u>urine</u> tests (which Defendant Johnson had) and <u>blood</u> tests (which Mr. Britt had), the Supreme Court has noted that <u>blood</u> tests "unquestionably can identify very recent drug use." <u>Skinner v. Ry. Labor Executives'</u>

Ass'n, 109 S. Ct. 1402, 1421 (U.S. 1989)(citing 49 Fed. Reg. 24291 (1984))[1].  Thus, while a blood test may be competent evidence for proving a person's impairment, a urine test is not.

It is undisputed that, following the subject accident, Theodore Johnson underwent only a urine test–not a blood test.  The fact that the urine test was "positive" for marijuana is entirely consistent with Mr. Johnson's admission to having smoked marijuana approximately 48 hours prior to the accident.  It is not reliable evidence that Mr. Johnson was impaired by marijuana at the time of the accident.  There is no evidence that Mr. Johnson smoked marijuana at or near the time of the accident.  There is no evidence that Mr. Johnson was impaired or intoxicated in any way at the time of the accident.  To the contrary, the uncontroverted testimony of Corporal Bradley of the Montgomery Police Department is that Mr. Johnson was not

---

[1] The section cited by the Skinner Court involved a rulemaking regarding the post-accident alcohol and drug testing of railroad workers.  Regarding the "samples" that could possibly be used for such testing, the section states:

> Breath testing is useful only with respect to the detection of alcohol and, accordingly, does not appear to be the most productive method for these purposes. Blood is the only available body fluid that can be drawn from the living subject that can provide a clear indication not only of the presence of alcohol and drugs but also their current impairment effects. Accordingly, FRA proposes to place primary reliance on analysis of blood samples. Urine is not an adequate substitute for blood for present purposes, since the quantity of a drug or drug metabolite in the urine does not necessarily correlate with the quantity of the substance in the blood at any given time.

49 Fed. Reg. 24291 (1984).

intoxicated or under the influence of any substance at the time of the accident. Considering that Corporal Bradley observed Mr. Johnson shortly after the accident and interrogated him for an hour-and-a-half, his observations of Mr. Johnson's condition should be given particular weight.

Simply put, impairment cannot be proven by urine alone, and urine is all that the Plaintiff has. Without evidence that Mr. Johnson was actually <u>impaired</u> by marijuana at the time of the accident, the post-accident urine test has no bearing on the central issue in the case, *i.e.*, whether or not the subject accident was caused by Mr. Johnson's negligent and/or wanton driving. Accordingly, all evidence relating to the post-accident test of Mr. Johnson is due to be excluded from trial on the following grounds:

a. The evidence is irrelevant to the issues to be tried and is therefore due to be excluded under Rules 401 and 402 of the Federal Rules of Evidence.

b. Even if relevant, the evidence is so inflammatory that its minimal probative value is substantially outweighed by the danger of unfair prejudice to the Defendants, requiring exclusion under Rule Fed. R. Evid. 403.

c.   Such evidence would be improper character evidence of other crimes, wrongs, or acts offered to show action in conformity therewith. Fed. R. Evid. 404(b).

### III. CONCLUSION

WHEREFORE, premises considered, the Defendants respectfully move this Court to exercise its inherent power over the conduct of trials and order Plaintiff, his attorneys, and every one of his witnesses not to mention the above-described evidence during the course of the trial, including but not limited to, *voir dire* questioning of the venire, opening statement, questioning of witnesses, testimony, closing argument or remarks of any kind, without first securing the prior permission of the Court.

Respectfully submitted,

s/ Lea Richmond, IV
Thomas L. Oliver, II (ASB-3153-r53t)
Lea Richmond, IV (ASB-8479-l74r)
Attorneys for Defendants

**OF COUNSEL:**

**CARR ALLISON**
100 Vestavia Parkway
Birmingham, Alabama 35216
Telephone: (205) 822-2006
Facsimile: (205) 822-2057

## <u>CERTIFICATE OF SERVICE</u>

I do hereby Certify that on the 7th day of January, 2008, a true and correct copy of the foregoing has been furnished by electronic mail using the CM/ECF system which will send notification of such filing to the following:

Kenneth J. Mendelsohn, Esq.
**JEMISON, MENDELSOHN & JAMES**
1772 Platt Place
Post Office Box 241566
Montgomery, Alabama 36124

David E. Allred, Esq.
**Law Offices of David E. Allred**
Post Office Box 241594
Montgomery, AL 36124-1594

s/ Lea Richmond, IV
**OF COUNSEL**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LANDRIA BRITT, as                )
ADMINISTRATRIX of the            )
ESTATE OF JOHN W. BRITT,         )
deceased,                        )        Case No. 2:06cv868-ID-CSC
                                 )
              Plaintiff,         )
                                 )
v.                               )
                                 )
U S A TRUCK, Inc.; THEODORE      )
LEVERNE JOHNSON; et al.,         )
                                 )
              Defendants.        )

---

DEFENDANTS' THIRD MOTION IN LIMINE
(JOHNSON'S POST-ACCIDENT DRUG TEST)
EXHIBIT ONE

---

1

**National Medical Services Inc.**

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

**CONFIDENTIAL**

## Toxicology Report

**Report Issued** 03/03/2006 10:00

**Patient Name** BRITT,JOHN W.
**Patient ID** 06MM00269
**Chain** 10581674
**Age** 44 Y      **Gender** M

10235
Montgomery Medical Examiners Office
Attn: Ordering Pathologist
P.O. Box 240591
Montgomery, AL 36124

**Workorder** 06393988

**Received** 2/24/2006

This analysis was performed under chain of custody. The chain of custody documentation is on file at
National Medical Services.
Unless alternate arrangements are made by you, the remainder of the submitted specimens will be
discarded six (6) weeks from the date of this report; and generated data will be discarded five (5)
years from the date of this report.

---

**Lab Sample ID: 06393988-001      Patient Name: BRITT,JOHN W.**                      **Matrix: Blood**

| Collect Date/Time | Container Type | Approx Volume/Weight |
|---|---|---|
| 02/22/06 | Gray Top Tube | 6 mL |

Receipt Notes  None Entered

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| Specimen Source: Femoral Blood | | | | |
| **8094B Rapid Tox Panel I, Blood (Forensic)** | | | | |
| Analysis by Enzyme-Linked Immunosorbent Assay (ELISA) | | | | |
| Opiates | None Detected | ng/mL | 20 | |
| Cocaine Metabolites | None Detected | ng/mL | 20 | |
| Benzodiazepines | None Detected | ng/mL | 100 | |
| Cannabinoids | See Comment | ng/mL | 10 | |
| Comment:  This screening result indicates that further testing is required. Refer to the confirmation test for the final result(s). | | | | |
| Amphetamines | None Detected | ng/mL | 20 | |
| Barbiturates | None Detected | mcg/mL | 0.040 | |
| Methadone | None Detected | ng/mL | 25 | |
| Phencyclidine | None Detected | ng/mL | 10 | |





**National Medical Services Inc.**                    CONFIDENTIAL

3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

---

Lab Sample ID: 06393988-001     Patient Name: BRITT, JOHN W.                    Matrix: Blood

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| Propoxyphene | None Detected | ng/mL | 50 | |
| Analysis by Headspace Gas Chromatography (GC) | | | | |
| Ethanol | None Detected | mg/dL | 10 | |
| Synonym(s): Ethyl Alcohol | | | | |
| Methanol | None Detected | mg/dL | 5.0 | |
| Synonym(s): Methyl Alcohol | | | | |
| Isopropanol | None Detected | mg/dL | 1.0 | |
| Synonym(s): Isopropyl Alcohol | | | | |
| Acetone | None Detected | mg/dL | 1.0 | |

**5724B Cannabinoids Quantitation/Confirmation, Blood (Forensic)**

Analysis by Gas Chromatography/Mass Spectrometry (GC/MS)

| | | | | |
|---|---|---|---|---|
| Delta-9 Carboxy THC | 5.3 | ng/mL | 5.0 | |

Synonym(s): Inactive Metabolite

Usual peak levels in Serum for 1.75% or 3.55% THC marijuana cigarettes: 10 - 101 ng/mL about 32 to 240 minutes after beginning smoking, with a slow decline.
Usually not detectable after passive inhalation.

| | | | | |
|---|---|---|---|---|
| 11-Hydroxy Delta-9 THC | None Detected | ng/mL | 5.0 | |

Usual peak levels: Less than 10% of THC levels after smoking.

Analysis by Gas Chromatography/Mass Spectrometry (GC/MS)

| | | | | |
|---|---|---|---|---|
| Delta-9 THC | 6.5 | ng/mL | 1.0 | |

The concentrations in Blood are usually about one-half of Serum/Plasma concentrations.
Usual peak levels in Serum for 1.75% or 3.55% THC marijuana cigarettes:
50 - 270 ng/mL at 6 to 9 minutes after beginning smoking, decreasing to less than 5 ng/mL by 2 hours.
Passive inhalation: Up to 2 ng/mL.



**National Medical Services Inc.**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

**CONFIDENTIAL**

---

Lab Sample ID: 06393988-001      Patient Name: BRITT,JOHN W.                    Matrix: Blood

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|



**National Medical Services Inc.**
3701 Welsh Road, PO Box 433A, Willow Grove, PA 19090-0437
Phone: (215) 657-4900  Fax: (215) 657-2972
e-mail: nms@nmslab.com
Robert A. Middleberg, PhD, DABFT, DABCC, Laboratory Director

**CONFIDENTIAL**

---

**Lab Sample ID: 06393988-004     Patient Name: BRITT, JOHN W.**          **Matrix: Urine**

| Collect Date/Time | Container Type | Approx Volume/Weight |
|---|---|---|
| 02/22/06 | Clear Plastic Container | 30 mL |

Receipt Notes  None Entered

| Analysis and Comments | Result | Units | Reporting Limit | Notes |
|---|---|---|---|---|
| **8094U Rapid Tox Panel I, Urine (Forensic)** | | | | |
| Analysis by Enzyme Immunoassay (EIA) | | | | |
| Opiates | None Detected | ng/mL | 300 | |
| Cocaine/Metabolites | None Detected | ng/mL | 300 | |
| Benzodiazepines | None Detected | ng/mL | 300 | |
| Cannabinoids | Presump Pos | ng/mL | 50 | |
| Comment: This test is an unconfirmed screen. Confirmation by a more definitive technique such as GC/MS is recommended. | | | | |
| Amphetamines | None Detected | ng/mL | 1000 | |
| Barbiturates | None Detected | mcg/mL | 0.30 | |
| Methadone | None Detected | ng/mL | 300 | |
| Phencyclidine | None Detected | ng/mL | 25 | |
| Propoxyphene | None Detected | ng/mL | 300 | |



RECEIVED
MAR 0 3 2006

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LANDRIA BRITT, as )
ADMINISTRATRIX of the )
ESTATE OF JOHN W. BRITT, )
deceased, )               Case No. 2:06cv868-ID-CSC
                          )
        Plaintiff, )
                          )
v. )
                          )
U S A TRUCK, Inc.; THEODORE )
LEVERNE JOHNSON; et al., )
                          )
        Defendants. )

_____

DEFENDANTS' THIRD MOTION IN LIMINE
(JOHNSON'S POST-ACCIDENT DRUG TEST)
EXHIBIT TWO

_____

1

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

CIVIL ACTION NO. 2:06cv868-ID-CSC


LANDRIA BRITT, as Administratrix

of the Estate of JOHN W. BRITT,

Deceased,


             Plaintiff,


      vs.


U S A TRUCK, INC.; THEODORE

LEVERNE JOHNSON, et al.,

          Defendants.


                    DEPOSITION OF

                 DR. ANDREW MASON


9:15      At BOONE, North Carolina

          October 26, 2007

          9:15 A.M.


          Reported by: AMY CHAWNE HOLSCLAW

## Page 90

1   determination of the level of what the THC was?
2   A.  Well, you -- you classically don't.  That's the point.
3   Q.  Do you agree with this, that Dr. Huestis says; (READING.)
4   The law and elimination half life of cannaboids makes a
5   relationship between a positive urine test an accident
6   risk difficult to determine.  Do you agree with that
7   statement?
8   A.  Of course.
9   Q.  Okay.
10  A.  All I can say is that -- that again, no definitive
11  determination was made.  You don't have the concentration.
12  The positive finding in the urine is consistent in the
13  positive findings in the blood.  It, to some degree,
14  corroborates that, but it's not definitive.
15  And in any case, the concentrations in the urine are
16  generally not for a positive findings in urine are
17  generally not held to be related to the presence of
18  impairment.
19  Q.  Do you agree with Dr. Huestis' statement that; (READING.)
20  Although laboratory performance measures in driving
21  behavior have shown alterations following cannabis, few
22  studies, unequivocally linked and increased accident rates
23  with cannabis.  Do you agree with that statement?
24  A.  Its true.
25  Q.  Okay.

## Page 91

1   A.  It goes to the difficulties of epidemiologic studies I've
2   indicated before.
3   Q.  Do you agree with Dr. Huestis' statement that; (READING.)
4   Also, tasks that are well practiced, such as driving, tend
5   to be more resistant to drug effects.  Do you agree with
6   that statement?
7   A.  Absolutely true.
8   Q.  Dr. Huestis did some -- apparently did some tests with a
9   driving on a open or closed course, and with a flight
10  simulator in one of the articles that you relied on.
11  A.  I don't know if she did them, but --
12  Q.  -- Well, somebody did.
13  A.  -- Well --
14  Q.  -- Because she mentioned --
15  A.  -- Sure.  Those studies have been done.
16  Q.  And she says that she's got a table in there, and she
17  says; (READING.)  The degree of performance impairment
18  observed in driving simulator task an open and closed
19  driving courses following cannabis is not consistent
20  between the studies.  Do you agree with that?
21  A.  Yeah.  And that goes particularly to the way that an
22  individual study is designed.  Which has a big impact on
23  the results.  And obviously after realizing you're looking
24  at numerous studies across the board, that different
25  investigators don't automatically conduct their studies in

## Page 92

1   the exact same way.  Use the same criteria, use different
2   tasks that may vary in complexity, in difficulty.  T
3   The point being that positivity in a test that
4   relates to impairment is much easier to produce in a task
5   that is quite difficult.  Even the most sensitive test of
6   the criteria than it is in a test that is necessarily
7   easier.
8   Q.  You couldn't take a -- take her findings that she's cited
9   on this table for you in the article to support the
10  proposition that marijuana always causes impairment to
11  drivers?  It -- It would not support that concept, would
12  it?
13  A.  I -- I think you would have to go back, go back and look
14  at the individual studies.  My opinion is --
15  Q.  I'm talking about table three.
16  A.  I --
17  Q.  The one that she cites here.
18  A.  I would have to look at table three.  My opinion is that
19  marijuana is an impairing substance, and produces
20  characteristic effects that are dangerous for drivers.
21  Q.  My question is with regard to the one test here that I
22  read you, the sentence; (READING.)  That the degree of
23  performance impaired observed in driving simulator test,
24  open and closed driving courses following cannabis is not
25  consistent between studies.  You couldn't take that one

## Page 93

1   table there and say okay, this means if you have THC
2   present in your system, you're impaired.
3   A.  Well, you know, I agree.  You don't rely on any one thing.
4
5   Q.  All right.  Do you agree with Dr. Huestis cites in her
6   article that you relied on, it says; (READING.)  In a 1986
7   review of seven driving simulators performance studies,
8   and six on road driving performance studies, Smiley, and
9   he's an author.  Are you familiar with Smiley?
10  A.  I've read his papers.
11  Q.  Okay.  (READING.)  Concluded that after cannabis, drivers
12  tend to reduce speed, are less likely to pass, and
13  increased their following distance in an attempt to
14  compensate for their perceived impairment.  Do you -- do
15  you agree with that statement?
16  A.  I certainly do.  They can do all of those things.
17  Q.  Do you also agree that their, meaning after cannabis
18  drivers, their comprehension of potential impairment and
19  added concentration could have accounted for the
20  improvement in driving performance observed in some
21  subjects in low dose cannabis studies.  Cannabis -- well,
22  first of all, do you agree with that statement?
23  A.  I do.  Under certain circumstances, especially when
24  drivers know that they are being examined, they can modify
25  their -- their attention and their concentration on the

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LANDRIA BRITT, as              )
ADMINISTRATRIX of the          )
ESTATE OF JOHN W. BRITT,       )
deceased,                      )        Case No. 2:06cv868-ID-CSC
                               )
                Plaintiff,     )
                               )
v.                             )
                               )
U S A TRUCK, Inc.; THEODORE    )
LEVERNE JOHNSON; et al.,       )
                               )
                Defendants.    )

---

**DEFENDANTS' THIRD MOTION IN LIMINE
(JOHNSON'S POST-ACCIDENT DRUG TEST)
EXHIBIT THREE**

---

1



**WILCOX & FETZER LTD.**

In the Matter Of:

# Britt

v.

# USA Truck, Inc.; Theodore Leverne Johnson, et al.

C.A. # 06-cv-868-ID-CSC

———————————

Transcript of:

Theodore Leverne Johnson

November 3, 2007

———————————

Wilcox and Fetzer, Ltd.
Phone: 302-655-0477
Fax: 302-655-0497
Email: depos@wilfet.com
Internet: www.wilfet.com

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

---

**122**

1    Q.  But it was a person from USA?
2    A.  Right.
3    Q.  Where were you when you received the call?
4    A.  I was in, I think -- was I in the hotel?  No, I
5    was -- I received it on my cell phone, I think, yeah.
6    Q.  Same cell phone you'd had all along?
7    A.  Yeah, right.
8    Q.  All right.  Had you had anything done to the
9    cell phone?
10   A.  Like what?
11   Q.  Anything repaired on it or anything like that?
12   A.  No.
13   Q.  All right.  So you got a call on your cell
14   phone.
15   A.  Right.
16   Q.  By the way, how long did you have that same
17   cell phone?
18   A.  Not that long.  Not that long after the fact,
19   the accident.
20   Q.  On February the 20th when the wreck happened,
21   how long had you had that cell phone?
22   A.  On February 20th?
23   Q.  Right.
24   A.  I had it the whole day.

---

**123**

1    Q.  How long had you had it before that day?
2    A.  Oh, before.  Oh, I don't remember.  Probably
3    like, I don't remember.
4    Q.  Long time?
5    A.  Yeah.
6    Q.  All right.  Did you ever have any trouble with
7    it?
8    A.  Yeah.
9    Q.  All right.  But a few days after the drug test,
10   you get a call on your cell phone number?
11   A.  Right.
12   Q.  Correct?  And that was the number you had given
13   USA Truck; is that right?
14   A.  Right.
15   Q.  And somebody from USA Truck called you about
16   the marijuana test?
17   A.  Right.
18   Q.  What did they say to you and what did you say
19   to them?
20   A.  I don't remember.  I just know I got a positive
21   result, that's all I remember.
22   Q.  All right.  Did you ever contest that result to
23   say no, that's not correct?
24   A.  No.

---

**124**

1    Q.  All right.  Did you get a call from anybody
2    from the testing lab, somebody outside USA called you
3    about the marijuana test?
4    A.  Not to my knowledge, no.
5    Q.  Did not?  All right.  This person with USA
6    Truck, then he calls you a few days after the test,
7    and he says you had a positive marijuana test.
8    A.  Right.
9    Q.  And did he say anything else to you?
10   A.  Not that I can remember.  That's the only
11   pretty much thing I remember.
12   Q.  All right.  But you never contested it, and you
13   agree this result that's shown on 964, that's valid
14   and that's correct?
15   A.  Right.
16   Q.  Weren't you fired from USA Truck for using
17   marijuana?
18   A.  Yes.  I guess that had something to do with it.
19   Q.  All right.  And didn't you tell Officer Gann
20   and Officer Bradley at the Montgomery Police
21   Department that you smoked marijuana?
22   A.  Right, I told --
23   Q.  And you told -- I'm sorry, go ahead.
24   A.  I told them I smoked it that weekend --

---

**125**

1    Q.  All right.
2    A.  -- before the accident.
3    Q.  All right.  Well, that's the reason your test
4    turned up positive.
5    A.  Right.
6    Q.  Because you had actually smoked.
7        MR. RICHMOND:  Object to the form.
8    Q.  And you knew you had, right?
9    A.  Yeah, right, I guess.
10   Q.  And you smoked marijuana the Saturday night
11   before John Britt was killed, and you also drank some
12   beer along with it and you drank some hard liquor,
13   didn't you?
14   A.  Right.
15   Q.  And then the next day you got in USA's truck
16   and you started driving their truck on this Amsterdam
17   to Houston load, didn't you?
18   A.  Right -- no, not the next day.  It was --
19   Q.  Sunday?
20   A.  I guess it was like a 24-hour period, pretty
21   much, yeah, Sunday.
22   Q.  You started driving on a Sunday.
23   A.  Yeah, almost --
24   Q.  Which would be the next day after Saturday?

---

32 (Pages 122 to 125)

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

| | 126 |
|---|---|
| 1 | A. Yeah, right, right, right, right, right. |
| 2 | Q. And Saturday is when you smoked the dope, |
| 3 | right? |
| 4 | A. Yeah, Saturday night, yeah, Saturday night, |
| 5 | yeah. |
| 6 | Q. All right. And that Saturday when you smoked |
| 7 | that dope, that wasn't the first time you had ever |
| 8 | smoked, was it? |
| 9 | A. No, no. |
| 10 | Q. As a matter of fact, you had had that positive |
| 11 | test back in the end of '02, early '03, right? |
| 12 | A. Right. |
| 13 | Q. Okay. Now, on your marijuana test, on 964, it |
| 14 | also has something on there that says "positive |
| 15 | dilute." Let me show you that. You see that right |
| 16 | there? Wait a minute, I'm looking at it upside down. |
| 17 | "Positive dilute." You see that on 964? |
| 18 | A. Right. |
| 19 | Q. Okay. Now, when you were in there giving that |
| 20 | urine sample by yourself, did you put some tap water |
| 21 | in there to see if you could get your test down to see |
| 22 | if you could pass your test? |
| 23 | A. No, I drink water, as you can see. No. I'm |
| 24 | not going to sit up here and say that, I mean. |

| | 127 |
|---|---|
| 1 | Q. You didn't put any water in that, you didn't |
| 2 | add any water and dilute the sample, did you? |
| 3 | A. I mean if I did, I don't remember, you know |
| 4 | what I mean? |
| 5 | Q. All right. Might you have done that and you |
| 6 | just don't remember today? |
| 7 | A. I wouldn't say that. I just don't remember. I |
| 8 | mean who doesn't drink water? |
| 9 | Q. Well, you knew when you were giving the sample, |
| 10 | you knew you had been smoking Saturday night. You |
| 11 | knew that. |
| 12 | A. Right, right. |
| 13 | Q. And obviously you knew John Britt had been |
| 14 | killed. You knew that? |
| 15 | A. Right. |
| 16 | Q. And you knew there could be some criminal |
| 17 | trouble coming out of that. You knew that, didn't |
| 18 | you? |
| 19 | A. Right. My mouth still get dried up. |
| 20 | Q. Beg pardon? |
| 21 | A. I said my mouth still gets dried up. |
| 22 | Q. Okay, so you're saying this dilute, where the |
| 23 | lab determines that your urine sample was diluted, |
| 24 | that's not because you diluted it with tap water or |

| | 128 |
|---|---|
| 1 | anything else, it's why now? |
| 2 | A. It's what? You said -- |
| 3 | Q. Why did you say it showed up diluted? Dilute? |
| 4 | A. I don't know, I guess because I have water or |
| 5 | whatever. Water, soda or whatever in my system, I |
| 6 | guess. I don't know. I'm not for sure. |
| 7 | Q. So you just figure it's because you were |
| 8 | drinking a lot of liquids that morning? |
| 9 | A. Probably that whole period in time. I drink a |
| 10 | lot of fluid. I always kept water in my truck. |
| 11 | Q. All right. But you're sure when you're in |
| 12 | there by yourself giving that urine sample you didn't |
| 13 | put any water in, you didn't add any water to it? |
| 14 | A. Oh, no, I didn't do nothing like that. |
| 15 | Q. All right. Were you concerned when you were |
| 16 | giving that sample that what was going in that |
| 17 | specimen might get you indicted for John Britt's |
| 18 | death? |
| 19 | A. Not really. I mean I knew, I already knew my |
| 20 | urine was dirty, so you know what I mean. I didn't |
| 21 | really think nothing of it, you know what I mean. |
| 22 | Q. When you were in there giving that sample, you |
| 23 | knew that what was going in that specimen cup was |
| 24 | going to be a dirty sample, as you say, it was going |

| | 129 |
|---|---|
| 1 | to show marijuana? |
| 2 | A. Oh, yeah, I knew that. |
| 3 | Q. All right. Was there a lavatory with a faucet |
| 4 | in that bathroom? |
| 5 | A. I don't remember. I just remember using -- |
| 6 | Q. Were you in a bathroom, in a restroom? |
| 7 | A. Right, right, right. |
| 8 | Q. Okay. Be unusual if it didn't have a place to |
| 9 | wash your hands in there, wouldn't it? |
| 10 | A. Right. |
| 11 | Q. Have you ever learned or do you know what your |
| 12 | level of marijuana actually was that Tuesday morning? |
| 13 | A. No. |
| 14 | Q. And then it says 50 nanograms per milliliter, |
| 15 | that's just, that's just the cutoff. That's where |
| 16 | they start -- that's the threshold, that's where they |
| 17 | start gauging it. But you don't know what level it |
| 18 | was above that; is that correct? |
| 19 | A. No. |
| 20 | Q. All right. When you smoke that marijuana, how |
| 21 | does it make you feel? |
| 22 | A. I don't know, I couldn't tell you. |
| 23 | Q. All right. Why do you smoke it? Does it relax |
| 24 | you? Make you feel good? |

33 (Pages 126 to 129)

Britt v. USA Truck, Inc.; Theodore Leverne Johnson, et al.
Theodore L. Johnson

---

130

1    A.  No.  I mean, I don't know.
2    Q.  You don't know?
3    A.  Uh-uh.
4    Q.  Let me ask you this question:  Would it be a
5    dangerous activity in your opinion to drive a
6    tractor-trailer truck if you'd been smoking marijuana?
7        MR. OLIVER:  Object to the form.
8    A.  I would say, I would say so, but I mean I
9    wasn't driving a tractor-trailer at the time.
10   Q.  All right.  You weren't driving Saturday night?
11   A.  Right.
12   Q.  Okay.  You drove it the next day.
13   A.  Right.
14   Q.  In your best judgment, before that Saturday
15   night when you smoked, when was the last time you had
16   smoked before that night?
17   A.  Before that night?
18   Q.  Right.
19   A.  I don't remember.  Probably about, I'm
20   guessing, I don't remember.  I'm guessing, how you all
21   tell it, 2000 and whatever, you know what I mean,
22   2002, whatever you all got on information.
23   Q.  Well, that's just the last time you got caught.
24   I'm talking about when is the last time you smoked?

---

131

1    A.  Oh, I don't remember.  I don't remember.
2    Q.  Okay.  Would you smoke kind of just at home, as
3    I understand what you told the police --
4    A.  Right.
5    Q.  You just smoke when you come in at home, and
6    you went home about every other week; is that right?
7    A.  Yeah.
8    Q.  Okay.  All right, now tell me, you go to the
9    medical place and you give the urine sample that
10   Tuesday morning, and then what did you do?
11   A.  What, hold on.  Repeat the question?
12   Q.  Okay.  I want to pick up, kind of changing
13   gears here.  That Tuesday morning a fellow from USA
14   Truck picks you up, takes you out there to American
15   Family Care on Marty Lane in Montgomery.
16   A.  Um-hum.
17   Q.  You go in a room by yourself, you give a urine
18   sample.
19   A.  Right.
20   Q.  Then you leave American Family Care.
21   A.  Right.
22   Q.  How did you leave there?
23   A.  The same --
24   Q.  Riding with him?

---

132

1    A.  Yeah, same way, yeah.
2    Q.  Where did you go?
3    A.  To a hotel.
4    Q.  To the Motel 6?
5    A.  Right.
6    Q.  What did you do?
7    A.  Pretty much fell back for the rest of the day.
8    Q.  What do you say?  Fell back?
9    A.  Pretty much laid, I mean stopped, I mean
10   like -- how can I explain it?  Like just watch TV or
11   whatever, you know what I mean.
12   Q.  Okay, so you watch much TV at the Motel 6.
13   A.  Yeah, right.
14   Q.  Was there a phone in the room?
15   A.  Right.
16   Q.  Did you have your cell phone with you?
17   A.  Right.
18   Q.  Was it working?
19   A.  Right.
20   Q.  All right.  Then that would have been Tuesday.
21   Did you do anything else Tuesday with the USA Truck
22   people?
23   A.  To the best of my knowledge, no -- oh, yeah,
24   yeah, yeah, went to the, back to the, to the accident,

---

133

1    the crime scene, whatever you want to call it.
2    Q.  Went back out to the crime scene?
3    A.  Yeah, if that's what you want to call it.
4    Q.  All right.  And when you got there, what time
5    of the day or night was it?
6    A.  I don't remember.
7    Q.  Okay.  How did you get from the Motel 6 back
8    out to the crime scene?
9    A.  I think it was the same guy, yeah, same, yeah,
10   same guy with the Impala.
11   Q.  I'm sorry, same fellow?
12   A.  Yeah.
13   Q.  In the Chevrolet Impala?
14   A.  Yeah, to the best of my knowledge.
15   Q.  Okay.  When you got back out there, what time
16   do you think it was?
17   A.  I don't remember.
18   Q.  Still daylight?
19   A.  Yeah, daylight.
20   Q.  Was the sun shining or was it raining?
21   A.  Sun -- yeah, it was a nice day I remember.
22   Q.  How many people were there?
23   A.  I don't remember.
24   Q.  All right, so this fellow brings you in the

---

34  (Pages 130 to 133)

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

LANDRIA BRITT, as                     )
ADMINISTRATRIX of the                 )
ESTATE OF JOHN W. BRITT,              )
deceased,                             )          Case No. 2:06cv868-ID-CSC
                                      )
                Plaintiff,            )
                                      )
v.                                    )
                                      )
U S A TRUCK, Inc.; THEODORE           )
LEVERNE JOHNSON; et al.,              )
                                      )
                Defendants.           )
_____

DEFENDANTS' THIRD MOTION IN LIMINE
(JOHNSON'S POST-ACCIDENT DRUG TEST)
EXHIBIT FOUR
_____

1

# FREEDOM COURT REPORTING

Page 1

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE MIDDLE DISTRICT OF ALABAMA
3            NORTHERN DIVISION
4
5    LANDRIA BRITT, as
6    Administratrix of the
7    Estate OF JOHN W. BRITT,
8    deceased,
9            Plaintiff,
10   v.          CV-2:06CV868-ID-CSC
11   USA TRUCK, INC.,
12   THEODORE LEVERN JOHNSON,
13   et al.,
14           Defendants.
15
16      S T I P U L A T I O N S
17
18        IT IS STIPULATED AND AGREED
19   by and between the parties through their
20   respective counsel, that the deposition of
21   *********************************************
22      CORPORAL T.A. BRADLEY
23   *********************************************

Page 2

1    may be taken before Becky Harris,
2    Commissioner, at the offices of Balch &
3    Bingham, 105 Tallapoosa Street, Suite 200,
4    Montgomery, Alabama, on November 16, 2007.
5        IT IS FURTHER STIPULATED AND
6    AGREED that the signature and the reading
7    of the deposition by the witness is waived.
8    The deposition to have the same force and
9    effect as if full compliance had been had
10   with all laws and rules relating to the
11   taking of depositions.
12        IT IS FURTHER STIPULATED AND
13   AGREED that it shall not be necessary for
14   any objections to be made by counsel to any
15   questions, except as to the form or leading
16   questions, and that counsel for the parties
17   may make objections and assign grounds at
18   the time of trial, or at the time said
19   deposition is offered in evidence, or prior
20   thereto.
21        IT IS FURTHER STIPULATED AND
22   AGREED that notice of filing of the
23   deposition by the Commissioner is waived.

Page 3

1            I N D E X
2
3    WITNESS:
4    CORPORAL T.A. BRADLEY
5
6    EXAMINATION BY          PAGE
7    MR. RICHMOND.....................6
8    MR. MENDELSOHN.................119
9
10
11
12      PLAINTIFF'S EXHIBITS
13   NUMBER            PAGE
14   1...............................119
15   2...............................121
16   3...............................126
17   4...............................126
18   5...............................126
19   6...............................131
20   7...............................132
21   8...............................133
22
23

Page 4

1      DEFENDANT'S EXHIBITS
2    NUMBER            PAGE
3    1...............................77
4    2...............................78
5    3...............................78
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 57

1  goes to trial, there's not a witness out
2  there that you, you know, came up and I
3  didn't take a formal statement from them
4  but they said, oh, this is what we saw.
5      A  Did we leave a witness out, is what
6  you're asking?
7      Q  No.  Not did you leave a witness
8  out, but perhaps is there someone that you
9  interviewed that you talked to but you just
10 didn't think they had relevant or pertinent
11 enough information to warrant taking them
12 down to the station or taking a written
13 statement, anything like that?
14     A  No.
15     Q  Okay.  You eventually at some point
16 interacted with Mr. Johnson down at the
17 station?
18     A  Correct.
19     Q  Where was he when you first saw him
20 at the station?
21     A  He was in our office.
22     Q  Okay.  Had he already gone through
23 the breathalyzer test?

Page 58

1      A  Yes.
2      Q  And do you know what the results of
3  those were?
4      A  I believe zero zero.
5      Q  I'll represent to you that that's
6  what your case file says.
7      A  Yes, he blew straight zeros.  No
8  alcohol in his system whatsoever.
9      Q  Did you proceed at that time to sit
10 down and have an interview with him?
11     A  I believe so.  I believe I was the
12 one that took a statement from your client
13 as to what had happened during, before, and
14 after the collision.
15     Q  Do you recall if anyone else was
16 present while you were taking that
17 statement?
18     A  I believe Corporal Gann was in the
19 room with us just for the fact that he was
20 the case agent.
21     Q  So, how long did this statement
22 last, do you have a judgment?
23     A  It lasted for a while.

Page 59

1      Q  Do you think it would have been
2  longer than an hour, it's about a sixty
3  three page statement?
4      A  Beginning time was twenty-three
5  fifty hours and there's sixty three page.
6      Q  And I'll tell you, I did not see an
7  ending time recorded which is why I'm
8  asking you.
9      MR. RICHMOND:  And I could've missed
10 that, Kenny, if you see one.
11     THE WITNESS:  No.  It says ending
12 time and hour and it's blank, so.
13     Q  Do you have a memory as to how long
14 it's been?
15     A  As many interviews as I do, no, but
16 if it's sixty three pages long, I'll tell
17 you that was probably a good hour, hour and
18 a half worth of taped statement.
19     Q  While you were speaking with
20 Mr. Johnson there -- well, first of all let
21 me ask you, how much time had passed from
22 the point of the collision to the time that
23 you started to take that statement, do you

Page 60

1  have a judgment?
2      A  The time of collision was twenty
3  fifty hours and I believe I just said it
4  was twenty-three thirty.
5      Q  So roughly three hours later?
6      A  Time of interview was twenty-three
7  fifty hours, time of collision we put as
8  twenty fifty hours, so you're saying three
9  hours.
10     Q  Roughly three hours?
11     A  Roughly three hours.
12     Q  Did he appear to you, while speaking
13 to him for an hour and a half, to be
14 intoxicated in any way?
15     A  No.
16     Q  Did you, in speaking with
17 Mr. Johnson from being on the scene, at any
18 point during the course of your
19 investigation find any evidence that he was
20 intoxicated, under the influence of drugs
21 or alcohol at the time of the accident?
22     A  No.
23     Q  Did you, in your judgment as an

15  (Pages 57 to 60)